IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NOKIA CORPORATION and NOKIA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION, <br><br> Defendants. | C.A. No. 05-16 (JJF) |

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PURSUANT TO
<u>FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1), 12(B)(6), AND 12(H)(3)</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for NOKIA CORPORATION and
NOKIA, INC.

OF COUNSEL:

ALSTON & BIRD LLP
Peter Kontio
Patrick J. Flinn
Gardner S. Culpepper
Keith E. Broyles
1201 West Peachtree Street
Atlanta, GA 30309
404-881-7000

Dated: April 28, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

NATURE AND STAGE OF THE PROCEEDING .................................................... 1

SUMMARY OF ARGUMENT ................................................................................. 2

STATEMENT OF FACTS ....................................................................................... 3

ARGUMENT .......................................................................................................... 12

I.     THIS COURT HAS JURISDICTION TO ADJUDICATE
       NOKIA'S DECLARATORY JUDGMENT CLAIMS OF NON-
       INFRINGEMENT AND PATENT INVALIDITY. .............................. 12

       A.     Dismissal Standards And Burdens Under Fed. R. Civ. P.
              12(B)(1) And 12(H)(3). ............................................................ 12

       B.     Nokia Faced A Reasonable Apprehension Of Suit By
              Interdigital. ............................................................................... 13

              1.     Interdigital Could Have Sued Nokia In
                     January 2005 For Patent Infringement. .............................. 14

              2.     Nokia Was Reasonably Apprehensive That
                     Interdigital Would Initiate A Patent
                     Infringement Suit Against It. ............................................. 16

              3.     The 1999 License Does Not Bar Nokia's
                     Declaratory Judgment Action. ........................................... 18

       C.     Nokia Has Taken Concrete Steps With The Intent To
              Engage In The Activity Claimed To Be Infringing. .................. 20

       D.     This Infringement Dispute Is Plainly Ripe. ............................... 21

       E.     This Court Should Exercise Its Discretion To Resolve the
              Parties' Dispute. ....................................................................... 24

II.    NOKIA HAS ADEQUATELY PLEADED A CLAIM UNDER
       § 43(A) OF THE LANHAM ACT ......................................................... 25

       A.     The Elements of a Lanham Act Claim. ...................................... 26

       B.     Nokia Has Adequately Stated a Claim Under the Lanham
              Act. ........................................................................................... 27

1.    Interdigital Made A False Or Misleading Statement Of Fact In Commercial Advertising Or Promotion About Nokia's Products.................................................................27

2.    Interdigital's False Statement (1) Actually Deceives Or Is Likely To Deceive A Substantial Segment Of The Intended Audience And (2) Was Material And Likely To Influence Purchasing Decisions. ..................................28

3.    Interdigital's False Statement Described Goods That Traveled In Interstate Commerce. .......................................................................30

4.    Interdigital's Misleading Statements Have Caused Actual Or Probable Injury To Nokia....................31

5.    Interdigital Acted In Bad Faith. .........................................32

CONCLUSION...........................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                    <u>Page(s)</u>

*Amana Refrigeration, Inc. v. Quadlux, Inc.*,
     172 F.3d 852 (Fed. Cir. 1999) ................................................................. 19, 21

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
     846 F.2d 731 (Fed. Cir. 1988) .................................................... 12, 13, 17, 24, 25

*C.R. Bard, Inc. v. Schwartz*,
     716 F.2d 874 (Fed. Cir. 1983) ......................................................................... 18

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
     508 U.S. 83 (1993)........................................................................................ 12, 24

*Cedars-Sinai Med. Ctr. v. Watkins*,
     11 F.3d 1573 (Fed. Cir. 1993) ...................................................................... 12, 13

*Conley v. Gibson*,
     355 U.S. 41 (1957)................................................................................ 25, 27, 32

*Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*,
     165 F.3d 221 (3d Cir. 1998) ........................................................................... 31

*Cordis Corp. v. Medtronic, Inc.*,
     835 F.2d 859 (Fed. Cir. 1987) ......................................................................... 19

*digiGAN, Inc. v. iValidate, Inc.*,
     02 Civ. 420 (RCC), 2004 U.S. Dist. LEXIS 1324 (S.D.N.Y. Feb. 3, 2005) .......................... 28

*Dow Chem. Co. v. Exxon Corp.*,
     30 F. Supp. 2d 673 (D. Del. 1998).................................................................... 22

*Elmore v. Cleary*,
     399 F.3d 279 (3d Cir. 2005) ........................................................................... 26

*EMC Corp. v. Norand Corp.*,
     89 F.3d 807 (Fed. Cir. 1996) ................................................................ 13, 22, 24

*Enzo Life Scis., Inc. v. Digene Corp.*,
     295 F. Supp. 2d 424 (D. Del. 2003)......................................................... 28, 30, 32

*Erbamont, Inc. v. Cetus Corp.*,
     720 F. Supp. 387 (D. Del. 1989)...................................................................... 15

*Ericsson, Inc. v. InterDigital Communications Corp.*,
     No. 3:93-CV-1809-M, 2004 WL 1636924 (N.D. Tex. June 3, 2004) .................................. 4, 6

*Fina Oil & Chem. Co. v. Ewen*,
     123 F.3d 1466 (Fed. Cir. 1997) ....................................................................... 22

*Fina Research, S.A. v. Baroid Ltd.*,
     141 F.3d 1479 (Fed. Cir. 1998) .................................................................. 12, 15

*GAF Bldg. Materials Corp. v. Elk Corp.*,
  90 F.3d 479 (Fed. Cir. 1996) ................................................................. 22

*Gen-Probe Inc. v. Vysis, Inc.*,
  359 F.3d 1376 (Fed. Cir. 2004) ......................................... 13, 18, 19, 20

*Golan v. Pingel Enters., Inc.*,
  310 F.3d 1360 (Fed. Cir. 2002) .................................................... 32, 34

*InterDigital Tech. Corp. v. OKI Am., Inc.*,
  845 F. Supp. 276 (E.D. Penn. 1994) ......................... 4, 15, 16, 21, 33

*Interdynamics, Inc. v. Firma Wolf*,
  698 F.2d 157 (3d Cir. 1982) .................................................................. 17

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
  926 F.2d 1406 (3d Cir. 1991) ................................................................ 26

*Lang v. Pac. Marine & Supply Co.*,
  895 F.2d 761 (Fed. Cir. 1990) .............................................................. 15

*Laube v. KM Europa Metal AG*,
  96 Civ. 8147 (PKL), 1998 U.S. Dist. LEXIS 3921 (S.D.N.Y. Mar. 27, 1998) ...................... 28

*Lear, Inc. v. Adkins*,
  395 U.S. 653 (1969) ................................................................................ 19

*Markman v. Westview Instruments, Inc.*,
  517 U.S 370 (1996) ................................................................................ 27

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ................................................................ 23

*Menkowitz v. Pottstown Mem'l Med. Ctr.*,
  154 F.3d 113 (3d Cir. 1998) ................................................................. 26

*Mikohn Gaming Corp., v. Acres Gaming, Inc.*,
  165 F.3d 891 (Fed. Cir. 1998) .............................................................. 33

*Motorola, Inc. v. InterDigital Tech. Corp.*,
  121 F.3d 1461 (Fed. Cir. 1997) .............................................................. 5

*Motorola, Inc. v. InterDigital Tech. Corp.*,
  930 F. Supp. 952 (D. Del. 1996) ............................................................. 5

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*,
  330 F.3d 1345 (Fed. Cir. 2003) ...................................................... 22, 23

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*,
  357 F.3d 1319 (Fed. Cir. 2004) ............................................................ 23

*New York v. United States*,
  505 U.S. 144 (1992) ................................................................................ 23

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n.*,
  461 U.S. 190 (1983) ................................................................................ 23

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998) ................................................................................. 14

*Serbin v. Ziebart Int'l Corp.*,
    11 F.3d 1163 (3d Cir. 1993) .................................................................. 30

*Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*,
    363 F.3d 1361 (Fed. Cir. 2004) ........................................................ 20, 21

*Springs Window Fashions LP v. Novo Indus., L.P.*,
    323 F.3d 989 (Fed. Cir. 2003) .......................................................... 32, 33

*Teva Pharms. USA, Inc. v. Pfizer, Inc.*,
    395 F.3d 1324 (Fed. Cir. 2005) ........................................................ 13, 22

*Zenith Elecs. Corp. v. Exzec, Inc.*,
    182 F.3d 1340 (Fed. Cir. 1999) ........................................................ 26, 32

<u>Statutes</u>

15 U.S.C. § 1125(a) ...........................................................................................27

35 U.S.C. § 271 ...........................................................................................14, 30

## NATURE AND STAGE OF THE PROCEEDING

On January 12, 2005, Plaintiffs Nokia Corporation and Nokia, Inc. (collectively, "Nokia") initiated this suit by filing their Complaint for Declaratory Judgments of Patent Invalidity and Noninfringement and Violations of the Lanham Act Relating to 3G Mobile Phone Technology.   On March 15, 2005, Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively, "InterDigital") moved to dismiss this action, filing (1) Defendants' Motion To Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3) and (2) Opening Brief in Support of Defendants' Motion To Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3) (collectively, "Motion To Dismiss").   Nokia requests that this Court deny InterDigital's Motion To Dismiss.

## <u>SUMMARY OF ARGUMENT</u>

In seeking to dismiss this action, InterDigital argues that this Court lacks subject matter jurisdiction to adjudicate Nokia's declaratory judgment claims because Nokia purportedly did not reasonably apprehend a patent infringement lawsuit from InterDigital at the time Nokia filed this suit.  InterDigital is incorrect.

Nokia and InterDigital are parties to a license (the "1999 License"), which covers the patents in this suit.  That license will expire at the end of 2006.  According to InterDigital, the 1999 License allows InterDigital to attempt to coerce Nokia into extending the license – at a potential cost of hundreds of millions of dollars – by threatening Nokia with claims that its products infringe InterDigital's patents.  But InterDigital also contends that the 1999 License is a noose that prevents Nokia from challenging those threats.  The Declaratory Judgment Act, however, does not allow InterDigital to threaten Nokia without having to defend its claims in court.  Indeed, the function of the Declaratory Judgment Act is to quash exactly the kind of extra-judicial patent assertion that InterDigital has made against Nokia.  This Court has jurisdiction to resolve this dispute, which is ripe, hotly contested, and critical to the mobile telephony industry.

In addition, Nokia has pleaded a clear and straightforward claim against InterDigital for its violation of the Lanham Act.  Dismissal of Nokia's well-pleaded claim would be improper.

## STATEMENT OF FACTS

InterDigital is in the business of coercing mobile telephone equipment manufacturers into licensing its patents through litigation and threats of litigation.

InterDigital entered this business because it failed to develop any commercially viable wireless telephone product of its own. In the 1980's, InterDigital hired a third party to develop a wireless telephone system, which InterDigital dubbed the "Ultraphone." The Ultraphone was a commercial failure, but InterDigital did salvage some patent applications from its endeavor. By the early 1990's, InterDigital changed its business strategy from marketing the Ultraphone to selling "insurance" in the form of patent licenses that protected successful wireless technology manufacturers from patent infringement suits by InterDigital.

In its licensing campaign, InterDigital broadly claimed that virtually *any* mobile telephony product infringed its patents because those patents were purportedly essential to the practice of the digital mobile telephony standards.[1] In April 1993, InterDigital backed up its threats with litigation, when it sued both OKI America, Inc. and Qualcomm, Inc., alleging that any telephone that complied with or was compatible with the applicable digital mobile telephony

---

[1]    The wireless telephone industry has developed numerous standards that allow equipment produced by different manufacturers to be seamlessly integrated into wireless telephone systems. For example, by complying with these standards, a wireless-telephone-service provider, like Verizon, can use Nokia switching centers with Ericsson towers to communicate with Motorola phones. The First Generation ("1G") of standards covered analog wireless telephones. The Second Generation of standards ("2G") applied to digital-wireless-telephone systems. The most recent standards, so-called Third Generation or "3G" standards, use faster data speeds and greater bandwidth to allow mobile telephones to access the internet, view video signals, and perform other data-intensive communications.

standards would necessarily infringe InterDigital's patents.[2]  *InterDigital Tech. Corp. v. OKI Am., Inc.*, 845 F. Supp. 276, 280-81 (E.D. Penn. 1994).  A year later, OKI and Qualcomm became InterDigital's "insurance customers" when the companies settled the litigation and licensed InterDigital's patents (Exh. A at 28-29).[3]

Because the infringement arguments in the *OKI/Qualcomm* case were based on the mobile telephony standards that every manufacturer used to design its products, rather than on the particular features of OKI's or Qualcomm's products, InterDigital ensured that every participant in the mobile telephone industry would fear an InterDigital patent infringement suit. Five months after the *OKI* litigation began, Ericsson, Inc. sought to redress its fear and forestall InterDigital's threats, by filing a declaratory judgment suit for non-infringement and invalidity regarding some of the very same patents asserted by InterDigital in the *OKI* litigation.  *Ericsson, Inc. v. InterDigital Communications Corp.*, No. 3:93-CV-1809-M, 2004 WL 1636924, at *1 (N.D. Tex. June 3, 2004) (included in the Appendix as Exh. R).  Ericsson also sued InterDigital under the Lanham Act for InterDigital's claims that its patents were essential to the then-existing digital mobile telephony standards.  One month later, in October 1993, Motorola, Inc. also sought to remedy the ill effects of InterDigital's standards-based threats.  Motorola filed suit in this Court and sought a declaratory judgment of non-infringement and invalidity of the same patents challenged by Ericsson.  *Motorola, Inc. v. InterDigital Tech. Corp.*, 121 F.3d 1461, 1465

---

[2]  InterDigital carefully parses its words to avoid reference to the *OKI* litigation, stating that it "has filed exactly one patent infringement action . . . *since 1995*" (Br. at 18 (emphasis added)).  In 1993 and 1994, InterDigital filed three patent lawsuits.

[3]  Exhibits to this Opposition are labeled "Exh." and included in the accompanying Appendix of Exhibits in Support of Plaintiff's Answering Brief in Opposition to Defendants' Motion To Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3).

(Fed. Cir. 1997).  In response, InterDigital counterclaimed for patent infringement against both Ericsson and Motorola and also filed separate patent infringement suits against the companies

InterDigital lost the *Motorola* case.  After a jury trial, post-judgment motions, and an appeal to the Federal Circuit, the patent claims asserted by InterDigital against Motorola were found invalid, not infringed, or both.  *See id*. at 1474; *see also Motorola, Inc. v. InterDigital Tech. Corp.*, 930 F. Supp. 952, 957 (D. Del. 1996), *aff'd in part and rev'd in part*, 121 F.3d 1461 (Fed. Cir. 1997).

The *Ericsson* litigation remained pending during the *Motorola* litigation, but after the *Motorola* appeal concluded, InterDigital abandoned all its claims that Ericsson infringed the patent claims invalidated in the *Motorola* litigation (Exh. B at 1).  Undaunted, InterDigital returned to the Patent Office and obtained new patent claims through reexamination and patent continuations – based on the same Ultraphone disclosures.  Rearmed, InterDigital injected those new patent claims into the *Ericsson* case (*see id*.).

The post-*Motorola* patent claims had their own troubles.  The *Ericsson*  Special Master construed most of the claims to be limited to single-cell systems, rendering them inapplicable to modern mobile telephone systems, which utilize multiple cells (Exh. C at 56; *see also* Exh. D (unsealing Exh. C)).  The district court then granted summary judgment to Ericsson on most of InterDigital's infringement claims.[4]

Because some claims remained for trial, Ericsson agreed to take a license from InterDigital and become another "insurance customer."  Ericsson continued to deny infringement

---

[4]     The summary judgment ruling was sealed by the stipulation of the *Ericsson*  parties, but Nokia was given access to the record by the *Ericsson* court after the case settled (over InterDigital's objections), due to its relevance to the license dispute between Nokia and

(cont'd)

of any InterDigital patent claims and professed that it entered into the license to avoid the costs of trial and appeal (Exh. F at 1).[5]

A year after the *Ericsson* settlement, in March 2004, InterDigital began soliciting another prospective "insurance customer" by suing Lucent Technologies, Inc. for patent infringement (Exh. G at 37).[6]  That suit remains pending (*id*. at 65).

Today, despite its total defeat in *Motorola* and substantial defeat in *Ericsson*, InterDigital continues to advertise and to assert that that its patents are essential to the implementation of the mobile telephony standards (*e.g.*, *id*. at 14, Exh. H at 2).  InterDigital boasts of "its hardball enforcement of [its] intellectual property rights" and cultivates "a bizarre way of wooing customers," what business analysts characterize as a "pay up or else" strategy (Exh. I at 122).  To increase the burdens on its targets, InterDigital has used a very limited number of Ultraphone disclosures to file domestic patent continuations and foreign patent applications, thereby multiplying a small number of original patent applications into the 1600-patent portfolio of which InterDigital currently boasts.[7]

---

(cont'd)

    InterDigital, discussed in more detail below.  The summary judgment was, however, announced by InterDigital to its shareholders (Exh. E).

[5]    As a condition of the settlement, InterDigital required Ericsson to join it in a motion (1) to vacate the claim construction order and the court's summary judgment of non-infringement and (2) to hide the details of the *Ericsson* litigation under a permanent seal.  At Nokia's request, the *Ericsson* court reversed the vacature.  InterDigital has appealed that vacature, which now awaits a Federal Circuit decision.  *Ericsson, Inc. v. InterDigital Communications Corp.,* No. 04-1484 (Fed. Cir.) (fully briefed and argued).

[6]    InterDigital sued Lucent through its wholly-owned subsidiary, Tantivy Communications Inc. (Exh. G at 56).

[7]    InterDigital's unrelenting patent-continuation process has produced some patents that expire only weeks after they issue, (*e.g.*, U.S. Patent No. 6,842,440 (term of less than ten weeks)), and some applications that can only produce patents with no terms at all (*e.g.*, (cont'd)

InterDigital has used threats of expensive and time-consuming litigation to increase its "insurance customer" roster, even though InterDigital has never succeeded in proving that even one claim of one of its 1600 patents is essential to any mobile telephone standard. Indeed, InterDigital has never convinced any court anywhere in the world that any claim of any of its 1600 patents is infringed by any mobile telephone equipment.

Nokia is and has been one of InterDigital's prime targets for its threats of patent infringement litigation. In 1993, InterDigital began "wooing" Nokia by faxing Nokia a press release boasting that InterDigital had retained attorneys on a contingent-fee basis to pursue patent infringement claims against companies like Nokia (Exh. J at 3; Rahnasto Decl. at ¶ 5). InterDigital claimed that this fee arrangement, combined with certain insurance policies, allowed InterDigital to pursue litigation at virtually no cost (Rahnasto Decl. at ¶ 5).

Thereafter, InterDigital demanded exorbitant royalty rates, justifying its ultimatums with the costs of litigation, not the strength or scope of its patents (Rahnasto Decl. at ¶ 9). InterDigital noted that because it did not market any mobile telephone products, it was immune from patent infringement counterclaims, unlike many patent owners who actually contributed products to the industry (*id*. at ¶ 6). InterDigital boasted that it was a company led by lawyers and freely admitted that it used the threat of litigation to gain business advantages (*id*. at ¶ 10).

In 1999, recognizing that patent litigation would be expensive, Nokia ultimately agreed to license InterDigital's patents through 2006, when the original Ultraphone patents would expire.[8]

---

(cont'd)
  U.S. Application No. 2005-0025097 A1 (potential patent term expired without the application ever being examined)).

[8] The original Ultraphone patents expired seventeen years after they were granted. Because of an intervening change in the law, subsequent patents based on the same original patent application expired on March 20, 2005.

Nokia was unwilling in 1999 to pay the amount InterDigital demanded for a license through 2006, however, because Nokia did not believe that the patents were strong enough to justify InterDigital's demands (*id.* ¶ 17).

Instead, Nokia and InterDigital agreed to a compromise that called for Nokia to make an initial payment and possibly pay additional amounts under certain conditions. A necessary, but not sufficient, condition for an additional payment was whether one or more of a very limited and specified group of mobile telephone equipment manufacturers – including Ericsson – licensed InterDigital's patents. If all the necessary conditions were fulfilled, and if the parties could not agree on the amount of any additional payment, the compromise provided that an arbitration panel would determine how much, if anything, Nokia should pay.

When InterDigital settled the *Ericsson* litigation in 2003, it issued a press release announcing the settlement (Exh. K at 1). But the release primarily focused on InterDigital's assertion that, under the 1999 license, the *Ericsson* settlement obligated Nokia to pay hundreds of millions of dollars in new royalty payments through 2006, a sum dwarfing the revenue recognized from the settlement of the *Ericsson* case (*id.*).

But the extent to which Nokia owed any additional royalty payment was not determined by an automatic or arithmetic process. Furthermore, InterDigital refused to honor the factual inquiry set forth in the 1999 license, forcing Nokia to initiate arbitration proceedings so that Nokia could learn the necessary facts, including whether the Ericsson license fulfilled the condition precedent for additional royalties (Rahnasto Decl. at ¶ 23). In addition, Nokia was forced to intervene in the *Ericsson* litigation to obtain access to the rulings that Ericsson and InterDigital had jointly agreed to seal. The *Ericsson* court, over InterDigital's objection, agreed that any sealed portion of the record deemed relevant by the arbitration Tribunal would be

9

accessible to Nokia.  The Tribunal subsequently ruled portions of the *Ericsson* record admissible to the arbitration.

After Nokia initiated the arbitration proceeding to obtain information, InterDigital escalated the proceedings by counterclaiming against Nokia for the massive royalties it promised its shareholders in its press release (*id*. at ¶ 23).   As a result, a proceeding that would have been completed in a few months has lasted for more than a year, and the Tribunal still has not yet rendered a decision.[9]

Even the pending arbitration did not prevent InterDigital from continuing to threaten Nokia with litigation.  Shortly after the arbitration began, InterDigital's CEO, Howard Goldberg, stated in response to a question from an investment analyst that InterDigital was considering initiating lawsuits against Nokia to gain leverage in its negotiations with Nokia (Exh. L at 8).  Mr. Goldberg explicitly admitted that he did not want to reveal InterDigital's plans because he wanted Nokia to be "surprise[d]" (*id.*).

Meanwhile, InterDigital has been busy trying to replenish its patent arsenal by replacing the expiring Ultraphone patents with new patents, and it continues to claim that its patents are essential to practice even the newest "Third Generation" mobile telephony standards.  When asked to specify which of the 1600 patents are actually essential, InterDigital identified the patents for which declaratory relief is sought in this proceeding.  But InterDigital contends that this list is not exhaustive and has refused to provide a more comprehensive listing of the patents it contends are necessary to practice the standards, preferring instead the *in terrorem* leverage of vague threats arising out of its portfolio of 1600 patents.

---

[9]     The case has been submitted to the arbitrators, but no decision has been announced as of this writing.

In addition, InterDigital has told different stories to different courts at different times about the scope of the 1999 License on which it bases its pending motion. In this proceeding, InterDigital representative William Merritt represented to this Court, under oath, that the 1999 License covers all 3G technologies (at least until it expires):

> In January 1999, InterDigital and Nokia Corporation entered into a negotiated patent license agreement. Under that agreement, InterDigital granted to Nokia Corporation a worldwide non-exclusive license under essentially all of InterDigital's 1,609 active issued patents and 5,077 active pending patent applications. Those patents include InterDigital's TDMA and CDMA patents, which apply to 2G products such as GSM and US-TDMA, *as well as 3G products such as WCDMA and cdma2000 products*."

(Merritt Decl. ¶ 12 (emphasis added).)   In patent litigation pending between the parties in England, however, in describing "[w]hat is covered by the Patent License Agreement," InterDigital claimed that "as regards 3G CDMA equipment per se, the license does not extend to such technology" (Exh. M at 3). *Both* of the 3G standards referenced by Mr. Merritt are "3G CDMA standards."[10]   InterDigital's UK position directly contradicted its position in this case. And InterDigital has recently adopted yet another position in the UK proceedings, contending that its previous statement should be amended to read, "as regards 3G CDMA equipment per se, the *paid-up* license does not extend to such technology" (Exh. N at 4, 6 (emphasis in original)). But InterDigital offers no explanation for this substantial change in its understanding of the 1999 License, characterizing its flip-flopping as "clarification" (*id.* at 4), rather than conceding that its stance changes to suit its negotiating position.

---

[10]    The two 3G standards are (1) CDMA-2000, which is a successor to the CDMA standard IS-95, and (2) UMTS (also called Wideband CDMA, or WCDMA), a successor to the GSM standard. GSM used time-division multiple access (TDMA) not code-division multiple access (CDMA). One of the differences between GSM and its 3G successor is the replacement of TDMA with CDMA.

Nokia has an immediate and pressing need to resolve InterDigital's claims that Nokia's products will infringe InterDigital patents starting after 2006. The pending arbitration will not resolve all of the disputes between the parties because the 1999 License, which underlies the arbitration, will expire at the end of 2006. In light of InterDigital's exorbitant demands for royalties, negotiations to extend the 1999 license beyond 2006 have failed (Rahnasto Decl. at ¶¶ 28-29).

Moreover, Nokia is in the process of making, offering to sell, and selling such equipment now (Mehrotra Decl. at ¶¶ 8-14, 20-23). Nokia is presently executing contracts governing the sale of equipment that could be exposed to an infringement claim when it is delivered (*id.* at ¶ 8). Because of the practicalities of manufacturing mobile telephone equipment, to avoid InterDigital's present claims of patent infringement, Nokia's must change its production processes substantially in advance of the 2006 expiration (*id.* at ¶¶ 14, 23). In short, Nokia needs to resolve the infringement claims being leveled against it before the actual expiration of the 1999 License.

Since the early 1990's, InterDigital has threatened Nokia with litigation and made clear that it will support its threats with lawsuits. And InterDigital has continually claimed that its patents are essential to the practice of mobile telephony standards. But each time it is put to proof, InterDigital has failed to support its bold claims. Yet nothing has changed in InterDigital's sales pitch in the past fifteen years. InterDigital still uses threats of litigation for leverage and still makes wild and baseless claims about the scope of its patents. With the imminent expiration of the 1999 license, Nokia has no choice but to challenge InterDigital in this proceeding.

<u>**ARGUMENT**</u>

**I.    THIS COURT HAS JURISDICTION TO ADJUDICATE NOKIA'S DECLARATORY JUDGMENT CLAIMS OF <u>NON-INFRINGEMENT AND PATENT INVALIDITY.</u>**

InterDigital contends that this Court lacks subject matter jurisdiction over Nokia's declaratory judgment claims because there is no actual controversy.  But Nokia's Complaint applies the Declaratory Judgment Act in *precisely* the manner in which it was intended:

> This [case] presents a type of the sad and saddening scenario that led to enactment of the Declaratory Judgment Act (Act), 28 U.S.C. § 2201.  In the patent version of that scenario, a patent owner engages in a danse macabre, brandishing a Damoclean threat with a sheathed sword.  Guerrilla-like, the patent owner attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity.  Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue.  After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests.

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734-35 (Fed. Cir. 1988)   Here, Nokia seeks to challenge and defeat InterDigital's threats.

**A.    Dismissal Standards And Burdens Under Fed. R. Civ. <u>P. 12(B)(1) And 12(H)(3).</u>**

For this Court to exercise jurisdiction over Nokia's declaratory judgment complaint, there must be an "actual controversy."  28 U.S.C. § 2201(a); *see Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1481 (Fed. Cir. 1998); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1581-82 (Fed. Cir. 1993).  Nokia has the burden of demonstrating that a controversy exists.  *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993).  In reviewing a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12 (b)(1), however, this Court must accept as true uncontroverted factual allegations.  *Cedars-Sinai Med. Ctr.*, 11 F.3d at 1583-84.  "In establishing the predicate jurisdictional facts, [this Court] is not restricted to the face of the

pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." *Id.* at 1584.

The Federal Circuit applies a two-pronged test to determine the existence of an actual controversy:

> There must be both (1) an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit; and (2) present activity by the declaratory judgment plaintiff which could constitute infringement, or concrete steps taken with the intent to conduct such activity.

*Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1332 (Fed. Cir. 2005).  Whether the two-pronged test is satisfied is a fact-specific inquiry that depends on the totality of the circumstances.  *Gen-Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376, 1379 (Fed. Cir. 2004).  The uncontroverted allegations in Nokia's complaint and the evidence submitted with this Opposition demonstrate the existence of a viable and important controversy.

### B.    Nokia Faced A Reasonable Apprehension Of Suit By Interdigital.

When Nokia filed its complaint, it was reasonably apprehensive that InterDigital would initiate an infringement suit.  "To put a putative infringer in reasonable apprehension of suit does not require an express charge of infringement and threat of suit; rather, such apprehension may be induced by subtler conduct if that conduct rises 'to a level sufficient to indicate an intent [on the part of the patentee] to enforce its patent.'"  *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996) (quoting *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed. Cir. 1992)) (alteration in original).  Suit by InterDigital need not have been guaranteed – or even probable – provided that Nokia's apprehension was objectively reasonable, based on "all the circumstances."  *See Arrowhead Indus. Water, Inc.*, 846 F.2d at 737.

1.    **Interdigital Could Have Sued Nokia In January**
**2005 For Patent Infringement.**

InterDigital has publicly claimed that any mobile telephone products will infringe its patent portfolio and privately presented Nokia with specific allegations of infringement. Indeed, InterDigital could have sued Nokia in January 2005 based on three infringement theories.[11]

First, as of January 2005, InterDigital could have sued for an injunction to prevent Nokia from offering for sale mobile telephone equipment that will be produced after 2006. According to InterDigital, products produced after 2006 will infringe InterDigital's patents. The patent laws prohibit a defendant from "sell[ing]" or "offer[ing] to sell . . . a[] patented invention." 35 U.S.C. § 271(a). An "invention" can be "sold," as those terms are used in the patent laws, before it has been physically produced. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998). At the time this suit was filed, Nokia therefore could have entered into contracts for the sale of standards-compliant mobile telephone equipment that would not be produced until after the expiration of the 1999 License. In fact, Nokia has already entered into contracts defining the general provisions of certain sales of mobile telephony equipment after 2006 (Mehrotra Decl. ¶ 8). Those contracts – if not actual offers for sale – demonstrate Nokia's current plans to sell and offer for sale products that will not be produced until after 2006.

Second, InterDigital could have sued Nokia for inducing third parties to infringe InterDigital's patents after 2006. The patent laws prohibit a defendant from inducing a third party to use a patented invention. 35 U.S.C. § 271(b). By selling standards-compliant products, Nokia is currently encouraging mobile telephone service providers to establish standards-compliant mobile telephone systems.

---

[11]    Nokia does not concede liability under these infringement theories, and merely states that InterDigital could have filed suit under these theories.

Consequently, InterDigital could argue that, by promoting standards-compliant systems – which are interoperable with unlicensed standards-compliant equipment – Nokia is inducing or contributing to infringement by mobile telephone service providers who use unlicensed, infringing equipment.[12]  Furthermore, because the mobile telephone systems will continue to operate after the expiration of the 1999 License, InterDigital could argue that Nokia is inducing or contributing to mobile telephone service providers continuing to purchase standards-compliant equipment after the expiration of the 1999 License.  According to InterDigital, such equipment – even if produced by Nokia – will infringe InterDigital's patents.  Importantly, InterDigital could bring a declaratory judgment action for a defendant's inducement of infringement, even if there has not yet been any direct infringement.  *Fina Research*, 141 F.3d at 1485-86.

Third, as of January 2005, Nokia had already implemented concrete plans and made meaningful preparation to continue to manufacture the mobile telephone equipment allegedly covered by the InterDigital patents after the expiration of the 1999 License.  A patentee may sue a defendant for a declaratory judgment of infringement – before a defendant has actually infringed a patent – for "making meaningful preparation" toward acts claimed to be infringement.  *See Lang v. Pac. Marine & Supply Co.*, 895 F.2d 761, 764 (Fed. Cir. 1990); *InterDigital Tech. Corp. v. OKI Am., Inc.*, 845 F. Supp. at 283-84; *Erbamont, Inc. v. Cetus Corp.*, 720 F. Supp. 387, 392 (D. Del. 1989); *Automation Sys., Inc. v. Intel Corp.*, 501 F. Supp. 345, 346-47 (S.D. Iowa 1980).  "In determining whether an actual controversy exists, courts may consider . . . the degree of preparation for the potentially infringing activity[] and whether the defendant has advertised or solicited orders for the accused product."  *InterDigital Tech. Corp. v.*

---

[12]    Indeed, InterDigital has presented Nokia with such indirect infringement allegations in the past.

*OKI Am., Inc.*, 845 F. Supp. at 284. [13]  Indeed, InterDigital successfully filed such a preemptive suit against OKI and Qualcomm for making "meaningful preparation" to produce mobile telephone technology that InterDigital contended infringed its patents.  *Id.*

By the time it filed this suit, Nokia was producing allegedly infringing products (Mehrotra Decl. ¶¶ 8-13, 20-22).  Only the 1999 License prevented InterDigital from suing Nokia for the mere manufacture of such products.  But Nokia's sales literature and the contracts that Nokia has entered demonstrate that Nokia will produce standards-compliant mobile telephone technology well beyond the expiration of the 1999 License.  Thus, under precedent InterDigital itself helped establish with its suit against OKI America and Qualcomm, Nokia reasonably feared suit by IDC.

> ### 2.    Nokia Was Reasonably Apprehensive That Interdigital Would Initiate A Patent Infringement Suit Against It.

At the time Nokia filed this lawsuit, it was reasonably apprehensive that InterDigital would sue it for patent infringement.  InterDigital has attacked the mobile telephony industry for years, making bold threats and forcing manufacturers into expensive litigation.  Many of those threats were directed at Nokia, and InterDigital ultimately convinced Nokia to avoid the expense of litigation by taking a less expensive – but temporary – patent license.  InterDigital now hopes to force Nokia into an extension of that license through new and specific patent infringement threats.  InterDigital's litigious history with the mobile industry and its history with Nokia in particular demonstrate that Nokia's apprehension was objectively reasonable.

---

[13]    InterDigital now disingenuously contends that "an actual controversy for jurisdictional purposes cannot be based on a fear of litigation over future products" (Br. at 22 (internal quotation marks omitted)).

InterDigital claims to be the victim of litigation, contending that "InterDigital and its predecessors have been involved in only five patent infringement lawsuits in defense of their intellectual property rights, and three of those lawsuits were commenced by the infringing party" (Br. at 18). But InterDigital was the cause of *all* of the patent proceedings to which it has been a party. Since the early 1990s, InterDigital has been accusing *every* mobile telephone equipment manufacturer of patent infringement. It plainly created a reasonable apprehension on the part of Ericsson and Motorola, because both parties pled and proved actual controversies in their declaratory judgment actions against InterDigital. InterDigital also directly filed suit against OKI America and Qualcomm in 1993 and against Lucent this past year.

InterDigital's litigation history against the mobile telephone industry – and its inability to win any of those suits – "evidence[s] not only an intent but a willingness and capacity to employ litigation in pursuit of its patent rights." *Arrowhead Indus. Water, Inc.*, 846 F.2d at 737. Analysts have for good reasons characterized InterDigital's licensing strategy as "pay up or else" (*see* Exh. I at 122). Having refused to "pay up," Nokia was reasonably apprehensive that InterDigital would sue.

The litigation history between Nokia and InterDigital also demonstrates that Nokia's apprehension that InterDigital would sue was objectively reasonable. *See Interdynamics, Inc. v. Firma Wolf*, 698 F.2d 157, 168 (3d Cir. 1982) (stating that the litigation history between parties may contribute to a declaratory judgment plaintiff's reasonable apprehension of suit). For at least ten years, through correspondence, licensing presentations, meetings, and public statements, InterDigital has been claiming that Nokia's products infringed its patents (Rahnasto Decl. at ¶¶ 4-18, 26-30, 33). InterDigital has boasted to Nokia that it was a company run by lawyers that would use litigation to gain business advantages (*id.* at ¶¶ 5, 10). In its licensing negotiations,

InterDigital has repeatedly referenced its suits against other mobile telephone equipment manufacturers (*id.* at ¶¶ 9, 17, 33). Moreover, after Nokia initiated arbitration proceedings to obtain information, InterDigital escalated those proceedings – dragging Nokia through a year and a half of legal proceedings. And InterDigital's CEO, Howard Goldberg, recently threatened Nokia with suit, stating that InterDigital was considering litigation as a means of obtaining "leverage" in its negotiations with Nokia (Exh. L at 8).[14]

The 1999 License bought Nokia a temporary reprieve from InterDigital's threats. But that license will soon expire and negotiations for an extension have failed. The relationship between the parties has soured to the point that legal disputes have become the expected mode of discourse, and the dark cloud of InterDigital's litigation threats has once again settled over Nokia's business. InterDigital has demonstrated to Nokia an unequivocal "willingness . . . to enforce [the] patent rights [covered by the 1999 License]." *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983). Given InterDigital's history with Nokia and its many suits with other mobile telephone manufacturers, Nokia was reasonably apprehensive of suit.

### 3.    The 1999 License Does Not Bar Nokia's Declaratory Judgment Action.

InterDigital contends that the 1999 License "bars Nokia's declaratory judgment action" (Br. at 1). To support this assertion, InterDigital principally relies on the Federal Circuit's decision in *Gen-Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376 (Fed. Cir. 2004). InterDigital contends that Nokia cannot have a reasonable apprehension of suit "unless and until: (1) the agreement

---

[14]    InterDigital attempts to spin the comments of its CEO as non-threatening. But the issue is whether Nokia's understanding of these comments as veiled threats is objectively reasonable, not InterDigital's post-hoc rationalization of its intent.

expires at the end of 2006; or (2) unless Nokia materially breaches the [1999 License]" (Br. at

14).  InterDigital misreads *Gen-Probe*.

 *Gen-Probe* does not create a special jurisdictional test unique to licensee suits.  In fact,

the Federal Circuit in *Gen-Probe* noted:

> "[A] patent license need not be terminated before a patent licensee may bring a
> declaratory judgment action."  [*C.R. Bard*, 716 F.2d at 875].  Indeed, this court
> evaluated the law of various circuits and rejected "the blanket approach . . . that
> there can never be an apprehension of federal infringement suit and thus no
> controversy when a license is still in effect."  *Id.* at 880.

*Id.* at 1380 (first alteration in original).  Instead, the Federal Circuit held that courts must assess

the "totality of the circumstances" to determine whether there was an "actual controversy."  *Id.*

And public policy favors licensee suits:

> Licensees may often be the only individuals with enough economic incentive to
> challenge the patentability of an inventor's discovery.  If they are muzzled, the
> public may continually be required to pay tribute to would-be monopolists
> without need or justification.

*Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969).

 Consequently, licensees may bring declaratory judgment actions when the license does

not completely protect the licensee from suit.  *See, e.g.*, *Cordis Corp. v. Medtronic, Inc.*, 835

F.2d 859 (Fed. Cir. 1987) (finding a licensee's declaratory judgment lawsuit justiciable when it

could be sued for the sale of unlicensed products and enjoining termination of the patent license

during pendency of the suit); *C.R. Bard*, 716 F.2d at 880-82 (holding that a patent licensee can

bring a declaratory judgment lawsuit without terminating the license).  Only when the license

completely subsumes the patentee's threats of litigation does the licensee lack any reasonable

apprehension of a lawsuit.  *Gen-Probe Inc.*, 359 F.3d at 1382; *see also Amana Refrigeration, Inc.

v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999) (holding that a partial covenant not-to-sue

deprives a court of declaratory judgment jurisdiction when the plaintiff's apprehension of litigation pertains to the conduct protected by the covenant).

Unlike the patent license in *Gen-Probe*, which lasted for the life of the licensed patent, Nokia's limited license will expire well before the expiration of the patents challenged here. Consequently, Nokia's post-2006 products are not licensed and protected from suit. Despite InterDigital's claims to the contrary, Nokia faced a reasonable apprehension in January 2005 that InterDigital would bring suit regarding those post-2006 products. *See supra* at Parts I.B.1-2. In fact, if InterDigital's initial UK claims are to be believed (as opposed to the sworn statements made to this Court), the 1999 License did not even apply to Nokia's 3G products *at the time this suit was filed* (Exh. M at 3). In either instance, the 1999 License does not "obliterate[] any reasonable apprehension of a lawsuit" by InterDigital, *Gen-Probe Inc.*, 359 F.3d at 1381, and, applying the Federal Circuit's "actual controversy" test, this Court has jurisdiction to resolve this dispute.

### C.    Nokia Has Taken Concrete Steps With The Intent To Engage In The Activity Claimed To Be Infringing.

The second prong of the Federal Circuit's "actual controversy" test is satisfied if Nokia has undertaken "concrete steps taken with the intent to conduct [infringing] activity," *Teva Pharms. USA, Inc.*, 395 F.3d at 1332. To determine whether a declaratory judgment plaintiff has taken such "concrete steps", courts examine (1) "the period of time between the date on which the complaint was filed and the date on which potentially infringing activities will begin," and (2) "whether the design of the potentially infringing subject of the declaratory-judgment suit was substantially fixed, particularly with respect to its potentially-infringing characteristics, on the date the complaint was filed." *Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1378-79 (Fed. Cir. 2004).

Nokia's complaint satisfies both requirements.  As discussed above, Nokia was engaging in potentially infringing activity – for which InterDigital could have sued Nokia – at the time this suit was filed.  And InterDigital has not alleged that the design of Nokia's products will materially change between January 2005 and the end of 2006.[15]  Nokia has adequately established "concrete steps" taken towards infringement regarding future products.

InterDigital contends that Nokia cannot base its declaratory judgment action on products to be sold after 2006 because a declaratory judgment action "'cannot be based on a fear of litigation over future products'" (Br. at 22 (quoting *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999)).  To support this claim, InterDigital principally relies on the Federal Circuit's decision in *Lang v. Pacific Marine & Supply Co.*, 895 F.2d 761 (Fed. Cir. 1990).  But the Federal Circuit held in *Lang* that a patentee can bring a declaratory judgment action regarding the infringement of a patent by future products.  *Id*. at 764; *see also InterDigital Tech. Corp. v. OKI Am*, 845 F. Supp. at 283.  The Federal Circuit dismissed the declaratory judgment suit in *Lang* largely because it involved a product that was yet to be built, sold, or advertised.  *Id*. at 764-65.  The design of such a product could therefore materially change.  *See Sierra Applied Scis., Inc.*, 363 F.3d at 1378-79; *Amana Refrigeration, Inc.*, 172 F.3d at 855.  Here, InterDigital does not and cannot contest that the material features of Nokia's products – their compliance with the mobile telephony standards – will not change after 2006.

### D.    This Infringement Dispute Is Plainly Ripe.

Some Federal Circuit cases suggest that "the traditional two-part test is not the only way of determining in all cases that the constitutional requirement of an actual case or controversy

---

[15]    Because InterDigital claims that its patents are necessary for practicing the mobile telephony standards, which are fixed (*see* Niva Decl. at ¶¶ 8, 10; Numminen Decl. at ¶ 8), it cannot claim that changes in Nokia's products are material.

has been met." *See, e.g., Teva Pharms. USA, Inc.*, 395 F.3d at 1335; *see also Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1470 (Fed. Cir. 1997) ("Satisfaction of this traditional two-part test is not, however, a prerequisite to jurisdiction in every possible patent declaratory judgment action."); *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 482 (Fed. Cir. 1996) (stating that "[a] broader inquiry than [the] two-part 'test' [may sometimes be] required"). Another means of determining whether there is a sufficient case or controversy focuses on whether the dispute is ripe for adjudication. *See EMC Corp.* , 89 F.3d at 811 ("This court's two-part test for declaratory judgment jurisdiction is designed to police the sometimes subtle line between cases in which the parties have adverse interests and cases in which those adverse interests have ripened into a dispute that may properly be deemed a controversy.").

In determining whether a controversy is ripe, this Court must consider two factors: "(1) 'the fitness of the issues for judicial decision'; and (2) 'the hardship to the parties of withholding court consideration.'" *Dow Chem. Co. v. Exxon Corp.*, 30 F. Supp. 2d 673, 690 (D. Del. 1998) (citing *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967)); *see also Cedars-Sinai Med. Ctr.*, 11 F.3d at 1581-82. When deciding whether a dispute is fit for judicial resolution, the Federal Circuit analyzes the extent of adversity between the parties and whether there is sufficient factual development to allow the courts to act. *See Cedars-Sinai Med. Ctr.,* 11 F.3d at 1580-81 (controversy between the parties); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 330 F.3d 1345, 1347 (Fed. Cir. 2003) (sufficient factual development).

Even InterDigital does not contest that the parties are adverse. And the facts of this case are sufficiently developed for judicial resolution of both Nokia's claims of patent invalidity and non-infringement. The factual development necessary to determine the validity of the patents-in-suit is the prior art at the time of the alleged invention. *Nat'l Steel Car, Ltd. v. Canadian Pac.*

*Ry., Ltd.*, 357 F.3d 1319, 1334 (Fed. Cir. 2004). The factual development necessary to determine whether Nokia's products infringe the patents-in-suit is the design of Nokia's products and the application of those designs to the properly construed patent claims.[16]  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Nokia's products are already developed, designed, and marketed in the United States and abroad. The relevant technical operation and design of the products are fixed by the same mobile telephony standards on which InterDigital basis its infringement claims.

And Nokia will unquestionably suffer hardship in the absence of immediate adjudication. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n.*, 461 U.S. 190 (1983); *New York v. United States*, 505 U.S. 144 (1992); *Cedars-Sinai Med. Ctr.,* 11 F.3d at 1580-81. Nokia is currently engaged in developing, marketing, selling, and installing mobile phones and infrastructure that InterDigital has accused of infringing various patents. As the world's largest supplier of mobile phones and one of the leading suppliers of mobile telephone infrastructure, Nokia will continue marketing and selling its products after the conclusion of the limited license between InterDigital and Nokia at the end of 2006. Absent a declaratory judgment, Nokia is faced with the Hobson's choice between spending millions of dollars redesigning its products to avoid infringing patents of dubious value, or risking the costs of patent infringement.

---

[16]     The scope of InterDigital's patent claims is a question of law for the Court and was fixed with issuance of those claims. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996) (claim construction is a matter of law). Consequently, no additional factual development is needed. *See, e.g., Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 330 F.3d 1345, 1347 (Fed. Cir. 2003) (finding a dispute fit because disputed issue, statutory construction, does not need additional factual development").

**E.    This Court Should Exercise Its Discretion To Resolve the Parties' Dispute.**

In exercising its discretion to adjudicate declaratory judgment claims, this Court should consider "'the fitness of the case for resolution'" and the "'usefulness of the declaratory judgment remedy.'"  *EMC Corp.*, 89 F.3d at 813 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995)).   This dispute is precisely the sort of suit for which the Declaratory Judgment Act was designed, and the exercise of discretion is particularly appropriate here.

First, substantial commercial interests are at stake in this suit.  InterDigital is threatening not just Nokia, but the entire multi-billion-dollar mobile telephone business.  "The law does not require enterprises to keep their heads in the sand while a patentee picks them off one by one and at its leisure."  *Arrowhead Indus. Water, Inc.*, 846 F.2d at 738.  And part of the costs InterDigital seeks to impose on the mobile telephone manufacturers will be passed on to the billions of consumers who use mobile phones.  Timely resolution of this dispute is critical not only to Nokia, but also to the mobile telephone industry, and to consumers.

Second, the facts reveal that InterDigital hopes to extort license fees from Nokia while denying Nokia the opportunity to challenge InterDigital's patent infringement claims in court. "Merely the desire to avoid the threat of a 'scarecrow' patent . . . may . . . be sufficient to establish jurisdiction under the Declaratory Judgment Act."  *Cardinal Chem. Co.*, 508 U.S. at 96.

For its part, InterDigital says that this Court should not exercise its discretion to hear Nokia's declaratory judgment action because the parties have previously negotiated a business solution to a dispute, the 1999 License.  But that "business solution" explicitly allows Nokia to challenge the validity of InterDigital's patents.  And InterDigital's view of a "business solution" is simply Nokia's capitulation to InterDigital's exorbitant royalty demands in the face of threats of litigation.  This "extra-judicial enforcement" of patents is precisely why a declaratory

judgment action is appropriate in this case. *See Arrowhead Indus. Water, Inc.*, 846 F.2d at 736.

The parties' dealings since 2003 – when InterDigital attempted to leverage the *Ericsson*

settlement into hundreds of millions of dollars in additional royalty payments – belies any hope

of a "business solution" (*see* Rahnasto Decl. ¶¶ 20-29).  Indeed, Nokia and InterDigital are

presently on the opposite sides of four pending legal proceedings.[17]  Given its behavior,

InterDigital's cries for a "business solution," to be polite, are fanciful.

InterDigital also contends that this Court should decline to adjudicate this dispute

because Nokia filed it before the evidentiary hearings "to obtain leverage in arbitration (*e.g.*, for

settlement purposes) and/or the negotiations to renew and/or extend the [the 1999 License]

beyond 2006 (*e.g.*, to obtain more favorable terms)" (Br. at 24).  InterDigital has it backwards.

When asked by an investment analyst whether InterDigital would initiate a lawsuit against Nokia

to gain an advantage in the arbitration, InterDigital's CEO, Howard Goldberg, refused to answer,

stating that InterDigital was "look[ing] at every point of leverage" and that "leverage is best used

as a surprise" (Exh. L  at 8).  Nokia filed this action not to obtain leverage in the arbitration but

to deprive InterDigital of the improper leverage it was attempting to assert in its negotiations

with Nokia by threatening Nokia with its patents.

## II.    NOKIA HAS ADEQUATELY PLEADED A CLAIM UNDER § 43(A) OF THE LANHAM ACT.

This Court should deny InterDigital's motion to dismiss Nokia's Lanham Act claim

pursuant to Rule 12(b)(6) unless Nokia "can prove no set of facts in support of [its] claim which

would entitle [it] to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  "[U]nder Rule

---

[17]    In addition to the arbitration and this proceeding, Nokia and InterDigital are adverse on the appeal of the *Ericsson* ruling reversing the summary judgment vacatur, and the pending patent litigation in the United Kingdom.

12(b)(6) [InterDigital] has the burden of showing no claim has been stated." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). Moreover, this Court "must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences from such allegations in favor of [Nokia]." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005). In fact, "a plaintiff generally need not explicitly allege the existence of every element in a cause of action if fair notice of the transaction is given and the complaint sets forth the material points necessary to sustain recovery." *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124 (3d Cir. 1998).

InterDigital carefully sidesteps the appropriate standard of review. Instead, InterDigital's motion asks this Court to accept InterDigital's factual allegations as true and to draw inferences in favor of InterDigital. Under the proper standards of notice pleading, this Court should deny InterDigital's motion.

### A.    The Elements of a Lanham Act Claim.

To state a claim under 15 U.S.C. § 1125(a),

> [Nokia] must allege and ultimately prove: (1) that [InterDigital] made a false or misleading statement of fact in commercial advertising or promotion about the plaintiff's goods or services; (2) that the statement actually deceives or is likely to deceive a substantial segment of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the defendant caused the statement to enter interstate commerce; and (5) that the statement results in actual or probable injury to the plaintiff.

*Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1348 (Fed. Cir. 1999). In addition, "before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent . . . the marketplace activity must have been undertaken in bad faith." *Id.* at 1353.

**B.    Nokia Has Adequately Stated a Claim Under the Lanham Act.**

**1.    Interdigital Made A False Or Misleading Statement Of Fact In Commercial Advertising Or Promotion About Nokia's Products.**

InterDigital claims that any Nokia product that complies with the mobile telephony standards infringes its patent portfolio. InterDigital does not dispute that it made such a claim (*see, e.g.*, Br. at 30). This claim is a false or misleading statement about Nokia's products. At the very least, the truth or falsity of InterDigital's bold assertion is a factual issue, and InterDigital has not shown that Nokia "can prove no set of facts in support of [its] claim which would entitle [Nokia] to relief." *Conley,* 355 U.S. at 45-46.

InterDigital offers four unpersuasive arguments to support its motion. First, InterDigital contends that "Nokia confirmed the truthfulness of any such representation by voluntarily taking a license [the 1999 License] to those patents" (Br. at 30). But Nokia entered the 1999 License in part *because* of InterDigital's claims regarding the breadth of its patent portfolio. InterDigital's *successful* deception exposes it to suit – rather than insulates it from liability.

Second, InterDigital asserts that its representation about the scope of its portfolio is presumptively true because its patents are presumptively valid (Br. at 30). But Nokia's Lanham Act count focuses on the necessity of licensing InterDigital's patents. The presumed validity of a patent is irrelevant to whether InterDigital's patents validly cover the mobile telephony standards such that one must first pay a license fee before practicing those standards. *Compare* 28 U.S.C. § 282 *with Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

Third, InterDigital contends that, because Nokia has only challenged 18 patents from InterDigital's portfolio of over 1600 patents, Nokia has not properly disputed InterDigital's claim that any standards-compliant product infringes its portfolio. But Nokia's Lanham Act

claim focuses on InterDigital's entire patent portfolio, not the 18 patents challenged in the declaratory judgment claims (*compare* Complaint ¶¶ 142-45 (discussing Nokia's Lanham Act claim, "[InterDigital's] patent portfolio") and "InterDigital's patents") *with id* ¶ 11 (defining 18 particular patents as "InterDigital's 3G Patents")).

Finally, InterDigital contends that its public statements that any standards-compliant product infringes its patents is not a statement about "goods" covered by the Lanham Act (*see* Br. at 32). To support its claim, InterDigital cites cases involving statements about the ownership of patents. *digiGAN, Inc. v. iValidate, Inc.*, 02 Civ. 420 (RCC), 2004 U.S. Dist. LEXIS 1324, at *3, *14 (S.D.N.Y. Feb. 3, 2005) (included in the Appendix as Exh. Q); *Laube v. KM Europa Metal AG*, 96 Civ. 8147 (PKL), 1998 U.S. Dist. LEXIS 3921, at *6-*7 (S.D.N.Y. Mar. 27, 1998) (included in the Appendix as Exh. S). In contrast, Nokia's Lanham Act claim targets InterDigital's assertion that any standards-compliant *product* infringes InterDigital's portfolio. A Lanham Act claim can target an erroneous statement that a product infringes a patent. *See Enzo Life Scis., Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 427-28 (D. Del. 2003).

**2.    Interdigital's False Statement (1) Actually Deceives Or Is Likely To Deceive A Substantial Segment Of The Intended Audience And (2) Was Material And Likely To Influence Purchasing Decisions.**

InterDigital's false statement – that its patents cover any conceivable mobile telephony standards-compliant product – was directed to the makers and sellers of standards-compliant products, like Nokia, as well as to the users of that equipment, like Nokia's customers.[18] *See* 35

---

[18]    In Part III.D of its Motion To Dismiss, InterDigital lumps together the second and third elements of the five elements of a Lanham Act claim (Br. at 33-34). Although this organization is confusing, to assist this Court in comparing the merits of the Motion To Dismiss and this Opposition, Nokia elects adopt a similar organization.

U.S.C. § 271(a) (stating that "whoever without authority *makes, uses, offers to sell, or sells* any patented invention . . . infringes the patent" (emphasis added)).   Nokia's customers use standards-compliant products, and Nokia is one of the largest manufacturers of standards-compliant products.   The fact that so many "insurance customers" have signed InterDigital licenses is itself evidence of the materiality of the claim.

InterDigital makes two arguments related to materiality and deception that warrant comment.   First, InterDigital claims that any impact on the market for standards-compliant products would have been evenly distributed between Nokia and its competitors (Br. at 33-34).   Even if this unlikely claim were factually indisputable – as it must be in a motion to dismiss pursuant to Rule 12(b)(6) – InterDigital still would have influenced purchasing decisions by raising costs for all market participants.   InterDigital raised the illusion of infringement, and therefore increased production costs for Nokia and its competitors alike, as manufacturers must either design around InterDigital's portfolio of over 1600 patents or determine whether its products infringe any patent in that portfolio.   Increased production costs raise consumer prices.

Second, InterDigital contends that InterDigital's statement could not have misled any customers because Nokia's decision to enter the 1999 License was an "intervening cause" (Br. at 34).   This argument presents a factual issue wholly improper for resolution at the pleading stage.   Moreover, Nokia licensed the patents for a period substantially shorter than the term of the licensed patents or the operational life of the relevant technology.   InterDigital's claims have also misled and will continue to mislead customers making current purchasing decisions regarding equipment purchases in the coming months and years.

**3.    Interdigital's False Statement Described Goods
That Traveled In Interstate Commerce.**

InterDigital initially adopts the Federal Circuit's formulation of a Lanham Act claim,
stating that the fourth factor of such a claim is whether "the defendant caused the statement to
enter interstate commerce" (Br. at 28).    InterDigital does not dispute that its statements have
entered interstate commerce, as required by the Federal Circuit.    Instead, in its discussion of the
fourth factor, InterDigital relies on a Third Circuit's formulation of the Lanham Act, which asks
whether the "advertised goods" have traveled in interstate commerce.    *See Enzo Life Scis.*, 295 F.
Supp. 2d at 427.    InterDigital contends that the fourth factor requires "commercial advertising,"
which InterDigital construes as commercial speech *by a competitor*.    Because InterDigital is not
Nokia's competitor, InterDigital continues, Nokia has failed to state a claim.

InterDigital reads a new requirement into the Lanham Act.    To support its argument,
InterDigital relies on *Enzo Life Sciences. v. Digene Corp.*, 295 F. Supp. 2d at 427, which
happened to involve a Lanham Act dispute between competitors.    *Enzo Life Sciences*, however,
did not hold that the Lanham Act was limited to competitor disputes.    In fact, the Third Circuit
"do[es] not construe Section 43(a) as limiting the class of false advertising plaintiffs to those in
direct competition."    *Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163, 1177 (3d Cir. 1993).    Instead,
the Lanham Act "'provides a private remedy to a commercial plaintiff who meets the burden of
proving that its commercial interests have been harmed.'"    *Id.* (quoting *Sandoz Pharms. Corp. v.
Richardson-Vicks, Inc.*, 902 F.2d 222, 230 (3d Cir. 1990)).

Here, Nokia unquestionably seeks to protect a commercial interest.    InterDigital's
misleading statement has directly raised the cost of Nokia developing and marketing standards-
compliant technology and deterred Nokia's customers from purchasing Nokia's standards-
compliant products.    And by falsely representing characteristics of Nokia's products, InterDigital

has harmed Nokia's goodwill and reputation.  *See Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 234 (3d Cir. 1998).  Nokia therefore seeks to remedy a commercial injury "'of a type that Congress sought to redress by providing a private remedy.'"  *Id* at 233 (quoting *Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983)).

Moreover, the goods that InterDigital has disparaged have indisputably traveled in interstate commerce.  Nokia's claim is not, as suggested by InterDigital, premised solely on future Nokia standards-compliant products.  Nokia's claim also implicates the Nokia products that have already been produced and shipped in interstate commerce under the 1999 License.

### 4.    Interdigital's   Misleading   Statements   Have Caused Actual Or Probable Injury To Nokia.

InterDigital's false statements have caused Nokia a variety of harms.  As a manufacturer of standards-compliant products, InterDigital's statements have chilled consumer demand after the expiration of the 1999 License because consumers are reluctant to buy allegedly infringing products. Moreover, InterDigital's disparaging claims have tarnished the reputation of Nokia, a leader in mobile telecommunications technology.  And InterDigital's threats to the entire mobile industry have, for many manufacturers like Nokia, raised development costs, elicited considerable attorneys' fees, and chilled consumer demand.

InterDigital nevertheless claims that its statements could not have harmed Nokia for three reasons.  First, InterDigital contends that Nokia was not impacted by its threats because the 1999 License insulated Nokia from an infringement suit by InterDigital (Br. at 37).  But Nokia paid an initial sum to enter the 1999 License in part because of InterDigital's misleading statements. And InterDigital ignores the costs to Nokia attributable to the time period after the expiration of the license.  Second, InterDigital again contends that Nokia was not harmed because its threats

impacted all manufacturers equally. *Id.* Equal harm to all is nonetheless *harm to each.* Finally, InterDigital intimates that harm to Nokia's reputation was self-inflicted because Nokia "voluntarily" entered the 1999 License. *Id.* at 37-38. Success, however, does not insulate a false advertiser from suit.

**5.    Interdigital Acted In Bad Faith.**

InterDigital's bald assertions of good faith do not demonstrate that Nokia "can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley*, 355 U.S. at 45-46. "Exactly what constitutes bad faith remains to be determined on a case by case basis." *Zenith Elecs. Corp.*, 182 F.3d at 1354. Drawing all reasonable inferences from Nokia's well-pleaded allegations in favor of Nokia, this Court should not resolve such a fact-intensive issue on a motion to dismiss. In fact, this Court has suggested it would refuse to dismiss a Lanham Act claim against a patent holder even if the claimant, unlike Nokia, did not explicitly allege bad faith. *See Enzo Life Scis.*, 295 F. Supp. 2d at 427.

InterDigital's public actions suggest that discovery will produce "affirmative evidence" of bad faith. *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 999 (Fed. Cir. 2003). InterDigital's CEO has stated that "[a]ny company can design around our patents" (Exh. I at 124). Yet InterDigital continues to claim that it is impossible to design standards-compliant products that would not infringe InterDigital's patents. And "statements to the effect that a [party] is incapable of designing around [some] patent[s] are inherently suspect." *Zenith Elecs. Corp.*, 182 F.3d at 1354. Moreover, by asserting that its *portfolio* of over 1600 patents will be infringed, InterDigital has crafted its already suspicious claim to be threatening but practically indisputable. Certainly a patentee's claim that a particular product infringes a patent is presumptively made in good faith. *Golan v. Pingel Enters., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002). Here, however, InterDigital has asserted that a *portfolio* of over 1600 patents cannot

be designed around, not that a patent is infringed by a particular product.  InterDigital has made

its unsupported claim in willful disregard of the truth, if not with actual knowledge of the claim's

falsity.  Such conduct constitutes bad faith.  *Mikohn Gaming Corp., v. Acres Gaming, Inc.*, 165

F.3d 891 (Fed. Cir. 1998).

InterDigital's consistent failure to support in legal proceedings its claim that any

standards-compliant product will infringe its portfolio further suggests that discovery will reveal

affirmative evidence of bad faith regarding that claim.  *See Springs Window Fashions LP*, 323

F.3d at 999.  In the *OKI* litigation, InterDigital claimed that "any telephones which comply or are

compatible with [a certain standard] will necessarily infringe certain of [InterDigital's] patents."

*OKI*, 845 F. Supp. at 280.  But the *Motorola* litigation completely refuted InterDigital's claims

that the patents it asserted against *OKI* were necessarily infringed by standards-compliant

products.  Rather than admit defeat, however, InterDigital has continued to claim that some yet-

to-be-identified patents are necessarily infringed by any standards-compliant products.

And since the *Motorola* defeat, InterDigital has assiduously avoided litigating its claims

of essentiality.  Presently, one of the issues Nokia is seeking to have addressed in the UK

proceeding is whether its UK patents are essential to the practice of the GSM standard (Exh. O at

11-12).  But InterDigital has vigorously resisted any process that would reach the merits of that

claim in the UK (*id.*).

InterDigital can only offer two arguments to support its claim that it did not act in bad

faith.  First, InterDigital contends that Nokia's claims of bad faith target only a small subset of

InterDigital's patents (Br. at 38).  As noted previously, however, Nokia's Lanham Act claim

addresses InterDigital's entire patent portfolio, not the 18 identified patents.  Second, InterDigital

argues that Nokia's decision to enter a license demonstrates that InterDigital had a good-faith

basis for its claims.  *Id.*  InterDigital's successful coercion of Nokia, however, does not insulate InterDigital from suit.  Moreover, Nokia's decision to enter a temporary license does not indicate that Nokia considered InterDigital's claims meritorious or even colorable. [19]  *See Golan*, 310 F.3d at 1372.  Finally, the license expressly allows Nokia to challenge any InterDigital patent in the world, a point InterDigital concedes.

## CONCLUSION

For the foregoing reasons, Nokia respectfully requests that this Court deny InterDigital's Motion To Dismiss.


                                        MORRIS, NICHOLS, ARSHT & TUNNELL

                                        /s/  Jack B. Blumenfeld
                                        Jack B. Blumenfeld (#1014)
                                        Julia Heaney (#3052)
                                        1201 N. Market Street
                                        Wilmington, DE 19801
Of Counsel:                             (302) 658-9200
                                        jblumenfeld@mnat.com
ALSTON & BIRD LLP                       Attorneys for NOKIA CORPORATION and
                                        NOKIA, INC.
Peter Kontio
Patrick J. Flinn
Gardner S. Culpepper
Keith E. Broyles
1201 West Peachtree Street
Atlanta, GA  30309-3424
(404) 881-7000

April 28, 2005

---

[19]    Nokia's concerns regarding attorneys' fees were well placed.  InterDigital spent over $32 million in attorneys' fees litigating the *Ericsson* lawsuit (*see* Exh. P at ¶¶ 29, 43).

<u>CERTIFICATE OF SERVICE</u>

I, Jack B. Blumenfeld, hereby certify that on April 28, 2005 I electronically filed

Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss Pursuant to Federal

Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(h)(3) with the Clerk of the Court using

CM/ECF, which will send notification of such filing(s) to the following:

> Richard L. Horwitz
> Potter Andersoon & Corroon LLP
> rhorwitz@potteranderson.com

I also certify that copies were caused to be served on April 28, 2005 upon the

following in the manner indicated:

<u>BY HAND</u>

Richard L. Horwitz
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE  19801

<u>BY FEDERAL EXPRESS</u>

D. Dudley Oldham
Fulbright & Jaworski
1301 McKinney
Suite 5100
Houston, TX  77010

> /s/     Jack B. Blumenfeld (#1014)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> jblumenfeld@mnat.com