IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA, INC.,

      Plaintiffs,

          v.

INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION,

      Defendants.

C.A. No. 05-16-JJF

**APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1), 12(B)(6), AND 12(H)(3)**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for NOKIA CORPORATION and NOKIA, INC.

OF COUNSEL:

ALSTON & BIRD LLP
Peter Kontio
Patrick J. Flinn
Gardner S. Culpepper
Keith E. Broyles
1201 West Peachtree Street
Atlanta, GA 30309
404-881-7000

Dated: April 28, 2005

# INDEX

| | |
|---|---|
| InterDigital Communications Corp. Form 10-Q, dated Nov. 16, 1994 | Exh. A |
| Agreed Order, dated May 3, 1999, from *Ericsson Radio Sys., Inc. v. InterDigital Communications Corp.*, 3:93-CV-1809-H (N.D. Tex.) | Exh. B |
| Special Master's Final Report and Recommendation on Claim Construction, dated Sept. 8, 2000, from *Ericsson Radio Sys., Inc. v. InterDigital Communications Corp.*, 3:93-CV-1809-H (N.D. Tex.) | Exh. C |
| Agreed Order, dated Sept. 18, 2000, from *Ericsson Radio Sys., Inc. v. InterDigital Communications Corp.*, 3:93-CV-1809-H (N.D. Tex.) | Exh. D |
| InterDigital Press Release, dated June 3, 2002 | Exh. E |
| Ericsson's Response in Opposition to Nokia Corporation's Motion To Intervene and for Access to Sealed Record, dated Aug. 27, 2003, from *Ericsson, Inc. v. InterDigital Communications Corp.*, 3:93-CV-1809-H (N.D. Tex.) | Exh. F |
| InterDigital Communications Corp. Form 10-K, dated Mar. 31, 2005 | Exh. G |
| InterDigital Press Release, dated Nov. 9, 2004 | Exh. H |
| Elizabeth MacDonald, *Pay Up Or Else*, FORBES, Dec. 22, 2003 | Exh. I |
| Fax from Robert S. Bramson, President & CEO, InterDigital Patents Corp., to Timo Ruikka, Nokia Telecommunications (June 2, 1993) | Exh. J |
| InterDigital Press Release, dated Mar. 17, 2003 | Exh. K |
| Q2 2003 InterDigital Communications Corporation Earnings Conference Call, dated Aug. 13, 2003 | Exh. L |
| Fax from Milbank, Tweed, Hadley & McCloy LLP, to Bird & Bird (Apr. 8, 2005) | Exh. M |
| Fax from Milbank, Tweed, Hadley & McCloy LLP, to Bird & Bird (Apr. 25, 2005) | Exh. N |
| Appellant's Notice of Appeal, from *Nokia Corp. v. InterDigital Communications Corp.*, Claim No. HC 04 C 01952 (Ch., Patents Ct.) | Exh. O |
| Complaint, dated Nov. 4, 2003, from *InterDigital Communications Corp. v. Federal Ins. Co.* (E.D. Penn.) | Exh. P |
| *digiGAN, Inc. v. iValidate, Inc.*, 02 Civ. 420 (RCC), 2004 U.S. Dist. LEXIS 1324 (S.D.N.Y. Feb. 3, 2005) | Exh. Q |
| *Ericsson, Inc. v. InterDigital Communications Corp.*, No. 3:93-CV-1809-M, 2004 WL 1636924 (N.D. Tex. June 3, 2004) | Exh. R |

| | |
|---|---|
| *Laube v. KM Europa Metal AG*, 96 Civ. 8147 (PKL), 1998 U.S. Dist. LEXIS 3921 (S.D.N.Y. Mar. 27, 1998) | Exh. S |

# EXHIBIT A

Copyright 1994 Disclosure Incorporated
EDGARPlus(TM)

COMPANY: INTERDIGITAL COMMUNICATIONS CORP
CROSS-REFERENCE: INTERNATIONAL MOBILE MACHINES CORP
TICKER: IDC
EXCHANGE: AMS

FORM-TYPE: 10-Q

DOCUMENT-DATE: September 30, 1994
FILING-DATE: November 16, 1994

Full text  Company info  Contents  Other  Return

* * * * * * * * * * * * * * * * **TEXT OF FILING** * * * * * * * * * * * * * * * *

1

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C.  20549
FORM  10-Q
QUARTERLY REPORT UNDER SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934

INTERDIGITAL COMMUNICATIONS CORPORATION
2200 RENAISSANCE BOULEVARD
SUITE 105
KING OF PRUSSIA, PA  19406
(610) 278-7800

FOR QUARTER ENDED:      09/30/94
COMMISSION FILE NUMBER:   1-11152

STATE OF INCORPORATION:   PA
IRS EMPLOYER I.D.:      23-1882087

FORMER NAME, ADDRESS, AND FISCAL YEAR:  NA

INDICATE BY CHECK MARK WHETHER THE REGISTRANT  (1) HAS FILED ALL
REPORTS REQUIRED TO BE FILED BY SECTION 13 OR 15(D) OF THE SECURITIES
EXCHANGE ACT OF 1934 DURING THE PRECEDING 12 MONTHS (OR FOR SUCH
SHORTER PERIOD THAT THE REGISTRANT WAS REQUIRED TO FILE SUCH REPORTS),
AND  (2) HAS BEEN SUBJECT TO SUCH FILING REQUIREMENTS FOR THE PAST 90
DAYS.
YES (X).  NO ( ).

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

INDICATE THE NUMBER OF SHARES OUTSTANDING OF EACH OF THE ISSUER'S
CLASSES OF COMMON STOCK, AS OF THE LATEST PRACTICABLE DATE:

| COMMON STOCK | PAR VALUE | DATE | NUMBER OF SHARES |
|---|---|---|---|
| COMMON STOCK | .01 PER SHARE | 11/09/94 | 41,563,779 |

2

Note: The following index is part of the original document.  Page
numbers have been kept for your convenience in locating data referred to
within the text and are identified as (SOURCE PAGE #) in the upper
left-hand corner of each page.  To access these pages, refer to SEC
Online's Table of Contents.

Note: The following index is part of the original document.  Page
numbers have been kept for your convenience in locating data referred to
within text and are identified as (SOURCE PAGE #) in the upper left-hand
corner of each page.  To access these pages, refer to SEC Online's Table
of Contents.

INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES

INDEX

PAGES

Part I - Financial Information:

    Item 1.  Consolidated Financial Statements

        Consolidated Balance Sheets -    3-4
        December 31, 1993 and September
        30, 1994 (unaudited)

        Consolidated Statements of Operations    5
        Three and Nine Months Ended
        September 30, 1993 and 1994
        (unaudited)

        Consolidated Statements of Cash    6-7
        Flows - Nine Months Ended
        September 30, 1993 and 1994
        (unaudited)

        Notes to Consolidated Financial
        Statements    8-13

    Item 2.  Management's Discussion and
        Analysis of Financial Condition

and Results of Operations                    14–20

Part II – Other Information:

  Item 1. Legal Proceedings                    21–23

  Item 6. Exhibits and Reports on Form 8–K        24

3

INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS)
(UNAUDITED)

| | DECEMBER 31, 1993 | SEPTEMBER 30, 1994 |
|---|---|---|
| ASSETS | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents, including restricted cash of 2,494 and 1,094, respectively | 8,211 | 3,196 |
| Accounts receivable, net of allowance for uncollectible accounts of 1,235 and 996, respectively | 4,170 | 8,658 |
| Inventories | 9,951 | 8,543 |
| Deposits on inventory purchases | 381 | 1,539 |
| Net assets of discontinued operations | 2,366 | — |
| Other current assets | 377 | 822 |
| Total current assets | 25,456 | 22,758 |
| PROPERTY PLANT AND EQUIPMENT: | | |
| Machinery and equipment | 3,433 | 3,713 |
| Computer equipment | 3,323 | 3,449 |
| Furniture and fixtures | 1,513 | 1,520 |
| Leasehold improvements | 819 | 839 |
| | 9,088 | 9,521 |
| Less–Accumulated depreciation and amortization | (6,187) | (7,042) |
| Net property and equipment | 2,901 | 2,479 |
| OTHER ASSETS: | | |
| Patents, net of accumulated amortization of 2,446 and 2,821, respectively | 2,496 | 2,501 |
| Deferred software costs | 773 | 1,067 |

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

| | | |
|---|---|---|
| Other | 700 | 579 |
| Total other assets | 3,969 | 4,147 |
| | 32,326 | 29,384 |

The accompanying notes are an integral part of these statements.

4

INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS (CONT'D)
(IN THOUSANDS)
(UNAUDITED)

| | DECEMBER | SEPTEMBER |
|---|---|---|
| LIABILITIES AND SHAREHOLDERS' EQUITY | 31, 1993 | 30, 1994 |
| CURRENT LIABILITIES: | | |
| Short term borrowings | — | 2,402 |
| Current portion of long-term debt | 256 | 239 |
| Due to Hughes Network Systems, Inc. | 5,871 | 5,957 |
| Accounts payable | 5,164 | 7,381 |
| Accrued compensation | 1,110 | 1,701 |
| Accrued distributor commissions | 1,002 | 964 |
| Accrued warranty costs | 637 | 830 |
| Purchase commitments reserve | 1,600 | 1,438 |
| Other accrued expenses | 1,752 | 2,174 |
| Total current liabilities | 17,392 | 23,086 |
| LONG-TERM DEBT (principally capitalized leases) | 650 | 483 |
| OTHER LIABILITIES | 36 | 58 |
| MINORITY INTEREST | 244 | 211 |
| COMMITMENTS AND CONTINGENCIES (Note 3) | | |
| SHAREHOLDERS' EQUITY: | | |
| Preferred stock, .10 par value, 14,399 shares authorized – 2.50 Convertible Preferred, 113 shares issued and outstanding | 11 | 11 |
| Common Stock, .01 par value, 75,000 shares authorized, 34,960 shares and 40,151 shares issued and outstanding | 350 | 402 |
| Additional paid-in capital | 184,186 | 194,083 |
| Accumulated deficit | (170,335) | (188,828) |

|  |  |  |  |
|---|---|---|---|
|  | 14,212 | 5,668 |  |
| Deferred compensation |  | (208) | (122) |
| Total shareholders' equity |  | 14,004 | 5,546 |
|  | 32,326 | 29,384 |  |

The accompanying notes are an integral part of these statements.

5

INTERDIGITAL COMMUNICATIONS CORPORATION
CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE DATA)
(UNAUDITED)

|  | For the Three Months Ended September 30, | |
|---|---|---|
|  | 1993 | 1994 |
| REVENUES: | | |
| UltraPhone sales | 2,359 | 7,074 |
| Licensing revenue | — | 657 |
| Contract services | 409 | 368 |
|  | 2,768 | 8,099 |
| OPERATING EXPENSES: | | |
| Cost of UltraPhone sales | 2,945 | 7,193 |
| Contract services costs | 390 | 218 |
| Sales and marketing | 1,064 | 1,067 |
| General and administrative | 2,466 | 3,489 |
| Research and development | 1,811 | 2,119 |
| Restructuring charges | — | 440 |
|  | 8,676 | 14,526 |
| Loss from operations | (5,908) | (6,427) |
| OTHER INCOME (EXPENSE): | | |
| Interest income | 63 | 25 |
| Interest expense | (45) | (198) |
| Loss before minority interest | (5,890) | (6,600) |
| MINORITY INTEREST IN (GAIN)/LOSS OF SUBSIDIARIES | 20 | 38 |
| Net loss before discontinued operations | (5,870) | (6,562) |

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

| | | |
|---|---|---|
| DISCONTINUED OPERATIONS | (173) | — |
| GAIN ON SALE OF DISCONTINUED OPERATIONS | — | 121 |
| Net loss | (6,043) | (6,441) |
| PREFERRED STOCK DIVIDENDS | (71) | (70) |
| NET LOSS APPLICABLE TO COMMON SHAREHOLDERS | (6,114) | (6,511) |

EARNINGS PER SHARE:

| | | |
|---|---|---|
| NET LOSS FROM CONTINUING OPERATIONS | (0.18) | (0.17) |
| NET LOSS FROM DISCONTINUED OPERATIONS | (0.01) | — |
| NET LOSS PER COMMON SHARE | (0.19) | (0.17) |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING | 32,595 | 38,178 |

(TABLE CONTINUED)

| | For the Nine Months Ended September 30, | |
|---|---|---|
| | 1993 | 1994 |
| REVENUES: | | |
| UltraPhone sales | 8,912 | 10,447 |
| Licensing revenue | — | 3,199 |
| Contract services | 1,447 | 918 |
| | 10,359 | 14,564 |
| OPERATING EXPENSES: | | |
| Cost of UltraPhone sales | 10,562 | 11,322 |
| Contract services costs | 1,332 | 941 |
| Sales and marketing | 3,406 | 3,347 |
| General and administrative | 7,290 | 9,914 |
| Research and development | 5,146 | 5,668 |
| Restructuring charges | — | 1,000 |
| | 27,736 | 32,192 |
| Loss from operations | (17,377) | (17,628) |
| OTHER INCOME (EXPENSE): | | |
| Interest income | 197 | 106 |
| Interest expense | (192) | (497) |
| Loss before minority interest | (17,372) | (18,019) |

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

| | | |
|---|---|---|
| MINORITY INTEREST IN (GAIN)/LOSS OF SUBSIDIARIES | 69 | 33 |
| Net loss before discontinued operations | (17,303) | (17,986) |
| DISCONTINUED OPERATIONS | (846) | (416) |
| GAIN ON SALE OF DISCONTINUED OPERATIONS | — | 121 |
| Net loss | (18,149) | (18,281) |
| PREFERRED STOCK DIVIDENDS | (212) | (212) |
| NET LOSS APPLICABLE TO COMMON SHAREHOLDERS | (18,361) | (18,493) |
| EARNINGS PER SHARE: | | |
| NET LOSS FROM CONTINUING OPERATIONS | (0.57) | (0.50) |
| NET LOSS FROM DISCONTINUED OPERATIONS | (0.03) | (0.01) |
| NET LOSS PER COMMON SHARE | (0.60) | (0.51) |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING | 30,604 | 36,106 |

The accompanying notes are an integral part of these statements.

6

INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)
(UNAUDITED)

| | For the Nine Months Ended September 30, | |
|---|---|---|
| | 1993 | 1994 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | (18,149) | (18,281) |
| Adjustments to reconcile net loss to net cash used for operating activities– | | |
| Minority interest in subsidiary | (175) | (33) |
| Depreciation and amortization | 1,509 | 1,360 |

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

| | | |
|---|---:|---:|
| Compensation on stock issued and stock options granted | 186 | 86 |
| Loss from discontinued operations | (846) | (416) |
| Non-cash portion of loss on discontinued operations | 1,051 | 371 |
| Other | (241) (133) | |
| Decrease (increase) in assets– | | |
| Receivables | 2,034 | (4,210) |
| Inventories | (7,355) | 1,408 |
| Deposits on inventory purchases | 966 | (1,158) |
| Other current assets | (168) (445) | |
| Increase (decrease) in liabilities– | | |
| Accounts payable | 88 | 2,217 |
| Reserve for Hughes Network Systems, Inc. | 125 | 86 |
| Other accrued expenses | (1,532) | 1,263 |
| | | |
| Net cash used for operating activities | (22,507) | (17,885) |

The accompanying notes are an integral part of these statements.

7

INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES CONSOLIDATED
STATEMENTS OF CASH FLOWS (CONTINUED)
(IN THOUSANDS)
(UNAUDITED)

| | For the Nine Months Ended September 30, | |
|---|---:|---:|
| | 1993 | 1994 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Additions to property and equipment | (668) | (424) |
| Capitalized costs of product software development | (537) | (427) |
| Net proceeds on sale of discontinued operations | — | 2,411 |
| Other non-current assets | (796) | (794) |
| | | |
| Net cash used for investing activities | (2,001) | 766 |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Net proceeds from sales of Common Stock and exercises of stock options and warrants | 21,472 | 9,886 |
| Proceeds of short-term debt, net | — | 2,402 |

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

| | | |
|---|---|---|
| Proceeds from long–term debt | — | — |
| Payments on long–term debt | (204) | (184) |
| Net cash provided by financing activities | 21,268 | 12,104 |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (3,240) | (5,015) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 9,146 | 8,211 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | 5,906 | 3,196 |

SUPPLEMENTAL CASH FLOW INFORMATION:

| | | |
|---|---|---|
| Interest paid | 49 | 188 |
| Income taxes paid | — | — |

The accompanying notes are an integral part of these statements.

8

INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 1994
(UNAUDITED)

1. BACKGROUND:

InterDigital Communications Corporation ("IDC", together with its subsidiaries referred to as "InterDigital" or the "Company") develops and markets advanced digital wireless telecommunications systems using proprietary technologies for voice and data communications. The Company's principal product is the UltraPhone(TM), a telephone system providing businesses and households access to basic telephone service through a wireless local loop. Sales of UltraPhone accounted for approximately 88% of the total revenues of the Company during 1993 and are expected to continue to constitute a significant portion of its revenues through at least 1994. Since 1987, the Company has sold over 190 UltraPhone systems worldwide, with aggregate UltraPhone sales exceeding 110 million.

The Company's objective is to become a significant global supplier of digital wireless communications systems by establishing the UltraPhone as a fundamental component of large scale telecommunications infrastructure programs worldwide. To achieve this objective, the

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

Company's ongoing strategic goals involves (i) designing and implementing product engineering changes and seeking alternative supply and production sources in an attempt to significantly reduce costs of production, thereby supporting both aggressive, competitive UltraPhone pricing and enhanced gross margins, (ii) expanding product capabilities and developing product enhancements in order to broaden commercial applications to meet the needs of market segments previously unserved by the Company, (iii) targeting a limited number of markets with a more focused internal sales and marketing presence, and (iv) marketing the UltraPhone in areas where the Company has no direct presence through alliance partners.

In addition, the Company's research and development facilities are developing an alternative open air interface technology, Broadband Code Division Multiple Access ("B–CDMA"), which offers potential uses in an UltraPhone type of wireless local loop system and/or wireless personal communication system ("PCS").

In addition to its UltraPhone business and B–CDMA activities, the Company, through InterDigital Technology Corporation ("ITC"), is seeking to capitalize upon the revenue potential of ITC's extensive Time Division Multiple Access ("TDMA") and Code Division Multiple Access ("CDMA") patent portfolio. ITC has identified entities which it believes are infringing the Company's patents and has undertaken a strategy of targeted negotiation and litigation, the objective of which is to realize licensing revenues. (See Note 3 of the Notes to Consolidated Financial Statements). During the second quarter of 1994, the Company entered into a non–exclusive, world–wide, royalty bearing patent license agreement with American Telephone and Telegraph Company; during the third quarter of 1994, a similar license agreement was entered into with OKI Electric Industry, Co., Ltd. Subsequent to the third quarter of 1994, the Company settled its litigation with Qualcomm Incorporated with Qualcomm and the Company entering into separate licensing arrangements with each other. (See Note 12 of the Notes to Consolidated Financial Statement and Part II, Item I, Legal Proceedings.)

As an adjunct to its primary business, the Company has provided advanced digital wireless research and development services to government and business organizations and it also has directly provided telecommunications services to businesses and households through the ownership and operation of telephone operating companies ("TELCOs") in rural areas of the United States. The Company entered this line of business through the acquisition of Haviland Telephone Company ("Haviland") during 1991. The Company has sold substantially all of its investments in the TELCOs (See Note 10 of the Notes to Consolidated Financial Statements). Additionally, the Company is withdrawing from the contract services market in order to focus on its other business opportunities.

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

The Company was incorporated in 1972. As of September 30, 1994, its accumulated deficit was 188.8 million, and there can be no assurance that the Company will be able to attain a profitable level of operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations." Additional funds will be required by the Company on a continuing basis to meet its strategic goals, including to sustain its operations, continuing to produce and market the UltraPhone, continuing research and product development, maintaining and exploiting the Company's patent position and technology, and for other corporate purposes. The Company is pursuing other financing arrangements, including but not limited to, additional debt and equity infusions and strategic alliance relationships to provide funding for future developmental and market opportunities. No assurance can be given that sufficient funds will be generated from operations, that additional financing will be available, or if available, that it will be available on acceptable terms.

## 2. BASIS OF PRESENTATION:

In the opinion of management, the accompanying unaudited consolidated financial statements contain all adjustments necessary to present fairly InterDigital Communications Corporation and Subsidiaries' financial position as of September 30, 1994 and the results of their operations for the three and nine month periods ended September 30, 1993 and 1994 and cash flows for the nine month periods ended September 30, 1993 and 1994. The accompanying unaudited consolidated financial statements have been prepared in accordance with the instructions for Form 10–Q and accordingly do not include all of the detailed schedules, information and notes necessary for a fair presentation of financial condition, results of operations and cash flows in conformity with generally accepted accounting principles. Therefore, these financial statements should be read in conjunction with the financial statements and notes thereto contained in the Company's latest annual report on Form 10–K filed with the Securities and Exchange Commission. The results of operations for interim periods are not necessarily indicative of the results to be expected for the entire year.

The Consolidated Balance Sheet as of December 31, 1993 and the Consolidated Statement of Operations and Consolidated Statement of Cash Flows for the period ended September 30, 1993 have been reclassified to give effect to discontinued operations accounting for the TELCO operations.

## 3. CONTINGENCIES:

IDC is the defendant and counterclaim plaintiff in a lawsuit brought by Hughes Network Systems, Inc. ("HNS") which alleges breach of certain agreements by IDC. Additionally, IDC and ITC are variously parties to patent related litigation. ITC is the plaintiff in two actions alleging patent infringement and, in each instance, is seeking damages and equitable remedies. IDC and ITC are variously defendants in two actions filed by the alleged infringers seeking declaratory relief, damages,

and, in some instances, variously attempting to enjoin IDC and ITC from prospectively asserting equitable and legal claims arising from any additional, alleged patent infringement. The Company and its subsidiary intend to vigorously pursue and defend the lawsuits.

On November 7, 1994, a purported class action complaint was filed against the Company and its chief executive officer alleging certain violations of the disclosure requirements of the federal securities laws. The Company believes that the complaint is without merit and intends to contest it vigorously. (See Part II, Item I Legal Proceedings.)

10

## 4. CASH AND CASH EQUIVALENTS:

The Company considers investments with original maturities of three months or less to be cash equivalents for purposes of the statements of cash flows. The Company invests its excess cash in various time deposits and marketable securities, which are included in cash and cash equivalents, as follows (in thousands):

|  | December 31, 1993 | September 30, 1994 |
|---|---|---|
| Cash, money market and demand deposits | 971 | 1,590 |
| Certificates of deposit | 40 | 306 |
| Repurchase agreements | 7,200 | 1,300 |
|  | 8,211 | 3,196 |

All of the cash and cash equivalents of Patents Corp., which amounted to 350,000 at September 30, 1994, is restricted for exclusive use by Patents Corp. to fund its operations. In addition, 744,000 of IDC's cash and cash equivalents at September 30, 1994 is otherwise restricted.

## 5. MAJOR CUSTOMERS:

In 1993, the Company's largest UltraPhone customers were PT. Amalgam Indocorpora, Indonesia ("P.T. Amalgam") and Telefonos de Mexico ("Telmex"), which accounted for approximately 18% and 33% of UltraPhone sales, respectively. During the three months ended September 30, 1994, Myanmar Posts and Telecommunications ("Myanmar"), PT. Telekomunikasi, Indonesia ("PT. Telkom") and San Francisco/International Teleport ("SFIT"), the Company's Russian customer, accounted for 34%, 32% and 17% of UltraPhone sales, respectively. During the three months ended September 30, 1993, Telmex accounted for 25% of UltraPhone sales. During the nine months ended September 30, 1994, Myanmar, PT. Telkom,

Fiducoldex and SFIT accounted for 23%, 22%, 12% and 11% of UltraPhone sales, respectively.  During the nine months ended September 30, 1993, Telmex and P.T. Amalgam accounted for 25% and 31% of UltraPhone sales, respectively.  Net UltraPhone sales by geographic area for the three and nine months ended September 30, 1993 and 1994 are as follows (in thousands):

|  | Three Months Ended September 30, | |
|  | 1993 | 1994 |
| --- | --- | --- |
| Domestic | 1,353 | 1,050 |
| Foreign | 1,006 | 6,024 |
|  | 2,359 | 7,074 |

(TABLE CONTINUED)

|  | Nine Months Ended September 30, | |
|  | 1993 | 1994 |
| --- | --- | --- |
| Domestic | 3,338 | 2,687 |
| Foreign | 5,574 | 7,760 |
|  | 8,912 | 10,447 |

6.  NET LOSS PER COMMON SHARE:

For all periods presented, net income per share is based upon the weighted average shares outstanding during the period with the net income adjusted for cumulative dividends on Preferred Stock.  Common stock equivalents have not been included in the computation for these periods since the effect is anti-dilutive.

11

7.  INVENTORIES:

|  | December 31, 1993 | September 30, 1994 |
| --- | --- | --- |
|  | (In thousands) | |
| Component parts and work-in-progress | 7,441 | 5,624 |
| Finished goods | 2,510 | 2,919 |
|  | 9,951 | 8,543 |

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

8. INCOME TAXES:

At December 31, 1993, the Company had federal net operating loss carryforwards of approximately 135 million of which 341,000 had expired as of December 31, 1993. The Company also has approximately 1.5 million of tax credit carryforwards which begin to expire in 1998. Since the realization of the tax benefits associated with these carryforwards is not assured, a valuation allowance of 100% of the potential tax benefit is recorded as of December 31, 1993 and September 30, 1994. Pursuant to the Tax Reform Act of 1986, annual use of the Company's net operating loss and credit carryforwards may be limited if a cumulative change in ownership of more than 50% has occurred within a three-year period. The Company believes that such a change in ownership occurred during the fourth quarter of 1992. However, the determination of the date of an ownership change under Section 382 is subject to numerous interpretive uncertainties, including certain recently adopted Treasury Regulations. These Treasury Regulations may have voided the 1992 ownership change or caused it to occur at a later point in time.

In the event of an ownership change, the Company's net operating loss and credit carryforwards would be subject to an annual limitation equal to the product of (x) the aggregate fair market value of the Company's stock immediately before the ownership change times (y) the "long-term tax exempt rate" (within the meaning of Section 382(f) of the Code) in effect at that time. If an ownership change has occurred, as the Company believes, in the fourth quarter of 1992, the Company's ability to utilize its net operating loss and credit carryforwards generated prior to the date of the ownership change would be limited to approximately 10 million per year.

9. SHORT-TERM FINANCING:

During the second quarter of 1994, the Company received 2.4 million in proceeds from a series of Promissory Notes. The Notes were collateralized by the proceeds from the sale of Haviland Telephone Company, accrued interest at a rate of 11% which was payable at maturity and had initial terms of 90 days, with original maturities occurring during August and September 1994. At maturity, the holder may elect to have the repayment of principal, in whole or in part, in the form of Common Stock at the conversion price of 3.75 per share. In the event of such election, the Company's obligation to pay interest to the noteholders shall be waived. Additionally, as an inducement to enter into the note agreement, the noteholders were granted 280,000 warrants with a term of 10 years and an exercise price of 3.75 per share. As of September 30, 1994, 2.3 million of the Notes were extended in consideration for revised conversion rates. As of November 10, 1994, 2.2 million of the Notes had been repaid, 144,000 had converted in exchange for 81,067 shares of common stock, and 53,000 remain outstanding. It is anticipated that all of the Notes will be repaid in either cash or common stock by November 30, 1994.

During the third quarter of 1994, the Company received 9.5 million of net proceeds from the sale of Common Stock to foreign investors in

offshore transactions pursuant to the safe harbor provisions of
Regulation S under the Securities Act of 1933. Subsequent to September
30, 1994, the Company received an additional 3.1 million of proceeds
from these sales. The weighted average of actual discounts from fair
market value of Common Stock at the respective closing dates for
Regulation S sales during 1994 was 25%.

12

During June 1994, the Company entered into a loan agreement with ITC for
1.5 million. The loan carries an interest rate of 11% per annum and it
is expected to be repaid by December 1994.

## 10. SALE OF TELEPHONE OPERATING COMPANIES

During the first quarter of 1994, the Company committed to a formal plan
to sell its interests in the TELCOs and entered into negotiations with
interested parties to that end. The Company entered into a definitive
agreement to sell the Haviland Telephone Company operations as of
September 26, 1994. Proceeds on the sale were 3,050,000 in cash, the
assumption of existing liabilities and a 100,000 interest bearing,
unsecured note. Collection of the note by the Company is based on
certain performance measures of the fiscal 1995 Haviland Telephone
Company operations. The Company recognized a gain on the sale of
approximately 120,000. The Company is seeking an agreement to sell its
remaining TELCO operations by December 1994. The results of operations
of the TELCOs for the three and nine months ended September 30, 1993 and
1994 have been classified as discontinued operations.

Revenues for the TELCO operations were approximately 2.4 million for
both of the nine month periods ended September 30, 1993 and 1994.

## 11. RESTRUCTURING CHARGES

Pursuant to a plan to more fully support engineering yet reduce overall
expenditures, the Company recorded a restructuring charge of 560,000
during the first quarter of 1994 representing primarily salary
continuation benefits provided to employees who were terminated or
scheduled to be terminated during the first quarter of 1994.
Additionally, in the third quarter of 1994, the Company recorded
440,000 as an additional restructuring charge related to the first
quarter plan which reflects salary continuance to terminated employees
and the shutdown costs for the Company's governmental contract services
operations which could not be quantified as of March 31, 1994.

## 12. SUBSEQUENT EVENT

On November 2, 1994, IDC, IPC, ITC and Qualcomm Incorporated, reached a
settlement resulting in the dismissal of their respective Code Division

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

Multiple Access (CDMA) patent lawsuits.

ITC had filed a lawsuit against Qualcomm alleging that certain CDMA products built by Qualcomm in compliance with IS-95, a North American CDMA digital cellular standard, infringed three of ITC's patents. Qualcomm had filed a lawsuit against InterDigital alleging that their Broadband-CDMA development activities infringed one of Qualcomm's patents. Both lawsuits have been dismissed. The settlement only covers CDMA and does not affect ITC's Time Division Multiple Access (TDMA) patent claims regarding GSM, the European Global System for Mobile Communications, or IS-54, the North American TDMA digital cellular standard, nor does it affect ITC's current patent infringement litigation against Ericsson and Motorola with respect to IS-54 (See Part II, Item I, Legal Proceedings.)

In return for Qualcomm's agreement to make a one-time payment of 5.5 million upon completion of definitive documentation, ITC granted to Qualcomm a fully-paid, royalty free, world-wide license to use and to sublicense ITC's existing CDMA patents and certain future CDMA patents to make and sell products for IS-95-type wireless applications, including, but not limited to, cellular, PCS, wireless local loop and satellite applications. Qualcomm has the right to sublicense ITC's CDMA patents so that Qualcomm's licensees will be free to manufacture and sell IS-95-type CDMA products without requiring any payment to ITC. ITC's patents concerning cellular overlay and interference cancellation are not licensed to Qualcomm.

Qualcomm granted to InterDigital a royalty-free license to use and to sublicense the patent that Qualcomm had asserted against InterDigital and a royalty-bearing license to use certain Qualcomm CDMA patents in InterDigital's B-CDMA products, if needed. InterDigital believes that it will not be necessary to use any of Qualcomm's royalty-bearing or non-licensed patents in its B-CDMA system. In addition, Qualcomm agreed, subject to certain restrictions, to license certain CDMA patents on a royalty bearing basis to those InterDigital customers that desire to use Qualcomm's patents.

13

The license to InterDigital does not apply to IS-95-type systems, or to satellite systems. Certain of Qualcomm's patents, relating to key IS-95 features such as soft and softer hand-off, variable rate vocoding, and orthogonal (Walsh) coding, are not licensed to InterDigital.

14

ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

Overview

The following discussion should be read in conjunction with the Consolidated Financial Statements and notes thereto, contained elsewhere in this Form 10-Q.

InterDigital commenced operations in 1972 and until 1987 was primarily engaged in research and development activities related to this TDMA wireless digital communications technology. In 1986, the Company introduced the UltraPhone system, a fixed digital wireless local loop telephone system employing TDMA technology, which it began installing in 1987. The Company's operations from 1987 through 1992 were characterized by increasing revenues accompanied by significant operating losses. During this period, significant costs were incurred related to the commercialization and continued development of the UltraPhone system, development of production sources and capacity, and the implementation of a broad-based sales and marketing effort designed to promote regulatory and market acceptance of the UltraPhone system. During 1993 and 1994 to date, the Company has experienced a significant decrease in UltraPhone revenues accompanied by a significant operating loss as a result of unabsorbed production costs and increased research and development costs and administrative expenses. The Company's accumulated deficit as of September 30, 1994 was 188.8 million.

InterDigital's primary source of revenue is derived from sales of the UltraPhone digital wireless local loop telephone system. In recent years, foreign sales have represented a majority of the sales of UltraPhone systems, and it is anticipated that foreign sales will represent a majority of UltraPhone sales for the foreseeable future. UltraPhone sales have, on a historical basis, varied significantly from quarter to quarter due to the concentration of revenues from the Company's largest customers over a few fiscal quarters. This trend has become more significant due to the Company's reliance upon a fee major customers for a substantial portion of the Company's UltraPhone sales. For fiscal 1994, the Company anticipates that a significant portion of its UltraPhone sales will be concentrated in the last three months when it anticipates shipment of the majority of a 14.9 million order from Indonesia. The Company has recorded 2.4 million of sales during the third quarter of 1994 on the initial shipments of this order. See Note 5 to "Notes to Consolidated Financial Statements".

The Company experienced a significant decline in order backlog during 1992 continuing through the third quarter of 1993; in the fourth quarter of 1993 order backlog (primarily the 14.9 million Indonesian order) increased in comparison to levels prevailing in preceding quarters. Late in 1992, the Company commenced a restructuring of its sales and marketing program, which is being further adjusted in 1994, to focus market coverage on the multi-year, large-scale telecommunications infrastructure programs of a limited number of foreign countries or strategic alliances. In such programs, the UltraPhone would be positioned as a fundamental component in rural and near-urban telephone networks. Also since 1992, competition for sales of wireless telephone systems intensified as providers of both analog and digital cellular

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

systems more actively promoted their products for fixed site installations in the Company's target markets. Although the Company believes that the UltraPhone offers significant advantages over fixed cellular systems, it nonetheless recognized that the market for its products is price sensitive. In order to compete more effectively against lower-priced cellular alternatives, the Company began lowering UltraPhone system prices early in 1993. In addition, in order to support the flexible pricing generally required in multi-year programs, the Company expects to introduce a more fully-featured subscriber unit and a significantly lower-priced cluster unit late in 1994 or early in 1995. The Company anticipates that reductions in product costs will be most fully realized in cluster systems and will be realized, to a lesser degree, in other non-cluster configurations in which there is a high ratio of subscriber units to base stations. Price reductions since 1993 have resulted in continued pressure upon gross profit margins which will continue until such time as the Company is able to reduce product costs commensurately.

The inability to competitively approach the aggressive pricing from fixed cellular and other competitors and the significant additional complexities of, and time required in, negotiating large scale programs, as well as the restructuring of the sales force, all contributed to the decline in order backlog, and adversely impacted 1993 and year-to-date 1994 order volume and revenues. The Company's revenues from Indonesia (a historically significant customer) during 1993 and the year-to-date of 1994 were significantly lower than those achieved in 1992 due to an interruption in new orders and shipments which resulted from a requirement that equipment to be shipped to Indonesia must operate at different frequencies than the Company's previous production standard and must incorporate certain other internal engineering changes.

15

The Company completed those frequency and engineering changes during the fourth quarter of 1993 and received the above mentioned 14.9 million order from Indonesia in that quarter which began shipping in the third quarter of 1994.

The Company's efforts to focus its sales and marketing program on multi-year, large-scale telecommunications infrastructure programs and strategic alliances have not yet resulted in increased order volume or decreased dependency on a limited number of major customers. As of October 31, 1994, the Company's order backlog had declined to 12.4 million of which 10.3 million represents the remaining portion of the 14.9 million Indonesia order. The Company expects to ship the majority of the Indonesia order in 1994. Additionally, the Company and its business associates have entered into several agreements, not included in firm backlog, contemplating the Company's development, supply and field testing of prototype communication systems utilizing B-CDMA technology and the commercialization of that technology.

In addition to the effects of varying selling prices and product

materials costs, the Company's gross profit margin ratios are affected
by the relative proportions of direct and distributor sales, by the
average number of subscribers per system sold, by its ability to absorb
manufacturing, overhead costs through generation of sufficient
production volume and by its field service costs for installation,
warranty, training and post-sale support.  Consistent with industry
practices, distributor commissions have been included in both revenues
and cost of sales.  Historically, the Company's gross profit margin from
sales has been inadequate to support its operating and other expenses.
The low sales volumes experienced in 1993 and year-to-date 1994 have
resulted in decreased production volume, resulting in negative gross
profit margins during these periods.

The Company announced that it has sold or intends to sell its
investments in the TELCOs (see Note 10 of the Notes to Consolidated
Financial Statements) and accordingly has accounted for the TELCO
operations as discontinued operations in the current period.

In conjunction with its strategy to realize the revenue potential of its
intellectual property portfolio, during the second quarter of 1994, the
Company entered into a non-exclusive, world-wide, royalty bearing patent
license agreement with American Telephone and Telegraph Company
("AT&T").  The AT&T license agreement provided for a non-refundable
royalty advance payment and imposed on AT&T an obligation to pay a
running royalty under and subject to terms and limitations set forth in
the agreement against which the advance will be offset if additional
royalty payments become necessary.  During the third quarter of 1994,
the Company entered into a similar agreement with OKI Electric Industry
Co., Ltd. ("OKI"), the Japanese parent of OKI America, Inc., an entity
which was, in conjunction with the license agreement, dismissed as
defendant in patent infringement litigation initiated by InterDigitial.
At the present time, the Company anticipates that any further license
revenues realized from AT&T or OKI will be related to the Company's TDMA
patents.  Subsequent to the third quarter of 1994, the Company settled
its litigation with Qualcomm Incorporated with Qualcomm and the Company
entering into separate licensing arrangements with each other.  (See
Note 12 of the Notes to Consolidated Financial Statements and Part II,
Item 1, Legal Proceedings.)  The Company intends to continue to
vigorously enforce its patent rights and to seek to obtain additional
patent license agreements.

The Company has continued, during the first nine months of 1994, to
allocate significant financial resources towards its investment in its
patented and proprietary B-CDMA technology.

The Company's other sources of revenue include contract engineering and
marketing services.

16

Results of Operations – Third Quarter of 1994 Compared to the Third
Quarter of 1993

Total Revenues. Total revenues in the third quarter ended September 30, 1994 increased 192.6% to 8.1 million, from 2.8 million in the third quarter ended September 30, 1993, primarily due to an increase in UltraPhone sales in the three months ended September 30, 1994 and the recognition of 650,000 of licensing revenue in the 1994 period. UltraPhone sales increased 200.0% in the third quarter of 1994 to 7.1 million from 2.4 million in the comparable quarter of 1993.

In July 1994, the Company entered into a patent license agreement with OKI Electric, under which OKI Electric was required to pay the Company a non-refundable royalty advance of 650,000. The advance was received and recognized as revenue in July 1994.

The Company had contract revenue related to its U.S. Federal government and other services contracts for the third quarter in both 1993 and 1994. During the third quarter of 1994, the Company had 368,000 of contract revenue as compared to 409,000 during the third quarter of 1993. The decrease in revenue is due to a delay in the granting and funding of new contracts of the nature for which the Company is qualified by the U.S. Government, particularly the Department of Defense. During the third quarter of 1994, the Company began withdrawing from the contract services market in order to focus on its other core business activities.

Cost of UltraPhone Sales. The cost of UltraPhone sales for the third quarter of 1994 increased 144.2% to 7.2 million from 2.9 million for the third quarter of 1993. The Company incurred a negative gross margin on UltraPhone sales of 1.7% for the three months ended September 30, 1994 as compared to a negative gross margin of 24.8% for the three month period ended September 30, 1993. Included in cost of UltraPhone sales are costs of product assembly, integration and testing, distributor commissions, freight and tariffs, and expenses associated with installation, support and warranty services related to the UltraPhone systems. Also included in the cost of sales are the overhead expenses the Company has incurred in maintaining its production resources that were not absorbed into inventory due to the low volume of production.

Contract Services Costs. Contract services costs decreased 44.1% to 218,000 in the three month period ended September 30, 1994 from 390,000 in the third quarter of 1993, primarily due to the decrease in contract services revenue.

Other Operating Expenses. Other operating expenses include sales and marketing expenses, general and administrative expenses and research and development expenses.

Sales and marketing expenses were comparable between the third quarter of 1994 and the third quarter of 1993. Reduced staff and activity levels were offset by an increase in commission expense due to the increase in UltraPhone revenues in the three month period.

General and administrative expenses for the third quarter of 1994

increased 41.5% to 3.5 million from 2.5 million for the third quarter of 1993. Expenses related to the protection and exploitation of the Company's patents, including legal costs, increased by approximately 535,000 in the 1994 period compared to the 1993 period. Legal fees and expenses during the third quarter of 1994 related to litigation and other corporate matters increased by 305,000 over the comparable period in the prior year. Additionally, General and Administrative expenses includes a 250,000 charge for deferred financing costs that are not expected to be realized.

Research and development expenses increase 17.0% for the third quarter of 1994 to 2.1 million from 1.8 million for the third quarter of 1993. The increase over the prior year period is due primarily to increased staff and activity levels devoted to the development of the B-CDMA technology. Statement of Financial Accounting Standard No. 86 requires capitalization of certain software development costs. The effects of this statement reduced the research and development expenses for the three month periods ended September 30, 1993 and 1994 by 113,000 and 57,000, respectively.

17

Other Income and Expense. Interest expense for the three month period ended September 30, 1994 was 198,000 as compared to 45,000 for the three month period ended September 30, 1993. The increase is due primarily to 27,000 of interest expense related to the 3.0 million Promissory Notes entered into in March 1994 which were subsequently repaid, 52,000 of interest expense related to the 2.4 million of Short-Term Convertible Securities entered into during May 1994 and increased charges by vendors.

Minority Interest. In December 1992, the Company sold 5.76% of the common shares of Patents Corp., which had, prior thereto, been a wholly-owned subsidiary of the Company. The Company recorded 38,000 as a decrease in minority interest in the third quarter of 1994 representing 5.76% of the net loss of Patents Corp. for the third quarter of 1994. During the comparable 1993 period, the Company recorded a reduction of 20,000 in minority interest representing 5.76% of the net loss of Patents Corp. for the third quarter of 1993.

Results of Operations – Nine Months Ended September 30, 1994 Compared to Nine Months Ended September 30, 1993

Total Revenues. Total revenues in the nine months ended September 30, 1994 increased 40.6% to 14.6 million from 10.4 million in the nine months ended September 30, 1993, primarily due to the higher UltraPhone revenue in the 1994 and the recognition of licensing revenues during the 1994 period.

UltraPhone sales increased 17.2% in the nine months ended September 30, 1994 to 10.4 million from 8.9 million in the comparable period of 1993.

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

During the nine months ended September 30, 1994, the Company had 3.2 million of license fee revenue principally related to the OKI Electric and AT&T license agreements. There was no license fee revenue for the nine months ended September 30, 1993.

The Company realizes contract revenue related to its U.S. Federal government and other services contract activity. During the nine months ended September 30, 1994, the Company had 918,000 of contract revenue as compared to 1.4 million during the nine months of September 30, 1993. The decrease in revenue is due to a delay in the granting and funding of new contracts of the nature for which the Company is qualified, by the U.S. Government, particularly the Department of Defense.

Cost of UltraPhone Sales. The cost of UltraPhone sales for the nine months ended September 30, 1994 increased 7.2% to 11.3 million from 10.6 million for the first nine months of 1993 due to the increase in UltraPhone revenues. The Company incurred a negative gross margin on UltraPhone sales of 8.4% for the nine months ended September 30, 1994 as compared to a negative gross margin of 18.5% for the nine months ended September 30, 1993. Included in the cost of sales for 1993 and 1994 are the overhead expenses the Company has incurred in increasing its production resources that were not absorbed into inventory due to the lower than anticipated volume of production during the period.

Service Costs. Contract services costs decreased 29 4% to 941,000 in the nine month period ended September 30, 1994 from 1.3 million in the nine month period ended September 30, 1993. The decrease in margins on contract services reflects the lower activity levels and therefore unabsorbed overhead costs.

Other Operating Expenses. Sales and marketing expenses decreased 1.7% in the nine months ended September 30, 1994 to 3.3 million from 3.4 million in the nine months ended September 30, 1993. Expenses decreased from the prior year due to a decrease in the number of employees but were partially offset by increased UltraPhone sales commissions and marketing costs related to the Company's B-CDMA technology.

General and administrative expenses for the nine months ended September 30, 1994 increased 36.0% to 9.9 million from 7.3 million for the nine months ended September 30, 1993. Expenses related to the protection and exploitation of the Company's patents, including legal costs, increased by approximately 2.0 million in the 1994 period compared to the 1993 period. Legal fees and expenses during the nine months ended September 30, 1994 related to litigation and other corporate matters increased by 698,000 over the comparable period in the prior year.

18

Additionally, General and Administrative expenses includes a 250,000

charge for deferred financing costs that are not expected to be realized.

Research and development expenses increased 10.1% for the nine months ended September 30, 1994 to 5.7 million from 5.1 million for the nine months ended September 30, 1993. The increase in research and development costs stems from increased number of employees and activity levels as the Company further develops the UltraPhone system and the B–CDMA technology. Statement of Financial Accounting Standards No. 86 requires capitalization of certain software development costs. The effects of this statement reduced the research and development expenses for the nine month periods ended September 30, 1993 and 1994 by 536,000 and 423,000, respectively.

Other Income and Expense. Interest expense for the nine month period ended September 30, 1994 was 497,000 as compared to 192,000 for the nine month period ended September 30, 1993. Interest expense for the 1994 period increased primarily due to 97,000 of interest expense related to the 3.0 million Promissory Notes, 52,000 of interest expense related to the 2.4 million of Short–Term Convertible Securities and increased charges by vendors.

Minority Interest. The Company recorded, as minority interest during the nine months of 1994, 33,000, as a decrease in minority interest in the nine months ended September 30, 1994 representing 5.76% of the net loss of Patents Corp. for the 1994 period. During the comparable 1993 period, the Company recorded a reduction of 69,000 in minority interest representing 5.76% of the net loss of Patents Corp.

Pursuant to a plan to more fully support engineering yet reduce overall expenditures, the Company recorded a restructuring charge of 560,000 during the first quarter of 1994 representing primarily salary continuation benefits provided to employees who were terminated or scheduled to be terminated during the first quarter of 1994. Additionally, in the third quarter of 1994, the Company recorded a 440,000 as a restructuring charge which reflects salary continuance to terminated employees and the shutdown costs for the Company's governmental contract services operations.

Discontinued Operations. During the nine months of 1994, the Company had a loss from discontinued operations of 416,000 primarily from the interest expense on the Seller notes and the amortization of goodwill. The Company recognized a 121,000 gain on the sale of the Haviland Telephone Company operations.

Financial Position, Liquidity and Capital Requirements:

The Company has incurred losses since inception, and at September 30, 1994, the Company had unrestricted cash, cash equivalents and short–term investments of approximately 2.1 million.

Historically, the Company has experienced liquidity problems due to its lack of significant revenues, its record of significant operating losses and its need to invest in additional equipment, UltraPhone

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

technology development and patent activities, as well as the TELCO program. In addition, since October 1992, the Company has allocated significant cash resources towards its B–CDMA research and development activities. The Company has addressed such cash needs, in the absence of long–term bank financing arrangements, primarily by public offerings, private placements and other sales of its securities. The Company, due primarily to its large operating loss, used 22.5 million and 17.9 million in cash for operating activities for the nine months ended September 30, 1993 and 1994. During the nine months ended September 30, 1994, the Company generated 766,000 from investing activities. Net cash proceeds of 2.4 million were received on the sale of the Haviland Telephone Company operations but were offset by cash investments of 1.6 million, primarily for the equipment purchases and investments in technology and patents. During the nine month period ended September 30, 1993, the Company used 2.0 million in investing activities primarily for the equipment purchases and investments in technology and patents. These uses of cash for the 1994 period were funded in significant part by net proceeds of 2.4 million from a series of Promissory Notes and the net proceeds of 9.5 million from sales of common stock. (See Note 11 of the Notes to Consolidated Financial Statements.)

19

These uses of cash for the 1993 period were funded by the net proceeds of 21.5 million from sales of Common Stock and other equity transactions.

The Company had a working capital deficit, including restricted assets, of 304,000 at September 30, 1994 compared to working capital of 8.1 million at December 31, 1993. The decrease in working capital since December is due primarily to the operating loss sustained during the period.

The Company's operations to date have required substantial amounts of working capital. The Company expects to continue to require additional debt or equity capitalization to sustain its operations, to support its UltraPhone operations, to develop improvements and enhancements to the UltraPhone system, to support its product development and marketing activities relating to its proprietary technologies and to fund its patent enforcement activities. The Company's working capital requirements will depend on numerous additional factors, including but not limited to the level of demand for the UltraPhone system, the progress of the Company's research and product development programs, the ability to generate patent license fees and royalties, and the need to expand funds in connection with its patent protection activities. Depending on the outcome of the Motorola litigation, Patents Corp. believes that under certain limited circumstances, it may require additional debt or equity infusions in the future. In addition, when the Company builds to specification to complete an order, it traditionally experiences negative cash flows from inception of its production ordering through customer payment at the time of, or

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

subsequent to, order shipment. During 1994, the Company experienced
such negative cash flows as it continued to build UltraPhone equipment
for sale to its Indonesian customer. If the Company were to experience
additional sudden and significant increases in orders to be built to
specification, it would testify the need for significant short–term
financing arrangements. No assurance can be given that sufficient funds
will be generated from operations to sustain the Company's operations
and no assurance can be given that additional financing will be
available or, if available, that it will be available on acceptable
terms.

During the second quarter of 1994, the Company received 2.4 million in
proceeds from a series of Promissory Notes. (See Note 9 of the Notes to
Consolidated Financial Statements.) Repayment of the Notes began
subsequent to September 30, 1994 and it is anticipated that all of the
Notes will be repaid in either cash or common stock by November 1994.

During the third quarter of 1994, the Company received 9.5 million of
net proceeds from the sale of Common Stock to foreign investors in
offshore transactions pursuant to the safe harbor provisions of
Regulation S under the 1993 Securities and Exchange Act. Subsequent to
September 30, 1994, the Company received an additional 3.1 million of
proceeds from these assets. The weighted average of actual discounts
from fair market value of Common Stock at the respective closing dates
for Regulation S sales during 1994 was 25%.

The Company is pursuing other financing arrangements, including but not
limited to, additional debt and equity infusions and strategic alliance
relationships to provide funding for future developmental and market
opportunities.

Additionally, the Company entered into discussions during the first half
of 1994 with several interested parties regarding the possible sale of
its TELCOs. The Company sold its interest in the Haviland Telephone
Company operations on September 26, 1994 and expects to sell its
remaining TELCO interests by December 1994. Patents Corp. has received
approximately 475,000 in insurance proceeds during the nine months
ended September 30, 1994 as a reimbursement of expenses and believes
that additional proceeds will be received during 1994.

The receipt of significant orders for equipment that will comply with
IS–54 or GSM standards has been announced by two licensees of the
Company's TDMA patents, which cover equipment and systems complying with
those standards. Based upon limited information contained in such
public announcements, the Company is presently unable to determine or
reasonably estimate the gross amount of such orders which would be
royalty–bearing, the percentage royalties applicable, the timing of
shipments and related royalty payment obligations, and whether any
payment deferral conditions may be applicable at the time of shipment
or, in the case of one licensee, whether it may seek to offset certain
of its obligations in whole or in part against amounts which it has
sought in litigation filed against the Company.

Further, any earned royalties payable by one of the licensees would, at such time, be subject to any unamortized advance royalties which have been paid by that licensee. Also, substantial orders have been announced by unlicensed third parties, including defendants and affiliated companies of such defendants in patent infringement suits brought by the Company, for TDMA based digital cellular systems, some of which presently installed. The Company received 1.5 million as an advance royalty payment in the second quarter of 1994 and anticipates the receipt of 900,000 from the same licensee in 1995. Additionally, the Company received 650,000 as an advance royalty payment from a second licensee subsequent during the third quarter of 1994. The Company's future cash requirements will be mitigated to the extent of any further royalty payments, the ultimate receipt and timing of which are not assured.

The Company believes that its investment in inventories and non-current assets are stated on its September 30, 1994 balance sheet at realizable values based on expected selling price and order volumes. Property and equipment are currently being utilized in the Company's on-going business activities, and the Company believes that no additional write-downs are required at this time due to lack of use or technological obsolescence. With respect to other assets, the Company believes that the value of its patents is at least equal to the value included in September 30, 1994 balance sheet.

Changes in Cash Flows and Financial Condition:

The Company has experienced negative cash flows from operations during the nine months ended September 30, 1994. The negative cash flows from operations have stemmed from net losses which exceeded the non-cash charges for depreciation and amortization in each of the periods.

Net cash flows from investing activities were negative for the nine months ended September 30, 1994. Notwithstanding the above, the amount of cash used in investing activities has, historically, been low relative to cash used in operations.

The Company raised substantial sums of money during 1992 and 1993 and 1994 to date through the sale of Common Stock and other securities. The net cash provided by financing activities during 1992 and 1993 was sufficient, in the aggregate, to more than offset the combined negative cash flows from operating and investing activities in those years; this was not the case during the nine months ended September 30, 1994.

Cash and cash equivalents of 3.2 million as of September 30, 1994 includes 350,000 dedicated to Patents Corp. and 744,000 of other restricted cash. The accounts receivable of 9.3 million at September 30, 1994 reflect amounts due from normal trade receivables, including non-domestic open accounts, as well as funds to be remitted under letters of credit.

Of the outstanding receivables as of September 30, 1994, 1.8 million

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

has been collected through November 9, 1994.  Additionally, 2.9 million was received subsequent to September 30, 1994 as an advance draw on the letter of credit associated with the 14.9 million Indonesian order. Accounts receivable at September 30, 1994 also included approximately 1.4 million originally due from the Company's Indonesian customer related to the sale of three UltraPhone systems in 1993.  The Company entered into a purchase agreement evidenced by a secured interest bearing note with a third party to purchase these systems during the first half of 1994.  As of November 9, 1994, no payments have been made on these notes due to delays in installing the systems.  The Company currently believes that the systems are fully functional and that the purchaser will commence payment on the note and the receivable will be full realized.

Inventory levels have decreased at September 30, 1994 to 7.9 million from 10.0 million as of December 31, 1993, reflecting the sale of systems to Myanmar and Indonesia.  Inventories at December 31, 1993 and September 30, 1994 are stated net of valuation reserves of 6.0 million and 5.5 million, respectively.

Included in other accrued expenses at September 30, 1994 are professional fees, consulting and other accruals and deferred rent relating to the corporate headquarters and manufacturing facilities.

21

PART II.  OTHER INFORMATION

ITEM 1.  LEGAL PROCEEDINGS

In February 1993, IDC was sued by HNS in the United States District Court for the District of Maryland (Civil Action No. PJM–93–576).  HNS previously produced the UltraPhone system on behalf of the Company pursuant to a series of production agreements (the "Production Agreements").  In the lawsuit, HNS alleges that the Company breached certain agreements which were entered into between HNS and the Company in February 1992 relating to the termination of certain prior production agreements.  HNS is seeking damages approximating 7.5 million, plus interest, attorney's fees and court costs.  HNS is also seeking delivery of certain collateral, execution of a lock box agreement, information relating to a warrant certificate held by HNS pursuant to which HNS has the right to purchase shares of the Company's Common Stock, and unspecified amount of damages arising from IDC's alleged failure to provide such information to HNS.  HNS has filed a motion for partial summary judgment which the Company has opposed.  The court has scheduled a hearing on the motion for February 6, 1995, although it may decide the motion before that date.

The Company has filed an answer to the complaint in the lawsuit, and the

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

Company intends to vigorously defend the lawsuit. While the Company
believes that it has certain meritorious defenses to certain aspects of
the lawsuit which may result in the Company being required to pay HNS
less the full amount claimed in the suit, there can be no assurance that
the Company's defenses will be upheld or that the Company will not be
required to pay the full amount demanded by HNS.  Except for the
potential obligation of the Company to issue shares of Common Stock to
HNS under one of the agreements in dispute and by reason of certain
anti–dilution provisions contained in the warrant certificate held by
HNS, all amounts claimed by HNS (other than interest, attorney's fees
and court costs) to be owed are reflected as a liability on the
Company's Consolidated Balance Sheet at December 31, 1993.  The Company
has filed a counterclaim against HNS for breach of one of the Licenses.

On April 16, 1993, ITC filed a lawsuit against OKI America, Inc.
("OKI"), OKI Electric Industry Company LTD.  ("OKI Electric"), and
Qualcomm Incorporated ("Qualcomm") (collectively, the "Defendants") in
the United States District Court for the Eastern District of
Pennsylvania (Civil Action No. 93–2004 (E.D.Pa)) to enforce certain of
ITC's patents relating to CDMA and TDMA technology.  On July 21, 1994,
ITC, OKI Electric and OKI settled ITC's claims against OKI through the
execution of a license agreement.  Pursuant to the license agreement,
OKI paid ITC an advance royalty payment of 650,000 and agreed to pay a
running royalty on products complying with the IS–54–B standard under
and subject to terms and limitations set forth in the agreement if
additional payments become necessary.  In addition, ITC granted OKI the
option to extend the license to other TDMA based products and to
products that are compatible with the CDMA based TIA/EIA/IS–95 Mobile
Station–Base Station Compatability Standard For Dual–Mode Wideband
Spread Spectrum Cellular Systems (the "IS–95 Standard").  As part of the
settlement, ITC agreed to the dismissal with prejudice of its claims
against OKI and the Court a Stipulated Order of Dismissal on July 22,
1994.

In the lawsuit against Qualcomm which was continuing during the third
quarter of 1994, ITC sought damages, royalties, preliminary and
permanent injunctions enjoining Qualcomm from infringement of certain of
ITC's patents, and its costs and attorneys' fees.  The complaint, as
amended in July and September 1993 and February 1994, alleged,
among other things, that Qualcomm had undertaken substantial activity
and meaningful preparation toward the making, selling, and/or using of
digital wireless telephone systems that will constitute infringements of
three patents owned by ITC.  ITC alleged that these three patents cover,
among other things, digital wireless telephone systems and equipment
which are compatible with and/or comply with the IS–95 Standard.  ITC
was seeking a declaratory judgment that these patents would be
infringed by Qualcomm by its making, selling, or using of digital
wireless telephone systems and equipment which are compatible with
and/or county with the IS–95 Standard.  ITC's complaint had been amended
to also allege that Qualcomm has infringed, contributed to the
infringement of and/or induced the infringement of these three patents.

22

On May 10, 1994, Qualcomm filed a motion to amend its counterclaims to
include allegations that certain of ITC's CDMA patents, including two
patents which are alleged to be infringed by Qualcomm, were based on
Qualcomm proprietary information that was alleged to be wrongfully in
the Company's possession.  Qualcomm sought to add IDC as an additional
party in connection with such additional counterclaims.  In the proposed
amended complaint, Qualcomm is seeking injunctive relief with respect to
certain of ITC's CDMA patents and IDC's B-CDMA products, an assignment
to Qualcomm of such CDMA patents, an accounting for lost profits, and
unspecified monetary, including punitive, damages.  Although the Court
denied Qualcomm's motion on June 6, 1994, Qualcomm sought to add these
counterclaims in this suit against IDC discussed below.  On November 2,
1994, Qualcomm, IDC, IPC and ITC terminated the lawsuit by entering into
a Stipulation of Dismissal with Prejudice.  This was part of a
settlement of the lawsuit and of the Qualcomm lawsuit against IDC
discussed below.  As part of this settlement, the parties entered into a
Patent License Agreement licensing to each other certain rights with
respect to the patents asserted in the lawsuits.  The terms of the
Patent License Agreements is discussed more fully at Part I, Item 1,
Note 12 of the Notes to Consolidated Financial Statements.

On September 9, 1993, ITC filed a patent infringement action against
Ericsson GE Mobile Communications, Inc. ("Ericsson GE"), AND ITS Swedish
parent, Telefonaktiebolaget LM Ericsson ("LM Ericsson"), in the United
States District Court for the Eastern District of Virginia (Civil Action
No. 93-1158-A (E.D.Va)); by amendment on September 13, 1993, ITC added
as a defendant Ericsson Radio Systems, Inc. ("Ericsson Radio").  The
Ericsson action seeks a jury's determination that in making, selling, or
using and/or in participating in the making, selling or using of
digital wireless telephone systems and/or related mobile stations,
Ericsson has infringed, contributed to the infringement of and/or
induced the infringement of eight patents from ITC's patent portfolio.
The Ericsson action also seeks preliminary and permanent injunctions
against Ericsson from further infringement and seeks damages,
royalties, costs and attorneys' fees.  On September 22, 1993, Ericsson
Radio and Ericsson GE filed a motion to transfer ITC's action to the
United States District Court for the Northern District of Texas.  On
September 22, 1993, LM Ericsson Radio filed a motion to dismiss the
complaint against them for lack of personal jurisdiction.  Also, on
September 30, 1993, Ericsson GE filed an answer in which it denied the
allegations of the complaint and asserted a counterclaim seeking a
declaratory judgment that the asserted patents are either invalid or not
infringed.  On the same day that ITC's filed the Ericsson action, two of
the Ericsson Defendants, Ericsson Radio and Ericsson GE, filed a lawsuit
against the Company and ITC in the United States District Court for the
Northern District of Texas (Civil Action No. 3-93CVI809-H (N.D.Tx.))
(the "Texas action").  The Texas action, which involves the same patents
that are the subject to the Ericsson action, seeks the court's
declaration that Ericsson's products do not infringe ITC's patents, that
ITC's patents are invalid and that ITC's patents are unenforceable.  The
Texas action also seeks judgment against the Company and ITC for
tortious interference with contractual and business relations,

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

defamation and commercial disparagement, and Lanham Act violations. The
Company and ITC intend to vigorously defend the Texas action. October
8, 1993, the District Court for the Eastern District of Virginia granted
the motion to transfer that was filed by Ericsson Radio and Ericsson GE.
Both Ericsson actions have been consolidated and are scheduled to go
forward in the United States Federal District Court for the Northern
District of Texas. As a result of the transfer, Ericsson Radio has
withdrawn its motion to dismiss for lack of personal jurisdiction. ITC
agreed to dismissal without prejudice of LM Ericsson. On July 1, 1994,
ITC filed a motion to transfer the Texas action to the United States
District Court for the District of Delaware. On October 4, 1994, this
motion was denied.

On October 8, 1993, Motorola, Inc. filed an action against ITC in the
United States District Court for the District of Delaware (Civil Action
No. CA-93-488 (D.Del)) (the "Delaware action"). The Delaware action
seeks the court's declaration that Motorola's products do not infringe
six of ITC's patents and that these six patents are invalid and
unenforceable. On October 12, 1993, ITC filed a patent infringement
suit against Motorola in the United States District Court for the
Eastern District of Pennsylvania (Civil Action No. 93-CV-5430 (E.D.Pa)).
The complaint, as amended on November 18, 1993, seeks a jury's
determination that in making, selling, or using and/or in participating
in the making, selling or using of digital wireless telephone systems
and/or related mobile stations, Motorola has infringed, contributed to
the infringement of and/or induced the infringement of eight different
patents from ITC's patent portfolio. The complaint also seeks
preliminary and permanent injunctions against Motorola from further
infringement and seeks damages, royalties, costs and attorneys' fees.
ITC filed an answer and counterclaims asserting infringement of the six
patents in the Delaware action and filed a motion to transfer the
Delaware action to the United States District Court in the Eastern
District of Pennsylvania.

23

Motorola filed a motion to dismiss or transfer ITC's Pennsylvania patent
infringement case against it to Delaware. On January 11, 1994, the
District Court in the Eastern District of Pennsylvania granted
Motorola's transfer motion. As a result, ITC withdrew its transfer
motion and the two Motorola cases have been consolidated for trial in
Delaware (Civil Action No. 94-83 (D.Del) presently scheduled for
February 1995. By stipulation of the parties, the case is limited to
certain TDMA products made, used and/or sold by Motorola.

On July 19, 1993, Qualcomm filed a lawsuit against the Company (Civil
Action No. 93-1081H (LSP) (the "July Complaint") in the United States
District Court for the Southern District of California, seeking
unspecified damages and injunctive relief to enforce U.S. Patent No.
4,901,307 (the "Qualcomm Patent"). Qualcomm alleged, among other
things, that B-CMDA digital wireless telephones, systems and/or
equipment made, used, licensed, sold and/or tested by or on behalf of

the Company embody the invention claimed in the Qualcomm Patent.  On May
12, 1994, the District Court for the Southern District of California
issued an order to transfer this lawsuit to the United States District
Court for the Eastern District of Pennsylvania.  On July 26, 1994,
Qualcomm filed a motion to amend its complaint to include allegations
that certain of ITC's CDMA patents, including two patents which are
alleged to be infringed by Qualcomm, were based on Qualcomm proprietary
information that was alleged to be wrongfully in the Company's
possession.  Qualcomm sought to add ITC as an additional party in
connection with such additional claims.  In the proposed amended
complaint, Qualcomm sought, among other things, injunctive relief with
respect to certain of ITC's CDMA patents and IDC's B-CDMA products, an
assignment to Qualcomm to such CDMA patents, an accounting for lost
profits, and unspecified monetary, including punitive, damages.  On
October 5, 1994, the court denied this motion.

On November 2, 1994, Qualcomm and IDC terminated this lawsuit by
entering into a Stipulation of Dismissal with Prejudice.  This was part
of a settlement of the two lawsuits involving Qualcomm, IDC, IPC and
ITC.  The terms of the Patent License Agreements with which the parties
settled the lawsuit are discussed more fully at Part I, Item 1, Note 12
of the Notes to Consolidated Financial Statements.

On November 7, 1994, a purported class action complaint has been filed
in the United States District Court for the Eastern District of
Pennsylvania (Civil Action No. 94-CV-6751) against the Company and its
chief executive officer alleging certain violations of the disclosure
requirements of the federal securities laws and seeking damages on
behalf of shareholders who purchased IDC's stock during the class period
stated to be March 31, 1994 to August 4, 1994.  The Company believes
that the complaint is without merit and intends to contest it
vigorously.

In additional to litigation associated with patent enforcement and
licensing activities and the HNS litigation described above, the Company
is a party to certain legal actions arising in the ordinary course of
its business.  Based upon information presently available to the
Company, the Company believes that the ultimate of these actions would
not materially affect the Company.

24

ITEM 6.  EXHIBITS AND REPORTS ON FORM 8-K

(a) The following is a list of exhibits filed as part of the Form 10-Q.

None.

(b) Reports on Form 8-K

Subsequent to the quarter ended September 30, 1994, the Company filed a

EDGARPlus(TM) FORM-TYPE: 10-Q FILING-DATE: November 16, 1994

Current Report on Form 8–K which was dated September 26, 1994 and related to the Sale of the Haviland Telephone Company operations.  Pro forma financial statements were filed this report.

25

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INTERDIGITAL COMMUNICATIONS CORPORATION

/s/ DONALD L. SCHILLING
PRESIDENT
CHIEF EXECUTIVE OFFICER

NOVEMBER 11, 1994

/s/ JAMES W. GARRISON
CHIEF ACCOUNTING OFFICER

NOVEMBER 11, 1994

**DCN:** 01104939

**LOAD–DATE:** December 17, 1997

# EXHIBIT B

*ORIGINAL*   C/S

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**F I L E D**

MAY - 3 1999

NANCY DOHERTY, CLERK
BY _____
                     Deputy

ERICSSON RADIO SYSTEMS, INC., §
et al., §
 §
 §
Plaintiffs, §
 §
VS. §
 §
INTERDIGITAL COMMUNICATIONS §
CORPORATION, et al., §
 §
 §
Defendants. §

CIVIL ACTION NO. 3-93CV1809-H
(Consolidated with
 Civil Action No. 3:93CV2119-H)

ENTERED ON DOCKET

MAY - 3 1999

U.S. DISTRICT CLERK'S OFFICE

**AGREED ORDER OF DISMISSAL
OF CERTAIN CLAIMS WITH PREJUDICE**

**TO THE HONORABLE U.S. DISTRICT COURT JUDGE:**

Plaintiffs, Ericsson Radio Systems Inc. and Ericsson GE Mobile Communications Inc.,
now combined and reorganized as Ericsson Inc. ("Ericsson"), and Defendants, InterDigital
Communications Corporation, InterDigital Technology Corporation and InterDigital Patents
Corporation (collectively, "InterDigital"), hereby file this Agreed Order of Dismissal of Certain
Claims with Prejudice.

On March 30, 1999, at a conference and a hearing scheduled by the Court on the Partial
Motion for Summary Judgment filed by Ericsson, the parties agreed that InterDigital would
dismiss with prejudice any and all claims from U.S. Patent No. 4,675,863; U.S. Patent No.
4,779,262; U.S. Patent No. 4,785,450 (the "'450 Patent"); U.S. Patent No. 4,811,420 (the "'420
Patent"); U.S. Patent No. 4,817,089 (the "'089 Patent"); U.S. Patent No. 4,912,705 (the "'705
Patent"); U.S. Patent No. 5,022,024; U.S. Patent No. 5,119,375; U.S. Patent No. 5,121,391;
U.S. Patent No. 5,657,358 (the "'358 Patent"); and U.S. Patent No. 5,687,194 (the "'194
Patent") (collectively, the "Asserted Patents"); except for claim 1 of the '450 Patent; claim 3 of the

**AGREED ORDER OF DISMISSAL OF
CERTAIN CLAIMS WITH PREJUDICE - Page 1**


286

'420 Patent; claims 8 and 11 of the '089 Patent; claim 1 of the '705 Patent; claims 9 and 11 of the '358 Patent; and claims 1, 2, 4 and 7 of the '194 Patent (collectively, the "Asserted Claims").

Accordingly, Ericsson and InterDigital hereby agree, and request the Court to enter this order, as follows:

1.    InterDigital hereby dismisses with prejudice any cause of action for patent infringement against Ericsson based on any and all claims of the Asserted Patents other than the Asserted Claims (the "Dismissed Claims"). InterDigital, however, reserves the right to substitute for claim 8 of the '089 Patent another claim of the '089 Patent, whether in independent or dependent form, which is allowed after reexamination and which includes all of the limitations of claim 8 of the '089 Patent together with additional limitations.

2.    Ericsson hereby dismisses with prejudice its declaratory judgment action with respect to all Dismissed Claims.

SO ORDERED.

DATED:    _MAY 1st_, 1999.

_____
BAREFOOT SANDERS, Senior Judge
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**AGREED ORDER OF DISMISSAL OF
CERTAIN CLAIMS WITH PREJUDICE - Page 2**

AGREED TO AND ACCEPTED BY:

_Robert Samra_

Mike McKool, Jr.
State Bar No. 13732100
Kevin C. Nash
State Bar No. 14811100
**McKOOL SMITH**
300 Crescent Court, Suite 1500
Dallas, Texas  76201
Telephone:   (214) 978-4000
Facsimile:    (214) 978-4044


Robert A. Samra
State Bar No. 17566000
**SAMRA & ASSOCIATES**
750 N. St. Paul Street, Suite 520
Dallas, Texas 75201
Telephone:   (214) 965-9500
Facsimile:    (214) 965-9550



Thomas L. Crisman
State Bar No. 05080000
Jerry R. Selinger
State Bar No. 18008258
Susan E. Powley
State Bar No. 00784785
**JENKENS & GILCHRIST, P.C.**
1445 Ross Avenue, Suite 3200
Dallas, Texas 75202-2799
Telephone:   (214) 855-4785
Facsimile:    (214) 855-4300

ATTORNEYS FOR PLAINTIFFS

D. Dudley Oldham
State Bar No. 15248000
Robert S. Harrell
State Bar No. 09041350
Linda L. Addison
State Bar No. 00903700
**FULBRIGHT & JAWORSKI, LLP**
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:   (713) 651-5151
Facsimile:    (713) 651-5246

Dan Davison
State Bar No. 05590900
**FULBRIGHT & JAWORSKI, LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone:   (214) 855-8000
Facsimile:    (214) 855-8200

ATTORNEYS FOR DEFENDANTS

**AGREED ORDER OF DISMISSAL OF
CERTAIN CLAIMS WITH PREJUDICE - Page  3**