# EXHIBIT G

10-K 1 d10k.htm INTERDIGITAL COMMUNICATIONS CORP

**Table of Contents**

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

---

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2004

OR

☒ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2004 transition period from _____ to _____

Commission File Number 1-11152

---

# INTERDIGITAL COMMUNICATIONS CORPORATION
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Pennsylvania**<br>(State or other jurisdiction of incorporation or organization) | **23-1882087**<br>(I.R.S. Employer Identification No.) |
| **781 Third Avenue**<br>**King of Prussia, Pennsylvania**<br>(Address of principal executive offices) | **19406-1409**<br>(Zip Code) |
| **Registrant's telephone number including area code:** | **(610) 878-7800** |

---

| | |
|---|---|
| Securities registered pursuant to Section 12(b) of the Act: | **None** |
| Securities registered pursuant to Section 12(g) of the Act: | **Common Stock (Par Value $0.01 Per Share)**<br>**Series B Junior Participating Preferred Stock Rights** |

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this

chapter) is not herein contained, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).   Yes ☒   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter: $1,035,966,054 as of June 30, 2004.

The number of shares outstanding of the registrant's Common Stock was 54,894,180 as of March 16, 2005.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Definitive Proxy Statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A in connection with the registrant's 2005 Annual Meeting of Shareholders, to be filed subsequent to the date hereof, are incorporated by reference into Part III, Items 10, 11, 12, and 14 of this Annual Report. Such Definitive Proxy Statement will be filed not later than 120 days after the conclusion of the registrant's fiscal year ended December 31, 2004.

**Table of Contents**

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| **PART I** | | | |
| | ITEM 1. | BUSINESS | 1 |
| | | General | 1 |
| | | Wireless Communications Industry Overview | 3 |
| | | Evolution of Wireless Standards | 4 |
| | | Strategy | 5 |
| | | InterDigital's Technology Position | 6 |
| | | Business Activities | 8 |
| | | Competition | 15 |
| | | Employees | 16 |
| | | Executive Officers | 16 |
| | | Risk Factors | 18 |
| | ITEM 2. | PROPERTIES | 22 |
| | ITEM 3. | LEGAL PROCEEDINGS | 22 |
| | | Nokia | 22 |
| | | Samsung | 23 |
| | | Lucent | 24 |
| | | Federal | 24 |
| | | Other | 24 |
| | ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 25 |
| **PART II** | | | |
| | ITEM 5. | MARKET FOR COMPANY'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 26 |
| | ITEM 6. | SELECTED FINANCIAL DATA | 26 |
| | ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 27 |
| | ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 41 |
| | ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 42 |
| | ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 68 |
| | ITEM 9A. | CONTROLS AND PROCEDURES | 68 |
| | ITEM 9B. | OTHER INFORMATION | 69 |
| **PART III** | | | |
| | ITEM 10. | DIRECTORS AND EXECUTIVE OFFICERS OF INTERDIGITAL | 69 |
| | ITEM 11. | EXECUTIVE COMPENSATION | 69 |
| | ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 69 |
| | ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 69 |
| | ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 69 |
| **PART IV** | | | |
| | ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 70 |
| | | **SIGNATURES** | 75 |
| | | **EXHIBIT 10.55** | |
| | | **EXHIBIT 10.64** | |
| | | **EXHIBIT 10.65** | |
| | | **EXHIBIT 10.66** | |
| | | **EXHIBIT 21** | |
| | | **EXHIBIT 23.1** | |
| | | **EXHIBIT 31.1** | |
| | | **EXHIBIT 31.2** | |
| | | **EXHIBIT 32.1** | |
| | | **EXHIBIT 32.2** | |

InterDigital®, AIM™, AIM Antenna™, and AIM Performware™ are trademarks of InterDigital Communications Corporation. All other trademarks, service marks and/or trade names appearing in this Form 10-K are the property of their respective holders.

i

Table of Contents

## GLOSSARY OF TERMS

**2G**

"Second Generation." A generic term usually used in reference to voice-oriented digital wireless products, primarily mobile handsets that provide basic voice services.

**2.5G**

A generic term usually used in reference to fully integrated voice and data digital wireless devices offering higher data rate services and features compared to 2G and enhanced Internet access.

**3G**

"Third Generation." A generic term usually used in reference to the next generation of digital mobile devices and networks, which provide high speed data communications capability along with voice services.

**3.5G**

A generic term usually used in reference to fully integrated voice and data digital wireless devices offering higher data rate services and features when compared to 3G.

**802.11**

An IEEE standard for wireless LAN interoperability. Letter appendages identify various amendments to the standard which denote different features and capabilities.

**Adaptive Interference Management (AIM™)**

Intelligent software that monitors the RF environment and adapts operating parameters (such as antenna beam direction, power and frequency) of wireless devices to reduce the degrading effects of RF interference. AIM™ is a trademark of InterDigital Communications Corporation.

**Air Interface**

The wireless interface between a terminal unit and the base station or between wireless devices in a communication system.

**ANSI**

"American National Standards Institute." The United States national standards accreditation and policy agency. ANSI monitors and provides oversight of all accredited U.S. Standards Development Organizations to insure they follow an open public process.

**ASIC**

"Application Specific Integrated Circuit." A computer chip developed for a specific purpose, and frequently designed using a mircoprocessor core and integrating other functions unique to the application in which the chip will be used. Many SOC designs are ASICs.

**Bandwidth**

A range of frequencies that can carry a signal on a transmission medium, measured in Hertz and computed by subtracting the lower frequency limit from the upper frequency limit.

**Base Station**

The central radio transmitter/receiver, or group of central radio transmitters/receivers, that maintains communications with subscriber equipment sets within a given range (typically, a cell site).

**CDMA**

"Code Division Multiple Access." A method of digital spread spectrum technology wireless transmission that allows a large number of users to share access to a single radio channel by assigning unique code sequences to each user.

**cdmaOne**

A wireless cellular system application based on 2G narrowband CDMA technologies (e.g., TIA/EIA-95).

cdma2000

A standard which evolved from narrowband CDMA technologies (i.e., TIA/EIA-95 and cdmaOne). The CDMA family includes, without limitation, CDMA2000 1x, CDMA 1xEV-DO, CDMA2000 1xEV-DV and CDMA2000 3x. Although CDMA2000 1x is included under the IMT-2000 family of 3G standards, its functionality is similar to 2.5G technologies. CDMA2000® and cdma2000® are registered trademarks of the Telecommunications Industry Association (TIA – USA).

Chip

An electronic circuit that consists of many individual circuit elements integrated onto a single substrate.

Chip Rate

The rate at which information signal bits are transmitted as a sequence of chips. The chip rate is usually several times the information bit rate.

Circuit

The connection of channels, conductors and equipment between two given points through which an electric current may be established.

Digital

Information transmission where the data is represented in discrete numerical form.

Duplex

A characteristic of data transmission; either full duplex or half duplex. Full duplex permits simultaneous transmission in both directions of a communications channel. Half duplex means only one transmission at a time.

ii

**Table of Contents**

EDGE

"Enhanced Data rates for GSM Evolution." Technology designed to deliver data at rates up to 473.6 kbps, triple the data rate of GSM wireless services, and built on the existing GSM standard and core network infrastructure. EDGE systems built in Europe are considered a 2.5G technology.

FDD

"Frequency Division Duplex." A duplex operation using a pair of frequencies, one for transmission and one for reception.

FDMA

"Frequency Division Multiple Access." A technique in which the available transmission of bandwidth of a channel is divided by frequencies into narrower bands over fixed time intervals resulting in more efficient voice or data transmissions over a single channel.

Frequency

The rate at which an electrical current or signal alternates, usually measured in Hertz.

GHz

"Gigahertz." One gigahertz is equal to one billion cycles per second.

GPRS

"General Packet Radio Systems." A packet-based wireless communications service that enables high-speed wireless Internet and other data communications via GSM networks.

GSM

"Global System for Mobile Communications." A digital cellular standard, based on TDMA technology, specifically developed to provide system compatibility across country boundaries.

Hertz

The unit of measuring radio frequency (one cycle per second).

HSUPA

"High Speed Uplink Packet Access." An enhancement to WCDMA technology that improves the performance of the radio uplink to increase capacity and throughput, and to reduce delay.

HSDPA

"High Speed Downlink Packet Access." An enhancement to WCDMA technology optimized for high speed packet-switched data and high-capacity circuit switched capabilities. A 3G technology enhancement.

IEEE

"Institute of Electrical and Electronic Engineers." A membership organization of engineers that among its activities, produces data communications standards.

IEEE 802

A standards body within the IEEE that specifies communications protocols for both wired and wireless local area and wide area networks.

IC

"Integrated Circuit." A multifunction circuit formed in or around a semiconductor base.

Internet

A network comprised of more than 100,000 interconnected commercial, academic and governmental networks in over 100 countries.

ISO

"International Standards Organization." An international organization, which sets international electrical and electronics

Interdigital Communications Corp

standards. The U.S. member body is ANSI.

**ITU**

"International Telecommunication Union." An international organization established by the United Nations with membership from virtually every government in the world. Publishes recommendations for engineers, designers, OEMs, and service providers through its three main activities: defining and adoption of telecommunications standards; regulating the use of the radio frequency spectrum; and furthering telecommunications development globally.

**ITC**

"InterDigital Technology Corporation," one of our wholly-owned Delaware subsidiaries.

**Kbps**

"Kilobits per Second." A measure of information-carrying capacity (i.e., the data transfer rate) of a circuit, in thousands of bits.

**Km**

Kilometer.

**LAN**

"Local Area Network." A private data communications network linking a variety of data devices located in the same geographical area and which share files, programs and various devices.

iii

**Table of Contents**

Layer 1

"L1." The OSI Reference Model communications protocol that governs the hardware connections and byte stream-encoding/decoding for transmission. It is called the physical layer and is the only layer that makes a physical transfer of information between network nodes.

Layer 2/3

"L2/3." The OSI Reference Model Communications protocol that contains the physical address of a client or server station, also known as the data-link layer or MAC layer.

MAN

"Metropolitan Area Network." A communication network which covers a geographic area such as a city or suburb.

Mbps

"Megabits per Second." A measure of information – carrying capacity of a circuit; millions of bits per second.

Modem

A combination of the words modulator and demodulator, referring to a device that modifies a signal (such as sound or digital data) to allow it to be carried over a medium such as wire or radio.

Multiple Access

A methodology (e.g., FDMA, TDMA, CDMA) by which multiple users share access to a transmission channel. Most modern systems accomplish this through "demand assignment" where the specific parameter (frequency, time slot, or code) is automatically assigned when a subscriber requires it.

NTDD

Narrowband, low chip rate CDMA TDD, one form of which is commonly known as TD-SCDMA.

ODM

"Original Design Manufacturer." Independent contractors, primarily based in Taiwan, that develop and manufacture equipment on behalf of another company using another company's brand name on the product.

OEM

"Original Equipment Manufacturer." A manufacturer of equipment (e.g., base stations, terminals) that sells to operators.

OSI Reference Model

A seven layer network architecture model developed by ISO and ITU. Each layer specifies particular network functions.

Outer Loop Power Control

Outer Loop Power Control is a process used to maintain the required quality of communication for a given service, such as voice, data or video, while using minimal radio transmission power.

PDC

"Personal Digital Cellular." The standard developed in Japan for TDMA digital cellular mobile radio communications systems.

PHS

"Personal Handyphone System." A digital cordless telephone system and digital network based on TDMA. This low-mobility microcell standard was developed in Japan. Commonly known as PAS in China.

Platform

A combination of hardware and software blocks implementing a complete set of functionalities that can be optimized to create an end product.

Protocol

A formal set of conventions governing the format and control of interaction among communicating functional units.

RF

"Radio Frequency." The range of electomagnetic frequencies above the audio range and below visible light.

Smart Antenna

Antennas utilizing multiple elements with signal processing capabilities which enhance desired or reduce undesired transmission to or from wireless products.

iv

**Table of Contents**

SOC

"System-on-a-chip." The embodiment on a single silicon chip of the essential components that comprise the operational core of a digital system.

Standards

Specifications that reflect agreements on products, practices, or operations by nationally or internationally accredited industrial and professional associations or governmental bodies in order to allow for interoperability.

TDD

"Time Division Duplexing." A duplex operation using a single frequency, divided by time, for transmission and reception.

TDMA

"Time Division Multiple Access." A method of digital wireless transmission that allows a multiplicity of users to share access (in a time ordered sequence) to a single channel without interference by assigning unique time segments to each user within the channel.

TD-SCDMA

"Time Division Synchronous CDMA." A form of TDD utilizing a low Chip Rate.

Terminal

Equipment at the end of a communications path. Often referred to as an end-user device or handset. Terminal units include mobile phone handsets, personal digital assistants, computer laptops and telephones.

TIA/EIA-54

The original TDMA digital cellular standard in the United States. Implemented in 1992 and then upgraded to the TIA/EIA-136 digital standard in 1996.

TIA/EIA-95

A 2G CDMA standard.

TIA/EIA-136

A United States standard for digital TDMA technology.

TIA (USA)

The Telecommunications Industry Association.

UWC-136

An evolved form of the U.S. TIA/EIA-136 digital cellular TDMA standard based on EDGE. Included within the IMT-2000 family of 3G standards.

WAN

"Wide Area Network." A data network that extends a LAN outside of its coverage area, via telephone common carrier lines, to link to other LANs.

WCDMA

"Wideband Code Division Multiple Access" or "Wideband CDMA." The next generation of CDMA technology optimized for high speed packet-switched data and high-capacity circuit switched capabilities. A 3G technology.

Wideband

A communications channel with a user data rate higher than a voice-grade channel; usually 64kpbs to 2mbps.

Wireless

Radio-based systems that allow transmission of information without a physical connection, such as copper wire or optical fiber.

v

**Table of Contents**

Wireless LAN (WLAN)

"Wireless Local Area Network." A collection of devices (computers, networks, portables, mobile equipment, etc.) linked wirelessly over a limited local area.

WTDD

"Wideband TDD" or "Wideband Time Division Duplex." A form of TDD utilizing a high Chip Rate.

vi

Interdigital Communications Corp

Table of Contents

In this document, the words "we," "our," "ours," "us," "the Company," and "InterDigital" refer only to InterDigital Communications Corporation collectively with its subsidiaries.

# PART I

## Item 1. BUSINESS

### *General*

We design and develop advanced wireless technology solutions, which we make available for license or sale to semiconductor companies and equipment producers. Our advanced technology solutions are comprised of inventions, know-how and other technical data (e.g., software, designs and specifications) related to the design and operation of digital wireless products and systems. We patent many of our inventions and license those inventions to wireless communications equipment producers and/or related suppliers. In addition, we offer for sale or license, on a non-exclusive basis, various portions of our technology (e.g., reference designs, algorithms, know-how and software) to producers of wireless equipment products and components. Our advanced technology solutions have been developed independently, in conjunction with equipment manufacturers and through strategic acquisitions. We also actively participate in the standard setting process for wireless technologies, contributing solutions that are incorporated from time-to-time into the standards.

We currently generate revenues and cash flow primarily through royalties from the licensing of our patent portfolio. We also expect to generate revenues and cash flow from licensing of other technology product solutions (e.g., FDD terminal unit protocol stack software, smart antenna solutions, physical layer chipset designs, etc.) and the provision of specialized engineering services.

As an early participant in the digital wireless market, we developed pioneering solutions for both of the main air interface technologies in use in today's cellular systems, namely: TDMA and CDMA technologies. Our significant worldwide portfolio of patents and patent applications in wireless communications has been driven by our high level of early and fundamental invention in digital wireless technologies. A number of our patented inventions are essential to the implementation of 2G, 2.5G and 3G wireless products, and we have been licensing those and other inventions to numerous wireless communications manufacturers in conjunction with their manufacture, and sale of 2G, 2.5G or 3G products. As a result of our participation in the Standards, we have filed declarations that make our essential inventions available for use and we will license on fair, reasonable and non-discriminatory or similar terms consistent with the requirements of the individual Standards organizations. In addition, we have been developing various technology solutions for use in wireless LAN/MAN standards being developed by the IEEE (Institute of Electrical and Electric Engineering) 802 LAN/MAN standards committee. The products incorporating our inventions include but are not limited to:

- Mobile phones and personal digital assistants
- Other wireless devices (e.g., laptops, PC cards, USB sticks)
- Base stations and other infrastructure equipment
- Modules and components for wireless devices

We also incorporate our inventions into our own product solutions. We develop advanced technology platforms (including reference designs, know-how and software) that provide highly efficient solutions for the wireless market. We offer technology and product solutions for mainstream wireless applications that deliver time-to-market, performance and cost advantages, as well as product differentiation advantages to our customers. Most of our principal solutions are implemented in a proprietary manner to conform to applicable standards, although there are currently no standards requiring conformance by or use of our Adaptive Interference Management solutions.

We invest heavily in the development of advanced wireless technology and related products by building and sustaining a highly specialized engineering team. Over each of the last three years, our cost of development has represented approximately one-half of our total operating expenses. The largest portion of our cost of development has been personnel costs. As of December 31, 2004, we employed 209 engineers, of whom 58% hold masters degrees and an additional 17% hold PhDs. Our technology development programs broaden and deepen our extensive patent portfolio through inventing activities necessary to create new, higher performance, leading-edge technologies, and expand our body of technical know-how related to standards-based wireless technologies and systems, and have enabled us to bring product to market. We are developing technologies that may be utilized to extend the life of the current generation of products, and that may be applicable to multiple generational standards such as 2G, 2.5G and 3G as well as IEEE 802 wireless standards, and that may have applicability across multiple air interfaces.

Interdigital Communications Corp                                                  Page 15 of 134

We incorporated in 1972 under the laws of the Commonwealth of Pennsylvania. We conducted our initial public offering in November 1981. Our corporate headquarters and administrative offices are located in King of Prussia, Pennsylvania, USA. Our research and technology and product development teams are located in the following locations: King of Prussia, Pennsylvania, USA; Melville, New York, USA; Melbourne, Florida, USA; and Montreal, Quebec, Canada.

1

**Table of Contents**

Our Internet address is *www.interdigital.com*. There, in the "Investing" section, we make available, free of charge, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, other reports required to be filed under the Securities Exchange Act of 1934, and all amendments to those reports as soon as reasonably practicable after such material is filed with the United States Securities and Exchange Commission (SEC). The information contained on or connected to our website is not incorporated by reference into this Form 10-K. Reference to our website address does not constitute incorporation by reference of the information contained on the website.

2

Table of Contents

### *Wireless Communications Industry Overview*

Participants in the wireless communications industry include original equipment manufacturers (OEMs), semiconductor manufacturers, original design manufacturers (ODMs), a variety of technology suppliers, applications developers, and operators that deliver communications products and services to consumers and businesses. In order to achieve economies of scale and allow for interoperability across geographic regions, many market participants develop and produce standards-based solutions for digital wireless equipment. In the early stages of deployment, the cellular market originally focused on delivering voice-oriented services. Over the past three years, the industry has begun a transition from digital voice-oriented wireless products and services (commonly referred to as Second Generation or 2G), to more fully integrated digital voice and data services offering higher data rates and enhanced Internet access (in its most robust form commonly referred to as 3G). Concurrently, non-cellular wireless technologies such as IEEE 802.11, have emerged as a means to provide wireless Internet access for fixed and nomadic use.

Over the course of the last ten years, the cellular communications industry has experienced rapid growth worldwide. Total worldwide cellular wireless communications subscribers rose from slightly more than 200 million at the end of 1997 to 1.7 billion at the end of 2004. In several countries, mobile telephones now outnumber fixed-line telephones. Market analysts expect that the aggregate number of global wireless subscribers could reach 3 billion in 2009.



**Global Cellular Handset Sales by Technology**

| | 2001 | 2002 | 2003 | 2004* | 2005* |
|---|---|---|---|---|---|
| ⊠ GSM (GPRS/EDGE/WCDMA) | 255.84 | 279.39 | 347.53 | 484.70 | 534.30 |
| ■ TDMA | 41.50 | 41.84 | 33.66 | 17.10 | 6.50 |
| ⊠ CDMA (cdma2000 1x, EV-DO) | 62.81 | 75.76 | 101.71 | 136.74 | 159.40 |
| ☑ Other | 48.41 | 38.65 | 42.77 | 41.90 | 31.70 |

\* 2004 and 2005 data represents projections of handset sales.

Source: Strategy Analytics, Inc. – March 2005.

The growth in new cellular subscribers combined with customers who are replacing their mobile phones helped fuel the growth of mobile phone sales from approximately 115 million units in 1997 to approximately 680 million units in 2004. We believe the combination of a broad subscriber base, continued technological change, and the ever growing dependence on the Internet, e-mail and other digital media sets the stage for growth in the sales of wireless products and services through the balance of this decade. While 2.5G services have been widely deployed as an initial enabler of robust data services, a number of service providers have deployed 3G equipment to further enable enhanced data services.

NTT DoCoMo, the largest wireless operator in Japan, launched a WCDMA 3G network in Japan in October 2001. This service now has over 10.5 million subscribers. 3G services have also been launched by Hutchison, Vodafone, Orange and TIM Italy. The deployment, pace and growth of the 3G market will depend upon the ability of the manufacturers to offer and deliver fully-functional equipment, including mobile phones, at affordable prices and the introduction and uptake of new services designed to use the enhanced data capability. Major manufacturers brought 3G mobile phones to market during 2004. Approximately 16 million WCDMA enabled phones were sold in 2004, and analysts have forecast shipments of 30 to 40 million WCDMA-enabled mobile phones in 2005. Shipments of cdma2000 First Evolution (1x EV) phones reached almost 13 million units in 2004 and are expected to reach approximately 30 million units in 2005.

Interdigital Communications Corp                                    Page 18 of 134

   In addition to the advances in cellular technologies, additional wireless technologies to provide data and other communications have emerged. In particular, IEEE 802.11 WLAN has gained momentum in recent years as a wireless broadband solution in the home, office and in public areas. IEEE 802.11 technology offers high-speed data connectivity through unlicensed spectrum within a relatively modest operating range. From initial semiconductor shipments of products built to the IEEE 802.11 standard in 1998, sales have nearly doubled every year since introduction. While relatively small compared to the cellular market (80 million IEEE 802.11 wireless ICs shipped in 2004), the affordability and attractiveness of the technology has helped fuel rapid market growth. In addition, the IEEE wireless standards bodies are creating sets of standards to enable higher data rates, provide coverage over longer distances and enable roaming.

3

<u>**Table of Contents**</u>

<u>*Evolution of Wireless Standards*</u>

Wireless communications standards are formal guidelines for engineers, designers, manufacturers and service providers, that regulate and define the use of the licensed radio frequency spectrum in conjunction with providing specifications for wireless communications products. A primary goal of the standards is to assure inter-operability of products from multiple OEM companies across any given standard. A number of international and regional wireless Standards Development Organizations (SDOs), including the International Telecommunications Union (ITU), the European Telecommunications Standards Institute (ETSI), the Telecommunications Industry Association (TIA), the Alliance for Telecommunications Industry Solutions (ATIS), and the American National Standards Institute (ANSI), have responsibility for the development and administration of wireless communications standards. New standards are typically adopted with each new generation of products, are typically compatible with previous generations of the standards and are defined to ensure interoperability with other standards.

These SDOs ask participating companies to formally declare whether they believe they hold patents essential to a particular standard and whether they are willing to license those patents on either a royalty-bearing basis on fair, reasonable and nondiscriminatory terms or on a royalty-free basis. "Essential" patents include claims relating to those inventions that must be used in equipment which operates in conformance with a standard. To manufacture, have made, sell, offer to sell, or use such products on a non-infringing basis, a manufacturer or other entity doing so must first obtain a license from the holder of those essential patent rights. The SDOs do not have enforcement authority against entities that fail to obtain required licenses, nor the ability to protect the intellectual property rights of holders of essential patents.

The principal standardized digital cellular wireless products in use today are based on TDMA and CDMA technologies. The standardized TDMA technologies include GSM, TIA/EIA 54/136 (commonly known as AMPS-D, United States-based TDMA), PDC, PHS, DECT and TETRA standards. Of the TDMA technologies, GSM is the most prevalent, having been deployed in Europe, Asia, Africa, the Middle East, parts of the Americas and other regions. Due to its strong dominance in Europe and pervasive use elsewhere in the world, GSM permits, with very limited exceptions, inter-country roaming for its customers. Approximately 70% of handset sales for 2004 conformed to GSM standards. TIA/EIA 54/136 technology has been deployed primarily in North, Central and South America. PDC technology has been deployed in Japan while PHS technologies are deployed primarily in Japan, the People's Republic of China (under the name PAS) and Taiwan. DECT is a digital cordless telephone standard that operates primarily in Europe. TETRA is an open digital trunked radio standard widely deployed in Europe to meet the needs of professional mobile radio users such as railways and utilities. Collectively, the remaining non-GSM TDMA-based technologies accounted for approximately 6% of worldwide handset sales in 2004.

Deployment of standardized TDMA-based 2.5G systems (such as GPRS and EDGE) accelerated in 2004. 2.5G systems provide higher data rate services based on packet-data technology and, depending upon the generation of installed infrastructure, can be implemented without substantial additional infrastructure investment. However, 2.5G systems utilizing existing radio spectrum may face capacity constraints as data-rich applications become more widely used. Of the GSM handsets sold in 2004, approximately half contained 2.5G functionality.

Narrowband CDMA-based technologies, include TIA/EIA-95 (more commonly known as cdmaOne) and cdma2000 technologies and serve parts of the United States, Japan, South Korea and several other countries. In 2004, approximately 20% of worldwide handset sales were based on these CDMA technologies.

Deployment of 3G services is expected to allow operators to take advantage of additional radio spectrum allocations and, through the use of even higher speeds than 2.5G, deliver additional voice and data-rich applications to their customers. In 2004, approximately 3% of worldwide handset sales were based on WCDMA technologies. The remaining handset sales in 2004 used analog and other technologies.

In late 1999, the ITU established a set of recommendations for IMT-2000, the internationally accepted umbrella standard for various 3G technologies. IMT-2000 defined five sets of alternative specifications, which can be selected or aggregated by equipment manufacturers to produce standards-compliant 3G wireless products for their customers. The five specifications under the 3G standard include the following forms of CDMA technology: CDMA FDD, CDMA TDD, and Multichannel CDMA (cdma2000 technology). There are two forms of CDMA TDD in the specifications: WTDD (also referred to as High Chip Rate – HCR) and NTDD (also referred to as Low Chip Rate – LCR—or TD-SCDMA). WTDD and CDMA FDD combined are commonly referred to as Wideband CDMA (WCDMA) or UMTS. The IMT-2000 umbrella 3G standard also includes two forms of TDMA technology: UWC-136 and a form of DECT.

Depending upon their individual business plans, operators with existing GSM systems are deploying either GPRS-EDGE or WCDMA systems. Analysts expect that GSM operators will migrate to WCDMA. Operators that originally

deployed TIA/EIA-95-based systems are generally expected to deploy cdma2000 systems. Operators that originally deployed TIA/EIA-136 systems are deploying either UWC-136 or WCDMA systems. Analysts expect that TIA/EIA-136 operators will migrate to WCDMA. TD-SCDMA is being developed for potential deployment in the People's Republic of China and for possible export outside of China. The chart below shows the technology evolution from 2G to 2.5G to 3G to 3.5G:



4

Table of Contents

The capabilities of the various 3G technologies have continued to evolve within the SDOs. In particular, the development of faster and more efficient methods to carry packet data over the air has resulted in the ability to provide data rates substantially higher than were envisioned in the original 3G specifications. Chief among these emerging technologies are High Speed Downlink and High Speed Uplink Packet Access (HSDPA/HSUPA), an evolution of WCDMA, and First Evolution Data Optimized (1xEV-DO) and First Evolution Data and Voice (1xEV-DV), outgrowths of cdma2000.

The IEEE began to address the need for an interoperability standard among WLANs in 1990. The final standard, IEEE 802.11, was ratified in 1997. Since that time, the IEEE 802.11 Working Group has continued to update and expand the basic IEEE 802.11 standard to achieve higher data rates, accommodate additional operating frequencies and provide additional features. Equipment conforming to these standards (i.e., 802.11a/b/g) is in the marketplace today. Intended for short range applications, operating in unlicensed frequency bands and requiring little infrastructure, 802.11 standards-based equipment has seen substantial market growth, especially in consumer home networking applications. Similar to 3G, this standard also continues to evolve toward higher data rates and improved service capabilities.

The wide area network community has also established the IEEE 802.16 Working Group to define air interface standards for longer distance (2 to 50 km) Metropolitan Area and Wide Area Networks (MAN/WAN). The first 802.16 standard was published in 2002. Specifying operating frequencies from 10 to 66 GHz, it is primarily aimed toward very high speed (>100 Mbps) wide area point to multipoint fixed applications, such as infrastructure backhaul. In 2003, an amendment to the 802.16 standard was published adding operation in the 2 to 11 GHz frequency bands. This addition made the standard much more suitable for providing wireless broadband high speed Internet access for residential and small office applications. Analysts expect that equipment conforming to the 802.16-2004 fixed standard will be introduced in 2005. Concurrent with this revision of the fixed standard, the 802.16 Working Group embarked on defining a mobile version of the standard (referred to as 802.16e). The mobile version of the standard is expected to be completed in 2005. More recently, the IEEE 802 community has begun to address the question of handover between the different IEEE 802 technologies, both wired and wireline, as well as handover to external non-802 networks, such as 3G. This new group, 802.21, entitled Media Independent Handover Services HS, is anticipating that their initial standard will be available mid-2006.

*Strategy*

Our vision is to be a preferred technology provider for our customers' advanced wireless solutions. We invest in the development of leading-edge, advanced technologies designed to meet existing and emerging demands of the wireless marketplace. We pursue technology investments that are aligned with our existing strengths and experience in developing advanced wireless modem technology and components (such as advanced interference solutions, 3G baseband processor, and associated protocol software, and radio resource management) and we make our inventive designs available to relevant standards bodies. We monetize our investment in technology development primarily through patent licensing and the non-exclusive sale or license of various portions of our technology (e.g., reference designs, know-how and software) that we have developed for incorporation into products of semiconductor, antenna or other equipment manufacturers. We market our technology solutions to commercial manufacturers and to suppliers to the U.S. government. We also provide engineering services to customers.

Our strategy consists of the following key elements:

- *Development and delivery of advanced wireless technologies to address the constantly evolving demands of the wireless market while securing and protecting the underlying intellectual property.* The heart of our ability to create value lies in our sustained investment in core technology development that advances the state-of-the-art of wireless solutions.

- *A program of licensing our patented technology to wireless equipment producers worldwide.* Our substantial portfolio of patents and patent applications includes inventions applicable to all forms of TDMA and CDMA products and systems, as well as 802-based and other wireless technologies. Our current patent license agreements and the capability to license our patent portfolio are valuable assets. We continue to broaden our base of licensees around the world and to expand the breadth of technologies covered under our patent license agreements.

5

Table of Contents

- *Implementation of our technologies into a diversified portfolio of products to serve a broad range of customers in the global cellular, IEEE 802 wireless and U. S. government markets.* Our products include reference designs (including ASIC designs and antenna designs), software, and know-how. These products, along with maintenance, support and upgrade services, can be sold directly to our customers or through partnerships entitling us to receive royalties and other fees.

- *Maximizing the value proposition for our customers and partners by combining our intellectual property rights and technology products into a coordinated offering.* Through such offerings our customers gain the enhanced benefit of access to our core technology and our efficient implementations to enhance the performance of their products in a cost effective and timely manner.

- *Substantial involvement in key worldwide standards bodies to contribute to the ongoing definition of wireless standards and to incorporate our inventions into those standards.* By actively participating in both cellular and IEEE 802 wireless standards development activities, we continue to contribute to the development of better solutions for the marketplace, build recognition of our technical competence, gain insight into market trends, and secure positions for our intellectual property within the technology standards.

- *Acquisition of valuable intellectual property, technologies and products that will enhance the value of our portfolio of solutions for our customers.* We seek to acquire technology assets that expand our patent portfolio, build presence in complimentary markets, and accelerate our ability to bring more complete and valuable solutions to our customers.

- *Creatively structured relationships with leading technology developers and equipment producers.* We pursue agreements with companies to transfer our technology into their products, giving them access to our technical competencies, to enhance their product offerings, to proliferate our technology, and to provide us access to a broader base of customers. Also, we selectively pursue relationships that accelerate our time-to-market.

### *InterDigital's Technology Position*

#### Cellular and Fixed Wireless Technologies

We have a strong history of developing wireless technologies including those related to CDMA and TDMA and, more recently, IEEE 802. We led the industry in establishing TDMA-based TIA/EIA-54 as a digital wireless standard in the U.S. in the 1980s and created a substantial portfolio of TDMA patented inventions. These inventions include or relate to many of the fundamental elements of TDMA based systems in use around the world. Among the most central of our inventions are:

- The fundamental architecture of commercial Time Division/Frequency Division Multiple Access (TD/FDMA) systems

- Methods of synchronizing TD/FDMA systems

- A flexible approach to managing system capacity through the reassignment of online subscriber units to different time slots and/or frequencies in response to system conditions

- The design of a multi-component base station utilizing distributed intelligence that allows for more robust performance

- Initializing procedures that enable roaming

A number of our TDMA inventions are being used in a broad range of 2G and 2.5G wireless networks and terminal devices. We believe these inventions are essential to both standards and to the 2G and 2.5G TDMA backwards compatibility included in many 3G wireless networks and terminal devices. (See, "-Business Activities, Patent and Technology Licensing").

We also have developed and patented innovative CDMA technology solutions. Today we hold a significant worldwide portfolio of CDMA patents and patent applications. Similar to our TDMA inventions, we believe that a number of our CDMA inventions are essential to the implementation of the 2G, 2.5G and 3G CDMA systems in use today. Our key CDMA inventions include or relate to (among others):

- Global pilot: The use of a common pilot channel to synchronize sub-channels in a multiple access environment

- Bandwidth allocation: Techniques including multi-channel and multi-code mechanisms

- Power control: Highly efficient schemes for controlling the transmission output power of terminal and base station devices, a vital feature in a CDMA system

6

Interdigital Communications Corp

Table of Contents

- Joint detection and interference cancellation techniques for reducing interference
- Soft handover enhancement techniques between designated cells
- Various sub-channel access and coding techniques
- Packet data
- Fast handoff
- Geo-location for calculating the position of terminal users
- Multi-user detection (MUD)

## IEEE 802-based Wireless Technologies

With our strong wireless background, we have expanded our engineering and corporate development activities to include solutions that apply to other wireless market segments. These segments primarily fall within the ever increasing scope of the IEEE 802 family of standards. With the convergence of the popularity of the Internet and wireless connectivity, the appetite for "always-on" broadband connectivity continues to grow among both business and consumer users. Under the premise that "wireline (broadband) addiction will lead to wireless (broadband) adoption," the number of wireless data users is expected to continue to grow over the next several years. This will lead to a significant increase in RF interference, resulting in more dropped connections, lower data throughput, and decreased service coverage. At the same time, wireless data users will increasingly demand predictable quality-of-service, including high data rates and consistent, continuous network connectivity. Today's wireless system solutions may not be able to deliver the required performance in an environment of increasing tension between the rapid proliferation of wireless networks, and end user expectations of high quality-of-service. It is these market needs that have driven our engineering and corporate development activities over the last several years.

In 2003, we acquired substantially all the assets of Windshift Holdings, Inc. (formerly known as Tantivy Communications, Inc., "Windshift") a developer of wireless data communications technology. Included in the acquisition were patents, patent applications, know-how, state-of-the-art laboratory facilities, and other technologies related to CDMA2000, smart antenna, wireless LAN and other wireless communications technologies. We have combined this acquired technology with our cellular technology and know-how to create a suite of technologies and initial set of products designed to address these relatively new segments, which typically operate in unlicensed spectrum bands where interference issues substantially affect quality-of-service. We are branding these product solutions as AIM, an acronym for Adaptive Interference Management. (See, "-Business Activities-Technology and Product Development- Adaptive Interference Management Solutions").

## Participation and Role within the Various Wireless Standards Bodies

Our reputation as innovators helps us to influence the content and direction of wireless technology standards. This influence also creates a positive climate for the growth of business opportunities, both by enhancing our image as a key innovator and providing early intelligence on technologies and market trends.

To facilitate our position as a contributor to emerging wireless standards we are active members of the Third Generation Partnership Project (3GPP) through our membership in the European Telecommunications Standards Institute (ETSI), a participant in the Third Generation Partnership Project 2 (3GPP2), and are also an active member of several SDOs and industry associations that influence and sponsor standards development including the ITU-R, the Telecommunications Industry Association (TIA), the Alliance for Telecommunications Industry Solutions (ATIS), and the American National Standards Institute (ANSI). We have been active in 3G standards, contributing numerous submissions to SDOs worldwide. In addition, we are submitting a growing number of technical contributions into the IEEE 802 wireless Standards Groups and expect that effort to continue to expand. We also have taken leadership positions in a number of these SDOs. Company management and engineers either have served or are currently serving in a number of leadership positions in key industry SDOs including past Chair of the IEEE 802.16a Task Group (Broadband Wireless Access, 2 to 11 GHz), current Chair of the IEEE 802.16e Task Group (Mobile Broadband Wireless Access); current Vice Chair of the 3GPP RAN Working Group 3 (WG3); Chair of the ATIS Wireless Technologies and Systems Committee (WTSC) Wireless Wideband Internet Access subcommittee (formerly T1P1.4); past North American Rapporteur for the ITU-R IMT-2000 Deployment Handbook; past Editor, 3GPP RAN WG1 Physical Layer Procedures

7

Table of Contents

(TDD)(R5) and past Editor and Rapporteur, 3GPP RAN WG4, TDD Base Station Classification. In addition to our participation in a number of standards bodies, we also are active in several technology forums that foster our business interests.

Based on our history of invention and our extensive participation in the standards bodies, together with the extensive use of our technology innovations across different standards, we believe that our patent portfolio, including patents applied for, is applicable to all of the air interface protocols described in the IMT-2000 standard. We also believe that we will have patents essential to new IEEE 802.11 standards currently under development. We have indicated to the appropriate SDOs that we hold patents and patent applications that are essential for implementation of the present 3G standards in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles of fairness, reasonableness and/or non-discrimination. (See, *"-Business Activities, Patent and Technology Licensing"*).

## Business Activities

### Technology and Product Development

Over the course of our history, we have designed, developed and placed into operation a variety of advanced wireless technologies, systems and products. In addition, through our involvement in the standards bodies and incubation efforts, we monitor emerging technologies and identify needs created by the development of advanced wireless systems. The Company began developing CDMA solutions in early 1999. Since 1999, we have focused the vast majority of our technology and product development on the air interface technology referred to as WCDMA. More recently, we have devoted resources to initial product implementations of our Adaptive Interference Management technologies and we continue to expand our technology and product development business, targeting new customers for our existing technologies and products as well as targeting new markets and investing in new technologies, such as wireless IEEE 802 wireless standard compliant solutions.

We recorded expenses of $51.2 million, $45.9 million, and $46.1 million during 2004, 2003 and 2002, respectively, related to our research, technology and product development efforts. Research and development efforts enable us to patent many of our inventions. As a result of such patents, we have generated substantial royalty revenues. In addition, in 2004, 2003, and 2002, we recognized revenues associated with technology development projects totaling $0.1 million, $1.1 million, and $4.5 million, respectively. Revenue amounts in 2003 and 2002 were primarily associated with a TDD development project for Finland-based Nokia Corporation (Nokia).

### 3G Air Transport Solutions

The WCDMA technology suite is comprised of two duplexing methods, FDD and TDD. With FDD transmission, communications signals are transmitted in full duplex mode via two separate radio bands of equal size. With TDD transmission, communications signals are sent in half duplex mode using a single radio channel. While global market demand for FDD products is growing in tandem with the emerging market demand for 3G generally, we expect that any deployment of TDD products will trail the emergence of FDD products.

*FDD Technology Products*

Infineon Technologies AG

We developed and continue to support an FDD protocol stack for use in terminal units under our cooperative development and sales agreement with Infineon Technologies AG (Infineon). This FDD protocol stack interfaces with existing GSM/GPRS hardware and software, supports Infineon's 3G baseband processor, and is portable to other baseband processors. The Company and Infineon completed the full multi-mode FDD protocol stack in 2003 and, in first quarter 2004, conducted a successful public demonstration of the protocol stack operating in a fully functional 3G handset. The FDD protocol stack solution is being offered to 3G mobile phone and semiconductor producers. We have supported Infineon in its early product launch with interoperability testing and continue to support product certification and launch with field support, lab testing and software support.

Under the March 2001 agreement with Infineon, which has a duration of twelve years from the first sale of the joint 3G protocol stack, the parties each own the technology they develop. In addition, the parties have cross-licensed to each other a limited set of patents for specified purposes. In our case, the cross-licensed patents are those generally applicable to the jointly developed software and related products for specified purposes. We have also agreed to a framework for determining royalties in other 2G and 3G products. No revenues have been generated under this agreement to date. (See, *"-Risk Factors, We Rely and Intend to Rely on Relationships with Third Parties to Develop and Deploy Products"*).

As a result of the relationship established under the March 2001 agreement, Infineon additionally requested that we

provide Outer Loop Power Control software for Infineon's UMTS platform. In addition, due to the technology portfolio we developed, we were positioned to license a commercial FDD protocol stack to General Dynamics Decision Systems, Inc. (General Dynamics) as described below.

8

**Table of Contents**

General Dynamics Decision Systems, Inc.

In December 2004, we entered into an agreement with General Dynamics, to serve as a subcontractor on the Mobile User Objective System (MUOS) program for the U.S. military. MUOS is an advanced tactical terrestrial and satellite communications system utilizing 3G commercial cellular technology to provide significantly improved high data rate and assured communications for U.S. warfighters.

The Software License Agreement requires us to deliver to General Dynamics standards-compliant WCMDA modem technology, originating from the technology developed under our agreement with Infineon, for incorporation into handheld terminals. Under the agreement, we expect to receive $18.5 million in exchange for delivery of and a limited license in our commercial technology solution for use within the government's MUOS and Joint Tactical Radio System programs, maintenance and product training. The agreement also includes options that are exercisable by General Dynamics at various times through March 2006 for additional deliverables for up to $4.0 million. We anticipate that a majority of our MUOS program deliverables and related payments will occur in 2005, excluding the exercise of options for additional deliverables. We will provide maintenance and support to General Dynamics for three years following delivery of the technology. In addition to the deliverables specifically identified in the agreement, we have agreed to provide additional future services as requested by General Dynamics. The contract may be terminated for convenience if the U.S. Government terminates for convenience that portion of the MUOS Program that includes General Dynamics.

HSDPA Development

As part of our commitment to develop and offer a robust FDD product offering, we are developing the next generation of FDD (3GPP Release 5) that provides advanced high-speed data capabilities. This technology is referred to as HSDPA (High-Speed Downlink Packet Access). Our HSDPA development effort includes the physical layer (commonly referred to as Layer 1) and the software protocol stacks (commonly referred to as Layers 2/3). Through our involvement in the standards bodies, we have made important contributions to the development of this technology. We are offering our HSDPA solution to semiconductor and handset manufacturers as a transfer of technology blocks for incorporation into UMTS FDD Release 99/Release 4 chips and as a separate coprocessor chip for early product introduction.

*TDD Technology Products*

Our TDD technology development work began in 1999 when we entered into a strategic technology development agreement with Nokia involving the development and validation of fully standards compliant WTDD technology. Under the Nokia development agreement, we own all of the developed technology and have the ability to license the technology to other companies, as well as design, manufacture, sell and use products and components that utilize the resulting technology. Under this agreement, we delivered technology building blocks to Nokia for use in 3G wireless products for which they paid an aggregate amount of approximately $58.0 million. This development effort concluded in 2003 upon final verification, testing and acceptance by Nokia. Certain royalty-free, non-exclusive licenses relating to TDD granted to Nokia under the agreement continue following completion of the development work. (See, "*-Patent and Technology Licensing, Patent Licenses*").

We deployed a demonstration system using our TDD technology, and demonstrated live, over-the-air, full screen streaming video calls at 2 Mbps while operating over a point-to-point fully functioning radio network controller, base station, and end-user terminal device. We have experienced varying degrees of preliminary interest in our TDD technology among manufacturers and operators as they begin to evaluate their use of unpaired spectrum. We will continue to monitor market interest in TDD. Allocation of current resources to our TDD development program has been deferred until we see further development of commercially meaningful market interest in TDD technologies or other technologies to which our TDD technology and know-how may apply. One area where we have sought to leverage our TDD technology and know-how is in advanced radio resource management. (See, "*-AIM Performware™ Solutions*").

**Adaptive Interference Management Solutions**

*AIM Antenna™ Products*

With our acquisition of substantially all the assets of Windshift in July 2003, we added smart antenna technology and capabilities to our portfolio. We have devoted additional resources to further develop and commercialize the product design which we now offer to OEM, ODM and semiconductor companies under the brand of AIM (Adaptive Interference Management) Antenna technology. In general, smart antenna technology seeks to improve the ability of a wireless device to acquire and hold the strongest path of a given radio signal. Our AIM Antenna technology employs a switched beam antenna that results in increased wireless system capacity, improved coverage and extended device battery life. Our product offering includes patented beam switching algorithms, antenna designs and related know-how licenses and specialized engineering

Interdigital Communications Corp

services. We are actively marketing AIM Antenna technology in the IEEE 802 wireless market, where it can be deployed in client devices including PC cards, USB devices, PCI cards for desktops as well as fully integrated into mobile devices. In December 2004, we entered into an agreement with Atmel Corporation (Atmel) to offer our AIM Antenna product solution in Atmel's WLAN products. In addition to IEEE 802.11 products, we are in active development of AIM Antenna technology for application to the cellular mobile environment and we are currently pursuing relationships with top antenna manufacturers, ODMs and OEMs.

9

Table of Contents

*AIM Performware™ Solutions*

As part of our Prior TDD development efforts, we created a complete suite of advanced radio resource management algorithms that maximize system performance, lower deployment costs and enhance operators' service offerings under different network deployment scenarios. We have extended this radio frequency (RF) management middleware technology to create a product solution for the IEEE 802 wireless market which we offer under the trademark AIM Performware. Our AIM Performware software algorithms enable wireless devices to allocate radio resources to suit the character of wireless traffic, optimizing network stability, connection reliability, system capacity, terminal battery consumption, and overall quality of service. In addition, the constructs and approaches involved in the AIM Performware solution may well be applicable in the integration of IEEE 802 and cellular systems technologies.

### Future Technology Efforts

The Company has created the InterDigital Incubation Center (IIC), comprised of a dedicated team of engineers, to explore and foster the development of new architectures and technologies for wireless systems. Under the direction of the Company's Chief Technology Officer, the IIC is focusing on identifying leading-edge technologies that have attractive long-term commercial potential in the wireless market. The IIC works with leading universities and research centers to expand the scope of its work and the Company's development efforts in material sciences and advanced software applications. We have entered into a series of collaborative development and consulting agreements with leading universities and professors which we might leverage by licensing the intellectual property advancements we have helped fund.

We also have selectively pursued relationships or acquisitions that enhance our intellectual property portfolio and/or accelerate our time-to-market, such as our acquisition, in July 2003, of substantially all the assets of Windshift. (See, *"– Business Activities – Adaptive Interference Management Solutions"*). In first quarter 2005, we acquired, for a purchase price of $8.0 million, selected patents, intellectual property blocks and related technology and products assets, the function of which are aimed at improving the range, throughput and reliability of wireless LAN and other technology systems.

### Patent and Technology Licensing

Our business model is based on developing advanced wireless technology solutions, and then making those solutions available to customers through non-exclusive licensing arrangements and product sales. These solutions, many of which are patented, include inventions, know-how and other technical data (e.g., software, designs, specifications, etc.) related to the design and operation of digital wireless products. We also seek to complement and enhance internally developed solutions by leveraging third party intellectual property through acquisitions and partnering. In arrangements we enter into with other companies to develop new technologies, we typically have retained ownership of all or portions of the patents, copyrights, know-how and/or other technical data we develop. One method by which we monetize these investments is through the non-exclusive licensing of our patents and technology.

*Our Patent Portfolio*

As of December 31, 2004, the Company's patent portfolio consisted of 444 U.S. patents (119 of which issued in 2004), and 1,256 non-U.S. patents (327 of which issued in 2004). The Company also has numerous patent applications pending worldwide. The patents and applications comprising our portfolio relate specifically to digital wireless radiotelephony technology (including, without limitation, TDMA and/or CDMA) and expire at differing times ranging from 2005 through 2024. (See, *"-Risk Factors- Our Future Financial Condition and Operating Results Could Fluctuate"*).

The United States Patent and Trademark Office (USPTO) permits the filing of "provisional" applications for, among other reasons, protecting rights on an expedited basis. Typically, the filing of a provisional application is followed with the filing of a "non-provisional" application, a formal filing which may add additional content such as claim language to the provisional application, including the combination of more than one provisional application. The USPTO as well as other patent offices, also permits the filing of "continuation" or "divisional" applications, which are based, in whole or part, on a previously filed patent application. Most of our foreign patent applications are single treaty application filings, which can produce patents in all of the countries that are parties to the treaty.

During 2004, we filed 159 new, non-provisional, non-continuation U.S. patent applications. Including provisional and continuation applications, as well as international filings claiming priority to a U.S. patent application, the Company filed a total of 858 patent applications in 2004.

*Patent Licenses*

A significant portion of our business involves the licensing of our patents on a worldwide basis. A number of our

Interdigital Communications Corp
Page 30 of 134

patented inventions have been included in various digital wireless communications standards. We consider many of these patented inventions to be essential (i.e., required to be used) to build equipment in accordance with the standards. (See, *"-Evolution of Wireless Standards"*.) Those standards include, but are not limited to, TIA/EIA-54/136, narrowband CDMA (TIA/EIA-95 and similar standards), WCDMA (both FDD and TDD), cdma2000, TD-SCDMA, GSM, GPRS, EDGE, PDC, PHS, TETRA and DECT. We also expect that many of our patents and patents expected to issue from existing applications will be commercially important in the actual 2G, 2.5G and 3G product implementations. Accordingly, we believe that companies making, using or selling products compliant with these standards require a license under our patents. We also believe that our patents have application beyond the air interface environment, including to IEEE 802 and smart antenna/interference management technologies.

10

Table of Contents

Currently, numerous manufacturers supply digital cellular equipment conforming to such standards. While some companies seek licenses before they commence manufacturing and/or selling devices that use our patented inventions, most do not. Consequently, we approach these companies and seek to establish license agreements. We expend significant effort identifying potential users of our inventions and negotiating license agreements with companies that may be reluctant to do so. In our license negotiations, we typically seek consideration for the prior sales of infringing equipment, as well as patent royalties for future sales of equipment incorporating the patented inventions. We are in active discussions with a number of companies on a worldwide basis regarding the licensing of our 2G, 2.5G and 3G-related patents. We attempt to be creative in structuring broad-based agreements that enable unlicensed companies to meet their obligations to us and position us as a value-added partner. During negotiations, from time to time, unlicensed companies raise different defenses and arguments as to the need to enter into a patent license with us. In the past year, these defenses and arguments have included positions by companies (i) as to the essential nature and/or validity of our patents, (ii) that their products do not infringe our patents, and (iii) relating to the impact on them of pending litigation between us and other third parties. We address these arguments and defenses by asserting our positions on essentiality and infringement, and by asserting our position that the existence of litigation does not provide a defense to the legal requirement for a patent license. Also, from time to time, if we believe that a third party is required to license our patents in order to manufacture and sell certain digital cellular products, and such third party will not enter into a license, we may institute a patent infringement lawsuit against the third party.

We offer non-exclusive, royalty-bearing patent licenses to companies that manufacture, use or sell, or intend to manufacture, use or sell, equipment that implements the inventions covered by our extensive portfolio of patents. In earlier years, we developed wireless technology solutions relating to 2G and 2.5G technologies. As a result, earlier licensing agreements include the 2/2.5G patents generated from such technology development. We continue to seek to license our 2/2.5G patents, as the key 2/2.5G patents will generally not start to expire until 2006, and 2G products remain pervasive in today's market. Since 1992 we have also been developing wireless technology solutions relating to 3G technologies, which have generated a significant number of 3G patents and continue to lead to the filing of additional 3G-related patent applications.

In addition to patent licensing, we have been actively engaged in the licensing of know-how both to companies with whom we have had strategic relationships (including alliance partners) and to other companies. In 1999, we signed a technology transfer agreement with Nokia involving the development of TDD technology. In 2001, we entered into a strategic relationship with Infineon involving the development of FDD technology and products. (See, *"–Business Activities, Technology and Product Development, 3G Air Transport Solutions"*). In 2004, we entered into an agreement with General Dynamics for the supply of our WCDMA modem technology for incorporation into handheld terminals. (See, *"–Business Activities, Technology and Product Development, 3G Air Transport Solutions"*). In 2004, we also entered into a patent and know-how license covering smart antenna technology with Atmel in connection with our AIM antenna product. (See, *"– Business Activities, Technology and Product Development, Adaptive Interference Management Solutions"*).

At December 31, 2004, we had granted to 36 licensees a total of 42 non-exclusive, generally non-transferable, royalty-bearing or paid-up licenses to incorporate our patented inventions covering 2G and/or 3G standards, plus one license with an additional licensee covering smart antenna technology. When we enter into a new patent license agreement with a licensee, the licensee typically agrees to pay consideration for sales made prior to the effective date of the license agreement and also agrees to pay royalties or license fees on covered products that it will sell during the term of the agreement. We expect that, for the most part, new license agreements will follow this model. In circumstances where we receive consideration for sales made prior to the effective date, we recognize revenue in the quarter in which the patent license agreement is signed. However, if the license agreement is reached as part of the settlement of patent infringement litigation, we recognize consideration for past sales as other income. Our license agreements are structured on a prepaid, paid-up, or current royalty-bearing basis, or a combination thereof. Non-refundable prepayments are advances against payment of future royalties, and are usually made in exchange for prepayment discounts. As the licensee reports sales of covered products, the royalties due are calculated and either applied against any prepayment, or paid in cash. Sometimes, the royalties due are applied in full against the prepayment while other times they are applied in partial satisfaction. In the latter case, a cash royalty would be due for the remaining amount not applied against the prepayment. Additionally, royalties on sales of covered products under the license agreement are payable or exhausted against prepayments based on the royalty formula applicable to the particular license agreement. These formulas include flat dollar rates per unit, a percentage of sales, percentage of sales with caps, and other similar measures. The formulas can also vary by other factors including territory, covered standards, quantity and dates sold.

Most of our license agreements that provide for the payment of royalties on an ongoing basis require the payment of royalties based on sales of covered products built to a particular standard. A few agreements that provide for the payment of royalties on an ongoing basis commence when there is an infringed patent issued in the applicable geographic sales region. In

Interdigital Communications Corp

third quarter 2004, we transitioned our recognition of per-unit royalties to recognize the revenue in the period when we receive royalty reports from licensees, rather than in the period in which our licensees' underlying sales occur.

11

Table of Contents

Most of our patent license agreements are royalty bearing, however, some license agreements provide for paid-up licenses and do not require further payments under specified ranges of conditions (e.g., for products built to particular standards). We recognize revenues related to paid-up amounts on a straight-line basis over the effective term of the license.

Our patent license agreement with Siemens AG's (Siemens) is paid-up under our 2G and selected 3G patents. The Siemens agreement does not include any rights under any of our patents (including essential patents) issuing from patent applications filed after December 15, 1999. Based on these limitations, the Siemens patent license agreement does not provide a license under all of our patents that we believe are essential to 3G, including cdma2000, or all of the inventions which we believe will be essential and which are contained in pending patent applications. Kyocera Corporation's license under certain of our patents is paid-up for PHS and PDC products, but not as to other TDMA-based products. SANYO Electric Co., Ltd's (Sanyo) license under certain of our patents is paid-up for PHS and PDC products and, within a limited territory and term, is paid up for certain other equipment, but is generally royalty-bearing otherwise. Toshiba Corporation's (Toshiba) license under certain of our patents is paid-up for PHS and PDC equipment made, sold and used in Japan but is generally royalty-bearing otherwise. NEC Corporation of Japan's (NEC) license under certain of our patents is paid-up as to PDC and PHS products; and the 2G Matsushita Electric Industrial, Inc. license under certain of our patents is generally paid-up for TDMA-based 2G and 2.5G products.

Our patent license agreement with Nokia is paid-up, generally, with respect to 2G and 3G covered products through the end of 2001, and contains a structure for determining the royalties thereafter. Nokia and InterDigital Technology Corporation, one of our wholly-owned subsidiaries (ITC), are parties to an ongoing arbitration proceeding regarding Nokia's royalty obligations for covered product sales beginning on January 1, 2002. The parties are awaiting the arbitration panel's decision, which is currently expected no later than May 31, 2005. (See, *"-Legal Proceedings"*). In addition, as part the development project with Nokia completed in 2003, Nokia's royalty obligations are also paid-up for TDD products based upon the scope of technology delivered under the development project. (See, *"-Business Activities, Technology and Product Development"*). Nokia is also non-exclusively licensed on the same basis with respect to certain patents technically necessary to implement TDD technology; however, such paid-up license does not extend to non-TDD functionality.

In March 2001, ITC signed a worldwide, royalty-bearing CDMA patent license agreement with Matsushita Communications Industrial Co., Ltd. (Matsushita), for Matsushita to manufacture, have manufactured, distribute and sell 3G terminal units, test equipment and infrastructure. Matsushita sells products under the Panasonic brand. In April 2001, ITC received an up-front non-refundable payment of $19.5 million (less non-U.S. source withholding taxes) as an advance against future royalties under the Matsushita patent license agreement. Pursuant to the agreement, after the initial prepayment is exhausted through sales of covered product, Matsushita has agreed to pay additional royalties to ITC as Matsushita (or its subsidiaries) sells covered product using ITC's patents issued around the world. Matsushita's royalty obligations under the patent license agreement legally accrue during the pendency of patent applications to the extent the local law permits recovery of patent-related compensation prior to patent issuance. For Japan, the parties agreed that such accrual would commence with covered product sales beginning in 2003. We are in discussions with Matsushita as to the impact of various patents that have been issued in Japan and other countries to ITC. To date, we have not recognized any revenue associated with this patent license agreement. The timing and amount of any revenue recognition will be dependent upon, among other things, the issuance in Japan and/or other countries of relevant patents covering infrastructure and/or terminal units, and receipt of relevant royalty reports from Matsushita. In all cases, we will recognize revenue associated with this agreement when all elements required for revenue recognition are met.

Additionally, in 1994 we entered into a paid-up CDMA-based patent license agreement with Qualcomm, Inc. (Qualcomm) that is limited in scope. The Qualcomm license excludes, among other things, any rights under our patents as regards TDMA standards, any rights under any of our patent applications filed after March 7, 1995, any rights under the patents and applications subsequently acquired, such as was the case with the Windshift transaction, and any rights to any patents relating to cellular overlay and interference cancellation. The Qualcomm license agreement grants Qualcomm the paid-up right to grant sub-licenses under designated patent and patent applications to Qualcomm's customers. For some of our patents, Qualcomm's sublicensing rights are limited to those situations where Qualcomm is selling ASICs to the customer. For a limited number of patents as to which applications were filed prior to March 7, 1995, Qualcomm may grant licenses under such ITC patents regardless of whether the customer is also purchasing an ASIC from Qualcomm. Based on these limitations, Qualcomm is not licensed under a significant portion of our patents that we believe are essential to 3G, including cdma2000, nor under a significant portion of the inventions which we believe will be essential and which are contained in pending patent applications. The proportion of essential Company patents under which Qualcomm is licensed has diminished substantially over time as the Company has been inventing and acquiring technology at an accelerating rate since early 1995 and the proportion continues to dramatically reduce on an annual basis.

Certain existing license agreements may be renegotiated or restructured based on most favored licensee (MFL) or other provisions contained in the applicable license agreement. MFL clauses typically permit a licensee to elect to apply the terms of a subsequently executed license agreement that are more favorable than those of the licensee's agreement. The application of the MFL clause may affect, and generally acts to reduce, the amount of royalty obligations of the licensee. The application of an MFL clause can be complex, given the varying terms among patent license agreements.

Expenditures relating to maintaining our current licenses (other than enforcement and arbitration proceedings) are not material, and are predominantly administrative in nature. Cash flows from patent license agreements have been used for general corporate purposes, including substantial reinvestment in standards contributions, technology development and productization. Revenues generated from royalties are subject to quarterly and annual fluctuations.

In 2004, 2003, and 2002, respectively, 77%, 64%, and 94% of our total revenue was derived from licensees based in Japan but generally covering products sold both within and outside of Japan. In 2004, revenues from our licensees NEC, Sharp Corporation of Japan (Sharp), and Sony Ericsson were approximately 43%, 24%, and 12% of our total revenues, respectively.

*Licensees Generating 2004 Revenues Exceeding 10% of Total Revenues*

The loss of revenues and cash payments under any of the license agreements discussed below (with the exception of the NEC 2G Agreement, for which all present and anticipated cash has been received) would adversely affect either our cash flow or results of operations and could affect our ability to achieve or sustain acceptable levels of profitability.

ITC is a party to a worldwide, generally nontransferable, royalty-bearing, narrowband CDMA and 3G patent licenses with NEC. Pursuant to its patent license agreement with ITC, NEC is obligated to pay royalties on a convenience basis on all sales of products

12

Table of Contents

covered under the license. Through second quarter 2004, we recognized revenue associated with this agreement in the periods that NEC's underlying sales occurred, and thereafter, in the periods we receive the related royalty reports. This patent license agreement expires upon the last to expire of the patents licensed under the agreement. NEC and ITC are also parties to a separate non-exclusive, worldwide, convenience-based, generally nontransferable, royalty-bearing TDMA patent license agreement (2G), which expires upon the last to expire of the patents licensed under the agreement. In 2002, the parties amended that agreement to provide for the payment by NEC to ITC of $53 million, in exchange for which royalty obligations for PHS and PDC products are considered paid-up. We are recognizing revenue associated with this $53.0 million payment on a straight-line basis from the January 2002 agreement date through February 2006, which is the expected period of use by NEC. It is unlikely that NEC would have any further royalty payment obligations under that agreement based on existing paid-up and other unique provisions. In 2004, we recorded revenues of $44.3 million from NEC of which approximately $12.9 million is attributable to our 2G patent license agreement and approximately $31.3 million is attributable to our narrowband CDMA and 3G patent license agreement.

ITC is a party to a worldwide, generally nontransferable, royalty-bearing, convenience-based patent license agreement with Sony Ericsson (Sony Ericsson Agreement) covering sales of terminal units compliant with 2G GSM/TDMA and 2.5G GSM/GPRS/TDMA standards. Under the terms of this license agreement, we received payments totaling $20.3 million related to sales of terminal unit products through December 31, 2002. We recognized this amount as revenue in 2003. For periods thereafter through 2006, Sony Ericsson is obligated under the terms of its agreement to pay ITC a royalty on each licensed product sold. In addition, Sony Ericsson made non-refundable advance royalty payments of approximately $26.2 million to ITC in 2003 covering Sony Ericsson's projected sales in 2003 and 2004 which has been exhausted. Sony Ericsson made an additional royalty prepayment during the first quarter of 2005 of approximately $28 million primarily covering Sony Ericsson's projected sales in 2005 and 2006. These prepayments entitle Sony Ericsson to receive royalty rate discounts. Through second quarter 2004, we recognized revenue associated with this agreement in the periods Sony Ericsson's underlying sales occurred. Commencing third quarter 2004, we recognize revenue associated with this agreement in the periods that we receive the related royalty reports. If the prepayment is exhausted prior to the end of 2006, Sony Ericsson will become obligated to make additional royalty payments on sales of licensed products through the end of 2006, at which time its license becomes paid-up. This license agreement expires upon the last to expire of the patents licensed under each agreement. In 2004, we recorded revenues of $12.7 million from the Sony Ericsson Agreement.

ITC is a party to a non-exclusive, worldwide, generally nontransferable, royalty-bearing, convenience-based patent license agreement with Sharp (Sharp PDC/PHS Agreement) covering sales of terminal devices compliant with TDMA-based PDC and PHS standards. In second quarter 2003, ITC and Sharp extended the term of the Sharp PDC/PHS Agreement until April 2008. Under the extension, Sharp made a $17.5 million up-front payment consisting of a renewal fee of $2.0 million and a royalty prepayment of $15.5 million. The royalty prepayment was exhausted in 2004, and Sharp has become obligated to make additional royalty payments on sales of licensed products sold through early 2008 as covered products are sold. Through second quarter 2004, we recognized revenue associated with this agreement in the periods Sharp's underlying sales occurred. Commencing third quarter 2004, we recognize revenue associated with this agreement in the periods we receive the related royalty reports. The renewal fee is being amortized on a straight-line basis over the five-year term of the extension.

ITC and Sharp are also parties to a separate non-exclusive, worldwide, convenience-based, generally nontransferable, royalty-bearing patent license agreement (Sharp NCDMA/GSM/3G Agreement) covering sales of GSM, narrowband CDMA and 3G products that expires upon the last to expire of the patents licensed under the agreement. Under an amendment to that Agreement executed in first quarter 2004 which affects certain payment terms and other obligations of the parties, Sharp made a royalty pre-payment of approximately $17.8 million in second quarter 2004. Once the prepayment is exhausted, Sharp will become obligated to make additional royalty payments on sales of licensed products. We recognized revenue from the prepayment as sales were reported through the second quarter of 2004. Commencing third quarter 2004, we recognize revenue associated with this agreement in the period that sales are reported. This license agreement expires upon the last to expire of the patents licensed under this agreement. In 2004, we recorded revenues of $25.1 million from Sharp of which approximately $12.1 million is attributable to the Sharp PDC/PHS Agreement and approximately $13.0 million is attributable to the Sharp NCDMA/GSM/3G Agreement.

*2004 Patent License Activity*

In first quarter 2004, we entered into a worldwide, royalty-bearing, convenience-based patent license agreement with Sierra Wireless, Inc. (Sierra) covering the sale of wireless terminal units and wireless modules built to 2G and 2.5G and 3G standards. Through second quarter 2004, we recognized revenue associated with this agreement in the periods Sierra's underlying sales occurred, and thereafter in the periods that we received the related royalty reports.

Interdigital Communications Corp                                                Page 36 of 134

In second quarter 2004, we entered into a non-exclusive, worldwide, convenience-based, royalty-bearing patent license agreement with Sanyo covering terminal units and infrastructure compliant with 2G and 2.5G TDMA-based and 3G standards. This new license agreement updates and expands our 1998 patent license agreement with Sanyo covering products compliant with TDMA-based standards. Under the new agreement, Sanyo paid us an upfront amount of $27 million, net of any

13

Table of Contents

applicable source withholding taxes. We applied $750,000 of the upfront amount toward the satisfaction of royalties previously recognized as revenue in first quarter 2004 under the agreement in its pre-second quarter 2004 form. Through second quarter 2004, we recognized revenue relating to sales of 2G and 3G products (excluding paid-up products) in the period such sales occurred, and thereafter, in the periods we receive the related royalty reports. Sanyo may apply its royalty obligation for such products against a $5 million credit provided to Sanyo under the new agreement, until such credit is exhausted. Upon exhaustion, Sanyo is required to pay royalties on a current basis. We will amortize evenly the remaining portion of the upfront payment from second quarter 2004 through fourth quarter 2008, the effective term of the new agreement as to such products. We and Sanyo have agreed on a process for negotiating additional payments covering cdma2000 sales in Japan after the expiration of the prepaid period and for sales in the People's Republic of China and the United States in excess of an allotted number of pre-paid units.

In third quarter 2004, we entered into a non-exclusive, worldwide, convenience-based, royalty-bearing patent license agreement with Toshiba covering terminal units and infrastructure compliant with all 2G and 2.5G TDMA-based and 3G standards. The new patent license agreement updates and expands a prior 2G and 2.5G TDMA-based patent license agreement between us and Toshiba, pursuant to which Toshiba was previously granted a paid-up license relating to certain sales of PDC and PHS compliant products, and now includes all 3G standards. Under the new patent license agreement, Toshiba paid us an upfront amount of $10 million, net of any applicable source withholding taxes, the majority of which serves as a prepayment of future unit-based royalties. Once that prepayment is exhausted, Toshiba will be obligated to pay additional royalties on sales of licensed products (excluding products as to which their license is paid-up) through the last to expire of the patents licensed under the agreement. We recognize a portion of the upfront payment as revenue on a straight-line basis over the expected period of use by Toshiba. We will recognize the remaining portion of the upfront payment in the periods we receive the related royalty reports.

In fourth quarter 2004, we entered into a non-exclusive, worldwide, convenience-based, royalty-bearing patent license agreement with Danger, Inc. (Danger), covering terminal units and infrastructure compliant with 2G and 2.5G TDMA-based and 3G standards. We will recognize revenue associated with this agreement in the periods we receive the related royalty reports.

In fourth quarter 2004, we entered into a non-exclusive, worldwide, convenience-based, royalty-bearing patent license agreement with Option NV (Option), covering terminal units and infrastructure compliant with all 2G, 2.5G, and 3G standards, and 802. We will recognize revenue associated with this agreement in the periods we receive the related royalty reports.

*Legal Proceedings*

Patent Oppositions

In high technology fields characterized by rapid change and engineering distinctions, the validity and value of patents are sometimes subject to complex legal and factual challenges and other uncertainties. Accordingly, our patent claims are subject to uncertainties that are typical of patent enforcement generally. The validity of some of our key patents has been and continues to be challenged in patent opposition and revocation proceedings in a number of jurisdictions. While in a few cases, our patents have been invalidated or substantially narrowed, this has not impaired our patent license program because we generally license a broad portfolio of patents held worldwide, not a single patent or invention in a single jurisdiction. If a party successfully asserts that some of our patent claims are not valid, should be revoked or do not cover their products, or if products are implemented in a manner such that patents we believe to be commercially important are not infringed, we do not believe there would be a material adverse impact on our ongoing revenues from existing patent license agreements although there could be an adverse impact on our ability to generate new royalty streams. The cost of enforcing and protecting our patent portfolio is significant.

Patent Infringement and Declaratory Action Lawsuits

From time to time, if we believe that a third party is required to license our patents in order to manufacture and sell certain digital cellular products and such third party has not done so, we may institute legal action against the third party. These legal actions typically take the form of a patent infringement lawsuit. In a patent infringement lawsuit, we would typically seek damages for past infringement, and an injunction against future infringement. The response from the third party can come in the form of challenges to the validity and applicability of our patents. We are currently in such a patent infringement lawsuit with Lucent Technologies, Inc. (Lucent) involving cdma2000 products, and Lucent has filed a counterclaim challenging the validity and applicability of our patents. (See, *"Legal Proceedings – Lucent"*). In addition, a third party might file a Declaratory Judgment action to seek a court's declaration that the patent holder's patents are invalid or not infringed by the third party's products. The response from the patent holder may include claims of infringement. Nokia

Interdigital Communications Corp

recently filed such an action against us in Delaware. (See, *"Legal Proceedings – Nokia"*). With either type of patent litigation, the risks from an adverse ruling on our ability to secure new licenses and the monetary cost can be significant. As part of a settlement of a lawsuit containing a claim against a third party for infringement, we could recover consideration for past infringement as well as license future sales for which we would be paid a license fee(s) and/or ongoing royalties. Court awards and settlements of patent infringement lawsuits can be substantial, but are uncertain, unpredictable and often of a non-recurring nature. If we recover amounts owed for past sales from the settlement of litigation (excluding contractual arbitration rulings) or pursuant to a litigation award, we recognize these amounts as other income.

14

Table of Contents

Contractual Arbitration Proceedings

We and our licensees, in the normal course of business, may have disagreements as to the rights and obligations of the parties under the applicable license agreement. For example, we could have a disagreement with a licensee as to the amount of reported sales and royalties. The license agreements typically provide for private arbitration as the mechanism for resolving disputes. Arbitration proceedings can be resolved through an award rendered by the arbitrators or by settlement between the parties. Awards and settlements of arbitration proceedings can be substantial, but are uncertain, unpredictable and often of a non-recurring nature. In circumstances where we receive consideration from the resolution of a disagreement or arbitration with a licensee over the terms of an existing agreement, whether by arbitrators' award or by settlement, we recognize the related consideration as revenue.

We believe that the license agreements with Ericsson and Sony Ericsson establish the financial terms necessary to define the royalty obligations of Nokia and Samsung Electronics Co., Ltd. (Samsung) on 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE infrastructure and terminal units under their existing patent licensing agreements with us. We believe that, under MFL provisions applicable to their respective patent licenses, both companies are obligated to pay royalties on sales of covered products from January 1, 2002 by reference to the terms of the Ericsson and Sony Ericsson licenses. Our patent license agreement with Nokia provides that, in exchange for a payment of $31.5 million, Nokia's royalty obligation to ITC had been paid-up generally with respect to certain 2G and certain 3G covered products through the end of 2001. The MFL provision in this agreement provides that Nokia's royalty obligations will be defined by the relevant licensing terms applicable to other designated leading manufacturers of wireless telecommunications equipment. It is our position that Ericsson and Sony Ericsson constitute such leading manufacturers under Nokia's agreement. Since the Ericsson and Sony Ericsson license agreements apply only to 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE infrastructure and terminal unit products, one or more additional agreements with a designated leading manufacturer will be necessary, in the absence of agreement between us and Nokia, to fully define the full scope of Nokia's obligations (including 3G) under its patent license agreement. The starting point for calculating Nokia's royalty obligation will be January 1, 2002. In the absence of the application of alternative royalty terms pursuant to the application of Nokia's MFL provision or agreement between the parties, Nokia's license (except to the extent paid up) will expire December 31, 2006.

In 2002, Samsung elected to apply its MFL provision to our patent license agreement with Nokia as regards Samsung's 2G and 2.5G GSM/GPRS/EDGE products. Therefore, it is our position that, beginning in 2002, Samsung's royalty rate is determined in the same manner as Nokia's royalty rate is determined for 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE infrastructure and terminal unit products. Nokia and Samsung each disputed our positions, and initiated arbitration proceedings to resolve the disputes. Nokia is seeking a determination that their obligation under our existing patent license agreement with Nokia is not defined by our license agreements with Ericsson and Sony Ericsson or has been discharged. The hearing in the Nokia arbitration was conducted in January 2005, and the Tribunal is expected to deliver a draft Award to the International Court of Arbitration of the International Chamber of Commerce (ICC) on or before an approximate date of March 31, 2005. The Company had previously been informed that the ICC set May 31, 2005 as the last date for rendering a Final Award. Samsung is seeking a determination that Samsung's obligations under our existing patent license agreement with Samsung are not defined by our license agreements with Ericsson and Sony Ericsson or, in the alternative, to determine the amount of the appropriate royalty due. The evidentiary hearing in the Samsung arbitration is scheduled for June 2005. (See, *"-Item 3. Legal Proceedings"*).

## *Competition*

We compete in a wireless communications market which is characterized by rapid technological change, frequent product introductions, evolving industry standards and, in many products, price erosion. Further, many current and potential competitors may have advantages over us, including (a) existing royalty-free cross-licenses to competing and emerging technologies; (b) longer operating histories and presence in key markets; (c) greater name recognition; (d) access to larger customer bases; and (e) greater financial, sales and marketing, manufacturing, distribution channels, technical and other resources. These competitors also may have established or may establish financial or strategic relationships among themselves or with our existing or potential customers, resellers or other third parties. These relationships may affect third parties' decisions to purchase products or license technology from us. (See, *"-Risk Factors, We Face Substantial Competition From Companies With Greater Resources."*).

The development cycle and the time it takes for the technologies we develop to become accepted in the marketplace can take years. Our future success will depend on (i) our ability to continue to make substantial resource investment in research and development, (ii) our ability to continue to develop, introduce and sell new products, technology and enhancements on a timely and consistent basis (See, *"-Risk Factors, Our Industry is Subject to Rapid Technological Change, Uncertainty, and Shifting Market Windows."*), and (iii) our ability to keep pace with technological developments, satisfy varying customer

Interdigital Communications Corp

requirements, price our products competitively and achieve market acceptance. Moreover, during this time frame alternative, competitive solutions often surface. Such alternative solutions may be made available to potential customers at a lower cost or a competitor may offer a more

15

Table of Contents

comprehensive solution. (See, *"-Risk Factors, Our Technologies May Not Be Adopted by the Market or Widely Deployed."*).
Our products and services face competition from existing companies developing product and technology offerings
comparable to ours for the same standardized air interface (e.g., a number of companies offer FDD protocol stack solutions).
The number of competitors varies by product and technology market, but the competitive landscape can generally be
characterized as consisting of a relatively small number of firms who deliver technology and products to wireless
semiconductor and equipment producers. We are well positioned in this market to deliver competitive products because of
our broad systems capability; the depth of our experience in developing physical layer, protocol stack and component design
solutions; the depth of our technology and intellectual property portfolio; our financial strength and our ability to deliver
time-to-market and cost advantages to our customers. We also face competition from the in-house development teams at
semiconductor fabricators and telecommunication equipment suppliers whom we seek as customers. It is also possible that
new competitors may enter the market.

We also face competition as regards the licensing of our patent portfolio. We believe that licenses under a number of our
patents and patents arising from patent applications are required to manufacture and sell 2G and 3G products. However,
numerous companies also claim that they hold essential 2G and 3G patents. To the extent that multiple parties all seek
royalties on the same product, the manufacturers may have difficulty in meeting the financial requirements of each patent
holder. In response, certain manufacturers have sought antitrust exemptions to act collectively, on a voluntary basis, and
impose agreed aggregate 3G licensing fees or rates for essential patents among the collaborating parties. One such group
desires to set up procedures to identify whether a submitted member patent is essential, to streamline the licensing of those
which are deemed essential, and to limit the overall license fees paid for the collaborating members' entire portfolio of
essential patents. The groups, sometimes identified as "patent platforms", are likely to be individually formed by
collaborating holders of essential patents for each of the principal 3G standards. We (as well as a number of other major 3G
essential patent holders) have not, at this time, elected to participate in any patent platforms, but are not precluded from
electing to do so at any future time. Participation in this group could simplify the process of entering into licensing
agreements but may also result in lower royalty rates to collaborating members for access to essential patents than might
otherwise be obtainable outside the patent platform structure.

### *Employees*

As of March 24, 2005, we employed 325 full-time individuals consisting of approximately 223 engineering and product
development personnel, 14 patent administration and licensing personnel and 88 other personnel, as well as 12 part-time
employees. None of our employees are represented by a collective bargaining unit.

### *Executive Officers*

The information regarding the executive officers of InterDigital is included pursuant to Part III, Item 10 of this Annual
Report on Form 10-K as follows:

| NAME | AGE | POSITION |
|---|---|---|
| Howard E. Goldberg | 59 | President and Chief Executive Officer |
| Charles "Rip" Tilden | 51 | Chief Operating Officer |
| Richard J. Fagan | 48 | Chief Financial Officer |
| William J. Merritt | 46 | General Patent Counsel and President of InterDigital Technology Corporation |
| Alain C. Briancon | 45 | Chief Technology Officer |
| Mark A. Lemmo | 47 | Senior Business Development Officer |
| Brian G. Kiernan | 58 | Chief Strategic Standards Officer |
| William C. Miller | 50 | Senior Programs and Engineering Officer |
| Lawrence F. Shay | 46 | General Counsel |

Howard E. Goldberg was promoted to Chief Executive Officer and appointed as a Director of the Company in
November 2000. He was named President in January 2001. Mr. Goldberg had served as Interim President since September
1999. Prior to becoming Chief Executive Officer, Mr. Goldberg also held the position of Executive Vice President – Strategic
Alliances from October 1998 to September 1999. Mr. Goldberg also held the positions of Executive Vice President, General

Counsel and Secretary from May 1995 to October 1998.

Charles "Rip" Tilden was promoted to the position of Chief Operating Officer in December 2001. Mr. Tilden also held the title of Executive Vice President of the Company from March 1998 to January 1, 2004. The title distinctions among Vice Presidents at the executive level were eliminated and the title nomenclature of all such individuals was revised effective January 1, 2004 without a change to responsibilities. As a result, Executive Vice President was deleted from Mr. Tilden's title. Prior to that, Mr. Tilden held the position of Senior Vice President from May 1997 and Vice President from November 1996 until May 1997. Before joining InterDigital, Mr. Tilden served as Vice President, Corporate Affairs at Alco Standard Corporation in Wayne, Pennsylvania, an office products and paper distribution company, since December 1994.

16

Table of Contents

Richard J. Fagan joined InterDigital as a Senior Vice President and Chief Financial Officer in November 1998, and was promoted to Executive Vice President in September 1999. The title distinctions among Vice Presidents at the executive level, were eliminated and the title nomenclature of all such individuals was revised effective January 1, 2004 without a change to responsibilities. As a result, Executive Vice President was deleted from Mr. Fagan's title. Prior to joining InterDigital, Mr. Fagan served as Controller and Treasurer of Quaker Chemical Corporation, a Pennsylvania corporation, since 1994.

William J. Merritt was promoted to General Patent Counsel of the Company and President of ITC in July 2001. Mr. Merritt also held the position of Executive Vice President of the Company from September 1999 to January 2004. The title distinctions among Vice Presidents at the executive level were eliminated and the title nomenclature of all such individuals was revised effective January 1, 2004 without a change to responsibilities. As a result, Executive Vice President was deleted from Mr. Merritt's title. Prior to that, Mr. Merritt held the positions of Senior Vice President, General Counsel and Secretary since October 1998 and Vice President Legal and Assistant Secretary since January 1996.

Dr. Alain C. Briancon joined InterDigital as Executive Vice President and Chief Technology Officer in January 2001. The title distinctions among Vice Presidents at the executive level were eliminated and the title nomenclature of all such individuals was revised effective January 1, 2004 without a change to responsibilities. As a result, Executive Vice President was deleted from Mr. Briancon's title. From 1996 through December 2000, Dr. Briancon served as Vice President and General Manager of Motorola Inc., with the Advanced Services Applications Platform Division within the Semiconductor Product Sector from 1999 to December 2000.

Mark A. Lemmo was named Executive Vice President, Product Management and Business Development in April 2000. The title distinctions among Vice Presidents at the executive level were eliminated and the title nomenclature of all such individuals was revised effective January 1, 2004 without a change to responsibilities. As a result, Mr. Lemmo's title was changed to Senior Business Development Officer. Prior to that, Mr. Lemmo held the position of Executive Vice President, Engineering and Product Operations since October 1996 and Vice President, Sales and Marketing since June 1994.

Brian G. Kiernan was promoted to Senior Vice President, Standards in July 1997. The title distinctions among Vice Presidents at the executive level were eliminated and the title nomenclature of all such individuals was revised effective January 1, 2004 without a change to responsibilities. As a result, Mr. Kiernan's title was changed to Chief Strategic Standards Officer. Prior to that, Mr. Kiernan held the position of Vice President, Marketing Support since January 1993.

William C. Miller joined InterDigital as Senior Vice President, Programs and Engineering in July 2000. The title distinctions among Vice Presidents at the executive level were eliminated and the title nomenclature of all such individuals was revised effective January 1, 2004 without a change to responsibilities. As a result, Mr. Miller's title was changed to Senior Programs and Engineering Officer. Before joining InterDigital, Mr. Miller served as Vice President, Programs with Telephonics Corporation, an aircraft and mass transit communications systems corporation located in Farmingdale, New York, since 1993.

Lawrence F. Shay joined InterDigital as Vice President, General Counsel and Corporate Secretary in November 2001. The title distinctions among Vice Presidents at the executive level were eliminated and the title nomenclature of all such individuals was revised effective January 1, 2004 without a change to responsibilities. As a result, Vice President was deleted from Mr. Shay's title. Mr. Shay served as Corporate Secretary until September 2004. Before joining InterDigital, Mr. Shay served as General Counsel and Corporate Secretary with U.S. Interactive, Inc., a multi-national publicly held Internet professional services corporation, from June 1999 to June 2001, Executive Vice President from September 2000 until June 2001, and Senior Vice President from June 1999 until September 2000. U.S. Interactive, Inc. filed a Chapter 11 bankruptcy petition in January 2001 and a reorganization plan was confirmed in September 2001. Prior to June 1999, Mr. Shay was a partner in the corporate group of Dilworth Paxson LLP, a major Philadelphia law firm, where he practiced law from 1985 until 1999.

InterDigital's executive officers are elected to the offices set forth above to hold office until their successors are duly elected and have qualified. All of such persons are parties to agreements that provide for severance pay and continuation of designated benefits. Mr. Goldberg's agreement generally provides for the payment of severance of up to a maximum of eighteen months salary and up to a maximum of eighteen months' continuation of medical and dental benefits. The other executives' agreements generally provide for the payment of severance up to a maximum of one year's salary and up to a maximum of one year's continuation of medical and dental benefits. In addition, with respect to all of these agreements, in the event of a termination or resignation within one year following a change of control, which is defined as the acquisition (including by mergers or consolidations, or by the issuance by InterDigital of its securities) by one or more persons in one transaction or a series of related transactions, of more than fifty percent (50%) of the voting power represented by the

outstanding stock of InterDigital, the executive would generally receive two years of salary and the immediate vesting of all restricted stock and stock options.

17