Table of Contents

*Risk Factors*

    This Annual Report, including "Item 1. Business" and "Item 7. Management's Discussion and Analysis", contains forward-looking statements reflecting, among other things, the Company's beliefs and expectations as to: (i) the deployment, migration to and growth of the 3G market and the wireless data services market; analysts and industry expert forecasts as to the market for wireless products and services and growth of certain technologies; our belief as to the inability of existing system solutions to meet anticipated demands of wireless data users; (ii) our ability to influence the wireless technology standards development process; the timing of new standards being adopted; (iii) our strategy including: (a) the development and delivery of advanced wireless technologies to address the constantly evolving demands of the wireless market while securing and protecting the underlying intellectual property; (b) a program of licensing our patented technology to wireless equipment producers worldwide; (c) the implementation of our technologies into a diversified portfolio of products to serve a broad range of customers in the global cellular, IEEE 802 wireless and U.S. government markets; (d) maximizing the value proposition for our customers and partners by combining our intellectual property rights and technology products into a coordinated offering; (e) substantial involvement in key worldwide standards bodies to contribute to the ongoing definition of wireless standards and to incorporate our inventions into those standards; (f) acquisition of valuable intellectual property, technologies and products that will enhance the value of our portfolio of solutions for our customers; (g) creatively structured relationships with leading technology developers and equipment producers; (iv) our belief that a number of our inventions are essential to the 2G, 2.5 G and 3G standards, and many will be commercially important in 2G, 2.5G and 3G product offerings and have application and will be essential in IEEE 802 and interference management technologies and our belief that our patent portfolio is applicable to all air interface protocols described in the IMT—2000 standard; (v) our plans to: (a) continue testing and implementation of the Company's and Infineon's FDD protocol stack, (b) offer our HSDPA solution to semiconductor and handset manufacturers; (c) monitor market interest in TDD technology and defer allocating further resources on TDD development; (d) market our AIM Antenna technology in the IEEE 802 wireless market, pursue relationships with top antenna manufacturers, ODMs and OEMs and our beliefs as to the applications and capabilities of our AIM Antenna and AIM Performware solutions; (e) enhance internal development efforts by partnering with leading universities and researchers and acquisitions and leveraging such relationships and acquisitions through licensing of associated patents and technology; (vi) the timing of deliverables and associated payments under our General Dynamics contract; (vii) our future revenues, cash flow, short-term investment position, operating expenses, and capital expenditures, and the sources and timing thereof, and our near term operating requirements and lack of need to seek additional financing; (viii) our ability to monetize our investment in technology development primarily through patent licensing or sale of all or a portion of our technologies; (ix) our ability to enter into new customer, partner and licensing relationships, secure patent protection for our inventions, and develop, introduce and sell new products, technology and enhancements on a timely and consistent basis; (x) the royalty obligations of Nokia and Samsung under their respective patent license agreements with us and the timing of the respective arbitration proceedings; (xi) our ability to collect royalties under existing license agreements and settlement agreements and derive future revenues from our patents, including: (a) the impact of a successful action against some of our patents based on validity or infringement or the impact of a design around some of our commercially important patents on ongoing and new royalty revenue streams and; (b) the impact on our cash flow, results of operations and level of profitability due to loss of revenues under the NEC 3G License, Sony Ericsson Agreement, or Sharp PDC/PHS Agreement and our expectation as to the structure of new patent license agreements. Words such as "expect," "will," "believe," "could," "would," "may," "anticipate," "our strategy," "future," "target," "trend," "seek to," "will continue," "outcome," "predict," "due to receive," "likely," "in the event" or similar expressions contained herein are intended to identify such forward-looking statements.

    Although forward-looking statements in this Annual Report on Form 10-K reflect the good faith judgment of our management, such statements can only be based on facts and factors currently known by the Company. Consequently, forward-looking statements are inherently subject to risks and uncertainties. We caution readers that actual results and outcomes could differ materially from those expressed in or anticipated by such forward-looking statements. You should not place undue reliance on these forward-looking statements, which are only as of the date of this Annual Report. In addition to the associated risks and uncertainties identified in this Annual Report as well as other information contained herein, each of the following risk factors should be considered in evaluating our business and prospects. The following risk factors are not listed in any order of importance or priority:

    Our Technologies May Not Be Adopted By the Market or Widely Deployed.

    We invest significant engineering resources in the development of advanced wireless technology and related products. These investments may not be recoverable or not result in meaningful revenue if products based on the technologies in which we invest are not widely deployed. Competing digital wireless technologies could reduce the opportunities for deployment of technologies we develop. If the technologies in which we invest are not adopted in the mainstream markets or in time periods we expect or we are unable to secure partner support for our technologies, our business, financial condition and operating

results could be adversely affected. For example, our ability to capitalize on our investments in WCDMA and smart antenna solutions depends upon market interest in such technologies. There are emerging wireless technologies, such as WiMAX, that may compete with WCDMA. If deployments of such other technologies obtained significant market share, the market size for WCDMA products could be reduced. All of these competing technologies also could impair multi-vendor and operator support for WCDMA, key factors in defining opportunities in the wireless market. Similarly, changes or delays in the implementation of new wireless standards could limit our opportunities in the wireless market.

18

Table of Contents

### Our Technology and Product Development Activities May Experience Delays.

We may experience technical, financial, resource or other difficulties or delays related to the further development of our technologies and products. Delays may have adverse financial effects and may allow competitors with comparable technology and/or product offerings to gain a commercial advantage over us. There can be no assurance that we have adequate staffing or that our development efforts will ultimately be successful. Further, if such development efforts are not successful or delays are serious, strategic relationships could suffer and strategic partners could be hampered in their marketing efforts of products containing our technologies. As a result we could experience reduced revenues or we could miss critical market windows. Moreover, our technologies have not been fully tested in commercial use. It is possible that they may not perform as expected. In such case, our business, financial condition and operating results could be adversely affected and our ability to secure new customers and other business opportunities could be diminished.

### The Markets for Our Technologies and Our Products May Fail to Materialize in the Manner We Expect.

We are positioning our current development projects for the evolving advanced wireless markets. Certain of the these markets, in particular the 3G market and the market for smart antenna solutions, may continue to develop at a slower rate or pace than we expect and may be of a smaller size than we expect. Additionally, the development projects that target only the emerging 3G market do not have direct bearing on the 2.5G or any other market which has developed or might develop after the 2G market but prior to the development of the 3G market. For example, the potential exists for 3G market preemption or reduction in scope by the success of current or future 2.5G solutions and of WLAN. In addition, there could be fewer applications for our technology and products than we expect. The development of the 3G and other advanced wireless markets also could be impacted by general economic conditions, customer buying patterns, timeliness of equipment development, pricing of 3G infrastructure and mobile devices, rate of growth in telecommunications services that would be delivered on 3G devices, and the availability of capital for, and the high cost of, radio frequency licenses and infrastructure improvements. Failure of the markets for our technologies and our products to materialize to the extent or at the rate we expect could reduce our opportunities for sales and licensing and could materially adversely affect our longer-term business, financial condition and operating results.

### Our Future Financial Condition and Operating Results Could Fluctuate.

Our financial condition and operating results have fluctuated significantly in the past and might fluctuate significantly in the future. Our financial condition and operating results could continue to fluctuate because (i) our markets are subject to increased competition from other products and technologies; (ii) it is difficult to predict the timing and amount of licensing revenue associated with past infringement and new licenses, and the timing, nature or amount of revenues associated with strategic partnerships; (iii) we may not be able to enter into additional or expanded strategic partnerships or license agreements, either at all or on acceptable terms; (iv) the strength of our patent portfolio could be weakened through patents being declared invalid, our claims being narrowed, changes to the standards, and adverse court decisions; (v) our licensing revenues are currently dependent on sales by our licensees which is outside of our control and which could be negatively impacted by a variety of factors including global economic conditions, buying patterns of end users, competition for our licensees' products, and any decline in the sale prices our licensees receive for their covered products. Our operating results also could be affected by general economic and other conditions that cause a downturn in the market for our products or technology. Because the base level of many of our expenses is relatively fixed, variations in revenue from a small number of customers could cause our operating results to vary from quarter to quarter. In addition, increased expenses which could result from factors such as increased litigation costs, actions designed to keep pace with technology and product market targets, and other strategic investments, could adversely impact near-term operating results. The foregoing factors are difficult to forecast and could adversely affect both our quarterly and annual operating results and financial condition.

Additionally, our 2G licensing revenue is expected to be impacted negatively over time by the decline of the 2G market coupled with the expiration of ongoing royalty obligations starting in 2006. Our revenue and cash flow also could be affected by: (i) the deterioration of the financial condition of any licensee or the unwillingness of any licensee to satisfy all of their royalty obligations on the terms we expect; and (ii) the failure of 2G and 2.5G sales to meet market forecasts due to global economic conditions, political instability, competitive technologies, or otherwise.

### The Number of 3G Patent Licensors and Downward Pressure on Royalty Rates Could Adversely Affect Our Future Revenue and Cash Flow.

A number of companies have made claims as to the essential nature of their patents for products for the 3G market. Additionally, licensees, individually and collectively, are increasingly demanding that the royalty rates for 3G patents be lower than historic royalty rates, and in some cases, that the aggregate royalty rates for their 3G products be capped at a maximum amount. Both the increasing number of potential licensors of 3G technology and any downward pressure on

Interdigital Communications Corp

royalty rates for such technology could cause a decrease in the royalty rates we receive for use of the inventions covered by our patents, causing future revenue and cash flow to be lower than we anticipate.

<u>We Face Substantial Competition From Companies with Greater Resources.</u>

Competition in the wireless telecommunications industry is intense. We face competition from companies developing other technologies including existing companies with in-house development teams and new competitors to the market. (See, "-Our

19

Table of Contents

Technologies May Not Be Adopted By the Market or Widely Deployed.") Many current and potential competitors may have advantages over us, including: (a) existing royalty-free cross-licenses to competing and emerging technologies; (b) longer operating histories and presence in key markets; (c) greater name recognition; (d) access to larger customer bases; and (e) greater financial, sales and marketing, manufacturing, distribution channels, technical and other resources. In particular, our more limited resources and capabilities may adversely impact our competitive position if the market were to move towards the provision of an existing complete technology platform solution which larger equipment manufacturers have the ability to provide.

### Our Industry is Subject to Rapid Technological Change, Uncertainty, and Shifting Market Windows.

Our market success depends, in part, on our ability to keep pace with changes in industry standards, technological developments, and varying customer requirements. Changes in industry standards and needs could adversely affect the development of and demand for our technology, rendering products and technology currently under development obsolete and unmarketable. If we fail to anticipate or respond adequately to these shifts or we experience any significant technical, financial, or other delays in the development, introduction or commercial availability of our products and technology, we could miss a critical market window, reducing or eliminating our ability to capitalize on our technology, products, or both.

### Our 2004 Revenues were Derived Primarily from Three Patent Licensees.

Revenues from patent license agreements with Sony Ericsson, NEC and Sharp accounted for approximately 79% of our recurring revenues in 2004. In the event any of these licensees fail to meet their payment and/or reporting obligations under their respective license agreements (with the exception of the NEC 2G Agreement for which all currently anticipated cash has been received), our future revenue and cash flow could be materially adversely impacted. Additionally, since two of these companies (accounting for approximately 67% of our 2004 recurring revenues) are based in Japan, the future level of revenue and/or cash flow from these two companies could be affected by general economic conditions in Japan and each company's respective success in selling covered products in markets both inside and outside of Japan.

### We Rely on Relationships with Third Parties to Develop and Deploy Products.

The successful execution of our strategic plan is partially dependent on the establishment and success of relationships with equipment producers and other industry participants. With respect to FDD products for example, our plan contemplates that these third parties will permit us to have access to product capability, markets, and additional libraries of technology. We currently have one semiconductor partner in our FDD technology development effort-Infineon. Delays or failure to enter into additional partnering relationships to facilitate other technology development efforts could impair our ability to introduce into the market, portions of our technology and resulting products, or cause us to miss critical market windows. With respect to our AIM Antenna technologies, our strategy contemplates that third parties will assist in the proliferation and preference for our technology solutions. The inability of such third parties to successfully market or sell their products containing our technology could impair our ability to meet critical market windows.

### Claims by Third Parties That We Infringe Their Intellectual Property Could Harm Our Technology and Product Solutions Business.

A number of third parties publicly have claimed that they own patents essential to various wireless standards. Certain of our products are designed to comply with such standards. If any of our products are found to infringe the intellectual property rights of a third party, we could be required to redesign such products, take a license from such third party, and/or pay damages to the third party. If we are not able to negotiate a license and/or if we cannot economically redesign such products, we could be prohibited from marketing such products. In such case, our prospects for realizing future revenue could be adversely affected. If we are required to obtain licenses and/or pay royalties to one or more patent holders, this could have an adverse effect on the commercial implementation of our wireless products.

### Our Revenue and Cash Flow Depend Upon the Success of Our Licensing Program.

Over the next several years, our strategic plan depends upon our ability to continue to generate patent licensing revenue and cash flow related to the sale by third parties of wireless devices and infrastructure compliant with the 2G, 2.5G, and 3G digital cellular standards in use today, among them GSM, GPRS, EDGE, TIA/EIA-54/136, PDC, PHS, WCDMA, and cdma2000. Our ability to collect such revenue and cash flow is subject to a number of risks:

#### Affect of Nokia and Samsung Arbitrations

First, we believe that the license agreements with Ericsson and Sony Ericsson establish the financial terms necessary to define the royalty obligations of Nokia and Samsung on 2G GSM/TDMA and 2.5G GSM/GPRS/TDMA products under their existing patent licensing agreements with ITC. However, Nokia and Samsung each dispute the applicability of the Ericsson

and Sony Ericsson agreements, and these disputes are in arbitration. (See, *"-Business Activities, Patent and Technology Licensing, Legal Proceedings, Contractual Arbitration Proceedings."*). These disputes have delayed our receipt of the payments that we believe are due from each of Nokia and Samsung. In addition, the resolution of these disputes could (a) reduce or eliminate amounts that we believe Nokia and/or Samsung owe and/or are required to pay in the future, and (b) negatively affect our ability to secure new patent License agreements.

20

Table of Contents

*Challenges to and Expirations of Existing License Agreements*

Revenue and cash flow from existing and potential licensees may also be affected by challenges to our interpretation of provisions of license agreements. Such challenges could result in rejection or modification of license agreements and the termination, reduction, and suspension of payments. Also, the license grant covering the sale of 2G/2.5G products under the Sony Ericsson Agreement which accounted for 12% of our recurring royalty revenue in 2004 becomes paid-up at the end of 2006, terminating future payments thereunder. In addition, the PHS/PDC license agreement with Sharp which accounted for 24% of our recurring royalty revenue in 2004 expires in 2008, terminating payments thereunder.

*Ability to Enter into New License Agreements*

We face challenges in entering into new patent license agreements. During discussions with unlicensed companies significant negotiation issues arise from time to time. For example, manufacturers and sellers of 2G products can be reluctant to enter into a license agreement because such companies might be required to make a significant lump sum payment for unlicensed past sales. Also, many of the inventions we believe will be employed in 3G products are the subject of our patent applications where no patent has been issued yet by the relevant patent reviewing authorities. Certain prospective licensees are unwilling to license patent rights prior to a patent's issuance. Additionally, in the ordinary course of negotiations, in response to our demand that they enter into a license agreement, manufacturers raise different defenses and arguments including defenses and arguments (i) as to the essential nature of our patents, (ii) that their products do not infringe our patents, and (iii) relating to the impact on them of litigation in which we are involved. We can not be assured that all prospective licensees will be persuaded during negotiations to enter into a patent license.

*Defending and Enforcing Patent Rights*

Major telecommunications equipment manufacturers have challenged, and we expect will continue to challenge, the validity of our patents. In some instances, certain of our patent claims have been declared invalid or substantially narrowed. We cannot assure that the validity of these patents will be maintained or that any of the key patents will be determined to be applicable to any 2G or 3G product. Any significant adverse finding as to the validity or scope of our key patents could result in the loss of patent licensing revenue from existing licensees and could substantially impair our ability to secure new patent licensing arrangements.

In addition, the cost of defending our intellectual property has been and may continue to be significant. Litigation may be required to enforce our intellectual property rights, protect our trade secrets, enforce confidentiality agreements, or determine the validity and scope of proprietary rights of others. In addition, third parties could commence litigation against us seeking to invalidate our patents and/or have determined that our patents are unenforceable. As a result of any such litigation, we could lose our proprietary rights and/or incur substantial unexpected operating costs. Any action we take to protect our intellectual property rights could be costly and could absorb significant management time and attention that, in turn, could negatively affect our results of operations. Moreover, third parties could circumvent our patents not considered essential to the standards through design changes. Any of these events could adversely affect our prospects for realizing future revenue.

<u>Our License Agreements Contain Provisions which Could Impair Our Ability to Realize Licensing Revenues.</u>

Certain of our licenses contain provisions that could cause the licensee's obligation to pay royalties to be reduced or suspended for an indefinite period, with or without the accrual of the royalty obligation. For example, some of the existing license agreements may be renegotiated or restructured based on MFL or other provisions contained in the applicable license agreement. The assertion or validity of such provisions under the existing agreements could affect the timing and amount of future recurring licensing revenue.

<u>We Face Risks From Doing Business in Global Markets.</u>

A significant portion of our business opportunities exists in a number of international markets. Accordingly, we could be subject to the effects of a variety of uncontrollable and changing factors, including: difficulty in protecting our intellectual property and enforcing contractual commitments in foreign jurisdictions; government regulations, tariffs and other applicable trade barriers; currency control regulations; political instability; natural disasters, acts of terrorism and war; potentially adverse tax consequences; and general delays in remittance and difficulties of collecting non-U.S. payments. In addition, we also are subject to risks specific to the individual countries in which our customers, our licensees and we do business.

<u>Consolidations in the Wireless Communications Industry Could Adversely Affect Our Business.</u>

The wireless communications industry has experienced consolidation of participants and this trend may continue. Any concentration within the wireless industry might reduce the number of licensing opportunities and, in some instances, result in the loss or elimination of existing royalty obligations. Further, if wireless carriers consolidate with companies that utilize

Interdigital Communications Corp

technologies competitive with our technologies, we could lose market opportunities.

21

Table of Contents

### We Depend on Sufficient Engineering and Licensing Resources.

Competition exists for qualified individuals with expertise in licensing and with significant engineering experience in emerging technologies, like WCDMA and smart antenna solutions. Our ability to attract and retain qualified personnel could be affected by any adverse decisions in any litigation or arbitration and by our ability to offer competitive cash and equity compensation and work environment conditions. The failure to attract and retain such persons with relevant and appropriate experience could interfere with our ability to enter into new license agreements and undertake additional technology and product development efforts, as well as our ability to meet our strategic objectives.

### Market Projections are Forward-Looking in Nature.

Our strategy is based on our own projections and on analyst, industry observer and expert projections, which are forward-looking in nature and are inherently subject to risks and uncertainties. The validity of their and our assumptions, the timing and scope of the 3G market, economic conditions, customer buying patterns, timeliness of equipment development, pricing of 3G products, growth in wireless telecommunications services that would be delivered on 3G devices, and availability of capital for infrastructure improvements could affect these predictions. The inaccuracy of any of these projections could adversely affect our operating results and financial condition.

### Unauthorized Use or Disclosure of Our Confidential Information Could Adversely Affect Our Business.

We enter into contractual relationships governing the protection of our confidential and proprietary information with our employees, consultants, and prospective and existing customers and strategic partners. If we are unable to timely detect the unauthorized use or disclosure of our proprietary or other confidential information or we are unable to enforce our rights under such agreements, the misappropriation of such information could harm our business.

### If Wireless Handsets Pose Health and Safety Risks, Demand for Products of Our Licensees and Customers Could Decrease.

Media reports and certain studies have suggested that radio frequency emissions from wireless handsets may be linked to health concerns, such as brain tumors, other malignancies and genetic damage to blood, and may interfere with electronic medical devices, such as pacemakers, telemetry and delicate medical equipment. If concerns over radio frequency emissions grow, this could discourage the use of wireless handsets, and cause a decrease in demand for the products of our licensees and customers. Concerns over safety risks posed by the use of wireless handsets while driving and the effect of any resulting legislation could reduce demand for the products of our licensees and customers.

## Item 2. PROPERTIES

The Company owns one facility, subject to a mortgage, for approximately 52,000 square feet, in King of Prussia, Pennsylvania. The Company is party to a lease expiring in 2007, for approximately 56,125 square feet of space in Melville, New York. The Company is also a party to a lease expiring in 2006, for approximately 11,918 square feet of space in Montreal, Canada and a lease expiring in 2005 for approximately 20,660 square feet of space in Melbourne, Florida. We expect to renew both the Montreal and Melbourne leases or find comparable space in those vicinities. These facilities are the principal locations for our technology development activities.

## Item 3. LEGAL PROCEEDINGS

### *Nokia*

Nokia Arbitration

In July 2003, Nokia requested arbitration regarding Nokia's royalty payment obligations for its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products under the existing patent license agreement with ITC (Nokia Arbitration). Pursuant to the dispute resolution provisions of the patent license agreement, the arbitration is being conducted in the International Court of Arbitration of the International Chamber of Commerce (ICC).

The binding arbitration relates to ITC's claim that the patent license agreements ITC signed with Ericsson and Sony Ericsson in March 2003 defined the financial terms under which Nokia would be required to pay royalties on its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products commencing January 1, 2002. Nokia is seeking a determination that its obligation under our existing patent license agreement is not defined by our patent license agreements with Ericsson and Sony Ericsson or has been discharged. Nokia also is seeking a ruling that no royalty rate for its sales after January 1, 2002 can be determined by the arbitration panel ("Nokia Tribunal") until certain contractual conditions precedent have been satisfied. Nokia has additionally claimed that, in any event, the Nokia Tribunal cannot award money damages. ITC filed an Answer to Nokia's Request for Arbitration arguing that the patent license agreements signed with Ericsson and Sony

Ericsson in March 2003 defined the financial terms under which Nokia would be required to pay royalties on its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products commencing January 1, 2002, that Nokia's duty to pay these royalties has not been discharged, and that the documents sought by Nokia are not relevant to the royalty determination. ITC also counterclaimed for an arbitration decision requiring that Nokia pay us royalties on equivalent terms and conditions as those set forth in the Ericsson and Sony Ericsson patent license agreements for the period January 1, 2002 to December 31, 2006, and a determination of the amount of the royalty and payment terms. During fourth quarter 2003, Nokia filed a Reply contesting our claims and included additional claims and defenses relating to the validity and infringement of certain of ITC's patents. Subsequently, Nokia withdrew from the arbitration its claims pertaining to invalidity and non-infringement of those same ITC patents, but maintains that the validity and infringement of those patents is a factor the arbitration panel should consider in the arbitration. We do not believe that the issues of patent validity or infringement are relevant to the arbitrable royalty dispute and have contested Nokia's position.

The hearing in the Nokia Arbitration was conducted in January 2005 and the Nokia Tribunal has notified the parties that the Nokia Tribunal expects to submit an internal draft Award to the ICC on or before March 31, 2005 (as an approximate date). The ICC has set May 31, 2005 as the last date for rendering a Final Award and the Company anticipates a decision by the ICC on or before such last date absent an earlier resolution by the parties. Any Final Award could be subject to appeal filings on limited bases and enforcement proceedings by the parties.

Other Nokia Proceedings

In July 2003, Nokia filed a motion to intervene in the now-settled Ericsson litigation in the United States District Court for the Northern District of Texas and to gain access to documents previously sealed by the Court in the settled litigation. We filed a response opposing the request to intervene and opposing the request for access to the documents. The Court granted Nokia's motion to intervene in the Ericsson litigation, and provided Nokia with document access on a limited basis. Thereafter, the Nokia Tribunal ordered that certain documents from the Ericsson litigation be produced to Nokia for its use in the Nokia Arbitration, though the Nokia Tribunal made no decision as to whether issues of patent infringement or validity were relevant to the determination of Nokia's royalty obligation. Nokia subsequently filed a motion to reinstate certain decisions that were vacated in the now-settled Ericsson litigation, which motion was granted by the Court. We have appealed that ruling to the U.S. Court of Appeals for the Federal Circuit. Nokia is contesting our appeal.

In late 2004, Nokia sought to enforce two subpoenas issued by the Nokia Tribunal to Ericsson and Sony Ericsson seeking certain documents. Those enforcement actions were commenced in the Federal District Court for the Northern District of Texas and the Federal District Court for the Eastern District of North Carolina. Nokia has withdrawn both enforcement actions.

22

Table of Contents

During the Nokia Arbitration, on June 14, 2004 Nokia commenced a patent revocation proceeding in the United Kingdom High Court of Justice, Chancery Division, Patents Court, seeking to have three of ITC's U.K. patents declared invalid ("U.K. Revocation Proceeding"). Nokia also seeks a declaration that the manufacture and sale of certain mobile and infrastructure equipment does not infringe these three patents, and that the patents are not essential under the applicable standard. ITC is contesting all of these claims, and the trial is scheduled to commence in October 2005.

In connection with the U.K. Revocation Proceeding, in September 2004 Nokia filed an action against Sony Ericsson in the Federal District Court for the Eastern District of North Carolina, and an action against Ericsson in the Federal District Court for the Eastern District of Texas. The actions are based upon 28 United States Code Section 1782 which provides for discovery in a United States court for use in a foreign proceeding and addresses jurisdictional, procedural and evidentiary matters associated with such foreign proceeding. In both actions, Nokia sought documents related to the ITC patents and patent licenses. Both the Federal District Court for the Eastern District of Texas and the Eastern District of North Carolina have denied Nokia's motions with respect to any documents not previously produced in the Nokia Arbitration.

During the Nokia Arbitration, in January 2005, Nokia and Nokia, Inc. filed a complaint in the United States District Court for the District of Delaware against InterDigital Communications Corporation and ITC for declaratory judgments of patent invalidity and non-infringement of certain claims of certain patents, and violations of the Lanham Act. We have filed a motion to dismiss the complaint.

*Samsung*

In 2002, during an arbitration proceeding, Samsung elected, under its 1996 patent license agreement with ITC (1996 Samsung License Agreement), to have Samsung's royalty obligations commencing January 1, 2002 for 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE wireless communications products be determined in accordance with the terms of the Nokia patent license agreement, including its MFL provision. By notice in March 2003, ITC notified Samsung that such Samsung obligations had been defined by the relevant licensing terms of ITC's license agreements with Ericsson (for infrastructure products) and Sony Ericsson (for terminal unit products) as a result of the MFL provision in the Nokia license agreement. In November 2003, Samsung initiated a binding arbitration against the Company and ITC. The arbitration was filed with the ICC. Samsung is seeking to have an ICC arbitration panel determine that Samsung's obligations under the 1996 Samsung License Agreement are not defined by our license agreements with Ericsson and Sony Ericsson or, in the alternative, to determine the amount of the appropriate royalty due. ITC has counterclaimed for an arbitration decision requiring that Samsung pay ITC royalties on equivalent terms and conditions as those set forth in the Ericsson and Sony Ericsson patent license agreements for the period January 1, 2002 to December 31, 2006, and determining the amount of the royalty and payment terms. We also seek a declaration that the parties' rights and obligations are governed by the 1996 Samsung License Agreement, and that the Nokia patent license agreement dictates only Samsung's royalty obligations and most favored rights for those products licensed under the 1996 Samsung License Agreement. Samsung has replied to ITC's answer and counterclaim, maintaining Samsung's position (as set forth in its arbitration demand) and arguing that it has succeeded to all of Nokia's license rights, including its 3G license. If the arbitration panel were to agree with Samsung's position, Samsung would be licensed to sell 3G products on the same terms as Nokia. In the alternative, Samsung asserts that its royalty obligations should be governed by the MFL clause in the 1996 Samsung License Agreement. The arbitration panel has informed the Company and Samsung that the evidentiary hearing in this matter is scheduled to commence in June 2005.

23

Table of Contents

### *Lucent*

In March 2004, Tantivy Communications, Inc., one of our wholly-owned subsidiaries, filed a lawsuit in the United States District Court for the Eastern District of Texas against Lucent, a leading manufacturer of cdma2000 equipment. The case is based on our assertions of infringement by Lucent of several of our subsidiary's patents issued in the United States. The lawsuit seeks damages for past infringement and an injunction against future infringement as well as interest, costs, and attorneys' fees. Lucent has responded to the lawsuit denying any infringement, and seeking a declaration of non-infringement and that the patents are invalid. Lucent has requested attorneys' fees and costs. The Court has issued a scheduling order pursuant to which the Markman hearing (for claim construction) is scheduled for May 2005, and the trial is scheduled to commence in September 2005. Pursuant to court order, the parties attended a mediation session in January 2005. The parties are currently in the discovery phase of the litigation.

### *Federal*

In October 2003, Federal Insurance Company (Federal), the insurance carrier for the now-settled litigation involving Ericsson Inc., delivered to us a demand for arbitration under the Pennsylvania Uniform Arbitration Act. Federal claims, based on their determination of expected value to the Company resulting from our settlement involving Ericsson Inc., that an insurance reimbursement agreement requires us to reimburse Federal approximately $28.0 million for attorneys' fees and expenses it claims were paid by it. On November 4, 2003 the Company filed an action in United States District Court for the Eastern District of Pennsylvania seeking a declaratory judgment that the reimbursement agreement is void and unenforceable, seeking reimbursement of attorneys' fees and expenses which have not been reimbursed by Federal and which were paid directly by the Company in connection with the Ericsson Inc. litigation, and seeking damages for Federal's bad faith and breach of its obligations under the insurance policy. In the alternative, in the event the reimbursement agreement is found to be valid and enforceable, the Company is seeking a declaratory judgment that Federal is entitled to reimbursement based only on certain portions of amounts received by the Company from Ericsson Inc. pursuant to the settlement of the litigation involving Ericsson Inc. Federal has requested the Court to dismiss the action and/or to have the matter referred to arbitration. We have opposed such requests. Prior to Federal's demand for arbitration, we had accrued a contingent liability of $3.4 million related to the insurance reimbursement agreement.

### *Other*

We have filed patent applications in the United States and in numerous foreign countries. In the ordinary course of business, we currently are, and expect from time to time to be, subject to challenges with respect to the validity of our patents and with respect to our patent applications. We intend to continue to vigorously defend the validity of our patents and defend against any such challenges. However, if certain key patents are revoked or patent applications are denied, our patent licensing opportunities could be materially and adversely affected.

We and our licensees, in the normal course of business, have disagreements as to the rights and obligations of the parties under the applicable patent license agreement. For example, we could have a disagreement with a licensee as to the amount of reported sales of covered products and royalties owed. Our patent license agreements typically provide for arbitration as the mechanism for resolving disputes. Arbitration proceedings can be resolved through an award rendered by an arbitration panel or through private settlement between the parties.

In addition to disputes associated with enforcement and licensing activities regarding our intellectual property, including the litigation and other proceedings described above, we are a party to other disputes and legal actions not related to our intellectual property but also arising in the ordinary course of our business.

Based upon information presently available to us, we believe that the ultimate outcome of these other disputes and legal actions will not materially affect us.

24

Interdigital Communications Corp

Table of Contents

**Item 4. <u>SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS</u>**

During the fourth quarter of fiscal year ended December 31, 2004, no matters were submitted for a vote of our security holders.

25

**Table of Contents**

**PART II**

**Item 5. MARKET FOR COMPANY'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

The following table sets forth the range of the high and low sales prices of InterDigital's Common Stock for the years 2004 and 2003, as reported by The Nasdaq Stock Market.

|  | High | Low |
|---|---|---|
| **2004** | | |
| First Quarter | $27.87 | $15.81 |
| Second Quarter | 19.50 | 15.00 |
| Third Quarter | 19.46 | 13.89 |
| Fourth Quarter | 23.50 | 15.34 |

|  | High | Low |
|---|---|---|
| **2003** | | |
| First Quarter | $24.14 | $11.50 |
| Second Quarter | 28.85 | 18.21 |
| Third Quarter | 26.25 | 13.90 |
| Fourth Quarter | 21.13 | 15.00 |

As of March 1, 2005, there were approximately 1,578 holders of record of our Common Stock.

We have not paid cash dividends on our Common Stock since inception. It is anticipated that in the foreseeable future, without regard to any cash proceeds we may receive from any settlement or resolution of outstanding arbitrations or litigations, no cash dividends will be paid on our Common Stock and any cash otherwise available for such dividends will be reinvested in our business. The payment of cash dividends will depend on our earnings, any dividend requirements on Preferred Stock if issued in the future, our capital requirements and other factors considered relevant by our Board of Directors.

The Company did not make any purchases of its Common Stock during fourth quarter 2004.

**Item 6. SELECTED FINANCIAL DATA**

**(in thousands, except per share data)**

| Consolidated Statements of Operations Data: | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Revenues: | | | | | |
| Licensing and alliance (*a*) | $103,685 | $114,574 | $ 87,895 | $ 52,562 | $ 51,244 |
| Products | — | — | — | — | 5,634 |
| Total revenues | $103,685 | $114,574 | $ 87,895 | $ 52,562 | $ 56,878 |
| (Loss) income from operations | $ (6,292) | $ 29,541 | $ 9,240 | $(20,943) | $ 3,243 |
| Other Income (*b*) | $ — | $ 10,580 | $ — | $ — | $ — |
| Income tax benefit (provision) (*c*) | $ 4,704 | $ (7,269) | $ (8,748) | $ (3,418) | $ (3,607) |
| Net income (loss) applicable to common shareholders before cumulative effect of change in accounting principle | $ 89 | $ 34,332 | $ 2,375 | $(19,421) | $ 5,564 |
| Net income (loss) per common share before cumulative effect of change in accounting principle – basic | $ — | $ 0.62 | $ 0.04 | $ (0.36) | $ 0.11 |
| Net income (loss) per common share before cumulative effect of change in accounting principle – diluted | $ — | $ 0.58 | $ 0.04 | $ (0.36) | $ 0.10 |
| Cumulative effect of change in accounting principle (*d*) | $ — | $ — | $ — | $ — | $(53,875) |
| Net income (loss) applicable to common shareholders | $ 89 | $ 34,332 | $ 2,375 | $(19,421) | $(48,311) |
| Net income (loss) per common share – basic | $ — | $ 0.62 | $ 0.04 | $ (0.36) | $ (0.91) |
| Net income (loss) per common share – diluted | $ — | $ 0.58 | $ 0.04 | $ (0.36) | $ (0.91) |

Weighted average number of common shares outstanding –

| | | | | | |
|---|---|---|---|---|---|
| basic | 55,264 | 55,271 | 52,981 | 53,446 | 52,855 |
| Weighted average number of common shares outstanding – diluted | 59,075 | 59,691 | 56,099 | 53,446 | 57,306 |
| Consolidated Balance Sheet Data: | | | | | |
| Cash and cash equivalents | $ 15,737 | $ 20,877 | $ 22,337 | $ 17,892 | $ 12,343 |
| Short-term investments | 116,081 | 85,050 | 65,229 | 72,471 | 76,644 |
| Working capital | 106,784 | 112,325 | 111,845 | 87,696 | 87,390 |
| Total assets | 241,920 | 205,165 | 191,178 | 148,381 | 141,625 |
| Total debt | 1,884 | 1,970 | 2,159 | 2,342 | 2,560 |
| Total shareholders' equity | $115,659 | $ 97,485 | $ 78,791 | $ 60,274 | $ 73,910 |

26

**Table of Contents**

---

(a)  In third quarter 2004, we transitioned to reporting per-unit royalties in the period in which we receive our licensees' royalty reports rather than in the period in which our licensees' sales of covered products occur. As a result of this transition, our results for 2004 include only three quarters of per-unit royalties.

(b)  In 2003, we recognized, as other income, $14 million from the settlement of our litigation with Ericsson, net of an estimated $3.4 million associated with a claim under an insurance agreement.

(c)  Our income tax provision in 2004 included a benefit of approximately $17 million related to the third quarter 2004 recognition of an increase in the value of our deferred tax assets. For the years 2000 through 2003, our income tax provision was comprised primarily of non-U.S. withholding taxes and Alternative Minimum Tax. The volatility in our income tax provision, prior to our recognition of an increase in the value of our deferred tax assets, was primarily due to changes in the level of royalty revenue subject to non-U.S. withholding tax.

(d)  Effective January 1, 2000, we modified our policy for recognizing revenues from patent licensing in response to Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements". Under our revised policy we defer recognition of up-front payments that represent the fulfillment or prepayment of a licensee's future royalty obligations and recognize such up-front payments over the period of benefit.

**Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**OVERVIEW**

The following discussion should be read in conjunction with the Selected Financial Data and the Consolidated Financial Statements and notes thereto, contained in this document. Please refer to the Glossary of Terms immediately following the Table of Contents for a list and detailed description of the various technical, industry and other defined terms that are used in this Form 10-K.

We are in the business of designing and developing advanced wireless technology solutions which we make available for license or sale to semiconductor companies and equipment producers. Our advanced technology solutions are comprised of inventions, know-how and other technical data (e.g., software designs and specifications) related to the design and operation of digital wireless products and systems. We patent many of our inventions and license those inventions to wireless communications equipment producers and related suppliers. In addition, we offer for sale or license, on a non-exclusive basis, various portions of the technology (e.g., reference designs, algorithms, know-how and software) to producers of wireless equipment products and components. Our advanced technology solutions have been developed both independently, in conjunction with certain equipment manufacturers and through strategic acquisitions. We also actively participate in the standard setting process for wireless technologies, contributing solutions that are incorporated, from time to time, into Standards. In 2004, we generated substantially all of our revenue from patent license agreements.

In third quarter 2004, we transitioned to reporting per-unit royalties in the period in which we receive our licensees' royalty reports rather than in the period in which our licensees' sales of covered products occur. Consequently, our results for 2004 include only three quarters of per-unit royalties compared to four quarters in 2003. Our revenues in 2004, 2003 and 2002 included approximately $1.4 million, $20.6 million and nearly $8.0 million, respectively, related to our licensees' product sales from prior periods. In 2004 and 2002, our revenues also included $0.4 million and $16.5 million, respectively, of previously received non-refundable prepayments that were recognized upon our receipt of evidence that the licensees had discontinued sales of covered products. These non-recurring items represented approximately 2%, 18% and 28% of our total revenues in 2004, 2003 and 2002, respectively. We also recorded $14.0 million of other income in 2003 related to the settlement of a patent litigation that was not associated with a pre-existing patent license agreement. Unpredictable, non-recurring amounts like those noted above could continue in the future.

In the last three years, we have signed eleven new or amended patent license agreements with both new and existing customers, including six license agreements covering 3G technologies. Over that period, we nearly tripled our quarterly recurring patent license royalties, from $11.1 million in first quarter 2002 to $33.0 million in fourth quarter 2004. The increase resulted from both an increase in the number of licensees and higher royalties from existing licensees based on increased sales of covered 2G and 3G products. We expect that our 2G/3G royalty mix will shift to a higher percentage of 3G royalties as the decade unfolds due to the emergence of the 3G market, the continued maturation of the 2G market and the expiration, beginning in 2006, of certain of our TDMA patents.

27

Table of Contents

During 2004, wireless handset manufacturers, including our licensees, continued to experience declining average selling prices on mature 2G devices with limited functionality (e.g., voice-only handsets). However, these decreases were offset in large part by both increased volumes and higher average selling prices for devices with increased functionality and features, such as 3G devices and camera-enabled 2.5G handsets. Our royalty rates and terms differ by licensee. Some royalty obligations are calculated strictly as a percentage of sales. Other agreements provide for fixed royalties per unit sold and others provide for combinations or variations thereof. As such, changes in our royalty revenue from covered handsets may not highly correlate with overall industry changes in average selling prices or volumes. That was the case in both 2003 and 2004 when we experienced limited diminution in per-unit royalties from licensees due to the mix of royalties and related agreements. We believe our 2G licensing revenue will decline over time as a result of the continued maturation of the 2G market, coupled with the expiration of certain of our TDMA patents in coming years.

From time-to-time, if we believe that a third party is required to license our patents in order to manufacture and sell digital cellular products, and such third party will not enter into a patent license agreement with us, we may institute a patent infringement lawsuit against the third party. In March 2004, we filed a patent infringement lawsuit against Lucent Technologies, Inc. (Lucent), a leading manufacturer of cdma2000 equipment, for infringement of seven United States patents. The complaint seeks damages for past infringement and an injunction against future infringement as well as interest, costs, and attorney's fees. Lucent has responded to the lawsuit denying any infringement.

We and our licensees, in the normal course of business, may have disagreements as to the rights and obligations of the parties under the applicable license agreement. For example, we may have a disagreement with a licensee as to the amount of reported sales and royalties due. Currently, we are involved in separate arbitration proceedings regarding our respective license agreements with Nokia Corporation (Nokia) and Samsung Electronics Co., Ltd. (Samsung). The evidentiary hearing and post filing briefs in the arbitration proceeding with Nokia recently concluded. The Tribunal presiding over the arbitration proceeding with Nokia is expected to deliver a draft award to the International Court of Arbitration of the International Chamber of Commerce (ICC) on or before an approximate date of March 31, 2005. The arbitration panel for our arbitration with Samsung has informed the parties that the evidentiary hearing in this matter is scheduled to commence in June 2005.

In 2004, our cost of development increased from approximately $45.9 million to approximately $51.2 million and represented approximately 47% of our total operating expenses. Our development efforts are integral to both establishing product offerings and expanding our portfolio of wireless patents and will continue to be a substantial portion of our operating expenses in 2005.

The value of our deferred tax assets at December 31, 2003, including a net deferred tax asset of $42.1 million relating to our federal net operating loss (NOL) credit carryforwards, was $88.3 million. At December 31, 2003, we provided a full valuation allowance on all deferred tax assets other than those associated with revenue that was recognized in the computation of our foreign source withholding tax liability but deferred for financial statement purposes. During 2004, we determined that our recent operating performance coupled with our current expectations to generate future taxable income indicated that it was more likely than not that we would utilize a portion of our deferred tax assets. Accordingly, in third quarter 2004, we recognized an increase in the value of our deferred tax assets of approximately $27 million through a partial reversal of the valuation allowance. Of the $27 million benefit, approximately $17 million was recognized as income in the statement of operations and approximately $10 million was credited directly to additional paid-in-capital. Our assessment of the value of our deferred tax assets did not take into consideration all potential income sources, such as impacts from litigation or arbitration proceedings. We will continue to evaluate the potential use of our deferred tax assets and, depending on various factors, could reverse all or a portion of the remaining valuation allowance in the future.

We seek to maintain a strong balance sheet and have increased our cash and short-term investment position from $105.9 million at December 31, 2003 to $131.8 million at December 31, 2004. We achieved this increase while investing approximately $17 million during 2004 to repurchase one million shares of our common stock. In fourth quarter 2004, our Board of Directors authorized a program to repurchase an additional one million shares of common stock. In March 2005, the Board expanded their authorization under this share repurchase program by one million shares. We initiated share repurchases under this share repurchase program early in 2005. We plan to continue to maintain a strong cash and short-term investment position. However, we will consider investment opportunities that may require us to reduce our cash and short-term investment position and/or increase our long-term debt. Such opportunities may include, but are not limited to, additional share repurchase programs, accelerated investment in our internally developed technology and the acquisition of patents and technology products from third parties.

Our revenue and cash flows are dependent, in large part, on the overall market for wireless products and our licensees' share of that market. Over the course of the last ten years, the cellular communications industry has experienced rapid growth

Interdigital Communications Corp                                    Page 62 of 134

worldwide. Total worldwide cellular wireless communications subscribers rose from slightly more than 200 million at the end of 1997 to 1.7 billion at the end of 2004. In several countries, mobile telephones now outnumber fixed-line telephones. Market analysts expect that the aggregate number of global wireless subscribers will reach 3 billion in 2009.

28

Table of Contents



### Global Cellular Handset Sales by Technology

|                              | 2001   | 2002   | 2003   | 2004*  | 2005*  |
|------------------------------|--------|--------|--------|--------|--------|
| ⊠ GSM (GPRS/EDGE/WCDMA)      | 255.84 | 279.39 | 347.53 | 484.70 | 534.30 |
| ■ TDMA                       | 41.50  | 41.84  | 33.66  | 17.10  | 6.50   |
| ⊠ CDMA (cdma2000 1x, EV-DO)  | 62.81  | 75.76  | 101.71 | 136.74 | 159.40 |
| ▨ Other                      | 48.41  | 38.65  | 42.77  | 41.90  | 31.70  |

\* 2004 and 2005 data represents projections of handset sales.

Source: Strategy Analytics, Inc. – March 2005.

The growth in new cellular subscribers, combined with customers who are replacing their mobile phones, helped fuel the growth of mobile phone sales from approximately 115 million units in 1997 to approximately 680 million units in 2004. We believe the combination of a broad subscriber base, continued technological change, and the ever growing dependence on the Internet, e-mail and other digital media sets the stage for growth in the sales of wireless products and services through the balance of this decade. While 2.5G services have been widely deployed as an initial enabler of robust data services, a number of service providers have deployed 3G equipment to further enable enhanced data services.

NTT DoCoMo, the largest wireless operator in Japan, launched a WCDMA 3G network in Japan in October 2001. This service now has over 10.5 million subscribers. 3G services have also been launched by Hutchison, Vodafone, Orange and TIM Italy. The deployment, pace and growth of the 3G market will depend upon the ability of manufacturers to offer and deliver fully-functional equipment, including mobile phones, at affordable prices, and the introduction and uptake of new services designed to use the enhanced data capability. Major manufacturers brought 3G mobile phones to market during 2004. Approximately 16 million WCDMA-enabled phones were sold in 2004, and analysts have forecast shipments of 30 to 40 million WCDMA-enabled mobile phones in 2005. Shipments of cdma2000 1x EV phones reached almost 13 million units in 2004 and are expected to reach approximately 30 million units in 2005.

The adoption of 3G technologies including WCDMA and cdma2000 have been important contributors to our revenue in 2004. Although we cannot always clearly identify the contribution from 3G versus 2G royalties in license agreements that cover both generations of air interface technology, our royalties from patent license agreements that include 3G grew to just over one half of our total revenues in 2004 compared to approximately 32% in 2003. The continued adoption of 3G and our ability to license manufacturers of 3G equipment is integral to our strategy and necessary to replace revenues from 2G only royalties which we expect will begin to decline in 2006.

In addition to the advances in cellular technologies, additional wireless technologies designed to provide data and other communications have emerged. In particular, IEEE 802.11 WLAN has gained momentum in recent years as a wireless broadband solution in the home, office and in public areas. IEEE 802.11 technology offers high-speed data connectivity through unlicensed spectrum within a relatively modest operating range. From initial semiconductor shipments of products built to the IEEE 802.11 standard in 1998, sales have nearly doubled every year since introduction. While relatively small compared to the cellular market (80 million IEEE 802 wireless integrated circuits shipped in 2004) the affordability and attractiveness of the technology has helped fuel rapid market growth. In addition, the IEEE wireless standards bodies are currently creating sets of standards to enable higher data rates, provide coverage over longer distances and enable roaming.

In 2004, we signed an $18.5 million agreement with General Dynamics to serve as a subcontractor on the Mobile User

Objective System ("MUOS") program for the U.S. military as more fully disclosed under our discussion of significant agreements and events below. While more than 99% of our 2004 revenues were related to patent license royalties, we expect that as a result of this agreement, our product and service offerings will begin to contribute revenues in 2005.

29

Table of Contents

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Our consolidated financial statements are based on the selection and application of accounting principles generally accepted in the United States of America, which require us to make estimates and assumptions that affect the amounts reported in both our consolidated financial statements and the accompanying notes thereto. Future events and their effects cannot be determined with absolute certainty. Therefore, the determination of estimates requires the exercise of judgment. Actual results could differ from these estimates, and any such differences may be material to the financial statements. Our significant accounting policies are described in Note 2 to our consolidated financial statements, and are included in Item 8 of the Form 10-K. We believe the accounting policies that are of particular importance to the portrayal of the Company's financial condition and results, and that may involve a higher degree of complexity and judgment in their application compared to others, are those relating to patents, contingencies, revenue recognition, compensation, and income taxes. If different assumptions were made or different conditions had existed, our financial results could have been materially different.

### Patents

We capitalize external costs, such as filing fees and associated attorney fees, incurred to obtain issued patents and patent license rights. We expense costs associated with maintaining and defending our patents subsequent to their issuance. We amortize capitalized patent costs on a straight-line basis over the estimated useful lives of the patents. Ten years represents our best estimate of the average useful lives of our patents relating to technology developed directly by the Company. The ten year estimated life of internally generated patents is based on our assessment of such factors as the integrated nature of the portfolios being licensed, the overall makeup of the portfolio over time and the term(s) of license agreements for such patents. The estimated useful lives of acquired patents and patent rights, however, will be based on analysis related to each acquisition and may differ from the estimated useful lives of patents obtained directly by the Company. We assess the potential impairment to all capitalized net patent costs when there is evidence that events or changes in circumstances indicate that the carrying amount of these patents may not be recovered. Amortization expense was $4.4 million, $3.3 million and $2.2 million in 2004, 2003 and 2002, respectively. As of December 31, 2004 and 2003, we capitalized gross patent costs of $62.5 million and $49.3 million, respectively; such costs were offset by accumulated amortization of $21.5 million and $17.1 million, respectively. The weighted average estimated useful life of our capitalized patent costs at December 31, 2004 and 2003 was 11.2 years and 11.4 years, respectively.

### Contingencies

We recognize contingent assets and liabilities in accordance with Statement of Financial Accounting Standards (SFAS) No. 5 *Accounting for Contingencies*.

In first quarter 2003, we accrued a $3.4 million liability related to an insurance reimbursement agreement. Our insurance carrier has demanded arbitration, claiming that our obligation under the agreement is approximately $28.0 million. We have since filed an action seeking a declaratory judgment that the insurance reimbursement agreement is void and that we are due damages from our insurance carrier for their bad faith and breach of obligations under a related insurance policy. At this time, it is impossible to predict the outcome of the litigation and any arbitration, therefore we have not adjusted our original accrual of $3.4 million.

### Revenue Recognition

In 2004, we derived revenue principally from patent licensing. The timing of revenue recognition and the amount of revenue actually recognized from each source depends upon a variety of factors, including the specific terms of each agreement and the nature of the deliverables and obligations. Such agreements are often complex and multi-faceted. These agreements can include, without limitation, elements related to the settlement of past patent infringement liabilities, up-front and non-refundable license fees for the use of patents and/or know-how, patent and/or know-how licensing royalties on covered products sold by licensees, cross licensing terms between us and other parties, the compensation structure and ownership of intellectual property rights associated with contractual technology development arrangements, and advanced payments and fees for service arrangements. Due to the combined nature of some agreements and the inherent difficulty in establishing reliable, verifiable and objectively determinable evidence of the fair value of the separate elements of these agreements, the total revenue resulting from such agreements may sometimes be recognized over the combined performance period. In other circumstances, such as those agreements involving consideration for past and expected future patent royalty obligations, the determining factors necessary to allocate revenue across past, current, and future years may be difficult to establish. In such instances, the appropriate recording of revenue between periods may require the use of judgment, after consideration of the particular facts and circumstances. Generally, we will not recognize revenue related to payments that are due greater than twelve months from the balance sheet date. In all cases, revenue is only recognized after all of the following

criteria are met: (1) written agreements have been executed; (2) delivery of technology or intellectual property rights has occurred or services have been rendered; (3) fees are fixed or determinable; and (4) collectibility of fees is reasonably assured.

*Patent license agreements*

Upon signing a patent license agreement, we provide the licensee permission to use our patented inventions in specific applications. We have no material future obligations associated with such licenses, other than, in some instances, to provide such licensees with notification of future license agreements pursuant to most favored licensee rights. Under our patent license agreements, we typically receive one or a combination of the following forms of payment as consideration for permitting our licensees to use our patented inventions in their applications and products:

- Consideration for Prior Sales: Consideration related to a licensee's product sales from prior periods. Such consideration may result from a negotiated agreement with a licensee that utilized our patented inventions prior to signing a patent license agreement with us or from the resolution of a disagreement or arbitration with a licensee over the specific terms of an existing license agreement. In each of these cases, we record the consideration as revenue. We may also receive consideration from the settlement of patent infringement litigation where there was no prior patent license agreement. We record the consideration related to such litigation as other income.

30

Table of Contents

- <u>Paid-up Amounts:</u> Up-front, non-refundable royalty payments that fulfill the licensee's obligations to us under a patent license agreement, for the lifetime of the agreement.

- <u>Prepayments:</u> Up-front, non-refundable royalty payments towards a licensee's future obligations to us related to its expected covered product sales in future periods. Our licensees' obligations to pay royalties extend beyond the exhaustion of their Prepayment balance. Once a licensee exhausts its Prepayment balance, we may provide them with the opportunity to make another Prepayment toward future sales or it will be required to make Current Royalty Payments.

- <u>Current Royalty Payments:</u> Royalty payments covering a licensee's obligations to us related to its covered product sales in the current contractual reporting period.

We recognize revenues related to Consideration for Prior Sales when we have obtained a signed agreement, identified a fixed and determinable price and determined that collectability is reasonably assured. We recognize revenues related to Paid-up Amounts on a straight-line basis over the effective term of the license. We utilize the straight-line method because we have no future obligations under these licenses and we can not reliably predict in which periods, within the term of a license, the licensee will benefit from the use of our patented inventions.

Licensees that either owe us Current Royalty Payments or have Prepayment balances provide us with quarterly or semi-annual royalty reports that summarize their sales of covered products and their related royalty obligations to us. We typically receive these royalty reports subsequent to the period in which our licensees' underlying sales occurred. Consideration for Prior Sales, the exhaustion of Prepayments and Current Royalty Payments are often calculated based on related per-unit sales of covered products. In third quarter 2004, we transitioned our recognition of these per-unit royalties to recognize the revenue in the period in which we receive royalty reports from licensees, rather than in the period in which our licensees' underlying sales occur.

The transition was necessary because we could no longer both wait to receive royalty reports from our licensees and file our financial statements on a timely basis. Without royalty reports, our visibility into our licensees sales is very limited because we are not involved in the supply or sale of their products and industry analysts do not provide information detailed or timely enough to give us sufficient visibility to make reasonably accurate estimates for our most significant licensees. As such, it is unlikely that we could arrive at estimates for our most significant licensees that are objective and supportable.

Previously, we recognized revenue related to per-unit sales of covered products in the period the sales occurred. When we did not receive the royalty reports prior to the issuance of our financial statements, we accrued the related royalty revenue if reasonable estimates could be made. Such estimates, which were limited to a small number of licensees and never exceeded 5% of our revenue in any period presented, were based on the historical royalty data of the licensees involved, currently available third party forecasts of royalty related product sales in the applicable market and, if available, information provided by the licensee. When our licensees formally reported royalties for which we had previously accrued revenues based on estimates, or when they reported updates to prior royalty reports, we adjusted revenue in the period in which the final reports were received. In cases where we receive objective, verifiable evidence that a licensee has discontinued sales of covered products, we recognize any remaining deferred revenue balance related to unexhausted Prepayments in the period that we receive such evidence.

*Software and Service Revenues*

Software license revenues are recognized in accordance with the American Institute of Certified Public Accountants Statement of Position (SOP) 97-2 "Software Revenue Recognition" and SOP 98-9 "Modification of SOP 97-2, Software Revenue Recognition". When the arrangement with the customer includes significant production, modification or customization of the software, the Company uses contract accounting, as required by SOP 97-2. For those arrangements accounted for under SOP 81-1 "Accounting for Performance of Construction-Type and Certain Production-Type Contracts", the Company uses the percentage-of-completion method. Under this method, revenue and profit are recognized throughout the term of the contract, based on the percentage of costs incurred to date compared to the total estimated contract costs. Changes in estimates for revenues, costs and profits are recognized in the period in which they are determinable. When such estimates indicate that costs will exceed future revenues and a loss on the contract exists, a provision for the entire loss is recognized at that time.

We recognize revenues associated with service arrangements that are outside the scope of SOP 81-1 on a straight-line basis under Staff Accounting Bulletin No. 104 "Revenue Recognition", unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer. Recently, our service agreements have been long-term

in nature and we have recorded revenue from them based on our proportional performance of services rendered. The terms of these arrangements have provided evidence that this approach better reflects the pattern in which the revenue has been earned or the obligations have been fulfilled. When recognizing revenue based on our proportional performance, we measure the progress of our performance based on the relationship between incurred contract costs and total estimated contract costs. Our most significant cost has been labor and we believe labor cost provides a measure of the progress of our services. The effect of changes to total estimated contract costs is recognized in the period such changes are determined. Estimated losses, if any, are recorded when the loss first becomes probable and reasonably estimable.

*Deferred Charges*

31

Table of Contents

From time-to-time, we use sales agents to assist us in our licensing activities. We often pay a commission related to successfully negotiated patent license agreements. The commission rate varies from agreement to agreement. Commissions are normally paid shortly after the receipt of cash payments associated with our patent license agreements.

We defer recognition of commission expense related to Prepayments and Paid-up Amounts and amortize these expenses in proportion to our recognition of the related revenue. In 2004, 2003 and 2002, we paid approximately $7.5 million, $2.9 million and $1.2 million of commissions and recognized approximately $3.5 million, $3.4 million and $2.5 million, respectively, of commission expense as part of patent licensing and administration expense. At December 31, 2004 and 2003, we had approximately $7.2 million and $3.1 million, respectively, of deferred commission expense included within prepaid and other current assets and other non-current assets.

### Compensation

We invest heavily in the development of advanced wireless technology and related products by building and sustaining a highly specialized engineering team. Over each of the last three years, our cost of development has represented roughly one-half of our total operating expenses. The largest portion of our cost of development has been personnel costs. As of December 31, 2004 we employed 209 engineers, of whom 58% hold master's degrees and 17% hold PhDs.

We use a variety of compensation programs to both attract and retain engineers and other key employees and more closely align employee compensation with Company performance. These programs include, but are not limited to, an annual bonus tied to performance goals, cash awards to inventors for filed patent applications and patent issuances, as well as a long-term compensation program that includes restricted stock units (RSUs) and a performance-based cash incentive component. We accrued $2.9 million and $4.1 million of compensation expense in 2004 related to the performance-based cash incentive and restricted stock units (RSUs), respectively. We amortize the expense associated with our RSUs using an accelerated method. The amount of expense accrued in 2004 related to the performance-based cash incentive was based on our assumption that the Company will meet 100% of its goals under the long-term cash-based incentive. If we had assumed that the Company's performance will meet 120% of the Company's associated goals, we would have recorded approximately $1.4 million of additional operating expense. If we had assumed that the Company's performance will meet 80% of the associated goals, we would have recognized approximately $1.4 million less operating expense in 2004. There is no cash pay-out for performance that falls below 80% of target results. We expect that the expenses associated with the performance-based cash incentive and RSUs will each increase by between $4 million to $5 million in 2005 as we accrue expenses for both the final year of the initial measurement period (April 2004 through December 2005) and begin the first year of the first three year measurement period under our long term compensation programs. However, the amount recorded may change dependant upon our future expectations to attain performance targets.

### Income Taxes

Income taxes are accounted for under the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the Consolidated Statement of Operations in the period that includes the enactment date. A valuation allowance is recorded to reduce the carrying amounts of deferred tax assets if management has determined that it is more likely than not that such assets will not be realized.

We recognize deferred tax assets related to deferred revenue for both U.S. Federal Income tax purposes and non-U.S. jurisdictions that assess a source withholding tax on related royalty payments. We expense these deferred tax assets in accordance with FAS 109 as the related temporary differences reverse. In 2004, 2003 and 2002, we paid approximately $3.9 million, $9.5 million and $5.6 million of foreign source withholding tax and recognized approximately $4.5 million, $7.4 million and $8.3 million, respectively, of foreign source withholding tax expense in our income tax provision in accordance with this policy.

Our accumulated tax losses, which include allowable deductions related to exercised employee stock options, generated federal NOL credit carryforwards of approximately $110 million and $123 million as of December 31, 2004 and 2003, respectively. These NOL credit carryforwards were the largest component of our deferred tax assets which, before any adjustment for valuation allowance, had tax effected values of $107.6 million and $88.3 million, respectively. Generally accepted accounting principles require that we establish a valuation allowance for any portion of our deferred tax assets for which management believes it is more likely than not that we will be unable to utilize the asset to offset future taxes. At

December 31, 2003, we provided a full valuation allowance on all deferred tax assets other than those associated with revenue that was recognized in the computation of our foreign source withholding tax liability but deferred for financial statement purposes. In 2004, we determined that our recent operating performance coupled with our current expectations to generate future taxable income indicated that it was more likely than not that we would utilize a portion of our deferred tax assets. Accordingly, in third quarter 2004, we recognized an increase in the value of our deferred tax assets of approximately $27 million through a partial reversal of the valuation allowance. Of the $27 million benefit, approximately $17 million was recognized as income in our Statement of Operations and approximately $10 million was credited directly to additional paid-in-capital. Our assessment of the value of our deferred tax assets did not take into consideration all potential income sources, such as impacts from litigation or arbitration proceedings.

We will continue to evaluate the potential use of our deferred tax assets and, depending on various factors, could reverse all or a portion of the remaining valuation allowance in the future. We believe that the future utilization of our deferred tax assets, which are

32

Table of Contents

currently offset by a valuation allowance, continues to be dependent, in part, upon our success in three key areas, (1) the market acceptance of our technology products, (2) the outcome of outstanding patent license arbitrations and (3) our ability to sign additional patent license agreements. We will continue to provide a valuation allowance on a portion of our deferred tax assets until our success in these or other areas provides evidence that our deferred tax assets will be more fully utilized. Our cash income tax obligations are currently limited to foreign source withholding taxes on patent license royalties, state taxes and the federal alternative minimum tax. However, because we have recognized a portion of our deferred tax assets, we expect to provide for income taxes in 2005 at a rate equal to our combined federal and state effective rates, which would approximate 36% to 38% under current tax laws, respectively, plus an amount for deferred foreign source withholding tax expense which is in part dependent, in part, upon licensee royalty reports. Subsequent revisions to the estimated realizable value of our deferred tax assets could cause our provision for income taxes to vary significantly from period to period, although our cash tax payments would remain unaffected until our NOL credit carryforward is fully utilized or has expired.

## SIGNIFICANT AGREEMENTS AND EVENTS

### General Dynamics

In December 2004, we entered into an agreement with General Dynamics Decision Systems, Inc. (General Dynamics), to serve as a subcontractor on the Mobile User Objective System (MUOS) program for the U.S. military. MUOS is an advanced tactical terrestrial and satellite communications system utilizing 3G commercial cellular technology to provide significantly improved high data rate and assured communications for U.S. warfighters.

The Software License Agreement requires us to deliver to General Dynamics standards-compliant WCDMA modem technology, originating from the technology developed under our agreement with Infineon, for incorporation into handheld terminals. Under the agreement, we expect to receive $18.5 million for delivery of and a limited license in our commercial technology solution for use within the government's MUOS and Joint Tactical Radio System programs, maintenance and product training. The agreement also includes options that are exercisable by General Dynamics at various times through March 2006 for additional deliverables for up to $4.0 million. We anticipate that a majority of our MUOS program deliverables and related payments will occur in 2005, excluding the exercise of options for additional deliverables. We will provide maintenance and support to General Dynamics for three years following delivery of the technology. In addition to the deliverables specifically identified in the agreement, we have agreed to provide additional future services as requested by General Dynamics. The contract may be terminated for convenience if the U.S. Government terminates for convenience that portion of the MUOS Program that includes General Dynamics.

We are accounting for the delivery of and limited license in our commercial technology platform under the Software License Agreement using the percentage-of-completion method. This portion of the agreement is valued at $16.5 million. In 2004, we recognized approximately $0.1 million in revenue and at December 31, 2004 our accounts receivable included a related unbilled amount of approximately $0.1 million. In early 2005, we completed the first milestones under the agreement and have received $1.2 million in related payments. Subsequent to our delivery of our commercial technology platform, we will provide General Dynamics with support for a period of three years. This portion of the contract is valued at $2 million and revenue related to this portion will be recognized evenly over the period of support.

### Repositioning

In second quarter 2004, we reduced our headcount by 25 employees as part of a plan to strategically reposition the Company. We recorded a charge of approximately $0.6 million in second quarter 2004 associated with this repositioning. The charge was comprised primarily of severance and other cash benefits associated with the workforce reduction. During the balance of 2004, we adjusted our repositioning charge by less than $0.1 million and paid off all liabilities associated with this restructuring. At December 31, 2004 we believe that our financial obligations associated with this repositioning are substantially complete and do not expect to report further costs associated with the repositioning.

33

Table of Contents

*New Accounting Standard*

In December 2004, the Financial Accounting Standards Board, or FASB, issued SFAS No. 123 (revised 2004), *Share-Based Payment*. SFAS No. 123(R) requires that the compensation cost relating to share-based payment transactions be recognized in financial statements. The cost will be measured based on the fair value of the instruments issued. SFAS No. 123(R) covers a wide range of share-based compensation arrangements including share options, restricted share plans, performance-based awards, share appreciation rights and employee share purchase plans. SFAS No. 123(R) replaces SFAS No. 123 and supersedes APB Opinion No. 25. As originally issued in 1995, SFAS No. 123 established as preferable the fair-value-based method of accounting for share-based payment transactions with employees. However, that Statement permitted entities the option of continuing to apply the guidance in Opinion 25, as long as the footnotes to financial statements disclosed what net income would have been had the preferable fair-value-based method been used. We will be required to apply SFAS No. 123(R) as of the first interim reporting period that begins after June 15, 2005, and we plan to adopt it using the modified-prospective method, effective July 1, 2005. We are currently evaluating the effect SFAS No. 123(R) will have on our results. Based on our preliminarily analysis, we expect to incur between $1 million and $2 million in additional compensation expense from stock options during the period July 1, 2005 to December 31, 2005 as a result of this new accounting standard.

## LITIGATION AND LEGAL PROCEEDINGS

*Nokia*

Nokia Arbitration

In July 2003, Nokia requested arbitration regarding Nokia's royalty payment obligations for its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products under the existing patent license agreement with InterDigital Technology Corporation (ITC), a wholly-owned subsidiary of InterDigital Communications Corporation (Nokia Arbitration). Pursuant to the dispute resolution provisions of the patent license agreement, the arbitration is being conducted in the International Court of Arbitration of the International Chamber of Commerce (ICC).

The binding arbitration relates to ITC's claim that the patent license agreements ITC signed with Ericsson and Sony Ericsson in March 2003 defined the financial terms under which Nokia would be required to pay royalties on its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products commencing January 1, 2002. Nokia is seeking a determination that its obligation under our existing patent license agreement is not defined by our patent license agreements with Ericsson and Sony Ericsson or has been discharged. Nokia also is seeking a ruling that no royalty rate for its sales after January 1, 2002 can be determined by the arbitration panel ("Nokia Tribunal") until certain contractual conditions precedent have been satisfied. Nokia has additionally claimed that, in any event, the Nokia Tribunal cannot award money damages. ITC filed an Answer to Nokia's Request for Arbitration arguing that the patent license agreements signed with Ericsson and Sony Ericsson in March 2003 defined the financial terms under which Nokia would be required to pay royalties on its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products commencing January 1, 2002, that Nokia's duty to pay these royalties has not been discharged, and that the documents sought by Nokia are not relevant to the royalty determination. ITC also counterclaimed for an arbitration decision requiring that Nokia pay us royalties on equivalent terms and conditions as those set forth in the Ericsson and Sony Ericsson patent license agreements for the period January 1, 2002 to December 31, 2006, and a determination of the amount of the royalty and payment terms. During fourth quarter 2003, Nokia filed a Reply contesting our claims and included additional claims and defenses relating to the validity and infringement of certain of ITC's patents. Subsequently, Nokia withdrew from the arbitration its claims pertaining to invalidity and non-infringement of those same ITC patents, but maintains that the validity and infringement of those patents is a factor the arbitration panel should consider in the arbitration. We do not believe that the issues of patent validity or infringement are relevant to the arbitrable royalty dispute and have contested Nokia's position.

The hearing in the Nokia Arbitration was conducted in January 2005 and the Nokia Tribunal has notified the parties that the Nokia Tribunal expects to submit an internal draft Award to the ICC on or before March 31, 2005 (as an approximate date). The ICC has set May 31, 2005 as the last date for rendering a Final Award and the Company anticipates a decision by the ICC on or before such last date absent an earlier resolution by the parties. Any Final Award could be subject to appeal filings on limited bases and enforcement proceedings by the parties.

Table of Contents

Other Nokia Proceedings

In July 2003, Nokia filed a motion to intervene in the now-settled Ericsson litigation in the United States District Court for the Northern District of Texas and to gain access to documents previously sealed by the Court in the settled litigation. We filed a response opposing the request to intervene and opposing the request for access to the documents. The Court granted Nokia's motion to intervene in the Ericsson litigation, and provided Nokia with document access on a limited basis. Thereafter, the Nokia Tribunal ordered that certain documents from the Ericsson litigation be produced to Nokia for its use in the Nokia Arbitration, though the Nokia Tribunal made no decision as to whether issues of patent infringement or validity were relevant to the determination of Nokia's royalty obligation. Nokia subsequently filed a motion to reinstate certain decisions that were vacated in the now-settled Ericsson litigation, which motion was granted by the Court. We have appealed that ruling to the U.S. Court of Appeals for the Federal Circuit. Nokia is contesting our appeal.

In late 2004, Nokia sought to enforce two subpoenas issued by the Nokia Tribunal to Ericsson and Sony Ericsson seeking certain documents. Those enforcement actions were commenced in the Federal District Court for the Northern District of Texas and the Federal District Court for the Eastern District of North Carolina. Nokia has withdrawn both enforcement actions.

During the Nokia Arbitration, on June 14, 2004 Nokia commenced a patent revocation proceeding in the United Kingdom High Court of Justice, Chancery Division, Patents Court, seeking to have three of ITC's U.K. patents declared invalid (U.K. Revocation Proceeding). Nokia also seeks a declaration that the manufacture and sale of certain mobile and infrastructure equipment does not infringe these patents, and that the patents are not essential under the applicable standard. ITC is contesting all of these claims, and the trial is scheduled to commence in October 2005.

In connection with the U.K. Revocation Proceeding, in September 2004 Nokia filed an action against Sony Ericsson in the Federal District Court for the Eastern District of North Carolina, and an action against Ericsson in the Federal District Court for the Eastern District of Texas. The actions are based upon 28 United States Code Section 1782 which provides for discovery in a United States court for use in a foreign proceeding and addresses jurisdictional, procedural and evidentiary matters associated with such foreign proceeding. In both actions, Nokia sought documents related to the ITC patents and patent licenses. Both the Federal District Court for the Eastern District of Texas and the Eastern District of North Carolina have denied Nokia's motions with respect to any documents not previously produced in the Nokia Arbitration.

During the Nokia Arbitration, in January 2005, Nokia and Nokia, Inc. filed a complaint in the United States District Court for the District of Delaware against InterDigital Communications Corporation and ITC for declaratory judgments of patent invalidity and non-infringement of certain claims of certain patents, and violations of the Lanham Act. We have filed a motion to dismiss the complaint.

*Samsung*

In 2002, during an arbitration proceeding, Samsung elected, under its 1996 patent license agreement with ITC (1996 Samsung License Agreement), to have Samsung's royalty obligations commencing January 1, 2002 for 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE wireless communications products be determined in accordance with the terms of the Nokia patent license agreement, including its MFL provision. By notice in March 2003, ITC notified Samsung that such Samsung obligations had been defined by the relevant licensing terms of ITC's license agreements with Ericsson (for infrastructure products) and Sony Ericsson (for terminal unit products) as a result of the MFL provision in the Nokia license agreement. In November 2003, Samsung initiated a binding arbitration against the Company and ITC. The arbitration was filed with the ICC. Samsung is seeking to have an ICC arbitration panel determine that Samsung's obligations under the 1996 Samsung License Agreement are not defined by our license agreements with Ericsson and Sony Ericsson or, in the alternative, to determine the amount of the appropriate royalty due. ITC has counterclaimed for an arbitration decision requiring that Samsung pay ITC royalties on equivalent terms and conditions as those set forth in the Ericsson and Sony Ericsson patent license agreements for the period January 1, 2002 to December 31, 2006, and determining the amount of the royalty and payment terms. We also seek a declaration that the parties' rights and obligations are governed by the 1996 Samsung License Agreement, and that the Nokia patent license agreement dictates only Samsung's royalty obligations and most favored rights for those products licensed under the 1996 Samsung License Agreement. Samsung has replied to ITC's answer and counterclaim, maintaining Samsung's position (as set forth in its arbitration demand) and arguing that it has succeeded to all of Nokia's license rights, including its 3G license. If the arbitration panel were to agree with Samsung's position, Samsung would be licensed to sell 3G products on the same terms as Nokia. In the alternative, Samsung asserts that its royalty obligations should be governed by the MFL clause in the 1996 Samsung License Agreement. The arbitration panel has informed the Company and Samsung that the evidentiary hearing in this matter is scheduled to commence June 2005.

35

Table of Contents

### Lucent

In March 2004, Tantivy Communications, Inc., one of our wholly-owned subsidiaries, filed a lawsuit in the United States District Court for the Eastern District of Texas against Lucent, a leading manufacturer of cdma2000® equipment. The case is based on our assertions of infringement by Lucent of several of our subsidiary's patents issued in the United States. The lawsuit seeks damages for past infringement and an injunction against future infringement as well as interest, costs, and attorneys' fees. Lucent has responded to the lawsuit denying any infringement, and seeking a declaration of non-infringement and that the patents are invalid. Lucent has requested attorneys' fees and costs. The Court has issued a scheduling order pursuant to which the Markman hearing (for claim construction) is scheduled for May 2005, and the trial is scheduled to commence in September 2005. Pursuant to court order, the parties attended a mediation session in January 2005. The parties are currently in the discovery phase of the litigation.

### Federal

In October 2003, Federal Insurance Company (Federal), the insurance carrier for the now-settled litigation involving Ericsson Inc., delivered to us a demand for arbitration under the Pennsylvania Uniform Arbitration Act. Federal claims, based on their determination of expected value to the Company resulting from our settlement involving Ericsson Inc., that an insurance reimbursement agreement requires us to reimburse Federal approximately $28.0 million for attorneys' fees and expenses it claims were paid by it. On November 4, 2003 the Company filed an action in United States District Court for the Eastern District of Pennsylvania seeking a declaratory judgment that the reimbursement agreement is void and unenforceable, seeking reimbursement of attorneys' fees and expenses which have not been reimbursed by Federal and which were paid directly by the Company in connection with the Ericsson Inc. litigation, and seeking damages for Federal's bad faith and breach of its obligations under the insurance policy. In the alternative, in the event the reimbursement agreement is found to be valid and enforceable, the Company is seeking a declaratory judgment that Federal is entitled to reimbursement based only on certain portions of amounts received by the Company from Ericsson Inc. pursuant to the settlement of the litigation involving Ericsson Inc. Federal has requested the Court to dismiss the action and/or to have the matter referred to arbitration. We have opposed such requests. Prior to Federal's demand for arbitration, we had accrued a contingent liability of $3.4 million related to the insurance reimbursement agreement. If this matter results in us paying Federal substantially more than the amount accrued, it could have a material impact on our financial results.

36

Table of Contents

*Other*

We have filed patent applications in the United States and in numerous foreign countries. In the ordinary course of business, we currently are, and expect from time to time to be, subject to challenges with respect to the validity of our patents and patent applications. We intend to continue to vigorously defend the validity of our patents and defend against any such challenges. However, if certain key patents are revoked or patent applications are denied, our patent licensing opportunities could be materially and adversely affected.

We and our licensees, in the normal course of business, have disagreements as to the rights and obligations of the parties under the applicable patent license agreement. For example, we could have a disagreement with a licensee as to the amount of reported sales of covered products and royalties owed. Our patent license agreements typically provide for arbitration as the mechanism for resolving disputes. Arbitration proceedings can be resolved through an award rendered by an arbitration panel or through private settlement between the parties. Awards and settlements of arbitration proceedings can be substantial, but are uncertain, unpredictable and often of a non-recurring nature.

In addition to disputes associated with enforcement and licensing activities regarding our intellectual property, including the litigation and other proceedings described above, we are a party to other disputes and legal actions not related to our intellectual property but also arising in the ordinary course of our business.

Based upon information presently available to us, we believe that the ultimate outcome of these other disputes and legal actions will not materially affect us.

## FINANCIAL POSITION, LIQUIDITY AND CAPITAL REQUIREMENTS

In 2004 and 2003, we generated net cash from operating activities of $48.2 million and $59.6 million, respectively. The positive operating cash flow in 2004 arose principally from net receipts of approximately $138.3 million from patent licensing agreements. This included $34.6 million from NEC Corporation of Japan (NEC) associated with our 3G patent license agreement, $27.0 million and $10.0 million from SANYO Electric Co., Ltd (Sanyo) and Toshiba Corporation (Toshiba) relating to their respective 2004 patent license agreements, $23.0 million from Sharp Corporation of Japan (Sharp) related to 2G and 3G patent license agreements, $17.5 million and $11.6 million from Ericsson and Sony Ericsson relating to their respective 2003 patent license agreements, and $14.6 million from other licensees related to their respective patent license agreements. These receipts were partially offset by cash operating expenses (operating expenses less depreciation of fixed assets, amortization of intangible assets and non-cash compensation) of $94.7 million and changes in working capital during 2004. The positive operating cash flow in 2003 arose principally from net receipts of approximately $129.5 million from patent licensing agreements. This included $7.0 million from Ericsson and approximately $34.9 million from Sony Ericsson under the above-noted patent license agreements, $48.4 million from NEC associated with 2G and 3G patent license agreements, $29.3 million from Sharp related to 2G and 3G patent license agreements and $9.9 million from other licensees related to their respective patent license agreements. These receipts were partially offset by cash operating expenses of $74.0 million and changes in working capital during 2003.

We receive cash payments relating to current per-unit royalties. We also receive up-front cash payments for paid-up or prepaid royalties. When we record the receipt or expected receipt of up-front payments, we defer the recognition of the revenue associated with the up-front payments pursuant to our revenue recognition policy as discussed in our Critical Accounting Policies. We have no material obligations associated with such deferred revenue.

Our combined short-term and long-term deferred revenue balances at December 31, 2004 of approximately $99.2 million increased $12.6 million from December 31, 2003. The increase was mainly due to the receipt of approximately $66.2 million in Prepayments and Paid-up Amounts, primarily from new, expanded or amended patent license agreements, including $27.0 million from Sanyo, $17.8 million from Sharp, $10.0 million from Toshiba and $11.4 million from other licensees. These receipts were offset, in part, by current year deferred revenue recognition of approximately $21.7 million related to the amortization of paid-up royalties and approximately $31.9 million from current year per-unit exhaustion of prepaid royalties based upon royalty reports provided by our licensees.

Based on current license agreements, we expect to reduce the December 31, 2004 deferred revenue balance of $99.2 million by $22.8 million in 2005 related to the amortization of paid-up royalties. Additional reductions to deferred revenue will be dependent upon the level of per-unit royalties our licensees report against prepaid balances. In January 2005, we recorded an increase in deferred revenue of $28.0 million related to a new Prepayment from Sony Ericsson under their existing 2G/2.5G agreement.

Net cash flows used in investing activities increased to $48.2 million from $45.3 million in 2003. We purchased $31.3

million and $20.3 million of short-term marketable securities, net of sales, in 2004 and 2003, respectively. This change resulted from the higher level of cash receipts related to patent licensing in 2004, combined with a reduced use of cash in financing activities.

37

Table of Contents

Total investments in capital assets of $3.7 million in 2004 remained relatively constant with 2003 levels, while our investment costs associated with patents increased substantially from $9.2 million in 2003 to $13.1 million in 2004. There is often a lag between the filing of initial patent applications and the incurrence of costs to issue the patents both in the U.S. and in foreign jurisdictions. The increase in patent costs between 2003 and 2004 reflects increased patenting activity we have experienced over the past several years. In 2005, we expect that our purchases of property and equipment will be $5 million to $8 million. We also expect that our capitalized patent costs will be between $12 million to $14 million. In July 2003, we acquired substantially all of the tangible and intangible assets of Windshift Holdings, Inc. (formerly known as Tantivy Communications, Inc., "Windshift") for approximately $11.9 million, including acquisition-related costs.

Net cash used in financing activities in 2004 decreased $10.5 million to $5.2 million from $15.7 million in 2003. In 2004, we repurchased one million shares of common stock for a total of $17.1 million compared to repurchase of two million shares of our common stock in 2003 for a total of $34.7 million. We received proceeds from option and warrant exercises of $12.2 million and $19.2 million in 2004 and 2003, respectively.

In October 2004, our Board of Directors authorized the repurchase (Fourth Quarter Repurchase Program) of an additional one million shares of common stock. In March 2005, the Board expanded their authorization under the Fourth Quarter Repurchase Program by one million shares. We initiated share repurchases under this program in early 2005 and have repurchased 500,000 shares for a total of approximately $9 million through March 15, 2005.

We had 7,305,142 and 8,274,270 options outstanding at December 31, 2004 and 2003, respectively, that had exercise prices less than the fair market value of the Company's stock at each balance sheet date. These options would generate $78.9 million and $87.3 million of cash proceeds to the Company if they were fully exercised.

Effective April 1, 2004, we adopted a long-term incentive program applicable to a broad group of managers and executives, representing about one-third of our workforce. The program includes a cash incentive award tied to long-term company performance goals and a grant of restricted stock units (RSUs) that vest over time. Under this program, we substantially reduced the use of stock option grants as an equity incentive for these employees. Over the remaining three quarters of 2004, we recognized approximately $2.9 million and $4.1 million of compensation expense related to the cash-based incentive and RSUs, respectively.

As of December 31, 2004, we had $131.8 million of cash, cash equivalents and short-term investments, compared to $105.9 million at December 31, 2003. Our working capital (adjusted to exclude cash, cash equivalents, short-term investments, current maturities of debt and current deferred revenue) decreased to $3.3 million at December 31, 2004 from $29.0 million at December 31, 2003. This $25.7 million decrease is primarily due to a $26.2 million reduction in accounts receivable resulting from our third quarter 2004 transition in reporting per-unit royalty revenue. As a result of this transition, we book per-unit royalties in the period we receive the related royalty reports. Because we typically receive cash payments from current royalties in the same quarter we receive the related reports, we now collect most receivables in the same period we book the related revenue.

In first quarter 2005, we acquired, for a purchase price of $8.0 million, selected patents, intellectual property blocks and related assets from an unrelated third party, the function of which are aimed at improving the range, throughput and reliability of wireless LAN and other wireless technology systems.

Consistent with our strategy to focus our resources on the development and commercialization of advanced wireless technology products, we expect to see modest growth in operating cash needs related to planned staffing levels and continued investments in enabling capital assets in 2005. We are capable of supporting these and other operating cash requirements for the near future, as well as our Fourth Quarter Repurchase Program and our first quarter 2005 purchase of patents, intellectual property blocks and related assets, through cash and short-term investments on hand, as well as other internally generated funds such as patent license royalty payments. We do not expect that any resolution of the Federal litigation matter will prevent us from supporting our operating requirements for the near future. At present, we do not anticipate the need to seek additional financing through either bank facilities or the sale of debt or equity securities. However, we may seek to establish a bank facility to provide additional flexibility in managing our business.

At December 31, 2004, we did not have any significant purchase obligations outside the course of our ordinary business. Following is a summary of our consolidated debt and lease obligations at December 31, 2004 (in thousands):

| Obligation | Total | 1-3 Years | 4-5 Years | Thereafter |
|---|---|---|---|---|
| Debt | $1,884 | $   681 | $   469 | $   734 |

Interdigital Communications Corp

| | | | | |
|---|---|---|---|---|
| Operating leases | 5,317 | 5,317 | — | — |
| Total debt and operating lease obligations | $7,201 | $ 5,998 | $ 469 | $ 734 |

38

Table of Contents

## RESULTS OF OPERATIONS

### 2004 Compared With 2003

Revenues

Revenues in 2004 were $103.7 million compared with $114.6 million in 2003.

In third quarter 2004, we transitioned to reporting per-unit royalties in the period in which we receive our licensees' royalty reports rather than in the period in which our licensees' underlying sales of covered product occur. Consequently, our results for 2004 include only three quarters of per-unit royalties compared to four quarters in 2003. The decrease in 2004 revenues was due to the absence of per-unit royalties in third quarter 2004 associated with the transition in reporting per-unit royalties.

Notwithstanding the effect of the transition on 2004 revenues, recurring patent license royalties (which include both fixed and amortized amounts, as well as per-unit royalties reported to the Company) increased from $92.9 million in 2003 to $101.6 million in 2004. This included $28.5 million related to four quarters of fixed and amortized amounts, as well as $73.1 million associated with three quarters of per-unit royalties. Royalties from NEC (43%), Sharp (24%) and Sony Ericsson (12%) collectively contributed 79% of our recurring patent license royalty revenue in 2004. The $8.7 million increase in recurring patent license royalty revenue from 2003 to 2004 was primarily due to an increase in royalties from NEC offset by the effect of the absence of reporting per-unit royalties for one quarter in 2004.

In 2004, we recorded non-recurring revenue of $1.4 million related to past infringement from a number of new licensees signed in 2004 and $0.4 million associated with the remaining deferred revenue balance of a licensee that has discontinued sales of covered products. We also recorded approximately $0.1 million in revenues related to our Software License Agreement with General Dynamics. In 2003, we recorded $20.6 of non-recurring royalty revenue primarily associated with Sony Ericsson's pre-2003 handset sales. In 2003, we also recorded $1.1 million of revenue related to specialized engineering service revenue.

Operating Expenses

Operating expenses increased 29% from $85.0 million in 2003 to $110.0 million in 2004. The increase in our operating expenses reflects both our strong commitment to investing in the development of advanced wireless technology product solutions and legal costs associated with arbitration and litigation proceedings with Nokia, Samsung and Lucent. The $25.0 million increase in operating expenses was primarily due to increases in personnel costs ($13.1 million), legal fees ($11.3 million), patent amortization ($1.1 million) and insurance premiums ($0.8 million) and is partly offset by savings in other areas. Approximately 73% and 13%, respectively, of the increase in personnel costs was due to company-wide compensation initiatives instituted in first half 2004 and the addition of our Melbourne, Florida design center. The remaining increase in personnel costs was primarily due to severance associated with our second quarter repositioning and expanded training and development programs.

Development expenses increased 11% in 2004 to $51.2 million from $45.9 million in 2003. The increase resulted from a $6.6 million increase in salaries and benefits primarily associated with compensation initiatives instituted in first half 2004 offset, in part, by a decrease of $0.8 million in each of consulting fees and depreciation of fixed assets.

Sales and marketing expenses of $6.2 million in 2004 increased 26% from $4.9 million in 2003 primarily due to a $1.9 million increase in salaries and benefits offset, in part, by decreased consulting costs.

General and administrative expenses in 2004 increased 19% to $21.6 million from $18.2 million in 2003. Increased personnel costs accounted for 70% of this increase with the balance of the increase due to public entity costs including audit fees and insurance premiums.

Patents administration and licensing expenses increased 90% in 2004 to $30.3 million from $16.0 million in 2003. Nearly 82% of this increase was due to higher patent enforcement costs related to our respective arbitrations with Nokia and Samsung and our litigation with Lucent.

Other Income, Interest Income and Interest Expense

In 2003, we recognized $14.0 million from the settlement of our litigation with Ericsson, net of an estimated $3.4 million associated with a claim under an insurance reimbursement agreement, as other income. The $3.4 million represents a loss contingency associated with our insurance reimbursement agreement with Federal.

Interdigital Communications Corp

Net interest income of $1.7 million in 2004 remained relatively level with 2003.

39

Table of Contents

Income Taxes

Our income tax provision in 2004 included a benefit of approximately $17.1 million related to the recognition of an increase in the value of our deferred tax assets and was offset in part by approximately $7.8 million of federal income tax and alternative minimum tax and approximately $4.6 million of foreign source withholding tax. Our income tax provision in 2003 consisted primarily of foreign source withholding taxes associated with patent licensing royalties, principally from Japan. The decrease in our foreign source withholding tax expense from 2003 to 2004 resulted primarily from a July 2004 tax treaty between the U.S. and Japan that eliminates the foreign source withholding tax requirements between these countries, provided certain conditions defined in the treaty are met.

### 2003 Compared With 2002

Revenues

Revenues in 2003 increased 30% to $114.6 million from $87.9 million in 2002. Patent license royalty revenue in 2003 was $113.5 million compared to $83.4 million in 2002. Specialized engineering service revenue was $1.1 million in 2003 compared to $4.5 million in 2002.

Revenues in 2003 included $20.3 million and $0.3 million of royalties from Sony Ericsson and other licensees, respectively, related to sales from periods prior to the effective dates of their respective agreements. Revenues in 2002 included nearly $8.0 million of royalty revenue associated with NEC's pre-2002 3G sales, and the recognition of $16.5 million of deferred revenue associated with non-refundable and non-transferable patent license Prepayments previously received from Kyocera Corporation and Denso Corporation that had discontinued sales of covered products.

Recurring patent license royalty revenue increased 58% to $92.9 million from $58.9 million in 2002. Royalties from NEC (36%), Sharp (31%) and Sony Ericsson (14%) collectively contributed to 81% of our recurring patent license royalty revenue in 2003. The increase in recurring patent license royalty revenue from 2002 to 2003 was due to $18.7 million of recurring royalties related to 2003 patent license agreements with Ericsson and Sony Ericsson and increases in recurring royalties from NEC, Sharp and other licensees of $10.6 million, $2.4 million and $2.3 million, respectively. Royalties from NEC increased due to NEC's higher sales of infrastructure and handsets into the emerging 3G market. Royalties from Sharp reflected increased demand for its 2.5G handsets both in Japan and Europe.

In fourth quarter 2003, we completed the final delivery of services required under our WTDD technology development agreement with Nokia, collected the final $1.0 million payment due under this agreement and recognized $1.0 million in related service revenue. In 2002, we recognized $4.5 million of revenue for services performed under this agreement.

Operating Expenses

Development expenses decreased less than 1% in 2003 to $45.9 million from $46.1 million in 2002. The decrease was primarily due to an accrued loss of $1.2 million recorded in 2002 related to our WTDD agreement with Nokia offset, in part, by an increase of approximately $0.5 million and $0.4 million, respectively, in costs associated with engineering tools and research and development materials.

Sales and marketing expenses of $4.9 million in 2003 increased 15% from $4.3 million in 2002. This increase was primarily attributable to approximately equal increases in costs related to trade shows and market research activities. In 2003, we participated in an additional trade show and also increased our market research efforts to support strategic planning activities.

General and administrative expenses in 2003 increased 19% to $18.2 million from $15.2 million in 2002. Increases in public entity costs, including a $1.5 million increase in our directors' and officers' liability insurance premiums, were the primary contributors to this increase. We also incurred approximately $0.9 million of costs in second half 2003 related to an update of our strategic plan.

Patents administration and licensing expenses increased 22% in 2003 to $16.0 million from $13.1 million in 2002 due largely to a $1.1 million increase in amortization expense, resulting from an increase in the number of patents and related prosecution costs over the past couple years, a $0.8 million increase in legal fees and a $0.8 million increase in commission expense related to higher patent licensing royalty revenue.

Other Income, Interest Income and Interest Expense

In 2003, we recognized $14.0 million from the settlement of our litigation with Ericsson, net of an estimated $3.4 million associated with a claim under an insurance reimbursement agreement, as other income. The $3.4 million represents a

loss contingency associated with our insurance reimbursement agreement with Federal.

40