Table of Contents

Interest income of $1.8 million in 2003 decreased 20% from $2.3 million in 2002 primarily due to lower yields available in 2003 compared to 2002.

Income Taxes

Tax expense decreased $1.4 million in 2003 to $7.3 million from $8.7 million in 2002, due primarily to a decrease in the level of royalty revenue subject to non-US withholding tax. The income tax provision in both 2003 and 2002 consisted primarily of withholding taxes associated with patent licensing royalties, principally from Japan.

*Expected Trends*

In first quarter 2005, we expect to report revenue from current licensees of just over $30 million. In addition, we expect to recognize revenue associated with our agreement with General Dynamics in the range of $1.5 to $2.5 million. We also anticipate that our first quarter 2005 operating expenses will grow sequentially 13% to 17% due to long-term compensation program expenses, normal wage inflation and investment in marketing, technology and product development in response to expanding market opportunities. We also project that our book tax rate for first quarter 2005 will approximate 34% to 38%, plus an amount for deferred foreign source withholding tax expense, which is in part dependent on the level of per-unit royalties. Cash taxes paid in first quarter 2005 should be minimal.

## Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

*Cash Equivalents and Investments*

We do not use derivative financial instruments in our investment portfolio. We place our investments in instruments that meet high credit quality standards, as specified in our investment policy guidelines. This policy also limits the amount of credit exposure to any one issue, issuer, and type of instrument. We do not expect any material loss with respect to our investment portfolio.

The following table provides information about our cash and investment portfolio as of December 31, 2004. For investment securities, the table presents principal cash flows and related weighted average contractual interest rates by expected maturity dates. All investment securities are held as available for sale.

**(in thousands)**

| | | |
|---|---|---|
| Cash and demand deposits | $ 15,737 | |
| Average interest rate | | 0% |
| Cash equivalents | $ — | |
| Average interest rate | | 0% |
| Short-term investments | $116,081 | |
| Average interest rate | | 2.64% |
| Total portfolio | $131,818 | |
| Average interest rate | | 2.33% |

*Long-Term Debt*

The table below sets forth information about our long-term debt obligation, by expected maturity dates.

| | Expected Maturity Date December 31, (In thousands) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 and Beyond | Total Fair Value |
| Debt Obligation | $ 212 | $ 229 | $ 240 | $ 225 | $ 244 | $ 734 | $1,884 |
| Interest Rate | 8.21 % | 8.19 % | 8.18 % | 8.28 % | 8.28 % | 8.28 % | 8.23 % |

41

**Table of Contents**

## Item 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

|  | PAGE NUMBER |
|---|---|
| CONSOLIDATED FINANCIAL STATEMENTS: |  |
| Reports of Independent Registered Public Accounting Firm | 43 |
| Consolidated Balance Sheets as of December 31, 2004 and 2003 | 44 |
| Consolidated Statements of Operations for each of the three years ended December 31, 2004, 2003 and 2002 | 45 |
| Consolidated Statements of Shareholders' Equity and Comprehensive Income for each of the three years ended December 31, 2004, 2003 and 2002 | 46 |
| Consolidated Statements of Cash Flows for each of the three years ended December 31, 2004, 2003 and 2002 | 47 |
| Notes to Consolidated Financial Statements | 48 |

All other schedules are omitted because they are either not required or applicable or equivalent information has been included in the financial statements and notes thereto.

Table of Contents

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Interdigital Communications Corporation:

We have completed an integrated audit of Interdigital Communications Corporation's 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its 2003 and 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

In our opinion, the consolidated financial statements listed in the accompanying index, present fairly, in all material respects, the financial position of Interdigital Communications Corporation and its subsidiaries at December 31, 2004 and 2003, and the results of operations and their cash flows for each of the three years in the period ended December their 31, 2004 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Internal control over financial reporting

Also, in our opinion, management's assessment, included in "Management's Report on Internal Control over Financial Reporting" appearing in Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control-Integrated Framework*. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/   PricewaterhouseCoopers LLP
Philadelphia, Pennsylvania
March 30, 2005

**Table of Contents**

### INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
#### (in thousands, except per share data)

|  | DECEMBER 31, 2004 | DECEMBER 31, 2003 |
|---|---:|---:|
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 15,737 | $ 20,877 |
| Short-term investments | 116,081 | 85,050 |
| Accounts receivable | 11,612 | 37,839 |
| Deferred tax assets | 5,170 | 1,754 |
| Prepaid and other current assets | 8,017 | 6,874 |
| Total current assets | 156,617 | 152,394 |
| PROPERTY AND EQUIPMENT, NET | 10,716 | 12,137 |
| PATENTS, NET | 40,972 | 32,246 |
| DEFERRED TAX ASSETS | 27,164 | 5,160 |
| OTHER NON-CURRENT ASSETS | 6,451 | 3,228 |
|  | 85,303 | 52,771 |
| TOTAL ASSETS | $ 241,920 | $ 205,165 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| Current portion of long-term debt | $ 212 | $ 193 |
| Accounts payable | 6,758 | 6,435 |
| Accrued compensation and related expenses | 9,264 | 7,569 |
| Deferred revenue | 28,075 | 22,381 |
| Foreign and domestic taxes payable | 379 | 1,259 |
| Other accrued expenses | 5,145 | 2,232 |
| Total current liabilities | 49,833 | 40,069 |
| LONG-TERM DEBT | 1,672 | 1,777 |
| LONG-TERM DEFERRED REVENUE | 71,121 | 64,214 |
| OTHER LONG-TERM LIABILITIES | 3,635 | 1,620 |
| TOTAL LIABILITIES | 126,261 | 107,680 |
| COMMITMENTS AND CONTINGENCIES (NOTES 7 AND 8) | | |
| SHAREHOLDERS' EQUITY: | | |
| Preferred Stock, $.10 par value, 14,399 shares authorized- $2.50 Cumulative Convertible Preferred, 0 and 53 shares issued and outstanding, liquidation value of $0 and 1,319 | — | 5 |
| Common Stock, $.01 par value, 100,000 shares authorized, 59,662 and 58,202 shares issued and 55,156 and 54,702 shares issued and outstanding | 597 | 585 |
| Additional paid-in capital | 342,751 | 305,262 |
| Accumulated deficit | (164,524) | (164,613) |
| Accumulated other comprehensive loss | (66) | (270) |
| Unearned compensation | (3,276) | (722) |
|  | 175,482 | 140,247 |
| Treasury stock, 4,506 and 3,500 shares of common held at cost | 59,823 | 42,762 |

| | | | |
|---|---|---|---|
| Total shareholders' equity | | 115,659 | 97,485 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ | 241,920 | $ 205,165 |

The accompanying notes are an integral part of these consolidated financial statements.

44

Table of Contents

### INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS
#### (in thousands, except per share data)

| | FOR THE YEAR ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| REVENUES: | | | |
| Licensing and alliance | $103,685 | $114,574 | $87,895 |
| OPERATING EXPENSES | | | |
| Sales and marketing | 6,201 | 4,919 | 4,286 |
| General and administrative | 21,622 | 18,183 | 15,227 |
| Patents administration and licensing | 30,340 | 15,995 | 13,074 |
| Development | 51,218 | 45,936 | 46,068 |
| Repositioning | 596 | — | — |
| | 109,977 | 85,033 | 78,655 |
| (Loss) income from operations | (6,292) | 29,541 | 9,240 |
| OTHER INCOME (EXPENSE): | | | |
| Other income, net | — | 10,580 | — |
| Interest income | 2,006 | 1,828 | 2,276 |
| Interest and financing expenses | (263) | (215) | (257) |
| (Loss) income before income taxes | (4,549) | 41,734 | 11,259 |
| INCOME TAX BENEFIT (PROVISION) | 4,704 | (7,269) | (8,748) |
| Net income | 155 | 34,465 | 2,511 |
| PREFERRED STOCK DIVIDENDS | (66) | (133) | (136) |
| Net income applicable to common shareholders | $ 89 | $ 34,332 | $ 2,375 |
| NET INCOME PER COMMON SHARE - BASIC | $ 0.00 | $ 0.62 | $ 0.04 |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING - BASIC | 55,264 | 55,271 | 52,981 |
| NET INCOME PER COMMON SHARE - DILUTED | $ 0.00 | $ 0.58 | $ 0.04 |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING - DILUTED | 59,075 | 59,691 | 56,099 |

The accompanying notes are an integral part of these consolidated financial statements.

45

**Table of Contents**

## INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY AND COMPREHENSIVE INCOME
### (in thousands, except per share data)

| | $2.50 Cumulative Convertible Preferred Stock | Common Stock | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Unearned Compensation | Treasury Stock | Total Share-holder's Equity | Total Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 2001 | 5 | 544 | 271,461 | (201,320) | 221 | (2,564) | (8,073) | 60,274 | |
| Net income | — | — | — | 2,511 | — | — | — | 2,511 | $ 2,511 |
| Net change in unrealized gain/loss on Short-term investments | — | — | — | — | (11) | — | — | (11) | (11) |
| Total Comprehensive Income | | | | | | | | | $ 2,500 |
| Exercise of Common Stock options | — | 7 | 5,865 | — | — | — | — | 5,872 | |
| Exercise of Common Stock warrants | — | 9 | 4,731 | — | — | — | — | 4,740 | |
| Dividend of Common Stock and cash to $2.50 Preferred shareholders | — | — | 44 | (136) | — | — | — | (92) | |
| Sale of Common Stock under Employee Stock Purchase Plan | — | 2 | 1,253 | — | — | — | — | 1,255 | |
| Issuance of Common Stock options to a non-employee | — | — | 37 | — | — | — | — | 37 | |
| Issuance of Restricted Common Stock | — | 1 | 1,044 | — | — | (635) | — | 410 | |
| Tax benefit from exercise of stock options | — | — | 1,434 | — | — | — | — | 1,434 | |
| Amortization of unearned compensation | — | — | — | — | — | 2,361 | — | 2,361 | |
| BALANCE, DECEMBER 31, 2002 | 5 | 563 | 285,869 | (198,945) | 210 | (838) | (8,073) | 78,791 | |
| Net income | — | — | — | 34,465 | — | — | — | 34,465 | $ 34,465 |
| Net change in unrealized gain/loss on Short-term investments | — | — | — | — | (480) | — | — | (480) | (480) |
| Total Comprehensive Income | | | | | | | | | $ 33,985 |
| Exercise of Common Stock options | — | 19 | 17,490 | — | — | — | — | 17,509 | |
| Exercise of Common Stock warrants | — | — | 19 | — | — | — | — | 19 | |
| Dividend of Common Stock and cash to $2.50 Preferred shareholders | — | — | 56 | (133) | — | — | — | (77) | |
| Sale of Common Stock under Employee Stock Purchase Plan | — | 2 | 1,716 | — | — | — | — | 1,718 | |
| Issuance of Restricted Common Stock | — | 1 | 1,228 | — | — | (840) | — | 389 | |
| Reduction of tax benefit from exercise of stock options | — | — | (1,116) | — | — | — | — | (1,116) | |
| Amortization of unearned compensation | — | — | — | — | — | 956 | — | 956 | |
| Repurchase of Common Stock | — | — | — | — | — | — | (34,689) | (34,689) | |
| BALANCE, DECEMBER 31, 2003 | 5 | 585 | 305,262 | (164,613) | (270) | (722) | (42,762) | 97,485 | |
| Net income | — | — | — | 155 | — | — | — | 155 | $ 155 |
| Net change in unrealized gain/loss on Short-term investments | — | — | — | — | 204 | — | — | 204 | 204 |
| Total Comprehensive Income | | | | | | | | | $ 359 |
| Exercise of Common Stock options | — | 10 | 10,349 | — | — | — | — | 10,359 | |
| Exercise of Common Stock warrants | — | — | 583 | — | — | — | — | 583 | |
| Dividend of Common Stock and cash to $2.50 Preferred shareholders | — | — | 29 | (66) | — | — | — | (37) | |

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| Conversion of $2.50 Preferred Stock to Common Stock and redemptions |  | (5) | 1 | (47) | — | — | — | — | (51) |
| Sale of Common Stock under Employee Stock Purchase Plan |  | — | 1 | 1,211 | — | — | — | — | 1,212 |
| Issuance of Restricted Common Stock |  | — | — | 8,086 | — | — | (7,636) | — | 450 |
| Partial reversal of Valuation Allowance |  | — | — | 9,789 | — | — | — | — | 9,789 |
| Recognition of Deferred Tax Benefits |  | — | — | 7,489 | — | — | — | — | 7,489 |
| Amortization of unearned compensation |  | — | — | — | — | — | 5,082 | — | 5,082 |
| Repurchase of Common Stock |  | — | — | — | — | — | — | (17,061) | (17,061) |
| BALANCE, DECEMBER 31, 2004 | $ | — | $ 597 | $ 342,751 | $(164,524) | $ (66) | $ (3,276) | $ (59,823) | $115,659 |

The accompanying notes are an integral part of these consolidated financial statements

46

**Table of Contents**

**INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | FOR THE TWELVE MONTHS ENDED DECEMBER 31, | | |
|---|---|---|---|
| | **2004** | **2003** | **2002** |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net income | $ 155 | $ 34,465 | $ 2,511 |
| Adjustments to reconcile net income to net cash provided (used) by operating activities: | | | |
| Depreciation and amortization | 9,707 | 9,735 | 9,268 |
| Deferred revenue recognized | (53,601) | (61,563) | (54,738) |
| Increase in deferred revenue | 66,202 | 57,488 | 72,500 |
| Non-cash compensation | 5,532 | 1,345 | 2,771 |
| Recognition of deferred income tax benefits | (17,064) | — | — |
| Tax benefit from stock options | 7,489 | — | — |
| Other | 41 | 325 | 53 |
| Decrease (increase) in assets: | | | |
| Receivables | 26,227 | 15,647 | (39,007) |
| Deferred charges | (2,598) | 3,401 | (805) |
| Other current assets | 74 | (839) | (1,030) |
| Increase (decrease) in liabilities: | | | |
| Accounts payable | 323 | 1,023 | 550 |
| Accrued compensation | 4,655 | 1,683 | (99) |
| Other accrued expenses | 1,088 | (3,149) | 5,800 |
| Net cash provided (used) by operating activities | 48,230 | 59,561 | (2,226) |
| | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Purchases of short-term investments | (199,127) | (144,445) | (124,466) |
| Sales of short-term investments | 167,850 | 124,144 | 131,697 |
| Purchases of property and equipment | (3,746) | (3,926) | (6,519) |
| Capitalized patent costs | (13,153) | (9,209) | (5,475) |
| Acquisition of assets | — | (10,430) | — |
| Increase in notes receivable | — | (1,446) | — |
| Net cash used in investing activities | (48,176) | (45,312) | (4,763) |
| | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Net proceeds from exercise of stock options and warrants and employee stock purchase plan | 12,154 | 19,246 | 11,904 |
| Payments on long-term debt, including capital lease obligations | (199) | (189) | (378) |
| Dividends on preferred stock | (37) | (77) | (92) |
| Repurchase of preferred stock | (51) | — | — |
| Repurchase of common stock | (17,061) | (34,689) | — |
| Net cash (used) provided by financing activities | (5,194) | (15,709) | 11,434 |
| | | | |
| NET (DECREASE) INCREASE IN CASH AND CASH EQUIVALENTS | (5,140) | (1,460) | 4,445 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 20,877 | 22,337 | 17,892 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 15,737 | $ 20,877 | $ 22,337 |

SUPPLEMENTAL CASH FLOW INFORMATION:

| | | | | | |
|---|---|---|---|---|---|
| Interest paid | $ | 160 | $ | 187 | $ | 229 |
| Income taxes paid, including foreign withholding taxes | $ | 4,187 | $ | 9,537 | $ | 5,592 |
| Non-cash investing and financing activities Issuance of restricted common stock | $ | 450 | $ | 389 | $ | 410 |
| Accrued purchase of patent rights | $ | — | $ | — | $ | 450 |
| Cancellation of note receivable related to acquisition of assets | $ | — | $ | 1,446 | $ | — |
| Leased asset additions and related obligation | $ | 113 | $ | — | $ | 195 |
| Non-cash dividends on preferred stock | $ | 29 | $ | 56 | $ | 44 |

The accompanying notes are an integral part of these consolidated financial statements.

47

Table of Contents

### INTERDIGITAL COMMUNICATIONS CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2004

## 1. BACKGROUND

InterDigital Communications Corporation (collectively with its subsidiaries referred to as "InterDigital," the "Company," "we," "us" and "our") designs and develops advanced wireless technology solutions. We are developing technologies that may be utilized to extend the life of the current generation of products, may be applicable to multiple generational standards such as 2G, 2.5G and 3G cellular standards, as well as IEEE 802 wireless standards, and may have applicability across multiple air interfaces. In conjunction with our technology development, we have assembled an extensive body of technical know-how, related intangible products and a broad patent portfolio. We offer our solutions for license or sale to semiconductor companies and producers of wireless equipment and components.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Principles of Consolidation

The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation.

### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Cash, Cash Equivalents and Short-Term Investments

We consider all highly liquid investments purchased with initial maturities of three months or less to be cash equivalents. Management determines the appropriate classification of our investments at the time of acquisition and reevaluates such determination at each balance sheet date. At December 31, 2004 and 2003, all of our short-term investments were classified as available-for-sale and carried at amortized cost, which approximates market value. We determine the cost of securities by specific identification and report unrealized gains and losses on our available-for-sale securities as a separate component of equity, net of any related tax effect. Net unrealized losses on short-term investments were less than $0.1 million at December 31, 2004 and $0.3 million at December 31, 2003. Realized gains and losses for 2004, 2003 and 2002 were as follows (in thousands):

| Year | Gains | Losses | Net |
|------|-------|--------|------|
| 2004 | $ 34  | $ (55) | $ (21) |
| 2003 | $ 64  | $(322) | $(258) |
| 2002 | $ 12  | $(144) | $(132) |

Cash and cash equivalents at December 31, 2004 and 2003 consisted of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2004 | 2003 |
| Money market funds and demand accounts | $15,456 | $20,868 |
| Repurchase agreements | 281 | 9 |
| | $15,737 | $20,877 |

Our repurchase agreements are fully collateralized by United States Government securities and are stated at cost, which approximates fair market value.

48

Table of Contents

Short-term investments as of December 31, 2004 and 2003 consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2003 |
| US Government agency instruments | $ 66,058 | $53,804 |
| Corporate bonds | 50,023 | 31,246 |
| | $116,081 | $85,050 |

At December 31, 2004 and 2003, $104.2 million and $73.2 million, respectively, of our short-term investments had contractual maturities within one year. The remaining portions of our short-term investments had contractual maturities within two to five years

### Property and Equipment

Property and equipment are stated at cost. Depreciation and amortization of property and equipment are provided using the straight-line method. The estimated useful lives for computer equipment, machinery and equipment, and furniture and fixtures are generally three to five years. Leasehold improvements are being amortized over the lesser of their estimated useful lives or their respective lease terms, which are generally five to ten years. Buildings are being depreciated over twenty-five years. Expenditures for major improvements and betterments are capitalized while minor repairs and maintenance are charged to expense as incurred.

### Internal-Use Software Costs

Under the provisions of the American Institute of Certified Public Accountants (AICPA) Statement of Position (SOP) 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal-Use," we capitalize costs associated with software for internal-use. All computer software costs capitalized to date relate to the purchase, development and implementation of engineering, accounting and other enterprise software. Capitalization begins when the preliminary project stage is complete and ceases when the project is substantially complete and ready for its intended purpose. Capitalized computer software costs are amortized over their estimated useful life of three years. Amortization expense of these costs was $2.0 million, $2.7 million and $2.6 million in 2004, 2003 and 2002, respectively. Accumulated amortization related to these costs was $11.8 million and $9.9 million at December 31, 2004 and 2003, respectively.

### Patents

We capitalize external costs, such as filing fees and associated attorney fees, incurred to obtain issued patents and patent license rights. We expense costs associated with maintaining and defending our patents subsequent to their issuance. We amortize capitalized patent costs on a straight-line basis over the estimated useful lives of the patents. Ten years represents our best estimate of the average useful lives of our patents relating to technology developed directly by the Company. The ten year estimated life of internally generated patents is based on our assessment of such factors as the integrated nature of the portfolios being licensed, the overall makeup of the portfolio over time and the term(s) of license agreements for such patents. The estimated useful lives of acquired patents and patent rights, however, will be based on analysis related to each acquisition and may differ from the estimated useful lives of patents obtained directly by the Company. We assess the potential impairment to all capitalized net patent costs when there is evidence that events or changes in circumstances indicate that the carrying amount of these patents may not be recovered. Amortization expense was $4.4 million, $3.3 million and $2.2 million in 2004, 2003 and 2002, respectively. As of December 31, 2004 and 2003, we capitalized gross patent costs of $62.5 million and $49.3 million, respectively; such costs were offset by accumulated amortization of $21.5 million and $17.1 million, respectively. The weighted average estimated useful life of our capitalized patent costs at December 31, 2004 and 2003 was 11.2 years and 11.4 years, respectively.

49

**Table of Contents**

The estimated aggregate amortization expense for patents and patent rights as of December 31, 2004 is as follows (in thousands):

| | |
|---|---:|
| 2005 | $5,160 |
| 2006 | 4,864 |
| 2007 | 4,282 |
| 2008 | 4,165 |
| 2009 | 4,022 |

*Contingencies:*

We recognize contingent assets and liabilities in accordance with Statement of Financial Accounting Standards (SFAS) No. 5 *Accounting for Contingencies.*

*Revenue Recognition:*

In 2004, we derived revenue principally from patent licensing. The timing of revenue recognition and the amount of revenue actually recognized from each source depends upon a variety of factors, including the specific terms of each agreement and the nature of the deliverables and obligations. Such agreements are often complex and multi-faceted. These agreements can include, without limitation, elements related to the settlement of past patent infringement liabilities, up-front and non-refundable license fees for the use of patents and/or know-how, patent and/or know-how licensing royalties on covered products sold by licensees, cross licensing terms between us and other parties, the compensation structure and ownership of intellectual property rights associated with contractual technology development arrangements, and advanced payments and fees for service arrangements. Due to the combined nature of some agreements and the inherent difficulty in establishing reliable, verifiable and objectively determinable evidence of the fair value of the separate elements of these agreements, the total revenue resulting from such agreements may sometimes be recognized over the combined performance period. In other circumstances, such as those agreements involving consideration for past and expected future patent royalty obligations, the determining factors necessary to allocate revenue across past, current, and future years may be difficult to establish. In such instances, the appropriate recording of revenue between periods may require the use of judgment, after consideration of the particular facts and circumstances. Generally, we will not recognize revenue related to payments that are due greater than twelve months from the balance sheet date. In all cases, revenue is only recognized after all of the following criteria are met: (1) written agreements have been executed; (2) delivery of technology or intellectual property rights has occurred or services have been rendered; (3) fees are fixed or determinable; and (4) collectibility of fees is reasonably assured.

*Patent License Agreements*

Upon signing a patent license agreement, we provide the licensee permission to use our patented inventions in specific applications. We have no material future obligations associated with such licenses, other than, in some instances, to provide such licensees with notification of future license agreements pursuant to most favored licensee rights. Under our patent license agreements, we typically receive one or a combination of the following forms of payment as consideration for permitting our licensees to use our patented inventions in their applications and products:

- Consideration for Prior Sales: Consideration related to a licensee's product sales from prior periods. Such consideration may result from a negotiated agreement with a licensee that utilized our patented inventions prior to signing a patent license agreement with us or from the resolution of a disagreement or arbitration with a licensee over the specific terms of an existing license agreement. In each of these cases, we record the consideration as revenue. We may also receive consideration from the settlement of patent infringement litigation where there was no prior patent license agreement. We record the consideration related to such litigation as other income.

- Paid-up Amounts: Up-front, non-refundable royalty payments that fulfill the licensee's obligations to us under a patent license agreement, for the lifetime of the agreement.

- Prepayments: Up-front, non-refundable royalty payments towards a licensee's future obligations to us related to its expected covered product sales in future periods. Our licensees' obligations to pay royalties extend beyond the exhaustion of their Prepayment balance. Once a licensee exhausts its Prepayment balance, we may provide them with the opportunity to make another Prepayment toward future sales or it will be required to make Current Royalty Payments.

- Current Royalty Payments: Royalty payments covering a licensee's obligations to us related to its covered product sales in the current contractual reporting period.

We recognize revenues related to Consideration for Prior Sales when we have obtained a signed agreement, identified a fixed and determinable price and determined that collectibility is reasonably assured. We recognize revenues related to Paid-up

50

**Table of Contents**

Amounts on a straight-line basis over the effective term of the license. We utilize the straight-line method because we have no future obligations under these licenses and we can not reliably predict in which periods, within the term of a license, the licensee will benefit from the use of our patented inventions.

Licensees that either owe us Current Royalty Payments or have Prepayment balances provide us with quarterly or semi-annual royalty reports that summarize their sales of covered products and their related royalty obligations to us. We typically received these royalty reports subsequent to the period in which our licensees' underlying sales occurred. Consideration for Prior Sales, the exhaustion of Prepayments and Current Royalty Payments are often calculated based on related per-unit sales of covered products. In third quarter 2004, we transitioned our recognition of these per-unit royalties to recognize the revenue in the period when we receive royalty reports from licensees, rather than in the period in which our licensees' underlying sales occur.

The transition was necessary because we could no longer both wait to receive royalty reports from our licensees and file our financial statements on a timely basis. Without royalty reports, our visibility into our licensees sales is very limited because we are not involved in the supply or sale of their products and industry analysts do not provide information detailed or timely enough to give us sufficient visibility to make reasonably accurate estimates for our most significant licensees. As such, it is unlikely that we could arrive at estimates for our most significant licensees that are objective and supportable.

Previously, we recognized the revenue related to per-unit sales of covered products in the period the sales occurred, and when we did not receive the royalty reports prior to the issuance of our financial statements, we accrued the related royalty revenue if reasonable estimates could be made. Such estimates, which were limited to a small number of licensees' and never exceeded 5% of our revenue in any period presented, were based on the historical royalty data of the licensees involved, currently available third party forecasts of royalty related product sales in the applicable market and, if available, information provided by the licensee. When our licensees formally reported royalties for which we had previously accrued revenues based on estimates, or when they reported updates to prior royalty reports, we adjusted revenue in the period in which the final reports were received. In cases where we receive objective, verifiable evidence that a licensee has discontinued sales of covered products, we recognize any remaining deferred revenue balance related to unexhausted Prepayments in the period that we receive such evidence.

*Software and Service Revenues*

Software license revenues are recognized in accordance with the American Institute of Certified Public Accountants Statement of Position ( SOP ) 97-2 "Software Revenue Recognition" and SOP 98-9 "Modification of SOP 97-2, Software Revenue Recognition". When the arrangement with the customer includes significant production, modification or customization of the software, the Company uses contract accounting, as required by SOP 97-2. For those arrangements accounted for under SOP 81-1 "Accounting for Performance of Construction-Type and Certain Production-Type Contracts", the Company uses the percentage-of-completion method. Under this method, revenue and profit are recognized throughout the term of the contract, based on the percentage of costs incurred to date compared to the total estimated contract costs. Changes in estimates for revenues, costs and profits are recognized in the period in which they are determinable. When such estimates indicate that costs will exceed future revenues and a loss on the contract exists, a provision for the entire loss is recognized at that time.

We recognize revenues associated with service arrangements that are outside the scope of SOP 81-1 on a straight-line basis under Staff Accounting Bulletin No 104 "Revenue Recognition", unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer. Recently, our service agreements have been long-term in nature and we have recorded revenue from them based on our proportional performance of services rendered. The terms of these arrangements have provided evidence that this approach better reflects the pattern in which the revenue has been earned or the obligations have been fulfilled. When recognizing revenue based on our proportional performance, we measure the progress of our performance based on the relationship between incurred contract costs and total estimated contract costs. Our most significant cost has been labor and we believe labor cost provides a measure of the progress of our services. The effect of changes to total estimated contract costs is recognized in the period such changes are determined. Estimated losses, if any, are recorded when the loss first becomes probable and reasonably estimable.

*Deferred Charges*

From time-to-time, we use sales agents to assist us in our licensing activities. We often pay a commission related to successfully negotiated patent license agreements. The commission rate varies from agreement to agreement. Commissions are normally paid shortly after the receipt of cash payments associated with our patent license agreements.

51

Table of Contents

We defer recognition of commission expense related to Prepayments and Paid-up Amounts and amortize these expenses in proportion to our recognition of the related revenue. In 2004, 2003 and 2002, we paid approximately $7.5 million, $2.9 million and $1.2 million of commissions and recognized approximately $3.5 million, $3.4 million and $2.5 million, respectively, of commission expense as part of patent licensing and administration expense. At December 31, 2004 and 2003 we had approximately $7.2 million and $3.1 million, respectively, of deferred commission expense included within prepaid and other current assets and other non-current assets.

*Development*

All engineering development expenditures are expensed in the period incurred.

*Compensation*

We use a variety of compensation programs to both attract and retain engineers and other key employees, and more closely align employee compensation with Company performance. These programs include, but are not limited to, an annual bonus tied to performance goals, cash awards to inventors for filed patent applications and patent issuances, as well as, a long-term compensation program that includes restricted stock units (RSUs) and a performance-based cash incentive component. We accrued $2.9 million and $4.1 million of compensation expense in 2004 related to the performance-based cash incentive and RSUs, respectively. We amortize the expense associated with RSUs using an accelerated method.

We account for stock-based employee compensation using the intrinsic value method and provide pro forma disclosures related to our stock-based compensation under the provisions of Statement No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure an amendment of FASB Statement No. 123". Equity instruments issued to non-employees for services are accounted for at fair value and are marked to market until service is complete. We have not issued warrants or any other equity instruments to non-employees in any period presented and have not recognized any expense for our outstanding warrants in any period presented.

At December 31, 2004, the Company had several stock-based employee compensation plans which are described more fully in Note 11. The Company accounts for these plans under the recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees", and related interpretations. No stock-based employee compensation cost is reflected in net income, as all options granted under those plans have an exercise price equal to the market value of the underlying common stock on the date of grant. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of FASB Statement No. 123, "Accounting for Stock-Based Compensation", to stock-based employee compensation (in thousands, except per share data):

| For the Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net income applicable to Common Shareholders – as reported | $    89 | $ 34,332 | $   2,375 |
| Add: Stock-based employee compensation expense included in reported net income | 5,532 | 1,345 | 2,771 |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards | (13,926) | (13,472) | (21,764) |
| Tax effect (a) | 2,854 | — | — |
| Net (loss) income applicable to Common Shareholders – pro forma | $ (5,451) | $ 22,205 | $(16,618) |
| Net income (loss) per share – as reported – basic | 0.00 | 0.62 | (0.04) |
| Net income (loss) per share – as reported – diluted | 0.00 | 0.58 | (0.04) |
| Net (loss) income per share – pro forma – basic | (0.10) | 0.40 | (0.31) |
| Net (loss) income per share – pro forma – diluted | (0.10) | 0.37 | (0.31) |

(a)  In 2004, the pro forma tax effect has been limited to tax effects directly related to additional stock-based compensation expense recognized in the period for pro forma purposes. In our interim report for third quarter 2004 we had included all tax effects associated with recognizing stock-based employee compensation expense using the fair value method. No pro forma tax effect has been recognized for periods prior to 2004 due to the limited amount of federal and state tax expense recognized in such periods.

52

**Table of Contents**

The fair value of each option grant is estimated on the date of grant using the Black-Scholes option pricing model with the following weighted-average assumptions:

| For the Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Expected option life (in years) | 4.8 | 4.7 | 4.3 |
| Risk-free interest rate | 3.5% | 2.9% | 3.8% |
| Volatility | 86% | 104% | 72% |
| Dividend yield | — | — | — |
| Weighted average fair value | $19.59 | $15.99 | $8.51 |

### New Accounting Standard

In December 2004, the Financial Accounting Standards Board, or FASB, issued SFAS No. 123 (revised 2004), *Share-Based Payment*. SFAS No. 123(R) requires that the compensation cost relating to share-based payment transactions be recognized in financial statements. The cost will be measured based on the fair value of the instruments issued. SFAS No. 123(R) covers a wide range of share-based compensation arrangements including share options, restricted share plans, performance-based awards, share appreciation rights and employee share purchase plans. SFAS No. 123(R) replaces SFAS No. 123 and supersedes APB Opinion No. 25. As originally issued in 1995, SFAS No. 123 established as preferable the fair-value-based method of accounting for share-based payment transactions with employees. However, that Statement permitted entities the option of continuing to apply the guidance in Opinion 25, as long as the footnotes to financial statements disclosed what net income would have been had the preferable fair-value-based method been used. We will be required to apply SFAS No. 123(R) as of the first interim reporting period that begins after June 15, 2005, and we plan to adopt it using the modified-prospective method, effective July 1, 2005. We are currently evaluating the effect SFAS No. 123(R) will have on our results. Based on our preliminarily analysis, we expect to incur between $1 million and $2 million in additional compensation expense from stock options during the period July 1, 2005 to December 31, 2005 as a result of adopting this new accounting standard.

### Concentration of Credit Risk and Fair Value of Financial Instruments

Financial instruments that potentially subject us to concentration of credit risk consist primarily of cash equivalents, short-term investments, and accounts receivable. We place our cash equivalents and short-term investments only in highly rated financial instruments and in United States Government instruments.

Our accounts receivable are derived principally from patent license agreements and engineering services. At December 31, 2004, two customers represented 52%, and 36%, respectively, of our accounts receivable balance. At December 31, 2003, three customers represented 46%, 31% and 14%, respectively, of our accounts receivable balance. We perform ongoing credit evaluations of our customers who generally include large, multi-national, wireless telecommunications equipment manufacturers. We believe that the book value of our financial instruments, which include cash and cash equivalents, short-term investments and debt, approximate their fair values.

### Impairment of Long-Lived Assets

Pursuant to SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets", we evaluate long-lived assets and intangible assets for impairment when factors indicate that the carrying amount of an asset may not be recoverable. When factors indicate that such assets should be evaluated for possible impairment, we review the realizability of our long-lived assets by analyzing the projected undiscounted cash flows in measuring whether the asset is recoverable. No such adjustments were needed in 2004, 2003 or 2002.

### Income Taxes

Income taxes are accounted for under the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the Consolidated Statement of Operations in the period that includes the enactment date. A valuation allowance is recorded to reduce the carrying amounts of deferred tax assets if management has determined that it is more likely than not that such assets will not be realized.

We recognize deferred tax assets related to deferred revenue for both U.S. Federal Income Tax purposes and non-U.S.

jurisdictions that assess a source withholding tax on related royalty payments. We expense these deferred tax assets in accordance with FAS 109 as the related temporary differences reverse. In 2004, 2003 and 2002, we paid approximately $3.9 million, $9.5 million and $5.6 million of foreign source withholding tax and recognized approximately $4.5 million, $7.4 million and $8.3 million, respectively, of foreign source withholding tax expense in our income tax provision in accordance with this policy.

53

**Table of Contents**

*Net Income Per Common Share*

Basic earnings per share (EPS) are calculated by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period. Diluted EPS reflects the potential dilution that could occur if options, warrants or other securities with features that could result in the issuance of Common Stock were exercised or converted to Common Stock. The following tables reconcile the numerator and the denominator of the basic and diluted net income per share computation (in thousands, except per share data):

| For the Year Ended December 31, 2004 | Income (Numerator) | Shares (Denominator) | Per-Share Amount |
|---|---|---|---|
| Income per Share – Basic: | | | |
| Income available to common shareholders | $    89 | 55,264 | $   0.00 |
| Dilutive effect of options, warrants and convertible preferred stock | — | 3,811 | 0.00 |
| Income per Share – Diluted: | | | |
| Income available to common shareholders + dilutive effects of options, warrants and convertible preferred stock | $    89 | 59,075 | $   0.00 |

| For the Year Ended December 31, 2003 | Income (Numerator) | Shares (Denominator) | Per-Share Amount |
|---|---|---|---|
| Income per Share – Basic: | | | |
| Income available to common shareholders | $  34,332 | 55,271 | $   0.62 |
| Dilutive effect of options, warrants and convertible preferred stock | — | 4,420 | (0.04) |
| Income per Share – Diluted: | | | |
| Income available to common shareholders + dilutive effects of options, warrants and convertible preferred stock | $  34,332 | 59,691 | $   0.58 |

| For the Year Ended December 31, 2002 | Income (Numerator) | Shares (Denominator) | Per-Share Amount |
|---|---|---|---|
| Income per Share – Basic: | | | |
| Income available to common shareholders | $  2,375 | 52,981 | $   0.04 |
| Dilutive effect of options, warrants and convertible preferred stock | — | 3,118 | 0.00 |
| Income per Share – Diluted: | | | |
| Income available to common shareholders + dilutive effects of options, warrants and convertible preferred stock | $  2,375 | 56,099 | $   0.04 |

54

Table of Contents

For the years ended December 31, 2004, 2003 and 2002, options and warrants to purchase approximately 1.7 million, 1.1 million and 3.6 million shares, respectively, of Common Stock were excluded from the computation of diluted EPS because the exercise prices of the options were greater than the weighted average market price of our common stock during the respective periods and, therefore, their effect would have been anti-dilutive.

### Reclassification

Certain prior period amounts have been reclassified to conform to the current year presentation.

## 3. GEOGRAPHIC/CUSTOMER CONCENTRATION

We have one reportable segment. Substantially all of our revenue is derived from a limited number of customers based outside of the United States (primarily Japan and Europe). These revenues are paid in U.S. dollars and are not subject to any substantial foreign exchange transaction risk. During 2004, 2003, and 2002, revenue from our Japan-based licensees comprised 77%, 64%, and 94% of total revenues, respectively.

During 2004, 2003, and 2002, the following customers accounted for 10% or more of revenues:

|  | 2004 | 2003 | 2002 |
| --- | --- | --- | --- |
| NEC | 43 % | 29 % | 35% |
| Sharp | 24 % | 25 % | 30% |
| Sony Ericsson | 12 % | 29 % | — % |
| Denso | — % | — % | 11% |

## 4. SIGNIFICANT AGREEMENTS AND EVENTS

### General Dynamics

In December 2004, we entered into an agreement with General Dynamics Decision Systems, Inc. (General Dynamics), to serve as a subcontractor on the Mobile User Objective System (MUOS) program for the U.S. military. MUOS is an advanced tactical terrestrial and satellite communications system utilizing 3G commercial cellular technology to provide significantly improved high data rate and assured communications for U.S. warfighters.

The Software License Agreement requires us to deliver to General Dynamics standards-compliant WCMDA modem technology, originating from the technology we developed under our agreement with Infineon, for incorporation into handheld terminals. Under the agreement, we expect to receive $18.5 million for delivery of and a limited license in our commercial technology solution for use within the government's MUOS and Joint Tactical Radio System programs, maintenance and product training. The agreement also includes

55

Table of Contents

options that are exercisable by General Dynamics at various times through March 2006 for additional deliverables for up to $4.0 million. We anticipate that a majority of our MUOS program deliverables and related payments will occur in 2005, excluding the exercise of options for additional deliverables. We will provide maintenance and support to General Dynamics for three years following delivery of the technology. In addition to the deliverables specifically identified in the agreement, we have agreed to provide additional future services as requested by General Dynamics. The contract may be terminated for convenience if the U.S. Government terminates for convenience that portion of the MUOS Program that includes General Dynamics.

We are accounting for the delivery of and limited license in our commercial technology platform under the Software License Agreement using the percentage-of-completion method. This portion of the agreement is valued at $16.5 million. In 2004, we recognized approximately $0.1 million in revenue, and at December 31, 2004 our accounts receivable included a related unbilled amount of approximately $0.1 million. In early 2005, we completed the first milestones under the agreement and have received $1.2 million in related payments. Subsequent to our delivery of our commercial technology platform, we will provide General Dynamics with support for a period of three years. This portion of the contract is valued at $2 million and revenue related to this portion will be recognized evenly over the period of support.

### Repositioning

In second quarter 2004, we reduced our headcount by 25 employees as part of a plan to strategically reposition the Company. We recorded a charge of approximately $0.6 million in second quarter 2004 associated with this repositioning. The charge was comprised primarily of severance and other cash benefits associated with the workforce reduction. During the balance of 2004, we adjusted our repositioning charge by less than $0.1 million and paid off all liabilities associated with this restructuring. At December 31, 2004, we believe that our financial obligations associated with this repositioning are substantially complete and do not expect to report further costs associated with the repositioning.

### Acquisition

In July 2003, we entered into an Asset Purchase Agreement (the Asset Purchase Agreement) with Windshift Holdings, Inc. (formerly known as Tantivy Communications, Inc., "Windshift"), pursuant to which we acquired substantially all the assets of Windshift. Included in the acquisition were patents, patent applications, know-how, and state-of-the-art laboratory facilities related to cdma2000, smart antenna, wireless LAN and other wireless communications technologies. The acquisition included patents and patent applications to which we had previously acquired rights under a patent license agreement with Windshift. We acquired these assets to strengthen our existing cdma2000 patent portfolio and competitive position in that marketplace, broaden our offering to potential licensees and technology partners and eliminate contingent payment obligations we had to Windshift in connection with the license we entered into with them in 2002 regarding the cdma2000-related patents.

The purchase price for the acquisition was $11.5 million, consisting of approximately $10.0 million in cash and the cancellation of approximately $1.5 million in outstanding indebtedness owed to us by Windshift. In addition, under the terms of the Asset Purchase Agreement, Windshift will be entitled to receive, for a period of approximately five years, 1% and 4%, respectively, of amounts we receive from the licensing or sale of smart antenna and 802.11 intellectual property acquired from Windshift ("the Earn-out"). We have not incurred any royalty obligations at this time. In addition to the purchase price, we incurred approximately $0.4 million of acquisition related costs.

We accounted for this asset acquisition under FAS 141 *"Business Combinations."* The following table summarizes the estimated fair values of the assets acquired. Additional payments to Windshift under the Earn-out may result in the recognition of goodwill, which would be subject to impairment testing in accordance with SFAS 142 *"Goodwill and Other Intangible Assets."*

|  | (In thousands) | |
| --- | --- | --- |
| Property and Equipment | $ | 552 |
| Patents |  | 11,324 |
| Total assets acquired | $ | 11,876 |

As indicated in the table above, the majority of the purchase price has been allocated to patents with the remainder allocated to fixed assets. We have estimated the useful life of the acquired patents to be 15 years. We have estimated the useful lives of the acquired fixed assets to be between 3 and 10 years.

In connection with our acquisition, we opened an engineering design center in Melbourne, Florida and hired 10

Interdigital Communications Corp                                        Page 107 of 134

individuals that were formerly employed by Windshift. Beginning July 31, 2003, we have included the results of the Melbourne design center, amortization of the acquired patents, and depreciation of the acquired fixed assets in our results of operations.

56

**Table of Contents**

The following unaudited pro forma combined results of operations is provided for illustrative purposes only and assumes this acquisition of assets occurred as of the beginning of each of the periods presented. The unaudited pro forma combined financial results do not purport to be indicative of the results of operations for future periods or the results that actually would have been realized had the entities been a single entity during these periods.

|  | Year Ended December 31, | |
|  | **2003** | **2002** |
|  | (In thousands except per share data) | |
| Pro forma revenue | $ 114,574 | $ 88,220 |
| Pro forma net income (loss) | $ 31,651 | $ (8,290) |
| Diluted net income per share, as reported | $ 0.58 | $ 0.04 |
| Diluted net income (loss) per share, pro forma | $ 0.56 | $ (0.16) |

## 5. PROPERTY AND EQUIPMENT

|  | December 31, | |
|  | **2004** | **2003** |
|  | (In thousands) | |
| Land | $ 695 | $ 695 |
| Building and improvements | 5,996 | 5,941 |
| Machinery and equipment | 11,754 | 10,544 |
| Computer equipment | 14,287 | 12,909 |
| Computer software | 13,937 | 12,923 |
| Furniture and fixtures | 4,020 | 3,829 |
| Leasehold improvements | 2,312 | 2,301 |
|  | 53,001 | 49,142 |
| Less: Accumulated depreciation | (42,285) | (37,005) |
|  | $ 10,716 | $ 12,137 |

Depreciation expense was $5.3 million, $6.4 million, and $7.0 million in 2004, 2003 and 2002, respectively.

57

Table of Contents

## 6. LONG-TERM DEBT OBLIGATIONS

| | December 31, | |
|---|---|---|
| | **2004** | **2003** |
| | (In thousands) | |
| Mortgage debt | $1,777 | $1,939 |
| Capital leases | 107 | 31 |
| Total long-term debt obligations | 1,884 | 1,970 |
| Less: Current portion | (212) | (193) |
| | $1,672 | $1,777 |

During 1996, we purchased our King of Prussia, Pennsylvania facility for $3.7 million, including cash of $0.9 million and a 16-year mortgage of $2.8 million with interest payable at a rate of 8.28% per annum.

Capital lease obligations are payable in monthly installments at an average rate of 4.50%, through 2007. The net book value of equipment under capitalized lease obligations was $0.1 million at December 31, 2004 and less than $0.1 million at December 31, 2003.

Maturities of principal of the long-term debt obligations as of December 31, 2004 are as follows (in thousands):

| | |
|---|---|
| 2005 | $ 212 |
| 2006 | 229 |
| 2007 | 240 |
| 2008 | 225 |
| 2009 | 244 |
| Thereafter | 734 |
| | $1,884 |

## 7. COMMITMENTS

### Leases

We have entered into various operating lease agreements. Total rent expense, primarily for office space, was $2.7 million, $2.6 million, and $2.4 million in 2004, 2003 and 2002, respectively. Minimum future rental payments for operating leases as of December 31, 2004 are as follows (in thousands):

| | |
|---|---|
| 2005 | $2,636 |
| 2006 | 2,210 |
| 2007 | 471 |
| 2008 | — |
| 2009 | — |
| Thereafter | — |

## 8. LITIGATION AND LEGAL PROCEEDINGS

### Nokia

Nokia Arbitration

In July 2003, Nokia Corporation (Nokia) requested arbitration regarding Nokia's royalty payment obligations for its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products under the existing patent license agreement with InterDigital Technology Corporation (ITC), a wholly-owned subsidiary of InterDigital Communications Corporation (Nokia Arbitration). Pursuant to the dispute resolution provisions of the patent license agreement, the arbitration is being conducted in the International Court of Arbitration of the International Chamber of Commerce (ICC).

58

**Table of Contents**

Pursuant to the dispute resolution provisions of the patent license agreement, the arbitration is being conducted in the International Court of Arbitration of the International Chamber of Commerce (ICC).

The binding arbitration relates to ITC's claim that the patent license agreements ITC signed with Ericsson and Sony Ericsson in March 2003 defined the financial terms under which Nokia would be required to pay royalties on its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products commencing January 1, 2002. Nokia is seeking a determination that its obligation under our existing patent license agreement is not defined by our patent license agreements with Ericsson and Sony Ericsson or has been discharged. Nokia also is seeking a ruling that no royalty rate for its sales after January 1, 2002 can be determined by the arbitration panel ("Nokia Tribunal") until certain contractual conditions precedent have been satisfied. Nokia has additionally claimed that, in any event, the Nokia Tribunal cannot award money damages. ITC filed an Answer to Nokia's Request for Arbitration arguing that the patent license agreements signed with Ericsson and Sony Ericsson in March 2003 defined the financial terms under which Nokia would be required to pay royalties on its worldwide sales of 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE products commencing January 1, 2002, that Nokia's duty to pay these royalties has not been discharged, and that the documents sought by Nokia are not relevant to the royalty determination. ITC also counterclaimed for an arbitration decision requiring that Nokia pay us royalties on equivalent terms and conditions as those set forth in the Ericsson and Sony Ericsson patent license agreements for the period January 1, 2002 to December 31, 2006, and a determination of the amount of the royalty and payment terms. During fourth quarter 2003, Nokia filed a Reply contesting our claims and included additional claims and defenses relating to the validity and infringement of certain of ITC's patents. Subsequently, Nokia withdrew from the arbitration its claims pertaining to invalidity and non-infringement of those same ITC patents, but maintains that the validity and infringement of those patents is a factor the arbitration panel should consider in the arbitration. We do not believe that the issues of patent validity or infringement are relevant to the arbitrable royalty dispute and have contested Nokia's position.

The hearing in the Nokia Arbitration was conducted in January 2005 and the Nokia Tribunal has notified the parties that the Nokia Tribunal expects to submit an internal draft Award to the ICC on or before March 31, 2005 (as an approximate date). The ICC has set May 31, 2005 as the last date for rendering a Final Award and the Company anticipates a decision by the ICC on or before such last date absent an earlier resolution by the parties. Any Final Award could be subject to appeal filings on limited bases and enforcement proceedings by the parties.

Other Nokia Proceedings

In July 2003, Nokia filed a motion to intervene in the now-settled Ericsson litigation in the United States District Court for the Northern District of Texas and to gain access to documents previously sealed by the Court in the settled litigation. We filed a response opposing the request to intervene and opposing the request for access to the documents. The Court granted Nokia's motion to intervene in the Ericsson litigation, and provided Nokia with document access on a limited basis. Thereafter, the Nokia Tribunal ordered that certain documents from the Ericsson litigation be produced to Nokia for its use in the Nokia Arbitration, though the Nokia Tribunal made no decision as to whether issues of patent infringement or validity were relevant to the determination of Nokia's royalty obligation. Nokia subsequently filed a motion to reinstate certain decisions that were vacated in the now-settled Ericsson litigation, which motion was granted by the Court. We have appealed that ruling to the U.S. Court of Appeals for the Federal Circuit. Nokia is contesting our appeal.

In late 2004, Nokia sought to enforce two subpoenas issued by the Nokia Tribunal to Ericsson and Sony Ericsson seeking certain documents. Those enforcement actions were commenced in the Federal District Court for the Northern District of Texas and the Federal District Court for the Eastern District of North Carolina. Nokia has withdrawn both enforcement actions.

During the Nokia Arbitration, on June 14, 2004 Nokia commenced a patent revocation proceeding in the United Kingdom High Court of Justice, Chancery Division, Patents Court, seeking to have three of ITC's U.K. patents declared invalid (U.K. Revocation Proceeding). Nokia also seeks a declaration that the manufacture and sale of certain mobile and infrastructure equipment does not infringe these patents and that the patents are not essential under the applicable standard. ITC is contesting all of these claims, and the trial is scheduled to commence in October 2005.

In connection with the U.K. Revocation Proceeding, in September 2004 Nokia filed an action against Sony Ericsson in the Federal District Court for the Eastern District of North Carolina, and an action against Ericsson in the Federal District Court for the Eastern District of Texas. The actions are based upon 28 United States Code Section 1782 which provides for discovery in a United States court for use in a foreign proceeding and addresses jurisdictional, procedural and evidentiary matters associated with such foreign proceeding. In both actions, Nokia sought documents related to the ITC patents and patent licenses. Both the Federal District Court for the Eastern District of Texas and the Eastern District of North Carolina

Interdigital Communications Corp

have denied Nokia's motions with respect to any documents not previously produced in the Nokia Arbitration.

During the Nokia Arbitration, in January 2005, Nokia and Nokia, Inc. filed a complaint in the United States District Court for the District of Delaware against InterDigital Communications Corporation and ITC for declaratory judgments of patent invalidity and non-infringement of certain claims of certain patents, and violations of the Lanham Act. We have filed a motion to dismiss the complaint.

59

Table of Contents

*Samsung*

In 2002, during an arbitration proceeding, Samsung Electronics Co., Ltd. (Samsung) elected, under its 1996 patent license agreement with ITC (1996 Samsung License Agreement), to have Samsung's royalty obligations commencing January 1, 2002 for 2G GSM/TDMA and 2.5G GSM/GPRS/EDGE wireless communications products be determined in accordance with the terms of the Nokia patent license agreement, including its MFL provision. By notice in March 2003, ITC notified Samsung that such Samsung obligations had been defined by the relevant licensing terms of ITC's license agreements with Ericsson (for infrastructure products) and Sony Ericsson (for terminal unit products) as a result of the MFL provision in the Nokia license agreement. In November 2003, Samsung initiated a binding arbitration against the Company and ITC. The arbitration was filed with the ICC. Samsung is seeking to have an ICC arbitration panel determine that Samsung's obligations under the 1996 Samsung License Agreement are not defined by our license agreements with Ericsson and Sony Ericsson or, in the alternative, to determine the amount of the appropriate royalty due. ITC has counterclaimed for an arbitration decision requiring that Samsung pay ITC royalties on equivalent terms and conditions as those set forth in the Ericsson and Sony Ericsson patent license agreements for the period January 1, 2002 to December 31, 2006, and determining the amount of the royalty and payment terms. We also seek a declaration that the parties' rights and obligations are governed by the 1996 Samsung License Agreement, and that the Nokia patent license agreement dictates only Samsung's royalty obligations and most favored rights for those products licensed under the 1996 Samsung License Agreement. Samsung has replied to ITC's answer and counterclaim, maintaining Samsung's position (as set forth in its arbitration demand) and arguing that it has succeeded to all of Nokia's license rights, including its 3G license. If the arbitration panel were to agree with Samsung's position, Samsung would be licensed to sell 3G products on the same terms as Nokia. In the alternative, Samsung asserts that its royalty obligations should be governed by the MFL clause in the 1996 Samsung License Agreement. The arbitration panel has informed the Company and Samsung that the evidentiary hearing in this matter is scheduled to commence in June 2005.

*Lucent*

In March 2004, Tantivy Communications, Inc., one of our wholly-owned subsidiaries, filed a lawsuit in the United States District Court for the Eastern District of Texas against Lucent Technologies, Inc. (Lucent), a leading manufacturer of cdma2000® equipment. The case is based on our assertions of infringement by Lucent of several of our subsidiary's patents issued in the United States. The lawsuit seeks damages for past infringement and an injunction against future infringement as well as interest, costs, and attorneys' fees. Lucent has responded to the lawsuit denying any infringement, and seeking a declaration of non-infringement and that the patents are invalid. Lucent has requested attorneys' fees and costs. The Court has issued a scheduling order pursuant to which the Markman hearing (for claim construction) is scheduled for May 2005, and the trial is scheduled to commence in September 2005. Pursuant to court order, the parties attended a mediation session in January 2005. The parties are currently in the discovery phase of the litigation.

*Federal*

In October 2003, Federal Insurance Company (Federal), the insurance carrier for the now-settled litigation involving Ericsson Inc., delivered to us a demand for arbitration under the Pennsylvania Uniform Arbitration Act. Federal claims, based on their determination of expected value to the Company resulting from our settlement involving Ericsson Inc., that an insurance reimbursement agreement requires us to reimburse Federal approximately $28.0 million for attorneys' fees and expenses it claims were paid by it. On November 4, 2003 the Company filed an action in United States District Court for the Eastern District of Pennsylvania seeking a declaratory judgment that the reimbursement agreement is void and unenforceable, seeking reimbursement of attorneys' fees and expenses which have not been reimbursed by Federal and which were paid directly by the Company in connection with the Ericsson Inc. litigation, and seeking damages for Federal's bad faith and breach of its obligations under the insurance policy. In the alternative, in the event the reimbursement agreement is found to be valid and enforceable, the Company is seeking a declaratory judgment that Federal is entitled to reimbursement based only on certain portions of amounts received by the Company from Ericsson Inc. pursuant to the settlement of the litigation involving Ericsson Inc. Federal has requested the Court to dismiss the action and/or to have the matter referred to arbitration. We have opposed such requests. Prior to Federal's demand for arbitration, we had accrued a contingent liability of $3.4 million related to the insurance reimbursement agreement. If this matter results in us paying Federal substantially more than the amount accrued, it could have a material impact on our financial results.

60

Table of Contents

*Other*

We have filed patent applications in the United States and in numerous foreign countries. In the ordinary course of business, we currently are, and expect from time to time to be, subject to challenges with respect to the validity of our patents and with respect to our patent applications. We intend to continue to vigorously defend the validity of our patents and defend against any such challenges. However, if certain key patents are revoked or patent applications are denied, our patent licensing opportunities could be materially and adversely affected.

We and our licensees, in the normal course of business, have disagreements as to the rights and obligations of the parties under the applicable patent license agreement. For example, we could have a disagreement with a licensee as to the amount of reported sales of covered products and royalties owed. Our patent license agreements typically provide for arbitration as the mechanism for resolving disputes. Arbitration proceedings can be resolved through an award rendered by an arbitration panel or through private settlement between the parties. Awards and settlements of arbitration proceedings can be substantial, but are uncertain, unpredictable and often of a non-recurring nature.

In addition to disputes associated with enforcement and licensing activities regarding our intellectual property, including the litigation and other proceedings described above, we are a party to other disputes and legal actions not related to our intellectual property but also arising in the ordinary course of our business.

Based upon information presently available to us, we believe that the ultimate outcome of these other disputes and legal actions will not materially affect us.

61

Table of Contents

**9. RELATED PARTY TRANSACTIONS**

In 2004 and 2003, we engaged a consulting firm and paid approximately $0.1 million and $0.7 million, respectively, for their services. One of our outside directors is Chairman of the Advisory Board to the consulting firm. Our board member did not receive any direct compensation or commissions related to the engagement.

We paid less than $0.1 million to a consultant for services in 2003 prior to his appointment to our Board of Directors in December, 2003.

**10. PREFERRED STOCK**

During second quarter 2004, our Board of Directors approved the redemption of all shares outstanding of our $2.50 Cumulative Convertible Preferred Stock (Preferred Stock). We issued a redemption notice for 52,762 shares of Preferred Stock outstanding as of June 15, 2004. The holders of the Preferred Stock were entitled to convert their Preferred Stock at any time prior to the July 19, 2004 redemption date at a conversion rate of 2.08 shares of our Common Stock for each share of Preferred Stock. Between the date of our redemption notice and the redemption date, 50,738 shares of Preferred Stock were converted. In early third quarter 2004, we paid approximately $51,000 to fulfill our redemption obligation, the redemption price being $25.00 per share plus accrued dividends, for the remaining 2,024 Preferred Shares.

Prior to the above-noted redemption, the holders of the Preferred Stock were entitled to receive, when and as declared by our Board of Directors, cumulative annual dividends of $2.50 per share payable in cash or Common Stock at the Company's election (subject to a cash election right of the holder), if legally available. Such dividends were payable semi-annually on June 1 and December 1. In the event we failed to pay two consecutive semi-annual dividends within the required time period, penalties, such as adjusted conversion rates, may have been imposed. The Preferred Stock was convertible into Common Stock at any time prior to redemption at a conversion rate of 2.08 shares of Common Stock for each share of preferred. In 2004, 2003 and 2002, we declared and paid dividends on the Preferred Stock of $66,000, $133,000 and $136,000, respectively. These dividends were paid with both cash of $37,000, $77,000 and $92,000 and shares of the Company's Common Stock of 1,759, 2,593, and 3,113 in 2004, 2003 and 2002, respectively.

62

Table of Contents

Upon any liquidations, dissolution or winding up of the Company, the holders of the Preferred Stock would have been entitled to receive, from the Company's assets available for distribution to shareholders, $25 per share plus all dividends accrued, before any distribution was made to shareholders of common stock. After such payments, the holders of the Preferred Stock would not have been entitled to any other payments. The redemption price for each share of the Preferred Stock was $25 per share. The Preferred Stock was redeemable at our option.

The holders of the Preferred Stock did not have any voting rights except on those amendments to the Company's Articles of Incorporation which would have adversely affected their rights, created any class or series of stock ranking senior to or not at parity with the Preferred Stock, as to either dividend or liquidation rights, or increased the authorized number of shares of any senior stock. In addition, if two or more consecutive semi-annual dividends on the Preferred Stock were not paid by the Company, the holders of the Preferred Stock, separately voting as a class, would have been entitled to elect one additional director of the Company.

## 11. COMMON STOCK COMPENSATION PLANS

### Stock Compensation Plans

We have stock-based compensation plans under which, depending on the plan, directors, employees, consultants and advisors can receive stock options, stock appreciation rights, restricted stock awards and other stock unit awards.

### Common Stock Option Plans

We have granted options under two incentive stock option plans, three non-qualified stock option plans and two plans which provide for grants of both incentive and non-qualified stock options (Pre-existing Plans) to non-employee directors, officers and employees of the Company and other specified groups, depending on the plan. No further grants are allowed under the Pre-existing Plans. In 2000, our shareholders approved the 2000 Stock Award and Incentive Plan (2000 Plan) that allows for the granting of incentive and non-qualified options, as well as other securities. The 2000 Plan authorizes the offer and sale of up to approximately 7.4 million shares of common stock. The Board of Directors or the Compensation and Stock Option Committee of the Board determine the number of options to be granted. Under the terms of the 2000 Plan, the option price cannot be less than 100% of fair market value of the Common Stock at the date of grant.

In 2002, the Board of Directors approved the 2002 Stock Award and Incentive Plan (2002 Plan) that allows for the granting of incentive and non-qualified options, as well as other securities to Company employees who are not subject to the reporting requirements of Section 16 of the Securities Act of 1934 or an "affiliate" for purposes of Rule 144 of the Securities Act of 1933. The 2002 Plan authorizes the offer and sale of up to 1.5 million shares of common stock. The Board of Directors or the Compensation and Stock Option Committee of the Board determine the number of options to be granted. Under the terms of the 2002 Plan, the option price cannot be less than 100% of fair market value of the Common Stock at the date of grant. In addition, unless otherwise modified, no awards may be granted under the 2002 Plan after the close of business on March 31, 2012.

Under all of these plans, options are generally exercisable for a period of 10 years from the date of grant and may vest on the grant date, another specified date or over a period of time. However, under plans that provide for both incentive and non-qualified stock options, grants most commonly vest in six semi-annual installments.

63

Interdigital Communications Corp

**Table of Contents**

Information with respect to stock options under the above plans is summarized as follows (in thousands, except per share amounts):

| | Available For Grant | Outstanding Options | | Weighted Average Exercise Price |
|---|---|---|---|---|
| | | Number | Price Range | |
| BALANCE AT DECEMBER 31, 2001 | 971 | 10,564 | $ 0.01-39.00 | $ 11.67 |
| Granted | (1,056) | 1,056 | $ 6.32-19.10 | $ 12.46 |
| Canceled | 463 | (463) | $ 0.01-39.00 | $ 13.80 |
| Exercised | — | (695) | $ 0.01-17.13 | $ 8.45 |
| 2002 Plan Authorization | 1,500 | — | | |
| BALANCE AT DECEMBER 31, 2002 | 1,878 | 10,462 | $ 0.01-39.00 | $ 11.86 |
| Granted | (999) | 999 | $13.20-25.85 | $ 19.05 |
| Canceled | 151 | (151) | $ 6.50-39.00 | $ 19.34 |
| Exercised | — | (1,952) | $ 0.01-19.10 | $ 8.97 |
| BALANCE AT DECEMBER 31, 2003 | 1,030 | 9,358 | $ 0.01-39.00 | $ 13.11 |
| Granted | (390) | 390 | $15.63-27.26 | $ 22.75 |
| Canceled | 245 | (245) | $ 6.31-39.00 | $ 21.42 |
| Exercised | — | (1,030) | $14.91-27.74 | $ 22.25 |
| BALANCE AT DECEMBER 31, 2004 | 885 | 8,473 | $ 0.01-39.00 | $ 13.70 |

The following table summarizes information regarding the stock options outstanding at December 31, 2004 (in thousands, except for per share amounts):

| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contractual Life* | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $  0.01 - 5.25 | 442 | 5.15 | $  4.74 | 442 | $  4.74 |
| $  5.38 - 5.44 | 880 | 2.84 | 5.43 | 880 | 5.43 |
| $  5.50 - 8.25 | 897 | 7.35 | 6.92 | 858 | 6.89 |
| $  8.33 - 9.35 | 271 | 6.70 | 8.81 | 244 | 8.80 |
| $  9.38 - 9.60 | 1,071 | 6.98 | 9.60 | 1,060 | 9.60 |
| $  9.63 - 11.63 | 1,036 | 10.94 | 10.70 | 968 | 10.71 |
| $ 11.64 - 13.19 | 967 | 6.53 | 12.47 | 876 | 12.52 |
| $ 13.20 - 17.13 | 1,021 | 7.28 | 15.73 | 692 | 15.74 |
| $ 17.23 - 24.00 | 856 | 8.34 | 20.06 | 442 | 19.84 |
| $ 24.30 - 39.00 | 1,032 | 5.91 | 32.85 | 896 | 33.99 |
| $  0.01 - 39.00 | 8,473 | 6.96 | $ 13.70 | 7,358 | $ 13.20 |

* We currently have approximately 250,000 options outstanding that have an indefinite contractual life. These options were granted between 1983 and 1986 under a pre-existing plan. For purposes of this table these options were assigned an original life in excess of 50 years. The majority of these options have an exercise price of between $9.63 and $11.63.

64

**Table of Contents**

*Common Stock Warrants*

As of December 31, 2004 and 2003, we had warrants outstanding to purchase 80,000 and 192,000 shares of Common Stock, respectively, at exercise prices ranging from $2.50 to $7.63 per share, with weighted average exercise prices of $7.63 and $6.22 per share, respectively. As of December 31, 2004, the warrants outstanding to purchase 80,000 shares of Common Stock are exercisable and will expire in 2006. The exercise price and number of shares of Common Stock to be obtained upon exercise of these warrants are subject to adjustment under conditions specified in the warrant certificate.

*Restricted Stock*

Under our 1999 Restricted Stock Plan, as amended (1999 Plan), we may issue up to 3.5 million shares of restricted Common Stock and restricted stock units to directors, employees, consultants and advisors. The restrictions on issued shares lapse over periods generally ranging from 1 to 5 years from the date of the grant. As of December 31, 2004 and 2003, we had 1,444,669 and 1,006,491 shares of restricted stock and restricted stock units, respectively, issued under the 1999 Plan. The related compensation expense will be, or has been, amortized over vesting periods that are generally from 1 to 5 years. The balance of unearned compensation at December 31, 2004 and 2003 was $3.3 million and $0.7 million, respectively.

## 12. SHAREHOLDER RIGHTS PLAN

In December 1996, our Board of Directors (Board) declared a distribution under our Shareholder Rights Plan (Rights Plan) of one Right (as described below) for each outstanding common share of the Company to shareholders of record as of the close of business on January 3, 1997. In addition, any new common shares issued after January 3, 1997 will receive one Right for each common share. The Rights Plan was amended in a number of respects with the latest amendments in March 2000. As amended, each Right entitles shareholders to buy one-thousandth of a share of Series B Junior Participating Preferred Stock (Preferred Stock) at a purchase price of $250 per share, subject to adjustment. Ordinarily, the Rights will not be exercisable until (i) 10 business days after the earlier of any of the following events (A) a person, entity or group (other than certain categories of shareholders exempted under the Rights Plan) a Person acquires beneficial ownership of 10% or more of the Company's outstanding common shares, or (B) a Person publicly commences a tender or exchange offer for 10% or more of the Company's outstanding common shares, or (C) a Person publicly announces an intention to acquire control over the Company and proposes in a proxy or consent solicitation to elect such a number of directors, who if elected, would represent a majority of the directors when compared with the Independent Directors (as defined in the Rights Plan) on the Board, or (ii) such later date as may be determined by action of a majority of the Independent Directors prior to the occurrence of any event specified in (i) above (Distribution Date). In general, following the Distribution Date and in the event that the Company enters into a merger or other business combination with an Acquiring Person (as such term is defined in the Rights Plan) and the Company is the surviving entity, each holder of a Right will have the right to receive, upon exercise, units of Preferred Stock (or, in certain circumstances, Company common shares, cash, property, or other securities of the Company) having a value equal to twice the exercise price of the Right, or if the Company is acquired in such a merger or other business combination, each holder of a Right will have the right to receive stock of the Acquiring Person having a value equal to twice the exercise price of the Right. The Company reserves the right to redeem the Rights by majority action of its Independent Directors at any time prior to the date such Rights become exercisable. The Rights Plan will expire on December 31, 2006.

## 13. TAXES

Income tax expense/(benefit) consists of the following components for 2004, 2003, and 2002:

| | Year Ended December 31, | | |
| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (In thousands) | |
| Current | | | |
| Federal | $ 7,490 | $ (755) | $ 1,834 |
| State | — | — | — |
| Alternative Minimum Tax receivable (AMT) | 391 | (793) | — |
| Foreign income tax | 20 | — | — |
| Foreign source withholding tax | 1,309 | 3,170 | 2,861 |
| | 9,210 | 1,622 | 4,695 |
| Deferred | | | |
| Federal | (18,090) | 3,418 | (165) |

| | | | |
|---|---:|---:|---:|
| State | (2,381) | (410) | (4,095) |
| Foreign source withholding tax | 3,150 | 4,213 | 5,487 |
| Reversal of valuation allowance | (17,064) | — | — |
| Increase/(decrease) in valuation allowance – federal | 18,090 | (1,574) | 2,826 |
| Increase in valuation allowance – state | 2,381 | — | — |
| | (13,914) | 5,647 | 4,053 |
| Total | $ (4,704) | $ 7,269 | $ 8,748 |

65

Table of Contents

The deferred tax assets and liabilities are comprised of the following at December 31, 2004 and 2003:

| | 2004 | 2003 |
|---|---|---|
| | (In thousands) | |
| Depreciation | $ 1,079 | $ 1,143 |
| Patent amortization | 2,975 | 2,093 |
| Other employee benefits | 821 | 561 |
| Other accrued liabilities | 1,440 | 72 |
| Other | 38 | 1,279 |
| Stock compensation | 3,788 | 786 |
| Deferred revenue, net (federal) | 42,080 | 28,922 |
| Deferred revenue (foreign source withholding tax) | 5,481 | 6,914 |
| AMT credit carryforward | 1,299 | 1,711 |
| R&E credits | 10,576 | 2,657 |
| Net operating losses | 37,990 | 42,119 |
| | 107,567 | 88,257 |
| Less: valuation allowance | (75,233) | (81,343) |
| Net deferred tax asset | $ 32,334 | $ 6,914 |

The following is a reconciliation of income taxes at the federal statutory rate with income taxes recorded by the Company for the years ended December 31, 2004, 2003 and 2002:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | (In thousands) | | |
| Tax at U.S. statutory rate | $ (1,430) | $14,190 | $ 3,828 |
| Foreign withholding tax, with no U.S. foreign tax credit | 2,943 | 4,861 | 5,502 |
| State tax provision | (2,493) | (410) | — |
| Change in federal and state valuation allowance | 14,263 | (9,814) | (1,269) |
| Reversal of valuation allowance | (17,064) | — | — |
| AMT refund receivable | — | (793) | — |
| Other | (923) | (765) | 687 |
| Total tax (benefit) provision | $ (4,704) | $ 7,269 | $ 8,748 |

Our accumulated tax losses, which include allowable deductions related to exercised employee stock options, generated NOL credit carryforwards of approximately $110 million and $123 million as of December 31, 2004 and 2003, respectively. These NOL credit carryforwards were the largest component of our deferred tax assets which, before any adjustment for valuation allowance, had tax effected values of $107.6 million and $88.3 million, respectively. Generally accepted accounting principles require that we establish a valuation allowance for any portion of our deferred tax assets for which management believes it is more likely than not we will be unable to utilize the asset to offset future taxes. At December 31, 2003, we provided a full valuation allowance on all deferred tax assets other than those associated with revenue that was recognized in the computation of our foreign source withholding tax liability but deferred for financial statement purposes. In 2004, we determined that our recent operating performance coupled with our current expectations to generate future taxable income, indicated that it was more likely than not that we would utilize a portion of our deferred tax assets. Accordingly, in third quarter 2004, we recognized an increase in the value of our deferred tax assets of approximately $27 million through a partial reversal of the valuation allowance. Of the $27 million benefit, approximately $17 million was recognized as income in our Statement of Operations and approximately $10 million was credited directly to additional paid-in capital. Our assessment of the value of our deferred tax assets did not take into consideration all potential income sources, such as impacts from litigation or arbitration proceedings. At December 31, 2004, approximately $89 million of benefits associated with the exercise of non-qualified stock options are included in the NOL credit carryforward.

We will continue to evaluate the potential use of our deferred tax assets and, depending on various factors, could reverse

all or a portion of the remaining valuation allowance in the future. We believe that the future utilization of our deferred tax assets, which are currently offset by a valuation allowance, continues to be dependent, in part, upon our success in three key areas (1) the market acceptance of our technology products, (2) the outcome of outstanding patent license arbitrations, and (3) our ability to sign additional patent license agreements. We will continue to provide a valuation allowance on a portion of our deferred tax assets until our success in these or other areas provides evidence that our deferred tax assets will be more fully utilized. Our cash income tax obligations are currently limited to foreign source withholding taxes on patent license royalties, state taxes and the federal alternative minimum tax. Subsequent revisions to the estimated realizable value of our deferred tax assets could cause our provision for income taxes to vary significantly from period to period, although our cash tax payments would remain unaffected until our NOL carryforward is fully utilized or has expired.

Under the Internal Revenue Code Section 382, the utilization of a corporation's NOL credit carryforwards is limited following a change in ownership (as defined by the Internal Revenue Code) of greater than 50% within a three-year period. If it is determined that prior equity transactions limit the Company's NOL credit carryforwards, the annual limitation will be determined by multiplying the market value on the date of ownership by the federal long-term tax-exempt rate. Any amount exceeding the annual limitation may be carried forward to future years for the balance of the NOL credit carryforward period.

66

**Table of Contents**

    A more-than-50% cumulative change in ownership occurred in 1992. As a result of such change, approximately $20 million of the Company's NOL credit carryforwards were limited as of December 31, 2004. If the Company experiences an additional more-than-50% cumulative ownership change, the full amount of the NOL credit carryforward may become subject to annual limitation under Section 382. There can be no assurance that the Company will realize the benefit of any NOL credit carryforward.

67

Table of Contents

## 14. SUBSEQUENT EVENTS

In first quarter 2005, we acquired, for a purchase price of $8.0 million, selected patents, intellectual property blocks and related assets from an unrelated third party, the function of which are aimed at improving the range, throughput and reliability of wireless LAN and other wireless technology systems.

In October 2004, our Board of Directors authorized the repurchase (Fourth Quarter Repurchase Program) of an additional one million shares of common stock. In March 2005, the Board expanded their authorization under the Fourth Quarter Repurchase Program by one million shares. We initiated share repurchases under this program in early 2005 and have repurchased 500,000 shares for a total of approximately $9 million through March 15, 2005.

## 15. SELECTED QUARTERLY RESULTS (Unaudited)

The table below presents quarterly data for the years ended December 31, 2004 and 2003:

| Selected Quarterly Results<br>(in thousands, except per share amounts, unaudited) | First | Second | Third | Fourth |
|---|---|---|---|---|
| **2004:** | | | | |
| Revenues *(a)* | $33,016 | $29,379 | $ 7,358 | $33,932 |
| Net income (loss) applicable to common shareholders *(b)* | $ 5,800 | $ 856 | $ (6,403) | $ (164) |
| Net income (loss) per common share – basic | $ 0.11 | $ 0.02 | $ (0.12) | $ — |
| Net income (loss) per common share – diluted | $ 0.10 | $ 0.01 | $ (0.12) | $ — |
| **2003:** | | | | |
| Revenues | $37,324 | $25,777 | $26,790 | $24,683 |
| Net income applicable to common shareholders *(c)* | $26,693 | $ 3,125 | $ 3,431 | $ 1,083 |
| Net income per common share – basic | $ 0.49 | $ 0.06 | $ 0.06 | $ 0.02 |
| Net income per common share – diluted | $ 0.45 | $ 0.05 | $ 0.06 | $ 0.02 |

(a)  *In third quarter 2004, we transitioned to reporting per-unit royalties in the period in which we receive our licensees' royalty reports rather than in the period in which our licensees' sales of covered products occur. As a result of this transition, our results for 2004 include only three quarters of per-unit royalties.*

(b)  *Our income tax provision in third quarter 2004 included a benefit of approximately $17 million related to the recognition of an increase in the value of our deferred tax assets.*

(c)  *In first quarter 2003, we recognized, as other income, $14 million from the settlement of our litigation with Ericsson, net of an estimated $3.4 million associated with a claim under an insurance agreement.*

## Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None

## Item 9A. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures.

The Company's Chief Executive Officer and its Chief Financial Officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report, have concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

68

Table of Contents

*Internal Control Over Financial Reporting*

*(a) and (b) Management's Annual Report on Internal Control Over Financial Reporting.*

Management of InterDigital Communications Corporation is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes those policies and procedures that:

- Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America, and that receipts and expenditures of the Company are being made only in accordance with authorization of management and directors of the Company; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting includes the controls themselves, monitoring (including internal auditing practices) and actions taken to correct deficiencies as identified.

Management, including the Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of internal control over financial reporting as of December 31, 2004. Management based this assessment on criteria for effective internal control over financial reporting described in "*Internal Control—Integrated Framework*" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management determined that, as of December 31, 2004, the Company maintained effective internal control over financial reporting at a reasonable assurance level.

Our management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2004 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears under Item 8 in this Annual Report on Form 10-K.

*(c) Changes in Internal Control over Financial Reporting.*

There were no changes in our internal control over financial reporting during the fourth quarter of 2004 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B. OTHER INFORMATION

None.

## PART III

## Item 10. DIRECTORS AND EXECUTIVE OFFICERS OF INTERDIGITAL

Information concerning directors is incorporated by reference herein from the information following the caption "ELECTION OF DIRECTORS – Nominees for Election to the Board of Directors Three Year Term Expiring at 2008 Annual Meeting of Shareholders" to, but not including, "Committees and Meetings of the Board of Directors" in our Definitive Proxy Statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A, not later than 120 days after the end of our fiscal year ended December 31, 2004, and which shall be forwarded to shareholders prior to the 2005 Annual Meeting of Shareholders (Proxy Statement).

The Company's Code of Business Conduct Ethics is applicable to all employees of the Company including the Chief Executive Officer, Chief Financial Officer, and the Board of Directors (Code). A copy of the Code is available free of charge on our Internet website at *www.interdigital.com*. We intend to disclose any amendment to the Code or waiver from a provision of the Code made to our Chief Executive Officer, Chief Financial Officer or Controller on our website. Information concerning the Company's Audit Committee and the Company's Audit Committee financial expert is incorporated herein by reference to the Proxy Statement following the caption "Audit Committee Report" to, but not including, "RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM". In addition, information set

forth in the two paragraphs immediately following the caption "Compliance with Section 16(a) of the Securities Exchange Act of 1934" in the Proxy Statement is incorporated by reference herein. Information concerning executive officers appears under the caption "Item 1. Business, Executive Officers" in Part 1 of this Annual Report on Form 10-K.

## Item 11. EXECUTIVE COMPENSATION

Information concerning executive compensation required by this item is incorporated by reference to the Proxy Statement following the caption "Executive Compensation" to, but not including, "Shareholder Return Performance Graph" and information in the section "Compensation Committee Interlocks and Insider Participation". Information concerning director compensation is incorporated by reference to the Proxy Statement in the section "Compensation of Directors".

## Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The information required by this item is incorporated by reference to the Proxy Statement following the caption "Security Ownership of Certain Beneficial Owners" to and including all information in the section "Equity Compensation Plan Information".

## Item 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

None.

## Item 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by this item is incorporated by reference to the Proxy Statement following the caption "Independent Registered Public Accounting Firm's Fees".

69

Table of Contents

**PART IV**

**Item 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

(a)   The following documents are filed as a part of this Annual Report on Form 10-K:

    (1)   Financial Statements.

        The information required by this Item begins on Page 44.

    (2)   Financial Statement Schedules.

        None.

    (3)   Exhibits.

        See Item 15(b) below.

| (b) | Exhibit Number | Exhibit Description |
|---|---|---|
| | *2.1 | Asset Purchase Agreement dated as of July 30, 2003 by and between InterDigital Acquisition Corp. and Tantivy Communications, Inc. (Exhibit 2.1 to InterDigital's Current Report on Form 8-K dated August 4, 2003). |
| | *3.1 | Restated Articles of Incorporation (Exhibit 3.1 to Amendment No. 1 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended June 30, 1998). |
| | *3.2 | By-laws, as amended September 30, 2004 (Exhibit 3.3 to InterDigital's Current Report on Form 8-K dated October 5, 2004). |
| | *4.1 | Rights Agreement between InterDigital and American Stock Transfer & Trust Co., ("AST") (Exhibit 4 to InterDigital's Current Report on Form 8-K filed on January 2, 1997). |
| | *4.2 | Amendment No. 1 to the Rights Agreement between InterDigital and AST (Exhibit 4.2 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended June 30, 1997 (the "June 1997 Form 10-Q")). |
| | *4.3 | Amendment No. 2 to the Rights Agreement between InterDigital and AST (Exhibit 4.3 to the June 1997 Form 10-Q). |
| | *4.4 | Amendment No. 3 to the Rights Agreement between InterDigital and AST (Exhibit 4.4 to InterDigital's Annual Report on Form 10-K for the year ended December 31, 1999 (the "1999 Form 10-K")). |
| | *10.1 | Intellectual Property License Agreement between InterDigital and Hughes Network Systems, Inc. (Exhibit 10.39 to InterDigital's Registration Statement No. 33-28253 filed on April 18, 1989). |
| | *10.2 | 1992 License Agreement dated February 29, 1992 between InterDigital and Hughes Network Systems, Inc. (Exhibit 10.3 to InterDigital's Current Report on Form 8-K dated February 29, 1992 (the "February 1992 Form 8-K")). |
| | *10.3 | E-TDMA License Agreement dated February 29, 1992 between InterDigital and Hughes Network Systems, Inc. (Exhibit 10.4 to the February 1992 Form 8-K). |
| | †*10.4 | Non-Qualified Stock Option Plan, as amended (Exhibit 10.4 to InterDigital's Annual Report on Form 10-K for the year ended December 31, 1991). |
| | †*10.5 | Amendment to Non-Qualified Stock Option Plan (Exhibit 10.31 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended June 30, 2000 (the "June 2000 Form 10-Q")). |
| | †*10.6 | Amendment to Non-Qualified Stock Option Plan, effective October 24, 2001 (Exhibit 10.6 to the 2001 Form 10-K). |
| | †*10.7 | 1992 Non-Qualified Stock Option Plan (Exhibit 10.1 to InterDigital's Current Report on Form 8-K dated October 21, 1992). |
| | †*10.8 | Amendment to 1992 Non-Qualified Stock Option Plan (Exhibit 10.32 to the June 2000 Form 10-Q). |
| | †*10.9 | 1992 Employee Stock Option Plan (Exhibit 10.71 to InterDigital's Annual Report on Form 10-K for the year ended December 31, 1992). |

Interdigital Communications Corp

†*10.10    Amendment to 1992 Employee Stock Option Plan (Exhibit 10.29 to the June 2000 Form 10-Q).

†*10.11    Amendment to 1992 Employee Stock Option Plan, effective October 24, 2001 (Exhibit 10.11 to the 2001 Form 10-K).

†*10.12    1995 Stock Option Plan for Employees and Outside Directors, as amended (Exhibit 10.7 to InterDigital's Annual Report on Form 10-K for the year ended December 31, 1997 (the "1997 Form 10-K")).

70

Table of Contents

†*10.13    Amendment to the 1995 Stock Option Plan for Employees and Outside Directors (Exhibit 10.25 to the 1999 Form 10-K).

†*10.14    Amendment to 1995 Stock Option Plan for Employees and Outside Directors (Exhibit 10.33 to the June 2000 Form 10-Q).

†*10.15    Amendment to 1995 Stock Option Plan for Employees and Outside Directors, effective October 24, 2001 (Exhibit 10.15 to the 2001 Form 10-K).

†*10.16    1997 Stock Option Plan for Non-Employee Directors (Exhibit 10.34 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended September 30, 1997).

†*10.17    1997 Stock Option Plan for Non-Employee Directors, as amended March 30, 2000 (Exhibit 10.42 to the June 2000 Form 10-Q).

†*10.18    Amendment to 1997 Stock Option Plan for Non-Employee Directors (Exhibit 10.34 to the June 2000 Form 10-Q).

†*10.19    Amendment to 1997 Stock Option Plan for Non-Employee Directors, effective October 24, 2001 (Exhibit 10.19 to the 2001 Form 10-K).

†*10.20    2000 Stock Award and Incentive Plan (Exhibit 10.28 to the June 2000 Form 10-Q).

†*10.21    1999 Restricted Stock Plan, as amended April 13, 2000 (Exhibit 10.43 to the June 2000 Form 10-Q).

†*10.22    Amended and Restated Employment Agreement dated as of November 20, 2000 by and between InterDigital Communications Corporation ("InterDigital") and Howard E. Goldberg (Exhibit 10.12 to InterDigital's Annual Report on Form 10-K for the year ended December 31, 2000 (the "2000 Form 10-K")).

†*10.23    Employment Agreement dated November 18, 1996 by and between InterDigital and Charles R. Tilden (Exhibit 10.26 to InterDigital's Annual Report on Form 10-K for the year ended December 31, 1996).

†*10.24    Amendment dated as of April 6, 2000 by and between InterDigital and Charles R. Tilden (Exhibit 10.39 to the June 2000 Form 10-Q).

†*10.25    Employment Agreement dated May 7, 1997 by and between InterDigital and Mark A. Lemmo (Exhibit 10.32 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended March 31, 1997).

†*10.26    Amendment dated as of April 6, 2000 by and between InterDigital and Mark A. Lemmo (Exhibit 10.37 to the June 2000 Form 10-Q).

†*10.27    Employment Agreement dated September 3, 1998 by and between InterDigital and William J. Merritt (Exhibit 10.23 to InterDigital's Annual Report on Form 10-K for the year ended December 31, 1998 (the "1998 Form 10-K")).

†*10.28    Amendment dated as of April 6, 2000 by and between InterDigital and William J. Merritt (Exhibit 10.38 to the June 2000 Form 10-Q).

†*10.29    Employment Agreement dated November 16, 1998 by and between InterDigital and Richard J. Fagan (Exhibit 10.24 to the 1998 Form 10-K).

†*10.30    Amendment dated as of April 6, 2000 by and between InterDigital and Richard J. Fagan (Exhibit 10.36 to the June 2000 Form 10-Q).

†*10.31    Employment Agreement dated November 19, 1996 by and between InterDigital and Brian G. Kiernan (Exhibit 10.37 to the 2000 Form 10-K).

†*10.32    Amendment dated as of April 6, 2000 by and between InterDigital and Brian G. Kiernan (Exhibit 10.38 to the 2000 Form 10-K).

†*10.33    Employment Agreement dated July 24, 2000 by and between InterDigital and William C. Miller (Exhibit 10.39 to the 2000 Form 10-K).

†*10.34    Agreement dated January 2, 2001 by and between InterDigital and Alain C. Briancon (Exhibit 10.41 to the 2000 Form 10-K).

†\*10.35     Employment Agreement dated as of November 12, 2001 by and between InterDigital and Lawrence F. Shay (Exhibit 10.38 to the 2001 Form 10-K).

†\*10.36     Employment Agreement dated as of December 3, 2001 by and between InterDigital and Guy M. Hicks (Exhibit 10.39 to the 2001 Form 10-K).

†\*10.37     Agreement of Lease dated November 25, 1996 by and between InterDigital and We're Associates Company (Exhibit 10.42 to the 2000 Form 10-K).

71

**Table of Contents**

*10.38    Modification of Lease Agreement dated December 28, 2000 by and between InterDigital and We're Associates Company (Exhibit 10.43 to the 2000 Form 10-K).

†*10.39    Indemnity Agreement dated as of March 19, 2003 by and between Company and Howard E. Goldberg (pursuant to Instruction 2 to Item 601 of Regulation S-K, the Indemnity Agreements, which are substantially identical in all material respects, except as to the parties thereto and the dates, between the Company and the following individuals, were not filed: Lisa A. Alexander, D. Ridgely Bolgiano, Alain C. Briancon, Harry G. Campagna, Steven T. Clontz, Joseph S. Colson, Jr., Patrick J. Donahue, Richard J. Fagan, Howard E. Goldberg, Guy M. Hicks, Gary D. Isaacs, John D. Kaewell, Brian G. Kiernan, Mark A. Lemmo, Linda S. Lutkefedder, William J. Merritt, William C. Miller, Rebecca B. Opher, Robert S. Roath, Jane S. Schultz, Lawrence F. Shay, and Charles R. Tilden) (Exhibit 10.47 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended March 31, 2003).

*10.40    Patent License Agreement dated and effective January 1, 2003 between InterDigital Technology Corporation ("ITC") and Ericsson Inc. and Telefonaktiebolaget LM Ericsson (Exhibit 10.48 to InterDigital's Amendment No. 1 to Quarterly Report on Form 10-Q/A dated July 2, 2003 (the "July 2003 10-Q/A")).

*10.41    Patent License Agreement dated and effective January 1, 2003 between ITC and Sony Ericsson Mobile Communications AB (Exhibit 10.49 to the July 2003 10-Q/A).

†*10.42    2002 Stock Award and Incentive Plan (Exhibit 10.50 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002).

*10.43    Patent License Agreement dated May 8, 1995 between ITC and NEC Corporation ("NEC") (Exhibit 10.51 to InterDigital's Current Report on Form 8-K dated February 21, 2003 (the "2003 Form 8-K")).

*10.44    Amendment to the Patent License Agreement of May 8, 1995 between ITC and NEC (Exhibit 10.52 to the 2003 Form 8-K).

*10.45    Narrowband CDMA and Third Generation Patent License Agreement dated January 15, 2002 between ITC and NEC (Exhibit 10.53 to the 2003 Form 8-K).

*10.46    Settlement Agreement dated January 15, 2002 between ITC and NEC (Exhibit 10.54 to the 2003 Form 8-K).

*10.47    The TDD Development Agreement between and among InterDigital, ITC and Nokia (Exhibit 10.55 to the 2003 Form 8-K).

*10.48    Amendment No. 1 to the TDD Development Agreement dated September 30, 2001 between and among InterDigital, ITC and Nokia (Exhibit 10.56 to the 2003 Form 8-K).

*10.49    PHS and PDC Subscriber Unit Patent License Agreement dated March 19, 1998 between ITC and Sharp Corporation of Japan (Sharp) (Exhibit 10.57 to the 2003 Form 8-K).

*10.50    Amendment No. 1 dated March 23, 2000 and Amendment No. 2 dated May 30, 2003 to PHS and PDC Subscriber Unit Patent License Agreement dated March 19, 1998 between ITC and Sharp (Exhibit 10.58 to InterDigital's Amendment No. 1 to Current Report on Form 8-K/A dated July 2, 2003).

†*10.51    Indemnity Agreement dated as of May 5, 2003 by and between InterDigital and Richard J. Brezski (Exhibit 10.59 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003).

†*10.52    Severance Agreement dated January 20, 2004 by and between InterDigital and Guy M. Hicks (Exhibit 10.52 to InterDigital's Annual Report on Form 10-K for the year ended December 31, 2003 (the "2003 Form 10-K").

†*10.53    InterDigital Communications Corporation 2002 Stock Award and Incentive Plan, as amended through June 4, 2003 (Exhibit 10.52 to 2003 Form 10-K).

†*10.54    Indemnity Agreement dated March 15, 2004 by and between InterDigital and Edward B. Kamins (Exhibit 10.60 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended June 30, 2004).

†10.55    InterDigital Communications Corporation Long-Term Compensation Program, as amended December 2004 ("LTCP") (Exhibit 10.61 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004 (the "September 2004 Form 10-Q")).

†*10.56    1999 Restricted Stock Plan, Form of Restricted Stock Unit Agreement [Awarded to Independent Directors

Interdigital Communications Corp

Upon Re-Election] (Exhibit 10.62 to September 2004 Form 10-Q).

†*10.57    1999 Restricted Stock Plan, Form of Restricted Stock Unit Agreement [Annual Award to Independent Directors] (Exhibit 10.63 to September 2004 Form 10-Q).

72

**Table of Contents**

| | |
|---|---|
| †*10.58 | 1999 Restricted Stock Plan, Form of Restricted Stock Unit Agreement [Periodically Awarded to Members of the Board of Directors] (Exhibit 10.64 to September 2004 Form 10-Q). |
| †*10.59 | 1999 Restricted Stock Plan, Form of Restricted Stock Agreement [Awarded to Executives and Management as Part of Annual Bonus] (Exhibit 10.65 to September 2004 Form 10-Q). |
| †*10.60 | 2000 Stock Award and Incentive Plan, Form of Option Agreement [Director Awards] (Exhibit 10.66 to September 2004 Form 10-Q). |
| †*10.61 | 2000 Stock Award and Incentive Plan, Form of Option Agreement [Executive Awards] (Exhibit 10.67 to September 2004 Form 10-Q). |
| †*10.62 | 2000 Stock Award and Incentive Plan, Form of Option Agreement [Inventor Awards] (Exhibit 10.68 to September 2004 Form 10-Q). |
| †*10.63 | 2002 Stock Award and Incentive Plan, Form of Option Agreement [Inventor Awards] (Exhibit 10.69 to September 2004 Form 10-Q). |
| †10.64 | Software License Agreement dated December 21, 2004 between General Dynamics Decision Systems, Inc. and InterDigital. |
| †10.65 | 2005 Compensation Program for Outside Directors. |
| †10.66 | InterDigital Communications Corporation Annual Employee Bonus Plan. |
| 21 | Subsidiaries of InterDigital. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 for Howard E. Goldberg. |
| 32.2 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 for Richard J. Fagan. |

\* Incorporated by reference to the previous filing indicated.

† Management contract or compensatory plan or arrangement.

(c) None

73

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

### INTERDIGITAL COMMUNICATIONS CORPORATION

Date: March 31, 2005

/s/ Howard E. Goldberg

Howard E. Goldberg
President and Chief Executive Officer

Date: March 31, 2005

/s/ R. J. Fagan

Richard J. Fagan
Chief Financial Officer

74

Table of Contents

Pursuant to the requirement of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of InterDigital and in the capacities and on the dates indicated.

| | |
|---|---|
| Date: March 31, 2005 | /s/ D. Ridgely Bolgiano |
| | D. Ridgely Bolgiano, Director |
| Date: March 31, 2005 | /s/ Harry G. Campagna |
| | Harry G. Campagna, Director |
| Date: March 31, 2005 | /s/ Steven T. Clontz |
| | Steven T. Clontz, Director |
| Date: March 31, 2005 | /s/ Edward B. Kamins |
| | Edward B. Kamins, Director |
| Date: March 31, 2005 | /s/ Robert S. Roath |
| | Robert S. Roath, Director |
| Date: March 31, 2005 | /s/ Robert W. Shaner |
| | Robert W. Shaner, Director |
| Date: March 31, 2005 | /s/ Alan P. Zabarsky |
| | Alan P. Zabarsky, Director |
| Date: March 31, 2005 | /s/ Howard E. Goldberg |
| | Howard E. Goldberg, Director, President and Chief Executive Officer (Principal Executive Officer) |
| Date: March 31, 2005 | /s/ R. J. Fagan |
| | Richard J. Fagan, Chief Financial Officer (Principal Financial and Accounting Officer) |

75

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Exhibit Description |
|---|---|
| †10.55 | InterDigital Communications Corporation Long-Term Compensation Program, as amended December 2004 ("LTCP") (Exhibit 10.61 to InterDigital's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| †10.64 | Software License Agreement dated December 21, 2004 between General Dynamics Decision Systems, Inc. and InterDigital. |
| †10.65 | 2005 Compensation Program for Outside Directors. |
| †10.66 | InterDigital Communications Corporation Annual Employee Bonus Plan. |
| 21 | Subsidiaries of InterDigital. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 for Howard E. Goldberg. |
| 32.2 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 for Richard J. Fagan. |

† Management contract or compensatory plan or arrangement.