# EXHIBIT P

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

INTERDIGITAL COMMUNICATIONS          :
CORPORATION                          : Civil Action No._____
781 Third Avenue                     :
King of Prussia, PA 19406-1409       : **JURY TRIAL DEMANDED**
                                     :
               and                   :
                                     :
INTERDIGITAL TECHNOLOGY              :
CORPORATION                          :
300 Delaware Avenue, Suite 527       :
Wilmington, DE  19081,               :
                                     :
                    Plaintiffs,      :
                                     :
          v.                         :
                                     :
FEDERAL INSURANCE COMPANY            :
15 Mountain View Road                :
P.O. Box 1615                        :
Warren, NJ  07059                    :
                                     :
                    Defendant.       :

## COMPLAINT

Plaintiffs, InterDigital Communications Corporation and InterDigital

Technology Corporation by way of complaint, set forth the following allegations against

defendant Federal Insurance Company ("Federal"):

1.   This is an action for declaratory relief, and for breach of contract

arising out of, inter alia, 1) Federal's refusal to reimburse its insured  fully, as required by

Federal's insurance policy, for  attorneys' fees in the defense of litigation between

Ericsson Radio Systems, Inc. and Ericsson GE Mobile Communications, Inc., now

known as Ericsson Inc.  ("Ericsson") and InterDigital Communications Corporation  and

InterDigital Technology Corporation ("the Ericsson litigation") and 2) a purported

agreement between Federal and InterDigital Communications Corporation and

InterDigital Technology Corporation, drastically reducing the defense obligation of

Federal under its insurance policy, an agreement which plaintiffs believe as a matter of

law is void for lack of consideration.

## PARTIES

2.    Plaintiff InterDigital Communications Corporation is a Pennsylvania

corporation with its principal place of business located at 781 Third Avenue in King of

Prussia,  Pennsylvania.

3.    Plaintiff InterDigital Technology Corporation is a Delaware

Corporation with its principal place of business located at 300 Delaware Avenue in

Wilmington, Delaware.

4.    InterDigital Technology Corporation is a wholly owned subsidiary of

InterDigital Communications Corporation.

5.    InterDigital Technology Corporation and InterDigital Communications

Corporation were parties to the Ericsson litigation and to the purported agreement with

Federal which drastically reduced the defense obligation of Federal under its insurance

policy. (InterDigital Technology Corporation and InterDigital Communications

Corporation will hereinafter be collectively referred to as "InterDigital").

6.    Upon information and belief, defendant Federal is a company

organized and existing under the laws of Indiana, with its place of business in Warren,

New Jersey.

2

**JURISDICTION AND VENUE**

7.  This court has jurisdiction over this action pursuant to 28 U.S.C. §
1332, because (1) plaintiffs and defendant are citizens of different states and (2) the
amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.  This action for declaratory relief is authorized pursuant to 28 U.S.C.
§§ 2201 and 2202.  As is shown below, an actual immediate and justiciable controversy
exists between the parties regarding (1) Federal's refusal to reimburse InterDigital fully
for InterDigital's attorneys' fees in the defense of its insured in the Ericsson litigation and
(2) the validity of a purported contract denominated "Litigation Expense and
Reimbursement Agreement" between Federal and InterDigital, which InterDigital
believes is void for lack of consideration.

Venue is proper in this court pursuant to 28 U.S.C. § 1391(a), because a substantial part
of the events and omissions giving rise to this claim, took place in this judicial district.

**INSURANCE POLICY AT ISSUE**

9.  In consideration for the premiums paid, Federal issued to InterDigital a
Commercial General Liability Policy, insurance policy number 3529-74-28 for the policy
period from February 1, 1990 through December 22, 1990 (the "Policy").  The Policy
was renewed annually through December 22, 1993.  A true and correct copy of the Policy
is attached as Exhibit A.

10. InterDigital is a named insured under the Policy.

11. The Policy affords coverage for, inter alia, "damages the insured
becomes legally obligated to pay by reason of liability imposed by law or assumed under

3

an insured contract because of bodily injury or property damage caused by an occurrence; or personal injury or advertising injury . . . ."

12. Pursuant to the Policy, Federal was obligated to defend InterDigital with respect to any claim or suit against InterDigital seeking, inter alia, damages for personal injury. Specifically the Policy provides that Federal will "pay in addition to the applicable limit of insurance the defense expense."

13. Under the Policy the term, defense expense means, "payments allocated to a specific claim or suit for its investigation, settlement, or defense, including: (1) attorney fees and all other litigation expenses . . . ." (emphasis added).

14. The Policy does not provide that reasonable attorney fees incurred by InterDigital as a covered defense expense may be arbitrarily limited by Federal.

15. InterDigital paid Federal substantial premiums with the reasonable expectation that pursuant to the Policy, Federal would pay InterDigital's defense expenses when a claim or suit was brought against it seeking damages for personal injury.

## THE UNDERLYING LITIGATION

16. On or about September 9, 1993, Ericsson filed a six count complaint against InterDigital in the United States District Court for the Northern District of Texas, Ericsson Radio Systems, Inc. et. al. v. InterDigital Communications Corporation, et. al., Civil Action No. 3:93 CV 1809-H. A copy of the Complaint is attached hereto as Exhibit B.

17. In its complaint Ericsson alleged that it was developing and making, using or selling products which were in compliance with the Industry Standard known as IS-54. Ericsson further alleged that "since at least 1990, defendant IDC has charged in

press releases, in Annual Reports, in filings with the Securities and Exchange

Commission, and in face-to-face meetings with plaintiffs that all digital cellular systems

marketed in compliance with IS-54 (including those of plaintiffs and each other major

supplier of cellular systems in the United States) infringe some or all of the IDC Patents,

and has stated its clear intention to enforce the IDC  Patents against plaintiffs and the

other suppliers." See Exhibit B at ¶ 16.

18.  The Ericsson complaint sought declaratory and monetary relief based

upon several causes of action at least one of which alleged defamation and commercial

disparagement that constituted an advertising injury under the Policy.

19.  In the Ericsson litigation InterDigital made claims against Ericsson

alleging *inter alia* patent infringement.   The defamation and commercial disparagement

claim as well as all other claims and counterclaims in the Ericsson litigation involved the

same threshold legal issue, the validity of InterDigital's telephony patents.

**FEDERAL ACKNOWLEDGES AND ACCEPTS ITS OBLIGATION TO DEFEND
ALL COUNTS IN THE COMPLAINT AND ACKNOWLEDGES THAT IT HAD
NO RIGHT TO REIMBURSEMENT OF ATTORNEYS' FEES AND
LITIGATION EXPENSES**

20.  On or about September 23, 1993, InterDigital notified Federal of the

Ericsson suit and requested that, pursuant to the Policy, Federal reimburse InterDigital for

its attorneys' fees and litigation expenses.

21.  On or about November 23, 1993 Federal wrote a letter to InterDigital

acknowledging and accepting its obligation under the Policy to provide InterDigital with

a defense as to all Counts in the Ericsson complaint.  A true and correct copy of Federal's

November 23, 1993 Letter is attached hereto as Exhibit C.

22.  Specifically, Federal's November 23, 1993 letter stated "after a careful review of the policy and the allegations as set forth in the Complaint, defense coverage as to all counts in the Complaint will be provided," because there was coverage for Ericsson's "claim for defamation and commercial disparagement."  Federal has never denied and has never had any basis to deny coverage for Ericsson's "claim for defamation and commercial disparagement."  See Exhibit C.

23.  Moreover, in a letter dated February 17, 1995 Federal explicitly acknowledged it had no right to "reimbursement of attorneys' fees and defense expenses paid in the event that there is no potential claim for coverage in the underlying action." A true and correct copy of Federal's February 17, 1995 Letter is attached hereto as Exhibit D.

**WITHOUT ANY JUSTIFICATION FEDERAL ARBITRARILY LIMITS THE HOURLY RATE OF ATTORNEYS' FEES IT WILL REIMBURSE**

24.  Consistent with its acknowledged obligation under the Policy Federal began to reimburse InterDigital for its attorneys' fees and expenses.

25.  However, from commencement of coverage, without any justification, Federal announced to InterDigital that it was limiting its reimbursement of attorneys' fees to $240 per hour, although InterDigital's counsel regularly and reasonably charged up to $435 per hour.

26.  There is no provision in the Policy that provides for any limitation on attorneys' fees.  Nevertheless, Federal refused to reimburse InterDigital for attorneys' fees above $240 per hour.

6

27.  Fearing that Federal would cease payment for its defense, InterDigital did not challenge Federal's unilateral and arbitrary decision that the maximum billing rate for attorneys' fees which would be reimbursed by Federal would be $240 per hour.

28.  Further, in February 2000, Federal included a term in the Reimbursement Agreement lowering the maximum rate for attorneys' fees to be reimbursed by Federal from $240 per hour to $200 per hour for services performed after April 1, 1999.

29.  Because Federal refused to reimburse InterDigital for attorneys' fees above $240 before April 1, 1999 and $200 per hour after April 1,1999, InterDigital was forced to pay out of its own pocket in excess of $5 million to defend the Ericsson litigation, fees that should have been paid by Federal under the terms of its policy.

**FEDERAL CLAIMS IT IS ENTITLED TO SEEK REIMBURSEMENT OF ATTORNEYS' FEES AND LITIGATION EXPENSES ASSOCIATED WITH UNCOVERED CLAIMS DESPITE THE FACT THAT APPLICABLE LAW CLEARLY PREVENTED FEDERAL FROM OBTAINING SUCH REIMBURSMENTS AND THAT FEDERAL EXPLICITLY ACKNOWLEDGED IT HAD NO RIGHT TO SUCH REIMBURSEMENTS**

30.  As the Ericsson litigation progressed, although there was no limit of defense expenses in the Federal policy, Federal began to complain to InterDigital about the amount of attorneys' fees and litigation costs it was expending in defense of the Ericsson litigation.

31.  Contrary to applicable law and contrary to its prior explicit acknowledgement that it was not entitled to seek reimbursement of attorneys' fees and litigation expenses from InterDigital,  Federal threatened that it would seek reimbursement of attorneys' fees and litigation expenses associated with the defense of all

7

claims in the Ericsson litigation that did not fall within InterDigital's insurance coverage for advertising injuries.

32.   Further, also contrary to applicable law, Federal threatened that it would seek to obtain reimbursement of all attorneys' fees and litigation expenses it incurred in defending the uncovered claims <u>before</u> InterDigital received any settlement proceeds or award from the Ericsson litigation.

33.   Federal made these threats despite the fact that the law in Pennsylvania, where InterDigital's insurance policy was negotiated and issued, does not give an insurer the right to claim reimbursement of attorneys' fees and litigation expenses incurred in defending uncovered claims which are joined to at least one insured claim in a single integrated litigation.

34.   Moreover, prior to its claim for reimbursement, Federal was a party to a Middle District of Pennsylvania case involving another insured, which explicitly stated that Federal was not entitled to reimbursement of defense costs for uncovered claims which were joined to covered claims in a single action.  Thus, Federal's threats to InterDigital concerning reimbursement of defense costs for uncovered claims were made with the knowledge that such threats were contrary to Pennsylvania law.

35.   Additionally the law in Texas, where the Ericsson litigation was pending, also clearly prohibits an insurer from obtaining reimbursement of attorneys' fees and litigation expenses incurred in defending uncovered claims which are joined to at least one insured claim a single litigation.

36.   Fearing that Federal would cease payment for its defense and based on Federal's misrepresentation respecting its ability to obtain reimbursement of attorneys'

fees and expenses, on or about February 9, 2000, InterDigital entered into the Reimbursement Agreement with Federal. A true and correct copy of which is attached as Exhibit E.

## THE REIMBURSEMENT AGREEMENT

37. Pursuant to the Reimbursement Agreement  Federal stated that it would: "continue to reimburse the Insureds for Attorney time *in the same manner as Federal has been doing* consistent with the terms of this Agreement.  The maximum rate for attorney time to be reimbursed by Federal will be at the actual hourly rate up to a maximum of $200 per hour for services performed April 1, 1999 and thereafter."  Federal also stated that it would "continue to reimburse the Insureds for non-attorney litigation related expenses . . . *in the same manner as Federal has been doing to date*."  See Reimbursement Agreement at ¶¶ 2,3 (emphasis added).

38. The Reimbursement Agreement states that "the consideration for this Agreement is the reciprocal trade off, and/or compromise, of their [InterDigital and Federal's] respective rights which have been reserved and/or asserted with regard to funding, allocation, apportionment and reimbursement of litigation expenses with regard to the Combined Lawsuits [the Ericsson litigation] and, further, the certainty that is derived from such agreement."

39. However, under the Reimbursement Agreement Federal did not give up or compromise any of its rights with regard to funding, allocation, apportionment and reimbursement of litigation expenses, and InterDigital did not receive any benefit in this regard.  Rather, under the Reimbursement Agreement Federal only promised to do a part of what it had a pre-existing legal duty to do pursuant to the Policy: continue to provide

InterDigital with a defense in the Ericsson litigation.  As a matter of law, Federal's promise to continue to fulfill part of that duty does not constitute legal consideration.

40.  Moreover, as a matter of law, Federal's relinquishment of a claim to reimbursement of attorneys' fees and litigation expenses associated with the uncovered claims in the Ericsson litigation does not constitute legal consideration because such a claim is invalid under applicable law.

41.  Pursuant to the Reimbursement Agreement, in exchange for Federal's continuing to honor part of its pre-existing obligations under the Policy by paying only a portion of InterDigital's defense expenses in the Ericsson litigation, InterDigital was required to reimburse Federal's defense costs (even defense costs paid by Federal before the Reimbursement Agreement) by paying Federal 9% of the first $50 million of the "agreed-upon settlement" and 10% of everything above $50 million of the "agreed-upon settlement for the patent claims" if Ericsson made any settlement payment to InterDigital. See Exhibit E at ¶ 6(a).

42.  Moreover, Paragraph 6(c)(ii) of the Reimbursement Agreement provides that if Federal does not believe it will be fully reimbursed within four years from the date of the settlement, in exchange for continuing to honor part of its pre-existing obligation under the policy, it can seek additional reimbursement from InterDigital based upon "the additional value to the Insured [InterDigital] and its affiliates of the settlement (beyond the cash payments related to the Patents and Claims in Suit and for engineering services)." See Exhibit E at ¶6(c)(ii).

**FEDERAL DEMANDS FULL REIMBURSEMENT OF THE DEFENSE EXPENSES**

43.  After the Ericsson litigation settled, Federal, in a letter dated May 21, 2003, invoked section 6(c)(ii) of the Reimbursement Agreement and demanded full reimbursement of the $27,886,576.64 it claims it paid as partial reimbursement to InterDigital for its litigation expenses to defend the Ericsson litigation.

44.  InterDigital denies that it is obligated to reimburse Federal because, among other reasons, it believes that as a matter of law the Reimbursement Agreement is unenforceable for lack of consideration.

45.  On October 30, 2003 solely pursuant to a provision of the Reimbursement Agreement, Federal formally demanded arbitration of its claim for reimbursement of the $27,886,576.64 it claims it paid for litigation expenses to defend the Ericsson litigation.

**COUNT I**
**DECLARATORY RELIEF**

46.  InterDigital incorporates the averments set forth in paragraphs 1 through 45 herein by this reference.

47.  InterDigital paid Federal substantial premiums to secure insurance coverage under the Policy.

48.  Pursuant to the Policy, Federal was obligated to pay all attorneys' fees and defense expenses with respect to any claim or suit against InterDigital seeking, inter alia, damages for personal injury.

49.  Ericsson brought a suit against InterDigital seeking damages for personal injury by way of a claim for defamation and commercial disparagement.

11

50. In a letter dated November 23, 1993 Federal acknowledged and accepted its obligation to provide InterDigital with a defense as to all Counts of the Ericsson complaint.

51. As a matter of law, Federal's obligation to provide InterDigital with a defense as to all Counts in the Ericsson litigation does not cease until there is no possibility for recovery on any covered claims.

52. Under the Reimbursement Agreement, Federal only promised to do a part of what it had a pre-existing legal duty to do pursuant to the Policy: continue to provide InterDigital with a defense in the Ericsson litigation through appeal to final conclusion. As a matter of law, Federal's promise to continue to fulfill part of that duty does not constitute legal consideration.

53. Moreover, as a matter of law, Federal's relinquishment of a claim to reimbursement of attorneys' fees and litigation expenses associated with uncovered claims does not constitute legal consideration because such a claim is invalid under applicable law.

54. Nonetheless, Federal has demanded full reimbursement of the $27,886,576.64 it paid in litigation expenses to defend the Ericsson litigation.

55. InterDigital has already reimbursed Federal approximately $157,000. In fact the amount of money reimbursed to Federal under the Reimbursement Agreement should have been significantly less due to limitations within the Reimbursement Agreement. Therefore, even if the Reimbursement Agreement was a valid, enforceable agreement, which it is not, InterDigital is entitled to a refund from Federal.

56. An actual, immediate and justiciable controversy exists between Federal and InterDigital concerning whether InterDigital is obligated to reimburse Federal for the monies Federal paid to defend the Ericsson litigation.

57. InterDigital is in need of the Court's assistance in resolving the parties' differences concerning whether the Reimbursement Agreement is an enforceable contract.

58. InterDigital now seeks an affirmative declaration that InterDigital is not obligated to reimburse Federal for the monies Federal paid to defend the Ericsson litigation because the Reimbursement Agreement lacks consideration. In the alternative, if this Court finds that the Reimbursement Agreement is valid and enforceable, InterDigital seeks a declaration that: (1) Federal is entitled to reimbursement based only on those portions of the amounts received by InterDigital under the settlement of the Ericsson litigation relating to patents at issue in the Ericsson litigation and excluding any royalty payments made to InterDigital by Ericsson LM or any other entities that were not parties to the Ericsson litigation; and (2) InterDigital is entitled to a refund of its over payments to Federal.

WHEREFORE, plaintiff InterDigital demands that judgment be entered in its favor and against Federal declaring that InterDigital is not obligated to reimburse Federal for any of the attorneys' fees or defense expenses it paid to defend the Ericsson litigation, together with such other relief as the Court deems just and appropriate. In the alternative, if this Court finds that the Reimbursement Agreement is valid and enforceable, InterDigital seeks a declaration that: (1) Federal is entitled to reimbursement based only on those portions of the amounts received by InterDigital

under the settlement of the Ericsson litigation relating to patents at issue in the Ericsson litigation and excluding any royalty payments made to IDC by Ericsson LM or any other entities that were not parties to the Ericsson litigation; and (2) InterDigital is entitled to a refund of its over payments to Federal.

## COUNT II
## BREACH OF CONTRACT

59. InterDigital incorporates the averments set forth in paragraphs 1 through 58 herein by this reference.

60. Under the terms of the Policy, Federal's obligation to pay InterDigital's defense expenses is clear.

61. The Policy does not provide that attorney fees and other litigation expenses may be limited in any manner by the insurer.

62. Federal's unjustified refusal to reimburse InterDigital for attorneys' fees above $240 during one period and above $200 per hour during another period is a breach of contract.

63. As a result of Federal's breach of contract InterDigital was forced to pay a large portion of its total defense costs in the Ericsson litigation.

64. InterDigital has paid Federal, under the Reimbursement Agreement, approximately $157,000, an amount which should be refunded to InterDigital in its entirety.

65. InterDigital paid Federal substantial premiums with the reasonable expectation that pursuant to the Policy, Federal would pay InterDigital's defense

14

expenses, without limitation, when a claim or suit was brought against it seeking damages for personal injury.

66. Federal's breach of contract has caused InterDigital damages in excess of $75,000.

WHEREFORE, plaintiff InterDigital demands that judgment be entered in its favor and against Federal for compensatory damages in an amount in excess of $75,000 plus interest and attorneys' fees, together with such other relief as the Court deems just and appropriate.

## COUNT III

### BAD FAITH PURSUANT TO 42 PA. C.S.A. §8371

67. InterDigital incorporates the averments set forth in paragraphs 1 through 65 herein by this reference.

68. The bad faith claim against Federal as set forth herein subjects Federal to special damages as provided under 42 Pa. C.S.A. § 8371.

69. InterDigital has been injured by Federal's refusal to reimburse InterDigital fully, as required by Federal's insurance policy, for InterDigital's attorneys' fees in the defense of the Ericsson litigation and Federal's improper suggestions that it might stop payment unilaterally of attorneys' fees and expenses to defend the Ericsson litigation and would seek reimbursement of attorneys' fees and expenses associated with its defense of the uncovered claims in the Ericsson litigation, all without any good faith basis for doing so.

15

70.  Federal's bad faith constitutes a violation of 42 Pa. C.S.A. § 8371, and otherwise entitles InterDigital to recover special damages, including punitive damages, interest, attorneys' fees and costs.

WHEREFORE, plaintiff InterDigital demands that judgment be entered in its favor and against Federal for compensatory damages together with punitive and exemplary damages in an amount in excess of $75,000 plus interest and attorneys' fees, together with such other relief as the Court deems just and appropriate.

<div style="margin-left: 40%;">

_____
Stephen J. Mathes
Tammi Markowitz
HOYLE, FICKLER, HERSCHEL
& MATHES LLP
One South Broad Street - Suite 1500
Philadelphia, PA 19107
(215) 981-5700

Attorneys for InterDigital
Communications Corporation
and InterDigital Technology Corporation

</div>

Dated:  November 4, 2003

16

# EXHIBIT Q

DIGIGAN, INC., Plaintiff, - against - IV ALIDATE, INC. d/b/aPLENAR, MDM GROUP, INC., and TIE TECHNOLOGIES, INC. f/k/a GLOBAL WIDE WEB, INC.,Defendants.

02 Civ. 420 (RCC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OFNEW YORK

2004 U.S. Dist. LEXIS 1324; 71 U.S.P.Q.2D (BNA) 1455; 52U.C.C. Rep. Serv. 2d (Callaghan) 1022

February 3, 2004, Decided
February 3, 2004, Filed

**SUBSEQUENT HISTORY:** Magistrate's recommendation at *Digigan, Inc. v. Ivalidate, Inc., 2004 U.S. Dist. LEXIS 8705 (S.D.N.Y., Apr. 28, 2004)*

**PRIOR HISTORY:** *digiGAN, Inc. v. iVALIDATE, Inc., 2002 U.S. Dist. LEXIS 19696 (S.D.N.Y., Oct. 4, 2002)*

**DISPOSITION:** [*1] Defendants' motions to dismiss for failure to state claim GRANTED IN PART AND DENIED IN PART. MDM's motion to dismiss for lack of personal jurisdiction DENIED WITHOUT PREJUDICE.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendants, seeking a declaratory judgment that plaintiff was the owner of certain property, including a number of patents, and for damages based on violations of federal patent law and state unfair competition law. Defendants filed separate motions to dismiss the action.

**OVERVIEW:** The motion to dismiss was denied as to the claim for declaratory relief. There was a controversy involving ownership of the patents that would be resolved by the declaratory relief that plaintiff requested. The claim for patent infringement survived the motion to dismiss because plaintiff had alleged ownership of the patents, named defendants as the alleged infringers, cited the patents by number, and described the means by which they were infringed. However, plaintiff's Lanham Act claim was dismissed because plaintiff alleged misrepresentations of fact in connection with a patent, not goods or services. Plaintiff's unfair competition claim was also dismissed because plaintiff sought to restate its patent infringement claim as an unfair competition claim, without alleging any expenditure of time, labor, or talent. Plaintiff's claims under N.Y. Gen. Bus. Law §§ 349 and 350 were dismissed because there were no factual allegations in the complaint that suggested a broad impact on consumers. Finally, the third defendant's motion to dismiss for lack of personal jurisdiction was denied because the court accepted as true the allegations of jurisdiction in the complaint.

**OUTCOME:** Defendants' motions to dismiss were granted as to the Lanham Act, New York General Business Law, and unfair competition claims, and denied as to the claims for declaratory relief and patent infringement. The third defendant's motion to dismiss for lack of personal jurisdiction was denied without prejudice.

LexisNexis(R) Headnotes

**COUNSEL:** For Digigan, Inc, PLAINTIFF: David A Einhorn, James M Andriola, Anderson, Kill, Olick & Oshinsky PC, New York, NY USA.

For Ivalidate, Inc DBA Plenar, DEFENDANT: Anthony Motta, Law Offices of Joel Z Robinson & Co, New York, NY USA.

**JUDGES:** RICHARD CONWAY CASEY, United States District Court Judge.

**OPINIONBY:** RICHARD CONWAY CASEY

**OPINION: MEMORANDUM & ORDER**

RICHARD CONWAY CASEY, United States District Court Judge:

Plaintiff digiGAN, Inc. ("Plaintiff") brought this action against i Validate, Inc. ("iValidate"), MDM Group, Inc. ("MDM"), and TIE Technologies, Inc. ("TIE") (collectively referred to as "Defendants") for a declaratory judgment that Plaintiff is the owner of certain property, including a number of patents, and for damages based on violations of federal patent law and state unfair

Case 1:05-cv-00016-JJF    Document 15-13    Filed 04/28/2005    Page 20 of 42

Page 5
2004 U.S. Dist. LEXIS 1324, *; 71 U.S.P.Q.2D (BNA) 1455;
52 U.C.C. Rep. Serv. 2d (Callaghan) 1022

competition law. The three Defendants filed separate motions to dismiss the action. The Court addresses all three motions in this opinion. For the reasons that follow, Defendants' motions pursuant to *Federal Rule of Civil Procedure 12(b)(6)*[*2] are GRANTED IN PART AND DENIED IN PART. The Court DENIES WITHOUT PREJUDICE MDM's motion to dismiss for lack of personal jurisdiction.

I. BACKGROUND

The following facts are derived from the Amended Complaint in this case, the truth of which the Court assumes for purposes of these motions. On February 26, 2001, Plaintiff entered into an agreement with iValidate, titled "Advance Letter," under which Plaintiff lent sums of money to iValidate. (Compl. P 7.) The Advance Letter stated that if a separate agreement, called an "Asset Purchase Agreement," did not close by April 15, 2001, the advances made by Plaintiff to iValidate were to convert into a loan payable by April 30, 2001. (Id. P 8.) That deadline was extended by consent of the parties until October 1, 2001. (Id. P 10.) The Asset Purchase Agreement did not close, but iValidate failed to pay back $107,500 plus interest. (Id. PP 8, 11.) Under a security agreement executed on March 13, 2001, iValidate assigned certain collateral to Plaintiff to secure its obligations under the Advance Letter. (Id. P 12.) On October 23, 2001, Plaintiff notified iValidate that it would strictly foreclose on the[*3] collateral, and received no objection. (Id. PP 13, 14.) Plaintiff therefore contends that it is the legal owner of the collateral.

On October 21, 2001, MDM issued a press release in which it claimed ownership of the collateral--which appears to include a number of patents--despite Plaintiff's perfected security interest which it recorded in the states of New York and Georgia, and with the United States Patent and Trademark Office. (Id. PP 16, 17.) MDM then licensed rights in the patents to TIE (Id. P 19.) Defendants are alleged to be alter egos of one another. (Id. P 23.)

First, Plaintiff contends that it is entitled to a declaratory judgment that it is the rightful owner of the collateral and to an injunction against Defendants' infringement of its rights in the collateral. (Id. P 27.) Second, Plaintiff alleges that Defendants have violated the Lanham Act, *15 U.S.C. § 1125(a)*, by making false and misleading statements that they possess certain rights in the patents. (Id. P 36.) These statements allegedly caused confusion among the public and damage to Plaintiff. (Id. P 38.) The Amended Complaint also alleges that these misleading[*4] statements violated New York unfair competition law and *sections 349 and*

*350* of the New York General Business Law. (Id. PP 42, 44.)

Defendants argue that the Amended Complaint fails to state a claim on which relief can be granted, and have brought motions pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. In addition, MDM moves to dismiss the Amended Complaint for lack of personal jurisdiction under *Federal Rule of Civil Procedure 12(b)(2)*. n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 In its original moving papers, MDM moved for a more definite statement of the claims under *Federal Rule of Civil Procedure 12(e)*. However, in its supplemental moving papers filed after Plaintiff amended its complaint, that motion was not reasserted. The motion has therefore been abandoned.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

II. DISCUSSION

A. Defendants' 12(b)(6) Motions

Defendants argue that the Amended Complaint should be dismissed in its entirety. Under *Rule 12(b)(6)*, [*5] the Court must presume that all of the complaint's allegations are true and read the Amended Complaint in the light most favorable to Plaintiff. See *Connolly v. McCall, 254 F.3d 36 (2d Cir. 2001)*. The Court can only grant the motion if it appears beyond doubt that Plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995)*. The Court will discuss each cause of action separately.

1. First Claim: Declaratory Relief Under Article 9 of the New York Uniform Commercial Code

iValidate argues that the Amended Complaint does not state a claim for declaratory relief that Plaintiff is the rightful owner of the collateral for three reasons: (1) Plaintiff breached the Advance Letter and therefore the security agreement is void; (2) Plaintiff failed to comply

2004 U.S. Dist. LEXIS 1324, *; 71 U.S.P.Q.2D (BNA) 1455;
52 U.C.C. Rep. Serv. 2d (Callaghan) 1022

with the notice requirements of *section 9-620* of the New York Uniform Commercial Code ("N.Y.U.C.C."); and (3) the monies advanced by Plaintiff to iValidate were not loans but were deposits to be applied toward consideration that Plaintiff owed iValidate. (Memorandum of Law of Defendant iValidate[*6] in Support of Motion to Dismiss, at 16-19.)

All of these arguments must fail because they mistake the Court's role in deciding a *Rule 12(b)(6)* motion. The Court cannot make findings of fact, but must confine its analysis to whether the "facts stated on the face of the complaint, in documents appended to the complaint, or incorporated in the complaint by reference" would entitle Plaintiff to the requested relief. *Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).*

The argument that Plaintiff breached the Advance Letter may be a defense that iValidate might eventually assert, but it is not a ground for dismissal under *Rule 12(b)(6)*. It is only a proper basis for a motion to dismiss "if the defense appears on the face of the complaint." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 158 (2d Cir. 2003)* (quoting *Pani Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998))*. There is nothing in the Amended Complaint, the Advance Letter, or the security agreement, that allows the Court to determine that Plaintiff breached the Advance Letter without making factual[*7] findings, something the Court cannot do on a motion to dismiss. Thus, this argument is unavailing.

Second, the Amended Complaint alleges that Plaintiff notified iValidate that it intended to strictly foreclose upon the collateral in satisfaction of iValidate's obligations under the Advance Letter. (Compl. P 13.) The Amended Complaint further alleges that iValidate did not object to the foreclosure. (Id. P 14.) N.Y.U.C.C. section 9-620 permits a secured party to retain collateral in satisfaction of an obligation if it sends a proposal to the debtor and receives no objection within twenty days after sending the proposal. *N.Y.U.C.C. Law §§ 9-620 to -621.* iValidate argues that such notice did not satisfy the N.Y.U.C.C. requirements because iValidate had already sold the collateral to MDM and the Amended Complaint does not claim that MDM was notified of Plaintiff's proposal to strictly foreclose. However, the N.Y.U.C.C. only requires notification to parties from which the secured party received a claim of interest, or which held a perfected security interest or lien within ten days before the debtor consented to the foreclosure. See id. *§ 9-621(a).* It is doubtful that Plaintiff [*8]must plead the absence of any such claims of interest and secured interest-holders, but a reasonable inference from the allegation in the Amended Complaint that Plaintiff

complied with the N.Y.U.C.C. requirements is that MDM had neither claimed an interest in the collateral nor held a perfected security interest. Thus, the Amended Complaint adequately alleges the necessary facts under the N.Y.U.C.C.

Finally, iValidate argues that the sum Plaintiff claims is owed was not a loan but a deposit toward monies that Plaintiff owed to iValidate. iValidate asserts that the Court must construe the Advance Letter and the security agreement in conjunction with the Asset Purchase Agreement and something called the Term Sheet, which iValidate maintains was executed on January 18, 2001, and specifies that Plaintiff would make cash payments of $1.1 million to iValidate; assume certain of iValidate's liabilities, and deliver stock in Plaintiff to iValidate shareholders. The Term Sheet purportedly also states that the patents would not be officially assigned to Plaintiff until it made payments to iValidate of $650,000. iValidate argues that this Term Sheet was incorporated into the Asset Purchase[*9] Agreement, which the Court must consider because the Amended Complaint references the Asset Purchase Agreement.

The Amended Complaint does refer to the Asset Purchase Agreement, and in part, relies on the agreement to state its claim for declaratory relief, thus, it may be considered by the Court in ruling on the motion to dismiss. See *Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)* (holding that documents relied on by plaintiff in drafting complaint may be considered on 12(b)(6) motion). iValidate contends that the declaratory judgment claim should be dismissed because Plaintiff failed to tender agreed-upon consideration and because the transaction contemplated by the Asset Purchase Agreement never closed. These arguments ask the Court to make factual findings and then a conclusion of law that Plaintiff has no rights to the patent. Such actions are impermissible on a motion to dismiss.

Plaintiff has also sufficiently stated a claim for declaratory relief. A district court "must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate[*10] and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992)* (quoting *Broadview Chemical Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir. 1969))*. Plaintiff has plead facts suggesting that it is the rightful owner of the patents and that all three Defendants have asserted ownership of the patents. (Compl. PP 25, 26.) iValidate argues in defense that Plaintiff has no such rights. Thus, there is a controversy involving ownership of the patents

2004 U.S. Dist. LEXIS 1324, *; 71 U.S.P.Q.2D (BNA) 1455;
52 U.C.C. Rep. Serv. 2d (Callaghan) 1022

that will be resolved by the declaratory relief that Plaintiff requests. iValidate's motion to dismiss is therefore denied.

### 2. Second Claim: Patent Infringement

MDM and TIE contend that Plaintiff has failed to state a cause of action for patent infringement. n2 The Amended Complaint alleges that Defendants have violated *35 U.S.C. § 271(a)* by "making, using, offering to sell, and/or selling the invention claimed" in two patents. (Compl. P 31.) *35 U.S.C. § 271(a)* states in relevant part: "Whoever without authority makes, uses, offers to sell, or sells[*11] any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -
- -

n2 iValidate bases its motion on the argument that Plaintiff cannot recover on any of its legal theories because it has no ownership interest in the patents. For the reasons already stated, this argument must be rejected.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

According to both MDM and TIE, the Amended Complaint fails to state a cause of action against them because it does not claim that they actually produced or sold any patented inventions. "[A] patentee need only plead facts sufficient to place the alleged infringer on notice. This requirement ensures that the accused infringer has sufficient knowledge of the facts alleged to enable it to answer the complaint and defend itself." *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc., 203 F.3d 790, 794 (Fed. Cir. 2000)*. In Phonometrics, the Federal Circuit held that a complaint states a claim for patent infringement[*12] when it "alleges ownership of the asserted patent, names each individual defendant, cites the patent that is allegedly infringed, describes the means by which the defendants allegedly infringe, and points to the specific sections of the patent law invoked." Id.

Here, Plaintiff has met the standard articulated in *Phonometrics* for stating a claim under *§ 271*. It has alleged ownership of the patents, named Defendants as the alleged infringers, cited the patents by number, and describes the means by which they were infringed, that is, through making, using, selling, offering to sell or actually selling the patented inventions. Complaints that merely track the statutory language may be sufficient to withstand a motion to dismiss. See *Glazer Steel Corp. v. Yawata Iron & Steel Co., 56 F.R.D. 75, 81 n.1 (S.D.N.Y. 1972)*. In addition, the Amended Complaint specifically cites *§ 271* as the applicable patent-law provision. The information provided is adequate to allow Defendants to defend themselves. Therefore, the motions to dismiss the patent infringement claim are denied.

### 3. Third Claim: Lanham Act Violations

MDM and TIE next challenge Plaintiff's claim for[*13] violations of section 43(a)of the Lanham Act, *15 U.S.C. § 1125(a)*. Specifically, MDM and TIE contend that Plaintiff only alleges misrepresentations regarding a patent, which is not a good or service. *The Lanham Act* subjects to civil suit:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities ...

*15 U.S.C. § 1125(a)* (emphasis added). This provision of the *Lanham Act* is meant "to prevent customer[*14] confusion regarding a product's source or sponsorship." *Chambers, 282 F.3d at 156. The Lanham Act* is not, however, a panacea for all unfair trade practices. See *Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 156 L. Ed. 2d 18, 123 S. Ct. 2041, 2045 (2003)*.

The Amended Complaint alleges that Defendants violated *section 43(a) of the Lanham Act* by making false

2004 U.S. Dist. LEXIS 1324, *; 71 U.S.P.Q.2D (BNA) 1455;
52 U.C.C. Rep. Serv. 2d (Callaghan) 1022

and misleading representations concerning Defendants' rights in one of the patents (Compl. P 36.) These misrepresentations allegedly were made in the course of Defendants' website advertising of products protected by the patent. (Id.) The gravamen of Plaintiff's claim is that Defendants, in marketing their products, falsely stated that they owned the patent that Plaintiff received from iValidate under the security agreement. Thus, the alleged misrepresentations concerned the patent, not any products or services. A patent is not a "good or service" as those terms are used in the *Lanham Act*. See *Hans-Jurgen Laube & Oxidwerk HJL AG v. KM Europa Metal AG, 1998 U.S. Dist. LEXIS 3921, No. 96 Civ. 8147(PKL), 1998 WL 148427, at *2 (S.D.N.Y. Mar. 27, 1998)* (citing *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1574-75 (Fed. Cir. 1996)).*[*15]

In Hans-Jurgen, the plaintiffs alleged that the defendant violated *section 43(a)* when it falsely claimed ownership of a patent. Id. Judge Leisure concluded that the cause of action arose out of misrepresentations regarding ownership of the patent, and noted that the Federal Circuit has held that a patent is not a "good or service" under *section 43(a) of the Lanham Act.* See *id.*

Plaintiff responds that its *Lanham Act* claim is valid because Defendants advertised "products embodying technology protected by the Patent." (Compl. P 36.) However, drawing all reasonable inferences in Plaintiff's favor, the Amended Complaint does not allege any "false or misleading representation of fact" "in connection with any goods or services." See *15 U.S.C. § 1125.* The patent, and not any product or service, is at the center of the controversy between the parties.

First, the only misrepresentations alleged occurred when Defendants claimed to own the patent or to be licensees of the patent. (See Compl. P 35.) Second, the reason that Plaintiff claims the statements were false was that it, and not Defendants, actually own the patent. (See id. P 37.) Finally, [*16] Plaintiff's vague reference to Defendants' "products embodying technology" does not allege the necessary connection between the misrepresentations of fact and goods or services. Even paragraph 36 of the Amended Complaint, in which Plaintiff mentions Defendants' products, only alleges misrepresentations in connection with Defendants' rights to the patent, not with the products themselves. Thus, the Court concludes that Plaintiff has alleged misrepresentations of fact in connection with a patent, not goods or services. *Therefore, the Lanham Act* claim is dismissed.

4. Fourth Claim: Unfair Competition

Plaintiff states that Defendants' false representation that they are the owners or licensees of the patent constitutes unfair competition under New York State law. (Id. P 42.) "The primary concern in unfair competition is the protection of a business from another's misappropriation of the business' organization or its expenditures of labor, skill, and money." *Gucci America, Inc. v. Duty Free Apparel Ltd., 277 F. Supp. 2d 269, 275 (S.D.N.Y. 2003)* (quoting *Ruder & Finn, Inc. v. Seabord Sur. Co., 52 N.Y.2d 663, 422 N.E.2d 518, 522, 439 N.Y.S.2d 858 (N.Y. 1981))* (internal[*17] quotation marks omitted).

Defendants TIE and MDM argue that a cause of action for unfair competition cannot lie on the facts stated in the Amended Complaint because there are no allegations that they infringed on Plaintiff's patent rights or misappropriated Plaintiff's business name, reputation, or good will. In addition, they argue that because the *Lanham Act* claim fails, so too must the claim for unfair competition.

If Defendants are to succeed in dismissing the unfair competition claim, they must not rest on their *Lanham Act* arguments. As the Second Circuit has explained, "the elements of an unfair competition and *Lanham Act* claim are different." *Morex S.p.A v. Design Institute America, Inc 779 F.2d 799, 801 (2d Cir. 1985).* In New York, unfair competition is a broad tort encompassing an "incalculable variety of illegal practices." *Norbrook Labs. Ltd v. G.C. Hanford Mfg. Co., 297 F. Supp. 2d 463, 2003 U.S. Dist. LEXIS 23201, 2003 WL 23023866, at *24 (N.D.N.Y. Dec. 3, 2003)* (quoting *Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 161 N.E.2d 197, 204, 190 N.Y.S.2d 977 (N.Y. 1959)).* Plaintiff must allege, however, "unfairness and an unjustifiable attempt to profit from another's expenditure of[*18] time, labor, and talent." *Greenblatt v. Prescription Plan Servs. Corp., 783 F. Supp. 814, 825 (S.D.N.Y. 1992).*

Here, Plaintiff's labor was not expended, nor talent tapped, in producing the patented technology. Plaintiff's only argument is that it expended money through its agreements with iValidate, and has, in effect, purchased the patent. However, it is the money spent in developing a product or process that the tort of unfair competition protects. See *Norbrook Labs., 2003 U.S. Dist. LEXIS 23201, 2003 WL 23023866, at *25* (finding unfair competition when defendant misappropriated technology for which plaintiff expended substantial time and money in producing). Plaintiff seeks to restate its patent infringement claim as an unfair competition claim, without alleging any expenditure of time, labor, or talent. See *id.* For this reason, the Amended Complaint does not

2004 U.S. Dist. LEXIS 1324, *; 71 U.S.P.Q.2D (BNA) 1455;
52 U.C.C. Rep. Serv. 2d (Callaghan) 1022

adequately state a claim for unfair competition, and this cause of action is dismissed.

### 5. Fifth Claim: Violation of New York General Business Law

The Amended Complaint alleges that Defendants violated *sections 349 and 350* of the *N.Y. General Business Law. Sections 349 and 350* protect consumers against [*19] deceptive trade practices and false advertising. See N.Y. Gen. Bus. L. §§ 349, 350. The Court determines that Plaintiff has failed to state a claim under these statutes.

To establish a claim for deceptive trade practices under *section 349*, Plaintiff must allege that: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000)* (per curiam). Competitors have standing to bring a claim under this statute; however, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995)* (quoting *Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y. 1988)*).

The only harm to the public found anywhere in the Amended Complaint is the potential confusion that might arise due to Defendants' claims that they own, or are licensees of, the patent (See Compl. P 38.) Consumer confusion regarding the patent, the use or nature of which is not even stated in the Amended[*20] Complaint, does not rise to the level of consumer injury necessary to sustain a claim under *section 349*. See *New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 770, 639 N.Y.S.2d 283 (N.Y. 1995)*. "The conduct [alleged] need not be repetitive or recurring, but defendant's acts or practices must have broad impact on consumers at large ...." *Id.* There are no factual allegations in the Amended Complaint that suggest a broad impact on consumers; in fact, Plaintiff never alleges what the invention is for which it claims to own the patent.

The Amended Complaint is replete, however, with allegations of harm to Plaintiff's business. "Where the gravamen of the complaint is harm to a business as opposed to the public at large, the business does not have a cognizable cause of action under § 349." *Gucci America, 277 F. Supp. 2d at 274*. Because this is merely a private dispute "without direct impact on the body of consumers," the claim under *section 349* is dismissed. See *Maurizio, 230 F.3d at 522*.

Plaintiff's claim under *section 350* must suffer a similar fate. To state a claim for false advertising under *section 350*, Plaintiff again must allege conduct that[*21] has a broad impact on consumers. See id. (citing with approval *Galerie Furstenberg v. Coffaro, 697 F. Supp. 1282, 1291-92 (S.D.N.Y. 1988)*). Therefore, the *section 350* claim is also dismissed.

### B. MDM's 12(b)(2) Motion

MDM also maintains that it is not subject to personal jurisdiction in this Court because it has no contacts with the state of New York. MDM claims that it is incorporated in Georgia and has its principal place of business in Texas. It further asserts that it has no offices, employees, or agents in New York, and derives no income from, nor has caused any injuries in, New York. The Amended Complaint, in contrast, alleges that MDM's principal place of business is in New York. (Id. P 3.) Plaintiff argues that this allegation is itself sufficient to withstand a motion to dismiss on the issue of personal jurisdiction. In the alternative, Plaintiff claims that MDM has sufficient contacts through to its own activities and those of TIE.

In demonstrating personal jurisdiction, "the nature of the plaintiff's obligation varies depending on the procedural posture of the litigation." *Ball v. Metallurgie Hoboken-Overpelt S.A., 902 F.2d 194, 197 (2d Cir. 1990)*.[*22] As this motion was filed prior to discovery, Plaintiff must make a Prima facie showing of jurisdiction by allegations in the complaint. *Id.*; see also *Metropolitan Life Ins. Co. v. Robertson Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996)* ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction.").

MDM cites *Palmieri v. Estefan, 793 F. Supp. 1182 (S.D.N.Y. 1992)*, for the proposition that an evidentiary hearing is required when a defendant challenges the plaintiff's factual allegations relating to personal jurisdiction. See *id. at 1186*. This argument is only partially correct. MDM certainly may challenge both Plaintiff's theory of jurisdiction and the veracity of the facts that purportedly support that theory, *Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 153 (2d Cir. 1999)*, but the Court need not decide both challenges at the same time. See *Ball, 902 F.2d at 197*.

"In ruling on the theory of jurisdictional allegations, the court may provisionally accept disputed factual allegations as true ... The court need only[*23] determine whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction; no evidentiary hearing or factual determination is necessary for that purpose."

2004 U.S. Dist. LEXIS 1324, *; 71 U.S.P.Q.2D (BNA) 1455;
52 U.C.C. Rep. Serv. 2d (Callaghan) 1022

*Id. at 153* (emphasis added). MDM is correct that Plaintiff must prove facts establishing personal jurisdiction by a preponderance of the evidence, but Plaintiff need not do so on a prediscovery motion pursuant to *Rule 12(b)(2)*. See *Ball, 902 F.2d at 196*.

The Court will accept as true the allegation of jurisdiction at this time. The parties shall have an opportunity to conduct discovery on the issue of jurisdiction, if they have not yet done so; the Court will schedule further proceedings after such discovery. Plaintiff will bear the burden of proving, by a preponderance of the evidence, both its theory of jurisdiction and the facts on which that theory is based. Therefore, MDM's motion is denied with leave to renew after discovery has been completed.

III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss for failure to state a claim are GRANTED IN PART AND DENIED IN PART. Specifically, the Court concludes that Plaintiff has failed to state a[*24] cause of action under the *Lanham Act and New York General Business Law sections 349 and 350,* and for unfair competition. Plaintiff has, however, stated claims for declaratory relief and patent infringement. The Court DENIES WITHOUT PREJUDICE MDM's motion to dismiss for lack of personal jurisdiction.

So Ordered: February 3, 2004

Richard Conway Casey, U.S.D.J.

# EXHIBIT R

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.
ERICSSON, INC., Plaintiff,
v.
INTERDIGITAL COMMUNICATIONS CORPORATION
and Interdigital Technology
Corporation, Defendants,
**No. 3:93-CV-1809-M.**

June 3, 2004.

T. Gordon White, McKool Smith, Austin, TX, J. Patrick
Heptig, Jenkens & Gilchrist, Susan Elizabeth Powley,
Jenkens & Gilchrist, Robert A. Samra, Samra & Associates,
Dallas, TX, Sharon A. Israel, Jenkens & Gilchrist, Houston,
TX, for Plaintiffs.

D. Dudley Oldham, Linda L. Addison, Robert S. Harrell,
Fulbright & Jaworski, Houston, TX, Dan Duncan Davison,
Fulbright & Jaworski, Dallas, TX, Steven Kreiss, Law
Office of Steven Kreiss, Washington, DC, for Defendants.

Bruce S. Sostek, Thompson & Knight, Dallas, TX, for
ThirdParty Defendant.

Thomas B. Newell, Watt, Tieder, Hoffar & Fitzgerald,
McLean, VA, for Counter Claimant.

David J. Healey, Weil Gotshal & Manges, Houston, TX, for
Intervenor.

John T. Kotelly, Dickstein, Shapiro, Morin & Oshinsky,
Washington, DC, for Counter Claimant.

Jerry R. Selinger, Jenkens & Gilchrist, Dallas, TX, for
ThirdParty Plaintiff.

Mike McKool, Jr., McKool Smith, Dallas, TX, for Plaintiffs
and ThirdParty Plaintiff.

*MEMORANDUM OPINION AND ORDER*
LYNN, J.

*1 Before the Court is Nokia Corporation's Motion to
Reinstate Vacated Decisions, filed on December 29, 2003.
For the reasons stated below, the Court grants Nokia
Corporation's Motion to Reinstate Vacated Decisions.

I. BACKGROUND

In September 1993, Ericsson, Inc. ("Ericsson") filed this suit
seeking a declaratory judgment that Ericsson was not
infringing the patents of InterDigital Communications
Corporation and InterDigital Technology Corporation
(collectively "InterDigital") and that InterDigital's patents
were invalid and unenforceable. InterDigital
counterclaimed, alleging patent infringement by Ericsson.
On March 17, 2003, prior to a final judgment, Ericsson and
InterDigital filed a joint motion notifying the Court that the
parties had settled all outstanding disputes between the
parties, requesting the vacatur of the *Markman* rulings and
summary judgment orders previously entered in the case,
and asking that all documents under seal at that time remain
permanently under seal. On March 18, 2003, the Court
granted the parties' joint motion. The Court vacated the
following orders and rulings:

• Special Master's Draft Report and Recommendation on
Claim Construction, entered on July 14, 2000
• Special Master's Final Report and Recommendation on
Claim Construction, entered on September 8, 2000
• Findings, Conclusions, and Recommendations of the
United States Magistrate Judge, entered on May 21, 2001
• Order [on Claim Construction], entered on July 16, 2001
• Agreed Order [on Claim Construction], entered on July
24, 2001
• Memorandum Opinion and Order Granting Ericsson's
Motion for Summary Judgment of Non-Infringement
Based on the Single Base Station Limitation, entered on
May 21, 2002
• Order Dismissing Declaratory Judgment Action
Regarding Non-Infringed Claims, entered on January 9,
2003

Additionally, the Court ordered: "[A]ll documents under
seal in this case shall remain permanently under seal and
shall continue to be governed by the protective order signed
by this Court on December 18, 1993 and as subsequently
amended by this Court." On March 19, 2003, the Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                            Page 2
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

entered a "Stipulation and Order of Dismissal," dismissing the action with prejudice. Concurrent with the settlement and dismissal of this action, InterDigital and Ericsson entered into patent licensing agreements.

On July 22, 2003, Nokia Corporation ("Nokia") filed a motion to intervene in this action, for the limited purpose of seeking access to the sealed filings. Nokia and InterDigital are involved in a dispute over the calculation of royalties under Nokia's licensing agreement with InterDigital, which is currently before an arbitration panel. According to InterDigital, pursuant to a "most favored licensee" provision in Nokia's licensing agreement, the calculation of royalties under Nokia's licensing agreement is determined by the financial terms of Ericsson's licensing agreements. Nokia argued that access to the sealed records was proper because "InterDigital's assertion of the Ericsson settlement against Nokia has made the record of this case central to Nokia's opposition, which will require a detailed inquiry into the patents as construed by this Court and their applicability to the Ericsson technology accused of infringement in this case." Both Ericsson and InterDigital opposed Nokia's motion to intervene and Nokia's request for access to the sealed records.

**\*2** On November 25, 2003, the Court heard oral argument on Nokia's Motion to Intervene and for Access to Sealed Record. The Court granted Nokia's Motion to Intervene pursuant to <u>Federal Rule of Civil Procedure 24(b)</u>, and outlined a procedure for addressing Nokia's Motion for Access to Sealed Record. Under that procedure, InterDigital and Ericsson were required to prepare and provide Nokia with a schedule of the sealed documents. The Court explained that the schedule should identify each sealed document by docket number, without revealing the contents of the document but in sufficient detail to allow Nokia to determine whether it would like to view the document. Then, once the schedule was furnished to Nokia, Nokia could move the Court to make specific documents available to Nokia. Additionally, the Court ordered InterDigital and Nokia to advise the arbitration panel that, subject to protecting Ericsson's trade secrets, the Court would make available to the arbitrators any document that they request. InterDigital and Ericsson have provided Nokia with a

schedule of the sealed documents, but Nokia has not moved the Court to make specific documents from that schedule available to Nokia, apparently because the parties have agreed to make such documents available voluntarily. The arbitrators have not yet requested that the Court make any documents available to them.

On December 29, 2003, Nokia filed a motion under <u>Federal Rule of Civil Procedure 60(b)</u> to reinstate the orders and rulings vacated by the Court's March 18, 2003 Order. Nokia contends that the Court's March 18, 2003 Order vacating the Court's prior rulings "did not comply with the principles and policies articulated in Supreme Court precedent, did not demonstrate 'exceptional circumstances,' and went against the great weight of authority that claim construction and corresponding summary judgment orders should not be vacated merely because parties settle." InterDigital and Ericsson oppose the relief sought by Nokia, arguing that (1) the Court lacks jurisdiction to reinstate the vacated orders and rulings because <u>Rule 60(b)</u> does not allow the Court to reverse the Court's March 18, 2003 Order of vacatur, (2) the scope of Nokia's intervention does not allow Nokia to move for reinstatement of the vacated orders and rulings, (3) granting Nokia leave to intervene in order to move for reinstatement would be improper, and (4) the Court's March 18, 2003 Order of vacatur, if examined on the merits, withstands scrutiny under <u>Rule 60(b)</u>.

II. ANALYSIS

   *A. Whether <u>Rule 60(b)</u> Empowers the Court to Reverse the Court's March 18,*
   *2003 Order of Vacatur*

Under <u>Rule 60(b)</u>, the Court may upon motion relieve a party from a "final judgment, order, or proceeding" if one of the enumerated reasons warranting relief is satisfied. InterDigital and Ericsson contend that <u>Rule 60(b)</u> only authorizes the Court to reverse final judgments, not interlocutory orders, and that the March 18, 2003 Order of vacatur is an interlocutory order. In support, InterDigital and Ericsson quote the following Fifth Circuit precedent:

**\*3** By its own terms, <u>Rule 60(b)</u> is limited to relief from a "final" judgment or order. "Interlocutory orders and judgments are not within the provisions of 60(b), but are left within the plenary power of the court that rendered

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 3
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

them to afford such relief from them as justice requires." As we stated in *Bon Air Hotel, Inc. v. Time, Inc.,* 426 F.2d 858, 862 (5th Cir.1970), "an interlocutory order" is "not subject to being vacated under Rule 60(b)," but "because the order was interlocutory, 'the court at any time before final decree [could] modify or rescind it.' " *Zimzores v. Veterans Admin.,* 778 F.2d 264, 266 (5th Cir.1985) (citations omitted).

In both *Zimzores* and *Bon Air Hotel,* the Fifth Circuit held that an interlocutory order could not be revised under Rule 60(b) prior to the entry of a final judgment in the case. *See Zimzores,* 778 F.2d at 266; *Bon Air Hotel,* 426 F.2d at 862. Rather, prior to the entry of a final judgment, the Court retains the power "unburdened by the requirements of Rule 60(b)" to revise or vacate its interlocutory orders. *Zimzores,* 778 F.2d at 266.

In this case, the Court entered an order on March 19, 2003 dismissing this action with prejudice. Therefore, unlike the district courts in *Zimzores* and *Bon Air Hotel,* the Court no longer retains the "unburdened" power to revise or vacate the March 18, 2003 Order. *Zimzores* and *Bon Air Hotel* do not address whether the Court, burdened by the requirements of Rule 60(b), may revise or vacate its March 18, 2003 Order.

Ericsson and InterDigital further argue that, because Rule 60(b) applies only to "final" orders, Rule 60(b) would empower the Court to revise or vacate only the Court's March 19, 2003 Order dismissing this case with prejudice. Although not cited by Ericsson and InterDigital, the court in *Menoken v. McNamara* interpreted the text of Rule 60(b) in a manner similar to that advocated by Ericsson and InterDigital. *Menoken v. McNamara,* 213 F.R.D. 193 (D.N.J. Feb.27, 2003). In *Menoken,* the defendant removed the case to federal court, and the court found that it had subject matter jurisdiction over the case. *Id.* at 194. Apparently in reaction to that ruling, the plaintiff filed a notice of voluntary dismissal. *Id.* Subsequently, the plaintiff argued that the court should reconsider its finding of subject matter jurisdiction pursuant to Rule 60(b). *Id.* at 195. The court concluded that the finding of subject matter jurisdiction was interlocutory and thus not subject to review or revision pursuant to Rule 60(b). *Id.*

In contrast to the analysis of the court in *Menoken,* this Court does not interpret the reference to "final orders" in Rule 60(b) to apply only to orders which literally finally dispose of cases. Rather, the Court interprets "final orders" as describing those orders that the Court no longer has the inherent power to revise or vacate without satisfying the requirements of Rule 60(b). As the Fifth Circuit recognized in *Zimzores,* prior to the entry of a final judgment, a district court retains "the power, unburdened by the requirements of Rule 60(b), to revise or vacate its interlocutory orders." *Zimzores,* 778 F.2d at 266. Therefore, prior to the entry of a final judgment, those orders are not "final" under Rule 60(b). However, once a final judgment is entered, those orders may no longer be freely revised or vacated by the district court. Rather, those orders become "final orders" that may only be revised or vacated by the district court pursuant to Rule 60(b). Similarly, absent an exception, an interlocutory order is generally not appealable prior to a final judgment, but it may be freely revised or vacated by the district court prior to final judgment; however, once a final judgment is entered, the order becomes a "final order" for purposes of appeal. *See* 28 U.S.C. § 1291 ("The courts of appeals ... shall have jurisdiction from all final decisions of the district courts.").

**\*4** Therefore, in this Court's view, once the Court entered the March 19, 2003 Order dismissing this case with prejudice, the Court's March 18, 2003 Order of vacatur became a "final order" under Rule 60(b). Therefore, if the requirements of Rule 60(b) are satisfied, the Court has the power to revise or vacate the March 18, 2003 Order.

*B. Whether the Scope of Nokia's Intervention Allows Nokia to Move for Reinstatement of the Vacated Orders and Rulings*

On July 22, 2003, Nokia moved to intervene "for the limited purpose of gaining access to the record." At the November 25, 2003 hearing, the Court granted Nokia's motion to intervene. Nokia now contends that, despite the limited purpose of Nokia's motion to intervene, the scope of the intervention granted at the hearing allows Nokia to move for reinstatement of the vacated orders and rulings.

In support, Nokia cites the following statement, which the Court made at the November 25, 2003 hearing after granting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 4
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

Nokia's motion to intervene: "I will defer any ruling on any request for additional tender of the documents themselves. And if there is a motion to vacate my earlier vacating of orders, I will hear from you on that later." (Tr. at 66). Although the Court's statement, excerpted from the context of the hearing, arguably supports Nokia's motion for reinstatement, the Court did not then grant Nokia leave to intervene for any purpose beyond that described in Nokia's motion to intervene. Nokia's motion to intervene did not mention a desire to reinstate vacated orders and rulings. [FN1] As is apparent from the record, the Court's analysis of Nokia's motion to intervene was limited to the intervention described in Nokia's motion:

> FN1. The propriety of the Court's Order of vacatur was discussed at the hearing only as a result of the Court's inquiry into Nokia's stated reasons for desiring access to the sealed and vacated orders and rulings: "But if the Special Master's report and the Court's order of claim construction are void, why does it matter what they say?" (Tr. at 7).

I believe that Nokia would be prejudiced if the Court does not allow Nokia to intervene here, because separate actions to obtain the documents would be impossible, if not extraordinarily difficult, and I believe that the Court's order may have had the effect of prejudicing Nokia's right to argue its potential interest in the action. So I'm going to allow Nokia to intervene.
(Tr. at 64).

Therefore, the Court rejects Nokia's contention that the scope of Nokia's intervention is broad enough for the Court to consider Nokia's motion to reinstate the vacated orders and rulings.

### C. Whether the Court Should Grant Nokia Leave to Intervene in Order to Move for Reinstatement of the Vacated Orders and Rulings

Nokia has also moved for leave to intervene pursuant to Rule 24(b) to the extent necessary to allow Nokia to move for reinstatement of the vacated orders and rulings. Because the Court has found that the scope of Nokia's original intervention is not broad enough for the Court to consider Nokia's motion to reinstate, the Court must decide whether to grant Nokia's motion for leave to intervene pursuant to

Rule 24(b). Rule 24(b) provides:
> Upon timely application anyone may be permitted to intervene in an action (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

*5 Therefore, under Rule 24(b), before granting Nokia's motion to intervene, the Court must analyze whether Nokia's motion to intervene is timely, whether Nokia's motion to reinstate shares a question of law or fact in common with the main action, and whether the Court should, in its discretion, allow intervention. Although the parties reference the issue of Nokia's standing as though it were encompassed in the timeliness analysis, the Court finds it more appropriate to address the issue of Nokia's standing before analyzing the elements of Rule 24(b) intervention.

1. Nokia's Standing to Contest the Vacatur

There is a split among the Circuits about the relationship of the Article III standing requirement and permissive intervention under Rule 24(b). See In re Enron Corp. Sec., No. H-01-3624, 2004 WL 405886, at *22 (S.D.Tex. Feb.25, 2004) (summarizing the Circuits' positions). In Ruiz v. Estelle, the Fifth Circuit held: "Article III does not require intervenors to independently possess standing where the intervention is into a subsisting and continuing Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one subsisting party with standing to do so." Ruiz v. Estelle, 161 F.3d 814, 830 (5th Cir.1998). In this case, in contrast to Ruiz, the issue of the reinstatement of the vacated decisions and orders is not currently pending before the Court; rather, the Court will only have jurisdiction to consider this issue if the Court allows Nokia to intervene and assert a Rule 60(b) motion. Further, unlike in Ruiz, only Nokia, a non-party, seeks the reinstatement of the vacated decisions and orders; Ericsson and InterDigital oppose the relief sought by Nokia. Therefore, under the unique circumstances of this case, the Court finds that, unlike in Ruiz, the Court must analyze

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

whether Nokia has standing to seek reinstatement of the vacated decisions and orders.

In order for a party to have standing, the party must have suffered an "injury in fact," there must be a causal connection between the injury and the conduct complained of, and it must be likely that the injury would be redressed by a favorable decision. _Walker v. City of Mesquite,_ 169 F.3d 973, 978-79 (5th Cir.1999). Nokia contends that the vacated rulings directly impact Nokia's obligations under its agreement with InterDigital because the scope and validity of InterDigital's patents affect Nokia's obligations. Nokia and InterDigital's dispute about Nokia's obligations under their agreement is currently pending before the arbitration panel. As long as rulings in this case remain vacated, Nokia is barred from asserting their effect on its obligations under its agreement with InterDigital. Although the Court recognizes that Justice Stevens's dissent in _Izumi v. U.S. Philips Corp.,_ [FN2] with which Justice Blackmun joined, is not binding on this Court, the Court is persuaded by the logic of Justice Stevens's analysis, which concluded that "Izumi obviously had a stake in the outcome of the motion, because the vacation of the Florida judgment significantly increased the potential liability and litigation expenses of its indemnitee." _Izumi v. U.S. Philips Corp.,_ 510 U.S. 27, 34, 114 S.Ct. 425, 126 L.Ed.2d 396 (1993) (Stevens, J., dissenting). In this case, the vacatur of the Court's rulings potentially affects Nokia's obligations under its agreement with InterDigital. Therefore, the Court finds that Nokia has standing to move for their reinstatement. [FN3]

> FN2. The Court notes that the majority in _Izumi v. U.S. Philips Corp._ did not reach the issue of Izumi's standing because the majority found that the Court of Appeals's decision to deny Izumi's motion to intervene was not fairly included in Izumi's petition for certiorari. _Izumi v. U.S. Philips Corp.,_ 510 U.S. 27, 34, 114 S.Ct. 425, 126 L.Ed.2d 396 (1993).

> FN3. The Court may initiate its own Rule 60(b) motion. _See McDowell v. Celebrezze,_ 310 F.2d 43, 44 (5th Cir.1962). In this case, if the Court had found that Nokia did not have standing to assert a Rule 60(b) motion, the Court would have

reexamined the Court's Order of vacatur on its own motion, pursuant to Rule 60(b).

2. Timeliness of Application

**\*6** Ericsson and InterDigital contend that Nokia's motion to intervene is _per se_ untimely, because there is no litigation pending before this Court in which Nokia could intervene. In support, Ericsson and InterDigital cite _Houston General Insurance Co. v. Moore,_ 193 F.3d 838, 840 (4th Cir.1999), in which the Fourth Circuit denied a third party's motion to intervene to vacate a default judgment under Rule 60(b) because the motion to intervene was filed more than 60 days after the entry of final judgment. The Fourth Circuit based its ruling on the "well-settled law" that "intervention presupposes pendency of an action in a court of competent jurisdiction." _Id._ In _Non-Commissioned Officers Association v. Army Times Publishing Co.,_ the Fifth Circuit similarly articulated this "well-settled law" and denied a third party's motion to intervene to lift the seal of a settlement agreement four years after the entry of the consent order because "[a] prerequisite of an intervention (which is an ancillary proceeding in an already instituted suit) is an existing suit within the Court's jurisdiction." _Non-Commissioned Officers Ass'n v. Army Times Publ'g Co.,_ 637 F.2d 372, 373 (5th Cir.1981), _modified on other grounds,_ 650 F.2d 83 (5th Cir.1981).

Contrary to the import of the Fourth Circuit's holding in _Houston General,_ this Court concludes that the prerequisite of "an existing suit within the Court's jurisdiction" does not render Nokia's motion to intervene _per se_ untimely. In Section II.A. of this Order, the Court found that a motion under Rule 60(b) affords this Court jurisdiction to revise the Court's Order of vacatur. Therefore, if the Court allows Nokia to intervene and pursue a Rule 60(b) motion, the issue of whether to revise the Court's Order of vacatur would be within this Court's jurisdiction. [FN4] Nokia would not be intervening in a non-existent suit over which the Court no longer retained jurisdiction; rather, Nokia would be intervening to pursue an issue within this Court's jurisdiction. Consequently, Nokia's motion to intervene is not _per se_ untimely, but must be analyzed in light of the four timeliness factors outlined by the Fifth Circuit in _Stallworth v. Monsanto Co.:_

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 6
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

FN4. Similarly, at the November 23, 2003 hearing, the Court rejected the argument that Nokia's motion to intervene was *per se* untimely. The Court based this ruling on the Court's continuing jurisdiction to unseal the sealed documents. The Court's December 18, 1993 Protective Order provided: "The Court retains jurisdiction to enforce the provisions of this Order and to make such arrangements, modifications and additions to this Order as the Court may from time to time deem appropriate."

1. The length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene.
2. The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case.
3. The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied.
4. The existence of unusual circumstances militating either for or against a determination that the application is timely.
*Stallworth v. Monsanto Co., 558 F.2d 257, 264-66 (5th Cir.1977).*

*Factor One*

*7 According to Nokia's counsel, Nokia first learned that the Court was considering vacating the Court's former decisions and orders on April 21, 2003, when InterDigital sent Nokia a letter containing a draft of the motion to vacate and a proposed order. (Tr. at 6). Although Nokia was in receipt of the proposed order of vacatur submitted by Ericsson and InterDigital, the Court's March 18, 2003 Order of vacatur was not unsealed by this Court until December 2, 2003. Nokia's motion to intervene to reinstate vacated decisions was filed on December 29, 2003. The Court finds that Nokia did not receive actual notice of the Court's March 18, 2003 Order of Vacatur until that Order became publicly available on December 2, 2003, and the Court therefore finds that this factor weighs in favor of the timeliness of Nokia's motion.

*Factor Two*

Ericsson and InterDigital do not identify any prejudice that they may suffer as a result of Nokia's failure to move to intervene for this purpose prior to December 29, 2003. Therefore, the Court finds that this factor weighs in favor of finding Nokia's motion to be timely.

*Factor Three*

Nokia's intervention to move for reinstatement of the Court's vacated rulings and orders is the only avenue for Nokia to pursue this remedy. Therefore, this factor weighs in favor of finding Nokia's motion timely. *Compare Engra, Inc. v. Gabel, 958 F.2d 643, 645 (5th Cir.1992)* (finding it significant that the would-be intervenor "could just as easily have pursued this claim in state court").

*Factor Four*

Finally, the Court finds that unusual circumstances militate in favor of finding that Nokia's motion to intervene is timely. Six of the seven vacated documents remain under seal and thus are not publicly available. The Special Master's Final Report and Recommendation on Claim Construction, although not under seal, was mistakenly treated as sealed by the Clerk of Court. (Tr. at 23). The unavailability of the vacated documents certainly interfered with Nokia's ability to analyze whether Nokia wished to intervene to seek reinstatement of the vacated determinations.

Since all four factors weigh in favor of finding Nokia's motion to intervene to be timely, the Court finds that Nokia's motion is timely.

3. Common Question of Law or Fact

Nokia seeks to intervene in order to procure the reinstatement of the Court's vacated decisions and orders. The issue of whether vacatur was proper was before the Court when the Court considered Ericsson and InterDigital's Joint Motion to Vacate. Therefore, the Court finds that Nokia's motion to reinstate shares a question of law in common with the main action.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

Page 7

### 4. Exercise of the Court's Discretion

Since the Court has found that Nokia's motion to intervene is timely and that Nokia's motion to reinstate shares a question of law in common with the main action, the Court will exercise its discretion under Rule 24(b) and determine whether to grant Nokia's motion to intervene. In exercising this discretion, "the [C]ourt shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b).

**\*8** Ericsson's and InterDigital's settlement agreement was not conditioned upon the vacatur of the Court's rulings and orders; rather, it was conditioned upon the parties' filing a joint motion of vacatur. Therefore, the Court finds that permitting Nokia to intervene to challenge the vacatur of the Court's rulings and orders would not unduly delay or prejudice the adjudication of the rights of the original parties. Therefore, the Court grants Nokia leave to intervene to challenge the Court's March 18, 2003 Order under Rule 60(b).

### D. Whether the Court's March 18, 2003 Order Withstands Scrutiny Under Rule 60(b)(1) [FN5]

> FN5. Because the Court finds that the vacated rulings should be reinstated under Rule 60(b)(1), the Court does not address Nokia's additional arguments for reinstatement under Rule 60(b)(3) and Rule 60(b)(6).

Upon timely motion, the Court may relieve a party from a final judgment, order, or proceeding under Rule 60(b)(1) for "mistake, inadvertence, surprise, or excusable neglect." Nokia argues that relief under Rule 60(b)(1) is proper because, according to Nokia, the Court's Order of vacatur reflected a mistaken application of the law because it did not properly apply _U.S. Bancorp Mortgage v. Bonner Mall Partnership,_ 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

A Rule 60(b) proceeding "calls for a delicate adjustment between the desirability of finality and the prevention of injustice." _In re Casco Chem. Co.,_ 335 F.2d 645, 651 (5th Cir.1964). "[A] court is authorized under subsection (1) to

correct a substantive 'mistake' of its own." _Meadows v. Cohen,_ 409 F.2d 750, 752 n. 4 (5th Cir.1969). Rule 60(b)(1) can be invoked to correct judicial error, but only if it is an "obvious error of law, apparent on the record." _Hill v. McDermott,_ 827 F.2d 1040, 1043 (5th Cir.1987). For example, Rule 60(b)(1) may be employed when the judicial error "conflicts with a clear statutory mandate or when the judicial error involves a fundamental misconception of the law." _Id._

Therefore, the Court will determine (1) whether the Rule 60(b)(1) motion is timely; (2) if so, what standard should apply to prejudgment vacatur in the district courts; (3) in light of the proper standard, how the Court should have ruled on the parties' joint motion to vacate; (4) in light of how the Court should have ruled, whether the Court's Order of vacatur reflected an "obvious error of law;" and (5) if so, whether the interest in the prevention of injustice outweighs the desirability of finality.

### 1. Timeliness of a Rule 60(b)(1) Motion

A Rule 60(b)(1) motion must be made "not more than one year after the judgment, order, or proceeding was entered or taken" and "within a reasonable time." Fed. R. Civ. P. 60(b). The Court's Order of vacatur was entered on March 18, 2003. Nokia's Motion to Reinstate, filed on December 29, 2003, was made nine and one-half months after the Order of vacatur was entered. The determination of whether a Rule 60(b) motion was filed within a reasonable time depends on the particular facts and circumstances of the case, including "the interest in finality, the reason for delay, and practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." _Travelers Ins. Co. v. Liljeberg Enters., Inc.,_ 38 F.3d 1404, 1410 (5th Cir.1994) (quoting _Ashford v. Steuart,_ 657 F.2d 1053, 1055 (9th Cir.1981)). Because Ericsson's and InterDigital's settlement agreement was conditioned on the filing of a joint motion to vacate rather than on the vacatur, the Court's reinstatement of the vacated rulings would not affect the finality of the settlement agreement. Further, the unavailability of the vacated documents certainly interfered with Nokia's ability to analyze whether Nokia wished to intervene and seek reinstatement of those documents. Finally, Ericsson and InterDigital have not identified any prejudice that they have

Westlaw.

suffered as a result of the timing of Nokia's Rule 60(b) motion. Therefore, the Court finds that Nokia's Rule 60(b) motion was made within a reasonable time. Because the Rule 60(b) motion was filed within a reasonable time and within a year after the Order of vacatur, the Court will consider the merits of the Rule 60(b) motion.

2. Proper Standard for Prejudgment Vacatur in the District Courts

*9 In *U.S. Bancorp Mortgage v. Bonner Mall Partnership,* the Supreme Court addressed whether appellate courts should, under 28 U.S.C. § 2106, [FN6] vacate civil judgments of subordinate courts in cases after appeal is filed or certiorari sought. *U.S. Bancorp Mortgage v. Bonner Mall P'ship,* 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). Although the specific issue before the Supreme Court involved the propriety of the Supreme Court's vacating the judgment of the Court of Appeals, the Supreme Court explicitly extended its holding to apply equally to the propriety of the Court of Appeals vacating a district court's judgment. *Id.* at 28-29. The Supreme Court held that mootness by reason of settlement does not justify vacatur of a judgment under review absent "exceptional circumstances," and those exceptional circumstances "do not include the mere fact that the settlement agreement provides for vacatur." *Id.* at 29. In reaching this conclusion, the Supreme Court noted that a party seeking vacatur must demonstrate "equitable entitlement to the extraordinary remedy of vacatur." *Id.* at 26. The Supreme Court further recognized that the public's interest must be taken into account when analyzing whether vacatur is justified: "Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur." *Id.* at 26 (quoting *Izumi,* 510 U.S. at 40 (Stevens, J., dissenting)). The Supreme Court rejected the policy argument that vacatur by reason of settlement would facilitate settlement:

    FN6. 28 U.S.C. § 2106 provides:
    "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court

lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

But while the availability of vacatur may facilitate settlement after the judgment under review has been rendered and certiorari granted (or appeal filed), it may deter settlement at an earlier stage. Some litigants, at least, may think it worthwhile to roll the dice rather than settle in the district court, or in the court of appeals, if, but only if, an unfavorable outcome can be washed away by a settlement-related vacatur. And the judicial economies achieved by settlement at the district-court level are ordinarily much more extensive than those achieved by settlement on appeal.
*Id.* at 27-28.

Finally, the Supreme Court addressed whether it is inequitable to force settling parties to acquiesce in a judgment that was not tested on appeal: "Where mootness results from settlement, however, the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur. The judgment is not unreviewable, but simply unreviewed by his own choice." *Id.* at 25.

This case differs from *Bancorp* in two primary ways. First, this case involves vacatur of a district court's rulings by a district court rather than vacatur of a subordinate court's rulings by an appellate court. Second, this case involves prejudgment vacatur of rulings rather than post-judgment vacatur of rulings. Subsequent to *Bancorp,* numerous courts have found *Bancorp* to be a useful guide in analyzing whether a district court should grant settlement-related vacatur. These cases must be divided, however, into two categories: (1) those courts, as here, applying *Bancorp* in a prejudgment motion to vacate; and (2) those courts applying *Bancorp* in a post-judgment motion to vacate. See *Aqua Marine Supply v. AIM Machining, Inc.,* 247 F.3d 1216 (Fed.Cir.2001) (post-judgment); *Valero Terrestrial Corp. v. Paige,* 211 F.3d 112 (4th Cir.2000) (post-judgment); *PolyMASC Pharm., PLC v. Alza Corp.,* No. Civ. A.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                Page 9
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

01-228-JJF, 2004 WL 633256 (D.Del. Mar.26, 2004)
(post-judgment); *Nilssen v. Motorola, Inc.,* Nos. 93-C-6333
& 96-C-5571, 2002 WL 31369410 (N.D.Ill. Oct.21, 2002)
(prejudgment); *Ryland Group, Inc. v. Travelers Indem. Co.,*
No. A-00-CA-233-JRN, 2001 WL 1200655 (W.D.Tex.
Feb.16, 2001) (Austin, M.J.) (prejudgment); *Allen-Bradley
Co., LLC v. Kollmorgen Corp.,* 199 F.R.D. 316 (E.D.Wis.
Mar.27, 2001) (Callahan, M.J.) (prejudgment); *In re Fraser,*
98 F.Supp.2d 788 (E.D.Tex.2000) (Folsom, J.)
(post-judgment). Guided by the aforementioned cases
analyzing *Bancorp* in the context of district court vacatur,
the Court will determine whether *Bancorp's* reasoning
applies to this case despite the two primary differences
between this case and *Bancorp.*

**\*10** First, in *Bancorp,* the Supreme Court characterized
vacatur as an "extraordinary remedy" to which the parties
must show equitable entitlement, and this Court finds that
the remedy of vacatur is also as extraordinary when granted
by a district court prior to the entry of judgment. *Bancorp,*
513 U.S. at 26. Prior to the entry of judgment, orders and
decisions "are subject to revision at any time before the
entry of judgment adjudicating all the claims and the rights
and liabilities of all the parties." Fed. R. Civ. P. 54(b). The
Court's conclusion that prejudgment vacatur is an
extraordinary remedy arises from the nature of the remedy
itself. Like Rule 54(b), 28 U.S.C. § 2106 does not impose
strict standards on the granting of vacatur: "The Supreme
Court or any other court of appellate jurisdiction may
affirm, modify, vacate, set aside or reverse any judgment,
decree, or order of a court lawfully brought before it for
review...." Therefore, the Supreme Court's characterization
of vacatur as an extraordinary remedy likely arose from the
nature of the remedy itself. Thus, even though this case
involves a district court's vacatur of a district court's rulings
pursuant to Rule 54(b) rather than an appellate court's
vacatur of a district court's rulings pursuant to 28 U.S.C. §
2106, the remedy of vacatur is no less extraordinary. [FN7]

> FN7. The Ninth Circuit has found that district-level
> vacatur is less extraordinary than appellate vacatur:
> "Given the fact-intensive nature of the inquiry
> required, it seems appropriate that a district court
> should enjoy greater equitable discretion when

reviewing its own judgments than do appellate
courts operating at a distance." *Am. Games v.
Trade Prods., Inc.,* 142 F.3d 1164, 1170 (9th
Cir.1998). However, this Court agrees with the
Fourth Circuit that the district court's greater
familiarity with the facts of a case should not cause
the remedy of vacatur to be considered less
extraordinary; rather, the district court's greater
familiarity should result in "a deferential standard
of review on appeal." *Valero,* 211 F.3d at 119 n. 3.

In *Bancorp,* the Supreme Court further recognized that the
public's interest must be taken into account when analyzing
whether to vacate a judgment of the Court of Appeals,
which was presumptively correct and valuable to the legal
community as a whole. *Bancorp,* 513 U.S. at 26 (quoting
*Izumi,* 510 U.S. at 40 (Stevens, J., dissenting)). This Court
must determine whether, like an appellate court's judgment,
a district court's prejudgment ruling is presumptively correct
and valuable to the legal community. When extending its
holding to encompass a Court of Appeals vacatur of a
district court's judgment, the Supreme Court explicitly
rejected the argument that district court judgments are
presumptively less valid than appellate judgments: "If the
point of the proposed distinction is that district-court
judgments, being subject to review as of right, are more
likely to be overturned and hence presumptively less valid:
We again assert the inappropriateness of disposing of cases,
whose merits are beyond judicial power to consider, on the
basis of judicial estimates of their merits." *Id.* at 28. Further,
the Supreme Court quoted Justice Stevens's *Izumi* dissent
for the proposition that judgments are presumptively correct
and valid, and *Izumi* dealt with the vacatur of district court
judgments. *Id.* at 26 (quoting *Izumi,* 510 U.S. at 40 (Stevens,
J., dissenting)). Therefore, the Court finds that district court
judgments, like appellate judgments, are presumptively
correct and valuable to the legal community. In this case,
however, the Court must take the further step to determine
whether district court prejudgment rulings are, prior to the
entry of judgment, presumptively correct and valuable. Rule
54(b)'s recognition that prejudgment rulings are "subject to
revision at any time before the entry of judgment" suggests
that prejudgment rulings, prior to the entry of judgment, do
not carry the same presumption of correctness and value as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 10
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

final judgments.

**\*11** Additionally, the Supreme Court reasoned that the *Bancorp* standard for vacatur would discourage "rolling the dice" and would encourage district-level settlement, where the judicial economies achieved by settlement are greatest. *Bancorp,* 513 U.S. at 27-28. Here, the Court must determine whether application of the *Bancorp* standard for vacatur would encourage settlement prior to the Court's entry of *Markman* and summary judgment rulings, and, if so, whether encouraging settlement at that stage achieves substantial judicial economies. As recognized by the court in *Allen-Bradley,* "just as the availability of post-judgment vacatur by an appellate court may encourage some litigants to 'roll the dice' rather than settle, so too may the availability of post-*Markman* hearing vacatur encourage the gambler within some litigants." *Allen-Bradley,* 199 F.R.D. at 318. The application of the *Bancorp* standard to prejudgment motions to vacate would encourage settlement prior to the Court's entry of *Markman* and summary judgment rulings. Further, the Court recognizes that substantial judicial economies would be achieved if parties were encouraged to settle prior to the Court's entry of *Markman* and summary judgment rulings. Therefore, the Court finds that the application of the *Bancorp* standard for vacatur would promote judicial economy by encouraging settlement prior to the Court's entry of *Markman* and summary judgment rulings.

Finally, the Supreme Court found that applying the *Bancorp* standard was not inequitable because "the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari." *Bancorp,* 513 U.S. at 25. Similarly, where, as here, the parties settle the case without conditioning that settlement on the vacatur of prior rulings in the case, it is not inequitable to refuse to vacate the rulings, even though the parties did not have the opportunity to test those rulings on appeal. The parties voluntarily forfeit their right to the ordinary processes of appeal when they agree to settle the case; and, if settlement would no longer be advantageous absent vacatur, the parties can condition their settlement agreement upon vacatur.

Much of the reasoning underlying *Bancorp* applies with equal force to the vacatur of prejudgment rulings by a

district court: vacatur is an extraordinary remedy in this context, the *Bancorp* standard would encourage settlement and achieve judicial economies, and the application of the *Bancorp* standard would not be inequitable. Although prejudgment rulings, prior to the entry of judgment, may not carry the same presumption of correctness and value as final judgments, the Court nonetheless finds that the analysis of whether to vacate prejudgment rulings, prior to the entry of judgment, should be guided by the standards enunciated in *Bancorp.*

3. Proper Ruling on the Parties' Joint Motion to Vacate

Guided by the standards enunciated in *Bancorp,* the Court should not have granted the parties' joint motion to vacate absent a finding of "exceptional circumstances." In their joint motion to vacate, the parties proffered the following reasons in support of vacatur: (1) the parties' agreement to file the joint motion to vacate was a critical issue during the settlement negotiations; (2) no novel or controversial legal issues were decided in the rulings; (3) no non-parties would be affected by the vacatur "because there is no other litigation currently pending in any other court regarding the patents and issues involved in this litigation;" (4) the public interest in the decisional law is weak because the rulings sought to be vacated are interlocutory; and (5) the parties disagree with various aspects of the rulings and wish to prevent the rulings from having future precedential effect. The Court must determine whether these proffered reasons constitute "exceptional circumstances" under *Bancorp.*

**\*12** The parties' agreement to file the joint motion to vacate is insufficient to constitute "exceptional circumstances." [FN8] *Bancorp,* 513 U.S. at 29 ("[E]xceptional circumstances do not include the mere fact that the settlement agreement provides for vacatur--which neither diminishes the voluntariness of the abandonment of review nor alters any of the policy considerations we have discussed."). While the presence of novel legal issues or pending litigation involving the same issues would weigh against the granting of vacatur, the assertion that no novel legal issues were decided and that no other litigation currently pending involves the same issues does not allege "exceptional circumstances." Further, although the Court recognized in the preceding section that prejudgment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

rulings, prior to the entry of judgment, may not carry the same presumption of correctness and value as final judgments, the Court does not find that the public interest in the prejudgment rulings is so weak as to constitute "exceptional circumstances." Finally, the parties' interest in avoiding any future precedential effect of the rulings does not constitute "exceptional circumstances." If the parties had not settled the case, they could have argued their disagreement with the rulings to the Federal Circuit. By settling the case after the entry of the rulings, the parties chose to forego this opportunity: their "voluntary forfeiture of review constitutes a failure of equity." *Bancorp,* 513 U.S. at 26. Therefore, the parties' desire to avoid the possible precedential effect of the rulings does not constitute "exceptional circumstances." *See Aqua-Marine,* 247 F.3d at 1221 (finding no exceptional circumstances despite recognizing one party's "concern that the district court's judgment of invalidity could be asserted as a defense by another alleged infringer in a future infringement suit"); *Nilssen,* 2002 WL 31369410, at *3 (noting that the party urging vacatur "fails to demonstrate why avoiding issue preclusion constitutes an exceptional, or even significant, circumstance"). In conclusion, the Court, guided by *Bancorp,* finds that it erred in granting the parties' joint motion to vacate. That motion should have been denied.

> FN8. The Court does not address whether, if the parties' settlement agreement were conditioned upon the vacatur of earlier rulings, and if the further pendency of the case in the district court would expend a massive quantity of resources, the Court's interest in conserving its own judicial resources and the parties' interest in conserving their resources could constitute "exceptional circumstances" under *Bancorp.* In this case, the parties' settlement was conditioned on the filing of the joint motion to vacate, not on the granting of the joint motion to vacate.

4. "Obvious Error of Law"

In light of the Court's determination that the Court improperly granted the parties' joint motion to vacate, the Court must analyze whether that mistake constituted an "obvious error of law, apparent on the record." *Hill,* 827

F.2d at 1043. The Court finds that the mistake constituted an obvious error of law. Prior to the Court's ruling, numerous courts had recognized that *Bancorp* should guide district-level vacatur, but this Court nonetheless granted the parties' joint motion to vacate for the primary reason that the parties had settled their dispute, without finding exceptional circumstances.

5. Balancing the Interests in the Prevention of Injustice and the Desirability of Finality

*13 The Court must determine whether to reinstate the erroneously vacated rulings, balancing "the desirability of finality and the prevention of injustice." *In re Casco Chem. Co.,* 335 F.2d at 651. Here, the erroneous vacatur has unjustly prevented Nokia from arguing before the arbitration panel that the Court's *Markman* and summary judgment rulings affect Nokia's obligations under the license agreement. Further, as recognized in the preceding section addressing the timeliness of Nokia's Rule 60(b) motion, because InterDigital and Ericsson's settlement agreement was conditioned on the filing of a joint motion to vacate rather than on the vacatur, the Court's reinstatement of the vacated rulings would not affect the finality of the settlement agreement. Therefore, the Court concludes that the interest in preventing injustice outweighs the desirability of finality.

III. CONCLUSION

The Court finds that Rule 60(b) empowers the Court to reverse the Court's March 18, 2003 Order. Although the scope of Nokia's previously-granted intervention does not allow Nokia to move for reinstatement of the vacated orders and rulings, the Court grants Nokia leave to intervene in order to move for reinstatement. Based on the intervention, the Court reconsiders the parties' joint motion to vacate and concludes that it failed to follow the guidance of *Bancorp* and improperly granted the motion. Because the Court's error constituted an "obvious error of law, apparent on the record," and because the interest in preventing injustice outweighs the desirability of finality, the Court hereby reinstates the following rulings pursuant to Rule 60(b)(1):
• Special Master's Final Report and Recommendation on Claim Construction, entered on September 8, 2000

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 12
2004 WL 1636924 (N.D.Tex.)
**(Cite as: 2004 WL 1636924 (N.D.Tex.))**

• Findings, Conclusions, and Recommendations of the United States Magistrate Judge, entered on May 21, 2001
• Order [on Claim Construction], entered on July 16, 2001
• Agreed Order [on Claim Construction], entered on July 24, 2001
• Memorandum Opinion and Order Granting Ericsson's Motion for Summary Judgment of Non-Infringement Based on the Single Base Station Limitation, entered on May 21, 2002
• Order Dismissing Declaratory Judgment Action Regarding Non-Infringed Claims, entered on January 9, 2003

SO ORDERED.

2004 WL 1636924 (N.D.Tex.)

**Motions, Pleadings and Filings (Back to top)**

• 3:93CV01809 (Docket) (Sep. 09, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT S

LEXSEE 1998 U.S. DIST. LEXIS 3921

**HANS–JURGEN LAUBE AND OXIDWERK HJL AG, Plaintiffs, v. KM EUROPA METAL AG, Defendant.**

**96 Civ. 8147 (PKL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 3921; 47 U.S.P.Q.2D (BNA) 1058*

**March 27, 1998, Decided**
**March 27, 1998, Filed**

**DISPOSITION:** [*1] Defendant's motion pursuant to *Fed. R. Civ. P. 12(b)(6)* for judgment on pleadings GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs filed a suit against defendant alleging that defendant violated § 43(a)(1) of the Lanham Act, *15 U.S.C.S. § 1125*(a)(1)(A). Defendant filed a motion for judgment on the pleadings pursuant to *Fed. R. Civ. P. 12(b)(6)*.

**OVERVIEW:** Plaintiffs developed an industrial process for forming an oxidation patina on copper sheets. Plaintiffs disclosed confidential information about the process to defendant pursuant to the parties' agreement giving defendant the exclusive right to sell plaintiffs' products. Defendant then successfully submitted a patent application in the United States for plaintiffs' process. Plaintiffs alleged that defendant violated § 43(a) of the Lanham Act by falsely naming one of its employees as the inventor of plaintiffs' process and by falsely claiming ownership of the invention embodied in the patent. The court dismissed plaintiffs' Lanham Act claim. The court held that under the federal law of unfair competition, § 43(a)(1) of the Lanham Act imposed civil liability upon any person who, in connection with any goods, used in commerce any false designation of origin which was likely to cause confusion. The court held that plaintiffs could prove no set of facts that would entitle them to relief because neither a patent nor a process for creating a product were "goods" for purposes of the Lanham Act.

**OUTCOME:** The court granted defendant's motion for judgment on pleadings.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] When deciding a defendant's motion for judgment on the pleadings pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court may grant the motion only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. In considering the defendant's motion, the court must accept as true the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor.

*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Infringement Actions > Burdens of Proof*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Causes of Actions*
[HN2] Under the federal law of unfair competition, § 43(a)(1) of the Lanham Act imposes civil liability upon any person who, in connection with any goods, uses in commerce any false designation of origin which is likely to cause confusion. *15 U.S.C.S. § 1125*(a)(1)(A). The statute provides a remedy to a party injured by a competitor's false designation of origin of its product regardless of whether the party has secured a federally registered trademark. To prevail in an action under § 43(a)(1) of the Act, plaintiffs must demonstrate that its trade mark or trade dress is distinctive and that there exists a likelihood of confusion between its product and the alleged infringer's product. Patents are not goods in commerce under § 43(a).

**COUNSEL:** For HANS–JURGEN LAUBE, OXIDWERK HJL AG, plaintiffs: Michael J. Sweedler, Amy J. Benjamin, Peter C. Schechter, Darby & Darby P.C., New York, NY.

Case 1:05-cv-00016-JJF   Document 15-13   Filed 04/28/2005   Page 41 of 42

Page 2

1998 U.S. Dist. LEXIS 3921, *1; 47 U.S.P.Q.2D (BNA) 1058

For KM EUROPA METAL AG, defendant: Richard L. Mayer, Kenyon & Kenyon, New York, NY.

**JUDGES:** Peter K. Leisure, U.S.D.J.

**OPINIONBY:** Peter K. Leisure

**OPINION:**

### MEMORANDUM ORDER

**LEISURE, District Judge:**

Plaintiffs Hans-Jurgen Laube ("Laube") and Oxidwerk HJL AG ("Oxidwerk") claim that defendant KM Europa Metal AG ("Europa") has acted to cause confusion, mistake, or deception among purchasers and potential purchasers of patinated copper as to the origin of the process by which such copper is patinated and as to the ownership of the intellectual property embodied in U.S. Patent No. *5,376,190* (the "*'190* Patent"), which discloses the patination process. Defendant moves pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* for judgment on the pleadings. For the reasons stated below, defendant's motion is granted.

### BACKGROUND

Plaintiff Laube is the owner of Oxidwerk, a Swiss corporation, and is the developer of an industrial process for forming an oxidation patina on copper sheets (the "Laube Process"). In 1989, plaintiffs agreed to a contract granting Europa the exclusive right to sell copper products treated by the Laube Process in a territory that included [*2] the Federal Republic of Germany, Austria, Luxembourg, Belgium, the Netherlands, Great Britain, Spain, and Portugal. Plaintiffs maintained the Laube Process as a trade secret but delivered technical information on the Laube Process to a trustee pursuant to the contract with defendant; the parties agreed to maintain the confidentiality of the information.

Under a new agreement in 1992, plaintiffs transferred more detailed information on the Laube Process to defendant and also trained defendant's employees on the Laube Process. The terms of this agreement expanded defendant's contract territory in Europe and Africa, but did not include the United States. Later in 1992, defendant filed a patent application in the United States Patent and Trademark Office for the Laube Process; the *'190* Patent issued from this application in 1994. Plaintiffs learned of the *'190* Patent from Revere Copper Products, Inc., which had contracted for the exclusive right to sell products made by application of the Laube Process in all countries of North and South America, and filed the Complaint in this action in 1996.

In February of 1997, defendant moved pursuant to *Fed. R. Civ. P. 12(b)(6)* to dismiss Counts [*3] I and II of the Complaint and moved pursuant to Title *28, United States Code ("U.S.C."), Section 1367*(c)(3) to dismiss Counts III–V. The Court held in abeyance further proceedings on defendant's motion to dismiss Count I, which seeks correction of the inventorship of the *'190* Patent under *35 U.S.C. § 256,* pending the Federal Circuit's decision in *Stark v. Advanced Magnetics, Inc., 119 F.3d 1551 (Fed. Cir. 1997).* In *Stark,* the Federal Circuit held that § 256 permits correction of inventorship where, as in the instant case, it is alleged that the misnaming of the wrong inventor was done fraudulently. See *119 F.3d at 1555.* As the Federal Circuit nullified the basis of defendant's motion to dismiss Count I by overturning several district courts' interpretation of § 256, defendant withdrew its motion as to Count I. Since defendant's motion to dismiss Counts III–V was based on the lack of a cognizable claim in Count I, defendant also withdrew its motion to dismiss Counts III–V. Therefore, the defendant's motion to dismiss Count II is all that remains.

### DISCUSSION

#### I. Standard for Judgment on the Pleadings

[HN1] When deciding a defendant's motion for judgment [*4] on the pleadings pursuant to *Fed. R. Civ. P. 12(b)(6),* a court may grant the motion "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 44 (2d Cir. 1997)* (internal quotation omitted). In considering the defendant's motion, the court "must accept as true the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id. at 43.*

#### II. False Designation of Origin

[HN2] Under the federal law of unfair competition, Section 43(a)(1) of the Lanham Act imposes civil liability upon "[any] person who, . . . in connection with any goods . . ., uses in commerce . . . any false designation of origin . . . which is likely to cause confusion." *15 U.S.C. § 1125*(a)(1)(A) (1997). The statute provides a remedy to a party injured by a competitor's false designation of origin of its product regardless of whether the party has secured a federally registered trademark. See *Forschner Group, Inc. v. Arrow Trading Co., Inc., 124 F.3d 402, 407 (2d Cir. 1997).* To prevail in an action under this Section, plaintiffs must [*5] demonstrate that its trade mark or trade dress is distinctive and that there exists a likelihood of confusion between its product and the alleged infringer's product. See id. For the purposes of deciding defendant's motion, the Court assesses whether plaintiff

1998 U.S. Dist. LEXIS 3921, *5; 47 U.S.P.Q.2D (BNA) 1058

could prove any set of facts to satisfy these requirements with respect to the disputed patent. n1

n1 Plaintiffs do not state a claim for the false designation of the origin of patinated copper products (as opposed to the process for patinating copper) and do not allege that defendant sold copper treated by the Laube Process in the United States. See *Tubeco, Inc. v. Crippen Pipe Fabrication Corp., 402 F. Supp. 838, 848 (E.D.N.Y. 1975)*, aff'd, *538 F.2d 314 (2d Cir. 1976)* (a cause of action under the Lanham Act for false designation of origin of goods created through a patented process is predicated upon the sale of such goods in interstate commerce); see also *Buti v. Perosa, S.R.L., 139 F.3d 98, 1998 U.S. App. LEXIS 2875, 1998 WL 107690, at *5 (2d Cir. 1998)* (a foreign citizen's product not traded in the United States, and hence not subject to the constitutional regulatory authority of Congress, is not "used in commerce" for purposes of the Lanham Act). Accordingly, the Court restricts its inquiry to the false designation of the origin of the Laube Process.

[*6]

### III. The *'190* Patent

Plaintiffs allege that defendant violated § 43(a) of the Lanham Act by falsely naming a third party Europa employee as the inventor of the Laube Process and by falsely claiming ownership of the invention embodied in the *'190* Patent. See Amended Complaint at PP 39, 40. Plaintiff cites *Repap Enters. Inc. v. Kamyr Inc., No. 92–5701, 1993 U.S. Dist. LEXIS 19524 (E.D. Pa. June 8, 1993)*, to support the proposition that intellectual property is a "good" for the purposes of § 43(a). The Court rejects this reasoning since the United States Court of Appeals for the Federal Circuit, which would hear any appeal in the instant case, has stated unequivocally that patents are not goods in commerce under § 43(a). See *Pro–Mold*

*and Tool Company, Inc. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1574, 1575 (Fed. Cir. 1996)* (because "a question concerning whether alleged inequitable conduct in the prosecution of a patent application constitutes unfair competition clearly does impact our exclusive jurisdiction," the Federal Circuit "[does] not defer to the regional circuit law on this issue"; "there is no legal basis for a holding that inequitable conduct, [*7] or the assertion of a patent procured through inequitable conduct, constitutes unfair competition [in violation of Section 43(a) of the Lanham Act]."); see also *Tubeco, Inc., 402 F. Supp. at 848* (neither a patent nor a process for creating a product constitute "goods" under Section 43(a) of the Lanham Act). As a patent is not a "good" for purposes of the Lanham Act, the alleged conduct of defendant does not violate the statute. Plaintiffs can prove no set of facts that would entitle them to relief as to Count II of the Complaint; thus, the Court dismisses Count II. n2

n2 As the Court determines, *supra*, that neither a patent nor a process for creating a product are "goods" for purposes of the Lanham Act, the Court need not decide the questions of distinctiveness and likelihood of confusion.

### CONCLUSION

For the reasons stated above, defendant's motion pursuant to *Fed. R. Civ. P. 12(b)(6)* for judgment on the pleadings is HEREBY GRANTED. The parties are directed to appear for a pre–trial conference [*8] in Courtroom 18B at 500 Pearl Street on May 8, 1998, at 11:30 a.m.

### SO ORDERED.

New York, New York
March 27, 1998

Peter K. Leisure

U.S.D.J.