IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NOKIA CORPORATION and NOKIA, INC.<br><br>Plaintiffs,<br><br>v.<br><br>INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION<br><br>Defendants. | C.A. No. 05-16-JJF |

**DECLARATION OF ILKKA RAHNASTO**

Pursuant to 28 U.S.C. § 1746, I, Ilkka Rahanasto, declare and say as follows:

1. My name is Ilkka Rahnasto. I am an attorney, and I presently hold the title Vice President of Intellectual Property Rights ("IPR") for Nokia Corporation ("Nokia") in Espoo, Finland.

2. In that capacity, I am responsible for overseeing the protection and licensing of Nokia's intellectual property and the licensing, on Nokia's behalf, of the intellectual property of third parties. I joined Nokia in 1997 after practicing with a law firm in Helsinki.

3. I make this declaration in support of Nokia's Opposition to Defendants' Motion To Dismiss Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12(B)(6) and 12(H)(3). Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration.

1

**InterDigital's Early 2G Patent Infringement Threats**

4.  I have been a principal negotiator for Nokia in its dealings with InterDigital during my tenure at Nokia. In connection with that role, I learned the history of Nokia's relationship with InterDigital. Nokia's history with InterDigital (previously IMM) dates back to the late 1980s. During the 1990s, InterDigital made persistent but unsupported claims that it owned patents that were essential to the practice of so-called Second Generation ("2G") wireless telephony standards. But, in its discussions with Nokia, the true scope and value of InterDigital's patent portfolio were not InterDigital's primary bargaining chip. Instead, InterDigital focused its discussions on the U.S. legal system, where InterDigital felt it faced little – but Nokia faced enormous – risk and cost.

5.  InterDigital repeatedly boasted that it had hired attorneys to pursue infringement claims in the U.S. on a contingent-fee basis. It even issued a press release to this effect, which it faxed directly to Nokia's in-house lawyers in 1993. Through these fee arrangements and certain insurance policies, InterDigital threatened that it could pursue protracted infringement litigation in the United States at virtually no cost to itself.

6.  InterDigital emphasized that, unlike many other holders of wireless-technology patents, it did not make or sell any products whatsoever. Therefore, it was immune from the counterclaims that might make patent holders who were also manufacturers (like Ericsson and Motorola) reluctant to file suit.

7.  InterDigital was not just bluffing about its willingness to embrace litigation. It filed suit against Qualcomm in 1993 and later sued Motorola and Ericsson for patent infringement. The lawsuit with Ericsson was still pending in the late 1990s, when Inter-Digital again began to threaten Nokia with patent infringement.

8. Although InterDigital had lost against Motorola, InterDigital had nevertheless pursued litigation in the U.S. as it had threatened to do. For example, Nokia knew that InterDigital had added new claims to the litigation with Ericsson to help keep the lawsuit going for almost ten years.

9. In the license negotiations with Nokia, InterDigital made demands for astronomical royalty rates for a license to its 2G patent portfolio (between 5% and 8%). It justified these rates not by reference to the strength and value of its worldwide portfolio, but by reference to what it claimed was the unpredictable and dangerous nature of U.S. juries, which, according to InterDigital, could conceivably award rates of this magnitude for U.S. sales.

10. InterDigital made clear to Nokia that InterDigital was run by lawyers and that its business would be litigation. Both InterDigital's business model and the background of its leadership suggested that the company would not be dissuaded from litigation by the considerations that normally influence corporate managers.

11. Thus, when InterDigital came to Nokia in the late 1990s, it was clear that InterDigital had followed through on its promise to engage in U.S. litigation at what must have been great cost to its adversaries. Yet, it had not obtained any positive, definitive rulings as to the scope and validity of its portfolio. It had only suffered setbacks as evidenced by its loss to Motorola and the tactics it had taken to maintain its suit against Ericsson.

**The Agreement Between InterDigital And Nokia**

12. Nokia was willing to discuss the possibility of a license that measured the true value of InterDigital's patent portfolio. But, from Nokia's perspective at the time, the

3

license negotiations could only succeed if the threat of U.S. litigation was removed and the negotiations were properly focused on the global value (measured by scope, strength and validity) of InterDigital's patents.

13.   By 1998 it was also clear that the second generation digital wireless standards would inevitably be replaced by a third generation ("3G") standard. Which 3G technology that would emerge as the dominant standard was not as clear, and there were numerous technology candidates. Nokia was pursuing research and development of 3G technologies. But, while Nokia's substantial R&D capabilities are world class, it did not have the engineering resources to investigate and develop each permutation of every technology that, if adopted, might become a prevalent 3G technology. Thus, between 1996 and 1998, Nokia became interested in working to develop potential 3G technologies with other companies, including perhaps InterDigital.

14.   Nokia and InterDigital successfully negotiated a patent license agreement in 1999. Nokia's approach to these discussions was framed and influenced by its previous interactions with InterDigital and by the state of the wireless marketplace at that time.

15.   In early 1998, Nokia expressed its interest in working with InterDigital for 3G research and development, but it was necessary to resolve InterDigital's persistent demands that Nokia license its existing 2G TDMA patents. Direct licensing talks had not been productive in 1997 because of InterDigital's threatening and unreasonable approach.

16.   Serious discussions over the possibility of a 3G-technology-development alliance began in earnest in July of 1998. By this time, the mutual interest of Nokia and InterDigital in developing TDD – one of the technologies thought to have 3G potential – had matured to the point of detailed discussion. As a result, the mutual interest in resolv-

4

ing the outstanding licensing issue had also ripened. From July of 1998 forward, Heikki Huttunen (at the time a Vice President of Nokia Mobile Phones, responsible for patent licensing) and I handled the patent licensing negotiations with InterDigital on behalf of Nokia. We negotiated primarily with Mr. William Merritt and Mr. Howard Goldberg at InterDigital.

17.     When the licensing negotiations began in July of 1998, we were keenly aware of InterDigital's history of litigation, as well as its inclination to use the threat of what it characterized as the unpredictable U.S. jury system as both a negotiating hammer and a measuring stick for the value of its patents. Indeed, when the negotiations began, Inter-Digital proposed royalty rates much higher than Nokia was paying generally to other owners of essential wireless-technology patents. Nokia was unwilling to pay these sums for rights to patents of doubtful validity and scope.

18.     Nokia ultimately agreed to take a license to InterDigital's patent portfolio that covers 2G and 3G products, largely to clear the way for the TDD partnership and to end InterDigital's brandishing of the U.S. jury system as a weapon with respect to Nokia's 2G products. That license expires on December 31, 2006.

19.     As part of the compromise that supported the patent license agreement with InterDigital, Nokia agreed to pay an initial lump sum for licensing InterDigital's patents through the end of 2001 (Period 1). That lump sum was approximately half the amount that Nokia agreed to pay InterDigital for the TDD partnership. Under the license, Nokia would pay additional royalties after 2001 (Period 2), but only if InterDigital succeeded in licensing a "Major Competitor," as that term was defined in the agreement. Nokia agreed that, if InterDigital executed a qualifying license, the parties would negotiate in good

faith to determine how to adjust the Major Competitor's rate to determine an appropriate royalty rate for Nokia.

20. In March 2003, InterDigital contacted Nokia, claiming to have obtained a qualifying Major Competitor license regarding 2G products: the license agreements with Ericsson and Sony-Ericsson that settled InterDigital's patent infringement lawsuit against Ericsson.

21. InterDigital told Nokia of the settlement of the lawsuit with Ericsson when InterDigital informed Nokia on less than 24 hours notice that InterDigital was issuing a press release on the subject. The press release was a great surprise to Nokia, because it announced specific dollar amounts that InterDigital claimed Nokia would have to pay as a result of the settlement. The patent license agreement required Nokia and InterDigital to negotiate in good faith if a Major Competitor was licensed, and those negotiations should have included, among other things, a wide-ranging "all relevant factors" analysis that could (and should) change the numbers materially. At no point in our subsequent discussions did any of InterDigital's management deviate from the position staked out in their public statements, and no meaningful negotiations occurred.

22. During these discussions, InterDigital demanded that Nokia pay five to seven times the amount of the Ericsson and Sony-Ericsson royalty payments.

23. InterDigital refused to provide to Nokia information and documents that Nokia believed were required to evaluate InterDigital's demands, such as the critical documents that defined the scope of InterDigital's patents in the Ericsson case. Nokia was entitled to these documents under the patent license agreement. Nokia could not obtain these documents from alternate sources because InterDigital had convinced the court

to seal the record from its dispute with Ericsson. Nokia ultimately filed an arbitration claim with the International Chamber of Commerce based on InterDigital's bad faith and failures to abide by its contractual obligations, including its refusal to provide Nokia with the requested information.

24.   InterDigital escalated the arbitration proceeding and filed a counterclaim seeking hundreds of millions of dollars from Nokia. That dispute is presently before an ICC arbitration Tribunal. The parties conducted a two-week evidentiary proceeding in January 2005 and are currently awaiting the Tribunal's ruling.

**InterDigital's 3G Patent Infringement Threats**

25.   Nokia's 3G products are included in the patent license agreement that is currently in effect between InterDigital and Nokia and that is the subject of the arbitration over Period 2 royalties for 2G products. No period 2 royalties have been claimed or paid for 3G products under that agreement.

26.   Since Nokia entered into a patent license agreement with InterDigital in 1999, InterDigital has approached Nokia repeatedly in relation to Nokia's 3G products in an attempt to coerce Nokia into paying additional money for an extended license covering Nokia's 3G products.

27.   As part of the discussions on whether to extend the 3G license, InterDigital presented Nokia with infringement contentions identifying how all 3G-compliant products, including Nokia's, infringe certain InterDigital patents. The patents that InterDigital has identified to Nokia include the patents that form the basis of this lawsuit.

28.   As it did with 2G products, InterDigital is demanding exorbitant license fees from Nokia for an extended 3G license.

7

29. InterDigital's unwillingness to compromise and its continued unreasonable license fee demands have made the negotiations between the parties on extending the 3G license unsuccessful. There are no current license negotiations and there are no plans to conduct any further negotiations.

30. In addition to its private assertions against Nokia, InterDigital is also publicly representing that its patents cover 3G mobile systems that are currently being developed and implemented in the United States, including so-called WCDMA and CDMA2000 products.

31. In 2004, InterDigital also began a 3G litigation campaign similar to the campaign it began in the early 1990's with respect to 2G products. In March 2004, through its affiliate, Tantivy Communications, Inc., InterDigital filed a lawsuit against Lucent Technologies, Inc., alleging infringement of seven 3G-related patents by Lucent's design and sales of CDMA2000 infrastructure products.

32. Nokia does not sell any CDMA2000 infrastructure products, but it does sell WCDMA infrastructure and handsets and CDMA2000 handsets. These products are threatened with infringement claims by InterDigital's publicly-proclaimed 3G pronouncements and litigation campaign.

33. InterDigital has used the Lucent litigation in its 3G licensing negotiations with Nokia as a threat just as it used its pending 2G litigation in the late 1990's in attempting to obtain a 2G license with Nokia.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 28 day of April, 2005.

_____
ILKKA RAHNASTO

<u>CERTIFICATE OF SERVICE</u>

I, Jack B. Blumenfeld, hereby certify that on April 28, 2005 I electronically filed Declaration of Ilkka Rahnasto with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

>Richard L. Horwitz
>Potter Andersoon & Corroon LLP
>rhorwitz@potteranderson.com

I also certify that copies were caused to be served on April 28, 2005 upon the following in the manner indicated:

>  <u>BY HAND</u>
>
>Richard L. Horwitz
>Potter Anderson & Corroon LLP
>1313 N. Market Street
>Wilmington, DE  19801
>
>  <u>BY FEDERAL EXPRESS</u>
>
>D. Dudley Oldham
>Fulbright & Jaworski
>1301 McKinney
>Suite 5100
>Houston, TX  77010

>                    /s/    Jack B. Blumenfeld (#1014)
>                    Morris, Nichols, Arsht & Tunnell
>                    1201 N. Market Street
>                    P.O. Box 1347
>                    Wilmington, DE  19899
>                    (302) 658-9200
>                    jblumenfeld@mnat.com