## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and )
NOKIA, INC., )
                      )
         Plaintiffs, )
                      )    C. A. No. 05-16-JJF
      v. )
                      )
INTERDIGITAL COMMUNICATIONS )    **JURY TRIAL DEMANDED**
CORPORATION and INTERDIGITAL )
TECHNOLOGY CORPORATION, )
                      )
         Defendants. )

## NOTICE OF SUBPOENA AD TESTIFICANDUM AND DUCES TECUM

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil

Procedure, Defendants Interdigital Communications Corporation and Interdigital Technology

Corporation have served the attached subpoena on CT Corporation Systems, Inc., Fairfield

Resources International, Inc., 1021 Main Street, Suite 1150, Houston, Texas 77002.

OF COUNSEL:

D. Dudley Oldham
Linda L. Addison
Richard S. Zembek
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Tel: (713) 651-5151

Dan D. Davison
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Tel: (214) 855-8000

Dated: November 7, 2006
760612/ 28840

POTTER ANDERSON & CORROON LLP

By:   */s/ David E. Moore*
       Richard L. Horwitz (#2246)
       David E. Moore (#3983)
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       Wilmington, Delaware 19801
       Tel: (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore@potteranderson.com

*Attorneys for Defendants,*
*Interdigital Communications*
*Corporation And Interdigital*
*Technology Corporation*

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

SOUTHERN ————————— DISTRICT OF ————— TEXAS

Nokia Corporation and Nokia, Inc.

V.

InterDigital Communications Corporation and
InterDigital Technology Corporation

## SUBPOENA IN A CIVIL CASE

CASE NUMBER:[1] 05-16-JJF
District of Delaware

TO:     CT Corporation Systems, Inc.
        FAIRFIELD RESOURCES INTERNATIONAL, INC
        1021 Main Street, Suite 1150
        Houston, Texas 77002

☐ **YOU ARE COMMANDED** to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |

X  **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  Please see attached Notice of Deposition and Subpoena Duces Tecum and Attachment A thereto

| PLACE: Offices of Fulbright & Jaworski, L.L.P., 1301 McKinney, Suite 5100, Houston, Texas 77010 | DATE AND TIME NOVEMBER 21, 2006 AT 9:00 A.M. |
|---|---|

X  **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  Please see attached Notice of Deposition and Subpoena Duces Tecum and Attachment B thereto

| PLACE: Offices of Fulbright & Jaworski, L.L.P., 1301 McKinney, Suite 5100, Houston, Texas 77010 | DATE AND TIME NOVEMBER 17, 2006 AT 9:00 A.M. |
|---|---|

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* | 11/3/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Daniel Leventhal, Fulbright & Jaworski, L.L.P., 1301 McKinney, Suite 5100, Houston, Texas 77010
Phone No.: (713) 651-8360

Attorney for Defendant InterDigital Communications Corporation and InterDigital Technology Corporation

(SEE RULE 45, FEDERAL RULES OF CIVIL PROCEDURE, PARTS C & D ON REVERSE)

---

[1] If action is pending in district other than district of issuance, state district under case number

25712969 1

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 11-3-06  1:15pm | 1021 Main, ste 1150 Houston, Tx 77002 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| CT Corporation Systems, Inc. c/o Susan Thompson Corporate Service | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Kimberly Walleck | Process Server |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct

Executed on ___11-3-06___
                DATE

SIGNATURE OF SERVER  Kimberly Walleck

P.O. Box 3796
ADDRESS OF SERVER

Houston, Tx 77253-3796

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(I) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable        the        demanding        party        to        contest        the        claim

25712969 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA INC., | § § § | |
| Plaintiffs, | § § | C.A. No. 05-16-JJF |
| v. | § § | |
| INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION, | § § § § § | |
| Defendants. | § § | |

**DEFENDANTS' 30(b)(6) NOTICE DEPOSITION OF
FAIRFIELD RESOURCES INTERNATIONAL, INC.,
AND SUBPOENA DUCES TECUM**

TO:   Fairfield Resources International, Inc., by and through its registered agent, CT Corporation Systems, Inc., 1021 Main Street, Suite 1150, Houston, Texas 77002.

**PLEASE TAKE NOTICE** that the oral deposition of one or more corporate representatives of Fairfield Resources International, Inc. ("Fairfield"), designated pursuant to FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6), will be taken by stenographic and videographic means on November 21, 2006, beginning at 9:00 a.m., central time, at the offices of Fulbright & Jaworski L.L.P., Fulbright Tower, 1301 McKinney, Suite 5100, Houston, Texas, to testify on matters listed on Attachment A. The deposition will continue from day to day if the deposition is not completed on November 21, 2006. The deposition will be taken by an officer who is authorized by law to take depositions and by audio-video recording device. It may be attended by a corporate representative of InterDigital Communications Corporation and/or InterDigital Technology Corporation (collectively "InterDigital").

25713136.1                        - 1 -

No later than November 17, 2006, Fairfield is requested to produce to the undersigned counsel a list of proposed witnesses for each topic identified in Attachment A and to produce any documents which are in Fairfield's (and/or the designated person's or persons') possession, custody or control referring to the categories of documents set forth in Attachment B.

In addition, Fairfield is requested to produce and permit the inspection and copying at the deposition of all documents and things reviewed or relied upon by the witness in preparation for the deposition and not previously produced.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

FULBRIGHT & JAWORSKI L.L.P.
D. Dudley Oldham
Linda L. Addison
Richard S. Zembek
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Tel:  (713) 651-5151
Fax:  (713) 651-5246
doldham@fulbright.com
rharrell@fulbright.com
rzembek@fulbright.com

FULBRIGHT & JAWORSKI L.L.P.
Dan D. Davison
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Tel:  (214) 855-8000
Fax:  (214) 855-8200
ddavison@fulbright.com

By _David E. Moore_ *by permission*
*DSL*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, Delaware 19801
Tel:   (302) 984-6000
Fax::  (302) 658-1192
rhorwitz@potteranderson.com
dmoore@potteranderson.com

**Attorneys for Defendants, INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION**

## ATTACHMENT A

## DEFINITIONS OF TERMS AND INSTRUCTIONS

1.    **"Fairfield"** shall mean Fairfield Resources International, Inc., and its agents, employees, and consultants.

2.    **"Study"** shall mean any and all efforts related to the preparation, research, and analysis reflected in Exhibits 1 and 2, including any drafts thereof.

3.    **"Panelist"** shall mean any individual selected to perform and/or actually performing analysis of patent claims in conjunction with the Study.

4.    **"Authors"** shall mean David J. Goodman, Robert A. Myers, and any other unnamed individual(s) responsible for authoring the materials included as Exhibits 1 and 2.

5.    **"Document"** and **"documents"** shall have the broadest meaning accorded by Rule 34(a) of the FEDERAL RULES OF CIVIL PROCEDURE and shall include, without limitation, all of the matters defined in Rule 1001 of the FEDERAL RULES OF EVIDENCE, correspondence (as defined below), memoranda, stenographic or handwritten notes, drafts, studies, publications, invoices, ledgers, journals, books, records, accounts, pamphlets, voice recordings, photographs, reports, surveys, statistical compilations, work papers, data processing cards, computer tapes or printouts, microfiche or microfilm, and writings of every other kind and character, whether originals or reproductions. The terms "document" and "documents" also include every copy where such copy is not an identical reproduction of the original or where such copy contains any commentary, marginal comment, or notation whatsoever that does not appear in the original. The terms "document" and "documents" also mean any printed, typewritten, or handwritten matter of reproduction thereof of whatever character, or means or electronic storage of information, such as e-mail, that is within Nokia's possession, control, or custody. The terms "document" and "documents" also include all drafts. Without limitation of the term "control," a document is deemed to be with Nokia's control if Nokia has ownership, possession, or custody of the document or a copy thereof, or the right to secure the document or a copy thereof, from any other person or public or private entity having physical possession thereof,. If any document requested herein was, but is no longer, subjected to Nokia's control, please state what disposition was made of it, and the date or dates, or the approximate date or dates, of such disposition.

6.    **"Reflecting," "referring,"** and **"relating"** shall be used in the broadest sense and shall mean and include without limitation "referring to," "mentioning," "discussing," "containing," or "setting forth" and refers to every document or other form of information that in any way explicitly or implicitly refers to, or reasonably could be construed to refer to, the subject mater of the document requested or inquired about, or which in fact refers to its subject matter through such reference is only determinable with reference to some extrinsic information, program, or code. In the latter case, the document request or inquiry shall be read to include whatever extrinsic information, program, or code is useful or necessary to render intelligible the relationship and meaning of the document or other form of information with respect to the subject matter thereof, including, but not limited to, codes for identifying the person, organizations, and transactions described in the document request or inquiry.

7.    **"Nokia"** shall mean Nokia Corporation and Nokia Inc. and any of their officers, directors, employees, agents, and persons acting on behalf of each and predecessor or successor entities.

## TOPICS ON WHICH EXAMINATION IS REQUESTED

1.    The Study.

2.    Exhibit 1: David J. Goodman and Robert A. Myers, *3G Cellular Standards and Patents*, IEEE WirelessCom 2005.

3.    Exhibit 2: David J. Goodman and Robert A. Myers, *Analysis of Intellectual Property for Third Generation Cellular Technology*, IEEE InfoCom 2005.

4.    Documents produced in response to Attachment B.

5.    The design of the Study, including, without limitation, instructions from the Authors, selection of patents for the Study, and selection of Panelists for the Study.

6.    The performance of the Study, including, without limitation, instructions to the Panelists, questions from the Panelists, and responses to questions from the Panelists, determination of the technical area of each patent, assignment of each patent to a Panelist.

7.    The results of the Study, including, without limitation, any determination made by the Panelists as to each patent in the Study and any analysis performed on the results.

8.    The identity of each InterDigital patent determined to be essential and each Nokia patent determined to be nonessential.

9.    The meaning of the terms "Essential" and "Essentiality" as understood by Fairfield, the Authors, the Panelists, and generally within the cellular industry.

10.    Communications with any third party reflecting, referring to, or relating to the Study, Exhbit 1, and/or Exhibit 2.

11.    Communications with the Authors reflecting, referring to, or relating to the Study, Exhbit 1, and/or Exhibit 2.

12.    Fairfield's relationship with the Authors.

13.    Fairfield's relationship with Nokia.

**ATTACHMENT B**

**DEFINITIONS OF TERMS AND INSTRUCTIONS**

1.    **"Fairfield"** shall mean Fairfield Resources International, Inc., and its agents, employees, and consultants.

2.    **"Study"** shall mean any and all efforts related to the preparation, research, and analysis reflected in Exhibits 1 and 2, including any drafts thereof.

3.    **"Panelist"** shall mean any individual selected to perform and/or actually performing analysis of patent claims in conjunction with the Study.

4.    **"Authors"** shall mean David J. Goodman, Robert A. Myers, and any other unnamed individual(s) responsible for authoring the materials included as Exhibits 1 and 2.

5.    **"Document"** and **"documents"** shall have the broadest meaning accorded by Rule 34(a) of the FEDERAL RULES OF CIVIL PROCEDURE and shall include, without limitation, all of the matters defined in Rule 1001 of the FEDERAL RULES OF EVIDENCE, correspondence (as defined below), memoranda, stenographic or handwritten notes, drafts, studies, publications, invoices, ledgers, journals, books, records, accounts, pamphlets, voice recordings, photographs, reports, surveys, statistical compilations, work papers, data processing cards, computer tapes or printouts, microfiche or microfilm, and writings of every other kind and character, whether originals or reproductions. The terms "document" and "documents" also include every copy where such copy is not an identical reproduction of the original or where such copy contains any commentary, marginal comment, or notation whatsoever that does not appear in the original. The terms "document" and "documents" also mean any printed, typewritten, or handwritten matter of reproduction thereof of whatever character, or means or electronic storage of information, such as e-mail, that is within Nokia's possession, control, or custody. The terms "document" and "documents" also include all drafts. Without limitation of the term "control," a document is deemed to be with Nokia's control if Nokia has ownership, possession, or custody of the document or a copy thereof, or the right to secure the document or a copy thereof, from any other person or public or private entity having physical possession thereof,. If any document requested herein was, but is no longer, subjected to Nokia's control, please state what disposition was made of it, and the date or dates, or the approximate date or dates, of such disposition.

6.    **"Reflecting," "referring,"** and **"relating"** shall be used in the broadest sense and shall mean and include without limitation "referring to," "mentioning," "discussing," "containing," or "setting forth" and refers to every document or other form of information that in any way explicitly or implicitly refers to, or reasonably could be construed to refer to, the subject mater of the document requested or inquired about, or which in fact refers to its subject matter through such reference is only determinable with reference to some extrinsic information, program, or code. In the latter case, the document request or inquiry shall be read to include whatever extrinsic information, program, or code is useful or necessary to render intelligible the relationship and meaning of the document or other form of information with respect to the subject matter thereof, including, but not limited to, codes for identifying the person, organizations, and transactions described in the document request or inquiry.

"**Nokia**" shall mean Nokia Corporation and Nokia Inc. and any of their officers, directors, employees, agents, and persons acting on behalf of each and predecessor or successor entities.

"**InterDigital**" shall mean InterDigital Communications Corporation and InterDigital Technology Corporation and any of their officers, directors, employees, agents, and persons acting on behalf of each and predecessor or successor entities.

## CATEGORIES OF DOCUMENTS

1.   All documents reflecting, referring to, or relating to the Study.

2.   All documents reflecting, referring to, or relating to the design of the Study;

3.   All documents reflecting, referring to, or relating to performance of the Study;

4.   All documents reflecting, referring to, or relating to results of the Study including, but not limited to, any determination made by the Panelists as to each patent in the Study;

5.   All documents reflecting, referring to, or relating to analysis of the Study; and

6.   All documents reflecting, referring to, or relating to parties having a financial interest in or otherwise funding the study.

7.   All documents exchanged between Fairfield and any Panelist(s) reflecting, referring to, or relating to the Study including, without limitation, to instructions, questions, and reports of results.

8.   All documents reflecting, referring to or relating to the patents studied as part of the Study.

9.   All documents reflecting, referring to or relating to communications with Nokia.

10.   All documents reflecting, referring to or relating to communications with InterDigital.

11.   All documents reflecting, referring to or relating to any monies received by Fairfield from Nokia.

# Exhibit 1

# 3G CELLULAR STANDARDS AND PATENTS

David J. Goodman
Department of Electrical and Computer Engineering
Polytechnic University
Brooklyn, New York, USA
dgoodman@poly.edu

Robert A. Myers
Fairfield Resources International
Stamford Connecticut, USA
myers@frlicense.com

*Abstract*— At the beginning of 2004, the standards for third generation (3G) cellular technology were embodied in 483 Technical Specifications published by the two Partnership Projects: 3GPP and 3GPP2. Corporate members of the Partnership Projects are encouraged to identify intellectual property that is essential to implementing the standards. We have studied 7,796 patents and patent applications declared essential to the two standards. The patents are clustered in 887 families, where each family covers one invention. Three quarters of the declared patents are assigned to four companies. A preliminary evaluation of one patent from each family suggests that approximately 21% of the declared patents are actually essential. This paper presents the distributions of patents declared essential and patents judged essential according to technical category and patent ownership.

*Keywords-WCDMA, CDMA2000, 3GPP, 3GPP2*

## I. STANDARDS AND PATENTS

As information technology professionals, we are educated to seek the best technical solution to the tasks we address. However, we find that the success of our efforts, as indicated by the adoption of our contributions, depends on many factors besides the quality of our work. Two of these factors are technical standards and intellectual property rights (IPR) to technology that complements or competes with our own solutions. Standards can accelerate technology proliferation; they can also be barriers to innovation [1]. Governments issue patents to reward innovation and stimulate technology creation. However, distortions in the patent system can stifle creativity and block deployment of the best technology [2], [3]. The problem is especially acute when "… a user needs access to multiple patented inputs to create a single useful product." In these circumstances the patent system can retard, rather than encourage, innovation [4].

A recent article in *IEEE Spectrum* documents the tug of war between patent ownership and formulation of information technology standards [5]. Open (as opposed to proprietary) standards promote positive externalities and encourage widespread technology deployment. On the other hand, patents, by their nature as exclusionary monopolies, restrict technology deployment in order to encourage technology creation. Organizations that formulate open standards would like to exclude patented technology from the standards. If that is not possible, as is often the case, they prefer that patent owners grant free licenses to implement their patents in products that conform to the standards. In practice, however, information technology standards organizations are populated by representatives of companies that aim to profit from ownership of their IPR. From the point of view of the public interest, standards organizations have to compromise between the goal of unimpeded access to the standard and the possibility that "excluding a patented invention from a standard can unreasonably restrain by … excluding a technically advanced product from the market" [6]. To reconcile the contradiction between open standards and patent ownership, standards organizations encourage members to disclose "essential" patents and to agree to license the patents to all interested parties on "fair, reasonable, and non-discriminatory" terms.

This paper reports the results of a study of 7,796 patents and patent applications declared essential to two third generation cellular technologies: wideband code division multiple access (WCDMA) and CDMA2000. Section II describes the evolution of cellular technology and the roles of two international Partnership Projects in standardizing third generation systems. Section III describes the standards documents that define WCDMA and CDMA2000. Section IV explains that the 7,796 declared patents are clustered in 887 "families". All the patents in a family cover the same invention. Section V describes the distribution of the patent families across several technology categories and among companies that own rights to the patents. In Section VI, we report the results of a preliminary technical assessment of each patent family in order to estimate the number of inventions that are actually essential to the two sets of standards. Section VII summarizes our main findings and their implications.

## II. EVOLUTION OF CELLULAR TECHNOLOGY

Cellular telecommunications dates from the 1970s, when experimental systems demonstrated the technical feasibility of a radically new approach to telephony. The first commercial systems appeared in the early 1980s and since then technical progress has been measured in "generations". First generation technology relied on analog frequency modulation to transmit voice signals. Second generation systems, introduced in the 1990s, transmit speech in digital format. To promote network security and enable roaming, they employ standard signaling protocols for communication among base stations, mobile switching centers and databases. There are two broad categories of second generation systems, distinguished by their approaches to multiplexing and multiple access of radio signals. Some systems employ time division multiple access (TDMA) and others employ code division (CDMA). There are two standards for signaling in the core network: the mobile

applications part of the Global System for Mobile Communications (GSM) and Interim Standard 41 (IS-41), published by the Telecommunications Industry Association (TIA) In December 2004, there were 1.52 billion cellular subscribers worldwide, with 1.25 billion using GSM TDMA technology and 200 million using CDMA. The remainder used networks that employ various forms of TDMA that differ from GSM [7].

In recent years, GSM network operators have introduced two major upgrades to the original radio transmission technology. GPRS is a packet data overlay to the original circuit-switched technology of GSM. EDGE introduces 8-level phase shift keying modulation alongside Gaussian minimum shift keying, the original binary modulation technique of GSM. Both EDGE and GPRS are often referred to as "2.5G" technologies.

In 2005, many network operators are migrating to third generation (3G) technologies, with standardization guided by two "Third Generation Partnership Projects", 3GPP [8] and 3GPP2 [9]. The original Partnership Project, 3GPP, is concerned with descendents of GSM. The technology standardized by 3GPP is often referred to as WCDMA (wideband code division multiple access) The other project, 3GPP2, is concerned with advanced versions of the original CDMA cellular system. The technology standardized by 3GPP2 is often referred to as CDMA2000.

Table 1: Organizational Members of the Partnership Projects

| Organizational Member | Nationality | Affiliation |
|---|---|---|
| Association of Radio Industries and Businesses | Japan | 3GPP and 3GPP2 |
| Alliance for Telecommunication Industry Solutions | United States | 3GPP |
| China Communications Standards Association | China | 3GPP and 3GPP2 |
| European Telecommunication Standards Institute | Europe | 3GPP |
| Telecommunications Industry Association | North America | 3GPP2 |
| Telecommunications Technology Association | Korea | 3GPP and 3GPP2 |
| Telecommunication Technology Committee | Japan | 3GPP and 3GPP2 |

The Partnership Project members are regional and national standards organizations and "individual members." Individual members are companies affiliated with one or more of the constituent standards organizations Table 1 lists the standards organizations - based in Europe, the United States, Japan, China, and Korea – in the two Partnership Projects. There are 239 individual members of 3GPP and 75 individual members of 3GPP2. The Partnership projects and their constituent standards organizations encourage individual members to "declare" patents and patent applications that they believe are "essential" to implementing third generation cellular standards The official definition of essential is formulated in negative terminology:

"ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. [10]

Lists of patents declared essential to WCDMA appear at the web site of the European Telecommunications Standards Institute (ETSI) [11]. Lists of patents declared essential to CDMA2000 and WCDMA appear at the web sites of the Association of Radio Industries and Businesses (ARIB) [12] and the Telecommunication Technology Committee (TTC) [13]. ARIB and TTC are Japanese standards organizations. At the beginning of 2004, we identified 6,872 patents declared essential to WCDMA and 924 patents and patent applications declared essential to CDMA2000.

III.   THIRD GENERATION CELLULAR STANDARDS

Among the many types of standards, the ones that specify the details of telecommunications equipment are in the category of "compatibility specifications" [14]. Their purpose is to insure that different types of conforming equipment (for example cellular telephones and base stations) will operate correctly when they interact. The technologies covered by 3G cellular standards reside in three domains: core network, radio access network, and user equipment.    These categories are only partly reflected in the organizational structure of 3GPP and 3GPP2. Both projects have assigned the formulation of specifications to Technical Specification Groups (TSG). However, the definitions of the TSGs are different in the two projects. The TSGs in 3GPP are concerned with (a) core network, (b) radio access network, (c) terminals, and (d) services and systems aspects [15]. In 3GPP2, the TSGs are (a) access network interfaces, (b) CDMA2000, (c) services and systems aspects, (d) intersystem operations, (e) core network, and (f) packet data [16].

Although the technologies in the two projects cover the same ground, there are several differences in working methods. One difference is that 3GPP periodically produces a complete current version of its specifications in a sequence of Releases. At the beginning of 2004, the specifications were components of Release 5, consisting of 383 Technical Specifications in four categories. This number excludes the specifications published by TSG GERAN, covering the latest versions of GSM, GPRS, and EDGE It also excludes TS21 101 [17], which contains a list of all the Technical Reports and Technical Specifications published by 3GPP.

By contrast, 3GPP2 does not periodically publish a new release of the entire CDMA2000 standard. Instead, each TSG in 3GPP2 publishes a new version of one of its specifications when the version is approved. At the beginning of 2004, the documentation of 3GPP2 included 100 approved Technical Specifications in six categories.

0-7803-9305-8/05/$20 00 © 2005 IEEE

The disparity in numbers of specifications produced by the two partnership projects reflects the fact that 3GPP divides the standardization effort into smaller tasks than 3GPP2. 3GPP also publishes a large number of specifications devoted to project organization and management as distinct from definitions of technologies. Beyond this difference in style, there are different definitions of technology categories. 3GPP2 considers codecs and security technologies to be part of the radio access network (CDMA2000), while in 3GPP they are included among services and systems aspects. 3GPP classifies interfaces between the radio access network and other networks to be part of the radio access network. In 3GPP2 these interfaces comprise a separate category of standards.

Table 2 lists the TSGs and the number of standards published by each one at the beginning of 2004.

Table 2 Technical Specification Groups

| 3GPP Groups | Number of specs in 2004 | 3GPP2 Groups | Number of specs in 2004 |
|---|---|---|---|
| TSG-CN Core network | 109 | TSG-N Core network | 29 |
| | | TSG-X Intersystem operations | 10 |
| TSG-RAN Radio access network | 67 | TSG-C CDMA2000 | 43 |
| TSG-SA Services & systems | 179 | TSG-S Services & systems | 6 |
| TSG-T terminals | 28 | | |
| | | TSG-P Packet data | 1 |
| | | TSG-A Access network interfaces | 11 |

IV.  DECLARED PATENTS

Our sources for patents and patent applications declared essential to 3G technology are the web sites of three standards organizations. ETSI lists patents declared essential to 3GPP [18], as well as patents declared essential to other technologies standardized by ETSI including GSM. The web sites of the Japanese standards organizations ARIB [19], [20], and TTC [21] contain information about patents and patent applications declared essential to both third generation technologies. The ARIB notation for 3GPP standards is T63. The TTC notation is 3GA. For 3GPP2, the respective notations are T64 (ARIB) and 3GB (TTC). In the United States, the web site of the Telecommunications Industry Association contains statements by companies that have agreed to license essential patents on a non-discriminatory basis [23] but it does not contain lists of individual patents and patent applications.

Our study of WCDMA intellectual property is based on the ETSI list containing 6,872 patents and patent applications at the beginning of 2004. For CDMA2000, we used both ARIB and TTC, which together identified 924 items as of February 5, 2004. We analyzed the 7,796 patents and patent applications declared essential to the two technologies to cluster patents and applications into "patent families". The members of a family are patents and patent applications produced in different countries for a single invention. After examining declared patent applications to determine whether a patent was subsequently issued, we identified for WCDMA 732 patent families with patents issued prior to January 1, 2004. There were 527 patent families for CDMA2000 with patents issued prior to February 5, 2004. There is considerable overlap in the declarations for the two technologies: 372 inventions were declared essential to both technologies.

After clustering the patents into families, we chose one patent from each family for further analysis. To select a patent declared essential to WCDMA, we first looked for a patent issued by the European Patent Office. If there was no European patent in the family, we selected a United States patent if one was present. Our next choice was a Japanese patent. In the case of CDMA2000, our first priority was a United States patent. Our second choice for CDMA2000 was a European patent, followed by a Japanese patent. There were only three families with no European, United States or Japanese patent. For those inventions, we analyzed a German patent, a British patent, and a Swedish patent.

It is possible that there are essential patents that are not included in our study. These patents may be owned by companies that choose not to declare their patents to the standards organizations because they do not agree to license them on fair, reasonable and non-discriminatory terms. We also note that backward compatibility of 3G standards means that patents essential to an earlier standard such as CDMA, GSM, GPRS, or EDGE may also be essential to 3GPP or 3GPP2.

V.  PATENT CATEGORIES AND OWNERSHIP

After examining one patent from each patent family, we sorted the patents into 17 technical categories, covering key aspects of CDMA cellular communications. Examples are (a) CDMA fundamentals (including spreading codes, physical channels, and modulation), (b) radio resources management (including power and rate control), (c) location management (including location determination and mobility management), (d) layer 2 (including media access control, error detection, and retransmission), (e) source coding, (f) channel coding, (g) core network operations, (h) call management, and (i) synchronization. Table 3 shows the categories and the number of WCDMA and CDMA2000 patents in each category. With a few exceptions the ratios of patents in each category are similar for the two technologies. The biggest difference is the large number of electronic circuits patents declared essential to CDMA2000 (11%), compared to only 3% for WCDMA.

0-7803-9305-8/05/$20 00 © 2005 IEEE.

Table 3: Technical categories

| Technical category | Patents declared Essential to WCDMA | | Patents declared Essential to CDMA2000 | |
|---|---|---|---|---|
| | number | percent | number | percent |
| antenna | 20 | 2.7 | 17 | 3.2 |
| call management | 24 | 3.3 | 14 | 2.7 |
| cdma | 113 | 15.4 | 86 | 16.3 |
| channel coding | 50 | 6.8 | 30 | 5.7 |
| circuits | 21 | 2.9 | 59 | 11.2 |
| data | 13 | 1.8 | 12 | 2.3 |
| fax | 3 | 0.4 | 3 | 0.6 |
| handover | 80 | 10.9 | 49 | 9.3 |
| layer 2 | 29 | 4.0 | 22 | 4.2 |
| location | 40 | 5.5 | 21 | 4.0 |
| network | 59 | 8.1 | 32 | 6.1 |
| radio resources | 119 | 16.3 | 80 | 15.2 |
| security | 22 | 3.0 | 17 | 3.2 |
| source coding | 79 | 10.8 | 49 | 9.3 |
| synchronization | 40 | 5.5 | 21 | 4.0 |
| tdma | 4 | 0.5 | 1 | 0.2 |
| terminal | 7 | 1.0 | 6 | 1.1 |
| not related to 3G | 9 | 1.2 | 8 | 1.5 |
| Total | 732 | 100.0 | 527 | 100.0 |

In addition to the names of inventors, it is customary for a patent to state that the rights to the patent are "assigned" to a certain organization, usually the employer of the inventors. Although the patents in the study are assigned to 41 different companies, four companies own the rights to three quarters of the patents declared essential to the two systems: Qualcomm, Nokia, Ericsson, and Motorola. Twelve companies account for more than 90% of the patents. Figures 1 and 2 are pie charts showing the distribution of patent ownership for patents declared essential to 3GPP and 3GPP2.



Fig 2: 3GPP2 Ownership of declared IP

VI.   PATENT EVALUATION

Fairfield Resources International, an intellectual property consulting and licensing group headquartered in Stamford, CT, USA assembled a panel of technical experts in the United States, Canada, the United Kingdom, France, and Germany to perform a preliminary evaluation of the patents in the study. Each patent was assigned to one panelist according to the technical area of the patent. The panelists examined the independent claims of each patent and spent on average one hour comparing the independent claims with the the standard to which the patent was declared. Based on this evaluation, the panelist formed a preliminary judgment as to whether the technology in at least one independent claim is necessary to implement the standard.



Fig 1: 3GPP Ownership of declared IP



Fig 3: IP judged essential, 3GPP categories

0-7803-9305-8/05/$20.00 © 2005 IEEE.



Fig 4: IP judged essential, 3GPP2 categories



Fig 6: IP judged essential, 3GPP2 ownership

This preliminary evaluation uses the narrow definition of essential quoted in Section II, i e., every element of at least one claim must be practiced in order to implement the standard. The experts judged that 157 of the 732 patents (21.4%) declared essential to 3GPP are probably essential in the narrow sense of the definition and the others are probably not essential. For 3GPP2, the experts estimated that 108 of 527 patents (20.5%) are probably essential. Figures 3 and 4 display the distributions of patents judged to be essential by patent category for the two technologies. Figures 5 and 6 show the distributions by patent ownership.



Fig 5: IP judged essential, 3GPP ownership

## VII.  DISCUSSION OF RESULTS

### A  Implications for technology deployment

A salient outcome of the patent study is that the evaluation panel estimates that nearly 80% of the patents declared essential are probably not essential for practicing the standards under the narrow definition of essential adopted by the standards organizations. Nevertheless, a company that creates equipment or services for third generation cellular systems still faces a formidable task obtaining rights to patented technology. Even with the narrow definition of essential and the low ratio of essential patents to declared patents it may be necessary to acquire rights to several dozens of patents, depending on the equipment or service to be produced. In addition to the patents that are *technically* essential, there are probably other patents that are *commercially* essential because they contain the best (albeit not the only) possible implementation of the standard. For example, while very few electronic circuit patents were judged essential, there may be many others that cover compelling implementations.

Although the patents declared essential are assigned to 41 companies, the patents judged to be essential by the panel are assigned to 20 companies. Of the 13 companies with patents judged essential to 3GPP2, twelve companies have patents judged essential to 3GPP. Nineteen companies have patents judged essential to 3GPP technology. It is clear that the companies with major patent holdings can benefit from bilateral cross-licensing agreements containing rights to practice a group of patents. The alternative is for two companies to pay royalties to each other based on individual products produced.

Companies entering the 3G equipment market without a patent portfolio have to identify and obtain licenses to all the

essential patents. This problem exists in other information technology areas outside of cellular, where many different companies own essential intellectual property. One way of stimulating a diverse market for such a technology is for the owners of essential patents to form patent pools. A patent pool issues one license to all of the patents in the pool and divides the payments among the patent owners. A recent study based on game theory concludes that some patent owners have incentives to join a patent pool, while others are better off remaining outside the pool and negotiating individual licenses [22]. To our knowledge, no such pool exists for the majority of 3G essential patents.

Another problem facing equipment vendors is that in addition to the patents and patent applications declared to ETSI, ARIB, and TTC there may be others that are essential. For example, Nortel Networks has declared to the Telecommunication Industry Association that it owns technology essential to CDMA2000 [23]. Moreover, there may be other companies with essential patents that have chosen not to declare them to the standards organizations. As another example, Lucent Technologies, a major manufacturer of cellular infrastructure equipment, has apparently not declared any of its intellectual property to be essential to practicing the standards.

### B   Limitations of this research

We draw the attention of readers to several limitations of our study. With regard to patent ownership, we are aware that it is not unusual for a company to acquire the rights to patents invented by outsiders. As a consequence our pictures in Figures 1,2,5 and 6 are not precise indicators of who owns declared and essential intellectual property. The actual ownership distribution would take into account agreements that transfer patent rights from the company identified on the patent to another company.

It is also important to address the status of the essentiality data. In practice, the value of a patent depends on several *legal* and *commercial* factors. By contrast, the evaluations performed by the panel in this study are *preliminary technical* assessments, based on an average of one hour of analysis per patent. Determining the scope of a patent and its commercial value requires several days of effort by lawyers and engineers, and sometimes weeks or months of adjudication by judges and juries. In addition to the relationship of a patent to practical equipment and services, it is also necessary to consider patent *validity*. It is common for a company to assert that a competitor's patents are invalid and therefore unenforceable, either due to flaws in the patent itself or due to the fact that the claimed technology already existed when the inventor filed the patent application.

Another factor is the dynamic nature of both standards and intellectual property. By necessity, the standards cover existing proven technology, while patent applications describe novel techniques. Many of the patents were declared to be essential to technical specifications that were under consideration but not yet published when the patent applications were submitted. Both 3GPP and 3GPP2 continue to refine and enhance the standards. They regularly publish new and revised Technical Specifications, so that some of the patents that were judged not essential to specifications published before 2004 may be essential to present-day specifications or specifications to be published in the future. In addition, inventions that appeared in the databases in early 2004 as patent applications may now be embodied in published patents that are essential to 3G technology.

## REFERENCES

[1] P. Passal, Why the best doesn't always win. *New York Times Magazine*, May 5, 1996, pp 20 - 21.

[2] A. B Jaffe and J. Lerner, Patent Prescription, A Radical Cure for the Ailing U.S. Patent System, *IEEE Spectrum*, Vol 41, No. 12, December 2004, pp 38-43

[3] W. M. Cohen and S. A. Merrill, Editors, *Patents in the Knowledge-Based Economy*. The National Academies Press, 2003.

[4] M.A. Heller and R. S. Eisenberg, Can Patents Deter Innovation? The Anticommons in Biomedical Research, *Science*, Vol 280, May 1, 1998, pp 698-701

[5] S. J. Frank, Can you patent an industry standard?, *IEEE Spectrum*, Vol 39, No. 3, March 2002, pp. 14 – 15

[6] A. A. Marasco, Invention and Innovation: Protecting intellectual property in standards-setting, *ANSI Reporter*, Autumn/Winter 2003

[7] http://www.cellular.co.za/digital_cellular_technologies.htm

[8] www.3GPP.org

[9] www.3GPP2.org

[10] "ETSI IPR Policy", Nov. 22,2000
http://www.etsi.org/legal/documents/ETSI_IPRPolicy.pdf,

[11] http://www.etsi.org

[12] http://www.arib.or.jp/english/index.html

[13] http://www.ttc.or.jp/e/index.html

[14] D. J. Goodman, *Standards for Personal Communications in Europe and the United States*. Program on Information Policy Research, Harvard University, 1998. http://pirp.harvard.edu/pubs_pdf/goodman/goodman-p98-1.pdf

[15] http://www.3gpp.org/TB/home.htm

[16] http://www.3gpp2.org/Public_html/Misc/CommitteesHome.cfm

[17] 3GPP TS 21 101, Technical Specifications and Technical Reports for a UTRAN-based 3GPP system. http://www.3gpp.org/ftp/Specs/html-info/21101.htm

[18] http://webapp.etsi.org/ipr/

[19] http://www.arib.or.jp/IMT-2000/T64V230Jul29_03/2_Standard_General_Cover_T64/2.2_IPR_T64_v2.3.pdf

[20] http://www.arib.or.jp/IMT-2000/V340Jul03/T63/2_T63_V340_IPR.pdf

[21] http://www.ttc.or.jp/j/ipr/list/standard_order5.html

[22] R. Aoki and S. Nagaoka, Coalitiion formation for a consortium standard through a standard body and a patent pool: Theory and evidence from MPEG2, DVD and 3G, Working Paper WP05-01 of the Institute of Innovation Research of Hitotsubashi University, February, 2005 http://www.iir.hit-u.ac.jp/event/WP05-01aoki,%20nagaoka.pdf.

[23] http://www.tiaonline.org/standards/ipr/iprlist.cfm

0-7803-9305-8/05/$20.00 © 2005 IEEE

# Exhibit 2

# ANALYSIS OF INTELLECTUAL PROPERTY FOR THIRD GENERATION CELLULAR TECHNOLOGY

Infocom

March 17, 2005

David Goodman
Polytechnic University
Brooklyn, New York, 11201
dgoodman@poly.edu

Robert A. Myers
Fairfield Resources International
Stamford Connecticut, 06901
myers@frlicense.com

# Standards and Intellectual Property Rights (IPR)

- **Standards** promote openness and interoperability
  - Reduce risk for participants in the marketplace
- **Patents** promote innovation through exclusivity
  - Provide monopoly benefits to patent holders
- Success of a new technology often depends on the outcome of the tug-of-war between standards and IPR
  - MPEG, Modems, Facsimile, Data Compression, Firewire, IEEE8.11 are important examples where standards have succeeded
- Third Generation Wireless exemplifies the challenges
  - Almost 500 standards "documents"
  - Almost 8000 patents and applications declared as "essential"
- Our study addresses
  - Ownership of declared essential patents
  - **Essentiality** of declared essential patents
  - Technical fields of declared essential patents
  - Implications for the future development of 3G and 4G technologies

# 3G Intellectual Property

- Third generation cellular technologies
  - 3GPP (W-CDMA, UMTS, UTRAN)
  - 3GPP2 (CDMA2000)

- Owners declare "essential" intellectual property (patent or patent application) to
  - ETSI European Telecommunications Standards Institute 3GPP
    http://webapp.etsi.org/IPR/Results.asp?Company=&Country=&Project=ALL&opProjects=or&AppNumber=&Countries=AL
    L&Operator=or&PatentNumber=&Title=&Year=&Month=&Day=&ETSIDeliverable=&SortBy=Project&Show=Company&Sh
    ow=PatentNumber&Show=Project&Show=Countries&Show=Country&Show=ETSIDeliverable&Show=PatentTitle&Show=
    Notes&Show=AppNumber&Show=Date&Search=Search
  - ARIB Association of Radio Industries and Businesses [Japan]
    3GPP2 & 3GPP
    http://www.arib.or.jp/IMT-2000/T64V230Jul29_03/2_Standard_General_Cover_T64/2.2_IPR_T64v2.3.pdf
    http://www.arib.or.jp/IMT-2000/V340Jul03/T63/2_T63_V340_IPR.pdf
  - TTC – Telecommunications Technology Committee [Japan] 3GPP2
    & 3GPP
    http://www.ttc.or.jp/j/ipr/list/standard_order5.html

# An Essential Patent

- "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.

# Scope of This Work

- Evaluations by an international panel of technical experts with extensive industrial experience
  - **Technical estimates, not legal opinions**
  - **No assessment of validity or enforceability of the patents**
- A *moving target*
  - **Standards continually revised and updated**
  - **Patents continually filed, issued and declared**
- Evaluations only on *technical* considerations
  - **Patents may be commercially essential even if not mandated by a standard**
  - **Many "undeclared" patents may also be essential**
- Our study is a *snapshot*
  - 3GPP [WCDMA]
    - All patents and applications declared as of 12-31-2003
    - Includes all declared applications that issued as of 12-31-2003
    - WCDMA Standard Release 5
  - 3GPP2 [CDMA2000]
    - All patents and applications declared as of 2-10-2004
    - Includes all declared applications that issued as of 2-10-2004
    - CDMA2000 Standard as of 2-1-2004

# 3G Standards

- **3GPP2 (CDMA2000)**
- 100 Documents

http://www.3gpp2.org/Public_h
tml/specs/index.cfm

- – Access network interfaces
- – CDMA2000®
  - Including codecs and security
- – Services and system aspects
- – Intersystem operations

- **3GPP (WCDMA)**
- 386 Documents

http://www.3gpp.org/specs/spe
cs.htm

- – Core network
- – Radio access network
- – Terminals
- – Service and system aspects
  - Including codecs and security

# Summary of Essentiality Study

| | 3GPP (WCDMA) | 3GPP2 (CDMA2000) |
|---|---|---|
| Total Patents and Applications Declared as Essential | 6872 | 924 |
| Distinct Patent Families Declared as Essential | 732 | 527 |
| Distinct Patent Families Declared as Essential to Both | 372 | 372 |
| Total Patent Families Judged to be Essential | 158 | 109 |
| Patent Families Declared as Essential to Both and Found Essential | 58 | 79 |

32 of the above were judged essential to both standards

Total "declarations" may include as many as 20% duplicates

# 3G Patent Study

- Analyze technology standards
- Assemble review panel
- Determine patent families
  - Select one patent from each family
- Classify each patent
- Evaluate each patent
  - Locate section(s) of standard most relevant to a patent's independent claim(s)
  - Construct a virtual "claim chart"
    - **A patent is infringed and essential if and only if every single element of at least one claim must be practiced in order to conform to the standard**
- Analyze evaluations

# Technology Categories

- Antenna
- CDMA basics
- Channel coding
- Circuits
- Call management
- Data transmission
- Facsimile
- Handover

- Layer 2
- Location
- Networks
- Radio resources
- Security
- Source coding (speech codecs, etc)
- Synchronization

# Preparing for Evaluation

- Download lists of declared IP with following priority
  - 3GPP2: US, EP, JP or Other National with GDP>USD250B
  - 3GPP: EP, US, JP of Other National with GDP>USD250B
  - Within a family, we reviewed only the issued patent with the most recent filing date
- Merge lists from different standards organizations
- Identify distinct families
- Eliminate duplicate families
- Find most recent issued patent in each family
- If no issued patent declared, find an application that has issued
- Eliminate families with no issued patent
- Obtain English translation if necessary
- Identify technical field
- Assign patent to an evaluator




3GPP2 Patents Declared Essential patent ownership

527 patents

340 Qualcomm

45 Nokia

37 Motorola

18 NTT DoCoMo

16 Ericsson

15 Matsushita

11

8 NTT



3GPP2 Patents Judged Essential patent ownership

108 patents

Qualcomm 54

Motorola 14

14

NTT DoCoMo 7

Ericsson 3

2

4

2

2

3



3GPP2 Patents Declared Essential subject Matter

527 patents



3GPP2 Patents Judged Essential subject Matter

108 patents

radio resources 13
circuit 2
handover 8
source coding 28
cdma 17
call mgt 3
security 3
3
location 5
8
layer 2 11
channel coding 3
network 3



3GPP Patents Declared Essential patent ownership

732 patents

Qualcomm — 279
Ericsson — 129
Nokia — 94
Motorola — 38
Philips — 22
NTT DoCoMo — 22
Siemens — 15
Mitsubishi — 15
Fujitsu — 14
Hitachi — 13
Interdigital — 11
Matsushita — 11



3GPP Patents Judged Essential patent ownership

157 patents



3GPP Patents Declared Essential subject Matter

732 patents




3GPP Patents Judged Essential Subject Matter

157 patents

# Implications

- Our study did not assess patent "quality" or "validity"
  - **All "essential patents" are equal *if* they are valid**
- Cross licenses among major patentees are desirable
  - Balancing payments may be appropriate
- Non-patentee offerings of products or services may require licenses to dozens or even hundreds of patents
  - May not be economically feasible, even if individual royalties are "reasonable"
- We did not consider undeclared essential patents
  - Could be many
  - A potential business risk for all 3G participants if patentees assert their undeclared patents
  - A patentee demanding an "unreasonable" royalty might force a change in the standard or even lead to its premature replacement

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 7, 2006, the attached

document was hand delivered to the following person(s) and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification to the registered

attorney(s) of record that the document has been filed and is available for viewing and

downloading:

Jack B. Blumenfeld
Julia Heaney
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347

I hereby certify that on November 7, 2006, I have Electronically Mailed the

documents to the following:

Peter Kontio
Patrick J. Flinn
Gardner S. Culpepper
Keith E. Broyles
Randall L. Allen
Lance Lawson
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
 pkontio@alston.com
pflinn@alston.com
gculpepper@alston.com
keith.broyles@alston.com
rallen@alston.com
llawson@alston.com

By:  _/s/ David E. Moore_____
　　　Richard L. Horwitz
　　　David E. Moore
　　　Hercules Plaza, 6th Floor
　　　1313 N. Market Street
　　　Wilmington, Delaware 19899-0951
　　　(302) 984-6000
　　　rhorwitz@potteranderson.com
713935　　　dmoore@potteranderson.com