# EXHIBIT A

# FULBRIGHT & JAWORSKI L.L.P.

### A REGISTERED LIMITED LIABILITY PARTNERSHIP
2200 ROSS AVENUE, SUITE 2800
DALLAS, TEXAS 75201-2784
WWW.FULBRIGHT.COM

DAN D. DAVISON
PARTNER
DDAVISON@FULBRIGHT.COM

DIRECT DIAL:    (214) 855-8049
TELEPHONE:    (214) 855-8000
FACSIMILE:    (214) 855-8200

November 16, 2006

The Secretariat of the International Court of Arbitration    **(INTERNATIONAL DELIVERY)**
38 cours Albert 1er
75008 Paris France

Re: Request for Arbitration

Dear Secretariat:

This Request for Arbitration is submitted pursuant to Article 4 of the Rules of Arbitration of the International Chamber of Commerce.

## A) Name, Description, and Address of the Parties

*Claimants:*

InterDigital Communications Corporation is a Pennsylvania corporation, having its principal place of business in Pennsylvania, USA. Its principal business address is 781 Third Avenue, King of Prussia, Pennsylvania 19406, USA.

InterDigital Technology Corporation is a Delaware corporation, having its principal place of business in Delaware, USA. Its principal business address is Suite 105, Hagley Building, 3411 Silverside Road, Concord Plaza, Wilmington, Delaware 19801, USA.

InterDigital Communications Corporation ("IDC") and InterDigital Technology Corporation ("ITC") shall be referred to jointly as "InterDigital."

*Respondent:*

Nokia Corporation ("Nokia") is a corporation existing under the laws of the Country of Finland, having its principal place of business in Finland. Its principal business address is Keilalahdentie 4, Espoo 02150, Finland.

25637870.4

HOUSTON • NEW YORK • WASHINGTON DC • AUSTIN • DALLAS • LOS ANGELES • MINNEAPOLIS • SAN ANTONIO
DUBAI • HONG KONG • LONDON • MUNICH • RIYADH

The Secretariat of the International Court of Arbitration
November 16, 2006
Page 2

## B) <u>Nature and Circumstances of the Dispute Giving Rise to the Claims</u>

### <u>The Parties' Contractual Relationship</u>

In January 1999, InterDigital and Nokia entered into a series of related agreements pursuant to which InterDigital licensed to Nokia certain of its patented telecommunications technologies. These agreements are the Master Agreement, Patent License Agreement, and TDD Development Agreement, all effective January 29, 1999. The Master Agreement contains terms which govern both the Patent License Agreement and the TDD Development Agreement. The TDD Development Agreement provided for the development of a digital wireless air interface technology known as Time Division Duplex ("TDD"). The Patent License Agreement gave Nokia a license under certain InterDigital patents, and its term originally ran through December 31, 2006. Specifically, InterDigital licensed Nokia's Infrastructure and Subscriber Units under certain InterDigital Patents, which included Nokia's third generation ("3G") Subscriber Units and Infrastructure.[1]

The Master Agreement contains a confidentiality provision restricting the disclosure and use of the information by Nokia. It provides:

> <u>Protection of Confidential Information</u>.  Except as otherwise provided in this Agreement or Related Agreements, InterDigital and Nokia each agree not to disclose or make available to any third person the other's confidential information, or any confidential information created in the TDD Project (regardless of the creator or owner of such information), or the contents of this Agreement and Related Agreements without the express written consent of the disclosing party. *The party receiving confidential information shall use such information only as necessary to exercise its rights or perform its obligations under this Agreement and shall not circulate confidential information within its own organization except to employees with a specific need to know such confidential information for such purposes.*

Master Agreement at 5.1 (emphasis added). Thus, in addition to agreeing not to disclose any confidential information without consent, Nokia agreed not to *use* such confidential information in any way except for the very limited purpose of exercising its rights or performing its obligations under the Master Agreement.[2]

Nokia agreed to pay InterDigital a fixed royalty payment for the period ending on the earlier of December 31, 2001, or the TDD Project Termination Date ("Period 1"). Nokia agreed to pay InterDigital additional royalties if certain events occurred for the period commencing upon the termination of Period 1, and ending on December 31, 2006 ("Period 2"). In addition,

---

[1] Unless otherwise indicated, defined terms have the meaning set forth in the Master Agreement.
[2] Section 5.3 of the Master Agreement provides: "'Confidential Information,' for purposes of this Section, shall mean all tangible confidential information marked 'Confidential' or in a similar manner ... ."

The Secretariat of the International Court of Arbitration
November 16, 2006
Page 3

the Patent License Agreement expressly provided that the parties would further negotiate Nokia's Period 2 royalty obligations:

> Commencing in January 2001, or promptly after IDC receives the notice of termination under Article 9 of the TDD Development Agreement, whichever is earlier, *Nokia and ITC shall commence negotiations in good faith on the royalty payments to be made by Nokia for sales of Covered Subscriber Units and Covered Infrastructure occurring during Period 2.* If the parties are unable to reach an agreement after such good faith negotiations, the royalty obligation shall be determined in accordance with the provisions of Section 3.1.2 (B).

Patent License Agreement at 3.2.1 (A) (emphasis added).

As part of the negotiation of the Nokia's Period 2 royalty obligations as required by the Patent License Agreement, InterDigital provided two PowerPoint presentations to Nokia that were marked "Confidential" or "Confidential and Proprietary" and contain extensive confidential and proprietary information regarding InterDigital's patents and technology, as well as its business and legal dealings (the "Confidential Presentations"). The parties did not reach agreement on Nokia's Period 2 royalty obligations, and Nokia's Period 2 obligations on 2G TDMA Subscriber Units and Infrastructure became the subject of an arbitration between the parties in 2005, which resulted in an ICC award in InterDigital's favor. That award was confirmed in *InterDigital Comm'ns. Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522 (S.D.N.Y. 2005). The Parties settled their disputes related to the implementation of the award by way of agreements entitled Arbitration Settlement Agreement and UK Settlement Agreement, both dated April 26, 2006.

**The U.K. Proceeding**

In July 2005, Nokia brought a proceeding against InterDigital Technology Corporation ("IDT") in The High Court of Justice, Chancery Division, Patents Court in the United Kingdom, Claim No. HC05C02026 (the "U.K. Proceeding"). In the U.K. Proceeding, Nokia seeks a declaration that 29 of ITC's patents are not essential for the FDD mode of operation set forth in certain 3G cellular technology industry standards. InterDigital initially requested that the U.K. Proceeding be dismissed on the grounds, among other things, that the U.K. Court lacked jurisdiction primarily because there was no existing commercial dispute between the parties.

In response to InterDigital's jurisdictional challenge, Nokia submitted a number of witness statements from Nokia counsel, employees and consultants. Nokia submitted as attachments to one of its witness statements the Confidential Presentations.

InterDigital sought to enjoin Nokia's use and disclosure of the Confidential Presentations in the U.K. Proceeding, filing an action in the United States District Court for the Southern District of New York and seeking a temporary restraining order ("TRO") and preliminary injunction against such use. The Southern District granted InterDigital's TRO, precluding Nokia

25637870.4

The Secretariat of the International Court of Arbitration
November 16, 2006
Page 4

from disclosing or circulating the Confidential Presentations to anyone other than those explicitly permitted under the Master Agreement unless and until (i) the UK Court issued an order directing disclosure and then only to the extent of such order, or (ii) another judge in the Southern District shall issue an order amending or dissolving the initial order. The Southern District further ordered that defendant show cause why such restraints should not be continued.

On subsequent hearing of ITC's motion for preliminary injunction on March 29, 2006, the Southern District granted that motion and ordered that disclosure was not to be made of the Confidential Presentations, unless (i) the U.K. Court stated that it wanted disclosure of such information and under what circumstances; and (ii) the court in the Southern District agreed that such disclosure was appropriate. The Southern District ordered Nokia not to disclose the documents to the U.K. Court because of the restrictions in the Master Agreement until further addressed by the Southern District.

Upon presenting the issue to the U.K. Court on March 30, 2006, the U.K. Court (without seeing the Confidential Presentations) concluded that the Presentations were relevant to the jurisdictional challenge, but that whether Nokia could use those Presentations was a matter that had to be decided by arbitration under the Master Agreement. Thus, the U.K. Court stayed the hearing on ITC's jurisdictional challenge pending arbitration, but nonetheless decided to let the action proceed on the merits. Because proceeding in that way would have effectively negated ITC's jurisdictional challenge, InterDigital had little choice but to agree to Nokia's use of the Confidential Presentations on the jurisdictional challenge. It did so only on the express condition that such use was solely for the purpose of determining the jurisdictional challenge and with the agreement of both Nokia and the U.K. Court to maintain the Confidential Presentations in strict confidentiality. ITC expressly reserved its rights to seek further injunctive relief if Nokia attempted to use the documents for other than the jurisdictional challenge or without appropriate confidentiality protections. On those terms, ITC therefore withdrew the Southern District action without prejudice.

The U.K. Court subsequently determined that it had jurisdiction over Nokia's claims, which determination is currently awaiting confirmation by the Court of Appeal in the UK.

Nokia sought to amend its substantive pleading in such a way that it claims the Confidential Presentations become or become further relevant to issues in dispute. On August 18, 2006, ITC's U.K. counsel sent a letter to Nokia's U.K. counsel informing Nokia that ITC would not consent to that portion of the proposed amendment relating to the Confidential Presentations and asking Nokia to confirm that it would not use the Confidential Presentations for any purpose other than as ITC consented to in its letter dated March 30, 2006. On August 25, 2006, Nokia's U.K. counsel responded to that August 18 letter, stating that it was not relying on the Confidential Presentations for its proposed Amended Particulars of Claim but nonetheless asserting that they are relevant to the U.K. Proceeding. By insisting that the Confidential Presentations need to be disclosed as part of the U.K. discovery process, Nokia made clear its intent to try to use them further in the U.K. Proceeding. On 25 October 2006 the High Court

25637870.4

The Secretariat of the International Court of Arbitration
November 16, 2006
Page 5

permitted the amendment to Nokia's pleading, but also granted a stay of any obligation on the part of InterDigital to disclose the Confidential Presentations pending arbitration.

**The Delaware Proceeding**

Nokia has also sought to use the Confidential Presentations in a related action pending in the United States District Court for the District of Delaware between InterDigital and Nokia (the "Delaware Proceeding"). Pursuant to the Special Master's First Discovery Order dated June 12, 2006 in the Delaware Proceeding, Nokia submitted Plaintiffs' Statement Pursuant to First Discovery Order dated June 30, 2006 (the "Nokia Statement"). The Nokia Statement included as exhibits the same InterDigital Confidential Presentations that Nokia sought to use in the U.K. Proceeding and were subject of the earlier New York injunction proceedings. Although the Special Master's First Order only required Nokia to identify "public statements" by InterDigital that Nokia believed were false, Nokia nonetheless identified and disclosed to the Special Master the Confidential Presentations, notwithstanding the fact that they were private licensing presentations made in confidence to Nokia pursuant to the terms of the Master Agreement and the Patent License Agreement. Nokia appears to have gone out of its way to use and include these Confidential Presentations even though they provide no basis for and are not relevant to its Lanham Act claim. Nokia has also referred to the Confidential Presentations in its responses to InterDigital's Interrogatories, indicating that it is using same as a basis for its Lanham Act claims.

InterDigital has made a motion to the Special Master in the Delaware Proceeding to stay discovery (including any further use and/or disclosure) of or relating to the Confidential Presentations until such time as this arbitration process is concluded. That motion is being briefed and has not yet been decided.

On August 18, 2006, after learning of Nokia's use and threatened use of the Confidential Presentations in the U.K. and Delaware Proceedings, InterDigital sent Nokia a written notice of dispute under the Master Agreement and demanded that Nokia comply with its confidentiality obligations. Nokia responded on August 25, clearly indicating its intent to attempt to use the Confidential Presentations. A senior executive meeting between Nokia and InterDigital was held on November 6, 2006, although the dispute was not resolved.

C) **Relief Sought**

InterDigital seeks an arbitration award prohibiting Nokia from using the confidential information of InterDigital in violation of the protections imposed on same by the Master Agreement, including, but not limited to the prohibition of Nokia's use of the Confidential Presentations, any other confidential information of InterDigital, or any confidential information created in the TDD Project in the U.K. and Delaware Proceedings or in any other current or future legal or administrative proceedings.

25637870.4

The Secretariat of the International Court of Arbitration
November 16, 2006
Page 6

## D) Relevant Agreements, Including the Arbitration Agreement

InterDigital Communications Corp., InterDigital Technology Corp, and Nokia Corp entered into the following agreements on or about January 29, 1999:

1) Master Agreement

2) TDD Development Agreement

3) Patent License Agreement

4) Arbitration Settlement Agreement

5) UK Settlement Agreement

Copies of these agreements are attached hereto. The Master Agreement contains the arbitration agreement in Article 4.1, reproduced below:

> The parties shall attempt to amicably resolve all disputes arising under this Agreement or under the Related Agreements. A party shall first provide written notice to the other party of a dispute arising under this Agreement or Related Agreements ("Notice"). In the event such dispute cannot be amicably resolved within thirty (30) days after receipt of the Notice, senior representatives (e.g., Chief Executive Officer, President) of each party shall meet in an attempt to resolve the dispute. Such meeting shall occur at a mutually agreeable time and location. If such dispute is not resolved within sixty (60) days of receipt of the notice, the dispute shall be submitted to arbitration and shall be resolved by binding arbitration by three arbitrators in accordance with the then prevailing rules for commercial arbitration of the International Chamber of Commerce (Paris) (hereinafter "ICC"). The language of the Arbitration shall be English and the place of Arbitration shall be New York City, unless otherwise agreed between the parties. The proceedings shall be conducted so as to preserve privacy.

## E) Number of Arbitrators and Choice

In accordance with Article 4 of the Master Agreement, there shall be three arbitrators. Pursuant to Article 8.4 of the ICC Rules of Arbitration, InterDigital nominates Lois W. Abraham, Esq. as an arbitrator.

The Secretariat of the International Court of Arbitration
November 16, 2006
Page 7

**F) Place of arbitration, the Applicable Rules of Law, and the Language of the Arbitration**

In accordance with Article 4 of the Master Agreement, the place of the arbitration shall be New York City, New York, USA, and the Language shall be English. In accordance with Article 8.3 of the Master Agreement, the applicable law shall be New York law.

Very truly yours,

Dan D. Davison
FULBRIGHT & JAWORSKI L.L.P
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone:    (214) 855-8000
Telecopier:    (214) 855-8200
ddavison@fulbright.com

cc:    Nokia Corporation
       General Counsel
       Keilalahdentiw 4
       SF-02150 Espoo
       FINLAND

       Patrick J. Flinn
       Alston & Bird L.L.P.
       One Atlantic Center
       1201 West Peachtree Street
       Atlanta, Georgia  30309-3424

25637870.4

# EXHIBIT 1

PROPRIETARY INFORMATION

# MASTER AGREEMENT

## between

## InterDigital Communications Corporation

## InterDigital Technology Corporation,

## and

## Nokia Corporation

PROPRIETARY INFORMATION

## TABLE OF CONTENTS

ARTICLE 1 .................................................................................................... 2
   1.1   Definitions. .................................................................................. 2
ARTICLE 2 .................................................................................................... 2
   2.1   Related Agreements. ................................................................. 3
ARTICLE 3 .................................................................................................... 3
   3.1   Initial Cash Payment ................................................................ 3
   3.2   Additional Payments ................................................................. 3
   3.3   Manpower. ................................................................................. 3
   3.4   Additional Consideration. ........................................................ 4
   3.5   Related Agreements. ................................................................ 4
ARTICLE 4 .................................................................................................... 4
   4.1   Disputes; Mediation; Arbitration. ........................................... 4
ARTICLE 5 .................................................................................................... 6
   5.1   Protection of Confidential Information. ................................... 6
   5.2   Review of Publications. ............................................................ 7
   5.3   Marking of Confidential Information. ...................................... 7
   5.4   Limitations. ................................................................................ 7
   5.5   Disclosures Permitted. ............................................................. 8
ARTICLE 6 .................................................................................................... 9
   6.1   Registration .............................................................................. 9
   6.2   Audit. ......................................................................................... 9
   6.3   Taxes ........................................................................................ 10
   6.4   Payment in Dollars. ................................................................. 11
ARTICLE 7 .................................................................................................... 11
   7.1   Effective Date. .......................................................................... 11
   7.2   Term. ......................................................................................... 11
ARTICLE 8 .................................................................................................... 12
   8.1   Publicity. .................................................................................... 12
   8.2   Conflicts. ................................................................................... 12
   8.3   Governing Law. ........................................................................ 12
   8.4   Headings. .................................................................................. 13
   8.5   Effect; Assignment. ................................................................. 13
   8.6   Compliance with Law. ............................................................. 13
   8.7   Waivers. .................................................................................... 14
   8.8   Severability/Reformation. ........................................................ 14
   8.9   Independent Contractors ........................................................ 15
   8.10  Survival. .................................................................................... 15
   8.11  Exhibits. .................................................................................... 15
   8.12  Notices ...................................................................................... 15

**Master Agreement**
**Execution Copy**
**N:\15\Wolfe\NOKIA\DRAFTS\MASTER11.DOC**
**January 22, 1999**

i



PROPRIETARY INFORMATION

8.13  Controlling Version..................................................................16
8.14  Entire Agreement ...................................................................17
8.15  Counterparts; Faxed Signatures.  .................................................17

Master Agreement
Execution Copy
N:\Bill\Wpfiles\NOKIA\DRAFTS\MASTER11.DOC
January 22, 1999

ii

PROPRIETARY INFORMATION

MASTER AGREEMENT

THIS AGREEMENT is entered into as of the Effective Date between and among InterDigital Communications Corporation, a corporation existing under the laws of the Commonwealth of Pennsylvania with offices at 781 Third Avenue, King of Prussia, PA 19406 ("IDC"), InterDigital Technology Corporation, a Delaware corporation with offices at 300 Delaware Avenue, Suite 527, Wilmington, Delaware 19801("ITC" and, collectively with IDC and their Affiliates, "InterDigital"), and Nokia Corporation, a corporation existing under the laws of the Country of Finland,  with offices at Keilalahdentie 4, 02150 Espoo, Finland.

## BACKGROUND

Nokia is a global leader in the design, manufacture, and supply of advanced wireless telecommunications equipment, including Infrastructure and Subscriber Units utilizing time division multiple access technology (TDMA).  Nokia is also a leading developer of, and participant in the standards setting process associated with, Third Generation technologies.

IDC has developed extensive digital communications technology experience involving both TDMA and code division multiple access (CDMA) technologies.  ITC has an extensive and valuable portfolio of patents covering digital wireless telephone systems utilizing TDMA and CDMA technologies.

PROPRIETARY INFORMATION

Nokia desires to engage IDC to develop time division duplex ("TDD") technology, which technology is currently being proposed as part of the technological solution for Third Generation applications.

Nokia and InterDigital further desire to enter into an agreement providing for the mutually beneficial cross-licensing of the Developed TDD Technology as well as other patents and patent applications related to TDMA and CDMA technologies.

NOW, THEREFORE, in consideration of the covenants and promises made herein, the parties, intending to be legally bound, hereby agree as follows:

### ARTICLE 1    - DEFINTIONS

1.1    Definitions.    The terms set forth in Exhibit 1 hereto, when used with initial capital letters in this Agreement and the Related Agreements, including any Exhibits, attachments or amendments thereto, shall have the meanings described in Exhibit 1.

### ARTICLE 2    - PURPOSE

2.1    Related Agreements.    Simultaneously with the execution of this Master Agreement, the parties shall enter into the following agreements, which shall be referred to herein as the "Related Agreements":

2.1.1 The TDD Development Agreement; and

2

PROPRIETARY INFORMATION

2.1.2 The Patent License Agreement.

## ARTICLE 3  - CONSIDERATION

3.1 Initial Cash Payment. Nokia, in partial consideration of the rights and licenses granted by ITC to Nokia under Section 3.1.1(A) of the Patent License Agreement, shall pay ITC the sum of THIRTY ONE MILLION FIVE HUNDRED THOUSAND  U.S. DOLLARS [$31,500,000.00] by wire transfer by no later than the end of the thirtieth (30th) calendar day following the Effective Date of this Agreement. Such payment obligation, and payments made thereunder, shall be irrevocable and unconditional. Payments shall be directed to the following account, unless otherwise specified by InterDigital:

> PNC Bank
> ABA # 031100089
> Credit Trust Uninvested Funds
> Account # 5678702981
> Further Benefit of InterDigital Technology Corporation
> Acct. 470023012202
> Attention: Patrick Donahue

3.2 Additional Payments. Nokia shall make the patent royalty payments to ITC in accordance with the Patent License Agreement.  Nokia shall also pay IDC for its efforts on the TDD Project in accordance with the TDD Development Agreement.

3.3 Manpower. As further consideration for the rights and licenses granted by each party to the other hereunder, each party agrees to provide

3

PROPRIETARY INFORMATION

adequate and trained manpower towards the accomplishment of the TDD Project in accordance with the terms and conditions of the TDD Development Agreement.

3.4    Additional Consideration.  Additional consideration hereunder for the rights and licenses granted by IDC and ITC to Nokia shall be provided to IDC through the various benefits IDC obtains through the Related Agreements, including without limitation the right of IDC to buy generally available standard versions of single-mode TDD Products from Nokia pursuant to the terms of the TDD Development Agreement.

### ARTICLE 4   - DISPUTE RESOLUTION

4.1    Disputes; Mediation; Arbitration.   The parties shall attempt to amicably resolve all disputes arising under this Agreement or under the Related Agreements.  A party shall first provide written notice to the other party of a dispute arising under this Agreement or Related Agreements ("Notice").  In the event such dispute cannot be amicably resolved within thirty (30) days after receipt of the Notice, senior representatives (e.g., Chief Executive Officer, President) of each party shall meet in an attempt to resolve the dispute.  Such meeting shall occur at a mutually agreeable time and location. If such dispute is not resolved within sixty (60) days of receipt of the Notice, the dispute shall be submitted to arbitration and shall be resolved by binding arbitration by three arbitrators in accordance with the then prevailing rules for commercial arbitration of the International Chamber of Commerce (Paris) (hereinafter "ICC").  The language of the Arbitration



PROPRIETARY INFORMATION

shall be English language and the place of the Arbitration shall be New
York City, unless otherwise agreed between the parties.  The
proceedings shall be conducted so as to preserve privacy.

5

PROPRIETARY INFORMATION

ARTICLE 5   - PROPRIETARY INFORMATION

5.1    Protection of Confidential Information.  Except as otherwise provided in
this Agreement or the Related Agreements, InterDigital and Nokia each
agree not to disclose or make available to any third person the other's
confidential information, or any confidential information created in the
TDD Project (regardless of the creator or owner of such information), or
the contents of this Agreement and the Related Agreements without the
express written consent of the disclosing party. The party receiving
confidential information shall use such confidential information only as
necessary to exercise its rights or perform its obligations under this
Agreement and shall not circulate confidential information within its own
organization except to employees with a specific need to know such
confidential information for such purposes.  Notwithstanding the above,
both parties may, subject to the limitations of the TDD Development
Agreement, disclose the TDD Technology to independent consultants, and
to any third party, Affiliate, or end user as necessary implement the Work
Plans and Specifications or develop TDD Products for the party to this
Agreement disclosing the information, or to market and sell the TDD/FDD
Products, TDD ASICs, or license parties under TDD Technology, and
provided in each case that such party is under a substantially similar
obligation as is provided for herein to maintain the confidentiality of the
information.

5.2    Review of Publications.  Without limiting the requirements of Section 5.1,
each party agrees that, prior to publishing any articles or other materials

PROPRIETARY INFORMATION

containing technical information concerning the TDD Technology then under development within the TDD Project, such party shall submit (and shall cause its employees to submit) such article or materials to the other party for review.   Within ten (10) business days of receiving the documents proposed for publication, the reviewing party may notify the authoring party that the reviewing party objects to the publication of the article or materials on the grounds that the article or materials discloses confidential information or would adversely affect the patent position of one or more parties hereto. If the reviewing party notifies the authoring party in accordance with the prior sentence, the authoring party shall not publish the article or materials unless or until the confidential information specified by reviewing party has been deleted therefrom. If the reviewing party fails to provide the notice contemplated by this Section within the required ten day period, the reviewing party shall be deemed to have approved publication of the article or materials.

5.3   Marking of Confidential Information.   "Confidential information," for the purposes of this Section, shall mean all tangible confidential information marked "Confidential" or in a similar manner, and all information orally disclosed that is identified as such at the time of the disclosure.   In addition, confidential information shall include information which the receiving party should reasonably believe is confidential such as Know-How, source codes, design documents and other Technical Information.

5.4   Limitations. The obligations of the receiving party recited in Section 5.1 shall terminate when and to the extent that information is or becomes:

Master Agreement
Execution Copy
\\\\DCPAS\LEGAL\Bill\Wpfiles\NOKIA\DRAFTS\MASTER11.DOC
January 22, 1999



PROPRIETARY INFORMATION

5.4.1 public knowledge through no fault of the receiving party;

5.4.2 independently developed outside the TDD Project by the party without any reference to the Confidential Information; and/or

5.4.3 rightfully communicated to the receiving party by a third party free of any obligation of confidence.

Either party shall be free to use for any purpose the residuals resulting from access to or work with Confidential Information, provided that such party shall maintain the confidentiality of the Confidential Information. The term "residuals" means the concepts, ideas and know-how, which are retained in the unaided memories of those employees of the party that have been working with the Confidential Information without reference to any material which is written, stored in magnetic, electronic or physical form or otherwise fixed, and expressly excluding any information or works protected by copyright, patent or integrated circuit topography legislation.

5.5     Disclosures Permitted.    Notwithstanding Section 5.1, the parties may disclose confidential information (i) if accepted for disclosure in writing by the Contract Review Committee, or (ii) if required by law, listing exchange (AMEX, NYSE, etc.) regulation or a court order; provided, however, that in the case of (ii) the party being required to make such disclosure shall, to the extent practicable, provide the other party with advance notice of

8

PROPRIETARY INFORMATION

such disclosure requirement and assist such other party in seeking to have the governmental body agree to the redaction of the confidential information, or the disclosure of such material under seal or other appropriate and available means to protect confidentiality. In addition, ITC may disclose the terms of the Patent License Agreement to any existing TDMA patent licensee, only if, and only to the extent required, under most favored licensee clauses; provided, however, that ITC, shall make such disclosure to an outside attorney or agent for such licensee on a confidential basis and provide that only summary information necessary for the licensee to assess MFL rights be provided to such licensee.

## ARTICLE 6 - PAYMENT TERMS

6.1   <u>Registration</u>. Each party hereby agrees to register or cause to be registered, to the extent required by applicable law, and without expense to the other party or any of its Affiliates, this Agreement and/or any Related Agreements. Each party hereby waives any and all claims and defenses, arising by virtue of the absence of such registration, that might otherwise limit or affect its obligations to the other party.

6.2   <u>Audit</u>. Each party hereto shall (and shall cause their Affiliates to) keep books and records adequate to accurately determine the payments due under this Agreement or the Related Agreements. The books and records must be retained for at least five (5) years after the delivery of the royalty report, or the invoice, to which they relate. Each party shall have the right, no more than once per calendar year, to have an independent

PROPRIETARY INFORMATION

certified public accountant, who shall enter into an appropriate non-disclosure agreement with the other party, inspect all relevant books and records of the other party on seven (7) business days prior notice and during regular business hours to verify the reports and invoices required to be made hereunder.   The auditor shall disclose no more information than is reasonably necessary to determine the royalties owed or amounts invoiced hereunder.  Should a royalty underpayment in excess of five percent (5%) for any calendar year be discovered, Nokia shall pay the cost of the audit.  Should a TDD Project overcharge in excess of five percent (5%) for a calendar year be discovered, IDC shall pay the cost of the audit.  Nokia shall promptly pay any royalty underpayment together with interest at the compounded annual rate of ten percent (10%); similarly, IDC shall promptly refund any TDD Project overcharge with interest at the compounded annual rate of ten percent (10%).    All information obtained through such audit shall be held in confidence by the parties.

6.3   Taxes.  Each party shall pay its own tax, duty, levy, customs fee, or similar charge ("taxes"), including interest and penalties thereon, however designated, imposed as a result of the operation or existence of this Agreement, including but not limited to net income taxes imposed by any governmental entity within the United States (the fifty (50) states and the District of Columbia). All applicable taxes which are required by law to be deducted from amounts payable to ITC or IDC (including but not limited to deductions for Finnish withholding tax ) shall be deducted from the royalties payable hereunder and paid to the relevant government authority

PROPRIETARY INFORMATION

by Nokia on behalf of ITC or IDC, as applicable. If any such deduction is required by the relevant government, Nokia will furnish ITC or IDC (as applicable) with appropriate documentation evidencing the payment of such tax as issued by the appropriate authority of such government.

6.4    Payment in Dollars.  All payments required under this Agreement or the Related Agreements shall be made in U.S. dollars.

ARTICLE 7  - EFFECTIVE DATE; EXECUTORY OBLIGATIONS;
TERM; TERMINATION

7.1    Effective Date.  The Effective Date of this Agreement and each of the Related Agreements shall be the date on which this Agreement and each of the Related Agreements shall have been fully executed by all of the parties thereto; provided, however, that, for Effective Date to occur, this Agreement and each of the Related Agreements must be fully executed within the same 10 business day period.

7.2    Term.  The term of this Agreement shall continue from the Effective Date until termination of the last-to-terminate of the Related Agreements.

Master Agreement
Execution Copy
\\DCPAS\LEGAL\B\RWpMcs\NOKIA\DRAFTS\MASTER11.DOC
January 22, 1999




PROPRIETARY INFORMATION

## ARTICLE 8  - MISCELLANEOUS

8.1    Publicity.  The parties shall use the press releases included herein as Exhibit 2 as the basis for disclosures concerning the execution of this Agreement. Except:  (i) with respect to such disclosures; (ii) pursuant to a court order; or (iii) as required by law, listing exchange (AMEX, NYSE, etc.) rules or government regulation, the parties shall agree on any public statements as to the undisclosed terms of this Agreement and the Related Agreements. IDC shall use its best efforts to limit the disclosure of the terms and conditions of the Related Agreements and if appropriate under the circumstances shall seek confidential treatment for any filings required to be made with the Securities and Exchange Commission or similar regulatory agency or stock exchange; provided, however, if such a disclosure is required, the party required to make the disclosure shall give the other party notice of the disclosure as soon as possible after the disclosure.

8.2    Conflicts.  In the event of any conflicts between terms of any of the Related Agreements and any terms of this Agreement, the terms of the Related Agreement shall control.

8.3    Governing Law.  The validity and interpretation of this Agreement and the Related Agreements shall be governed by New York law, without regard to conflict of laws principles.

PROPRIETARY INFORMATION

8.4    Headings.  The headings of this Agreement have been inserted for the convenience of the parties and shall not be construed as a part of or modifying any provisions of this Agreement.

8.5    Effect; Assignment.  The terms and conditions of this Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto.  Except as specifically stated in this Agreement or any Related Agreement, neither this Agreement (or any Related Agreement) nor any of the rights, interests or obligations of any party hereunder shall be assigned without the prior written consent of the other, and any such unauthorized assignment shall be void. Notwithstanding the foregoing, (i) any party may assign this Agreement and the Related Agreements and all of its rights and obligations hereunder and thereunder with regard to internal corporate reorganizations, and (ii) the provisions of this Agreement shall be assigned as necessary to enforce rights resulting from assignments of the Related Agreements, as set forth in those agreements.

8.6    Compliance with Law.  The parties shall in the performance of this Agreement and the Related Agreement comply with all applicable laws, executive orders, regulations (including without limitation U.S. and EU export administration regulations), ordinances, rules proclamations, demands and requisitions of national governments or of any state, local or other governmental authority. In addition, Nokia acknowledges that the Technical Information, Know-How, TDD ASICs  and any other commodities, software or technology to be furnished to Nokia under the

PROPRIETARY INFORMATION

terms of this Agreement are exported from the United States in accordance with the U.S. Export Administration Regulations. Nokia also acknowledges that the U.S. Export Administration Regulations may apply to commodities, software or technology that Nokia may create outside of the United States that incorporate or are the direct product of the Technical Information or Know-How and any other commodities, software or technology to be furnished to Nokia under the terms of this Agreement or the Related Agreements. The Nokia Group will not divert, reexport or reship any of these commodities, software, technology contrary to U.S. export control law.

8.7    Waivers.  The failure of any party to insist upon the performance of any of the terms or conditions of this Agreement or any Related Agreement or to exercise any right hereunder, shall not be construed as a waiver or relinquishment of the future performance of any such term or condition.

8.8    Severability/Reformation.  The provisions of this Agreement and the Related Agreements shall be severable, and if any of them are held invalid or unenforceable, then that provision shall be construed or, if necessary, reformed, to the maximum extent permitted by law, so as to most closely meet the intent of the Parties. The invalidity or unenforceability of one provision shall not necessarily affect any other. In addition, in the TDD Development Agreement and the Patent License Agreement, the parties have made specific license grants to each other with specific rights and restrictions thereunder.  To the extent such grants are construed as violating any applicable law, or construed in a manner which extends

14



PROPRIETARY INFORMATION

beyond the intent of the parties, as evidenced in the Related Agreements (including but not limited to the creation of implied licenses where no such license was intended to be created), such provisions shall be reformed to the maximum extent possible by law to meet the intent of the parties, as stated in this Agreement and the Related Agreements.

8.9    Independent Contractors.  In making and performing this Agreement and the Related Agreements, the parties act and shall act at all times, as independent contractors, and nothing contained in this Agreement or any Related Agreement shall be construed or implied to create an agency, partnership, or employer and employee relationship between IDC and/or ITC and Nokia.  At no time shall any party make any commitments or incur any charges or expenses for or in the name of another party.

8.10   Survival.  The following Articles shall survive the termination of the Master Agreement: Article 1, Article 3.1, Article 4, Article 5 (except 5.2), Article 6.2, Article 6.3, Article 6.4, Article 8.1, Article 8.2, Article 8.3, Article 8.4, Article 8.5, Article 8.8, Article 8.13 and Article 8.14.

8.11   Exhibits.  All Exhibits and other attachments to this Agreement or the Related Agreements which are referred to herein or therein are hereby incorporated in and made a part of this Agreement or the applicable Related Agreement.

8.12   Notices.  All notices or other communications required or permitted under this Agreement or any Related Agreement shall be in writing and shall be

15



PROPRIETARY INFORMATION

delivered by personal delivery or by wire communications (i.e., telex, fax, etc.) and confirmed by an "express delivery service" (such as FedEx or DHL), and shall be deemed to be effective upon the earlier of personal delivery, or two (2) business days after the date of transmission by wire.

Notice to ITC shall be sent to:

President
InterDigital Technology Corporation
300 Delaware Avenue
Suite 527
Wilmington, DE 19801

Notice to IDC shall be sent to:

General Counsel
InterDigital Communications Corporation
781 Third Avenue
King of Prussia, PA 19406
Fax number: 01 (610) 878-7844

Notice to Nokia shall be sent to:

Nokia Corporation
General Counsel
Keilalahdentie 4
SF – 02150 Espoo
Finland
Fax Number: +358 9 605 042

8.13  Controlling Version.  In the event of any conflict between the English language version of this Agreement or any Related Agreement and any non-English language version thereof, the English language version shall control.

16



PROPRIETARY INFORMATION

8.14  <u>Entire Agreement</u>. This Agreement and the Related Agreements contain the complete and final agreement between the parties, and supersede all previous understandings relating to the subject matter hereof and thereof whether oral or written; provided, however, that the Non-Disclosure Agreement dated August 12, 1998 between the parties shall remain in full force and effect as to Confidential Information disclosed thereunder prior to the Effective Date. This Agreement and the Related Agreements may only be modified by a written agreement signed by duly authorized representatives of the parties.

8.15  <u>Counterparts; Faxed Signatures</u>. This Agreement and each of the Related Agreements may be executed by the parties in counterparts, each of which shall be deemed an original of the applicable document. Signatures provided by facsimile or other electronic means by any party shall be valid and enforceable upon delivery to the other parties hereto.

Master Agreement
Execution Copy
\\DCPA5\LEGAL\BJR\Wpfiles\NOKIA\DRAFTS\MASTER11.DOC
January 22, 1999



PROPRIETARY INFORMATION

IN WITNESS WHEREOF, the parties have executed this Master Agreement by their duly authorized representatives.

INTERDIGITAL COMMUNICATIONS CORPORATION

BY: _William A. Doyle_

Name:  William A. Doyle

Title  :  President

Date  :  January 29, 1999

INTERDIGITAL TECHNOLOGY CORPORATION

By: _Howard E. Goldberg_

Name:  Howard E. Goldberg

Title  :  President

Date  :  January 29, 1999

NOKIA CORPORATION

BY: _Yrjö Neuvo_

Name:  YRJÖ NEUVO

Title:  SUP, PRODUCT CREATION

Date :  ~~Feb. 3, 1999~~
JANUARY 28

BY: _Heikki Huttunen_

Name:  HEIKKI HUTTUNEN

Title:  V.P LICENSING

Date:  January 28, 1999

Master Agreement
Execution Copy
\\\DCPAS\LEGAL\Bill\Wpfiles\NOKIA\DRAFTS\MASTER11.DOC
January 22, 1999

Exhibit 1

<u>DEFINITIONS</u>

1.  "<u>ASIC</u>" means application specific integrated circuit.

2.  <u>Affiliate</u>" means a corporation of legal entity: (i) more than 50% of
    whose shares or other securities entitled to vote for election of
    directors (or other managing authority) is now or hereafter controlled
    by such company either directly or indirectly; or (ii) which does not
    have outstanding shares or securities but more than 50% of whose
    ownership interest representing the right to manage such corporation or
    other legal entity is now or hereafter owned and controlled by such
    company either directly or indirectly; but any such corporation or other
    legal entity shall be deemed to be an Affiliate of such company only as
    long as such control or ownership and control exists.
    Only for the purposes of this Agreement, Nokia's Chinese joint venture,
    Beijing Nokia Mobile Communications Ltd, shall be considered Affiliate,
    provided Nokia maintains a fifty percent (50%) ownership interest.
    Future Nokia Chinese joint ventures in which Nokia's ownership is fifty
    percent (for political reasons) may be added as Affiliates by agreement
    of the parties, such agreement not to be unreasonably withheld or
    delayed, provided that Nokia exercises control over such entity thru
    management position or technology access..

3.  "<u>Base Station</u>" means (i) terrestrial access equipment that provides for
    network receive and/or transmit functionality to and from Subscriber
    Units and  (ii) other variants (such as wireless PBX base stations).

1

PROPRIETARY INFORMATION

4.  "B-CDMA Products" means Subscriber Units and/or Infrastructure used solely in a Wireless Local Loop Applications and employing B-CDMA Technology.

5.  "B-CDMA Technology" means the particular form of wideband code division multiple access technology developed by InterDigital.

6.  "CDMA" means code division multiple access.

7.  "Control" means, as regards an acquisition by or of InterDigital or Nokia, the acquisition of more than 50% of the shares or securities entitled to vote for election of directors of the identified entity.

8.  "Covered Infrastructure" means Infrastructure designed to operate in accordance with one or more of the Covered Standards but excluding Infrastructure for B-CDMA Products. Covered Infrastructure shall also include Infrastructure employing TDD and/or FDD, regardless of whether TDD or FDD are included in Third Generation.

9.  "Covered Standards" mean recognized standards or other specifications for CDMA- and/or TDMA -based communications systems describing the air interface between Infrastructure Equipment and Subscriber Units. Covered Standards shall include but not be limited to IS-54, IS-136, GSM, DCS-1800/1900, PDC, PHS, DECT, TETRA, and Third Generation.

PROPRIETARY INFORMATION

10.   "Covered Subscriber Units" means Subscriber Units designed to operate
      in accordance with one or more Covered Standards but excluding
      Subscriber Units employed in B-CDMA Products.  Covered Subscriber
      Units shall also include Subscriber Units employing TDD or FDD,
      regardless of whether TDD or FDD are included in Third Generation.

11.   "DCS 1800-1900" means the compatibility standard developed for PCS
      based on GSM but intended for use in the 1.8Ghz and 1.9 Ghz
      bandwidths, as amended from time to time.

12.   "DECT" means the cordless telephone comparability standard entitled
      "Digital European Cordless Telephone" promulgated by the European
      Telecommunications Standards Institute, as amended from time to time.

13.   "Developed" when used in reference to Know-How, Patents and
      copyrights, means developed under the TDD Project.

14.   "Effective Date" shall have the meaning ascribed to it in Section 7.1 of
      the Master Agreement.

15.   "Existing", when used in reference to Know-How, Patents and
      copyrights, means owned or possessed by a party hereto on the
      Effective Date, or developed outside the TDD Project during the term of
      the TDD Project, but, in either case, contributed to the TDD Project.

PROPRIETARY INFORMATION

16.    "Existing InterDigital B-CDMA Licensees" means Siemens AG and its
        Affiliates, Alcatel Espana, its ultimate parent company, and its
        Affiliates, and Samsung Electronics Company and its Affiliates.

17.    "Existing InterDigital UltraPhone Licensee" means Samsung Electronics
        Company, Ltd. and its Affiliates.

18.    "FDD" means frequency division duplex, which is an air interface
        methodology combining frequency division multiple access and CDMA
        technologies.

19.    "GSM " means the compatibility standard developed for the 900 MHZ
        PanEuropean digital TDMA cellular mobile radio communication system,
        promulgated by the European  Telecommunication Standards Institute,
        as amended from time to time.

20.    "Infrastructure" means switching centers, base station controllers, base
        station transceivers, transmission equipment ,and similar telephony
        equipment, which are used to interconnect a Subscriber Unit to the
        telephone network.  Switching equipment may be included in the
        mobile switching center or the base station controller.

21.    "InterDigital Licensed TDD Technology" means (i) Existing and Developed
        TDD Copyrights, and (ii) Existing and Developed TDD Know-How, in all
        cases owned or otherwise licensable by InterDigital.

PROPRIETARY INFORMATION

22.  "InterDigital Patents"  means the following, to the extent owned by
ITC, IDC or its Affiliates: (i) every Existing Patent; (ii) every Patent
issuing from Existing patent applications (including divisional,
continuation and continuation-in-part applications related thereto); and
(iii) every Patent or patent application having the priority date  within
five years of the Effective Date (including divisional, continuation and
continuation-in-part applications related thereto).  InterDigital Patents
include utility models but exclude design patents and design
registrations.

23.  "InterDigital TDD Patents" means those TDD Patents owned or
otherwise licensable by InterDigital.  To the extent InterDigital has the
right under a third party TDD Patent to grant sublicenses, such license
shall be included as an InterDigital TDD Patent to the extent that Nokia
pays any incremental royalty or fee associated with such third party
TDD Patent.

24.  "IS-54" means Cellular Dual Mode Mobile Station - Base Station
Compatibility Standards, promulgated by the Electronics Industry
Association and the Telecommunications Industry Association, as
amended from time to time.

25.  "IS-136" means an improved version of IS-54 which includes, among
other things, a digital control channel, as amended from time to time.

TDD Development Agreement
First Draft
Exhibit 1-Definitions
\\IDCPAS\LEGAL\BILL\WPFILES\NOKIA\DRAFTS\MASTER11.DOC

5

PROPRIETARY INFORMATION

26.   "Know-How" means know-how, show-how, technical data and other
trade secrets that derive value from the fact that they are not generally
know in the industry, including without limitation an unpatented
invention that is the subject of a pending and unpublished patent
application.

27.   "Major Competitor License Agreement" means a royalty-bearing license
agreement between a Major Competitor and ITC; provided, however,
that the agreement between InterDigital Communications Corporation
and American Telephone & Telegraph dated April 22, 1994 shall not be
included as a Major Competitor License Agreement unless or until
Lucent and ITC execute an acknowledgement that such agreement has
transferred as a matter of law to Lucent as successor in interest to
AT&T wireless telephony manufacturing business.  Absent such an
acknowledgement, the Major Competitor License Agreement with
Lucent would be a new patent license agreement executed by Lucent
and ITC after the Effective Date.

28.   "Major Competitors" mean Lucent Technologies, Inc., Ericsson, Inc., and
Motorola, Inc., and their successors or assigns, including purchasers of
the assets related to the matters covered under the Patent License
Agreement.

29.   "Nokia Group" means Nokia and its Affiliates.

PROPRIETARY INFORMATION

30.   "Nokia Group Patents" means the following, to the extent owned by the Nokia Group: (i) every Existing Patent,  (ii) every Patent issuing from Existing patent applications (including divisional, continuation and continuation-in-part applications related thereto),  and (iii) every Patent and patent application having the priority date within five years of the Effective Date (including divisional, continuation and continuation-in-part applications related thereto).  Nokia Group Patents shall include utility models but exclude design patents and design registrations and patents covering the manufacturing processes for semiconductors.

31.   "Nokia Licensed TDD Technology" means  (i) Existing and Developed TDD Copyrights, and (ii) Existing and Developed TDD Know-How, in either case owned or otherwise licensable by the Nokia Group.

32.   "Nokia TDD Patents"  means those TDD Patents owed or otherwise licensable by the Nokia Group. To the extent the Nokia Group has the right under a third party TDD Patent to grant sublicenses, such license shall be included as an Nokia TDD Patent to the extent that InterDigital pays any incremental royalty or fee associated with such third party TDD Patent.

33.   "Patent" means an issued patent.

34.   "PDC" means the RCR STD 27 compatibility standard developed in Japan known as PDC,  or Personal Digital Cellular (also Japan Digital

PROPRIETARY INFORMATION

Cellular) for TDMA digital wireless mobile radio communication systems, as amended from time to time.

35.  "Period 1" means the period starting on the first date of manufacture of Covered Subscriber Units or Covered Infrastructure by Nokia or its Affiliates and ending on the earlier of December 31, 2001, or the TDD Project Termination Date.

36.  "Period 2" means the period commencing upon the termination of Period 1, and ending on December 31, 2006.

37.  " PHS" means the RCR STD 28 compatibility standard developed in Japan known as PHS or Personal Handy Phone System, as amended from time to time.

38.  "Program Managers"" means one individual from each side appointed by Nokia and InterDigital to manage and coordinate the TDD Project.

39.  "Specifications" means the desired outcome of the TDD Project.

40.  "Subscriber Unit" means a network termination having radiotelephone capabilities, including but not limited to fixed, mobile, transportable, vehicular, portable, hand-held or radiocard.

41.  "TDD" means time division duplex which is an air interface technology employing a combination of TDMA and CDMA technologies.

PROPRIETARY INFORMATION

42.  "TDD ASIC Applications Know-How" means TDD Know-How necessary to incorporate TDD ASICs into TDD Products and to use the TDD Air Interface.

43.  "TDD ASIC" means an ASIC designed by InterDigital employing TDD.

44.  "TDD Air Interface" means the defined transmission medium for TDD Products, including descriptions, specifications, software and design information necessary to ensure compatibility between Base Stations and Subscriber Units employing TDD.

45.  "TDD Copyright" means a copyright on Technical Information included in the results of the TDD Project.

46.  "TDD Development Agreement" means the TDD Development Agreement executed between Nokia, IDC and ITC.

47.  "TDD Know-How" means Know-how included in the results of the TDD Project.

48.  "TDD Licensee" means any person or entity licensed by InterDigital under any TDD Technology.

49.  "TDD Patents" means those claims of the Nokia Group Patents or the InterDigital Patents which are technically necessary to implement the

PROPRIETARY INFORMATION

features, functions, and processes included in the results of the TDD Project but limited to the portion of the TDD Product performing TDD functionality.

50.  "TDD Product" means a Subscriber Unit or Infrastructure employing TDD.

51.  "TDD Project" means the project described in the TDD Development Agreement.

52.  "TDD Project Budget" means the expected cost of the TDD Project, as amended from time to time.

53.  "TDD Project Completion" means the completion of the tasks, and Nokia's receipt and approval of the required deliverables, as set forth in the Work Plans and Specifications. As used herein, "approval" shall include compliance with acceptance criteria to be developed by the parties in good faith.

54.  "TDD Project Schedule" means the schedule for the completion of various tasks related to the Work Plan in TDD Project, as such schedule is amended from time to time.

55.  "TDD Project Termination Date" means the date on which the TDD Project is terminated by Nokia under Article 9.4 of the TDD Development Agreement.

PROPRIETARY INFORMATION

56.   "TDD Technology" means the TDD Copyrights and TDD Know-How.

57.   "TDD Trademarks" means those trademarks, belonging to IDC or for
which IDC has capacity to grant a sublicense whether or not registered,
used or intended to be used by IDC and/or its licensees in conjunction
with the TDD Products and the technology incorporated therein,
including without limitation the TDD Air Interface.

58.   "TDMA" means time division multiple access.

59.   "Technical Information" means designs, drawings, prints,
specifications, semiconductor masks, technical data, software, net
lists, documentation, and manufacturing information, whether existing
in paper form or stored on electronic media.

60.   "Third Generation" means the next generation of digital wireless
telephony standards currently (i.e., as of the Effective Date) in the
process of being adopted by world-wide standards setting bodies,
including without limitation ETSI.  This effort is also commonly referred
to as "3G."

61.   "Total TDD Project Cost" means the total cost to be paid by Nokia to
IDC for the TDD Project, as amended from time to time.

TDD Development Agreement
First Draft
Exhibit1-Definitions
\\IDCPA5\LEGAL\BILL\WPFILES\NOKIA\DRAFTS\MASTER11.DOC

PROPRIETARY INFORMATION

62.   "UltraPhone Products" means Subscriber Units and Infrastructure employing UltraPhone Technology.

63.   "UltraPhone Technology" means the TDMA technology developed by InterDigital and existing as of the Effective Date, including modifications and improvements thereto, but in any event only for Wireless Local Loop Application.

64.   "Wireless Local Loop Applications" means a digital wireless communications system that is primarily directed to providing fixed wireless telephone service in place of wireline service.

65.   "Work Plan" means an organized sequence of tasks, time-tables, milestones, staffing, and deliverables leading to the completion of the TDD Project.

EXHIBIT 2

PRESS RELEASE

InterDigital Contacts:
Susan Sutton

e-mail: susan.sutton@interdigital.com
(610) 878-5677
Blair Christie

e-mail: blair.christie@interdigital.com
(610) 878-7866

Nokia Contacts:
Arja Suominen, V.P., Communications,
Nokia
e-mail: arja.suominen@ntc.nokia.com
      +358 95 113 8193
Tapio Hedman, V.P., Communications, Nokia
Mobile Phones
e-mail: tapio.hedman@nmp.nokia.com
      +358 10 505 5750

FOR IMMEDIATE RELEASE
February 1, 1999

## INTERDIGITAL AND NOKIA ANNOUNCE MULTI-YEAR DEVELOPMENT PROJECT FOR THIRD GENERATION TECHNOLOGY;
### Estimated Value of Approximately $70 Million

King of Prussia, PA, and Helsinki, Finland, February 1, 1999 . . . InterDigital Communications Corporation (ASE: IDC) and Nokia today announced a long-term cooperation agreement involving the development of new technology for third generation wireless telecommunications products designed for high data rate applications, such as Internet access.

Under the multi-year agreement, InterDigital will deliver technology building blocks for Nokia to use in third generation wireless products. The agreement, which includes paid up TDMA and CDMA patent licenses which generally extend through the project period, has an estimated value to InterDigital of approximately $70 million, including an initial payment of approximately $30 million. The companies have defined a framework for establishing licensing terms after the initial licensing period.

"Nokia is committed to furthering the development of third generation technologies, which will herald the era of a true Wireless Information Society. In addition to Nokia's own core development of third generation, we place great emphasis on additional R&D, including co-operation with key industry players," said Ahti Väisänen, Vice President, Third Generation Technology, Nokia Mobile Phones. "Nokia believes that its work with InterDigital over the next several years will complement its own development of third generation products," he said.

29/01 '99 PE  00:23 FAX +358 9 51138199      NTC COMMUNICATIONS                    @002
: By: INTERDIGITAL;                    610 878 7848;      28 Jan 99 16:12;  Job 921;Page 3/6

Harry Campagna, Chairman of InterDigital, said: "Nokia has selected us to develop an important component of third generation wireless technology. In doing so, this global telecommunications leader recognizes our expertise in developing air interface technologies. This is an important relationship for us. The telecommunications industry is moving aggressively to address the demand for high-speed data capability and we are pleased to be participating in that technology arena. Our work with Nokia will broaden our position as a developer of leading-edge technologies and enable us to grow as third generation technologies are commercialized.

"In working for Nokia, we will use our technical expertise to design advanced technology and we will retain ownership rights over the technology we develop. This will enable InterDigital to produce and sell products utilizing the new technology, as well as license other companies under the technology," he said.

Nokia's in-depth know-how of wireless systems is acknowledged world-wide, and Nokia plays a central role in taking the future-proof GSM platform further into third-generation telecommunications systems with the UMTS (Universal Mobile Telecommunications System) and IMT-2000 (International Mobile Telecommunication System 2000) technology.

Nokia is the world's leading mobile phone supplier and a leading supplier of mobile and fixed telecom networks including related customer services. Nokia also supplies solutions and products for fixed and wireless datacom, as well as multimedia terminals and computer monitors. In 1997, net sales totaled FIM 52.6 billion (USD 9.8 billion). Headquartered in Finland, Nokia is listed on five European Stock Exchanges and on the New York Stock Exchange (NOK.A), has sales in 130 countries and employs more than 42,000 people world-wide.

InterDigital develops and markets wireless telecommunications systems and components using both proprietary and standards compliant technologies for voice and data communications. In the past twelve months, InterDigital has developed relationships with the leading wireless access provider, Alcatel, and now, the number one mobile phone supplier in the industry, Nokia.

As InterDigital begins its work for Nokia, it will also remain committed to B-CDMA™ technology for the wireless local loop and will continue to work in close cooperation with the B-CDMA Alliance™.

CCT

In conjunction with the B-CDMA Alliance ™, which consists of Siemens AG, Samsung Electronics Co. Ltd., and Alcatel Alsthom, InterDigital is commercializing its new B-CDMA™ technology for use in wireless communication products. InterDigital®, Broadband Code Division Multiple Access™, and B-CDMA™ are among the trademarks of InterDigital Communications Corporation. As used herein, where the context so requires, references to InterDigital Communications Corporation includes reference to InterDigital Technology Corporation, the holder of InterDigital patents. For more information, please visit InterDigital's web site: www.interdigital.com.

### 

This press release contains forward looking statements regarding InterDigital's current beliefs and expectations as to the estimated value of the agreement, Nokia's funding of the development project, the ability of the technology and products developed under the agreement to enhance the Company's competitive position and continued commitment to B-CDMA technology and alliances. Such statements are subject to risks and uncertainties. Actual outcomes could differ materially from those expressed in any such forward looking statement due to a variety of factors including, but not limited to: failure to achieve desired development goals, budget and/or schedule, Nokia's exercise of its rights to terminate the development project for convenience, the availability of competitive products or technology superior on a perceived, relative or actual basis with the InterDigital's products or technology, failure of business partners to meet expectations and inability to retain or hire adequate personnel. InterDigital undertakes no duty to publicly update any forward looking statements, whether as a result of new information, future events or otherwise.

# EXHIBIT 2

# TDD DEVELOPMENT AGREEMENT

## Between

## InterDigital Communications Corporation

## InterDigital Technology Corporation

## and

## Nokia Corporation

## Table of Contents

ARTICLE 1 - DEFINITIONS ....................................................................... 2
    1.1 Definition ..................................................................................... 2
ARTICLE 2 – TDD PROJECT ...................................................................... 2
    2.1 Overall Program/Goal .................................................................. 2
    2.2 Scope of Work .............................................................................. 2
    2.3 Pre-Requisites ............................................................................. 2
    2.4 Technology Transfer ..................................................................... 3
    2.5 Location of Services ..................................................................... 3
    2.6 Program Control/Management ...................................................... 3
    2.7 Reports/Penalty ........................................................................... 8
    2.8 No Solicitation ............................................................................ 11
ARTICLE 3 – STANDARDIZATION ASSITANCE .................................... 11
    3.1 Standardization Commitment ...................................................... 11
    3.2 Standardization Efforts ............................................................... 12
    3.3 Submittals ................................................................................... 13
    3.4 Notification .................................................................................. 13
ARTICLE 4 – INTELLECTUAL PROPERTY RIGHTS .............................. 13
    4.1 Ownership ................................................................................... 13
    4.2 ITC and IDC License Grants ...................................................... 14
    4.3 Nokia License Grants ................................................................. 15
    4.4 Jointly Developed Patent Rights ................................................. 17
    4.5 Patent Filing Coordination .......................................................... 19
    4.6 Certain Ackowledgements and Representations .......................... 19
    4.7 Additional Limitations and Conditions of the License Grant ........ 19
    4.8 Cooperation in Patent Infringement Assessment/Litigation ......... 21
    4.9 InterDigital TDD Technology Licensing ...................................... 22
ARTICLE 5 – COMPENSATION ................................................................ 23
ARTICLE 6 – TDD PRODUCT PURCHASES ............................................ 23
ARTICLE 7 – TDD ASIC SALES ............................................................... 24
ARTICLE 8 – WARRANTIES; LIMITATION OF LIABILITIES .................... 24
    8.1 Title Warranty ............................................................................. 25
    8.2 Limitation of Liability ................................................................... 25
    8.3 Limitation of Warranties .............................................................. 25
ARTICLE 9 – EFFECTIVE DATE; TERM; TERMINATION ........................ 26
    9.1 Effective Date .............................................................................. 26
    9.2 Term ............................................................................................ 26
    9.3 Termination for Cause ................................................................. 26
    9.4 Termination for Convenience ....................................................... 26
    9.5 Rights Upon Termination ............................................................. 27
ARTICLE 10 – MISCELLANEOUS ............................................................ 28
    10.1 Incorporation by Reference ....................................................... 28
    10.2 Exhibits ..................................................................................... 28
    10.3 Entire Agreement ...................................................................... 28

PROPRIETARY INFORMATION

10.4  Counterparts/Faxed Signatures.................................. .................. . ...   ..... . . 28

PROPRIETARY INFORMATION

## TDD DEVELOPMENT AGREEMENT

THIS AGREEMENT is entered into as of the Effective Date between and among InterDigital Communications Corporation, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with offices at 781 Third Avenue, King of Prussia, Pennsylvania 19406 ("IDC"), InterDigital Technology Corporation, a Delaware corporation with offices at 300 Delaware Avenue, Suite 527, Wilmington, Delaware 19801 ("ITC" and, together with IDC, "InterDigital"), and Nokia Corporation, a corporation existing under the laws of the Country of Finland, with offices at Keilalahdentie 4, SF - 02150 Espoo, Finland ("Nokia").

### Background

Nokia is a global leader in the design, manufacture, and supply of advanced wireless telecommunications equipment, including Infrastructure and Subscriber Units utilizing time division multiple access technology (TDMA). Nokia is also a leading developer and participant in the standards setting process associated with Third Generation applications.

IDC has developed extensive digital communications technology experience involving both TDMA and code division multiple access (CDMA) technologies.

Nokia desires to engage IDC to develop time division duplex ("TDD") technology, which .echnology is currently being proposed as part of the technological solution for Third Generation applications.

Nokia and InterDigital further desire to enter into an agreement providing for the mutually beneficial cross-licensing of the TDD Technology.

NOW THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto, intending to be legally bound, agree as follows:

PROPRIETARY INFORMATION

## ARTICLE 1 -- DEFINITIONS

1.1    <u>Definitions</u>.  As used herein, the terms set forth in the Master Agreement, <u>Exhibit 1</u> thereto, when used with initial capital letters in this Agreement, including any Exhibits, attachments or amendments, shall have the meanings described in such <u>Exhibit 1</u>.

## ARTICLE 2 -- TDD PROJECT

2.1    <u>Overall Program/Goal</u>.  Pursuant to the terms and conditions of this Agreement, IDC will undertake to develop TDD Technology for Nokia.   As contemplated by the Work Plans and Specifications as of the Effective Date, IDC will develop the technology and intellectual property blocks for the TDD Technology for use in Third Generation.  That development effort may include software development, ASIC development, modem development, and other aspects of TDD Technology.  IDC's development effort will be undertaken principally at IDC's R&D facilities. IDC will provide the TDD Technology to Nokia for its use in productizing the TDD Technology.   Nokia will be permitted to employ the TDD Technology without further royalty obligation to InterDigital, as set forth herein.  IDC will be permitted to use TDD Technology for its TDD Products, and license others under the TDD Technology, as set forth herein.

2.2    <u>Scope of Work</u>.  IDC will use reasonable efforts to accomplish the TDD Project and deliver to Nokia the deliverables pursuant to the Work Plans and Specifications.  The initial Work Plans and Specifications are contained in <u>Exhibit 1</u>.  The Work Plans and Specifications may be amended from time to time in accordance with the provisions of Section 2.6.

2.3    <u>Prerequisites</u>.  IDC shall provide adequate, experienced and trained resources to execute TDD Project according to the Work Plans and Specifications. IDC shall provide basic facilities like office and laboratory  space with standard furnishing and equipment. These arrangement are done so that necessary security and confidentiality

PROPRIETARY INFORMATION

requirements have been taken care. Nokia will provide experienced and trained resources for leading standardization activities, project supervision and technology transfer. IDC will provide for limited number of Nokia personnel (4-8) a possibility to work at the IDC R&D facilities premises on the TDD Project, with such working environment to be comparable with IDC's own project personnel. Such personnel will comply with IDC's policies and procedures on security.

2.4    Technology Transfer. InterDigital will provide Nokia with access to TDD Technical Information in accordance with the Work Plans and Specifications in real time. Generally, documentation will be made when closed and final, unless the Work Plans and Specifications provide for earlier release. For the quality control purposes, IDC shall not be required to provide working drafts of documentation absent a requirement to do so under the Work Plans and Specifications; provided, however, that Nokia may request such draft information, which request will IDC shall be considered promptly and in good faith by IDC. The documentation will be made available to Nokia by placement in electronic and paper format in repositories in at IDC's R&D facilities. Computer access will be provided to authorized Nokia employees having a valid password, and agreeing to comply with all IDC's policies and procedures on security.

2.5    Location of Services. The services to be rendered by IDC related to this Agreement shall be performed by IDC's employees primarily at the IDC facilities in Melville, New York, and King of Prussia, Pennsylvania, USA.

2.6    Program Control/Management. The TDD Project shall be directed and coordinated in the following manner:

2.6.1 Schedule/Budget. The initial Work Plans and Specifications, TDD Project Budget and TDD Project Schedule are contained in Exhibit 1. The Work Plans and Specifications may be revised by the parties jointly, or by Nokia, as set forth below. Any amendments to the TDD Project Budget and/or TDD Project Schedule must be by agreement of the parties (generally the Program

PROPRIETARY INFORMATION

Managers), as set forth below. IDC shall use its reasonable efforts to accomplish the TDD Project in a minimum budget and schedule.

2.6.2 InterDigital Management. InterDigital shall have the management responsibility for the implementation of the Work Plans and Specifications, such management responsibility to include but not be limited to:

    (a)    Employ appropriate and skilled engineers and technicians for the performance of the Work Plans and Specifications, it being understood that IDC will use reasonable efforts to minimize any changes in its personnel engaged in the TDD Project and keep Nokia informed of any significant changes in staffing among the first two tiers of management assigned to the project;

    (b)    Engage and monitor contractors using standards customary in the industry;

    (c)    Maintain appropriate security measures regarding the development, disclosure and dissemination of TDD Technology;

    (d)    Provide suitable training opportunities for employed personnel to maintain and enhance competence; and

    (e)    Establish suitable project procedures and guidelines regarding document and revision control, cost reporting, quality assurance, program review, etc.

2.6.3 Technical Steering Committee. A technical steering committee (TSC), comprised of technical representatives from Nokia and IDC, shall provide overall technical direction for the TDD Project. The TSC will meet on an as-needed basis to review technical matters and, with due consideration to the

PROPRIETARY INFORMATION

cost, schedule, and intellectual property issues, make recommendations as to the technical direction of the TDD Project. Recommendations of the TSC shall be made by agreement of IDC and Nokia. TSC recommendations shall be approved in writing in program management meetings (described in Section 2.6.4) prior to implementation.

2.6.4 <u>Program Management Meeting</u>. The Nokia and IDC Program Managers for the TDD Project shall meet on a regular basis. The Program Managers' Meeting (PMM) will be used to track program status, review deliveries and milestones, coordinate project activities, review TSC recommendations (or the inability of the TSC to reach a consensus), approve revised TDD Project Budgets and TDD Project Schedules prepared by IDC (as directed by the Contract Review Committee – see below), assign and review program level action items, make recommendations as to the how to best address Major Deviations (described in Section 2.7.3) and generally address any other program issues. In addition, at any PMM, the Program Managers shall have the authority to approve changes to the Work Plans and Specifications provided such changes do not result in (i) upward deviations of more than five percent (5%) in the projected Total TDD Project Cost, as compared to the then-existing TDD Budget, or (ii) upward deviation of more than 10% in the projected Total TDD Project Cost, as compared to the then-existing TDD Budget, when such change is combined with previously approved changes to the Work Plans and Specifications underlying the then-current TDD Budget, or (iii) delays in the completion of project milestones or deliverables of more than two months as compared to the then-existing TDD Schedule, or (iv) delays of more than four (4) months in the TDD Projection Completion, as compared to such TDD Schedule, when such change is combined with previously approved changes in the Work Plans and Specifications. PMM decisions shall be made by agreement of IDC and Nokia and recorded in the written minutes signed by the Program Managers of both IDC and Nokia. Regardless of the number of individuals attending for each company, IDC and Nokia shall each have one vote. Any such changes to the

PROPRIETARY INFORMATION

Work Plans and Specifications not authorized to be made at the PMM as set forth above must be approved in a Contract Review Meeting (described in Section 2.6.5) prior to implementation. In addition, any deviations or changes to the TDD Project Budget and TDD Project Schedule for which the PMM cannot reach a consensus shall be referred to the Contract Review Committee. All approvals and recommendations of the PMM shall be documented in writing.

2.6.5 <u>Contract Review Meetings</u>.  Contract review meetings ("CRM") will be held at major program milestones, as set forth in the Work Plans and Specifications, or as otherwise needed but in no event less than once every six months. The Contract Review Meetings will be used to approve project results, define the Confidential Information available for disclosure to third parties (unless already exempted under Master Agreement or this Agreement), review the scope and the focus of the project, review the actions taken at, or recommendations arising out of, the PMM, approve the TDD Project Schedule or TDD Project Budget (to the extent such approval was not attained by the Project Managers), track external circumstances which will have an impact to the project and give approval of plans and funding of the project for the following six months' period. These meetings will be attended by four Nokia and four IDC senior corporate representatives; provided, however, that Nokia and IDC shall each have one vote per company, regardless of the number of representatives attending the Contract Review Committee. Nokia will nominate one of its representatives to act as a chairman of the Contract Review Committee. The Chairman will have the responsibility to call the meetings; provided, however, that IDC may call a meeting if required to have TDD Technology deliverables approved. In addition to other matters, any changes to the Work Plans and Specifications recommended by the Program Managers but for which the PMM did not have the authority to implement, shall be reviewed and voted on in the Contract Review Meeting. Such changes to the Work Plans and Specifications, as well as any PMM proposed changes to the Work Plans and Specifications, TDD Project Schedule and/or TDD Project Budget to address Major Deviations

PROPRIETARY INFORMATION

(described in Section 2.7.3 below), shall be agreed to in writing by IDC's and Nokia's senior corporate representatives on the Contract Review Committee, such agreement not to be unreasonably withheld or delayed; provided, however, that the Contract Review Committee Chairman may, in good faith and after consultation with IDC, unilaterally reduce the scope of the work effort for the TDD Project, provided such change does not materially impair the objective of IDC to have the development of useable and licensable TDD Technology funded by Nokia in exchange for other considerations in this Agreement and the Patent License Agreement. By way of examples only, "material impairment" (i) includes reduction in the Work Scope and Specifications that would significantly reduce the Total Project Cost below the $40,000,000 amount contemplated by the initial Work Plans and Specifications and materially reduce any development of TDD Technology necessary for Third Generation, and (ii) excludes a significant reduction to the Work Plans and Specifications (a) necessary to achieve TDD Project Completion by the year 2002 or (b) that would significantly reduce a future TDD Project Budget (which provided for higher than $40,000,000 spending) back to $40,000,000. To the extent that such changes are approved or directed, the Work Plans and Specifications, TDD Project Budget and TDD Project Schedule, as applicable, shall be revised by IDC, and approved at the next PMM. In addition, the Contract Review Committee shall direct IDC to revise the TDD Project Budget and TDD Project Schedule to reflect the changes to the Work Plans and Specifications previously approved by the PMM and within the PMM's authority. The Chairman shall provide written directives to IDC to perform all such actions set forth above. Such directive shall be a prerequisite for IDC to commence work according to the revised Work Plans and Specifications for changes not previously approved at a PMM, and within the PMM's authority.

PROPRIETARY INFORMATION

2.7    Progress Review/Penalty.

      2.7.1 <u>Monthly Reports</u>. At the end of each month IDC will provide Nokia a Monthly Report, which contains (i) expended hours for each person in the project, (ii) actual labor cost, (iii) list of other expenses with appropriate backup documentation for expenses, (iv) status of the Deliverables having scheduled date in previous month and the status of all delayed deliverables and (v) a short description of the plan of next month activities. IDC monthly invoice to Nokia is based on this report (See Compensation Schedule, <u>Exhibit 2</u>).

      2.7.2 <u>Quarterly Reports</u>. At the first PMM after the end of each calendar quarter, IDC shall make a report to Nokia describing the status of the TDD Project. Such report shall provide information to Nokia as to (i) actual TDD Project costs to date versus the budget cost, (ii) the projected year-end cost versus the budgeted year-end costs, (iii) the projected project-end costs versus budgeted project-end costs, (iv) estimated delivery dates for key deliverables (as set forth in the Work Plans and Specifications) as compared to the TDD Project Schedule, and (v) the estimated date of TDD Project Completion as compared to the TDD Project Schedule. The report will provide suitable explanations for (i) any deviations of 5% or greater between the actual costs or estimated costs, by appropriate cost category (labor, travel, equipment, etc.) for the applicable period (month-end, year-end, project-end) and the budget, and (ii) any delays of greater than two months or more in the expected completion of deliverables as compared to the TDD Schedule.

      2.7.3 <u>Major Deviations</u>. If, at the PMM (as set forth in Section 2.6.2), IDC identifies that either (i) the projected Total TDD Project Cost will exceed the then-current TDD Project Budget by ten percent (10%), or (ii) the projected TDD Project Completion date shall exceed the TDD Project Schedule by more than four months ("Major Deviation"), the Program Managers will devise a course of action to properly deal address the causes for such Major Deviation, and a

PROPRIETARY INFORMATION

meeting of the Contract Review Committee will be promptly convened. The Contract Review Committee will review the proposal made by the Program Managers for appropriate adjustments to the Work Plans and Specifications and/or the TDD Project Budget or TDD Project Schedule as set forth in Section 2.6.3.

2.7.4 <u>IDC Penalty</u>. The TDD Project is a research and development project, with the attendant risks and uncertainties as regards, among other things, schedule, cost and final results. As a result, the parties understand that, IDC may not be able to complete the TDD Project in accordance with the TDD Project Budget or TDD Project Schedule adopted by the parties, and that IDC will require flexibility in timing and cost estimates for the TDD Project. Notwithstanding the foregoing, but subject to 2.7.5, if a Major Deviation occurs that (i) was not caused by Nokia , (ii) was not the result of changes to the Work Plans and Specifications approved at the PMM or by the Contract Review Committee,(iii) cannot be attributed to the inherent risks of R&D projects, or (iv) cannot be attributed to situations or influences beyond the reasonable control of IDC, such situations beyond IDC's control including without limitation changes in Third Generation, shortage of qualified engineering resources arising from changed conditions (as compared to those in effect as of the Effective Date), failure of contractors selected by Nokia, or failure of contractors selected by IDC (excluding contractors being used to supplement IDC's internal work force) unless such failure is solely attributable to IDC's failure to use commercially accepted practices in   managing such contractor, ("IDC-Caused Major Deviation"), the parties agree that, subject to Nokia's rights to terminate or reduce the TDD Project work scope, the Work Plans and Specifications, TDD Project Budget, and/or TDD Project Schedule shall be revised by mutual agreement of the parties, such approval not to be unreasonably withheld or delayed, to properly address the causes or causes for the Major Deviation. Nokia shall have the burden of proving that a delay was an IDC-Caused Major Deviation. Thereafter, if another IDC-Caused Major Deviation occurs without



PROPRIETARY INFORMATION

there having been an intervening approved modification to the Work Plans and Specifications, TDD Project Schedule or TDD Project Budget for other than IDC-Caused Major Deviations ("Intervening Change"), the royalty credit cap provided under Section 3.1.3 of the Patent License Agreement (i.e., 50% of the monies paid to IDC for the TDD Project) shall be increased by 5% (i.e., to 55% of the monies paid to IDC for the TDD Project). The Contract Review Committee will also make appropriate changes to the Work Plans and Specifications, TDD Project Budget, and/or TDD Project Schedule to properly address the IDC-Caused Major Deviation.  In the event of (i) a subsequent IDC-Caused Deviation as regards such revised TDD Project Budget or TDD Project Schedule, without Intervening Change,  or (ii) two consecutive IDC-Caused Deviations as regards a future adopted TDD Project Budget or TDD Schedule, the royalty credit cap shall be increased  by an additional 5%.  The maximum royalty credit cap shall be 75%.

2.7.5  <u>No Cumulative Remedies</u>.  As an alternative to adjusting the royalty credit cap, as set forth in Section 2.7.4, Nokia may alternatively pursue the termination of the agreement pursuant to the provisions of Section 9.3.  Nokia shall not be permitted to avail itself to both the royalty credit cap increase remedy, and the remedies available under contract and law for termination for breach  with regard to the same IDC-Caused  Major Deviation.

2.8    <u>No Solicitation</u>.  During the term of the TDD Project and for one year thereafter or for one year after the termination of this Agreement, the parties' employees engaged in the TDD Project shall not actively seek to employ, or make offers of employment to, either directly or indirectly, the engineering, technical, or project-related supervisory personnel of the other party engaged in the TDD Project without the prior written consent of such other party; and further, irrespective of how such employment is sought, neither party shall directly or indirectly actively seek to employ, or make offers of employment to the engineering personnel occupying top two organizational tiers on the TDD Project.  IDC shall inform its employees of such restrictions. The parties

PROPRIETARY INFORMATION

acknowledge that, in the event of a breach of this agreement, the affected party will not have an adequate remedy at law. Therefore, in such event, the affected party shall have the right, in addition to other rights and remedies in law or in equity, to have the provision of this section specifically enforced and to obtain a temporary or permanent injunction or order prohibiting any of the breaching party from employing any individual of the affected party in violation of this Section.

## ARTICLE 3 – STANDARDIZATION ASSISTANCE

3.1    Standardization Commitment. Nokia will take an active role, with the assistance of IDC, in promoting the adoption by the European Technical Standards Institute ("ETSI"), the Telecommunications Industry Association ("TIA") and International Telecommunication Union ("ITU") as well as other standard setting groups where Nokia has influence, of wireless communications standards for Third Generation applications embodying key components of TDD.

3.2    Standardization Efforts. Nokia and IDC will undertake the standardization activities in accordance with the Work Plan and Specifications, such efforts to include as minimum:

3.2.1    Nokia acting as the lead promoter of the TDD for inclusion of technically and commercially desirable features in appropriate telecommunications standards within its regular standardization activities;

3.2.2    Nokia and IDC attending appropriate meetings and workshops, preparing submittals and presentations, either jointly or independently, regarding TDD;

3.2.3    IDC performing patent clearance reviews with regard to submittals and presentations regarding TDD; and

PROPRIETARY INFORMATION

    3.2.4   IDC and Nokia keeping each other informed as to standardization strategies, efforts and the like regarding TDD.

3.3    <u>Submittals</u>.  Prior to making a submission regarding specifically TDD Technology to any standard setting body during the term of the TDD Project, the submitting party shall first provide a copy of the proposed submission to the other parties for review and comment in respect of the technical quality and commercial feasibility of the proposed submission. All comments shall be considered by the submitting party in good faith, and the parties will use all reasonable efforts to resolve any disagreements as regards the content of the submission including, if necessary, submitting the matter to a Contract Review Meeting for discussion. Notwithstanding the foregoing, a party, after complying with the foregoing provisions, may make the submission without the consent of the other party provided that the submission does not include the name of the dissenting party and that, in any event, the submitting party has complied with the Proprietary Information provisions of the Master Agreement, including but not limited to patent bar review.

3.4    <u>Notification</u>.  Notwithstanding the provisions of Section 3.1 and 3.2, Nokia and/or IDC may find it desirable to support other or multiple technologies for inclusion in Third Generation. Nokia and IDC will use reasonable efforts to keep each other informed on a regular basis as to each party's standardization strategy.

3.5    <u>Compliance with IPR Rules of Relevant Standardization Bodies</u>. Both parties undertake to comply with the IPR Rules of the relevant standardization bodies in respect of the submissions made to the TDD standardization and undertake to license under the rules of such bodies.

PROPRIETARY INFORMATION

## ARTICLE 4 – INTELLECTUAL PROPERTY RIGHTS

4.1   Ownership

4.1.1  Existing Patents, Copyrights and Know-How.  InterDigital shall continue to own its Existing TDD Technology and Existing Patents.  Nokia shall continue to own its Existing TDD Technology and Existing Patents.

4.1.2  Developed Technology.  Except as provided in Section 4.1.3, InterDigital will own the Developed TDD Technology and Developed Patents created by InterDigital, and Nokia will own any Developed TDD Technology and Developed Patents created by Nokia.  Except as provided in Section 4.1.3, Developed TDD Technology jointly developed by the parties shall be jointly owned by the parties with the respective rights and responsibilities of the parties as to jointly held Developed Patents being as set forth in Section 4.4.

4.1.3  Lab-Created Technology.   Notwithstanding any provision herein to the contrary, InterDigital will be the exclusive owner of all Developed TDD Technology  and Developed Patents created or invented solely by a Laboratory Person(s).  For the purpose of this Section, Laboratory Person(s) shall mean (i) those InterDigital   personnel (including contractors, subcontractors, or consultants hired by  InterDigital) working principally at the IDC research and development laboratories, and (ii) any Nokia personnel (including contractors, subcontractors, or consultants hired by Nokia) assigned principally to work at the IDC research and development laboratories, including any such person for ninety days after the completion of such assignment. Nokia will promptly execute, or cause its employees, consultants and/or subcontractors, to execute, at Nokia's sole expense, all appropriate assignments and other documents necessary to accomplish or acknowledge IDC and/or ITC's ownership of intellectual property consistent with this Section 4.1.3.

PROPRIETARY INFORMATION

4.2    ITC and IDC License Grants.

    4.2.1    InterDigital Copyright and Know-How License Grant.    InterDigital hereby grants to the Nokia Group a non-exclusive, non-transferable, personal, world-wide, royalty-free license under InterDigital Licensed TDD Technology (including all related TDD Technical Information as a result of the TDD Proejct) and Developed Patents, to design, develop, manufacture and have manufactured (if substantially designed by Nokia), market, sell, distribute and use Subscriber Units and Infrastructure.    The licenses granted pursuant to this Section shall exclude any rights to sublicense, or any rights to design, develop, manufacture and have manufactured, market, sell and distribute B-CDMA Products.

    4.2.2    Technically Necessary TDD Patents. To the extent not covered by Section above, IDC and ITC shall grant, and they shall cause any of their Affiliates to grant, to the Nokia Group a non-exclusive, non-transferable, personal, world-wide, royalty-free license to design, develop, manufacture and have manufactured (if substantially designed by Nokia), market, sell, distribute and use TDD Products under (i) the InterDigital TDD Patents, and (ii) those InterDigital Patents which would otherwise necessarily be infringed when complying with any TDD standard for Third Generation; provided, however, that such license shall only be with respect to that portion of the TDD Product performing TDD functionality and shall not apply to any non-TDD portion (e.g., FDD, GSM, etc) of a TDD Product.

    4.2.3    Components. The grant above shall not include, by implication or otherwise, any license for components, except when used solely as a part and within the licensed products defined above.

    4.2.4    IDC Trademark License Grant.    At the request of Nokia, IDC shall grant Nokia and its affiliates a non-exclusive, non-transferable, personal, world-

PROPRIETARY INFORMATION

wide, royalty-free license to use the TDD Trademarks in conjunction with Subscriber Units and Infrastructure employing TDD, such license to be in accordance with standard trademark license terms as to maintenance of quality, and recognition of InterDigital trademark ownership.

4.3    Nokia License Grants.

4.3.1    Nokia Grant of License.  Nokia hereby grants to IDC and its Affiliates a non-exclusive, personal, world-wide, royalty-free license under the Developed Patents and Nokia Licensed TDD Technology (including all related TDD Technical Information as a result of the TDD Project) to design, develop, manufacture and have manufactured (if substantially designed by InterDigital), market, sell and distribute Subscriber Units and Infrastructure. The above license shall include the right to grant sublicenses under the Nokia Licensed TDD Technology but not under the Developed Patents owned solely by Nokia.

4.3.2    Technically Necessary TDD Patents. To the extent not covered by Section 4.3.1 above, Nokia shall grant, and it shall cause any of its Affiliates to grant, to IDC and its Affiliates a non-exclusive, non-transferable, personal, world-wide, royalty-free license to design, develop, manufacture and have manufactured (if substantially designed by InterDigital), market, sell, distribute and use TDD Products under (i) the Nokia TDD Patents, and (ii) those Nokia Group Patents which would otherwise necessarily be infringed when complying with any TDD standard for Third Generation; provided, however, that such license shall only be with respect to that portion of the TDD Product performing TDD functionality and shall not apply to any non-TDD portion (e.g., FDD, GSM, etc) of a TDD Product.

4.3.3    Components. The grant above shall not include, by implication or otherwise, any license for components, except when used solely as a part and within the licensed products defined above.

PROPRIETARY INFORMATION

4.3.4 <u>Nokia Non-Assertion</u>.  Nokia shall not assert (and shall ensure that its Affiliates do not assert) against IDC or its Affiliates any claims for infringement of the Nokia Group Patents regarding IDC's or its Affiliates' design, manufacture, have made, distribution, sale or use of TDD ASICs or modems.  In addition, Nokia shall not assert (and shall ensure that its Affiliates do not assert) any claims of infringement of the Nokia TDD Patents against (i) any purchaser of TDD ASICs or modems from InterDigital regarding the use of such TDD ASICs or modems in the TDD Products by such purchaser, or (ii) any TDD Licensee with regard to the use of the TDD Technology in TDD Products by such TDD Licensee; provided, however, that, with regard to (i) and (ii) such non-assertion shall not apply as to any such purchaser or TDD Licensee that asserts its Patents against the Nokia Group.

4.4    <u>Jointly Developed Patent Rights</u>.

4.4.1 ITC shall have the primary responsibility for (a) preparing and filing applications in the United States and other countries for all jointly Developed Patents, (b) pursuing the issuance of such Patents, and (c) maintaining such patents after issuance.  ITC, in performing such obligations, shall provide Nokia with copies of all material correspondence with the U.S. Patent Office and any foreign counterpart thereof concerning such Patents, and shall consult at regular intervals with Nokia concerning the same.  If ITC elects not to file or prosecute a patent application, or maintain such a patent after issuance, then Nokia may undertake such actions at its cost ("Nokia Controlled Patent").  ITC will use reasonable efforts to provide Nokia with adequate notice so as not to materially prejudice Nokia's rights as regards such patent applications or patents.

PROPRIETARY INFORMATION

4.4.2   Nokia and its Affiliates shall have the unrestricted right to use or have used, for itself or its Affiliates, the inventions claimed under such jointly owned Developed Patents. In addition, to the extent that Nokia is sharing in the cost of patent filing, prosecution and maintenance, Nokia shall have the right under the jointly owned Developed Patents to grant sublicenses to any party, in any field, for any purpose. Nokia shall also have the right under Nokia Controlled Patents to use such Patents in any manner, and to grant sublicenses to any party, in any field, for any purpose.

4.4.3   IDC and its Affiliates shall have the unrestricted right to use or have used, for itself or its Affiliates, the inventions claimed under such jointly owned Developed Patents. In addition, to the extent that ITC is sharing in the cost of patent filing, prosecution and maintenance, ITC shall have the right under the jointly owned Developed Patents to grant sublicenses to any party, in any field, for any purpose.

4.4.4   The parties agree that all attorneys fees and other out-of-pocket expenses reasonably incurred by the parties in applying for, maintaining and defending (as regards patent opposition proceedings but not Declaratory Judgment actions) the jointly owned Developed Patents shall be shared equally by the parties.   In addition, the parties will consult with each other prior to commencing any litigation over infringement of jointly owned Developed Patents. The parties will share in the recoveries of any such lawsuit in proportion to the costs borne by each party in such lawsuit. Without the prior written consent of the other party, a party that has not paid in a timely manner for the filing, prosecution and maintenance of a jointly owned Developed Patent shall not be permitted to commence litigation over such patent or to share in any recoveries regarding such patent.

4.4.5   Each party agrees, at its own expense, to provide reasonable cooperation to the other party in the application for and maintenance of the jointly

PROPRIETARY INFORMATION

Developed Patents. Without limiting the foregoing, each party, at the other party's reasonable request, shall execute (or cause its employees to execute) all applications for jointly Developed patents and such other instruments as may be necessary to apply for and maintain the jointly Developed Patents. Each party hereto grants to the other party a limited power of attorney until the expiration of the last to expire of the jointly owned Developed Patent to execute such applications and other documents on the first party's behalf and to the extent the first party is unable or unwilling to execute the same upon second party's reasonable request.

4.5    Patent Filing Coordination. Within sixty (60) days after the end of each calendar quarter, each party shall submit to the other party a summary of the patent application filings made during such quarter for inventions related to TDD Project. Such summary shall provide an abstract of the invention, the inventor(s), and the independent claims. Each party shall have sixty (60) days to provide comments to the other party as regards inventorship. In the event of a dispute over inventorship or ownership, the parties shall engage an independent patent lawyer, acceptable to both parties, to resolve the dispute. Such resolution shall be final and binding absent material new facts that affect inventorship.

4.6    Certain Acknowledgments and Representations. Each party represents that it fully understands and willingly accepts the allocation of intellectual property rights as set forth herein. Each party further acknowledges that the patents covering the inventions licensed pursuant to this Agreement are not perpetual, and that various Patents may expire during the term of this Agreement. Each party represents and acknowledges that all allocations of intellectual property rights set forth in this Agreement, as well as the duration of the patents covering such intellectual property rights, have been taken into account in the negotiation of the economic terms set forth in this Agreement.

PROPRIETARY INFORMATION

4.7    Additional Limitations and Conditions of the License Grant.  The license grants of this Article 4 are subject to the following conditions:

4.7.1  As used in Article 4, Infrastructure and Subscriber Units shall mean Subscriber Units and Infrastructure designed by, or for, the licensed party and which are sold by the licensed party or its Affiliates as fully completed units to its customers, including but not limited to end-users, operators or distributors (but not other telecommunications equipment manufacturers). The Nokia Group shall have no right to transfer licenses under the IDC Licensed TDD Technology or InterDigital Patents through the sale of ASICs, software or other parts to third parties; provided, however, the foregoing limitation will not limit the Nokia Group's right to provide spare parts and enhancements for licensed Subscriber Units and Infrastructure.   In addition, neither IDC nor its Affiliates shall have no right to transfer licenses under the Nokia Group Patents through the sale of ASICs, software or other parts to third parties; provided, however, the foregoing limitation will not limit the right of IDC or its Affiliates to provide spare parts and enhancements for licensed Subscriber Units and Infrastructure.

4.7.2  Subject to the provisions of Section 4.2.2, 4.3.2, 4.3.4, and 4.7.1, third party purchasers of Subscriber Units and Infrastructure licensed hereunder and purchased directly or indirectly from, respectively, Nokia or its Affiliates on the one hand or, IDC or its Affiliates or Licensees on the other hand, shall have the right to use and sell such purchased products for their normal or expected uses without further obligation under InterDigital TDD Patents, InterDigital Licensed TDD Technology, Nokia TDD Patents and Nokia Licensed TDD Technology licensed hereunder.

4.7.3  Notwithstanding the terms of Section 4.7.2, no license is granted by estoppel or implication under the Existing or Developed Patents to any purchaser of Subscriber Units (which are licensed hereunder) to make, use or sell



PROPRIETARY INFORMATION

Infrastructure not licensed hereunder; and no license is granted by estoppel or implication to any third party purchaser of Infrastructure Units (which are licensed hereunder) to make, use or sell Subscriber Units not licensed hereunder. Any claims that ITC or Nokia may have against a third party manufacturer that such units contributorily infringe or induce infringement of any claims of the Existing or Developed Patents are expressly reserved by ITC and Nokia hereunder; provided, however that in no event shall Nokia or IDC be held liable for contributory infringement or inducing infringement (or under any similar theory of liability) of Existing or Developed Patents licensed in this Agreement based on the uses made of Infrastructure and Subscriber Units licensed hereunder by direct or indirect purchasers, regardless of the manner in which such products are sold, marketed or promoted by Nokia or IDC.

4.8    Cooperation in Patent Infringement Assessment/Litigation.

4.8.1    Cooperation. As part of the TDD Project, InterDigital and Nokia will evaluate, on a regular basis, the applicability of third party Patents and patent applications to the TDD Technology, and take appropriate action to address any potential infringement issues. Notwithstanding the foregoing, neither InterDigital nor Nokia shall be required to undertake any TDD Project activity to the extent that, in the reasonable opinion of patent counsel for either party, the TDD Technology or may infringe, or otherwise create a potential for liability, under third party patent rights.

4.8.2    Notice. To the extent known, each party shall provide timely notice to the other party as to any theft or misappropriation of any Know-How licensed hereunder.

4.8.3    Non-Inclusion. Unless otherwise agreed or known by Nokia, and subject to the provisions of Section 4.8.1, IDC shall not knowingly and willingly, and

PROPRIETARY INFORMATION

based on actual knowledge of relevant third party Patents or copyrights, nonetheless include as part of the Developed TDD Technology Know-How any know-how that, when used by Nokia in its intended manner would infringe such third party Patents or copyrights. This Section shall not apply to Patents or copyrights that are essential to the implementation of Third Generation.

4.8.4  Limited IPR Indemnity.  .To the extent, and only to the extent, that IDC (i) is grossly negligent in the performance of patent clearance reviews anticipated by the Work Plans and Specifications, or (ii)  withholds from Nokia reasonable and considered conclusions by counsel that implementation of the TDD Technology would likely infringe Patents held by third parties, ((i) and (ii) excluding patents that are essential to Third Generation for which no indemnity shall apply). IDC shall defend, indemnify and hold Nokia and its Affiliates harmless against infringement of third party Patent rights by the TDD Technology as follows.  Such indemnity shall be limited to 50% of the reasonable costs and damages associated with such claims, capped at $1 million for each claim asserted and in no event greater than $10 million in the aggregate. In addition, such indemnity shall only apply only if Nokia (i) completes the TDD Project with IDC, (ii) promptly informs IDC in writing of any threatened infringement action against Nokia regarding TDD Technology (iii) permits IDC to actively participate in the defense of such suit, claim or proceeding, (iv) informs IDC of any possible settlement, and (v) does not enter into any settlement without the written consent of IDC, which consent shall not be unreasonably withheld or delayed.  IDC may, at its option, supply non-infringing modification to the TDD Technology sufficient to avoid the infringement.  Notwithstanding anything in this Agreement to the contrary, this indemnification obligation shall apply only if the alleged infringement relates directly to the TDD Technology provided to Nokia by IDC, and not any unintended combination of such technology with technology provided by Nokia or others



PROPRIETARY INFORMATION

4.9    InterDigital TDD Technology Licensing.   Notwithstanding any provision in this Agreement to the contrary, InterDigital's right to (i) market its services and enter into agreements and transfer TDD Technology to TDD Licensees, (ii) disclose Confidential Information developed in the TDD Project, and (iii) permit laboratory visits by third parties, shall be subject to the following restrictions:

   4.9.1    Pre-Marketing.    InterDigital may commence discussions with prospective TDD Technology Licensees concerning non-confidential TDD Technology commencing upon the earlier of July 1, 1999 or Nokia's disclosure of the TDD development effort with InterDigital. ("Pre-Marketing Date").

   4.9.2    Technical Marketing.     InterDigital may commence discussions with prospective IDC TDD Technology Licensees involving confidential TDD Technology (on a summary, non-use, confidential basis), including visits to the IDC research and development laboratories, commencing three months after the Pre-Marketing Date.

   4.9.3    TDD Technology Transfer.   Commencing April 1, 2000, InterDigital may provide TDD Licensees with access to Developed TDD Technology based on a marketing plan to be adopted by the Contract Review Committee at the first such meeting of such committee after the Effective Date. Such plan shall be consistent with the following guidelines (which the parties may change from time to time to address changed circumstances, approval to any proposed changes to the guidelines not to be unreasonably withheld or delayed):

      (i)    The transfer of TDD Technology may not occur earlier than sixty (60) days after such technology has been delivered to Nokia in final form

PROPRIETARY INFORMATION

as part of a complete deliverable contemplated by the Work Plans and Specifications;

(ii)  In the case of IP blocks, the grace period shall be three (3) months from testing and approval;

(iii)  For ASIC samples, no grace period after testing and approval;

(iv)  For ASIC volume delivers, the grace period shall be three (3) months provided that Nokia has executed an agreement with InterDigital for supply of ASICs in non di minimus quantities; and

(v)  IDC's arrangements with TDD Licensees may not interfere with the TDD Project or require changes to the content, schedule or cost of the TDD Project without Nokia's approval.

## ARTICLE 5 – COMPENSATION

5.1   Compensation.  IDC will be paid for the TDD Development Project in accordance with the Compensation Schedule set out in Exhibit 2.  Nokia's commitment hereunder shall only cover costs and fees which are incurred in accordance with this Agreement, the Work Plans and Specifications, and the Compensation Schedule, or future amendments or revisions thereto.

## ARTICLE 6 – TDD PRODUCT PURCHASES

6.1   IDC Purchase.  IDC is hereby granted the option to buy from Nokia generally available standard single-mode TDD Products for sale in those markets for which Nokia opted to allow non-exclusive distribution by third parties, such sales to be on the non-discriminatory terms and conditions as compared to those customarily given by Nokia to similarly situated wholesale customers; provided, however, that nothing in this Section shall obligate Nokia to develop such TDD Products.

PROPRIETARY INFORMATION

## ARTICLE 7 – TDD ASIC SALES

7.1    Joint ASIC Sales.  As part of the TDD Project, IDC and Nokia shall explore the possibility of the joint development, manufacture and sale of single-mode TDD ASICs. If Nokia determines that such a cooperative manufacture and sales effort has commercial merit, Nokia shall first negotiate such a cooperative alliance with InterDigital, which negotiation shall be undertaken in good faith.

## ARTICLE 8 – WARRANTIES; LIMITATION OF LIABILITIES

8.1    Title Warranty.  IDC and ITC, as applicable, represent and warrant that, to the best of their knowledge, they have sufficient right, title and interest in the InterDigital Licensed TDD Technology and TDD Trademarks to grant the licenses contemplated by this Agreement.  Nokia represents and warrants that, to the best of its knowledge, it has sufficient right, title and interest in the Nokia Licensed TDD Technology to grant the licenses contemplated by this Agreement.

8.2    Limitation of Liability.  Neither of the parties hereto shall be liable to the other party in tort, contract or otherwise for any consequential, incidental, exemplary, punitive, indirect or special damages of any kind, including, but not by way of limitation, damages for loss of profit by IDC, ITC or Nokia, even if the possibility of such damages was disclosed to, or could reasonably have been foreseen by, the injuring party.  In addition, IDC's and Nokia's total limit of liability under this Agreement, regardless of claim or series of claims, shall not exceed fifty percent (50%) of the amount paid to IDC under Article 5 hereto; provided, however, that the fifty percent limitation shall not apply to Nokia's obligation to pay IDC for services as required under Article 5, or either party's obligation hereunder to reimburse the other for costs.

8.3    Limitation of Warranties. THE PARTIES MAKE NO WARRANTIES EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION, IMPLIED WARRANTIES OF

PROPRIETARY INFORMATION

MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WARRANTY AS TO PATENT NON-INFRINGEMENT, OTHER THAN THE WARRANTIES SET FORTH IN THIS ARTICLE.

### ARTICLE 9 – EFFECTIVE DATE; TERM; TERMINATION

9.1    Effective Date.  The Effective Date of this Agreement shall be as set forth in the Master Agreement.

9.2    Term.  The term of this Agreement shall be perpetual, unless terminated as provided herein.

9.3    Termination for Cause.  A party may terminate this Agreement by written notice to take effect immediately if the other party is in material breach of this Agreement, and (i) the first Party previously notified the breaching party in writing of the default and such other party's intention to terminate the agreement, and (ii) the breaching party has failed to cure its breach within at least sixty (60) days after such notice or to make substantial progress towards curing such default or, in the case the breach consists of the breaching party's failure to make payments due hereunder, fails to cure such breach within at least thirty (30) days of such notice.

9.4    Termination for Convenience.  Nokia may terminate this Agreement for convenience upon forty-five (45) days advance written notice to IDC.  The date of termination shall be forty-five (45) days after the date of Nokia's notice to IDC.  IDC shall be paid for all services rendered by IDC under and in accordance with this Agreement up to and including the termination date.  In addition, to the extent that IDC does not continue the TDD Project without Nokia, IDC shall be reimbursed, as a full and complete compensation for the costs incurred by IDC as a consequence of the short termination period, for the following documented out-of-pocket costs, arising due to such project termination, such charges not to exceed  THREE MILLION U.S. DOLLARS ($US 3,000,000),  and provided further that IDC shall undertake appropriate and

PROPRIETARY INFORMATION

commercially reasonable actions, including commencing the orderly shutdown of the TDD Project promptly after receipt of the notice of termination from Nokia, to minimize the termination liability costs to be paid by Nokia hereunder,:

(a)    actual cancellation charges for equipment ordered prior to the notice of termination pursuant to the Work Plans and Specifications except that Nokia shall, at its option, be entitled to purchase any such equipment by paying the actual amount due after the termination date;

(b)    actual cancellation charges under consulting and engineering services agreements engaged pursuant to the Work Plans and Specifications and executed prior to the notice of termination;

(c)    actual cancellation charges on equipment leases necessary for the TDD Project and entered into prior to the notice of termination except that Nokia shall, at its opition, be entitled to assign any leases to it to the extent accepted by the leasor;

(d)    actual and documented severance benefits for IDC employees hired after the Effective Date and to be laid-off as a result of the termination of the TDD Project, such benefit not to exceed twelve (12) weeks of pay per employee, at 50% of the rates set forth in Exhibit 2;

(e)    one-hundred percent (100%) of the laboratory and dedicated office build-out, if such termination occurs in 1999, and fifty percent (50%) if such termination occurs in 2000;

(f)    other actual and out-of pocket costs arising from such termination and approved by Nokia, such approval not to be unreasonably withheld or delayed.

9.5    <u>Rights Upon Termination</u>.   Nokia shall be entitled to receive any TDD Technical Information developed up to the termination date. The licenses granted under Sections 4.2. and 4.3 shall survive termination of this Agreement as to the results conceived as part of the TDD Project. To the extent any of the Developed Patents are jointly owned, the provisions of Section 4.4 shall survive termination as regards such Developed

PROPRIETARY INFORMATION

Patents. In addition, the following provisions will survive termination of this Agreement: Section 2.4(but only as to Technical Information developed prior to the date of termination), Section 2.8, Section 4.1.1, Section 4.1.2, Sections 4.1.3, 4.2.2 and 4.3.2 (but only as to those Patent claims necessary for the implementation of the TDD Technology developed prior to the date of termination) , Section 8.2, Section 8.3, and Section 9.4.

## ARTICLE 10 -- MISCELLANEOUS

10.1   Incorporation by Reference. All of the terms and conditions of the Master Agreement are hereby incorporated herein by reference.

10.2   Exhibits. All Exhibits and other attachments to this Agreement which are referred to herein or therein are hereby incorporated in and made a part of this Agreement.

10.3   Entire Agreement. This Agreement contains the complete and final agreement between the parties, and supersedes all previous understandings relating to the subject matter hereof and thereof whether oral or written. This Agreement may only be modified by a written agreement signed by duly authorized representatives of the parties.

10.4   Counterparts; Faxed Signatures. This Agreement may be executed by the parties in counterparts, each of which shall be deemed an original of the applicable document. Signatures provided by facsimile or other electronic means by any party shall be valid and enforceable upon delivery to the other parties hereto.

PROPRIETARY INFORMATION

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized representatives.

INTERDIGITAL COMUNICATIONS CORPORATION

BY: _____

    Name:    William A. Doyle

    Title:    President

    Date:    January 29, 1959

INTERDIGITAL TECHNOLOGY CORPORATION

By: _____

    Name:    Howard E. Goldberg

    Title:    President

    Date:    January 29, 1995

NOKIA CORPORATION

By: _____    _____

    Name:    YRJÖ NEUVO        Name:    HEIKKI HUTTUNEN

    Title:    SVP, PRODUCT CREATION    Title:    V.P. LICENSING

    Date:    Feb 3, 1999        Date:    January 28, 1999

    JANUARY 28

**TECHNICAL EXHIBITS INTENTIONALLY
OMITTED**

PROPRIETARY INFORMATION

<u>AMENDMENT No.1 to the TDD DEVELOPMENT AGREEMENT</u>

THIS AMENDMENT AGREEMENT No. 1 is entered into as of September 30, 2001 between and among InterDigital Communications Corporation, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with offices at 781 Third Avenue, King of Prussia, Pennsylvania 19406 ("IDC"), InterDigital Technology Corporation, a Delaware corporation with offices at 300 Delaware Avenue, Suite 527, Wilmington, Delaware ("ITC" and, together with IDC, "InterDigital"), and Nokia Corporation, a corporation existing under the laws of the Country of Finland, with offices at Keilalahdentie 4, SF - 02150 Espoo, Finland ("Nokia").

<u>Background</u>

Nokia and IDC entered into a Master Agreement, Patent License Agreement, and a TDD Development Agreement, each effective as of January 29, 1999. The parties wish to amend the Master Agreement and TDD Development Agreement as provided herein.

NOW, THEREFORE, in consideration of the covenants and promises made herein, the parties, intending to be legally bound, hereby agree as follows:

<u>Agreement</u>

1.    <u>New Definitions.</u>   The following new definitions are added to the Master Agreement:

"2a.    "Base TDD Project" means the TDD Project described in Exhibit 1 to this Amendment Agreement."

"28a.    "Nokia Cap" means $US59,000,000."

2.    <u>New TDD Project Definition.</u>   The parties hereby adopt the Base TDD Project as the TDD Project to be undertaken by the parties pursuant to the terms of the Master Agreement and Related Agreements, as amended herein.    Exhibit 1 hereto is hereby incorporated and made part of the Work Plans and Specifications.    Any portions of the Work Plans and Specifications as of the Effective Date that are inconsistent with the provisions of Exhibit 1, either express or implied, are hereby superceded by Exhibit 1

Amendment to the TDD Development Agreement
10/5/2001
C:\WINDOWS\TEMP\AMENDENTNo1-final.doc                    1

PROPRIETARY INFORMATION

hereto. Changes to the TDD Project shall be made in accordance with terms of the TDD Development Agreement, as amended herein.

3.     Adoption of Cap and Payment Schedule For Reimbursement of Base TDD Project Costs     Nokia and IDC hereby agree to modify the compensation terms of the TDD Development Agreement, from a time and materials basis without a cap, to payments schedule with a cap, as follows:

A.     Section 5.1 is hereby replaced in its entirety with the following:

"Compensation.  IDC will be paid for its reimbursable costs incurred in the Base TDD Project in accordance with Exhibit 2, such reimbursable costs to be (i) 100% of such costs up to $US56,300,000 plus (ii) 50% of the reimbursable costs in excess of $US56,300,000 up to and including the Nokia Cap. Nokia shall reimburse IDC in accordance with the following payment schedule:

(i)     For services rendered by IDC during 2001, IDC will be paid the lesser of (i) $US18,900,000 or (ii) the actual reimbursable costs incurred in such year determined in accordance with the Compensation Schedule set out in Exhibit 2.

(ii)     For monthly services rendered by IDC commencing January 1, 2002, Nokia shall pay IDC the lesser of (i) $US1,300,000 or (ii) the actual reimbursable costs incurred in such month determined in accordance with the Compensation Schedule set forth in Exhibit 2; provided, however, that the total payments by Nokia under (i) and (ii) shall not exceed $US56,650,000.

(iii)     Upon final delivery of all deliverables as set forth in the Work Plans and Specifications, Nokia shall pay IDC the lesser of (a) the cumulative difference between the actual reimbursable costs for the entire Base TDD Project, determined in accordance with the Compensation Schedule in Exhibit 2, and that paid by Nokia pursuant to (i) and (ii) above, and (b) $US1,000,000.

Nokia's commitment hereunder shall cover only costs and fees incurred in accordance with this Agreement, the Work Plans and Specifications, and the Compensation Schedule, or future amendments or revisions thereto.  Notwithstanding the foregoing, Nokia shall continue to be responsible to pay costs related to Jointly Developed Patent Rights in accordance with Section 4.4 of the Agreement, and for resolving patent ownership disputes in accordance with Section 4.5."

4.     Changes to the Work Plans and Specifications.  As regards the Base TDD Project, the review and approval of the associated TDD Project Budget shall be as set forth in the TDD Development Agreement except as modified under Section 5 hereto. Any changes to the Work Plans and Specifications shall be made in accordance with the TDD Development Agreement.  Notwithstanding anything in this Agreement or in the TDD Development Agreement to the contrary, any change to the Work Plans and Specifications representing an increase in effort or expansion of the Base TDD Project shall be approved by the parties in writing prior to

Amendment to the TDD Development Agreement
10/5/2001
C:\WINDOWS\TEMP\AMENDENT\No1-final.doc                         2

## PROPRIETARY INFORMATION

implementation. The Project Managers shall have the authority to jointly approve such changes to the Work Plans and Specifications provided the increased effort is not expected to exceed $500,000.

5.    Changes to Budgeting, Invoicing and Penalty Provisions. If the Total TDD Project Cost for the Base TDD Project has exceeded the Nokia Cap, then, other than providing on a one time basis the details reasonably necessary to demonstrate that the Total TDD Project Cost has exceeded the Nokia Cap, IDC shall have no further obligation to report costs, budget changes or other financial related information to Nokia as otherwise required in the Agreement. In addition, Nokia shall no longer have approval rights as regards any expenditures made by IDC in the implementation of the Work Plans and Specifications. In addition, in consideration of IDC limiting Nokia's reimbursement responsibility to the Nokia Cap for the Base TDD Project as provided herein, the penalty related to cost overruns set forth in Section 2.7.3 of the TDD Development Agreement is hereby deleted. The above limitation shall not apply to any additional effort being provided by IDC under different economic terms and conditions, as set forth in Section 4 hereto.

6.    Joint Cooperation on RRM/Continued Support. Nokia and IDC shall cooperate with regard to Radio Resource Management technology development to assess, investigate and determine appropriate solutions for the interference issues. Without otherwise limiting Nokia's obligations under the Work Plans and Specifications, Nokia also agrees to maintain at least the same level of support as regards the project (including standards support) as has been provided by Nokia historically over the term of the project.

7.    TDD Technology Transfer. Section 4.9.3 of the TDD Development Agreement is hereby amended to eliminate the grace periods under subparagraphs (i), (ii), and (iv).

8.    Amendment to Termination Liability. Section 9.4 ("Termination for Convenience") is hereby deleted.

9.    Additional Termination Right. The parties will meet on a regular basis to discuss the future market applications for TDD. In the event that due to the availability of other competing technologies or other factors, UTRA TDD technology is projected with a reasonable degree of certainty as having no relevant market application, IDC and Nokia shall meet to discuss termination of the project, an agreement to do such, in view of the above circumstances, will be made in good faith and not unreasonably withheld or delayed.

Amendment to the TDD Development Agreement
10/5/2001
C:\WINDOWS\TEMP\AMENDENTNo1-final.doc                    3

## PROPRIETARY INFORMATION

10. <u>Intellectual Property Rights.</u> Except as otherwise expressly stated by Nokia in writing in respect of particular parts ("Sensitive Cells") at the time of disclosure to IDC (such designation requirement to be strictly enforced), the license for IDC and its Affiliates under the Nokia Licensed TDD Technology (but not as to Developed Patents and any patent rights under any pending patent applications), as set forth in Section 4.3.1 of the TDD Development Agreement, shall include any product of IDC (including, without limitation semiconductors, integrated circuits, software, radio equipment, IP blocks, etc.) actually used or intended to be used in connection with the manufacture or installation of TDD Products ("IDC TDD Components"), including when such IDC TDD Components are not used as part and within licensed products, and test equipment. It is hereby understood and agreed that (i) Sensitive Cells shall exclude any Technical Information disclosed by Nokia to IDC as of the Effective Date of this Amendment, (ii) understanding that IDC needs to have licensable IP as a product of this Base TDD Project, Nokia shall limit designating Sensitive Cells to exceptional circumstances, and (iii) IDC may, after good faith discussion with Nokia, decline to accept and/or utilize Sensitive Cells in the Base TDD Project to the extent such acceptance or use may materially adversely impact the licensability of the Developed Technology. Nokia's non-assert, as set forth in Section 4.3.4 of the TDD Development Agreement, shall also apply to IDC TDD Components in addition to TDD ASICs and modems but solely in respect of TDD portion of such products (and excluding, without limitation, any possible GSM or FDD portion in the same product). Moreover, as used in Sections 4.2 and 4.3 of the TDD Development Agreement, TDD Products shall be interpreted to include test equipment for TDD Products. In addition, IDC and Nokia will be permitted to provide spare parts for test equipment (Nokia's right being limited to spare parts for the test equipment supplied by Nokia), as set forth in Section 4.7.1 of the TDD Development Agreement. The licenses granted for Nokia and its Affiliates as set forth in Section 4.2.1 of the TDD Development Agreement shall also include the licenses to any Developed Patents of IDC under the TDD Program Plan Revision D with the exception of Patents relating to the software implementation of the protocol stack (not related to the systems work) of L2/3 Release 2 features (e.g., handover, mobility procedures, temporary DCH, RRM (escape mechanisms and load balancing), etc.). Contingent upon Nokia and InterDigital executing an agreement on a future TDD program, InterDigital shall grant Nokia a license under the terms of section 4.2.1 to the Patents developed under the TDD Program Plan Revision D that are excepted under the preceding sentence. Nothing contained in this provision shall obligate InterDigital to perform any work under the TDD Program Plan Revision D other than the work encompassing the Base TDD Project under this Amendment.

For the avoidance of doubt, and to avoid the need to disclose the contents of the Agreements and this Amendment to customers seeking to license TDD Technology or purchase TDD components from IDC, or to

Amendment to the TDD Development Agreement
10/5/2001
C:\WINDOWS\TEMP\AMENDENTNo1-final.doc                          4

PROPRIETARY INFORMATION

foundries producing TDD products for sale, Nokia and IDC will mutually agree on a holding statement that can be provided on a confidential basis to customer and other vendors, acknowledging (i) that IDC owns all of the TDD Technology it developed under the Agreements and this Amendment, (ii) that IDC has secured sufficient and appropriate rights as regards any Nokia TDD Technology included in the results of such projects for the purpose of licensing third parties to manufacture and sell TDD products, and (iii) that such rights as regards any Nokia Patents are conditional on such third parties not asserting their Patents against Nokia Group.

11.    Continued Cooperation.  Without limiting either party's ability to pursue their own business interests, IDC and Nokia shall continue to cooperate and communicate on potential future activities on TDD so that, if desirable, the parties can promptly undertake such activities if and when market conditions and circumstances are appropriate. In this regard, IDC and Nokia shall maintain a regular, frequent dialog on each other's views on TDD.  Further, in the event Nokia determines to pursue TDD activities beyond the Base TDD Project, it shall first meet with IDC with the view of providing IDC with the first opportunity to meet Nokia's development needs.

12.    Future Cooperation.  Contingent upon Nokia and InterDigital executing an agreement on a future TDD program, InterDigital shall provide to Nokia any TDD technology items which were deliverables under the TDD Program Plan Revision D, but are not part of the deliverables under this Amendment, provided:

i    InterDigital has the right to grant licenses to such deliverables, and

ii    Nokia compensates InterDigital for any mutually agreed upon, incremental expenses (e.g., equipment or labor associated with the test platform or license fees payable to third parties in connection with any license granted under section 12(i) above).

Nothing contained in this provision shall obligate InterDigital to perform any work under the TDD Program Plan Revision D other than the work encompassing the Base TDD Project under this Amendment.

13.    Miscellaneous.  All of the terms and conditions of the Master Agreement are hereby incorporated herein by reference. Unless modified herein, all other terms and conditions of the Master Agreement and Related Agreements remain unaltered and in full force and effect. This Amendment Agreement shall be subject to the terms of the Master Agreement unless inconsistent with the terms in this Agreement. All Exhibits and other attachments to this Amendment Agreement which are referred to herein are hereby incorporated in and made a part of this Agreement. This Amendment Agreement contains the complete and final agreement between the

Amendment to the TDD Development Agreement
10/5/2001
C:\WINDOWS\TEMP\AMENDENTNo1-final.doc                     5

## PROPRIETARY INFORMATION

parties, and supersedes all previous understandings relating to the subject matter hereof and thereof whether oral or written. This Amendment Agreement may only be modified by a written agreement signed by duly authorized representatives of the parties. This Amendment Agreement may be executed by the parties in counterparts, each of which shall be deemed an original of the applicable document. Signatures provided by facsimile or other electronic means by any party shall be valid and enforceable upon delivery to the other parties hereto.

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement by their duly authorized representatives.

INTERDIGITAL COMUNICATIONS CORPORATION

BY: _____
Name: HOWARD E. GOLDBERG
Title: PRESIDENT & CEO
Date:

INTERDIGITAL TECHNOLOGY CORPORATION

By: _____
Name: William J. MERRITT
Title: President
Date:

NOKIA CORPORATION

By: _____          _____
Name: YRJÖ NEUVO                     J.T. BERGQVIST
Title: EXECUTIVE VP, CTO             SENIOR VP, NOKIA NETWORKS
Date:

Amendment to the TDD Development Agreement
10/5/2001
C:\WINDOWS\TEMP\AMENDENTNo1-final.doc                    6

# TECHNICAL EXHIBITS INTENTIONALLY
## OMITTED

# EXHIBIT 3

PROPRIETARY INFORMATION

# PATENT LICENSE AGREEMENT

## BETWEEN

## INTERDIGITAL COMMUNICATIONS CORPORATION,

## INTERDIGITAL TECHNOLOGY CORPORATION

## AND

## NOKIA CORPORATION

PROPRIETARY INFORMATION

## TABLE OF CONTENTS

ARTICLE I ......................................................................................................... 2
  1.1 Definitions ................................................................................................ 2

ARTICLE II ........................................................................................................ 2
  2.1 ITC Grant ................................................................................................. 2

ARTICLE III ....................................................................................................... 6
  3.1 Royalty Payments .................................................................................... 6

ARTICLE IV ....................................................................................................... 18
  4.1 Term ......................................................................................................... 18
  4.2 Termination for Default ........................................................................... 18

ARTICLE V ........................................................................................................ 20
  5.1 Payments/Reports ................................................................................... 20
  5.2 Currency Conversion ............................................................................... 20
  5.3 Oppositions .............................................................................................. 20
  5.4 Release ..................................................................................................... 2020
  5.5 Audit ......................................................................................................... 2020
  5.6 Nokia Identification on Covered Subscriber Units/Covered Infrastructure ........ 21
  5.7 Limited Warranty ..................................................................................... 21
  5.8 Affiliate Performance ............................................................................... 2120
  5.9 Limitation ................................................................................................. 22
  5.10 Acquisitions/Assignment ....................................................................... 22
  5.11 Entire Agreement/Amendment ............................................................. 24



PROPRIETARY INFORMATION

## PATENT LICENSE AGREEMENT

THIS IS A PATENT LICENSE AGREEMENT (the "Agreement") entered into as of the Effective Date between InterDigital Communications Corporation, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with a mailing address at 781 Third Avenue, King of Prussia, Pennsylvania 19406, InterDigital Technology Corporation ("ITC"), a Delaware corporation with a mailing address of 300 Delaware Avenue, Suite 527, Wilmington, DE 19801, and Nokia Corporation ("Nokia"), a company organized and existing under the laws of Finland, with a mailing address of Keilalahdentie 4, SF-02150 Espoo, Finland.

### PREAMBLE

IDC has developed extensive digital communications technology experience involving both TDMA and code division multiple access (CDMA) technologies. ITC has an extensive and valuable portfolio of patents covering digital wireless telephone systems utilizing TDMA and CDMA technologies. ITC owns and has the right to license the ITC Patents.

In conjunction with the execution of this Patent License Agreement, ITC, IDC and Nokia are executing a TDD Development Agreement, providing for substantial value to IDC and ITC in the form of a funded development effort, a significant opportunity to license others under the Third Generation technology being developed, and the ability to procure Third Generation equipment on a most favored customer basis.

In consideration of the substantial value being provided to InterDigital under the TDD Development Agreement, ITC is willing to grant Nokia a world-wide, non-exclusive license under the InterDigital Patents, and Nokia desires to obtain such a license, on the terms set forth below.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and intending to be legally bound, the parties agree as follows:

1

PROPRIETARY INFORMATION

## ARTICLE I  DEFINITIONS

1.1    Definitions.   As used herein, the terms set forth in the Master Agreement,  Exhibit 1 thereto, when used with initial capital letters in this Agreement, including any Exhibits, attachments or amendments, shall have the meanings described in such Exhibit 1 .

## ARTICLE II  LICENSE GRANT

2.1    InterDigital Grant.  ITC hereby grants and shall cause IDC and their Affiliates to grant to Nokia a non-exclusive, non-transferrable, worldwide, royalty-bearing  license under the InterDigital Patents (excluding Patents for which the license is provided under the TDD Development Agreement) to design, make, have made (if substantially designed by Nokia), use, import, sell and otherwise distribute Covered Subscriber Units and Covered Infrastructure.

The grant above shall not include, by implication or otherwise, any license for components, except when used solely as a part and within the licensed products defined above.

The licenses granted in this Agreement shall extend to the Affiliates of Nokia but only as long as and to the extent that such entities remain Affiliates. Any licenses granted herein shall terminate by the time an entity ceases to be an Affiliate of Nokia.

2.2    Conditions and Limitations on InterDigital Grant.

2.1.1  The license grant set forth in Section 2.1 shall exclude the right to grant sublicenses under the InterDigital Patents.

Execution Copy
January 21, 1999
N:\5ill\Wpfiles\NOKIA\DRAFTS\PATAGR11.DOC

2

PROPRIETARY INFORMATION

2.2.2  As used in Section 2.1, Covered Subscriber Units and Covered Infrastructure shall be that equipment designed by or for Nokia or its Affiliates and which are used by Nokia or its Affiliates or sold by Nokia or its Affiliates, in completed form, to its customers, including without limitation operators, end-users or retail distributors.  Provided Nokia is not in default of its obligations hereunder, Nokia's and its Affiliates' customers that without limitation are operators, resellers and end-users but who are not also telecommunications suppliers (other than retail) will receive a pass-through license for sale (including lease) or use of Covered Subscriber Units and Covered Infrastructure for which a royalty has been paid hereunder (to the extent royalties are payable hereunder). Neither this Agreement nor any payments made hereunder, are intended, nor should they be construed, as exhausting ITC's rights to royalties or damages or other compensation from unlicensed purchasers.

2.2.3  The Nokia Group shall have no rights to transfer licenses under the InterDigital Patents through the sale of ASICs, software or other parts to third parties; provided, however, the foregoing limitation will not limit the Nokia Group's right to provide spare parts and enhancements for licensed Covered Subscriber Units and Covered Infrastructure.

2.2.4  The sale of any item of Covered Subscriber Units or Covered Infrastructure shall not convey any licenses or other rights to Subscriber Units or Infrastructure made by third parties used in conjunction with such Covered Subscriber Units and Covered Infrastructure.  For example, sale or use of a Nokia master switching center with a base station manufactured by Ericsson will not convey any rights under the InterDigital Patents to such base station or its use.  ITC shall have the right to initiate legal action against such third parties for direct or contributory infringement to the same extent as if this license had not been executed.

PROPRIETARY INFORMATION

2.3    <u>Nokia License Grant</u>. Nokia  hereby grants and shall cause its Affiliates to grant
to ITC  a non-exclusive, non-transferrable, worldwide, royalty-free  (except for
Section 5.15.1) license under the Nokia Patents (excluding Patents for which the
license is provided under the TDD Development Agreement) to design, make,
have made (if substantially designed by ITC), use, import, sell and otherwise
distribute Covered Subscriber Units, Covered Infrastructure, UltraPhone
Products and B-CDMA Products.

The grant above shall not include, by implication or otherwise, any license for
components, except when used solely as a part and within the licensed products
defined above.

The licenses granted in this Agreement (including without limitation Section 2.5)
shall extend to IDC and the Affiliates of IDC but only as long as and to the extent
that  (i) ITC is Controlled by IDC and (ii) such other entities remain Affiliates of
IDC. Any licenses granted herein in respect of a particular entity shall terminate
by the time an entity ceases to be an Affiliate of IDC or ITC ceases to be
Controlled by IDC.

2.4    <u>Conditions and Limitations on Nokia Grant</u>.

2.4.1  The license grant set forth in Section 2.3 shall exclude the right to grant
sublicenses under the Nokia Patents.

2.4.2  As used in Section 2.3, Subscriber Units and Covered Infrastructure shall be that
equipment designed by or for IDC or its Affiliates and which are sold by IDC or
its Affiliates, in completed form,  to their customers, including without limitation
operators, end-users or retail distributors.  Provided IDC is not in default of its

PROPRIETARY INFORMATION

obligations hereunder, IDC's and its Affiliates' customers that are, without limitation, operators, resellers and end-users but who are not also telecommunications suppliers (other than retail) will receive a pass-through license for sale (including lease) or use of Covered Subscriber Units, Covered Infrastructure, for which a royalty has been paid hereunder (to the extent royalties are payable hereunder). Neither this Agreement nor any payments made hereunder, are intended, nor should they be construed, as exhausting Nokia's or its Affiliates rights to royalties or damages or other compensation from unlicensed purchasers.

2.4.3    InterDigital shall have no rights to transfer licenses under the Nokia Group Patents through the sale of ASICs, software or other parts to third parties; provided, however, the foregoing limitation will not limit InterDigital's right to provide spare parts and enhancements for licensed Covered Subscriber Units, Covered Infrastructure, B-CDMA Products and UltraPhone Products.

2.4.4    The sale of any item of Covered Subscriber Units or Covered Infrastructure shall not convey any licenses or other rights to Subscriber Units or Infrastructure made by third parties used in conjunction with such Covered Subscriber Units and Covered Infrastructure.    Nokia shall have the right to initiate legal action against such third parties for direct or contributory infringement to the same extent as if this license had not been executed.

2.5    <u>Nokia Non-Assertion</u>.  Nokia hereby agrees not to assert (and shall ensure that its Affiliates do not assert) any claims for infringement of the Nokia Group Patents against (i) ITC as regards the design, manufacture, have made, sale, import, distribution or use of B-CDMA ASICs or modems in or for B-CDMA Products or UltraPhone ASICs or modems  in or for  UltraPhone Products, or (ii) any Existing InterDigital UltraPhone Licensee or Existing InterDigital B-CDMA Licensee as

PROPRIETARY INFORMATION

regards the design, manufacture, have made, sale, import, distribution or use of UltraPhone Products or B-CDMA Products to the extent licensed by ITC or (iii) any purchaser of B-CDMA or UltraPhone ASICs or modems from ITC as regards the design, manufacture, have made, sale, import, distribution or use of such modems or ASICs in B-CDMA Products or UltraPhone Products but with such non-assertion extending to only those Patent claims that are technically necessary for the features, functions, or processes performed by the B-CDMA or UltraPhone ASIC or modem; provided further, however, that such non-assertion set forth in (ii) and (iii) shall not apply as to (a) any portion of the B-CDMA Product or UltraPhone Product built to comply with a Covered Standard or (b) entities set forth in (ii) if such entities assert their patents against Nokia TDD Products or Covered Subscriber Units and Covered Infrastructure complying with TETRA, or entities set forth in (iii) if such entities assert their Patents against Nokia Group.

## ARTICLE III ROYALTY RATES/PAYMENTS

3.1    Royalty Payments.

    3.1.1    Period 1.

        (A)    Initial Payment. Subject to the provisions of Section 3.1.1 (C), 3.1.1(D), and 5.10.2, Nokia, in satisfaction of its royalty obligation for Covered Subscriber Units or Covered Infrastructure (excluding Covered Subscriber Units and Covered Infrastructure complying with PHS and/or PDC) sold by Nokia or its Affiliates (but only during the period of affiliation) up to the end of Period 1, shall pay to ITC thirty-one million, five hundred thousand U.S dollars ($US31,500,000.00). Such payment shall be irrevocable and non-refundable.

Execution Copy
January 21, 1999
N \Bill\Wpfiles\NOKIA\DRAFTS\PATAGR11 DOC

6

PROPRIETARY INFORMATION

(B)    PHS/PDC Units:

(i)    Nokia shall pay ITC an additional, non-refundable amount of
$U.S.1.00 for each Covered Subscriber Unit complying with PHS
and/or PDC ("Per Unit Rate") sold by Nokia or its Affiliates on or
after the Effective Date. This payment is intended to cover the
PHS/PDC functionality of the PHS/PDC Covered Subscriber Units
and additional consideration for the functionality implementing
other Covered Standards (excluding that functionality covered
under any royalty-free license granted to Nokia under the TDD
Development Agreement for TDD Products) shall be provided
under the provisions of Section 3.1.1(A), as adjusted in Sections
3.1.1(C) and (D). In consideration of the payment set forth in
Section 3.1.1(A), ITC hereby releases and acquits Nokia and its
Affiliates (as of the Effective Date and only during the period of
Affiliation) from any and all claims of infringement of the InterDigital
Patents by the making, selling or distributing of Covered
Subscriber Units built to comply with only PHS or PDC prior to the
Effective Date. Nokia and ITC shall also negotiate in good faith on
the royalty to be payable if and when Nokia or its Affiliates begin
to manufacture Infrastructure complying with PHS and /or PDC .

(ii)    Provided Nokia is not in default of its obligations hereunder, Nokia
shall be treated as a most favored licensee ("MFL") under the
InterDigital Patents with regard to Covered Subscriber Units
complying with PHS and/or PDC Products sold by Nokia or its
Affiliates during Period 1, such MFL being as to those previously
entirely un-licensed entities having assets in excess of

PROPRIETARY INFORMATION

$US500,000,000 or sales at time of agreement execution in excess of 250,000 Covered Subscriber Units ("Large Entity") and executing a license agreement with ITC covering PHS and/or PDC. If a Large Entity executing such agreement with ITC was partially licensed by ITC prior to the Effective Date, Nokia shall also have the right to substitute a revised Per Unit Rate in this Agreement with the terms in such agreement if such agreement (a) covers at least one previously unlicensed Patent that is technically necessary when manufacturing, selling or using Covered Subscriber Units complying with PHS/PDC or, (b) extends to multimode products, combining PHS/PDC and any other previously unlicensed air interface technology, but only to the extent such patent is used in Covered Subscriber Unit. In determining the revised Per Unit Rate, all the relevant factors under the applicable or related license agreements (including the amendment thereto) by the licensee shall be considered in arriving at a revised Per Unit Rate for the PHS/PDC functionality of the Covered Subscriber Units to be compared with Nokia's Per Unit Rate hereunder. Within thirty days of executing any such license agreement as set forth in this Section, ITC shall within thirty (30) days provide Nokia with a copy of such agreements on a confidential basis. Nokia shall make such election within sixty (60) days of receipt of the subject license agreements from ITC; otherwise, Nokia's MFL rights under this Section shall be deemed waived. If Nokia elects to substitute the more favorable Per Unit Rate, Nokia, as a condition precedent to the effectiveness of the substitute royalty-terms, shall pay all royalties owed under it then existing agreement with ITC for PHS/PDC Covered Subscriber Unit sales made prior to the date Nokia executes an agreement with such substitute royalty terms or



PROPRIETARY INFORMATION

a maximum of ninety (90) days from the date such MFL Agreement
was executed by ITC

(C)   Competition Adjustment.  As an additional royalty payment for Period 1,
Nokia will pay ITC an additional SEVEN MILLION AND FIVE HUNDRED
THOUSAND DOLLARS ($7,500,000) for each of the first two Major
Competitor License Agreement signed after the Effective Date.  All
payments required hereunder shall be made within thirty (30) days of the
receipt of ITC's written notification (including all the material terms
thereof) by Nokia that such an agreement has been signed. Such
payment shall be non-refundable and be made regardless of whether the
Major Competitor License Agreements become effective in Period 1 or
Period 2.

(D)   Early Termination Payment.  If Nokia terminates the TDD Development
Agreement for convenience or cause (except as noted below), Nokia shall
have the option to (i) terminate Period 1 and commence Period 2, or (ii)
pay the following additional amount to ITC, within thirty days of Nokia's
notice of termination under the TDD Development Agreement, based
upon the year in which such termination occurs, to permit Period 1 to
extend up to an including December 31, 2001:

| Year of Termination | Additional Royalty Payment |
| --- | --- |
| 1999 | $U.S. 20,000,000.00 |
| 2000 | $U.S. 12,500,000.00 |
| 2001 | $U.S. 7,500,000.00 |

If Nokia terminates the TDD Project  for cause attributable to the gross
negligence or willful misconduct of IDC, then Nokia's shall be required



PROPRIETARY INFORMATION

only to make one-half of the payment otherwise required above unless such termination is based on IDC's willful abandonment of the TDD Project, in which event no payment shall be required hereunder.

(E)    Nokia shall not be required to make full payment under Section 3.1.1 (C) if such payment(s) would result in Nokia's total payments under this Section 3.1.1 exceeding the upfront payment to be made by such Major Competitor. As used herein, and upfront payment shall mean an unconditional payment to be made by such Major Competitor within twelve months of agreement execution. In such instance, Nokia shall only be required to pay that amount which, when combined with other payments made under this Section 3.1.1, results in Nokia's total payment being equal to the amount of the upfront payment. Any further royalty obligation of Nokia hereunder to be determined using the provisions set forth under Section 3.1.2.

3.1.2   Period 2.

(A)    Commencing in January 2001, or promptly after IDC receives the notice of termination under Article 9 of the TDD Development Agreement, whichever is earlier, Nokia and ITC shall commence negotiations in good faith on the royalty payments to be made by Nokia for sales of Covered Subscriber Units and Covered Infrastructure occurring during Period 2. If the parties are unable to reach an agreement after such good faith negotiations, the royalty obligation shall be determined in accordance with the provisions of Section 3.1.2 (B).

(B)    Absent an agreement by the parties to the contrary, Nokia's royalty payments during Period 2 shall be determined thru the application of most

PROPRIETARY INFORMATION

favored licensee rights, as set forth in this Section. Nokia shall be considered a most favored licensee of ITC with regard to (i) any Major Competitor License Agreement or (ii) other ITC or IDC patent license agreement involving at least IS54/136 and/or GSM and signed on or after the Effective Date with any entities having sales (at time of agreement execution) assets in excess of $US500,000,000 or in excess of 250,000 Covered Subscriber Units ("Large Entity") (i) and (ii) collectively being referred to as the "MFL Agreements"). In applying this MFL status, Nokia may elect whether or not to accept a non-Major Competitor License Agreement as an MFL Agreement. If Nokia elects not to accept a non-Major Competitor License Agreement as an MFL Agreement, Nokia shall not be required to make any payments based on such agreement but shall also shall waive any MFL rights as to such agreement. If Nokia accepts such agreement as an MFL agreement, Nokia's royalty payments during Period 2, subject to Nokia's exercise of its available MFL rights under future MFL Agreements, shall be determined under (C) and (D) below. Nokia shall be required to accept as an MFL Agreement the first Major Competitor License Agreement but may later substitute another MFL Agreement, unless the MFL rights to such agreement has been waived by Nokia.

(C)    Subject to the credits to be applied to Nokia's royalty obligation (such credit being set forth in Section 3.1.3), Nokia shall pay royalties to ITC for Period 2 sales on equivalent terms and conditions as those set forth in the MFL Agreement last imposed on (in the case of the first Major Competitor License Agreement), or selected by (in the case of all other MFL Agreements), except for any payment obligations which shall solely be determined in accordance with Section (C) and (D).