PROPRIETARY INFORMATION

In determining the appropriate payment, all payments made, or to be made, by such competitor under the applicable agreement shall be considered to arrive at the per unit royalty or percentage-based royalty rate, if more appropriate, (for the purposes of this section, a per unit rate or precentage based rate being the "Royalty Rate") being paid by such competitor for sales during Period 1 and Period 2. In determining the applicable Royalty Rate separately for Period 1 and Period 2, the analysis shall take into account all relevant factors.

(i)    Once such Royalty Rates have been determined, that Royalty Rate for Period 2 shall be applied to sales made by Nokia and its Affiliates during Period 2. In addition, the Royalty Rate for Period 1 shall be applied to sales made by Nokia and its Affiliates during Period 1 to determine if Nokia is entitled to any credit against Period 2 payments. To determine any such credit, the Royalty Rate shall be applied to Nokia and its Affiliates Period 1 sales. If this amount (the "Calculated Amount") is less than Nokia's Period 1 actual payments, adjusted for time value of money, and assuming the MFL Agreement covers the same Covered Standards and equipment as the Nokia agreement, the excess payment shall be applied as a credit against Nokia's royalty obligation in Period 2. In addition, if such MFL Agreement is a Major Competitor License Agreement and such a credit exists, no further payments shall be due by Nokia under Section 3.1.1(C) for such competitor. Further, if such agreement is a Major Competitor Agreement, and any payments under Section 3.1.1(C) had been deferred pursuant to Section 3.1.1(E), the deferred amount shall be payable only up to an amount such that Nokia's actual payment for Period 1, including the payment of any or all of

PROPRIETARY INFORMATION

such deferred amount, does not exceed the Calculated Amount.

(ii)    If the MFL Agreement is of a narrower scope than this Agreement (i.e., includes fewer Covered Standards or equipment) , then the determination of any credits shall be made by apportioning Nokia's actual payments during Period 1 among the applicable Cover Subscriber Units and Covered Infrastructure sold by Nokia and its Affiliates. (For example, if the MFL Agreement covered only GSM Infrastructure, there would be a determination, based on sales revenue, of what portion of the Nokia Period 1 actual payment is applicable to Nokia GSM Infrastructure). In such case, any credit (i.e., the amount of money actually Paid by Nokia for the applicable equipment in excess of what Nokia should have paid using the Royalty Rate) shall be applied against Nokia royalty obligations for the applicable equipment in Period 2.

(iii)    For Period 2, Nokia shall pay royalties to ITC based on the Royalty Rate for Period 2. If the applicable MFL Agreement provided for running royalty payments, Nokia's payments shall be on the same basis. If the applicable MFL Agreement provided for payment on a lump sum basis, Nokia shall pay on a lump sum basis. As part of the MFL application, Nokia would have to abide by all relevant royalty-bearing terms in the MFL Agreement, except that whenever there is a conflict between the terms of this Agreement (and, if applicable, the Related Agreements) and the MFL Agreement, the terms of this Agreement (and, if applicable, the Related Agreements) shall control to the extent necessary to meet the intent of the parties hereunder.

PROPRIETARY INFORMATION

D. The procedure for applying Nokia's MFL rights shall be as follows:

    (i)    Until ITC signs a Major Competitor License Agreement, or Nokia selects a non-Major Competitor Agreement as an MFL Agreement Nokia will have no obligation to pay ITC royalties during Period 2. If Lucent Technologies, Inc. executes a Major Competitor Agreement, such agreement shall be considered an MFL Agreement for Covered Infrastructure but will not be considered an MFL Agreement as to Covered Subscriber Units unless or until Lucent's annual market share for GSM Covered Subscriber Units is 5% or greater (for worldwide sales.) The parties shall rely on accepted industry reports in assessing Lucent's market share.

    (ii)    Promptly, but no later than thirty (30) days after execution, ITC shall provide a copy of each MFL Agreement on a confidential basis. Within sixty (60) days of Nokia's receipt of the first Major Competitor License Agreement, or Nokia's notification to ITC that it may want to exercise MFL rights as to a non-Major Competitor Agreement, the parties will meet to determine, in good faith, how to apply such agreements to Nokia ("Nokia MFL Agreement"). If the parties have failed to execute a Nokia MFL Agreement within sixty (60) days of the either receipt set forth above, either party may declare a dispute and seek resolution under the Dispute Resolution Procedures; provided, however, that , as regards any MFL Agreement except for the first Major Competitor Agreement, Nokia may cancel such dispute if it elects not to accept any such agreement as an MFL Agreement.

    (iii)    As regards the second and third Major Competitor Agreements and any other MFL Agreements executed after the first Major

PROPRIETARY INFORMATION

Competitor Agreement. ITC shall provide a copy of each Major Competitor License Agreement and other patent license agreement to Nokia promptly but no later than thirty (30) days after execution. If Nokia wishes to take advantage of its MFL rights as regards such agreement, Nokia shall notify ITC of that election within sixty (60) thirty days of receipt of such agreement. Nokia's failure to notify ITC shall act as a waiver of Nokia's MFL rights as regards such agreement. If Nokia elects to exercise its MFL rights, the parties will use the procedure outlined above under (ii).

(iv)   To the extent that a Major Competitor License Agreement or any other MFL Agreement does not extend to the same Covered Standards or equipment as this Agreement, such agreement may still be imposed on Nokia , or selected by Nokia, as the case may be, as an MFL Agreement. Nokia's payment obligations under the application of its MFL rights as regards such agreement shall be affected only as to the equipment and Covered Standards included. By way of example, if ITC enters into an agreement with Lucent covering only Covered Infrastructure, Nokia's payment obligations (to the extent the Lucent agreement is selected or imposed) shall be affected as only regards such equipment. In the case that a Major Competitor Agreement does not include the same Covered Standards and same equipment as this Agreement, ITC may impose a latter Major Competitor License Agreement on Nokia with regard to those Covered Standards or equipment not included in the first such Major Competitor License Agreement.

(v)   In no event shall the application of Nokia's MFL rights result in (i) any additional payments for Nokia or its Affiliates sales during

PROPRIETARY INFORMATION

Period 1, unless specifically provided for in other parts of this Agreement, or (ii) any refund of royalty payments made by Nokia to ITC. To the extent that Nokia was not paying royalties (due to there being no Major Competitor License Agreement or Nokia-accepted MFL Agreement), any payments to be made by Nokia for sales during Period 2 but prior to the effective date of the Nokia MFL Agreement shall be made with interest, compounded annually, using an interest rate of 5%.

(vi)   The effective date for the Nokia MFL Agreement (not waived by Nokia) shall be the earlier of (a) the date Nokia elects the MFL Agreement or (b) the date ninety (90) days has passed from the execution of the MFL Agreement.

(vii)  If an entity meeting the sales and/or asset threshold set forth in Section 3.1.2(B) executes a patent license agreement with ITC in respect of CDMA Patents after the Effective Date, the royalty Nokia shall pay for the CDMA portion of any Covered Subscriber or Covered Infrastructure during Period 2 shall not exceed the royalty being paid by such entity, after considering all relevant factors.

(viii) In the event that (a) the Nokia Covered Subscriber Units and Covered Infrastructure differ substantially and demonstrably from the design of a Major Competitor, and (b) the Major Competitor's unique design formed the material basis for the execution of a Major Competitor Agreement, and (c) the application of such an MFL Agreement, either in whole or in part, because of such material differences in design, would be inappropriate in light of the parties' intent hereunder, the objectionable portions of such

PROPRIETARY INFORMATION

agreement shall not be imposed on Nokia hereunder.

(ix)    If Nokia is already licensed in a separate agreement under some of
the InterDigital Patents, no double royalties shall be due as a
consequence of the MFL Agreement for patents licensed under
such agreement.

3.1.3  Royalty Credits Nokia will be afforded two royalty credits against any royalty
obligations due during Period 2.  The first credit will be equal to a percentage of
the applicable Nokia royalty obligation in any reporting period during Period 2
("TDD Credit"), such percentage to be 10% if Nokia completes the TDD Project
with IDC, or the following amount if Nokia terminates the TDD Project for
convenience in accordance with Article 9 of the TDD Development Agreement:

| Year of Termination | Credit |
|---|---|
| 1999 | 2.5% |
| 2000 | 5.0% |
| 2001 | 7.5% |
| 2002 or after | 10% |

The second credit, available only if Nokia participates with IDC thru to TDD
Project Completion, would be equal to 10% of up-front technology transfer fees
or net profits IDC receives on TDD technology licensing or TDD product sales
("Licensing Credit").  The Licensing Credit would be applied towards up to one
fifth of Nokia's royalty obligation.  To the extent any Licensing Credit remains, it
can be carried over to successive years during the term of this Agreement
unless otherwise agreed.  The Licensing Credit shall be eliminated (including
any unused credit) once the total credits (i.e. TDD Credit and Licensing Credit)
used by Nokia against its royalty obligations hereunder have equalled 50% of
the monies paid by Nokia to IDC for the TDD Project.



PROPRIETARY INFORMATION

## ARTICLE IV TERM/TERMINATION

4.1     <u>Term</u>. The term of this Agreement shall commence on the Effective Date and terminate on December 31, 2006, unless sooner terminated as provided herein.

4.2     <u>Termination for Default</u>. This Agreement may be canceled by either party, upon sixty (60) days' prior written notice, if the other party is in breach of any of its material obligations hereunder and the breach is not remedied within the notice period. The non-payment of any license fees (except the initial fee and the royalties for PDC/PHS) by Nokia because of a good faith disagreement in respect of (i) expiration of Period 1; (ii) occurrence of a Major Competitor Event; (iii) Nokia MFL rights,(iv) terms applicable to the license of Nokia after the occurrence of a competitor event; shall not be a breach of any material obligation hereunder, or (v) other requirements of such payment obligations, until the dispute has been solved in Arbitration in accordance with the Master Agreement.   In case of a breach under PDC/PHS portion, the parties shall only be entitled to terminate the PDC/PHS portion of this Agreement.

4.3     <u>Other Termination Rights</u>. This Agreement may be canceled upon thirty (30) days' prior written notice by Nokia, if Control of  IDC or ITC is acquired by an entity with whom Nokia is licensed under such acquiring entity's patents and such agreement extends to the patents of ITC.

4.4     <u>Effect of Expiration/Termination</u>. Upon expiration of this Agreement, or termination of this Agreement in accordance with Section 4.2 or 4.3.

4.4.1   Except for Section 4.4.2 and 4.4.3 below, all rights, releases, and licenses granted by the parties hereunder shall terminate as to future sales provided,

PROPRIETARY INFORMATION

further that if no Major Competitor event has occurred prior to expiration, Nokia shall have the option to be considered as having made licensed sales up to the expiration provided Nokia agrees to make any payments required under Section 3.1.2 (but not 3.1.1(C)) in the event a Major Competitor event occurs subsequent to such expiration.

4.4.2   To the extent Nokia has, prior a termination due to the material default of IDC or ITC (including terminations arising thru the filing of oppositions), paid to ITC the initial payment of thirty one and one-half (31.50) million U.S. dollars, the paid-up license for Period 1 shall continue and, upon the choice of Nokia, other rights and licenses granted hereunder by ITC to Nokia shall remain in force, along with the related obligations. To the extent Nokia has, prior to a termination due to the default of Nokia or its Affiliates(including terminations arising thru the filing of oppositions), paid to ITC the initial payment of thirty one and one-half (31.50) million U.S. dollars, the paid-up license for Period 1 shall continue along with the obligation to make competition adjustment payments (Section 3.1.1(C)) and TDD Project termination payments (Section 3.1.1(D))as set forth herein.

4.4.3   If the license or rights hereunder are terminated partially (whenever this Agreement allows partial termination), such partial termination shall not affect the remaining rights, obligations and licenses of this Agreement.

4.5   Survival. In addition to the foregoing, the following provisions shall survive expiration of this Agreement: 3.1.1(A), 5.1, 5.2, and 5.4.

ARTICLE V MISCELLANEOUS

5.1   Payments/Reports. All payments made hereunder shall be non-refundable. During Period 1, Nokia shall provide, on September 1, for the six month period ending June

PROPRIETARY INFORMATION

30, and March 1, for the six month period ending December 31, a royalty report and, if required, royalty payment, as regards Covered Subscriber Units and Covered Infrastructure complying with PHS and/or PDC sold by Nokia and its Affiliates during such period. Each report shall be certified as accurate by Nokia's Chief Financial Officer or Vice President – Intellectual Property, and set forth the quantity of each type of Covered Subscriber Units and Covered Infrastructure sold, and additional information sufficient to determine the royalties payable for such Covered Subscriber Units and Covered Infrastructure. All such reports shall be held in confidence by ITC.

5.2     Currency Conversion. United States Dollar ($US) denominated sales shall be reported as transacted. Sales denominated in other currencies than United States dollars shall be reported at the US/non-US rate applied generally by Nokia. Such rate shall be defined by Nokia.

5.3     Oppositions. During Period 1, either party may terminate this agreement if the other party formally opposes, or seeks a declaration of invalidity of, any TDMA patent of the other party. During Period 2, each party will provide to the other party three (3) month's advance notice prior to initiating or joining as a party in any action to have any Patents of the other declared invalid. During such three month period, the parties will negotiate in good faith on a commercial resolution to the patent issue.

5.4     Release. Nokia hereby releases, and shall cause its Affiliates to release, IDC and its Affiliates from any and all claims of infringement under the Nokia Group for the making, have made, importing, distributing, selling or using of Covered Subscriber Units, Covered Infrastructure, UltraPhone Products and B-CDMA Products prior to the Effective Date.

5.5     Audit . In addition to audit rights granted to both parties in the Master Agreement in respect of the accuracy of payments, Nokia shall have the right to audit ITC and IDC for

PROPRIETARY INFORMATION

their complience with Nokia's MFL under Sections 3.1.1 (B) and 3.1.2 of this Agreement. Such audit right shall be in accordance , as applicable, with the provisions of Section 6.2 of the Master Agreement.

5.6   Identification on Covered Subscriber Units/Covered Infrastructure   Both parties shall, and shall cause its Affiliates to,  use reasonable efforts to affix in appropriate product packaging or instructions, to the extent required by the local laws, a label indicating that the products are manufactured or sold under one or more of following patents:  [as defined by the other party]

5.7   Limited Warranty.  ITC and Nokia each represents and warrants that it has the right to license the licensed patents.  Neither ITC, IDC nor Nokia makes any other representation or warranty with regard to the validity of the InterDigital Patents or Nokia Group Patents, or the other party's ability to use, manufacture, have manufactured or sell Covered Subscriber Units and/or Covered Infrastructure free of infringement of third party intellectual property rights.  Neither ITC nor Nokia shall have any obligation to maintain or prosecute InterDigital Patents or Nokia Group Patents.

5.8   Affiliate Performance.  Both parties shall be responsible for all actions required of its Affiliates hereunder and shall be liable to the other party for any adverse action or failure to perform by its Affiliates hereunder.

5.9   Limitation.  Nothing in this Agreement shall be construed as: (a) an agreement to bring or prosecute actions against third party infringers of the Nokia Group Patents or InterDigital Patents; (b) conferring any license or right under any patent other than the Nokia Group Patents or InterDigital Patents; or (c) conferring any right to use such Patents outside the field of use defined by the license grant of this Agreement.

PROPRIETARY INFORMATION

5.10    Acquisitions/Assignment.  This Agreement is personal to Nokia and ITC and may not
be assigned or transferred, nor may any license granted hereunder be assigned or
transferred to another entity, whether by operation of law or otherwise, and any attempt
to make any such assignment or transfer shall be null and void, except as follows:

5.10.1      Acquisition of InterDigital.   If Control of IDC or ITC is acquired by another
entity (aside from corporate re-organizations among IDC and its Affiliates),
the licenses granted by Nokia to ITC under this Agreement shall, at the
sole discretion of Nokia, be either (i) retroactively and prospectively limited
to IDC's then-current product operations (including type and quantity of
products produced and reasonable extensions and growth thereof not
resulting from the acquisition), or (ii) extended to the comparable business
operations of the acquiring entity,   with (a) appropriate adjustments being
made to IDC's royalty obligation to address, if necessary, higher than
expected volumes, different product categories, etc., as a result of such
acquisition, and (b) such entity being required to grant Nokia licenses
under its patents comparable to the licenses granted by Nokia to ITC
hereunder.

5.10.2      Acquisition of Nokia.    If Control of Nokia is acquired by another entity
(aside from corporate re-organizations among Nokia and its Affiliates), the
licenses granted by ITC to Nokia under this Agreement shall, at the sole
discretion of ITC, be either (i) retroactively and prospectively limited to
Nokia's then-current product operations (including type and quantity of
products produced and reasonable extensions and growth thereof not
resulting from the acquisition), or (ii) extended to the comparable business
operations of the acquiring entity,   with (a) appropriate adjustments being
made to Nokia's royalty obligation under the Nokia MFL Agreement to
address, if necessary, higher than expected volumes, different product

PROPRIETARY INFORMATION

categories, etc., as a result of such acquisition, and (b) such entity being required to grant ITC licenses under its patents comparable to the licenses granted by Nokia to ITC hereunder.

5.10.3    Acquisition by Nokia. To the extent that Nokia or its Affiliates gains Control of, or acquires the associated assets of another entity, involved in the manufacture, sale or use of Covered Subscriber Units and/or Covered Infrastructure, Nokia and ITC shall negotiate in good faith (subject to resolution under the Dispute Resolution Procedures) as regards to unlicensed sales (as regards InterDigital Patents) of Covered Subscriber Units and/or Covered Infrastructure. To the extent (i) such entity did not have annual sales in excess of 250,000 Covered Subscriber Units or Ten Million U.S Dollars ($US10,000,000) of Covered Infrastructure revenue at the time of Nokia acquisition no adjustment shall be made to the payments set forth in Section 3.1.1 or to any lump sum payment, or the determination of any running royalty rate made under any existing Nokia MFL Agreement ; otherwise, the parties shall negotiate in good faith such adjustments incremental to the respective sales, subject to resolution under the Dispute Resolution Procedures. The parties shall also negotiate such an adjustment if Nokia acquires a number of entities, the aggregate of which had 1,000,000 Covered Subscriber Unit sales or $US40,000,000 in Covered Infrastructure revenue at the time of the Nokia acquisition.

5.10.4    Assignment of Patents. ITC, IDC and their Affiliates , and Nokia Group may assign any patents or patent applications covered by this Agreement to third parties only on the condition that the licenses granted hereunder shall remain to be valid and effective subject to the terms of this Agreement.

PROPRIETARY INFORMATION

5.16 <u>Entire Agreement/Amendment</u>.  This Agreement contains the complete and final agreement between the parties, and supersedes all previous understandings relating to the subject matter hereof whether oral or written.  This Agreement may only be modified by a written agreement signed by duly authorized representatives of the parties

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized representatives.

INTERDIGITAL COMMUNICATIONS CORPORATION

By: _____

Name:    William A. Doyle

Title:    President

Date:    January 29, 1999

INTERDIGITAL TECHNOLOGY CORPORATION

By: _____

Name:    Howard E. Goldberg

Title:    President

Date:    January 29, 1999

NOKIA CORPORATION

By: _____          By: _____

Name:    YRJÖ NEUVO          Name:    HEIKKI HUTTUNEN

Title:    SVP, PRODUCT CREATION          Title:    V.P LICENSING

Date:    Feb 3, 1999          Date:    January 28, 1999
         JANUARY 28
                     YR

# EXHIBIT 4

## ARBITRATION SETTLEMENT AGREEMENT

This Settlement Agreement is entered into and effective as of April 26, 2006 by and between InterDigital Communications Corporation ("IDCC"), a Pennsylvania corporation with offices at 781 Third Avenue, King of Prussia PA 19406, and InterDigital Technology Corporation ("ITC"), a Delaware corporation having a mailing address of Suite 105, Hagley Building, 3411 Silverside Road, Concord Plaza, Wilmington, DE 19810, (individually and together, "InterDigital"), on the one hand, and Nokia Corporation ("Nokia"), a Finnish corporation with offices at Keilalahdentic 4, 02150 Espoo, Finland, on the other hand. (IDCC, ITC, and Nokia are sometimes referred to herein individually as a "Party" or together as the "Parties").

### BACKGROUND

A.  InterDigital and Nokia are parties to three interrelated contracts relating to digital cellular technology, including the Nokia PLA, the TDD Development Agreement, and the Master Agreement.

B.  In 2003, a dispute arose between InterDigital and Nokia concerning Nokia's royalty obligations for the sale of certain terminal unit and infrastructure products under the Nokia PLA. Pursuant to the terms of the Master Agreement and the Nokia PLA, the Parties submitted their dispute to Arbitration. In mid-2005, the Arbitral Tribunal issued its Award, in which it, among other things: (i) concluded that Nokia's obligation under the Nokia PLA to pay royalties on certain Period 2 terminal unit and infrastructure sales had been triggered; and (ii) set forth the Period 1 and Period 2 royalty rates to be applied to Nokia's sales of such certain terminal unit and infrastructure products under the Nokia PLA.

C.  In July 2005, InterDigital filed an action before the United States District Court for the Southern District of New York to confirm the Award. In December 2005, Judge William H. Pauley III issued the Order confirming the Award. In January 2006, Nokia filed a Notice of Appeal to the United States Court of Appeals for the Second Circuit.

D.  After the Tribunal issued the Award, a dispute between InterDigital and Nokia arose over, among other things, the calculation and scope of Nokia's royalty base and resultant royalty obligation under the terms of the Award and the Nokia PLA. In December 2005, ITC sent Nokia a Notice of Dispute, initiating additional dispute resolution procedures. In January 2006, Nokia responded in correspondence, identifying additional issues in dispute. On March 30, 2006, InterDigital commenced an arbitration before the International Chamber of Commerce related to its December 2005 Notice of Dispute (the "Second Arbitration"). In addition, on March 24, 2006, ITC sent Nokia a Notice of Dispute initiating additional dispute resolution procedures related to Nokia's purported breach of certain confidentiality obligations under the Master Agreement (the "Confidentiality Dispute").

E.  The Parties hereto desire to settle and resolve certain past, current and future disputes involving Nokia's license under the InterDigital Patents for sales of 2G Covered Terminal Units, 2G Covered Infrastructure, and certain Excluded Products and payment of royalties

on 2G Covered Terminal Units, 2G Covered Infrastructure, and certain Excluded Products, including, without limitation, disputes over the calculation of Nokia's royalty obligation under the terms of the Award by, among other things, implementing the Award (including the rates set forth therein as to Nokia and its Affiliates), as follows.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the Parties agree as follows:

1.    **DEFINITIONS.** The terms set forth in Exhibit "A," attached hereto and incorporated herein, when used with initial capital letters in this Agreement, shall have the meanings ascribed to them in Exhibit "A" for purposes of this Agreement.

2.    **DISMISSAL & CESSATION OF DISPUTES.** In consideration of the Parties' releases, acknowledgements, and agreements set forth herein, Nokia shall: (i) within 2 business days after obtaining confirmation by email from InterDigital that InterDigital has received the Settlement Fee, cause its counsel to file a Notice of Withdrawal of Nokia's Notice of Appeal of the Order; (ii) promptly take any other steps necessary to dismiss and terminate any appeal of the Order with prejudice; and (iii) refrain from taking any action to appeal, vacate or otherwise attack the validity of the Award or the Order. In addition, InterDigital shall, within 2 business days of receiving the Settlement Fee, submit a letter to the Secretariat of the ICC International Court of Arbitration requesting dismissal of the Second Arbitration with prejudice and thereafter take any and all other steps required to effect the dismissal of the Second Arbitration, and also withdraw without prejudice the Confidentiality Dispute. Each Party shall bear its own attorneys' fees and costs, if any, incurred in connection with the Arbitration, the federal court proceeding that resulted in the Order, Nokia's previous effort to appeal the Order, the Second Arbitration, and the Confidentiality Dispute.

3.    **RELEASES.**

   a.    **InterDigital Release.**

         (i)    In consideration of the execution and delivery of this Agreement, effective and contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, and subject to (3)(a)(ii) below, InterDigital Group irrevocably releases, acquits and forever discharges Nokia Group and its attorneys and agents from any and all Claims that InterDigital or its predecessors, successors, Affiliates and assigns ever had, now have or hereafter can, shall or may have, for, upon or by reason of Claims asserted or which could have been asserted against Nokia or its Affiliates (a) relating to Nokia's or its Affiliates' Protected Acts with respect to 2G Covered Terminal Units, 2G Covered Infrastructure and Additional Released Products sold by Nokia or its Affiliates, regardless of whether such Claims relate to an alleged infringement of the InterDigital Patents or the rights and obligations created by the Nokia PLA, the Master Agreement, the TDD Development Agreement or the Award; (b) relating to Nokia's payment obligations, including royalty reporting obligations, under the

2 of 25

Award; (c) for any increase of, addition to, or premium of any kind charged against the Settlement Fee (except for interest, costs and attorney's fees that may become due under Section 5(c)), regardless of whether such Claim is pursued in a suit at law or equity, and regardless of the legal theory on which such Claim is pursued (e.g., Lanham Act, antitrust law, fraud, fraudulent inducement, or negligent misrepresentation, or contract law based on the Nokia PLA, Master Agreement or TDD Development Agreement or under the Award); (d) for any increase of, addition to, or premium of any kind charged against monies already paid for 2G Covered Terminal Units, 2G Covered Infrastructure, or Additional Released Products under the Master Agreement, Nokia PLA, or TDD Development Agreement, regardless of whether such Claim is pursued in a suit at law or equity, and regardless of the legal theory on which such Claim is pursued (e.g. Lanham Act, antitrust law, fraud, fraudulent inducement, or negligent misrepresentation, contract law based on the Nokia PLA, Master Agreement or TDD Development Agreement); or (e) for any rights relating to 2G Covered Terminal Units, 2G Covered Infrastructure, or Additional Released Products that are different from those acknowledged and agreed to herein, whether under the Award, Master Agreement, Nokia PLA, or application of the terms of the Ericsson PLA, Sony Ericsson PLA, Ericsson Side Letter, Sony Ericsson Side Letter, or the Lucent Agreement (as defined in Section 4(a) below).

Effective and contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, InterDigital acknowledges and agrees that Nokia and its Affiliates will have a fully paid-up, perpetual, irrevocable, non-exclusive, world-wide license (without the right to grant sublicenses) under the InterDigital Patents for Protected Acts with respect to 2G Covered Terminal Units and 2G Covered Infrastructure sold by Nokia or its Affiliates. Any entity operating under Nokia's or Nokia's Affiliates' "have made" rights for the Protected Acts shall only have such rights with respect to (A) the entity's sales of 2G Covered Terminal Units and 2G Covered Infrastructure to Nokia or Nokia's Affiliates, (B) the entity's sales of ASICs, software, or other components to Nokia or Nokia's Affiliates when such ASICs, software, or other components are used as part of and within 2G Covered Terminal Units and 2G Covered Infrastructure sold by Nokia or Nokia's Affiliates, (C) the entity's internal use of reference designs and software to design and/or make 2G Covered Terminal Units or 2G Covered Infrastructure sold by such entity to Nokia or Nokia's Affiliates, and (D) the entity's internal use of reference designs and software to design and/or make ASICs, software or other components when such ASICs, software, or other components are sold to Nokia or Nokia's Affiliates to be used as part of and within 2G Covered Terminal Units and 2G Covered Infrastructure sold by Nokia or Nokia's Affiliates.

In addition, effective and contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, InterDigital acknowledges and agrees that Nokia and its Affiliates will have a fully paid-up, irrevocable, non-exclusive, world-wide release under the InterDigital Patents for Protected Acts with respect to Additional Released Products. Any entity that made Additional Released

3 of 25

Products designed by or for Nokia or Nokia's Affiliates will also have a fully paid-up, irrevocable, not-exclusive, world-wide release under the InterDigital Patents with respect to (A) the entity's sales of such Additional Released Products to Nokia or Nokia's Affiliates, (B) the entity's sales of ASICs, software, or other components to Nokia or Nokia's Affiliates when such ASICs, software, or other components were used as part of and within the Additional Released Products sold by Nokia or Nokia's Affiliates, (C) the entity's internal use of reference designs and software to design and/or make the Additional Released Products sold by such entity to Nokia or Nokia's Affiliates, and (D) the entity's internal use of reference designs and software to design and/or make ASICs, software, or other components when such ASICs, software, or other components are sold to Nokia or Nokia's Affiliates to be used as part of and within Additional Released Products sold by Nokia or Nokia's Affiliates

InterDigital also acknowledges and agrees that, effective and contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a), Nokia's and its Affiliates' customers have a release or will receive a pass-through license (as appropriate) from InterDigital with respect to 2G Covered Terminal Units and 2G Covered Infrastructure sold by Nokia or its Affiliates, and are released by InterDigital with respect to Additional Released Products sold by Nokia or its Affiliates to such customers. Such pass-through license or release (as appropriate) shall apply only to 2G Covered Terminal Units, 2G Covered Infrastructure, and Additional Released Products in each case sold by Nokia or its Affiliates to their customers, and will not apply to any Excluded Product that is not an Additional Released Product or to any third party products, including the customer's products, even if such products are used in combination with 2G Covered Terminal Units, 2G Covered Infrastructure, and Additional Released Products in each case sold by Nokia or its Affiliates (e.g., if a third party handset is used in combination with a Nokia base station, the third party handset will not be licensed hereunder, and no third party will be licensed to the combination of any third party handset and the Nokia base station, but the Nokia base station remains licensed to Nokia and its customers).

The foregoing release and license do not include a release or license with respect to subject matter other than that expressly set forth above and do not apply to any third party products even when used in combination with 2G Covered Terminal Units, 2G Covered Infrastructure, and Additional Released Products in each case sold by Nokia or its Affiliates.

(ii)     The release, acknowledgement, license and agreement described in Section 3(a)(i) above do not extend, by implication or otherwise, to (A) any products other than 2G Covered Terminal Units, 2G Covered Infrastructure and Additional Released Products in each case sold by Nokia or its Affiliates, including without limitation, any Excluded Product and any portion of any Multi-Mode Product (including any portion compliant with a 2G Covered Standard) sold by Nokia or its Affiliates that is not an Additional Released Product; (B) any ASICs, software, or other components except when such ASICs,

software, or other components are used as part of and within 2G Covered Terminal Units, 2G Covered Infrastructure or Additional Released Products sold by Nokia or its Affiliates and licensed or released in Section 3(a)(i) above; (C) any reference designs or software except for use of such reference designs or software to design and/or make 2G Covered Terminal Units, 2G Covered Infrastructure or Additional Released Products sold by Nokia or its Affiliates and licensed or released in Section 3(a)(i) above, or any ASICS, software or other components used as part of and within such 2G Covered Terminal Units, 2G Covered Infrastructure, or Additional Released Products; (D) any right to grant sublicenses; or (E) the rights and obligations under Sections 2.1, 3.5, 4, 8.1, 8.2 and 8.3 of the TDD Development Agreement and paragraphs 7 and 10 of Amendment No. 1 to the TDD Development Agreement.

b.     <u>Nokia Release.</u>

(i)     In consideration of the execution and delivery of this Agreement, effective and contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, and subject to 3(b)(ii) below, Nokia Group irrevocably releases, acquits and forever discharges InterDigital Group and its attorneys and agents from Claims that Nokia or its predecessors, successors, Affiliates and assigns ever had, now have or hereafter can, shall or may have, for, upon or by reason of Claims asserted or which could have been asserted against InterDigital or either or their Affiliates (a) that the Award is invalid, improper, subject to vacatur or otherwise subject to any challenge whatsoever at law, equity or by virtue of Nokia's MFL or other rights under the Nokia PLA, Master Agreement and TDD Development Agreement, (b) for any refund of, return, recovery, credit or set-off against, offset, or reduction of any kind of the Settlement Fee or monies already paid under the Master Agreement, Nokia PLA, TDD Development Agreement or this Agreement, regardless of whether such Claim is pursued in a suit at law or equity, and regardless of the legal theory on which such Claim is pursued (e.g. Lanham Act, antitrust law, fraud, fraudulent inducement, or negligent misrepresentation, contract law based on the Nokia PLA, Master Agreement, TDD Development Agreement or under the Award), (c) for any rights relating to 2G Covered Terminal Units, 2G Covered Infrastructure, or Additional Released Products that are different from those acknowledged and agreed to herein, whether under the Award, Master Agreement, or Nokia PLA, or (d) for any rights relating to or benefits arising from the application of the terms of the Ericsson PLA, Sony Ericsson PLA, Sony Ericsson Side Letter, or Ericsson Side Letter, except as expressly provided in Section 4(d) of this Agreement.

(ii)     Except as set forth below in 3(b)(iii), the release and acknowledgement described in Section 3(b)(i) above does not extend, by implication or otherwise, to any Claims: (a) under any patents owned or controlled by Nokia or its Affiliates or with respect to any InterDigital products; (b) with respect to the rights and obligations under Sections 2.1, 3.5, 4, 8.1, 8.2 and 8.3 of the TDD Development Agreement and paragraphs 7 and 10 of Amendment No. 1 to the TDD Development Agreement; (c) that Nokia has asserted in the lawsuit currently

pending in the United States District Court for the District of Delaware captioned *Nokia Corporation v. InterDigital Communications Corporation and InterDigital Technology Corporation*, Case No. 05-16-JJF ("the Delaware Action"); (d) that Nokia has asserted in the action currently pending in the United Kingdom High Court of Justice, Chancery Division, Patents Court captioned *Nokia Corporation and InterDigital Technology Corporation*, Claim No. HC 05 C02026 (the "UK 3G Action"); or (e) that Nokia has asserted in Claim No. HC04 C01952 in the High Court of Justice of England and Wales, Chancery Division, Patents Court initiated by Nokia against InterDigital, including the application to the Court of Appeal, Case No. A3/2004/2639, Chancery Division, Patents Court, captioned Nokia Corporation v. InterDigital Technology Corporation (the "UK 2G Action").

(iii)    Notwithstanding Section 3(b)(ii) above, the release and acknowledgement described in Section 3(b)(i) shall apply to any Claim that all or any portion(s) of the Settlement Fee and/or any monies previously paid under the Nokia PLA, Master Agreement and/or TDD Development Agreement constitute recoverable damages or that any alleged damages should be increased based on the payment of any such amounts. Nokia and its Affiliates agree that no portion of the Settlement Fee and/or monies already paid under the Master Agreement, the Nokia PLA, and/or the TDD Development Agreement constitute recoverable damages, a basis for recoverable damages, or that any alleged damages should be increased based on the payment of any such amounts, and will not allege in the Delaware Action or in any other Proceeding, that all or any portion of the Settlement Fee and/or monies already paid under the Master Agreement, the Nokia PLA, and/or the TDD Development Agreement constitute recoverable damages, a basis for recoverable damages, or that any alleged damages should be increased based on the payment of any such amounts.

4.    **OTHER COVENANTS**

a.    Rights Under Prior Agreements Terminated. The Parties understand and agree that, as of the Effective Date and contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, all of the Parties' rights and obligations under the Award and the Nokia PLA shall have terminated, and, with respect to the Award, have been satisfied and discharged by this Agreement and, with respect to the Nokia PLA, have been satisfied and discharged by this Agreement and the UK Settlement Agreement. Further, Nokia acknowledges, represents, and warrants that it has not elected to accept any third party license agreement under Section 3.1.2 of the Nokia PLA as of the Effective Date, and InterDigital acknowledges, represents, and warrants that it has not executed any Major Competitor License Agreement (as that term is used and defined in the Master Agreement) other than those deemed to be Major Competitor License Agreements in the Award. Notwithstanding the foregoing, IDCC's subsidiary, Tantivy Communications, Inc., entered into a settlement agreement, which included a patent license, on November 1, 2005, with Lucent Technologies Inc. (the "Lucent Agreement"). InterDigital represents and warrants that the license granted in the Lucent Agreement (i) licenses only those patents that were involved in the litigation between Lucent Technologies Inc. and Tantivy

Communications, Inc., (ii) only covers certain Lucent infrastructure products compliant with "cdma2000," and (iii) defines "cdma2000" as "a family of IMT-2000 standards, as amended, which evolved from narrow band CDMA technologies (e.g., IS-95 and cdmaOne) and, include without limitation CDMA2000 1X, CDMA 1X EV-DO, CDMA-2000 1X EV-DV and CDMA2000 3X."

b. <u>No Admission of Liability or Limitations on Patent Challenges</u>. By entering into this Agreement, Nokia and its Affiliates do not make any admission as to the validity, scope, essentiality, enforceability, or value of any InterDigital Patent nor do Nokia or any of its Affiliates admit or agree that any product of Nokia or its Affiliates infringes any claim of any InterDigital Patent. By entering into this Agreement, InterDigital and its Affiliates do not make any admission as to the invalidity, scope, non-essentiality, unenforceability, or value of any InterDigital Patent nor do InterDigital or any of its Affiliates admit or agree that any products of Nokia or its Affiliates (including those released or licensed hereunder) do not infringe any claim of any InterDigital Patent. Further, notwithstanding anything to the contrary, nothing in any agreements between the parties shall preclude or limit in any way the ability of Nokia or its Affiliates to institute, participate as an adverse party in, otherwise provide material support or continue their participation in or support to, any Proceeding anywhere in the world challenging any InterDigital Patent, including seeking to re-examine, declare not infringed, invalid, unenforceable or non-essential, or limit or construe the scope of any claim of any InterDigital Patent except for Nokia's commitments under the UK Settlement Agreement with regard to 2G Patents (as that term is used and defined in the UK Settlement Agreement). This provision shall in no way, however, eliminate or reduce, or expand or increase, any confidentiality obligations or restrictions (including those regarding the use of confidential information) that either party may have under any agreement (including those obligations and restrictions set forth in Article 5 of the Master Agreement) or court order.

c. <u>Audit Rights</u>. Contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, neither Party shall take any action after the Effective Date to pursue an audit or inspection of the other Party's or the other Party's Affiliates' books and records for any purpose relating to 2G Covered Terminal Units, 2G Covered Infrastructure or Additional Released Products sold by Nokia or its Affiliates, or to InterDigital's billing relating to the TDD development project. This Section shall not be deemed to preclude discovery in any Proceeding between the Parties to the extent such discovery is otherwise available. Notwithstanding the above, as to any entity that is created or comes into existence after the Effective Date and that Nokia claims as an Affiliate under this Agreement, InterDigital shall have the right to obtain an audit only as to the questions of whether the claimed Affiliate has sales above or below the thresholds described in subparagraphs (ii) and (iii) of the Affiliate definition, or as to what percentage of the claimed Affiliate's shares or securities are controlled by Nokia. In addition, in the event that Nokia transfers it rights pursuant to Section 8(c), InterDigital may request an audit at its own expense, and in accordance with the provisions of this Section 4(c) regarding compliance with Section 8(c), which audit will only address the relevant market share for Nokia's 2G

Covered Terminal Units or 2G Covered Infrastructure, whichever is subject to the transfer, and the percentage of the Nokia business actually being transferred and regarding compliance with Section 8(d), which audit will only address whether an acquired entity had sales above or below the thresholds described in Section 8(d), what percentage of the acquired entity's shares or securities are controlled by Nokia, and the acquired entity's sales of 2G Covered Terminal Units and 2G Covered Infrastructure in the full calendar year prior to its acquisition. Similarly, as to any entity that is created or comes to exist after the Effective Date and that InterDigital or one of its Affiliates claims as an Affiliate under this Agreement, Nokia shall have the right to obtain an audit only as to the questions of what percentage of the claimed Affiliate's shares or securities are controlled by InterDigital or one of its Affiliates, or as to the patents and patent applications of the claimed Affiliate and the rights of InterDigital or one of its Affiliates to license or sublicense those patents or patent applications and/or the inclusion of those patents or patent applications in the definition of InterDigital Patents. The auditing party shall be entitled to audit, in each case at its own expense, no more than once per calendar year, following fifteen (15) business days prior notice, using an independent certified public accountant or independent patent licensing professional that has signed an appropriate and reasonable nondisclosure agreement with the Party being audited. Any information obtained during the course of the audit shall be held in confidence by the auditing Party and the auditor except as necessary to enforce this agreement.

d.  Multi-Mode Infrastructure.

Contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, in the event that InterDigital sues Nokia for patent infringement based upon infringement of an InterDigital Patent by Nokia's or its Affiliates' Multi-Mode Infrastructure (other than subsequent to a declaratory judgment claim regarding non-infringement in the United States or similar claim regarding infringement or lack thereof in another jurisdiction brought by Nokia or its Affiliates specifically concerning Multi-Mode Infrastructure), Nokia can claim the benefit of whatever license Ericsson has for Multi-Mode Infrastructure under the terms and conditions of the Ericsson PLA, and Nokia shall be free to litigate in any such infringement action Nokia's position that the Ericsson PLA includes a paid-up license for Multi-Mode Infrastructure, with respect to which InterDigital may contest. If the court finds that the Ericsson PLA grants Ericsson a paid-up license for Multi-Mode Infrastructure, InterDigital agrees that (regardless of any definitions, terms, or conditions of this Agreement to the contrary) the release from InterDigital and Nokia's paid-up license (both set out in Section 3(a)(i) above) extend to and cover Multi-Mode Infrastructure without the payment of additional royalties or consideration by Nokia, but such license, with regard to 2G Covered Infrastructure and Multi-Mode Infrastructure only, shall be altered as follows: the definitions of "Affiliate," "Infrastructure," and "ITC Patents," found in the Ericsson PLA shall apply to Nokia's license for 2G Covered Infrastructure and Multi-Mode Infrastructure. Any benefits obtained by Nokia under this Section 4(d) shall not alter

in any way Nokia's rights with regard to 2G Covered Terminal Units or Additional Released Products.

In the event that, prior to a declaratory judgment claim or similar claim as described above or a court action involving Nokia as described above, the scope of the Ericsson PLA with respect to whether or not it provides Ericsson with a paid-up license for Multi-Mode Infrastructure, is interpreted in a final, non-appealable and binding judicial or arbitral determination then InterDigital shall promptly notify Nokia of such event.

Nothing in this Section 4(d) shall affect (i) Nokia's release to InterDigital, (ii) Nokia's payment obligations, as set forth in Section 5 herein, or (iii) Nokia's rights with regard to Infrastructure under Section 4 of the TDD Development Agreement. Nothing in this Section shall be construed as an acknowledgment or admission from InterDigital that the Ericsson PLA extends to such Multi-Mode Infrastructure.

e.  Use of this Agreement.  Contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, InterDigital acknowledges and agrees that it will not use this Agreement in any manner in the Delaware Action, the UK 2G Action, or the UK 3G Action to challenge jurisdiction over the claims currently being asserted in those actions (or, in the case of the UK 3G Action, a future claim that any or all of the InterDigital Patents currently in the UK 3G action are invalid), or to otherwise prevent such claims being asserted in those actions from proceeding to judgment, but InterDigital may use this Agreement for the limited purpose of establishing the existence of the terms of this Agreement to support any other position.  Nokia acknowledges and agrees that it will not use this Agreement in any manner in the Delaware Action, the UK 2G Action, or the UK 3G Action in an effort to establish jurisdiction or permit any of those matters to proceed to judgment, but Nokia may use this Agreement for the limited purpose of establishing the existence of the terms of this Agreement to support any other position or to counter any claim or defense raised by InterDigital. Notwithstanding the foregoing, neither Party shall offer into evidence or otherwise disclose to the fact-finder at any trial between or involving both InterDigital and Nokia (other than in an action for breach of this Agreement and other than by court order) the amount or approximate magnitude of the Settlement Fee or the terms, including royalty rates and any discounts, of the Award.  In the event that a court orders that the amount or approximate magnitude of the Settlement Fee be offered into evidence or otherwise disclosed to the fact-finder at any trial, either Party may offer into evidence or otherwise disclose to the fact-finder the terms, including royalty rates and any discounts, of the Award.  In addition, in the event that a court orders that the terms, including royalty rates and any discounts, of the Award be offered into evidence or otherwise disclosed to the fact-finder at any trial, either Party may offer into evidence or otherwise disclose to the fact-finder the amount or approximate magnitude of the Settlement Fee.

f.  Agreement Not to Pursue Infringement Claims.  Contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, InterDigital and

its Affiliates agree not to initiate or assert any patent infringement claims in any action, litigation, arbitration, or other legal or administrative proceeding (including a United States International Trade Commission action or comparable actions in any other jurisdictions around the world) against Nokia or its Affiliates before January 1, 2007, other than in response to a future affirmative action or claim initiated or asserted on or after the Effective Date by Nokia or its Affiliates concerning the validity or infringement of InterDigital Patents (but specifically excepting any invalidity claims asserted in the future in the UK 3G Action against the InterDigital Patents currently in that action, provided such invalidity claims are not initiated or asserted until the earlier of: (i) January 1, 2007; or (ii) three days prior to any deadline established by the Court in the UK 3G Action for initiating or asserting such invalidity claims (the Parties agree that they shall jointly request at any scheduling hearing that such a deadline be established after November 1, 2006)). InterDigital may, at its option, file such responsive action, litigation or proceeding in any forum of InterDigital's choice, subject to the rights of Nokia or its Affiliates to contest personal jurisdiction or seek to dismiss, stay, or transfer the action.

g.  Potential Future Royalties on Excluded Products.  Contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, in the event that, after January 1, 2007, any of Nokia's or its Affiliates' Excluded Products sold during the period between the Effective Date and December 31, 2006, are found to infringe any InterDigital Patent and a royalty rate or amount is imposed on such product sales, the Parties agree that Nokia and its Affiliates will be entitled to a thirty-five percent (35%) reduction in any such judicially-imposed royalty rate or amount for such product sales and that InterDigital waives and will not seek enhanced damages for alleged willful infringement with respect to such product sales; provided, however, InterDigital may attempt to establish Nokia's knowledge of an InterDigital Patent during such period to establish willful infringement related to sales that occurred after such period. Except as necessary to enforce InterDigital's agreement not to seek enhanced damages or to enforce Nokia's thirty-five percent (35%) discount, the Parties agree and acknowledge that neither Party may use or refer to this provision in any way in any action seeking damages from Nokia or any of its Affiliates for patent infringement. In no event shall either Party offer into evidence or otherwise disclose to the fact finder at any trial between or involving both InterDigital and Nokia (other than in an action for breach of this Agreement and other than by court order) the existence of the discount provided in this Section 4(g) and such discount shall be applied only following the fact finder's determination of a royalty rate or amount.

5.  PAYMENTS

a.  Nokia shall pay to ITC the Settlement Fee on or before April 28, 2006, as further provided for in this Section 5. The Parties agree that this payment by Nokia is (i) unconditional and not refundable, and (ii) not subject to any deductions, additions, set-offs, increases, interest (except as set forth in Section 5(c) herein), offsets, premium, discounts (including, without limitation, prepayment), credits (including, without limitation, any TDD Credit or Licensing Credit under Section

10 of 25

2.1.3 of the Nokia PLA or Period 1 Credit under the Nokia PLA), or withholdings (other than tax withholding as described in Section 6.3 of the Master Agreement).

b.    Nokia shall pay the Settlement Fee to ITC in United States currency by wire transfer to the following account:

>     ABA #031100089
>     PNC Bank
>     300 Delaware Avenue
>     Wilmington, Delaware 19801
>     USA
>     Swift Code: PNCCUS33
>
>     Credit to: InterDigital Facility Company
>     Account # 5605676655

c.    Other than any tax withholdings permitted under Section 6.3 of the Master Agreement, if the payment of the Settlement Fee is not made when due, it shall bear interest at the lesser of the prime rate plus five percent (5%), as reported by Morgan Guaranty Trust Co. of New York, New York, or the maximum rate permitted by law, from the date that such amount was payable under this Section 5 until the date upon which such payment is made. In any action to collect past due amounts which have not been paid in accordance with this Section 5, Nokia shall reimburse InterDigital for InterDigital's costs and reasonable attorneys' fees incurred in such action.

6.    <u>CONFIDENTIALITY OF TERMS.</u>  Unless otherwise required by law or court or arbitral order, the Parties shall maintain as strictly confidential this Agreement and any proprietary information disclosed under, or as a result of the negotiation or performance of, this Settlement Agreement. Without limiting the foregoing, each Party acknowledges all pre-existing obligations of confidentiality (including in particular the separately executed Nondisclosure Agreement governing the communications made in connection with the negotiation and execution of this Agreement) and agree that they continue to be bound thereby in accordance with their terms. Notwithstanding the foregoing, following the exchange of fully-executed versions of this Agreement, either Party may (i) issue a press release discussing the execution of this Agreement and the material terms hereof, (ii) provide this Agreement or the contents thereof in confidence to other licensees to the extent required by most favored licensee clauses (but only to the extent such licensee is bound by a non-disclosure agreement), and (iii) disclose such information as may be necessary to satisfy SEC, NASDAQ, or other statutory, regulatory, taxation, or administrative requirements, to its accountants, or in a Proceeding between the Parties.

7.    <u>REPRESENTATIONS, WARRANTIES AND DISCLAIMERS</u>

a.    InterDigital and its Affiliates represent and warrant to Nokia and its Affiliates that InterDigital is the sole and lawful owner of all rights, title and interest in and to each and every Claim and other matters which its purports to release herein and

that InterDigital has not heretofore assigned or transferred to any person or entity any right, title or interest in the released matters.

b.  Nokia and its Affiliates represent and warrant to InterDigital and its Affiliates that Nokia is the sole and lawful owner of all rights, title and interest in and to each and every Claim and other matters which it purports to release herein and that Nokia has not heretofore assigned or transferred to any person or entity any right, title or interest in the released matters.

c.  Each Party represents and warrants to the other Party that (i) the person signing this Agreement on its behalf is fully authorized and legally competent to execute and deliver this Agreement on its behalf; (ii) it is executing this Agreement wholly upon its own volition, individual judgment, belief, and knowledge; (iii) this Agreement is made without reliance upon any statement or representation of any other Party, except those representations and warranties expressed in this Agreement; (iv) the performance of this Agreement and the transactions contemplated hereunder have been fully authorized by all necessary corporate and other action; and (v) it is executing this Agreement after consultation with its own independent legal counsel.

d.  This Agreement shall not be construed against any of the Parties hereto as an admission or concession as to the value of any Claims resolved herein.

e.  Each Party represents and warrants to the other Party that the Settlement Fee, this Agreement, and all prior payments made under the Nokia PLA, TDD Development Agreement, and Master Agreement are in no way based upon any statement by InterDigital or its Affiliates regarding the validity, essentiality, and/or infringement of any InterDigital Patent.

f.  Nokia represents and warrants that, as of the Effective Date, the only suits, arbitrations (including dispute resolution notices under the Master Agreement) or actions initiated by Nokia and currently pending between the Parties or their Affiliates are: (i) the Delaware Action; (ii) Nokia's appeal to the United States Court of Appeals for the Second Circuit of the Order confirming the Award; (iii) the UK 2G Action; and (iv) the UK 3G Action. InterDigital represents and warrants that, as of the Effective Date, the only suits, arbitrations (including dispute resolution notices under the Master Agreement) or actions initiated by InterDigital and currently pending between the Parties or their Affiliates are: (v) the Second Arbitration and (vi) the Confidentiality Dispute

8.  <u>MISCELLANEOUS</u>

a.  Subject only to 8(b) below and (c) below and the applicability of the pass-through rights granted in Section 3(a) above, this Agreement is personal to the Parties hereto and their respective Affiliates and may not be assigned or transferred, nor may any license or release granted hereunder be assigned or transferred whether by

operation of law or otherwise, and any attempt to make any such assignment or transfer shall be null and void.

b.  If, after the Effective Date, InterDigital and/or its Affiliates assigns or transfer any of the InterDigital Patents to third parties, it may do so only on the condition that (i) the assigned or transferred patents remain fully encumbered by the license and release described in this Agreement, which license and release shall remain valid and effective as to the patent once assigned or transferred and (ii) InterDigital provides the assignee or transferee written notice of this condition prior to effecting the assignment or transfer.

c.  Contingent upon InterDigital's receipt of the Settlement Fee in accordance with Section 5(a) herein, if, after the Effective Date, Nokia assigns or transfers all or substantially all of any of its three current business groups for manufacturing and/or selling 2G Covered Terminal Units (namely, Nokia's Mobile Phones, Multimedia and Enterprise Solutions groups and any restructuring of any of these business groups in the normal course of Nokia's business going forward, provided that the restructured business groups are identified in Nokia's public documents, e.g., website, SEC filings, etc.) or assigns or transfers all or substantially all of its current business group for manufacturing and/or selling 2G Covered Infrastructure (namely, Nokia's Networks group and any restructuring of this business group in the normal course of Nokia's business going forward, provided that the restructured business group is identified in Nokia's public documents, e.g., website, SEC filings, etc.) to a third party (i.e., a party other than Nokia or one of its Affiliates), in either case through merger, divestiture of assets, the sale of shares, or otherwise, so that such divested business group is not an Affiliate hereunder, Nokia may assign or transfer the paid-up license applicable to such transferred business group to the acquiring entity only as to those Protected Acts undertaken by the acquiring entity for the same business market(s) served by the transferred business group and in accordance with this Section c.  Nokia shall be deemed to have assigned or transferred substantially all of such business group to the third party acquiring entity if the assignment or transfer represents at least eighty percent (80%) of such business group, based upon the sales associated with such business group in the full calendar year prior to the transfer.

In the event that the third party acquiring entity at the time of the assignment or transfer is a licensee of InterDigital for 2G Covered Terminal Units or 2G Covered Infrastructure, whichever is applicable based on the Nokia business group being transferred, Nokia's paid-up license may only be assigned or transferred to such third party acquiring entity under the following conditions: (a) the third party acquiring entity agrees in writing prior to the assignment or transfer that it will not claim, argue or otherwise take the position that any of the third party acquiring entity's royalty obligations under the third party acquiring entity's then-existing patent license agreement(s) with InterDigital should be reduced or eliminated based on the paid-up 2G Covered Terminal Unit and/or 2G Covered Infrastructure license being assigned or transferred from Nokia; and (b) the paid-up license being

assigned or transferred from Nokia will expire 4 years after the date of the assignment or transfer.

In the event that the third party acquiring entity at the time of assignment or transfer is not a licensee of InterDigital, the paid-up license being transferred by Nokia will not be subject to either of the conditions described in the immediately preceding paragraph.

In addition, whether or not the third party acquiring entity at the time of the assignment or transfer is a licensee of InterDigital for 2G Covered Terminal Units or 2G Covered Infrastructure, the paid-up license assigned or transferred by Nokia shall only apply (i) to Protected Acts of the third party acquiring entity on and after the acquisition date and (ii) to the portion of the business group that was actually obtained from Nokia, such portion to be defined, on an annual basis, as the number of units of 2G Covered Terminal Units or 2G Covered Infrastructure (whichever the case may be) sold by the business group in the full calendar year prior to the acquisition date multiplied by the percentage of the business assigned or transferred. Nokia's paid up license will be unaffected by such assignment or transfer. For example, if Nokia sells 90% of its Multimedia business group to a third party and during the full calendar year prior to the acquisition date the Multimedia business group sold 100,000 units of 2G Covered Terminal Units, then the paid-up license assigned or transferred by Nokia to the third party shall only apply, on an annual basis, to 90,000 units of 2G Covered Terminal Units made, used, sold, etc. by the third party, and Nokia's paid up license will be unaffected by such assignment or transfer. Further, the transferred or assigned paid-up license shall not extend to any larger operations into which such assigned or transferred business group may be subsumed or any subsequent additions or expansion made to such business group by the acquiring entity.

Notwithstanding anything to the contrary, (i) Nokia may assign or transfer its paid-up license pursuant to this provision to a third party no more than two times as to 2G Covered Terminal Units and only one time as to 2G Covered Infrastructure and (ii) Nokia may not transfer the rights under Section 4(d) herein to a third party.

d.   In the event that (i) Nokia acquires an entity after the Effective Date that meets the definition of Affiliate, but that does not constitute a Nokia Affiliate because the acquired entity had, in the full calendar year prior to its acquisition, sales of 2G Covered Terminal Units in excess of 250,000 units and/or revenues of 2G Covered Infrastructure in excess of Ten Million U.S. Dollars ($US10,000,000) and (ii) Nokia merges the acquired entity into Nokia or one of Nokia's Affiliates, then the licenses set forth in Section 3(a)(i) shall not extend, on an annual basis, to the number of unit sales by Nokia or its Affiliates of 2G Covered Terminal Units and/or 2G Covered Infrastructure that were sold by the acquired entity in the full calendar year prior to the acquisition; provided however, the licenses set forth in Section 3(a)(i) shall continue to cover all other unit sales by Nokia or its Affiliates

14 of 25

of 2G Covered Terminal Units and/or 2G Covered Infrastructure, including any additional unit sales of 2G Covered Terminal Units and/or 2G Covered Infrastructure by Nokia or Nokia's Affiliates that may be attributable to the merger of the acquired entity. For example, if Nokia acquires and merges into itself an entity that sold one million 2G Covered Terminal Units during the full calendar year prior to the acquisition, then one million 2G Covered Terminal Units sold by Nokia or its Affiliates each calendar year after the acquisition would be unlicensed under this Agreement, but all other unit sales of 2G Covered Terminal Units sold by Nokia or its Affiliates each calendar year after the acquisition would continue to be licensed under this Agreement.

In the event that (i) Nokia acquires an entity after the Effective Date that meets the definition of Affiliate, but that does not constitute a Nokia Affiliate because the acquired entity had, in the full calendar year prior to its acquisition, sales of 2G Covered Terminal Units in excess of 250,000 units and/or revenues of 2G Covered Infrastructure in excess of Ten Million U.S. Dollars ($US10,000,000) and (ii) Nokia operates the acquired entity as a separate company (i.e., does not merge the entity into Nokia or one of Nokia's Affiliates), then any Protected Acts performed by the acquired entity with regard to 2G Covered Terminal Units and 2G Covered Infrastructure shall not benefit from any of the licenses granted to Nokia and Nokia's Affiliates under this Agreement.

e.   No express or implied waiver of any breach of any term, condition or obligation of this Agreement shall be construed as a waiver of any subsequent breach of that term, condition or obligation or of any other term, condition or obligation of the same or of a different nature.

f.   This Agreement shall be governed by and construed in accordance with New York law, without regard to conflict of laws principles. The exclusive jurisdiction and venue for any and all litigation over any alleged breach of this Agreement shall be the United States District Court, Southern District of New York (except that the provisions of this Agreement may be asserted as a defense or counterclaim in an action properly filed elsewhere subject to the restrictions on the manner of use of the Agreement contained herein). In particular, this provision will have no impact on any pending litigation between the Parties, namely the Delaware Action, the UK 2G Action, or the UK 3G Action.

g.   The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable, then that provision shall be construed to the maximum extent permitted by law. The invalidity or unenforceability of one provision shall not necessarily affect any other

h.   Each Party shall be responsible for all actions required of its Affiliates hereunder and shall be liable to the other Party for any adverse action or failure to perform by any of such Affiliates.

i.   Each Party shall bear its own attorney's fees and related expenses incurred by or on behalf of said Party in connection with the negotiation of this Agreement.

j.   This Agreement, the Award, the Master Agreement, the TDD Development Agreement, and the Nokia PLA constitute the entire agreement and understanding between the Parties as to the subjects addressed in this document, and supersede all prior agreements, understandings, discussions and other communications, if any, between the Parties with respect to the subject matter thereof, whether oral or written.  In the event of a conflict between the terms of this Agreement and the Award, Master Agreement, and/or Nokia PLA, this Agreement shall control.  In addition, the Parties hereby acknowledge the contemporaneous execution of the UK Settlement Agreement and agree that, to the extent there is deemed to be any conflict or inconsistency between the releases and licenses (or exclusions thereto) granted to Nokia in this Agreement for 2G Covered Terminal Units, 2G Covered Infrastructure, or Additional Release Products and the releases and licenses (and exclusions thereto) granted to Nokia in the UK Settlement Agreement, the terms and conditions of this Agreement shall control with regard to 2G Covered Terminal Units, 2G Covered Infrastructure, and Additional Released Products.

k.   No modification or amendment to this Agreement will be effective unless it is in writing and executed by authorized representatives of the Parties, nor will any waiver of any rights be effective unless assented to in writing by the Party to be charged.

l.   Each Party to this Agreement agrees to perform any further acts and execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this Agreement.

m.   This Agreement and any counterpart original thereof may be executed and transmitted by facsimile or by emailed portable document format (".PDF") document.  The facsimile and/or .PDF signature shall be valid and acceptable for all purposes as if it were an original.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together

shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officer as of the date first set out above.

Nokia Corporation                                    InterDigital Communications Corporation

By: _____            By: _____

Name: ~~ILKKA RAHNASTO~~ Auli Luukkanen-Lääper  Name: _____
         ~~Vice President, IPR~~ Director, IPR Strategy & Development
Title: _____           Title: _____

Date: _27 April 2006_                         Date: _____

InterDigital Technology Corporation

By: _____

Name: _____

Title: _____

Date: _____

## EXHIBIT "A"

### DEFINITIONS

a.    "Additional Released Products" means those units of Excluded Products that Nokia or its Affiliates sold to an entity other than Nokia or a Nokia Affiliate where such sale, including the passage of title, was completed on or before the Effective Date.

b.    "Affiliate" means a corporation or legal entity: (i) more than 50% of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (ii) which does not have outstanding shares or securities but more than 50% of whose ownership interest representing the right to manage such corporation or other legal entity is now or hereafter owned and controlled by such company either directly or indirectly; but any such corporation or other legal entity shall be deemed to be an Affiliate of such company only as long as such control or ownership and control exists.

Notwithstanding anything to the contrary contained herein, including without limitation the definition of Affiliate above, only entities described in (i)-(iv) below shall constitute Nokia Affiliates:

(i)    entities which constitute Affiliates, as defined above, on or before the Effective Date so long as such entity continues to be an Affiliate on the Effective Date;

(ii)    a third party entity acquired after the Effective Date which meets the definition of Affiliate above, provided that the entity does not have, in the full calendar year prior to the acquisition, sales of 2G Covered Terminal Units in excess of 250,000 units and/or revenues of 2G Covered Infrastructure in excess of Ten Million U.S. Dollars ($US10,000,000);

(iii)    any Nokia joint venture formed or coming into existence after the Effective Date in a country where, for political reasons (conforming to customary practice), foreign ownership of joint ventures is limited to fifty percent (50%) or less, provided that Nokia maintains at least a fifty percent (50%) ownership interest in such joint venture, and so long as the operations or assets being contributed by the joint venture partner to such entity did not generate, in the full calendar year prior to formation of the joint venture, sales of 2G Covered Terminal Units in excess of 250,000 units and/or revenues of 2G Covered Infrastructure in excess of Ten Million U.S. Dollars ($US10,000,000); and

(iv)    entities that would qualify as Affiliates, as defined above, that Nokia or one of its Affiliates creates after the Effective Date as part of a corporate restructuring or reorganization and that do not involve the acquisition of an entity or assets from a independent third party.

18 of 25

c.   "Arbitration" means that certain Arbitral proceeding conducted between the Parties from 2003 to 2005 in accordance with the arbitration rules of the International Chamber of Commerce.

d.   "Award" means the Final Award issued by the Tribunal.

e.   "Capable" means having capacity or ability without requiring further modification by Nokia or its Affiliates after the product is sold. Notwithstanding anything to the contrary in this Agreement, in the event any Terminal Unit or Infrastructure which is, when sold, not Capable of operating in accordance with an Excluded Standard but becomes Capable of operating in accordance with an Excluded Standard as a result of further modification, such Terminal Unit or Infrastructure shall be deemed to be an Excluded Product upon such modification and shall not be licensed hereunder (including under any pass-through license) from that date forward.  If such modification is performed by Nokia or one of its Affiliates or by someone acting at the direction of, with the assistance of or on behalf of Nokia or one of its Affiliates, then Nokia (in addition to other parties) shall be liable (to the extent any such liability is established) for any Protected Acts associated with such unlicensed Excluded Product.  If such modification is not performed by Nokia or one of its Affiliates or by someone acting at the direction of, with the assistance of or on behalf of Nokia or one of its Affiliates, then liability for any Protected Acts associated with such unlicensed Excluded Product shall be determined in accordance with the laws governing such Protected Acts.

f.   "CDMA2000" means a family of IMT-2000 standards, as amended from time to time, being developed by the 3GPP2, which standards evolved from narrow band CDMA technologies (e.g., TIA/EIA 95 and cdmaOne) and, include without limitation CDMA2000 1X, CDMA 1X EV-DO, CDMA-2000 1X EV-DV and CDMA2000 3X.

g.   "Claims" means actions, causes of action, damages, claims and demands, known and unknown.

h.   "Code Division Multiple Access" or "CDMA" means a method of digital spread spectrum technology wireless transmission that allows a large number of users to share access to a single radio channel by assigning unique code sequences to each user thus permitting multiple simultaneous radio transmissions on the same radio channel or frequencies.

i.   "EDGE" means the "Enhanced Data rates for GSM Evolution" standard promulgated by the European Telecommunications Standards Institute and later by 3GPP (i.e., by GERAN), as amended from time to time, and including future evolutions of this standard that utilize a TDMA air interface, provided that such future evolutions are considered by the industry to be second generation standards (i.e., 2G or 2.xG standards) and not Third Generation standards or future digital cellular standards beyond Third Generation (e.g., the LTE work ongoing in 3GPP and IMT-2000, the Advanced efforts underway at the ITU, and 4G).

j.   "Effective Date" means April 26, 2006.

k.  "End-User Device" means a wireless communications device having fully integrated modem/baseband/RF functionality and designed for use by an end user in combination with another device to provide the other device with complete wireless communications capability, but only so long as the use of the communications device with the other device does not require significant further physical integration by the user of the communications device with the other device. An example of an End-User Device is a communication card such as a PCMCIA card (which may include an antenna) for simple insertion (generally by the end user) into a laptop computer to provide wireless communication capability.

l.  "Ericsson PLA" means that certain Patent License Agreement effective January 1, 2003, between InterDigital Technology Corporation and Ericsson Inc. and Telefonaktiebolaget LM Ericsson.

m.  "Ericsson Side Letter" means that certain letter dated March 10, 2003, from InterDigital Technology Corporation to Ericsson Inc. and Telefonaktiebolaget LM Ericsson relating to the Ericsson PLA and the March 10, 2003, settlement agreement between InterDigital Technology Corporation, Ericsson Inc. and Telefonaktiebolaget LM Ericsson, a copy of which is attached hereto as Attachment A.

n.  "Excluded Product" means any product (i) Capable of operating in accordance with one or more Excluded Standards or (ii) not Capable of operating in accordance with any 2G Covered Standard. For example, Multi-Mode Products, products Capable of operating only in accordance with an Excluded Standard, or products Capable of operating only in accordance with a Network Related Standard shall each constitute Excluded Products.

o.  "Excluded Standards" shall mean any wireless communications standard other than a 2G Covered Standard and other than a Network Related Standard. Excluded Standards include, without limitation, Third Generation standards and future digital cellular standards beyond Third Generation standards (e.g., the LTE work ongoing in 3GPP and IMT-2000, the Advanced efforts underway at the ITU, and 4G).

p.  "GPRS" means the standard developed for digital cellular networks (GSM, DCS, PCS) promulgated by the European Telecommunications Standards Institute and later by 3GPP (i.e., by GERAN), as amended from time to time, which utilizes a packet radio principle and can be used for carrying end users' packet data protocol (such as IP and X.25) information from/to GPRS terminals to/from other GPRS terminals and/or external packet data networks technology, and including future evolutions of this standard that utilize a TDMA air interface, provided that such future evolutions are considered by the industry to be second generation standards (i.e., 2G or 2.xG standards) and not Third Generation standards or future digital cellular standards beyond Third Generation (e.g., the LTE work ongoing in 3GPP and IMT-2000, the Advanced efforts underway at the ITU, and 4G).

q.  "GSM" means the compatibility standard developed for the 900 MHZ PanEuropean digital TDMA cellular mobile radio communication system, promulgated by the European Telecommunications Standards Institute and later by 3GPP (i.e., by GERAN), as amended from time to time, and including future evolutions of the standard that utilize a TDMA air interface, provided that such future evolutions are considered by the industry

to be second generation standards (i.e., 2G or 2.xG standards) and not Third Generation standards or future digital cellular standards beyond Third Generation (e.g., the LTE work ongoing in 3GPP and IMT-2000, the Advanced efforts underway at the ITU, and 4G), or the compatibility standard developed for PCS based on GSM but intended for use in the 850 MHZ, 1.8 GHz and 1.9 GHz bandwidths ("DCS 1800-1900"), as amended from time to time, and including future evolutions of this standard that utilize a TDMA air interface, provided that such future evolutions are considered by the industry to be second generation standards (i.e., 2G or 2.xG standards) and not Third Generation standards or future digital cellular standards beyond Third Generation (e.g., the LTE work ongoing in 3GPP and IMT-2000, the Advanced efforts underway at the ITU, and 4G).

r.   "Infrastructure" shall mean any past, present, or future wireless network equipment including but not limited to mobile switching centers, base station controllers, base stations, positioning node equipment, operation and maintenance equipment, core networks, service nodes, radio resource management devices and software, digital transceivers, digital channel cards, and software used in connection with the aforementioned devices whether sold as individual items or bundled as an integrated product with other Infrastructure, which are used to interconnect a Terminal Unit to a public or private data or voice network (whether wired or unwired), including the internet. Network gateway products and servers shall constitute Infrastructure to the extent they are used in connection with any of the above wireless network equipment.

s.   "InterDigital Group" means InterDigital, with its respective officers, directors, shareholders, employees, agents, representatives, parents, Affiliates, successors and permitted assigns.

t.   "InterDigital Patents" means all patent applications, patents, utility models, or other enforceable patent rights worldwide, issued to, assigned to, owned or under which InterDigital or any of its Affiliates has a right to grant a license or sublicense at any time before, as of, or after the Effective Date regardless of whether such patents or patent applications are declared essential to any standard. The term "InterDigital Patents" shall also include any patent reissued, reexamined, amended, or claiming priority from any of the aforesaid patents or patent applications.

The licenses set forth in this Agreement were established based on the assumption that more than the majority of Terminal Units and Infrastructure sold after April 15, 2012 will be Capable of operating in accordance with an Excluded Standard.   If at any time after April 15, 2012, a Network Related Standard substantially displaces the expected role of Excluded Standards, such that over 60% of the global market share of Terminal Units or Infrastructure at that time are Capable of operating in accordance with a Network Related Standard in lieu of any Excluded Standard (e.g., over 60% of Terminal Units and Infrastructure are Capable of operating in accordance with a Network Related Standard in combination with a 2G Covered Standard and not also Capable of operating in accordance with an Excluded Standard), then, effective as to sales made after April 15, 2012 or the date on which 60% of the global market share of Terminal Units or Infrastructure are Capable of so operating, whichever is later in time, the definition of InterDigital Patents in this Agreement shall be revised to exclude only those InterDigital Patents having a

priority date on or after April 15, 2012 and that are necessarily infringed by Terminal Units or Infrastructure Capable of operating in accordance with a Network Related Standard (i.e., that are technically essential to that standard) but that are also not necessarily infringed by Terminal Units or Infrastructure Capable of operating in accordance with a 2G Covered Standard (i.e., that are not technically essential to such standards).

u.    "Knock-Down Unit" means a substantially complete end-user terminal device having RF transmit and/or RF receive capabilities and designed for wireless voice and/or data communications sold to a third party in a partially or assembled form for final manufacturing, packaging, sale and distribution to meet the local manufacturing requirements of a particular country.

v.    "Master Agreement" means the means that certain Master Agreement entered into January 29, 1999 between the Parties.

w.    "MFL" means most favored licensee.

x     "Module" means a fully integrated wireless communications product, including required ASICS, software and/or firmware, which is sold to a third party for physical integration into other devices such as handsets, vending machines, computers, laptop computers, sensing/telemetry applications, motor vehicles and fixed wireless telephone systems.

y.    "Multi-Mode Product" means a product Capable of operating in accordance with both (i) one or more 2G Covered Standards, and (ii) one or more Excluded Standards (e.g., a handset with GSM and 3G capabilities). For example, a handset Capable of operating in accordance with GSM and WCDMA is a Multi-Mode Product. However, a product Capable of operating in accordance with only GSM and WLAN is not a Multi-Mode Product.

z.    "Multi-Mode Infrastructure" means Infrastructure that constitutes a Multi-Mode Product.

aa.   "Network Related Standards" means those wireless data communication network standards, as amended from time to time, whether or not adopted by any recognized standardizing body, considered by the industry as Wireless WAN, LAN, MAN, and PAN related standards (e.g., IEEE 802 or ETSI BRAN related standards). For purposes of this Agreement, Network Related Standards do not include 2G Covered Standards, Third Generation standards or future digital cellular standards, provided that any such future digital cellular standard is adopted by a recognized standards-setting body in which telecommunications operators participate or are otherwise involved (e.g., the LTE work ongoing in 3GPP and IMT-2000, the Advanced efforts underway at the ITU, and similar efforts in a recognized standards-setting organization concerning 4G).

bb.   "Nokia Group" means Nokia with its respective officers, directors, shareholders, employees, agents, representatives, parents, Affiliates, successors and permitted assigns.

cc.   "Nokia PLA" means that certain Patent License Agreement entered into January 29, 1999 between the Parties.

dd.     "Order" means that certain order and a judgment issued by United States District Judge William H. Pauley III of the U.S. District Court for the Southern District of New York, confirming the Tribunal's Award.

ee.     "PDC" mains the RCR STD 27 compatibility standard developed in Japan known as PDC or Personal Digital Cellular or Pan Asian Digital Cellular for TDMA digital wireless mobile radio communication systems, as amended from time to time.

ff.     "Period 1" means the period starting on the first date of manufacture of Terminal Units or Infrastructure covered under the Nokia PLA by Nokia or its Affiliates and ending on December 31, 2001.

gg.     "Period 2" means January 1, 2002 through December 31, 2006.

hh.     "PHS" means the RCR STD 28 compatibility standard developed in Japan and known as the Personal Handyphone Standard, as amended from time to time.

ii.     "Proceeding" means, without limitation, any action, litigation, arbitration, mediation, opposition, reexamination, revocation, or other legal or administrative proceeding.

jj.     "Protected Acts" means any of making, designing, having made (if designed by or for Nokia or its Affiliates), using, importing, selling, distributing or any other act which would constitute patent infringement under the laws of any country.

kk.     "2G Covered Infrastructure" means Infrastructure Capable of operating in accordance with one or more 2G Covered Standards but not also Capable of operating in accordance with an Excluded Standard.   For example, 2G Covered Infrastructure excludes Multi-Mode Products.

ll.     "2G Covered Standards" means (i) the following digital cellular standards:  TIA/EIA 54/136, GSM, GPRS, EDGE, PDC, and PHS, and (ii) DECT and TETRA.  In no event shall "2G Covered Standards" be construed to include any Excluded Standard or any Network Related Standard.

mm.     "2G Covered Terminal Units" means Terminal Units Capable of operating in accordance with one or more 2G Covered Standards, and Terminal Units Capable of operating in accordance with one or more 2G Covered Standards and one or more Network Related Standards, but in each case not also in accordance with an Excluded Standard (e.g. a handset Capable of operating in accordance with only GSM or in accordance with only GSM and WLAN is a 2G Covered Terminal Unit, but a handset Capable of operating in accordance with GSM and WCDMA is not).

nn.     "Settlement Fee" means Two Hundred Fifty-Three Million United States Dollars (US $253,000,000.00).

oo.     "Sony Ericsson PLA" means that certain Patent License Agreement effective January 1, 2003, between InterDigital Communications Corporation and Sony Ericsson Mobile Communications AB.

pp.  "Sony Ericsson Side Letter" means that certain letter dated March 10, 2003, from InterDigital Technology Corporation to Sony Ericsson Mobile Communications AB confirming their mutual understanding regarding several matters relating to the March 10, 2003, settlement agreement between Ericsson Inc. and InterDigital Technology Corporation and to certain terms in the Sony Ericsson PLA.

qq.  "TDMA" means time division multiple access.

rr.  "TDD Development Agreement" means the certain TDD Development Agreement entered into January 29, 1999 between the Parties, as amended on September 30, 2001.

ss.  "Terminal Unit" means any past, present, or future end-user terminal device, whether fixed, mobile, vehicular, portable, or hand-held, having RF transmit and/or RF receive capabilities, which device is designed for wireless voice and/or data communications. Terminal Units shall include, without limitation, Modules, End-User Devices, and Knock-Down Units. Terminal Units shall also include end-user terminal devices that comply with standards or specifications that address operation or functionality other than the air interface physical layer such as, but not limited to, WAP or OMA requirements. Examples of Terminal Units include, without limitation, handsets, (including handsets having substantial functionality unrelated to voice and data communications), wireless modules, wireless-enabled PDAs and computers, and wireless-enabled handsets with multi-media functionality (e.g., handsets with MMS functionality), gaming functionality (e.g., handsets with gaming functionality), and/or imaging functionality (e.g., a camera phone).  Additional examples of Terminal Units include, without limitation, handsets having substantial functionality unrelated to voice and data communications such as, a computer or a fully featured PDA, or  a handset that has one or more of the following integrated functionalities:  an enhanced display (more than 4,000 colors), some meaningful PIM (personal information management) functionality, enhanced multimedia capability which may include a camera and/or an ability to do video and audio streaming (real player) and/or the ability to play music, or  memory stick or similar high function memory transfer device.

tt.  "Third Generation" means any digital cellular mobile radio telecommunication standards generally considered by the industry to be the third generation, and as amended from time to  time and adopted by any recognized standards-setting body in which telecommunications operators participate or are otherwise involved. Examples of current standards issued and under development, or related standardization efforts, which the Parties agree are Third Generation, are the International Telecommunications Union – Radio efforts under the label IMT-2000, the specifications issued and being developed under the Third Generation Partnership Projects (3GPP and 3GPP2), and comparable or related standards adopted by ARIB, ETSI, TTA, TIA, TIPI, CWTS, as well as other recognized standards development organizations. These standards are also known by the names, among others, WCDMA (including UTRA FDD and UTRA TDD), CDMA2000, and TD-SCDMA.  For the avoidance of doubt, Third Generation does not include those specifications or standards issued or being developed by 3GPP GERAN, but only as part of its work on the continued maintenance and improvement of the existing GSM, GPRS, and EDGE  standards.

uu.   "TIA/EIA 54/136" means the Cellular Dual Mode Mobile Station-Base Station Compatibility Standards promulgated by the Electronics Industry Association and the Telecommunications Industry Association, as amended from time to time, and improved to include, among other things, a digital control channel, and formerly known as IS-54 and IS-136.

vv.   "Tribunal" means the Arbitral Tribunal presiding over the Arbitration.

ww.   "UK Settlement Agreement" shall mean that certain UK Settlement Agreement of even date herewith between InterDigital Communications Corporation, InterDigital Technology Corporation and Nokia Corp. resolving the UK 2G Action and other issues between the parties.

**EXHIBIT 5**

## UK SETTLEMENT AGREEMENT

This Settlement Agreement is entered into and effective April 26, 2006 by and between InterDigital Communications Corporation ("IDCC"), a Pennsylvania corporation with offices at 781 Third Avenue, King of Prussia PA 19406 and InterDigital Technology Corporation ("ITC"), a Delaware corporation having a mailing address of Suite 105, Hagley Building, 3411 Silverside Road, Concord Plaza, Wilmington, DE 19810 (individually and together, "Interdigital"), on the one hand, and Nokia Corporation ("Nokia"), a Finnish corporation with offices at Keilalahdentie 4, 02150 Espoo, Finland, on the other hand. (IDCC, ITC, and Nokia are sometimes referred to herein individually as a "Party" or together as the "Parties").

### BACKGROUND

A.    In June 2004, Nokia initiated Claim No. HC04 C01952 in the High Court of Justice of England and Wales, Chancery Division, Patents Court against InterDigital captioned Nokia Corporation v. InterDigital Technology Corporation (the "UK 2G Action"), seeking revocation of certain of InterDigital's patents in the United Kingdom and a declaration that such patents are not essential to the practice of one or more ETSI GSM Standards. InterDigital has initiated the UK Amendment Application to amend certain of the claims of those patents and this application is opposed by Nokia.

B.    The Parties desire to settle and resolve all disputes arising under the UK 2G Action and the UK Amendment Application and, as part of resolving those disputes, resolve certain issues regarding Nokia's First Generation Products and TIA/EIA 95 Products.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and of other good and valuable consideration, the Parties agree as follows:

1.    **DEFINITIONS.** The terms set forth in Exhibit "A" attached hereto and incorporated herein, when used with initial capital letters in this Agreement, shall have the meanings ascribed to them in Exhibit "A" for purposes of this Agreement.

2.    **DISMISSAL & CESSATION OF DISPUTES.**

    a.    <u>UK 2G Action and UK Amendment Application.</u>    In consideration for InterDigital's release and acknowledgement and agreement to a paid-up license set forth in Section 3(a) herein, and Nokia's release set forth in Section 3(b) herein, within two (2) business days after the Effective Date, InterDigital and Nokia shall cause their respective counsel to make an application to discontinue the UK 2G Action by consent and Nokia shall withdraw its opposition to the UK Amendment Application in accordance with the draft Order attached hereto as Exhibit "B", and to take any and all steps as may be necessary to achieve such discontinuance and withdrawal. Notwithstanding any Order of the Court to the contrary, the Parties agree that each Party will pay its own respective

costs and expenses of the UK 2G Action, the UK Amendment Application and any and all appeals in either. For the avoidance of doubt, costs and expenses shall include, without limitation, the fees of solicitors, barristers, expert witnesses, overseas legal counsel, witness expenses and all other costs incurred by a Party solely in connection with the UK 2G Action and the UK Amendment Application and any and all appeals in either. Also, for the avoidance of doubt and in furtherance of this Agreement, the Parties specifically relieve each other from any liability under any Orders made by the Court solely in connection with the UK 2G Action or the UK Amendment Application relating to the payment of costs and expenses whether already made (for example the Order of the Court of Appeal dated 26 April 2005 made in Case No. A3/2004/2639) or which may be made in the future solely in connection with the UK 2G Action or the UK Amendment Application; provided, however, that neither Party shall be obligated to refund any costs or expenses already paid to it by the other Party pursuant an Order made by the Court.

b. Order. The Parties agree that the Order of the Honourable Mr. Justice Pumfrey made on November 4, 2005, which was sealed on February 7, 2006, shall continue in full force and effect and the Parties agree to apply to the Court for such continuance if necessary. Each Party shall bear its own attorneys' fees and costs for such an application.

c. Documents. Except for those documents that relate to Contested UK Prior Art, the Parties agree that, within five (5) business days after the Effective Date, all other documents disclosed and produced by one Party to the other Party in the UK 2G Action and/or in the UK Amendment Application, together with any and all copies and summaries made of such documents, shall be destroyed and shall not be used for any purpose.

d. U.K. Amendment Application Appeal. InterDigital and Nokia each agree not to appeal a finding in the Judgment of the Honourable Mr. Justice Pumfrey on the UK Amendment Application as to whether the Contested UK Prior Art was or was not Prior Published. This paragraph is without prejudice to, and nothing in this Agreement shall affect, InterDigital's right to apply for leave to appeal any other aspect of the Judgment of the Honourable Mr. Justice Pumfrey on the UK Amendment Application.

3.   RELEASES.

a. InterDigital Release.

(i)   In consideration of Nokia's agreement to discontinue the UK 2G Action and withdraw its opposition to the UK Amendment Application, effective and contingent upon such discontinuance and withdrawal, and subject to the limitations set forth in Sections 3(a)(ii) and 3(a)(iii) below, InterDigital Group irrevocably releases, acquits and forever discharges Nokia Group and its attorneys and agents from any and all Claims that InterDigital or its predecessors, successors, Affiliates

2 of 42

and assigns ever had, now have or hereafter can, shall or may have, for, upon or by reason of Claims asserted or which could have been asserted against Nokia or its Affiliates (a) relating to Nokia's or its Affiliates' Protected Acts with respect to Covered Products sold by Nokia or its Affiliates, regardless of whether such Claims relate to an alleged infringement of the InterDigital Patents or the rights and obligations created by the Nokia PLA, the Master Agreement, or the TDD Development Agreement, (b) for any rights relating to Covered Products that are different from those acknowledged and agreed to herein, whether under the Master Agreement, the Nokia PLA, or otherwise, and (c) for any costs and/or expenses relating to the UK 2G Action, the UK Amendment Application, and any and all appeals in either, whether incurred prior to the Effective Date or which may be incurred in the future.

Effective and contingent upon the discontinuance of the UK 2G Action and Nokia's withdrawal of its opposition to the UK Amendment Application, InterDigital acknowledges and agrees that Nokia and its Affiliates will have a fully paid-up, perpetual, irrevocable, non-exclusive, world-wide license (without the right to grant sublicenses) under the InterDigital Patents for Protected Acts with respect to Covered Products sold by Nokia or its Affiliates. Any entity operating under Nokia's or Nokia's Affiliates' "have made" rights for the Protected Acts shall only have such rights with respect to (A) the entity's sales of Covered Products to Nokia or Nokia's Affiliates, (B) the entity's sales of ASICs, software, or other components to Nokia or Nokia's Affiliates when such ASICs, software, or other components are used as part of and within Covered Products sold by Nokia or Nokia's Affiliates, (C) the entity's internal use of reference designs and software to design and/or make Covered Products sold by such entity to Nokia or Nokia's Affiliates, and (D) the entity's internal use of reference designs and software to design and/or make ASICs, software or other components when such ASICs, software, or other components are sold to Nokia or Nokia's Affiliates to be used as part of and within Covered Products sold by Nokia or Nokia's Affiliates.

In addition, effective and contingent upon the discontinuance of the UK 2G Action and Nokia's withdrawal of its opposition to the UK Amendment Application, InterDigital acknowledges and agrees that Nokia's and its Affiliates' customers will receive a pass-through license from InterDigital with respect to Covered Products sold by Nokia or its Affiliates to such customers. Such pass-through license shall apply only to Covered Products sold by Nokia or its Affiliates to their customers, and will not apply to any Excluded Product or any third party products, including the customer's products, even if such products are used in combination with Covered Products sold by Nokia or its Affiliates (e.g., if a third party handset is used in combination with a Nokia base station, the third party handset will not be licensed hereunder, and no third party will be licensed to the combination of any third party handset and the Nokia base station, but the Nokia base station remains licensed to Nokia and its customers).

The foregoing release and license do not include a release or license with respect to subject matter other than that expressly set forth above and do not apply to any third party products even when used in combination with Covered Products sold by Nokia or its Affiliates.

(ii)    The release, acknowledgement, license and agreement described in Section 3(a)(i) above do not extend, by implication or otherwise, to (A) any products other than Covered Products sold by Nokia or its Affiliates, including without limitation, any portion of any Multi-Mode Product (including any portion compliant with a First Generation Standard or TIA/EIA 95); (B) any ASICS, software, or other components except when such ASICS, software, or other components are used as part of and within Covered Products sold by Nokia or its Affiliates and licensed or released in Section 3(a)(i) above; (C) any reference designs or software except for use of such reference designs or software to design and/or make Covered Products sold by Nokia or its Affiliates and licensed or released in Section 3(a)(i) above, or design and/or make ASICS, software, or other components used as part of and within such Covered Products; (D) any right to grant sublicenses; or (E) the rights and obligations under Sections 2.1, 3.5, 4, 8.1, 8.2 and 8.3 of the TDD Development Agreement and paragraphs 7 and 10 of Amendment No. 1 to the TDD Development Agreement.

(iii)    Nokia may, at its sole discretion and by notifying InterDigital fifteen days in advance thereof in writing, elect to extend to the Nokia/Sanyo JV the benefit of the paid up license for TIA/EIA-95 Products, as described in Section 3(a)(i), on the following conditions: (1) Nokia maintains at least a forty percent (40%) ownership interest in the Nokia/Sanyo JV; (2) the Nokia/Sanyo JV agrees in advance in writing to abide by the provisions of Sections 4(b), 4(c), and 5 hereof; and (3) Sanyo and the Nokia/Sanyo JV agree in writing, to InterDigital, that it will not claim, argue or otherwise take the position that any of the Nokia/Sanyo JV's or Sanyo's royalty obligations under Sanyo's then-existing patent license agreement(s) with InterDigital should be reduced or eliminated based on the Nokia/Sanyo JV's benefit of the paid up license for TIA/EIA-95 Products. In addition, the Nokia/Sanyo JV's right to enjoy the benefit of such paid up license for TIA/EIA-95 Products shall be limited, on an annual basis, cumulatively with Nokia's non-divested TIA/EIA 95 Products business, to the global market share for TIA/EIA 95 Products business transferred by Nokia in the full calendar year prior to formation of the Nokia/Sanyo JV, and allowing for reasonable organic growth from that portion of the business so transferred. The Nokia/Sanyo JV shall not benefit from any other patent rights, non-assert provisions, or licenses hereunder whatsoever, including with respect to First Generation Products and sales in excess of the market share limitations set forth in this paragraph. Nokia's paid up license hereunder will be unaffected by Nokia's election to extend the benefit of its license hereunder to the Nokia/Sanyo JV.

b.  Nokia Release.

(i)     In consideration of the execution and delivery of this Agreement, effective and contingent upon Nokia's discontinuance of the UK 2G Action and withdrawal of Nokia's opposition to the UK Amendment Application, and subject to 3(b)(ii) below Nokia Group irrevocably releases, acquits and forever discharges InterDigital Group and its attorneys and agents from Claims that Nokia or its predecessors, successors, Affiliates and assigns ever had, now have or hereafter can, shall or may have, for, upon or by reason of Claims asserted or which could have been asserted against InterDigital or its Affiliates (a) for any rights relating to Covered Products that are different from those acknowledged and agreed to herein, whether under the Master Agreement, the Nokia PLA, or otherwise and (b) for any costs and/or expenses relating to the UK 2G Action, the UK Amendment Application, and any and all appeals in either, whether incurred prior to the Effective Date or which may be incurred in the future.

(ii)     The release and acknowledgement described in Section 3(b)(i) above does not extend, by implication or otherwise, to any Claims: (a) under any patents owned or controlled by Nokia or its Affiliates or with respect to any InterDigital products; (b) with respect to the rights and obligations under Sections 2.1, 3.5, 4, 8.1, 8.2 and 8.3 of the TDD Development Agreement and paragraphs 7 and 10 of Amendment No. 1 to the TDD Development Agreement; (c) that Nokia has asserted in the lawsuit currently pending in the United States District Court for the District of Delaware captioned *Nokia Corporation v. InterDigital Communications Corporation and InterDigital Technology Corporation*, Case No. 05-16-JJF ("the Delaware Action"); or (d) that Nokia has asserted in the action currently pending in the United Kingdom High Court of Justice, Chancery Division, Patents Court captioned *Nokia Corporation and InterDigital Technology Corporation*, Claim No. HC 05 C02026 (the "UK 3G Action").

c.     <u>InterDigital Non-Assert</u>.     Also in consideration of Nokia's agreement to discontinue the UK 2G Action and withdraw its opposition to the UK Amendment Application, effective and contingent upon such discontinuance and withdrawal, InterDigital and its Affiliates irrevocably and perpetually agree not to initiate or assert any patent infringement claims under the 2G Patents against any Excluded Products in any action, litigation, arbitration, or other legal or administrative proceeding (including a United States International Trade Commission action or comparable actions in any other jurisdictions around the world) against Nokia or its Affiliates.

4.     **OTHER COVENANTS**

a.     <u>MFL/License Rights</u>. The Parties understand and agree that, as of the Effective Date and contingent upon the discontinuance of the UK 2G Action and Nokia's withdrawal of its opposition to the UK Amendment Application, all of the Parties' rights and obligations under the Nokia PLA (including with respect to TIA/EIA 95 Products) shall have terminated, and have been satisfied and discharged by this Agreement and the 2G Settlement Agreement. Further, Nokia acknowledges,

represents, and warrants that it has not elected to accept any third party license agreement under Section 3.1.2 of the Nokia PLA as of the Effective Date with regard to TIA/EIA 95 Products, and InterDigital acknowledges, represents, and warrants that it has not executed any Major Competitor License Agreement (as that term is used and defined in the Master Agreement) with regard to TIA/EIA 95 Products.

b.    2G Patent Challenges.  The application of this Section 4(b) to each of the 2G Patents is governed by the laws of the country in which the patent is registered.  For example, the application of this Section 4(b) to the 2G Patents registered in the United Kingdom shall be governed by the laws of England and Wales.

To the extent permitted under the applicable law, the following provision shall apply:

Nokia and its Affiliates shall not (directly or indirectly), excluding, however, any obligation Nokia or its Affiliates may have to produce documents or provide testimony under applicable law, (i) institute or participate as an adverse party in any action (legal, administrative, or otherwise) anywhere in the world, seeking to re-examine, declare not infringed, invalid, unenforceable or non-essential, limit or construe the scope of, or otherwise challenge, oppose or dispute any claim of the 2G Patents, or (ii) assist any third party (other than in respect of products supplied by Nokia or its Affiliates) in defending any assertion of any claim of the 2G Patents made against that third party by InterDigital.  The restriction stated above only prohibits Nokia and its Affiliates from challenging a claim of a 2G Patent, and does not in any way prohibit Nokia or its Affiliates from challenging any claim of any other InterDigital Patent.

In the event that Nokia or its Affiliates were to decide to challenge a 2G Patent or take an action prohibited by this Section 4b, Nokia agrees to provide thirty days advanced written notice to InterDigital of such decision so that  InterDigital may take appropriate action.

c.    Audit Rights.  Contingent upon the discontinuance of the UK 2G Action and Nokia's withdrawal of its opposition to the UK Amendment Application, neither Party shall take any action after the Effective Date to pursue an audit or inspection of the other Party's or the other Party's Affiliates' books and records for any purpose relating to Covered Products sold by Nokia or its Affiliates. This Section shall not be deemed to preclude discovery in any legal proceeding between the Parties to the extent such discovery is otherwise available.  Notwithstanding the above, as to any entity that is created or comes into existence after the Effective date and that Nokia claims as an Affiliate under this Agreement, InterDigital shall have the right to obtain an audit only as to the questions of whether the claimed Affiliate has sales above or below the thresholds described in subparagraphs (ii) and (iii) of the Affiliate definition, or as to what percentage of the claimed Affiliate's shares or securities are controlled by Nokia.  In addition, in the event

that Nokia transfers it rights pursuant to Section 7(c), InterDigital may request an audit at its own expense, and in accordance with the provisions of this Section 4(c) regarding compliance with Section 7(c), which audit will only address the relevant market share for Nokia's Covered Products and the percentage of the Nokia business actually being transferred regarding compliance with Section 7(d), which audit will only address whether an acquired entity had sales above or below the thresholds described in Section 7(d), what percentage of the acquired entity's shares or securities are controlled by Nokia, and the acquired entity's sales of Covered Products in the full calendar year prior to its acquisition. Similarly, as to any entity that is created or comes to exist after the Effective Date and that InterDigital claims as an Affiliate under this Agreement, Nokia shall have the right to obtain an audit only as to the questions of what percentage of the claimed Affiliate's shares or securities are controlled by InterDigital or one of its Affiliates, or as to the patents and patent applications of the claimed Affiliate and the rights of InterDigital or one of its Affiliates to license or sublicense those patents or patent applications and/or the inclusion of those patents or patent applications in the definition of InterDigital Patents. InterDigital may also request an audit at its own expense, and in accordance with the provisions of this Section 4(c), regarding compliance with Section 3(a)(iii), which audit will only address Nokia's ownership percentage of the Nokia/Sanyo JV and the market share for the TIA/EIA 95 Products business transferred by Nokia in the full calendar year prior to formation of the Nokia/Sanyo JV. The auditing party shall be entitled to audit, in each case it its own expense, no more than once per calendar year, following fifteen (15) business days prior notice, using an independent certified public accountant or independent patent licensing professional that has signed an appropriate and reasonable nondisclosure agreement with the Party being audited. Any information obtained during the course of the audit shall be held in confidence by the auditing Party and the auditor except as necessary to enforce this Agreement.

d.    Subsequent Actions.  In any proceeding between the Parties, other than the UK 2G Action and the UK Amendment Application, InterDigital and Nokia agree that either party may introduce any evidence produced or obtained in the UK 2G Action or the UK Amendment Application regarding Contested UK Prior Art and the other party shall not oppose the admissibility or use of such evidence on any grounds other than relevance. This provision does not, however, preclude either Party from attempting to present any other evidence to refute the evidence produced or obtained in the UK 2G Action or the UK Amendment Application regarding Contested UK Prior Art. In addition, this provision does not alter either Party's confidentiality obligations or restrictions (including those regarding the use of confidential information) under any agreement (including those set forth in Article 5 of the Master Agreement) or court order.

e.    Scope.  Nothing in this Agreement will be construed to provide or expand, by implication or otherwise, any license to Nokia or its Affiliates to make, use, sell, or import any Excluded Products.

5.    <u>CONFIDENTIALITY OF TERMS</u> Unless otherwise required by law or court or arbitral order, the Parties shall maintain as strictly confidential this Agreement and any proprietary information disclosed under, or as a result of the negotiation or performance of, this Settlement Agreement. Without limiting the foregoing, each Party acknowledges all pre-existing obligations of confidentiality (including in particular the separately executed Nondisclosure Agreement governing the communications made in connection with the negotiation and execution of this Agreement) and agree that they continue to be bound thereby in accordance with their terms. Notwithstanding the foregoing, following the exchange of fully-executed versions of this Agreement, either Party may (i) issue a press release discussing the execution of this Agreement and the material terms hereof, (ii) provide this Agreement or the contents thereof in confidence to other licensees to the extent required by most favored licensee clauses (but only to the extent such licensee is bound by a non-disclosure agreement), and (iii) disclose such information as may be necessary to satisfy SEC, NASDAQ, or other statutory, regulatory, taxation, or administrative requirements, to its accountants, or in a legal proceeding, mediation or arbitration between the Parties.

6.    <u>REPRESENTATIONS, WARRANTIES AND DISCLAIMERS</u>

a.    InterDigital and its Affiliates represent and warrant to Nokia and its Affiliates that InterDigital is the sole and lawful owner of all rights, title and interest in and to each and every Claim and other matters which it purports to release herein and that InterDigital has not heretofore assigned or transferred to any person or entity any right, title or interest in the released matters.

b.    Nokia and its Affiliates represent and warrant to InterDigital and its Affiliates that Nokia is the sole and lawful owner of all rights, title and interest in and to each and every Claim and other matters which it purports to release herein and that Nokia has not heretofore assigned or transferred to any person or entity any right, title or interest in the released matters.

c.    Each Party represents and warrants to the other Party that (i) the person signing this Agreement on its behalf is fully authorized and legally competent to execute and deliver this Agreement on its behalf; (ii) it is executing this Agreement wholly upon its own volition, individual judgment, belief, and knowledge; (iii) this Agreement is made without reliance upon any statement or representation of any other Party, except those representations and warranties expressed in this Agreement; (iv) the performance of this Agreement and the transactions contemplated hereunder have been fully authorized by all necessary corporate and other action; and (v) it is executing this Agreement after consultation with its own independent legal counsel.

d.    InterDigital makes and has made no representation, warranty, and/or statement (and this Agreement is made without reliance upon any such representation, warranty, or statement) that it owns, controls, or has the right to license patents or patent applications relating to any First Generation Product.

e.    This Agreement shall not be construed against any of the Parties hereto as an admission or concession as to the value of any claims in, or related to, the UK 2G Action or the 2G Patents.

f.    Each Party represents and warrants to the other Party that this Agreement is in no way based upon any statement by InterDigital or its Affiliates regarding the validity, essentiality, and/or infringement of any InterDigital Patent.

7.    **MISCELLANEOUS**

a.    Subject only to Sections 3(a)(iii) above and 7(b) and (c) below and the applicability of the pass-through rights granted in Section 3(a) above, this Agreement is personal to the Parties hereto and their respective Affiliates and may not be assigned or transferred, nor may any license or release granted hereunder be assigned or transferred whether by operation of law or otherwise, and any attempt to make any such assignment or transfer shall be null and void.

b.    If, after the Effective Date, InterDigital and/or its Affiliates assigns or transfer any of the InterDigital Patents to third parties, it may do so only on the condition that (i) the assigned or transferred patents remain fully encumbered by the license and release described in this Agreement, which license and release shall remain valid and effective as to the patent once assigned or transferred, and (ii) InterDigital provides the assignee or transferee written notice of this condition prior to effecting the assignment or transfer

c.    Contingent upon the discontinuance of the UK 2G Action and Nokia's withdrawal of its opposition to the UK Amendment Application, in the event that Nokia/Sanyo JV is not established, and, after the Effective Date, Nokia assigns or transfers all or substantially all of any of its three current business groups for manufacturing and/or selling Covered Products that are Terminal Units (namely, Nokia's Mobile Phones, Multimedia and Enterprise Solutions groups and any restructuring of any of these business groups in the normal course of Nokia's business going forward, provided that the restructured business groups are identified in Nokia's public documents, e.g., website, SEC filings, etc.) or assigns or transfers all or substantially all of its current business group for manufacturing and/or selling Covered Products that are Infrastructure (namely, Nokia's Networks group and any restructuring of this business group in the normal course of Nokia's business going forward, provided that the restructured business group is identified in Nokia's public documents, e.g., website, SEC filings, etc.) to a third party (i.e., a party other than Nokia or one of its Affiliates), in either case through merger, divestiture of assets, the sale of shares, or otherwise, so that such divested business group is not an Affiliate hereunder, Nokia may assign or transfer the paid-up license applicable to such transferred business group to the acquiring entity only as to those Protected Acts undertaken by the acquiring entity for the same business market(s) served by the transferred business group and in accordance with this Section c. Nokia shall be deemed to have assigned or transferred substantially all of such business group to

the third party acquiring entity if the assignment or transfer represents at least eighty percent (80%) of such business group, based upon the sales associated with such business group in the full calendar year prior to the transfer.

In the event that the third party acquiring entity at the time of the assignment or transfer is a licensee of InterDigital Covered Products, Nokia's paid-up license may only be assigned or transferred to such third party acquiring entity under the following conditions: (a) the third party acquiring entity agrees in writing prior to the assignment or transfer that it will not claim, argue or otherwise take the position that any of the third party acquiring entity's royalty obligations under the third party acquiring entity's then-existing patent license agreement(s) with InterDigital should be reduced or eliminated based on the paid-up Covered Product license being assigned or transferred from Nokia; and (b) the paid-up license being assigned or transferred from Nokia will expire 4 years after the date of the assignment or transfer.

In the event that the third party acquiring entity at the time of assignment or transfer is not a licensee of InterDigital, the paid-up license being transferred by Nokia will not be subject to either of the conditions described in the immediately preceding paragraph.

In addition, if the third party acquiring entity at the time of the assignment or transfer is a licensee of InterDigital for Covered Products, the paid-up license assigned or transferred by Nokia shall only apply (i) to Protected Acts of the third party acquiring entity on and after the acquisition date and (ii) to the portion of the business group that was actually obtained from Nokia, such portion to be defined, on an annual basis, as the number of units of Covered Product sold by the business group in the full calendar year prior to the acquisition date multiplied by the percentage of the business assigned or transferred. Nokia's paid up license will be unaffected by such assignment or transfer. For example, if Nokia sells 90% of its Multimedia business group to a third party and during the full calendar year prior to the acquisition date the Multimedia business group sold 100,000 units of Covered Product, then the paid-up license assigned or transferred by Nokia to the third party shall only apply, on an annual basis, to 90,000 units of Covered Product made, used, sold, etc. by the third party, and Nokia's paid up license will be unaffected by such assignment or transfer. Further, the transferred or assigned paid-up license shall not extend to any larger operations into which such assigned or transferred business group may be subsumed or any subsequent additions or expansion made to such business group by the acquiring entity.

Notwithstanding anything to the contrary, (i) Nokia may assign or transfer its paid-up license pursuant to this provision to a third party no more than two times as to Covered Products that are Terminal Units and only one time as to Covered Products that are Infrastructure.

d.      In the event that (i) Nokia acquires an entity after the Effective Date that meets the definition of Affiliate, but that does not constitute a Nokia Affiliate because the acquired entity had, in the full calendar year prior to its acquisition, sales of Covered Products that are Terminal Units in excess of 250,000 units and/or revenues of Covered Products that are Infrastructure in excess of Ten Million U.S. Dollars ($US10,000,000) and (ii) Nokia merges the acquired entity into Nokia or one of Nokia's Affiliates, then the licenses set forth in Section 3(a)(i) shall not extend, on an annual basis, to the number of unit sales by Nokia or its Affiliates of Covered Products that are Terminal Units and/or Infrastructure that were sold by the acquired entity in the full calendar year prior to the acquisition; provided however, the licenses set forth in Section 3(a)(i) shall continue to cover all other unit sales by Nokia or its Affiliates of Covered Products, including any additional unit sales of Covered Products by Nokia or Nokia's Affiliates that may be attributable to the merger of the acquired entity. For example, if Nokia acquires and merges into itself an entity that sold one million units of Covered Products during the full calendar year prior to the acquisition, then one million units of Covered Products sold by Nokia or its Affiliates each calendar year after the acquisition would be unlicensed under this Agreement, but all other unit sales of Covered Products sold by Nokia or its Affiliates each calendar year after the acquisition would continue to be licensed under this Agreement.

In the event that (i) Nokia acquires an entity after the Effective Date that meets the definition of Affiliate, but that does not constitute a Nokia Affiliate because the acquired entity had, in the full calendar year prior to its acquisition, sales of Covered Products that are Terminal Units in excess of 250,000 units and/or revenues of Covered Products that are Infrastructure in excess of Ten Million U.S. Dollars ($US10,000,000) and (ii) Nokia operates the acquired entity as a separate company (i.e., does not merge the entity into Nokia or one of Nokia's Affiliates), then any Protected Acts performed by the acquired entity with regard to Covered Products that are Terminal Units or Infrastructure shall not benefit from any of the licenses granted to Nokia and Nokia's Affiliates under this Agreement.

e.      No express or implied waiver of any breach of any term, condition or obligation of this Agreement shall be construed as a waiver of any subsequent breach of that term, condition or obligation or of any other term, condition or obligation of this of the same or of a different nature.

f.      Except as set forth in Section 4(b) herein, this Agreement shall be governed by and construed in accordance with New York law, without regard to conflict of laws principles. The exclusive jurisdiction and venue for any and all litigation over any alleged breach of this Agreement shall be the United States District Court, Southern District of New York (except that the provisions of this Agreement may be asserted as a defense or counterclaim in an action properly filed elsewhere). In particular, this provision will have no impact on any pending litigation between the Parties, namely the Delaware Action and the UK 3G Action.

g.    The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable, then that provision shall be construed to the maximum extent permitted by law. The invalidity or unenforceability of one provision shall not necessarily affect any other.

h.    Each Party shall be responsible for all actions required of its Affiliates hereunder and shall be liable to the other Party for any adverse action or failure to perform by any of such Affiliates.

i.    Each Party shall bear its own attorney's fees and related expenses incurred by or on behalf of said Party in connection with the negotiation of this Agreement.

j.    This Agreement, the Master Agreement, the TDD Development Agreement, and the Nokia PLA constitute the entire agreement and understanding between the Parties as to the subjects addressed in this document, and supersede all prior agreements, understandings, discussions and other communications, if any, between the Parties with respect to the subject matter thereof, whether oral or written. In the event of a conflict between the terms of this Agreement and the Master Agreement, and/or Nokia PLA, this Agreement shall control. In addition, the Parties hereby acknowledge the contemporaneous execution of the 2G Settlement Agreement and agree that, to the extent there is deemed to be any conflict or inconsistency between the releases and licenses (and exclusions thereto) granted to Nokia in the 2G Settlement Agreement for 2G Covered Terminal Units, 2G Covered Infrastructure, or Additional Released Products (as those terms are used and defined in the 2G Settlement Agreement) and the releases and licenses (and exclusions thereto) granted to Nokia in this Agreement, the terms and conditions of the 2G Settlement Agreement shall control with regard to 2G Covered Terminal Units, 2G Covered Infrastructure, and Additional Released Products but the terms of this Agreement shall control with regard to Covered Products, InterDigital's non-assert obligations with respect to 2G Patents, and Nokia's right to transfer the benefit of its license hereunder to the Nokia/Sanyo JV.

k.    No modification or amendment to this Agreement will be effective unless it is in writing and executed by authorized representatives of the Parties, nor will any waiver of any rights be effective unless assented to in writing by the Party to be charged.

l.    Each Party to this Agreement agrees to perform any further acts and execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this Agreement.

m.    This Agreement and any counterpart original thereof may be executed and transmitted by facsimile or by emailed portable document format ("PDF") document. The facsimile and/or pdf signature shall be valid and acceptable for all purposes as if it were an original. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together

shall constitute one and the same instrument.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.


　IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officer as of the execution date.

Nokia Corporation                          InterDigital Technology Corporation

By: _____          By: _____

Name: ILKKA RAHNASTO   Auli Luukkanen-Lääpert Name: _____
　　　 Vice President, IPR   Director, IPR Strategy & Development
Title: _____          Title: _____

Date: ___27. April 2006___              Date: _____


InterDigital Communications Corporation


By: _____


Name: _____


Title: _____


Date: _____

## EXHIBIT "A"

## DEFINITIONS

a.      "Affiliate" means a corporation or legal entity: (i) more than 50% of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (ii) which does not have outstanding shares or securities but more than 50% of whose ownership interest representing the right to manage such corporation or other legal entity is now or hereafter owned and controlled by such company either directly or indirectly; but any such corporation or other legal entity shall be deemed to be an Affiliate of such company only as long as such control or ownership and control exists.

Notwithstanding anything to the contrary contained herein, including without limitation the definition of Affiliate above, only entities described in (i)-(iv) below shall constitute Nokia Affiliates:

(i) entities which constitute Affiliates, as defined above, on or before the Effective Date so long as such entity continues to be an Affiliate on the Effective Date;

(ii) a third party entity acquired after the Effective Date which meets the definition of Affiliate above, provided that the entity does not have, in the full calendar year prior to the acquisition, sales of Covered Products that are Terminal Units in excess of 250,000 units and/or revenues of Covered Products that are Infrastructure in excess of Ten Million U.S. Dollars ($US10,000,000);

(iii) any Nokia joint venture formed or coming into existence after the Effective Date in a country where, for political reasons (conforming to customary practice), foreign ownership of joint ventures is limited to fifty percent (50%) or less, provided that Nokia maintains at least a fifty percent (50%) ownership interest in such joint venture, and so long as the operations or assets being contributed by the joint venture partner to such entity did not generate, in the full calendar year prior to formation of the joint venture, sales of Covered Products that are Terminal Units in excess of 250,000 units and/or revenues of Covered Products that are Infrastructure in excess of Ten Million U.S Dollars ($US10,000,000); and

(iv) entities that would qualify as Affiliates, as defined above, that Nokia or one of its Affiliates creates after the Effective Date as part of a corporate restructuring or reorganization and that do not involve the acquisition of an entity or assets from a independent third party.

b.      "CDMA2000" means a family of IMT-2000 standards, as amended from time to time, being developed by the 3GPP2, which standards evolved from narrow band CDMA technologies (e.g., TIA/EIA 95 and cdmaOne) and, include without limitation CDMA2000 1X, CDMA 1X EV-DO, CDMA-2000 1X EV-DV and CDMA2000 3X.

c.    "Capable" means having capacity or ability without requiring further modification by Nokia or its Affiliates after the product is sold. Notwithstanding anything to the contrary in this Agreement, in the event any Terminal Unit or Infrastructure which is, when sold, not Capable of operating in accordance with an Excluded Standard but becomes Capable of operating in accordance with an Excluded Standard as a result of further modification, such Terminal Unit or Infrastructure shall be deemed to be an Excluded Product upon such modification and shall not be licensed hereunder (including under any pass-through license) from that date forward. If such modification is performed by Nokia or one of its Affiliates or by someone acting at the direction of, with the assistance of or on behalf of Nokia or one of its Affiliates, then Nokia (in addition to other parties) shall be liable (to the extent any such liability is established) for any Protected Acts associated with such unlicensed Excluded Product. If such modification is not performed by Nokia or one of its Affiliates or by someone acting at the direction of, with the assistance of or on behalf of Nokia or one of its Affiliates, then liability for any Protected Acts associated with such unlicensed Excluded Product shall be determined in accordance with the laws governing such Protected Acts..

d.    "Claims" means actions, causes of action, damages, claims and demands, known and unknown.

e.    "Contested UK Prior Art" means any of the documents set out in Exhibit "C", attached hereto and incorporated herein.

f.    "Covered Products" means First Generation Products and/or TIA/EIA 95 Products.

g.    "Effective Date" means April 26, 2006.

h.    "End-User Device" means a wireless communications device having fully integrated modem/baseband/RF functionality and designed for use by an end user in combination with another device to provide the other device with complete wireless communications capability, but only so long as the use of the communications device with the other device does not require significant further physical integration by the user of the communications device with the other device. An example of an End-User Device is a communication card such as a PCMCIA card (which may include an antenna) for simple insertion (generally by the end user) into a laptop computer to provide wireless communication capability.

i.    "Excluded Product" means any product (i) Capable of operating in accordance with one or more Excluded Standards, or (ii) not Capable of operating in accordance with TIA/EIA 95 or any First Generation Standard. For example, Multi-Mode Products , products Capable of operating only in accordance with an Excluded Standard, or products Capable of operating only in accordance with a Network Related Standard shall each constitute Excluded Products.

j.    "Excluded Standards" shall mean any wireless communications standard other than TIA/EIA 95, a First Generation Standard, or a Network Related Standard. Excluded Standards include, without limitation, 2G Covered Standards, Third Generation standards,

and future digital cellular standards beyond Third Generation (e.g., the LTE work ongoing in 3GPP and IMT-2000, the Advanced efforts underway at the ITU, and 4G).

k.  "First Generation Products" means Terminal Units and Infrastructure Capable of operating in accordance with one of more of the First Generation Standards but not also Capable of operating in accordance with an Excluded Standard.

l.  "First Generation Standards" mean the following wireless standards: AMPS, C-450, C-Netz, Comvik, N-AMPS, NMT450, NMT900, NMT-F, NTT, RC2000, and TACS.

m.  "Infrastructure" shall mean any past, present, or future wireless network equipment including but not limited to mobile switching centers, base station controllers, base stations, positioning node equipment, operation and maintenance equipment, core networks, service nodes, radio resource management devices and software, digital transceivers, digital channel cards, and software used in connection with the aforementioned devices whether sold as individual items or bundled as an integrated product with other Infrastructure, which are used to interconnect a Terminal Unit to a public or private data or voice network (whether wired or unwired), including the internet. Network gateway products and servers shall constitute Infrastructure to the extent they are used in connection with any of the above wireless network equipment.

n.  "InterDigital Group" means InterDigital, with its respective officers, directors, shareholders, employees, agents, representatives, parents, Affiliates, successors and permitted assigns.

o.  "InterDigital Patents" means all patent applications, patents, utility models, or other enforceable patent rights worldwide issued to, assigned to, owned or under which InterDigital or any of its Affiliates has a right to grant a license or sublicense at any time before, as of, or after the Effective Date regardless of whether such patents or patent applications are declared essential to any standard . The term "InterDigital Patents" shall also include any patent reissued, reexamined, amended, or claiming priority from any of the aforesaid patents or patent applications.

p.  "Knock-Down Unit" means a substantially complete end-user terminal device having RF transmit and/or RF receive capabilities and designed for wireless voice and/or data communications sold to a third party in a partially or assembled form for final manufacturing, packaging, sale and distribution to meet the local manufacturing requirements of a particular country.

q.  "Master Agreement" means the means that certain Master Agreement entered into January 29, 1999 between the Parties.

r.  "MFL" means most favored licensee.

s.  "Module" means a fully integrated wireless communications product, including required ASICS, software and/or firmware, which is sold to a third party for physical integration

into other devices such as handsets, vending machines, computers, laptop computers, sensing/telemetry applications, motor vehicles and fixed wireless telephone systems.

t.  "Multi-Mode Product" means a product Capable of operating in accordance with both (i) a First Generation Standard and/or TIA/EIA 95, and (ii) one or more Excluded Standards. For example, a handset Capable of operating in accordance with TIA/EIA 95 and CDMA2000 is a Multi-Mode Product. However, a product Capable of operating in accordance with only TIA/EIA 95 and WLAN is not a Multi-Mode Product.

u.  "Network Related Standards" means those wireless data communication network standards, as amended from time to time, whether or not adopted by any recognized standardizing body, considered by the industry as Wireless WAN, LAN, MAN, and PAN related standards (e.g., IEEE 802 or ETSI BRAN related standards). For purposes of this Agreement, Network Related Standards do not include 2G Covered Standards, Third Generation standards or future digital cellular standards, provided that any such future digital cellular standard is adopted by a recognized standards-setting body in which telecommunications operators participate or are otherwise involved (e.g., the LTE work ongoing in 3GPP and IMT-2000, the Advanced efforts underway at the ITU, and similar efforts in a recognized standards-setting organization concerning 4G)

v.  "Nokia Group" means Nokia, with its respective officers, directors, shareholders, employees, agents, representatives, parents, Affiliates, successors and permitted assigns.

w.  "Nokia PLA" means that certain Patent License Agreement entered into January 29, 1999 between the Parties.

x.  "Nokia/Sanyo JV" shall mean the proposed joint venture between Nokia and Sanyo, announced on February 14, 2006 by Nokia.

y.  "Prior Published" means published before March 20, 1985 in respect of GB 2,174,571, the '571 System Patent and 16 March 1988 in respect of GB 2,208,774, the '774 Base Station Patent.

z.  "Protected Acts" means any of making, designing, having made (if designed by or for Nokia or its Affiliates), using, importing, selling, distributing or any other act which would constitute patent infringement under the laws of any country.

aa. "Sanyo" means Sanyo Electric Co. Ltd.

bb. "TDMA" means time division multiple access.

cc. "TDD Development Agreement" means the certain TDD Development Agreement entered into January 29, 1999 between the Parties, as amended on September 30, 2001.

dd. "Terminal Unit" means any past, present, or future end-user terminal device, whether fixed, mobile, vehicular, portable, or hand-held, having RF transmit and/or RF receive capabilities, which device is designed for wireless voice and/or data communications.

Terminal Units shall include, without limitation, Modules, End-User Devices, and Knock-Down Units. Terminal Units shall also include end-user terminal devices that comply with standards or specifications that address operation or functionality other than the air interface physical layer such as, but not limited to, WAP or OMA requirements. Examples of Terminal Units include, without limitation, handsets, (including handsets having substantial functionality unrelated to voice and data communications), wireless modules, wireless-enabled PDAs and computers, and wireless-enabled handsets with multi-media functionality (e.g., handsets with MMS functionality), gaming functionality (e.g., handsets with gaming functionality), and/or imaging functionality (e.g., a camera phone). Additional examples of Terminal Units include, without limitation, handsets having substantial functionality unrelated to voice and data communications such as, a computer or a fully featured PDA, or a handset that has one or more of the following integrated functionalities: an enhanced display (more than 4,000 colors), some meaningful PIM (personal information management) functionality, enhanced multimedia capability which may include a camera and/or an ability to do video and audio streaming (real player) and/or the ability to play music, or memory stick or similar high function memory transfer device.

ee.  "Third Generation" means any digital cellular mobile radio telecommunication standards generally considered by the industry to be the third generation, as amended from time to time, whether adopted by any recognized standardizing body or promoted by major telecommunications operators as de facto standards. Examples of current standards issued and under development, or related standardization efforts, which the Parties agree are Third Generation, are the International Telecommunications Union – Radio efforts under the label IMT-2000, the specifications issued and being developed under the Third Generation Partnership Projects (3GPP and 3GPP2), and comparable or related standards adopted by ARIB, ETSI, TTA, TIA, T1P1, CWTS, as well as other recognized standards development organizations. These standards are also known by the names, among others, WCDMA (including UTRA FDD and UTRA TDD), CDMA2000, and TD-SCDMA. For the avoidance of doubt, Third Generation does not include those specifications or standards issued or being developed by 3GPP GERAN, but only as part of its work on the continued maintenance and improvement of the existing GSM, GPRS, and EDGE standards.

ff.  "TIA/EIA 95" formerly known as "IS-95," means the Mobile Station-Base Station Compatibility Standard for Dual-Mode Wideband Spread-Spectrum Cellular Systems, as administered by the Telecommunications Industry Association and as amended from time to time, including without limitation TIA/EIA 95A and TIA/EIA 95B. For the avoidance of doubt, TIA/EIA 95 excludes CDMA2000.

gg.  "TIA/EIA 95 Products" means Terminal Units and Infrastructure Capable of operating in accordance with TIA/EIA 95 but not also Capable of operating in accordance with an Excluded Standard.

hh.  "2G Patents" means the patents and applications listed in Exhibit "D" attached hereto and incorporated herein.

18 of 42

ii.    "2G Covered Standards" means (i) the following digital cellular standards:  TIA/EIA
54/136, GSM, GPRS, EDGE, PDC, and PHS, and (ii) DECT and TETRA.

jj.    "2G Settlement Agreement" means that certain Arbitration Settlement Agreement of even
date herewith between InterDigital Communications Corporation, InterDigital and Nokia
regarding Terminal Units and Infrastructure compliant with 2G Covered Standards.

kk.    "UK 2G Action" means Claim No. HC 04 C01952 in the High Court of Justice of England
and Wales, Chancery Division, Patents Court initiated by Nokia against InterDigital and
also includes the application to the Court of Appeal, Case No. A3/2004/2639.

ll.    "UK Amendment Application" means the application by InterDigital Technology
Corporation in the UK 2G Action for leave to amend UK Patent Nos. GB 2,174,571,
GB 2,208,774 and GB 2,224,414, respectively the '571 System Patent, the '774 Base
Station Patent and the '414 Frequency Agility Patent.

EXHIBIT "B"

Claim No. HC 04 C01952

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**PATENTS COURT**

Before The Honourable Mr Justice Pumfrey
... April 2006

BETWEEN:

**NOKIA CORPORATION**
(a company incorporated under the laws of Finland)

*Claimant*

- and -

**INTERDIGITAL TECHNOLOGY CORPORATION**
(a company incorporated under the laws of the State of Delaware, USA)

*Defendant*

————————

**ORDER**

————————

UPON the Parties having agreed terms of settlement

AND UPON the Claimant undertaking to withdraw its Opposition to the Defendant's application

of 8 October 2004, as amended by the Order of Pumfrey J. of 17 May 2005, to amend its UK

Patents No. 2,174,571, 2,208,774 and 2,224,414 and to take no further part in the amendment

application

AND UPON reading those documents recorded on the Court File as having been read

IT IS HEREBY ORDERED BY CONSENT THAT:

1.    This action is discontinued.

2.    There be no order as to costs.

3.    The Order made by Pumfrey J. on 4 November 2005, which was sealed on 7 February
      2006, shall continue.

**AND IT IS HEREBY ORDERED THAT:**

4.    The Defendant's application of 8 October 2004, as amended by the Order of Pumfrey J of 17 May 2005, to amend its UK Patents No. 2,174,571, 2,208774 and 2,224,414 is allowed.


.....................................    ...................................

Bird & Bird    Milbank Tweed Hadley & McCloy LLP

Solicitors for Claimant    Solicitors for Defendant

### EXHIBIT "C"

**The '571 System Patent**

1. "Ultraphone Wireless Local Loop" by Richard Saunders [Annex 2 to Nokia's Re-Amended Grounds of Invalidity, served on 22 November 2005, in the UK 2G Action].

2. The Telecom Australia request for tenders for the Digital Radio Concentrator System (DRCS) [Annex 4A to Nokia's Re-Amended Grounds of Invalidity, served on 22 November 2005, in the UK 2G Action].

**The '774 Base Station Patent**

3. The matter alleged to have been made available to the public on or about 22nd October 1986 during an alleged public presentation and demonstration of the Ultraphone 100 system at the Holiday Inn, Douglas, Wyoming and at Mountain Bell's premises in Glendo, Wyoming [Annexes 7 and 8 to Nokia's Re-Amended Grounds of Invalidity, served on 22 November 2005, in the UK 2G Action].

4. The matter alleged to have been made available to the public by the sale and supply of Ultraphone 100 systems by IMM before the 16 March 1988 [Annexes 9 and 10 to Nokia's Re-Amended Grounds of Invalidity, served on 22 November 2005, in the UK 2G Action].

5. The document entitled "Ultraphone 100 Wireless Digital Loop Carrier - SYSTEM DESCRIPTION (Preliminary)" [Annex 11A to Nokia's Re-Amended Grounds of Invalidity, served on 22 November 2005, in the UK 2G Action].

6. The document entitled "Response to Design Requirements for Trunked Exchange Radio Telephone Service (TERTS)" [Annex 11C to Nokia's Re-Amended Grounds of Invalidity, served on 22 November 2005, in the UK 2G Action].

## EXHIBIT "D"

FAMILY OF UK PATENT NUMBER 2224414

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| AR241364 AR19880312638 | APPRATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS (ARGENTINEAN TITLE: UNA DISPOSICION TELFONICA DIGITAL INALAMBRICA) | 06/12/1988 | 06/12/1988 | 29/05/1992 |
| AU590168B1 | WIRELESS DIGITAL COMMUNICATION SYSTEM | 27/10/1988 | 27/10/1988 | 26/10/1989 |
| BE1001871A | DISPOSITIF ET PROCEDE POUR OBTENIR DE LA SOUPLESSE EN MATIERE DE FREQUENCE DANS DES SYSTEMES DE COMMUNICATION NUMERIQUE. | 09/11/1988 | 09/11/1988 | 03/04/1990 |
| BE19880001283 | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS (BELGIAN TITLE: DISPOSITIF ET PROCEDE POUR OBTENIR DE LA SOUPLESSE EN MATIERE DE FREQUENCE DANS DES SYSTEMES DE CO | 09/11/1988 | 09/11/1988 | 03/04/1990 |
| BR8805901A | SISTEMA DE COMUNICACAO E PROCESSO DE DESIGNAR RANHURAS OU PONTOS DE TEMPO E CANAIS DE FREQUENCIA PARA ASSINANTES SELECIONADOS NO MESMO | 11/11/1988 | 11/11/1988 | 19/06/1990 |
| CA1295434A1 | APPRATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | 14/11/1988 | 14/11/1988 | 04/02/1992 |
| CN1012548B | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEM | 14/11/1988 | 14/11/1988 | 01/05/1991 |
| CN1042812A | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEM | 14/11/1988 | 14/11/1988 | 06/06/1990 |
| CN19880107850 | APPRATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | 14/11/1988 | 14/11/1988 | |
| DE3837734A1 | Digitales Funkfernsprechsystem | 07/11/1988 | 07/11/1988 | 10/05/1990 |
| DE3837734C2 | Digitales Funkfernsprechsystem | 1988-10-27\|1987-08-06 | 07/11/1988 | 20/04/1995 |
| DE3837734C3 | Digitales Funkfernsprechsystem | 1988-10-27\|1987-08-06 | 07/11/1988 | 07/11/2002 |
| DE3845015A1 | | | | 06/09/2001 |
| DE3845017A1 | | | | 06/09/2001 |
| DK8806348A | | | | 15/05/1990 |
| DK175902B1 | Apparat og fremgangsmåde til opnåelse af fleksibilitet i digitale kommunikationssystemer | 14/11/1988 | 14/11/1988 | 30/05/2005 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| DK634888A0 | APPARAT OG FREMGANGSMAADE TIL OPNAAELSE AF FLEKSIBILITET I DIGITALE KOMMUNIKATIONSSYSTEMER | 14/11/1988 | 14/11/1988 | 14/11/1988 |
| DK634888A | APPARAT OG FREMGANGSMAADE TIL OPNAAELSE AF FLEKSIBILITET I DIGITALE KOMMUNIKATIONSSYSTEMER | 14/11/1988 | 14/11/1988 | 15/05/1990 |
| ES2011184AF | SISTEMA TELEFONICO DIGITAL INALAMBRICO. | 02/11/1988 | 02/11/1988 | 16/12/1989 |
| ES19880003332 | APPRATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS (SPANISH TITLE: SISTEMA TELEFONICO DIGITAL INALAMBRICO) | 02/11/1988 | 02/11/1988 | |
| FI98691B | LAITE JA MENETELMAE TAAJUUSJOUSTAVUUDEN AIKAANSAAMISEKSI DIGITAALISISSA TIETOLIIKENNEJAERJESTELMISSAE | 25/10/1988 | 25/10/1988 | 15/04/1997 |
| FI98691C | LAITE JA MENETELMAE TAAJUUSJOUSTAVUUDEN AIKAANSAAMISEKSI DIGITAALISISSA TIETOLIIKENNEJAERJESTELMISSAE | 25/10/1988 | 25/10/1988 | 25/07/1997 |
| FI884923A0 | ANORDNING OCH FOERFARANDE FOER AOSTADKOMMANDE AV FREKVENSFLEXIBILITET I DIGITALA TELEKOMMUNIKATIONSSYSTEM. | 25/10/1988 | 25/10/1988 | 25/10/1988 |
| FI884923A | ANORDNING OCH FOERFARANDE FOER AOSTADKOMMANDE AV FREKVENSFLEXIBILITET I DIGITALA TELEKOMMUNIKATIONSSYSTEM. | 25/10/1988 | 25/10/1988 | 26/04/1990 |
| FR2638920A1 | DISPOSITIF ET PROCEDE POUR OBTENIR DE LA SOUPLESSE EN MATIERE DE FREQUENCE DANS DES SYSTEMES DE COMMUNICATION NUMERIQUE | 09/11/1988 | 09/11/1988 | 11/05/1990 |
| FR19880014617 | APPRATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS (FRENCH TITLE: DISPOSITIF ET PROCEDE POUR OBTENIR DE LA SOUPLESSE EN MATIERE DE FREQUENCE DANS DES SYSTEMS DE COM) | 06/08/1987 | 09/11/1988 | |
| GB2224414A | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | 25/10/1988 | 25/10/1988 | 02/05/1990 |
| GB2224414B | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN TIME DIVISION MULTIPLE ACCESS SYSTEMS | 25/10/1988 | 25/10/1988 | 27/10/1993 |
| IL0088187A | | | | 23/09/1992 |
| ID 0000713 P-003016 | FREQUENCY AGILITY | 19/05/1992 | 12/11/1988 | 17/06/1996 |
| IN178151A | A COMMUNICATIONS SYSTEMS FOR COMMUNICATING BETWEEN A CENTRAL OFFICE BASE STATION AND A PLURALITY OF SUBSCRIBER STATIONS | 1992-02-03\|1988-10-26 | 03/02/1992 | 08/03/1997 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| IN174241 | FREQUENCY AGILITY | 25/10/1988 | 26/10/1988 | 22/10/1994 |
| IT1235150A | SISTEMA DIGITALE DI COMUNICAZIONE E METODO,ATTI AD OTTENERE AGILITA'DI FREQUENZA | 11/11/1988 | 11/11/1988 | 22/06/1992 |
| IT8848549A0 | SISTEMA DIGITALE DI COMUNICAZIONE EMETODO, ATTI AD OTTENERE AGILITA'DI FREQUENZA | 11/11/1988 | 11/11/1988 | 11/11/1988 |
| JP2137530A2 | Communication System | 11/11/1988 | 11/11/1988 | 25/05/1990 |
| JP2899805B2 | Communication System | 11/11/1988 | 11/11/1988 | 02/06/1999 |
| JP000284050 | | | 11/11/1988 | |
| KR9201549B1 | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | 05/11/1988 | 05/11/1988 | 18/02/1992 |
| KR19880014565 | FREQUENCY AGILITY | 05/11/1988 | 05/11/1988 | 18/02/1992 |
| MX170412B | APARATO Y METODO PARA OBTENER AGILIDAD DE FRECUENCIA EN SISTEMAS DE COMUNICACION DIGITALES | 14/11/1988 | 14/11/1988 | 20/08/1993 |
| MY -101118-A P188001229 | FREQUENCY AGILITY | 28/10/1988 | 27/10/1988 | 16/07/1991 |
| NL191725B | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | | | 01/12/1995 |
| NL191725C | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | | | 21/08/2002 |
| NL8802798A | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | | | 01/06/1990 |
| NO176780B | ANORDNING OG FREMGANGSMAATE FOR AA OPPNAA FREKVENSSMIDIGHET I DIGITALE KOMMUNIKASJONSSYSTEMER | 03/11/1988 | 03/11/1988 | 13/02/1995 |
| NO176780C | ANORDNING OG FREMGANGSMAATE FOR AA OPPNAA FREKVENSSMIDIGHET I DIGITALE KOMMUNIKASJONSSYSTEMER | 03/11/1988 | 03/11/1988 | 24/05/1995 |
| NO884898A0 | ANORDNING OG FREMGANGSMAATE FOR AA OPPNAA FREKVENSSMIDIGHET I DIGITALE KOMMUNIKASJONSSYSTEMER. | 03/11/1988 | 03/11/1988 | 03/11/1988 |
| NZ226967A | RADIO TELECOMMUNICATION SYSTEM WITH TDM: FREQUENCY AGILITY | 14/11/1988 | 14/11/1988 | 26/06/1990 |
| PT88942A | SISTEMA E PROCESSO DE COMUNICACOES PARA A OBTENCAO DE UMA AGILIDADE DE FREQUENCIAS NOS SISTEMAS DE COMUNICACOES DIGITAIS | 04/11/1988 | 04/11/1988 | 31/05/1990 |
| PT88942B | SISTEMA E PROCESSO DE COMUNICACOES PARA A OBTENCAO DE UMA AGILIDADE DE FREQUENCIAS NOS SISTEMAS DE COMUNICACOES DIGITAIS | 04/11/1988 | 04/11/1988 | 30/06/1995 |
| RU2237366 4613023/09 | FREQUENCY AGILITY | 11/11/1988 | 11/11/1988 | 18/02/2004 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| SE466375B | SAETT OCH ANORDNING FOER AASTADKOMMANDE AV FREKVENSROERLIGHET I DIGITALA KOMMUNIKATIONSSYSTEM | 26/10/1988 | 26/10/1988 | 03/02/1992 |
| SE466375C | SAETT OCH ANORDNING FOER AASTADKOMMANDE AV FREKVENSROERLIGHET I DIGITALA KOMMUNIKATIONSSYSTEM | 26/10/1988 | 26/10/1988 | 04/06/1992 |
| SE8803823A0 | SAETT OCH ANORDNING FOER AASTADKOMMANDE AV FREKVENSROERLIGHET I DIGITALA KOMMUNIKATIONSSYSTEM | 26/10/1988 | 26/10/1988 | 26/10/1988 |
| SG9692130-9 | APPRATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | 06/08/1987 | 25/10/1988 | 15/11/1996 |
| TW NI-036023 77107911 | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | 06/08/1987 | 14/11/1988 | 12/11/1989 |
| US4785450 | Apparatus and method for obtaining frequency agility in digital communication systems | 1987-08-06\|1988-10-27 | 06/08/1987 | 15/11/1988 |
| ZA8808062A | APPARATUS AND METHOD FOR OBTAINING FREQUENCY AGILITY IN DIGITAL COMMUNICATION SYSTEMS | 27/10/1988 | 27/10/1988 | 27/06/1990 |

FAMILY OF UK PATENT NUMBER 2208774

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| AR 310572 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 15/04/1988 | |
| AR 255707 325365 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 15/04/1988 | |
| AR P010101925 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 15/04/1988 | |
| AU0585748B2 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 31/03/1988 | 22/06/1989 |
| AU1412788A1 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 31/03/1988 | 16/02/1989 |
| AU8814127A | | | | 16/02/1989 |
| AZ I20000075 285-11 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 14/04/1993 | |
| BY 1154 487 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 13/02/1995 | |
| BE1002284A | STATION DE BASE POUR SYSTEME TELEPHONIQUE NUMERIQUE SANS FIL. | 14/08/1987 | 30/03/1988 | 20/11/1990 |
| BE19880000372 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 30/03/1988 | |
| BR8801530A | ESTACAO DE BASE EM UMA REDE DE COMUNICACAO DE ASSINANTES PARA COMUNICAR ENTRE AS ESTACOES DE ASSINANTE E UMA REDE EXTERNA | 14/08/1987 | 30/03/1988 | 10/01/1989 |
| CA1339157 C | CONNECTION OF SUBSCRIBER COMMUNICATION NETWORK BASE STATION TO EXTERNAL INFORMATION NETWORK | | | 29/07/1997 |
| CA1339158A1 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 1988-03-28|1987-08-14 | 04/10/1989 | 29/07/1997 |
| CA19880562633 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 28/03/1988 | |
| CN1011561B | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 18/04/1988 | 06/02/1991 |
| CN1031305A | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 18/04/1988 | 22/02/1989 |
| CN19880102129 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 18/04/1988 | 22/02/1989 |
| DE3812611A1 | Basisstation fuer ein drahtloses digitales Telefonsystem | 14/08/1987 | 15/04/1988 | 23/02/1989 |
| DE3812611C2 | Basisstation fuer ein drahtloses digitales Telefonsystem | 14/08/1987 | 15/04/1988 | 12/09/1996 |
| DE3845012A1 | | | | 01/04/1999 |
| DE3845018A1 | | | | 31/01/2002 |
| DK0130088A0 | GRUNDSTATION TIL DIGITALT RADIOTELEFONSYSTEM | 14/08/1987 | 10/03/1988 | 10/03/1988 |
| DK0130088A | GRUNDSTATION TIL DIGITALT RADIOTELEFONSYSTEM | 14/08/1987 | 10/03/1988 | 15/02/1989 |
| DK0172084B1 | GRUNDSTATION TIL DIGITALT RADIOTELEFONSYSTEM | 14/08/1987 | 10/03/1988 | 13/10/1997 |
| DK8801300A | | | | 15/02/1989 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| ES2007170AF | CENTRAL DE BASE PARA SISTEMA TELEFONICO DIGITAL INALAMBRICO. | 14/08/1987 | 29/03/1988 | 01/06/1989 |
| ES19880000057 | INTEGRATED BASE STATION | 14/08/1987 | 29/03/1989 | |
| FI0098430B | TUKIASEMA JOHDOTONTA DIGITAALISTA PUHELINJAERJESTELMAEAE VARTEN | 14/08/1987 | 12/05/1988 | 28/02/1997 |
| FI0098430C | TUKIASEMA JOHDOTONTA DIGITAALISTA PUHELINJAERJESTELMAEAE VARTEN | 14/08/1987 | 12/05/1988 | 10/06/1997 |
| FI0882229A0 | BASSTATION FOER TRAODLOEST, DIGITALT TELEFONSYSTEM. | 14/08/1987 | 12/05/1988 | 12/05/1988 |
| FI0882229A | BASSTATION FOER TRAODLOEST, DIGITALT TELEFONSYSTEM. | 14/08/1987 | 12/05/1988 | 15/02/1989 |
| FR2619477A1 | STATION DE BASE POUR SYSTEME TELEPHONIQUE SANS FIL | 14/08/1987 | 31/03/1988 | 17/02/1989 |
| FR2619477B1 | STATION DE BASE POUR SYSTEME TELEPHONIQUE SANS FIL | 14/08/1987 | 31/03/1988 | 14/12/1990 |
| FR19880004289 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 31/03/1988 | 17/02/1989 |
| GB2208774A | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 16/03/1988 | 12/04/1989 |
| GB2208774A1 | | | | 12/04/1989 |
| GB2208774B | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 16/03/1988 | 31/07/1991 |
| GB2208774B2 | | | | 31/07/1991 |
| GB8806221A0 | | | | 13/04/1988 |
| GB8806221A | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 16/03/1988 | 13/04/1988 |
| HK0083494A | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 18/08/1994 | 26/08/1994 |
| HK 940834 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | | |
| IN178383 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 15/04/1988 | 17/07/1991 | |
| IN1988DE00317 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 13/04/1988 | 13/04/1988 | |
| ID 0001825 P-003026 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 09/04/1988 | |
| IL0085678A0 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 09/03/1988 | 09/02/1990 |
| IL0085678A1 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 22/03/1988 | 31/01/1993 |
| IT1219926A | STAZIONE BASE PER SISTEMA TELEFONICO DIGITALE SENZA FILI | 14/08/1987 | 19/04/1988 | 24/05/1990 |
| IT8847867A0 | STAZIONE BASE PER SISTEMA TELEFONICO DIGITALE SENZA FILI | 14/08/1987 | 19/04/1988 | 19/04/1988 |
| JP01117531A2 | BASE STATION FOR RADIO DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 07/04/1988 | 10/05/1989 |
| JP02979319B2 | | 14/08/1987 | 07/04/1988 | 15/11/1999 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| KR9110007B1 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 12/05/1988 | 10/12/1991 |
| KR19880005585 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 12/05/1988 | 10/12/1991 |
| MY -100488A PI 8800341 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 01/04/1988 | 01/04/1988 | 15/10/1990 |
| MX0171366B | ESTACION BASE PARA UN SISTEMA TELEFONICO DIGITAL INALAMBRICO | 14/08/1987 | 12/04/1988 | 21/10/1993 |
| NL0193162B | BASISSTATION IN EEN ABONNEECOMMUNICATIENET WERK VOOR COMMUNICATIE VAN SIGNALEN TUSSEN ABONNEESTATIONS EN EEN EXTERN COMMUNICATIENETWERK. | 14/08/1987 | 15/03/1988 | 03/08/1998 |
| NL0193162C | BASISSTATION IN EEN ABONNEECOMMUNICATIENET WERK VOOR COMMUNICATIE VAN SIGNALEN TUSSEN ABONNEESTATIONS EN EEN EXTERN COMMUNICATIENETWERK. | 14/08/1987 | 15/03/1988 | 04/12/1998 |
| NL0194571B | BASISSTATION IN EEN ABONNEECOMMUNICATIENET WERK. | 1988-03-15\|1987-08-14 | 26/05/1998 | 01/03/2002 |
| NL0194571C | BASISSTATION IN EEN ABONNEECOMMUNICATIENET WERK. | 1988-03-15\|1987-08-14 | 26/05/1998 | 02/07/2002 |
| NL8800636A | BASISSTATION VOOR EEN DRAADLOOS DIGITAAL TELEFOONSTELSEL. | 14/08/1987 | 15/03/1988 | 01/03/1989 |
| NL9800006A | BASISSTATION IN EEN ABONNEECOMMUNICATIENET WERK VOOR TRANSMISSIE VAN EN NAAR ABONNEESTATIONS. | 1988-03-15\|1987-08-14 | 26/05/1998 | 01/10/1998 |
| NO017555BB | BASISSTASJON FOR TRAADLOEST DIGITALT TELEFONSYSTEM | 14/08/1987 | 06/04/1988 | 18/07/1994 |
| NO017555BC | BASISSTASJON FOR TRAADLOEST DIGITALT TELEFONSYSTEM | 14/08/1987 | 06/04/1988 | 26/10/1994 |
| NO0881468A0 | BASISSTASJON FOR TRAADLOEST DIGITALT TELEFONSYSTEM. | 14/08/1987 | 06/04/1988 | 06/04/1988 |
| NO0881468A | BASISSTASJON FOR TRAADLOEST DIGITALT TELEFONSYSTEM. | 14/08/1987 | 06/04/1988 | 09/01/1989 |
| PT0087283A | ESTACAO DE BASE PARA SISTEMA TELEFONICO DIGITAL POR VIA RADIOELECTRICA | 14/08/1987 | 20/04/1988 | 29/06/1990 |
| PT0087283B | ESTACAO DE BASE PARA SISTEMA TELEFONICO DIGITAL POR VIA RADIOELECTRICA | 14/08/1987 | 20/04/1988 | 31/05/1995 |
| RU2003229C1 | SYSTEM OF COMMUNICATION WITH SUBSCRIBER'S STATIONS | 14/08/1987 | 12/08/1988 | 15/11/1993 |
| SE0400592A0 | Basstation for tr dlest, digitalt telefonsystem | 14/08/1987 | 10/03/2004 | 10/03/2004 |
| SE0400592A | Basstation for tr dlest, digitalt telefonsystem | 14/08/1987 | 10/03/2004 | 10/03/2004 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| SE0468617B | BASSTATION FOER TRAADLOEST, DIGITALT TELEFONSYSTEM | 14/08/1987 | 09/03/1988 | 15/02/1993 |
| SE0523859C2 | Basstation för trådlöst, digitalt telefonsystem | 14/08/1987 | 23/06/1998 | 25/05/2004 |
| SE0526116C2 | Basstation för trådlöst, digitalt telefonsystem | 14/08/1987 | 10/03/2004 | 05/07/2005 |
| SE8800824A0 | BASSTATION FOR TRADLOST, DIGITALT TELEFONSYSTEM | 14/08/1987 | 09/03/1988 | 09/03/1988 |
| SE8800824A | BASSTATION FOER TRAADLOEST, DIGITALT TELEFONSYSTEM | 14/08/1987 | 09/03/1988 | 15/02/1989 |
| SE9802261A0 | BASSTATION FOER TRAADLOEST, DIGITALT TELEFONSYSTEM | 14/08/1987 | 23/06/1998 | 23/06/1998 |
| SE9802261A | BASSTATION FOER TRAADLOEST, DIGITALT TELEFONSYSTEM | 14/08/1987 | 23/06/1998 | 23/06/1998 |
| TW NI-031631 77103828 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 08/06/1988 | 08/06/1988 | 01/04/1989 |
| UA 27687 93003135 | BASE STATION FOR WIRELESS DIGITAL TELEPHONE SYSTEM | 14/08/1987 | 12/08/1988 | 16/10/2000 |
| US4777633 | Base station for wireless digital telephone system | 14/08/1987 | 14/08/1987 | 11/10/1988 |
| US4779262 | Connection of subscriber communication network base station to external information network | 21/10/1986 | 21/10/1986 | |
| ZA8805981A | | | | 26/04/1989 |

FAMILY OF UK PATENT NUMBER 2174571

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| AR241429 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS (ARGENTINEAN TITLE - DISPOSICION TELEFONICA DE RF PAR | 29/01/1987 | 29/01/1987 | 31/07/1992 |
| AT0073186A | DIGITALES TELEFONSYSTEM, WELCHES EINE VIELZAHL VON VON FERNSPRECHLEITUNGEN AUSGEHENDEN INFORMATIONSSIGNALEN VERARBEITET | 20/03/1985 | 19/03/1986 | 15/01/1998 |
| AT0404202B | DIGITALES TELEFONSYSTEM, WELCHES EINE VIELZAHL VON VON FERNSPRECHLEITUNGEN AUSGEHENDEN INFORMATIONSSIGNALEN VERARBEITET | 20/03/1985 | 19/03/1986 | 25/09/1998 |
| AT18600007A5 | DIGITALES TELEFONSYSTEM, WELCHES EINE VIELZAHL VON VON FERNSPRECHLEITUNGEN AUSGEHENDEN INFORMATIONSSIGNALEN VERARBEITET | 20/03/1985 | 19/03/1986 | 15/01/1998 |
| AT8600731A | | | | 15/01/1998 |
| AU0576627B2 | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 23/09/1985 | 01/09/1988 |
| AU0595139B2 | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 04/11/1988 | 22/03/1990 |
| AU2471088A1 | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 04/11/1988 | 02/02/1989 |
| AU4767985A1 | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 23/09/1985 | 25/09/1986 |
| AU8824710A | | | | 02/02/1989 |
| AU8547679A | | | | 25/09/1986 |
| BE0904065A | SYSTEME DE TELEPHONE NUMERIQUE | 20/03/1985 | 20/01/1986 | 15/05/1986 |
| BR8505596A | SISTEMA PARA A TRANSMISSAO SEM-FIO DE MULTIPLOS SINAIS DE INFORMACAO UTILIZANDO CIRCUITOS DE TRANSMISSAO DIGITAL POR DIVISAO DE TEMPO ENTRE UMA ESTACAO DE BASE E UMA PLURALIDADE DE ESTACOES DE ASSINANTE | 20/03/1985 | 07/11/1985 | 16/12/1986 |
| CA1250673A1 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 23/10/1985 | 28/02/1989 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| CA1307064C | | | | 01/09/1992 |
| CH0675333A | INSTALLATION DE TELEPHONIE NUMERIQUE. | 20/03/1985 | 16/01/1986 | 14/09/1990 |
| CH0675333A5 | INSTALLATION DE TELEPHONIE NUMERIQUE. | | 16/01/1986 | 14/09/1990 |
| CL 36.080 1987-00139 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 10/03/1987 | 11/07/1988 |
| CL 37.738 1989-00059 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS (CHILEAN TITLE - SISTEMA DE COMUNICATION DIGITAL ENTR | 02/02/1989 | 02/02/1989 | 12/06/1991 |
| CN1008962B | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 13/02/1986 | 25/07/1990 |
| CN86100949A | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 13/02/1986 | 15/10/1986 |
| DE3609395A1 | Kommunikationssystem | 20/03/1985 | 20/03/1986 | 25/09/1986 |
| DE3609395C2 | Digitales Telefonsystem | 20/03/1985 | 20/03/1986 | 28/06/1990 |
| DE3609395C3 | Digitales Telefonsystem | 20/03/1985 | 20/03/1986 | 08/04/1999 |
| DE3609395R3 | Digitales Telefonsystem | 20/03/1985 | 20/03/1986 | 08/04/1999 |
| DE3645360C2 | Digitales Telefonsystem | 20/03/1985 | 20/03/1986 | 25/01/2001 |
| DE3645383B4 | Digitales Telefonsystem | 20/03/1985 | 20/03/1986 | 17/11/2005 |
| DE3645394B4 | Funkkommunikationssystem | 20/03/1985 | 20/03/1986 | 09/02/2006 |
| DE3645295A1 | | | | 24/03/1994 |
| DE3645297A1 | | | | 03/03/1994 |
| DE3645289A1 | | | | 03/03/1994 |
| DE3645296A1 | | | | 24/02/1994 |
| DK133795A | Digitalt telefonsystem | 1995-11-27\|1985-09-20\|1985-03-20 | 27/11/1995 | 27/11/1995 |
| DK171304B1 | Digitalt telefonsystem | 20/03/1985 | 20/09/1985 | 26/08/1996 |
| DK174058B1 | Digitalt telefonsystem | 1995-11-27\|1985-09-20\|1985-03-20 | 27/11/1995 | 13/05/2002 |
| DK175353B1 | Digitalt trådløst system | 2002-02-12\|1995-11-27\|1985-03-20 | 12/02/2002 | 06/09/2004 |
| DK200209A5 | Digitalt trådløst system | 2002-02-12\|1995-11-27\|1985-03-20 | 12/02/2002 | 12/02/2002 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| DK300306A5 | Et tr difst kommunikationssystem | 2003-02-27\|2002-02-12\|1985-03-20 | 27/02/2003 | 24/03/2003 |
| DK0426985A0 | DIGITALT TELEFONSYSTEM | 20/03/1985 | 20/09/1985 | 20/09/1985 |
| DK0426985A | DIGITALT TELEFONSYSTEM | 20/03/1985 | 20/09/1985 | 21/09/1986 |
| DK9501337A |  |  |  | 27/11/1995 |
| DK8504269A |  |  |  | 21/09/1986 |
| ES0548366A1 | SISTEMA PARA LA TRANSMISION ANALAMBRICA DE SENALES MULTIPLES DE INFORMACION. | 20/03/1985 | 30/10/1985 | 16/08/1987 |
| ES0548366A5 | SISTEMA PARA LA TRANSMISION ANALAMBRICA DE SENALES MULTIPLES DE INFORMACION. | 20/03/1985 | 30/10/1985 | 14/09/1987 |
| ES8707831A1 | SISTEMA PARA LA TRANSMISION ANALAMBRICA DE SENALES MULTIPLES DE INFORMACION. | 20/03/1985 | 30/10/1985 | 01/11/1987 |
| ES2019165A |  |  |  | 01/06/1991 |
| ES8903349 | IMPROVEMENTS TO THE OBJECT OF PATENT NO. 548366/2 BY MEANS OF A SYSTEM FOR THE WIRELESS TRANSMISSION OF MULTIPLE INFORMATION SIGNALS. | 05/10/1989 | 05/10/1989 | 24/04/1991 |
| ES8800808A |  |  |  | 01/02/1988 |
| ES19870557496 | Telephone local circuit data signal processor - has radio controlled 450 to 460 megahertz 26 channel linkage technique | 20/03/1985 | 30/10/1985 | 14/10/1987 |
| ES2009118 ES8803594 | MEJORAS EN EL OBJETO DE LA PATENTE PRINCIPAL N( 548.366N2 POR "SISTEMA PARA LA TRANSMISION ANALAMBRICA DE SENALES MULTIPLES DE INFORMACION". | 27/03/1987 | 24/11/1988 | 29/06/1989 |
| FI0081940B | HOEGFREKVENS BESTAELLARTELEFONSYSTEM FOER ATT AOSTADKOMMA FLERA TAL- OCH/ELLER DATASIGNALER SAMTIDIGT ANTINGEN GENOM EN ELLER FLERA RADIOFREKVENSKANALER. | 20/03/1985 | 30/12/1985 | 31/08/1990 |
| FI0104676B1 | Suurtaajuinen tilaajapuhelinjärjestelmä useiden puhe- ja/tai datasignaalien aikaansaamiseksi samanalkaisesti joko yhden tai useiden radiotaajuisten kanavien kautta | 1985-12-30\|1985-03-20 | 16/09/1996 | 14/04/2000 |
| FI0855175A0 | HOEGFREKVENS BESTAELLARTELEFONSYSTEM FOER ATT AOSTADKOMMA FLERA TAL- OCH/ELLER DATASIGNALER SAMTIDIGT ANTINGEN GENOM EN ELLER FLERA RADIOFREKVENSKANALER. | 20/03/1985 | 30/12/1985 | 30/12/1985 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| FI0855175A | HOEGFREKVENS BESTAELLARTELEFONSYSTEM FOER ATT AOSTADKOMMA FLERA TAL- OCH/ELLER DATASIGNALER SAMTIDIGT ANTINGEN GENOM EN ELLER FLERA RADIOFREKVENSKANALER. | 20/03/1985 | 30/12/1985 | 21/09/1986 |
| FI0963647A0 | Suurtaajuinen tilaajapuhelinjärjestelmä useiden puhe- ja/tai datasignaalien aikaansaamiseksi samanaikaisesti joko yhden tai useiden radiotaajuisten kanavien kautta | 1985-12-30j1985-03-20 | 18/09/1996 | 16/09/1996 |
| FI0963647A | Suurtaajuinen tilaajapuhelinjärjestelmä useiden puhe- ja/tai datasignaalien aikaansaamiseksi samanaikaisesti joko yhden tai useiden radiotaajuisten kanavien kautta | 1985-12-30j1985-03-20 | 18/09/1996 | 16/09/1996 |
| FR8600440 | SUBSCRIBER RF TELEPHONE SYSTEM | 20/03/1985 | 14/01/1986 | 26/09/1986 |
| FR2579391A1 | SYSTEME DE TELEPHONE NUMERIQUE | 20/03/1985 | 14/01/1986 | 26/09/1986 |
| FR2579391B1 | SYSTEME DE TELEPHONE NUMERIQUE | 20/03/1985 | 14/01/1986 | 16/03/1990 |
| GB2174571A | DIGITAL WIRELESS TELEPHONE SYSTEM | 20/03/1985 | 16/10/1985 | 05/11/1986 |
| GB2174571A1 | | | | 05/11/1986 |
| GB2174571B | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 16/10/1985 | 31/08/1989 |
| GB2174571B2 | | | | 31/08/1989 |
| GB8525464A | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 16/10/1985 | 20/11/1985 |
| GB8525464A0 | | | | 20/11/1985 |
| GR870966 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 19/06/1987 | 04/12/1987 |
| GR88100694 GR1000657 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 14/10/1988 | 01/05/1990 |
| HK 3/1990 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 16/10/1985 | 04/01/1990 |
| HK0000390A | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 04/01/1990 | 12/01/1990 |
| ID P-004466 | SUBSCRIBER RF TELEPHONE SYSTEM | 20/03/1985 | 31/07/1992 | |
| ID P00200400532 | SUBSCRIBER RF TELEPHONE SYSTEM | 20/03/1985 | 31/07/1992 | 12/05/2005 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| IE0056780B | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 04/11/1985 | 04/12/1991 |
| IE852731 L | DIGITAL TELEPHONE SYSTEM | | | 20/09/1986 |
| IL0076618A1 | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 09/10/1985 | 28/09/1989 |
| IL0076618A0 | | | | 28/02/1988 |
| IN0165724A | SYSTEM FOR PROCESSING A GIVEN NUMBER OF INFORMATION SIGNALS RECEIVED SIMULTANEOUSLY OVER TELEPHONE COMPANY TRUNK LINES FOR SIMULTANEOUS TRANSMISSION OVER A GIVEN RADIO FREQUENCY (RF) CHANNEL | 20/03/1985 | 15/10/1985 | 30/12/1989 |
| IT1191300B | SISTEMA TELFONICO DI ABBONATO A RADIOFREQUENZA PER FORNIRE SENGALI DI FONIA E/O DATI SIMULTANEAMENTE SU UNO O UNA MOLTEPLICITA' DI CANALI A RADIOFREQUENZA | | | 24/02/1988 |
| IT1191300A | SISTEMA TELFONICO DI ABBONATO A RADIOFREQUENZA PER FORNIRE SENGALI DI FONIA E/O DATI SIMULTANEAMENTE SU UNO O UNA MOLTEPLICITA' DI CANALI A RADIOFREQUENZA | 20/03/1985 | 17/03/1986 | 24/02/1988 |
| IT8647781A0 | SISTEMA TELEFONICO DI ABBONATO A RADIOFREQUENZA PER FORNIRE SEGNALI DI FONIA E/O DATI SIMULTANEAMENTE SU UNO O UNA MOLTEPLICITA' DI CANALI A RADIOFREQUENZA | 20/03/1985 | 17/03/1986 | 17/03/1986 |
| JP02816349B2 | | 20/03/1985 | 26/02/1986 | 27/10/1998 |
| JP02979064B2 | | 20/03/1985 | 11/07/1997 | 15/11/1999 |
| JP03186733B2 | | 20/03/1985 | 05/02/1999 | 11/07/2001 |
| JP10174173A2 | RADIO DIGITAL SUBSCRIBER TELEPHONE SYSTEM FOR SIMULTANEOUSLY PERFORMING MULTIPLEX VOICE COMMUNICATION OR DATA COMMUNICATION THROUGH SINGLE OR PLURAL CHANNELS | 20/03/1985 | 11/07/1997 | 26/06/1998 |
| JP2000004483A2 | WIRELESS DIGITAL SUBSCRIBER TELEPHONE SYSTEM FOR SIMULTANEOUSLY PERFORMING MULTIPLE AUDIO COMMUNICATION OR DATA COMMUNICATION THROUGH SINGLE OR PLURAL CHANNELS | 20/03/1985 | 26/02/1986 | 07/01/2000 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| JP2001025052A2 | RADIO DIGITAL SUBSCRIBER TELEPHONE SYSTEM FOR SIMULTANEOUSLY PERFORMING MULTIPLE VOICE COMMUNICATION AND DATA COMMUNICATION BY SINGLE OR PLURAL CHANNELS | 20/03/1985 | 26/02/1986 | 26/01/2001 |
| JP2002204483A2 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 26/02/1986 | 19/07/2002 |
| JP2003244756A2 | WIRELESS COMMUNICATION SYSTEM SIMULTANEOUSLY CONDUCTING MULTIPLEX VOICE COMMUNICATION AND DATA COMMUNICATION THROUGH PLURALITY OF CHANNELS | 20/03/1985 | 26/02/1986 | 29/08/2003 |
| JP61218297A2 | SUBSCRIBER'S RF TELEPHONE SYSTEM FOR MULTIPLEX VOICE AND/OR DATA SIGNAL COMMUNICATION SIMULTANEOUSLY WITH SINGLE OR MULTIPLE CHANNELS | 20/03/1985 | 26/02/1986 | 27/09/1986 |
| JP2001025052 JP 2000-142479 | RADIO DIGITAL SUBSCRIBER TELPHONE SYSTEM FOR SIMULTANEOUSLY PERFORMING MULTIPLE VOICE COMMUNICATION AND DATA COMMUNICATION BY SINGLE OR PLURAL CHANNELS | 20/03/1985 | 26/02/1986 | 26/01/2001 |
| JP 2001-246767 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 26/02/1986 | 19/07/2002 |
| JP 2003-7452 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 26/02/1986 | |
| KR9007130B1 | SUBSCRIBER OF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS | 20/03/1985 | 11/11/1985 | 29/09/1990 |
| KR19850008416 | SUBSCRIBER RF TELEPHONE SYSTEM | 20/03/1985 | 11/11/19855 | 29/09/1985 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| MY -1023335-A PI8801152 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 20/02/1987 | 28/05/1992 |
| MY -100722-A PI8700086 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 20/02/1987 | |
| MX0162175A | MEJORAS EN SISTEMA TELEFONICO DIGITAL INALAMBRICO PARA LA TRANSMISION SIMULTANEA DE SENALES DE INFORMACION MULTIPLES EN CANALES DE RADIO FRECUENCIA | 20/03/1985 | 20/03/1986 | 05/04/1991 |
| NL0195021C | Radiofrequent abonneetelefoonsysteem. | 20/03/1985 | 10/12/1985 | 10/06/2003 |
| NL8503400A | HOOGFREQUENT ABONNEETELEFOONSYSTEEM VOOR HET VERSCHAFFEN VAN EEN AANTAL SIMULTANE SPRAAK- EN/OF DATASIGNALEN OVER OFWEL EEN ENKEL HF KANAAL DAN WEL EEN AANTAL HF KANALEN. | 20/03/1985 | 10/12/1985 | 16/10/1986 |
| NO0304090B1 | Abonnentradiofrekvens-telefonsystem for tilvelebringelse av flere talo- og/eller datasignaler over en eller flere radiofrekvenskanaler, samt fremgangsmåte for å drive et abonnentradiofrekvens-telefonsystem | 1985-11-18\|1985-03-20 | 20/06/1994 | 19/10/1998 |
| NO0308879B1 | Abonnent-RF-telefonsystem for Ö forsyne flere tale- og/eller datasignaler samtidig over enten en enkel eller en flerhet av RF- kanaler | 1994-12-29\|1994-06-20\|1985-03-20 | 29/12/1994 | 06/11/2000 |
| NO0B54603A | MODEM FOR TELEFONSYSTEMER. | 20/03/1985 | 18/11/1985 | 22/09/1986 |
| NO0942346A0 | | 1985-11-18\|1985-03-20 | 20/06/1994 | 20/06/1994 |
| NO0942346A | MODEM FOR TELEFONSYSTEMER | | | 22/09/1986 |
| NO0945085A | MODEM FOR TELEFONSYSTEMER | | | 22/09/1986 |
| NO0945085A0 | Modem for telefonsystemer | 1994-12-29\|1994-06-20\|1985-03-20 | 29/12/1994 | 29/12/1994 |
| PT85136 | SUBSCRIBER RF TELEPHONE SYSTEM | 20/03/1985 | 22/06/1987 | 31/05/1989 |
| SE0301915A0 | Digitalt telefonsystem | 20/03/1985 | 30/06/2003 | 30/06/2003 |
| SE0301915A | Digitalt telefonsystem | 20/03/1985 | 30/06/2003 | 30/06/2003 |
| SE0402229A0 | Digitalt telefonsystem | 20/03/1985 | 16/09/2004 | 16/09/2004 |
| SE0402229A | Digitalt telefonsystem | 20/03/1985 | 16/09/2004 | 16/09/2004 |
| SE0506944C2 | Digitalt telefonsystem | 20/03/1985 | 09/10/1985 | 02/03/1998 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| SE0521707C2 | Digitalt telefonsystem för samtidig överföring av flera informationssignaler över en eller flera radiofrekvenskanaler | 20/03/1985 | 18/12/1997 | 25/11/2003 |
| SE0524940C2 | Digitalt telefonsystem | 20/03/1985 | 30/06/2003 | 26/10/2004 |
| SE0526967C2 | Digitalt trådlöst kommunikationssystem med multipelåtkomst | 20/03/1985 | 16/09/2004 | 29/11/2005 |
| SE8504662A0 | DIGITALT TELEFONSYSTEM | 20/03/1985 | 09/10/1985 | 09/10/1985 |
| SE8504662A | DIGITALT TELEFONSYSTEM | 20/03/1985 | 09/10/1985 | 21/09/1986 |
| SE9704730A0 | Digitalt telefonsystem | 20/03/1985 | 18/12/1997 | 18/12/1997 |
| SG0064989A0 | DIGITAL TELEPHONE SYSTEM | 20/03/1985 | 20/09/1989 | 09/03/1990 |
| TR 24577 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 19*08/1987 | | |
| TW NI-030412 74105869 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 28/12/1985 | 01/10/1988 |
| US4675863 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 20/03/1985 | 20/03/1985 | 23/06/1987 |
| US4817089 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1987-03-27\|1985-03-20 | 27/03/1987 | 28/03/1989 |
| US4912705 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1987-03-27\|1985-03-20 | 16/03/1989 | 27/03/1990 |
| US5022024 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1989-05-08\|1989-03-16\|1985-03-20\|1987-03-27 | 08/05/1989 | 04/06/1991 |
| US5119375 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 27/12/1990 | 02/06/1992 |
| US5121391 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1989-03-16\|1987-03-27\|1985-03-20 | 20/11/1989 | 09/06/1992 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| US5657358 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or plurality of RF channels | 1993-04-22\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-17\|1985-03-20 | 22/04/1993 | 12/08/1997 |
| US5687194 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1993-04-22\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-17\|1985-03-20 | 22/04/1993 | 11/11/1997 |
| US5734678 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 02/10/1996 | 31/03/1998 |
| US6014374 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 09/09/1997 | 11/01/2000 |
| US6282180 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 04/11/1999 | 28/08/2001 |
| US6282180B1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | | | 28/08/2001 |
| US6393002 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 06/08/2001 | 21/05/2002 |
| US6393002B1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | | | 21/05/2002 |
| US6771667 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2003-02-26\|2002-05-14\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 26/02/2003 | 03/08/2004 |
| US6842440 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2002-04-25\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 25/04/2002 | 11/01/2005 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| US6954470 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2002-05-14\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 14/05/2002 | 11/10/2005 |
| US20020021679A1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 06/08/2001 | 21/02/2002 |
| US20030067895A1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2002-05-14\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 14/05/2002 | 10/04/2003 |
| US20030142646A1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2002-04-25\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 25/04/2002 | 31/07/2003 |
| US20030185167A1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2003-02-26\|2002-05-14\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 26/02/2003 | 02/10/2003 |
| US20050018636A1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2004-08-20\|2002-04-25\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 20/08/2004 | 27/01/2005 |
| US20050025094A1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2004-08-20\|2002-04-25\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 20/06/2004 | 03/02/2005 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| US20050025097A1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2004-08-24\|2002-05-14\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 24/08/2004 | 03/02/2005 |
| US20050025101A1 | Subscriber RF telephone system for providing multiple speech and/or data signals simultaneously over either a single or a plurality of RF channels | 2004-08-20\|2002-04-25\|2001-08-06\|1999-11-04\|1997-09-09\|1996-10-02\|1992-01-31\|1990-12-27\|1989-05-08\|1989-03-16\|1987-03-27\|1985-03-20 | 20/08/2004 | 03/02/2005 |
| US 08/052,006 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULATHNEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF | 20/03/1985 | 22/04/1993 | |
| US 07/831,198 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF | 20/03/1985 | 31/01/1992 | |
| US B14817089 90/004,868 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 12/12/1997 | |
| 10/925,027 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 24/08/2004 | 03/02/2005 |
| 10/923,285 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 20/08/2004 | 03/02/2005 |
| 10/922,361 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1985 | 20/08/2004 | 03/02/2005 |

| Publication Number | Title | Priority Date | Application Date | Publication Date |
|---|---|---|---|---|
| 10/922,427 | SUBSCRIBER RF TELEPHONE SYSTEM FOR PROVIDING MULTIPLE SPEECH AND/OR DATA SIGNALS SIMULTANEOUSLY OVER EITHER A SINGLE OR A PLURALITY OF RF CHANNELS | 20/03/1986 | 20/08/2004 | 27/01/2005 |

# EXHIBIT B

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT C

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT D

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY