# EXHIBIT E

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT F

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT G

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT H

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT I



**INTERDIGITAL TECHNOLOGY CORPORATION**
*Suite 105 Hagley Building*
*3411 Silverside Road, Concord Plaza*
*Wilmington, Delaware 19810*

Jane S. Schultz
General Counsel
610.878.5671 Voice
jane.schultz@interdigital.com

August 18, 2006

**VIA FEDERAL EXPRESS
AND E-MAIL**

Nokia Corporation
General Counsel
Keilalahdentiw 4
SF-02150 Espoo
FINLAND

Re:   Dispute under Master Agreement ("Master Agreement"), dated January 29, 1999, between Nokia Corporation ("Nokia") and InterDigital Communications Corporation and InterDigital Technology Corporation (collectively, ("InterDigital")

Dear Sir or Madam:

In accordance with Section 4.1 of the above-referenced Master Agreement, InterDigital writes to provide Nokia with written notice of a dispute arising under the Master Agreement, as described below.

Nokia has indicated its intention to use and disclose information which constitutes "Confidential Information" under Article 5 of the Master Agreement for impermissible purposes in the action styled *Nokia Corporation and Nokia, Inc. v. InterDigital Communications Corporation and InterDigital Technology Corporation*, No. C.A. No. 5-16-JJF pending in the United States District Court, District of Delaware (the "Delaware Proceeding"). Among other things, Nokia's Exhibit "D" designated as "Exhibit to Plaintiffs' Statement Pursuant to First Discovery Order" (the "Confidential Exhibit") submitted in the Delaware Proceeding contains such Confidential Information. InterDigital demands that Nokia withdraw the confidential documents contained in Exhibit D because Nokia's intended use and disclosure would violate the Master Agreement and no consent has been given permitting such use and/or disclosure. Nokia, well aware that InterDigital has refused to provide such consent and objects to Nokia's use of the private, confidential materials in the litigation between the parties, has persisted in its intent to improperly use and disclose same.

In the action styled *Nokia Corporation v. InterDigital Technology Corporation*, No. HC05 CO2026 pending in England in the High Court of Justice, Chancery Division, Patents

Nokia Corporation
Page 2

Court ("UK Proceeding"), Nokia has sought to amend its pleading to include Particulars of Private Position and has made clear that it intends to seek disclosure of private negotiations including documents underlying the very same confidential documents referred to above. On 15 August 2006, Wragge & Co. sent a letter to Bird & Bird seeking confirmation by return that Nokia will not use the same confidential documents for any purpose other than as consented to by InterDigital in its letter to Nokia dated 30 March 2006. Use for any other purpose would also be a violation of the Master Agreement. Wragge & Co.'s letter stated that unless Nokia provided this confirmation, InterDigital would have to provide written notice of this dispute. As of the date of this letter, no such confirmation has been received from Bird & Bird.

Accordingly, InterDigital hereby declares a dispute regarding the foregoing use and/or threatened use and/or disclosure of Confidential Information. Under Section 4.1 of the Master Agreement, the parties are required to attempt to amicably resolve these disputes within thirty days after receipt of this notice. Towards that end, I propose that representatives of the parties meet and confer to discuss these issues. At your earliest convenience, please provide us proposed dates to meet and confer and let us know Nokia's senior representatives' availability.

By this notice, InterDigital does not waive any of its rights under the Master Agreement or otherwise.

Very truly yours,

INTERDIGITAL TECHNOLOGY
CORPORATION

Jane S. Schultz, General Counsel

JSS/las
cc:    Ilkka Rahnasto, Nokia (via e-mail)
       Patrick Flinn, Alston & Bird (via e-mail)
       William Merritt, InterDigital (via e-mail)
       Bruce Bernstein, InterDigital (via e-mail)
       Nick Cunningham, Wragge & Co. (via e-mail)

# EXHIBIT J

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT K

06-1317

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## QUALCOMM, INCORPORATED

## and SNAPTRACK, INC.,

Plaintiffs – Appellees,

v.

## NOKIA CORPORATION

## and NOKIA INC.,

Defendants – Appellants.

Appeal from the United States District Court for the Southern District of California in Civil Action No. 05-CV-2063B (BLM), Judge Rudi Brewster.

## APPELLANTS' CORRECTED PRINCIPAL BRIEF
### (Non-Confidential)

PATRICK J. FLINN
KEITH E. BROYLES
JOHN D. HAYNES

ALSTON & BIRD, LLP
1201 W. Peachtree Street
Atlanta, Georgia 30309-3424
Phone: (404) 881-7000
Fax: (404) 881-7777

LEGAL02/30030987v2

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*Qualcomm, Incorporated, et al. v. Nokia Corporation et al.*, No. 06-1317

## CERTIFICATE OF INTERESTED PARTIES

Counsel for Defendants-Appellants certifies the following:

1.     The full name of every party or amicus represented by me is:

> Nokia Corporation
> Nokia Inc.

2.     The real name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> Nokia Corporation is the parent corporation of Nokia Inc.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> ALSTON & BIRD LLP:  Peter Kontio, Patrick J. Flinn, S. Gardner
>      Culpepper III, Keith E. Broyles, John D. Haynes
> NEIL, DYMOTT, FRANK, HARRISON & MCFALL:  Michael I.
>      Neil; David P. Hall
> JONES DAY:  Michael J. Newton

July 28, 2006

_____
John D. Haynes
Attorney for Defendants-Appellants

LEGAL02/30030987v2

## REQUEST FOR ORAL ARGUMENT

Due to the complexity and importance of the issues raised on appeal,

Appellants respectfully request oral argument in this matter.

# TABLE OF CONTENTS

*Confidential material subject to court order has been deleted from this brief. Fed. Cir. R. 28(d)(1)(B). The deleted material pertains to: (1) confidential documents relevant to or submitted in support of Nokia Corporation's Confidential Arbitration Demand against Qualcomm, Incorporated; (2) confidential documents and information relevant to or submitted in support of Nokia's Motion to Stay, Dismiss and For a More Definite Statement filed in Civil Case No. 05CV2063B(BLM); or (3) confidential documents and information concerning Nokia's or Qualcomm's business.*

STATEMENT OF RELATED CASES ....................................................................1

JURISDICTIONAL STATEMENT ......................................................................2

STATEMENT OF THE ISSUES .........................................................................3

STATEMENT OF THE CASE.............................................................................4

STATEMENT OF FACTS ...................................................................................6

SUMMARY OF THE ARGUMENT ..................................................................17

ARGUMENT .......................................................................................................18

    I.     STANDARD OF REVIEW. ...................................................................18

    II.   THE DISTRICT COURT ERRED IN DENYING THE MOTION FOR A MANDATORY STAY. ......................................................................19

        A. The Plain Language of the FAA Requires That the District Court Stay Litigation Pending Arbitration of the Issues Now in Arbitration.. 19

        B. The Fact That the Issues Referable to Arbitration Are Litigation Defenses Rather Than the Plaintiff's Affirmative Claims Is Irrelevant............................................................................................21

        C. The Fact That Nokia Has Submitted These Three Issues to Arbitration, Rather Than Pleading Them, Does Not Preclude Application of the FAA's Mandatory Stay Provision. ...........................24

III. THE DISTRICT COURT MAY HAVE IMPROPERLY DECIDED
THAT THE ISSUES NOKIA HAS RAISED IN ARBITRATION ARE
NOT ARBITRABLE. ...................................................................................25

A. Arbitrability Is for the Arbitrator, Not the Court, to Decide. ................26

B. The Issues Raised in Nokia's Arbitration Demand Are Arbitrable........29

1.  It is undisputed that the disputes over the
and the scope of Nokia's licensed products are arbitrable..............30

2.  The estoppel defense is arbitrable. ...................................................31

CONCLUSION.........................................................................................................33

- iii -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

# TABLE OF AUTHORITIES

## CASES

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
960 F.2d 1020 (Fed. Cir. 1992) ............................................................................20

*Adams v. Suozzi,*
433 F.3d 220 (2d Cir. 2005) .................................................................................18

*Anderson v. Pitney Bowes, Inc.,*
No. 04-4808, 2005 WL 1048700 (N.D. Cal. May 4, 2005) ...............................26, 28

*Apollo Computer, Inc. v. Berg,*
886 F.2d 469 (1st Cir. 1989).................................................................................28

*AT&T Techs., Inc. v. Commc'ns. Workers of Am.,*
475 U.S. 643 (1986)..........................................................................................26, 29

*Boston Telecomms. Group, Inc. v. Deloitte Touche Tohmatsu,*
278 F. Supp. 2d 1041 (N.D. Cal. 2003) ................................................................30

*Chew v. KPMG, LLP,*
407 F.Supp.2d 790 (S.D. Miss. 2006) ..................................................................22

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.,*
207 F.3d 1126 (9th Cir. 2000) ..............................................................................30

*Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.,*
252 F.3d 707 (4th Cir. 2001) ...............................................................................22

*Circuit City Stores, Inc. v. Adams,*
532 U.S. 105 (2001)...............................................................................................29

LEGAL02/30030987v2

*Contec Corp. v. Remote Solution Co.,*
398 F.3d 205 (2d Cir. 2005) ...................................................................27

*Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.,*
297 F.3d 1343 (Fed. Cir. 2002) ...............................................................18

*Dream Theater, Inc. v. Dream Theater,*
21 Cal. Rptr. 3d 322 (Ct. App. 2004) ..............................................27, 29

*First Options of Chicago, Inc. v. Kaplan,*
514 U.S. 938 (1995)................................................................................26

*Gilmer v. Interstate/Johnson Lane Corp.,*
500 U.S. 20 (1991)..................................................................................19

*Harvey v. Joyce,*
199 F.3d 790 (5th Cir. 2000) .................................................................18

*Klay v. All Defendants,*
389 F.3d 1191 (11th Cir. 2004) .......................................................20, 22

*Kroll v. Doctor's Assocs., Inc.,*
3 F.3d 1167 (7th Cir. 1993) ...................................................................22

*Levin v. Ripple Twist Mills, Inc.,*
416 F. Supp. 876 (E.D.Pa. 1976)...........................................................22

*Leyva v. Certified Grocers of Cal., Ltd.,*
593 F.2d 857 (9th Cir. 1979) .................................................................22

*Lucile Packard Children's Hosp. v. United States Nursing Corp.,*
No. 02-0192, 2002 WL 1162390 (N.D. Cal. May 29, 2002) ...................27

- v -

*Mago v. Shearson Lehman Hutton Inc.,*
956 F.2d 932 (9th Cir. 1992) ..................................................................18

*McMahan Sec. Co. v. Forum Capital Mkts., L.P.,*
35 F.3d 82 (2d Cir. 1994) ........................................................................20

*Microchip Tech. Inc. v. U.S. Philips Corp.,*
367 F.3d 1350 (Fed. Cir. 2004) ...........................................................2, 18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.,*
473 U.S. 614 (1985).................................................................................29

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983).....................................................................................29

*Nissan Forklift Corp. v. Zenith Fuel Sys., L.L.C.,*
2006 WL 643937 (N.D. Ill. 2006) ...........................................................22

*Powertex, Inc. v. Insta-Bulk, Inc.,*
No. 2:91cv2794 (D.N.J. July 7, 1992).....................................................22

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
388 U.S. 395 (1967).............................................................................24, 32

*Qualcomm, Inc. v. Broadcom Corp.,*
No. 05CV1392 (S.D. Cal.).......................................................................16

*Rhone-Puolenc Specialtes Chimiques v. SCM Corp.,*
769 F.2d 1569 (Fed. Cir. 1985) ...............................................................23

*Schoenduve Corp. v. Lucent Techs., Inc.,*
No. 04-15529, 2006 WL 709194 (9th Cir. Mar. 22, 2006) .................30, 32

- vi -

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) ............................................................30, 32

*Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*,
432 F.3d 1327 (11th Cir. 2005) .............................................................28

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960)..............................................................................29

**STATUTES**

28 U.S.C. § 1292.....................................................................................2

28 U.S.C. § 1338.....................................................................................2

9 U.S.C. § 16...........................................................................................2

9 U.S.C. § 3 ....................................................................................passim

**RULES**

Fed. R. Civ. Proc. 8 ...............................................................................20

**OTHER AUTHORITIES**

VIJAY K. GARG, WIRELESS NETWORK EVOLUTION, 2G
TO 3G (2002)...........................................................................................7

- vii -

## STATEMENT OF RELATED CASES

There are no related cases within the meaning of Federal Circuit Rule 47.5.

LEGAL02/30030987v2

## JURISDICTIONAL STATEMENT

Nokia Corporation and Nokia Inc. (collectively, "Nokia") appeal the district court's March 14, 2006 Order denying Nokia's motion to stay litigation pending arbitration (JA1-JA7). This order is immediately appealable as a matter of right pursuant to Section 16 of the Federal Arbitration Act, 9 U.S.C. § 16. Nokia's Notice of Appeal was timely filed on March 16, 2006 (JA734-JA738).

Because the district court's original jurisdiction rested on 28 U.S.C. § 1338, appellate jurisdiction is properly with the Federal Circuit under 28 U.S.C. § 1292(c)(1). *See Microchip Tech. Inc. v. U.S. Philips Corp.*, 367 F.3d 1350, 1355 (Fed. Cir. 2004) (appellate jurisdiction of appeals under 9 U.S.C. § 16 rests with Federal Circuit in patent cases).

- 2 -

## STATEMENT OF THE ISSUES

1.   Did the district court violate the Federal Arbitration Act in refusing to stay litigation of Qualcomm's patent infringement claims pending resolution of the potentially-dispositive issues in Nokia's pending arbitration against Qualcomm?

– 3 –

## STATEMENT OF THE CASE

Qualcomm, Incorporated and Snaptrack, Inc. (collectively, "Qualcomm") filed suit against Nokia on November 4, 2005. Nokia's defenses were intertwined with and related to an agreement entered into by Nokia and Qualcomm in 2001 (the "2001 Agreement") (JA101-147). That agreement requires all disputes "arising out of or relating to" the 2001 Agreement to be resolved through arbitration (JA137). Nokia accordingly filed an arbitration demand on December 20, 2005 (JA900). Nokia also filed a motion in the district court for a mandatory stay under the Federal Arbitration Act ("FAA")(9 U.S.C. § 3) pending resolution of the issues raised in Nokia's Arbitration demand (JA41-65). Nokia filed concurrently a motion to dismiss Qualcomm's Complaint or, in the alternative, for a more definite statement (JA41-65).

The district court denied Nokia's motion for stay pending arbitration and motion to dismiss, but granted in part Nokia's motion for a more definite statement (JA1-7). Following the denial of Nokia's motion to stay, Nokia requested a stay pending resolution of this appeal (JA881-883). The district court granted Nokia's request (JA895-897). Nokia filed its Notice of Appeal on March 16, 2006 (JA734-738).

Qualcomm filed an expedited motion for reconsideration on March 17, 2006 (JA759-761), which was denied on March 24, 2006. Pursuant to the district

- 4 -

court's March 14 Order, Qualcomm filed its First Amended Complaint for Patent

Infringement, Specific Performance, and Breach of Contract on March 27, 2006

(JA774-781). The parties submitted a joint request for expedited briefing of this

appeal, which this Court granted on April 6, 2006 (JA784-785).

### STATEMENT OF FACTS

**The Parties and the Technology.** Nokia manufacturers wireless telephone handsets and telecommunications infrastructure equipment used by wireless carriers (JA966). Historically, Nokia's wireless handset and infrastructure business has focused on products that comply with the Global System for Mobile Communications ("GSM") standard – a second generation wireless telecommunication standard utilized by a number of major wireless carriers in Europe and the United States (*id.*). Nokia, however, also sells products compliant with all major wireless telephony standards, including those employing Code Division Multiple Access ("CDMA"), including third generation standards such as the Universal Mobile Telecommunications System ("UMTS") (JA971).

Qualcomm is engaged in the business of licensing wireless telephony patents related to CDMA telecommunications systems (JA1000). Qualcomm also manufactures and sells chipsets for CDMA mobile telephones and equipment (JA959; JA1008). While Qualcomm describes itself as a leader in the development of CDMA technology and claims to have licensed many companies to its CDMA patents (JA959; JA1014), it has never claimed to be a primary developer of GSM technology (*see* JA519-523).

Second-generation mobile phone systems, such as GSM and a CDMA standard known as IS-95, replaced the so-called first generation analog cell phone

- 6 -

LEGAL02/30030987v2

system with digital technology. *See* VIJAY K. GARG, WIRELESS NETWORK
EVOLUTION, 2G TO 3G (2002) (JA1485-1486). GSM uses time division
multiple access (TDMA) as the means by which multiple users can use the same
radio frequency at the same time (JA455-456; JA1486). In GSM, each user is
given a short time period (a fraction of a second) for the user's signal (*id.*). IS-95,
in contrast, uses CDMA and "spreads" each user's signal across the frequency
band with a "spreading code" that is unique to each user (JA479-481; JA1487-
1490). An IS-95 base station receiver knows each user's spreading code and thus
can separate one user's signal from the others (*id.*).

These second generation technologies are giving way to a third generation of
mobile phone systems (JA452-453. The third generation successor to IS-95 is
sometimes referred to as CDMA2000 (JA453; JA1495-1496). UMTS is the third
generation successor to GSM (JA1491-1493). UMTS, sometimes called
W[ideband]-CDMA, uses code division as the method of multiple access instead of
time division as used in GSM, (JA1494).

**The 2001 Agreement.** Qualcomm and Nokia have actively participated in
the wireless telecommunications industry for decades, each playing a role in the
development of wireless communication standards (JA979-980; JA1041-1048;
JA519-523; JA1006). Both parties have substantial patent portfolios (JA982-983;
JA1014). Qualcomm's patents are primarily directed to CDMA technology

- 7 -

LEGAL02/30030987v2

(JA1014). Qualcomm claims to have a portfolio of over 4000 issued patents (*id.*). Nokia has developed a substantial portfolio of patents directed to many different wireless technologies including GSM and CDMA (JA982).

In July 2001, after protracted negotiations, Qualcomm and Nokia entered into the 2001 Agreement, the purpose of which was to secure "patent peace" for a defined period of time (JA904-JA905; JA101-JA147). The Agreement expressly licensed Nokia to practice Qualcomm's patents in Nokia's CDMA products, allowing Nokia to make UMTS, IS-95 and CDMA2000 products (JA100, JA122).

The 2001 Agreement is not, however, a mere CDMA license. For example, it contains a general release in which both parties released any claims that may have arisen prior to execution of the 2001 Agreement without regard to whether the technology involved CDMA (JA138-139).

- 8 -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

As alleged in the parallel arbitration that is at the heart of this appeal, Nokia's fundamental goal in entering into the 2001 Agreement was to avoid patent litigation with Qualcomm during the term of the license (JA904-905). In the course of negotiations, Qualcomm led Nokia to believe that the Agreement would serve that purpose (JA905). Through its misleading silences, statements and other conduct, Qualcomm convinced Nokia that Qualcomm would not assert (or attempt to assert) its existing patent portfolio against GSM technology (JA905-906). The deal, Nokia was made to believe, would secure the "patent peace" both parties sought (JA905).

The 2001 Agreement also contains a broad arbitration clause, which provides that "any dispute, claim or controversy *arising out of or relating to* this Agreement" would be resolved through arbitration (emphasis added) (JA137-138). The parties further agreed that the arbitration would be governed by the rules of the American Arbitration Association (JA137), which expressly require that any dispute over arbitrability be resolved by an arbitrator (JA1071). California law applies to the contract (JA137-138). Neither the parties nor the district court contests the validity of the parties' agreement to arbitrate.

**Qualcomm's Infringement Complaint and the Arbitration.** Although Nokia continued to believe it had achieved peaceful relations with Qualcomm, by 2005 it became concerned, along with a number of other companies, that

- 9 -

LEGAL02/30030987v2

Qualcomm had been misusing its market power in exclusive dealings and tying arrangements in its CDMA chipset business. In 2005, Nokia, Ericsson, NEC, Texas Instruments and Broadcom asked the European Commission to investigate the issue (JA951). Qualcomm received notice that the EU Commission had begun an investigation in late October, 2005 (*id.*). On November 4, 2005, shortly after receiving that notice, Qualcomm sued Nokia for patent infringement in the United States District Court for the Southern District of California (JA247; JA954-955). Qualcomm publicly admitted that the lawsuit was retaliation for asking the EU to investigate Qualcomm (JA954). Qualcomm further said that anyone not involved in the EU investigation need not worry about enforcement of patents against GSM (*id.*).

Qualcomm's Complaint asserted that Nokia infringed twelve of Qualcomm's patents (JA247-253). Most of the twelve patents appearing in Qualcomm's Complaint issued before the execution of the 2001 Agreement (JA249-251). Qualcomm's Complaint referenced unspecified Nokia products practicing the "GSM family of standards" (JA251-252). The Complaint further broadly accused Nokia of infringement without placing any limitations on the scope of accused products (*id.*).

Qualcomm's Complaint necessarily raises at least three issues that are subject to arbitration under the 2001 Agreement:

- 10 -

1.    Prior to the execution of the 2001 Agreement, the majority of the patents Qualcomm now sues upon had already issued (and the applications of the others had been filed) (JA249-251). Yet, during the negotiations, Qualcomm never disclosed or claimed to hold patents reading on GSM among the 4000 patents it owned (JA905-906). Qualcomm deliberately led Nokia to believe that a GSM license was unnecessary (*id.*). Whether this conduct estops Qualcomm for asserting the patents in suit against GSM products is an arbitrable, potentially dispositive affirmative defense that Nokia has raised in the arbitration and would be compelled to plead in answer to the complaint.

2.

- 11 -

Confidential Material Has Been Deleted From This Page.

3.    The Complaint was so broad that, on its face, it accused all Nokia products of infringement, including products expressly licensed under the 2001 Agreement (JA251-252; JA778-779). Any dispute over the scope of Nokia's license defense under the 2001 Agreement must also be resolved in arbitration.

Thus, before it could even frame an answer to the infringement complaint, Nokia had to confront each of these unavoidable issues. The defenses of estoppel, invalidity, and license are affirmative defenses which must be pled in the answer. If Nokia failed to plead those defenses, it would risk waiver. If Nokia did plead these defenses, it would be exposed to a claim that it had waived the right to arbitrate them.

Nokia filed an Arbitration Demand on December 20, 2005, asking an arbitrator to resolve the disputes over the estoppel defense and                    . As described further below, the dispute over the license scope was later added to the Arbitration by amendment.[1] An arbitrator

---

[1]    Nokia did not initially request that the arbitrator decide the license issue because it could not ascertain from the Complaint what products Qualcomm had in fact accused of infringement. As set forth below, however, Nokia subsequently amended its Arbitration Demand to request a determination regarding the scope of Nokia's licensed products (JA1049).

- 12 -

Confidential Material Has Been Deleted From This Page.

was subsequently appointed, and a preliminary hearing in the case was held on

March 28, 2006 (JA930-937).

**Motions in the District Court.** On December 20, 2005, the day the

arbitration was filed, Nokia also moved pursuant to Section 3 of the FAA, 9 U.S.C.

§ 3, for a mandatory stay of the district court action pending the outcome of the

Arbitration (JA41; JA49-50).  Nokia further moved the district court to dismiss the

Complaint under Federal Rule Civil Procedure 12(b)(6) or, alternatively, for a

more definite statement under Rule 12(e) that specifically identified the products

accused of infringement (*id.*).

Qualcomm also argued that there was no dispute

with respect to the scope of the accused products, but did not amend its Complaint

or otherwise identify the products accused of infringement (JA73).

At the February 13, 2006 hearing, the district court indicated that it believed

Qualcomm's Complaint satisfied the Rule 12 pleading requirements.  It also noted

that the Complaint seemed to encompass licensed products and invited the parties

to submit supplemental briefing on that issue (JA795, JA797

- 13 -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

Following the hearing, Nokia further investigated the patents asserted by Qualcomm in an effort to ascertain the products encompassed by Qualcomm's Complaint. Because the patents on their face are directed to CDMA technology, Qualcomm's allegations in the Complaint plainly encompassed Nokia's CDMA products (*see, e.g.* JA1135; JA1141; JA1142). Nokia accordingly filed an Amended Arbitration Demand to add a request that the arbitrator determine the scope of Nokia's licensed products (JA1052-1053) and informed the court below in its supplemental brief that Qualcomm's infringement allegations should be stayed pending arbitration of that issue as well (JA205-206).

The continued hearing on Nokia's motions was held on March 13, 2006. During the hearing, the court orally denied Nokia's motion for a stay pending arbitration (JA898). The court stated that it had the power to determine if the estoppel defense was arbitrable (JA874) ("[T]he issue that I'm going to have to handle . . . is whether or not [Nokia's claims raised in arbitration are] arbitrable in the arbitration."), and then said that the estoppel defense was not, in fact, subject to the arbitration clause (JA898) ("I'm denying the motion to stay this case on the grounds that I'm not satisfied that this case is arbitrable by the arbitration."). The

- 14 -

Confidential Material Has Been Deleted From This Page.

district court also denied Nokia's motion to dismiss, but granted Nokia's motion for a more definite statement and required Qualcomm to amend its Complaint (JA897).

The district court's written Order, filed the next day, confirmed the disposition of the motions, but stated that a stay pending arbitration was not needed because the estoppel and                    issues were "not in the case" and Qualcomm's claims of infringement were "not even remotely connected to the 2001 Agreement" because the "products listed in the complaint are non-CDMA products" (JA3).

At the March 13 hearing, Nokia orally moved for a stay pending Nokia's appeal of the district court's denial of Nokia's motion for stay pending arbitration (JA881-882). The district court granted Nokia's request and entered the stay as part of the court's March 14 Order (JA4). Qualcomm filed an expedited motion for reconsideration on March 17, 2006 (JA759-761). Before Nokia had an opportunity to respond to Qualcomm's motion for reconsideration and notwithstanding the existing stay order, on March 21, 2006, the court requested that Nokia participate in a teleconference regarding the scheduling of claim construction hearings in another case to which Nokia was not a party (JA1078,

- 15 -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

JA1081-1082).[2]  During that teleconference, the court ordered Nokia to participate in claim construction hearings, the first of which was to begin on April 3, 2006 (JA1078; JA1120-1127, JA37-38).  A written order to that effect issued the following day (JA36-38).  Although it was being ordered into claim construction hearings, Nokia had not answered the complaint, had not taken any discovery, and not been told which of its products were accused of infringement.

On March 23, 2006, the district court held a telephonic hearing on Qualcomm's motion for reconsideration (JA1408).  At this hearing, Nokia raised the conflict between the impending claim construction proceedings and the issues in arbitration (JA1434-1435).  The court then vacated its order requiring Nokia to join in the claim construction hearings, denied Qualcomm's motion for reconsideration, and reinstated the stay pending appeal (JA1459, JA1460).  A written order issued on March 24, 2006 (JA39-40).

On March 27, 2006, Qualcomm filed an amended complaint, which still did not name any specific Nokia products (JA774-783).  It contained allegations directed to standards promulgated by the "3rd Generation Partnership Project" which promulgates standards for UMTS (JA778; JA940-941), a technology Nokia

---

[2]    The case, *Qualcomm, Inc. v. Broadcom Corp.*, No. 05CV1392 (S.D. Cal.), involves six of the same patents Nokia is accused of infringing (*see* JA37-38).  Broadcom is one of the companies that asked the European Union to investigate Qualcomm's business practices (JA951).

- 16 -

believes is licensed under the 2001 Agreement (JA1466). The complaint also alleges, however, that it "excludes" products licensed under the 2001 Agreement from the accusation of infringement (JA778). Because the complaint continues to accuse UMTS products, however, a dispute appears to remain regarding just what products are licensed.

### SUMMARY OF THE ARGUMENT

The FAA mandates a stay of any litigation brought "upon an issue referable to arbitration." Qualcomm's infringement Complaint necessarily and inescapably draws in issues that have now been raised, as they must be, in a pending parallel arbitration. Qualcomm has therefore brought litigation upon three issues referable to (and actually in) arbitration: the estoppel defense, the                  , and the scope of the license. Each of these issues are directly related to and raised by Qualcomm's infringement litigation, all of them are presently being arbitrated, and each standing alone is more than sufficient to trigger the mandatory stay required under the FAA, 9 U.S.C. § 3.

In addition, to the extent the district court based its decision on its own determination of arbitrability, the court erred. The parties in this case specifically contracted to have arbitrability disputes resolved solely by an arbitrator (JA137-138). Any decision by the district court to address this issue was therefore contrary to law. Moreover, even if the district court were permitted to determine

- 17 -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

arbitrability, its conclusions on the merits were incorrect because all of the issues pending in the arbitration are arbitrable under the broad arbitration clause in the 2001 Agreement. Indeed, Qualcomm has not even disputed that two of the issues – the                    and license scope – are arbitrable (JA78; JA85-86; JA212-218).

## ARGUMENT

I.    **STANDARD OF REVIEW.**

The Federal Circuit applies regional circuit law to questions of arbitrability and the interpretation of arbitration agreements. *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1349 (Fed. Cir. 2002) (reviewing questions of arbitrability of invalidity and noninfringement claims *de novo* in accordance with 10th Circuit law); *Microchip Tech. Inc. v. U.S. Philips Corp.*, 367 F.3d 1350, 1356 (Fed. Cir. 2004) (applying circuit law to issues of arbitrability). Under Ninth Circuit law, a district court's order refusing to stay an action pending arbitration is reviewed *de novo*. *Mago v. Shearson Lehman Hutton Inc.*, 956 F.2d 932, 934 (9th Cir. 1992) (de novo review of District Court's order denying party's motion to stay proceedings and compel arbitration); *see also Adams v. Suozzi*, 433 F.3d 220, 226 (2d Cir. 2005) ("We review de novo the district court's denial of the motion to stay litigation pending arbitration."); *Harvey v. Joyce*, 199 F.3d 790, 793 (5th Cir. 2000).

- 18 -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

## II.  THE DISTRICT COURT ERRED IN DENYING THE MOTION FOR A MANDATORY STAY.

In its March 14, 2006 Order, the district court clearly denied Nokia's motion for a mandatory stay under 9 U.S.C. § 3 (JA3).  Why it did so is less clear.  The written order seems to hold that the arbitrable "defenses" to the infringement action are "not in the instant case" and that the infringement claims actually pled are not arbitrable (*id.*).  But, from the bench, the court seemed to express an opinion on the underlying arbitrability of the issues.  (*see, e.g.,* JA898) ("I'm the denying the motion to stay this case on the grounds that I'm not satisfied that this case is arbitrable by the arbitration.").  This ruling is in error regardless of the underlying rationale.

### A.  The Plain Language of the FAA Requires That the District Court Stay Litigation Pending Arbitration of the Issues Now in Arbitration.

The public policy favoring arbitration is undisputed.  *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (various provisions of the FAA "manifest a 'liberal federal policy favoring arbitration agreements'").  In this regard, Section 3 of the FAA mandates that courts stay actions to the extent they implicate arbitrable issues:

> *If any suit or proceeding be brought* in any of the courts of the United States *upon any issue referable to arbitration* under an agreement in writing for such arbitration, *the court* in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding

- 19 -

LEGAL02/30030987v2

is referable to arbitration under such an agreement, *shall* on application of one of the parties *stay the trial of the action until such arbitration has been had* in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added). Once an issue referable to arbitration is identified, courts are obligated to grant a stay of all litigation implicating the arbitrable issue. *McMahan Sec. Co. v. Forum Capital Mkts., L.P.*, 35 F.3d 82, 85-86 (2d Cir. 1994) (Under the FAA "a district court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding. The FAA leaves no discretion with the district court in the matter." (citation omitted)); *Klay v. All Defendants*, 389 F.3d 1191, 1203-04 (11th Cir. 2004) (same), *cert. denied*, 125 S. Ct. 2523 (2005).

There can be no dispute that Qualcomm's claims of infringement necessarily raise, and are "brought upon," issues that are referable to (and actually in) arbitration. The estoppel defense that Nokia now seeks to vindicate in arbitration is an affirmative defense that Nokia must raise or risk waiver. Fed. R. Civ. Pro. 8(c). It provides a potentially complete defense to Qualcomm's infringement claims. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc)). Even Qualcomm and the district court recognized as much (JA886) (Qualcomm counsel acknowledging that "if the estoppel claim were correct, your Honor, it could provide a defense to the [infringement] claims");

- 20 -

(JA885) (court commenting Nokia's estoppel claim, if correct, "would prohibit infringement litigation").

Nokia's ability to defend itself accordingly remains in dispute, and this arbitrable issue is directly raised by Qualcomm's infringement claims. Finally, the parties still do not seem to agree on what products are licensed under the 2001 Agreement or the extent to which Qualcomm accuses licensed products. Because the Amended Complaint still does not define what products are accused (JA778), there can be no agreement on what products are "excluded" from the case because of the license.

These facts, and the plain language of the FAA, mandated a stay of the infringement litigation.

### B. The Fact That the Issues Referable to Arbitration Are Litigation Defenses Rather Than the Plaintiff's Affirmative Claims Is Irrelevant.

If Congress had intended to limit the mandatory stay of the FAA to cases where the claim itself is arbitrable, thus precluding a stay in cases where the claim raises arbitrable issues by means of affirmative defense or otherwise, it would have specifically used the word "claim" in the statute. It carefully chose the word "issue," making clear that if the case produces an arbitrable *issue*, not just a claim,

- 21 -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

the case should be stayed. *Kroll v. Doctor's Assocs., Inc.*, 3 F.3d 1167, 1171 (7th Cir. 1993) ("[S]ection three of the Federal Arbitration Act 'plainly requires that a district court stay litigation where *issues* presented in the litigation are the subject of an arbitration agreement.'") (emphasis in original).[3]

The policy of the FAA – to protect parties who bargained for the benefits of arbitration – plainly supports applying the rule to claims that raise arbitrable defenses. Indeed, the courts who have confronted this question have seemingly so ruled. *See Powertex, Inc. v. Insta-Bulk, Inc.*, No. 2:91cv2794 (D.N.J. July 7, 1992) (staying patent infringement action pending arbitration on whether patents were covered by license agreement), *upheld*, 14 F.3d 612 (Fed. Cir. 1993); *Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876, 881 (E.D. Pa. 1976) (staying patent

---

[3]    Cases vary as to whether the mandatory stay provisions of the Federal Arbitration Act apply to nonarbitrable *claims* that do not raise arbitrable issues when accompanied by claims that do. *Compare Kroll*, 3 F.3d at 1171 (mandatory stay of litigation applies to nonarbitrable claims against nonparty to arbitration agreement), *Nissan Forklift Corp. v. Zenith Fuel Sys., L.L.C.*, No. 05 C 4849, 2006 WL 643937, at *8 (N.D. Ill. Mar. 3, 2006) (mandatory stay requires stay of entire case, even though most counts did not raise arbitrable issues), *and Chew v. KPMG, LLP*, 407 F. Supp. 2d 790, 803 (S.D. Miss. 2006) (same), *with Klay*, 389 F.3d at 1203-04 (stay is mandatory only with respect to claims raising arbitrable issues), *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 712 (4th Cir. 2001) (same), *and Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857 (9th Cir. 1979) (same). This Court need not resolve this dispute, however, because Qualcomm's infringement claim raises issues that are subject to arbitration.

- 22 -

infringement case pending resolution of arbitration regarding the existence of a license).[4]

Nokia bargained for the right to be free from the expense and delay of litigating a needless patent infringement action. Should Nokia be forced to proceed in parallel litigation and arbitration, Nokia will have irrevocably lost that right even if it ultimately prevailed in the arbitration; it is a bell that cannot be unrung. In addition, Nokia will needlessly have spent millions of dollars in legal fees over litigation that served no purpose. That Nokia might be deprived of its contractual right to arbitration and as a result made to incur the ills of litigation is exactly the species of prejudice that caused Congress to mandate a stay.

On the other hand, the only possible harm to Qualcomm in allowing the arbitration to proceed first is a short delay to allow the arbitrator to rule on the arbitrability and merits of Nokia's claims in the arbitration. But given that Qualcomm waited years before deciding to bring an infringement claim (most of the patents in suit were issued prior to 2001), and, moreover, chose not to assert a claim against any other GSM handset manufacturer, Qualcomm is hard-pressed to

---

[4]    Similarly, courts have not required defendants to answer before invoking the mandatory-stay provision of the FAA. *See, e.g., Rhone-Puolenc Specialtes Chimiques v. SCM Corp.*, 769 F.2d 1569, 1570 (Fed. Cir. 1985). Indeed, such a requirement would effectively undermine Section 3 by actually *prescribing* litigation instead of preventing it.

- 23 -

establish any genuine, cognizable prejudice resulting from a stay of the

infringement action.

C.    **The Fact That Nokia Has Submitted These Three Issues to Arbitration, Rather Than Pleading Them, Does Not Preclude Application of the FAA's Mandatory Stay Provision.**

To the extent the order denying the stay rests on the notion that the arbitrable

issues were not "in the instant case" because they had yet to be pled, the district

court still erred.  The FAA, and in particular the stay provisions of Section 3, are

intended to vindicate the right to arbitration and to protect that right from the

intrusions of litigation.  *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388

U.S. 395, 403-04 (1967) (the FAA reflects an "unmistakably clear congressional

purpose that the arbitration procedure, when selected by the parties to a contract,

be speedy and not subject to delay and obstruction in the courts.") .  Once

Qualcomm initiated this litigation, three arbitrable issues were immediately

implicated.  Because Nokia had contracted for the right to arbitrate these issues –

and to avoid any argument that it had waived the right to arbitrate – Nokia was

entitled to submit these three issues to arbitration rather than pleading them in

court.  It would be ironic and contrary to the public policy underlying the FAA if,

in so doing, Nokia lost the protection of the mandatory stay provisions.

- 24 -

### III.  THE DISTRICT COURT MAY HAVE IMPROPERLY DECIDED THAT THE ISSUES NOKIA HAS RAISED IN ARBITRATION ARE NOT ARBITRABLE.

Although not clearly reflected in the district court's March 14, 2006 Order, much of the debate during the hearings on Nokia's motion for stay pending arbitration revolved around the issue of arbitrability (*See, e.g.*, JA855-858; JA837-839; JA874).  During the March 13, 2006 hearing, for example, the district court stated that "the matter before the arbitration is not arbitrable, and therefore this case should not be stayed" (JA888).  To the extent that the order denying the stay is based on any finding that the issues presently in arbitration are somehow *not* referable to arbitration under 9 U.S.C. § 3, it is in manifest error.  This is so for at least two reasons.

First, the 2001 Agreement grants the arbitrator, not any judge, the *sole* authority to determine arbitrability.  The estoppel,                       and license issues in question are actually in a pending arbitration.  Until the recently-appointed arbitrator rules to the contrary, these three issues remain both in, and manifestly referable to, arbitration as a matter of law.

Second, even if some assessment of arbitrability is allowed on the law and facts of this case, the issues raised in Nokia's Arbitration demand are arbitrable under the broad "arising under or related to" arbitration clause in the 2001 Agreement.

- 25 -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

A.    **Arbitrability Is for the Arbitrator, Not the Court, to Decide.**

When parties "clearly and unmistakably" provide for an arbitrator to decide whether an issue is arbitrable, the FAA dictates that courts *must* honor that decision. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Anderson v. Pitney Bowes, Inc.*, No. 04-4808, 2005 WL 1048700, at *2 (N.D. Cal. May 4, 2005) ("[I]f the parties 'clearly and unmistakably' empowered an arbitrator to determine arbitrability, *the Court must compel arbitration . . . .*") (emphasis added). State contract law determines whether a contract contains such a "clear and unmistakable" provision. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Under unequivocal California law, which governs the 2001 Agreement,[5] Nokia and Qualcomm clearly and unmistakably contracted for the arbitrator alone to decide whether the issues raised in Nokia's arbitration demand are arbitrable. In the 2001 Agreement, the parties agreed that they would arbitrate all disputes "arising out of or relating to this Agreement . . . in accordance with the arbitration rules of the American Arbitration Association" (JA137). The AAA's International Dispute Resolution Rules, in turn, explicitly grant the arbitrator the authority to

---

[5]    The 2001 Agreement's arbitration clause requires the Agreement to be "construed and enforced in accordance with the laws of the State of California" (JA137-138).

- 26 -

LEGAL02/30030987v2

determine arbitrability of disputes[6] (JA1071 ("The tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.")). California law is crystal clear that incorporation of the AAA Rules into an arbitration agreement demonstrates the unmistakable intent to have the arbitrator alone decide whether a dispute is subject to arbitration:

> [P]arties state a clear and unmistakable agreement that the arbitrator will decide whether the dispute is subject to arbitration when they incorporate into their agreement the AAA Commercial Arbitration Rules which specify the arbitrator will decide arbitrability . . . .

*Dream Theater, Inc. v. Dream Theater*, 21 Cal. Rptr. 3d 322, 323 (Ct. App. 2004); *see also Lucile Packard Children's Hosp. v. United States Nursing Corp.*, No. 02-0192, 2002 WL 1162390, at *4 (N.D. Cal. May 29, 2002) (parties "clearly agreed to submit . . . the issue of arbitrability of [underlying dispute] to the arbitrator" by incorporating the AAA Commercial Dispute Resolution Procedures into their agreement). Courts outside of California have likewise reached this conclusion. *See Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ("[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to

---

[6]    Article 1.1 of the AAA's International Dispute Resolution Procedures ("IDRP") provides that where, as here, the parties "have provided for arbitration of an international dispute by . . . the American Arbitration Association without designating particular rules, the arbitration shall take place in accordance with these [International Dispute Resolution] rules." (JA1068)

- 27 -

decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989) (same); *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005) (same).

Tellingly, in the proceedings below, Qualcomm never denied promising to arbitrate questions of arbitrability. That both parties actually intended to arbitrate such disputes is perhaps best demonstrated by Qualcomm's own Arbitration Answer, which expressly (i) tendered to the *arbitrator* the question of whether the estoppel claim fell within the scope of the arbitration clause, and (ii) requested a briefing schedule *in the Arbitration* to resolve that question (JA173-174).

Qualcomm nonetheless urged the district court to resolve the issue of arbitrability, and it appears the court may have intended to do so, stating that it was "not satisfied that this case is arbitrable by the arbitration" (JA898). If the district court so ruled, it exceeded its authority. The district court "must only decide whether the parties have in fact clearly and unmistakably agreed to commit the question of arbitrability to the arbitrator." *Anderson*, 2005 WL 1048700 at *4. If such an agreement is present, the district court must defer to the arbitrator's decision on arbitrability. *Id.* At present, the estoppel, and license issues are in arbitration, and they will remain subject and referable to arbitration unless an arbitrator – the only person with the power to do so – rules to

- 28 -

Confidential Material Has Been Deleted From This Page.

the contrary. Accordingly, the district court should have stayed the litigation pending a ruling on that issue from the arbitrator. *Dream Theater, Inc.*, 21 Cal. Rptr. 3d at 323.

**B.    The Issues Raised in Nokia's Arbitration Demand Are Arbitrable.**

Even ignoring the fact that the parties' contract and the FAA do not permit the district court to make a threshold determination of arbitrability, the district court erred in concluding that Nokia's defenses are not subject to the broad arbitration clause in the 2001 Agreement.

The Supreme Court has long recognized a powerful "presumption of arbitrability." *AT&T Techs.*, 475 U.S. at 650; *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 132 n.15 (2001); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). Consequently, courts are not to deny a request to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). All doubts regarding the scope of an arbitration agreement should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Section 22 of the 2001 Agreement provides that "[a]ny dispute, claim or controversy *arising out of or relating to* th[e] Agreement . . . shall be settled by

- 29 -

LEGAL02/30030987v2

arbitration." (JA137) (emphasis added). Such "arising out of or relating to" clauses are "broad and far reaching" as a matter of law. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000). Indeed, they render arbitrable "*all* aspects of [the parties'] relationship." *Schoenduve Corp. v. Lucent Techs., Inc.*, No. 04-15529, 2006 WL 709194, *4 (9th Cir. Mar. 22, 2006) (emphasis added); *see also Boston Telecomms. Group, Inc. v. Deloitte Touche Tohmatsu*, 278 F. Supp. 2d 1041, 1046 (N.D. Cal. 2003) (broad arbitration clauses "contemplate coverage of 'matters or claims independent of the contract or collateral thereto'"). Thus, if Nokia's factual allegations even "'touch matters' covered by the contract," then Nokia's claims are arbitrable. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999). There can be no question that the issues raised in Nokia's Arbitration Demand are related to the 2001 Agreement and therefore fall within the scope of the arbitration clause.

1. **It is undisputed that the disputes over the and the scope of Nokia's licensed products are arbitrable.**

Qualcomm has never argued that the disputes over the and the scope of the Nokia's licensed products are not arbitrable. To the contrary, Qualcomm has not disputed that both of these disputes fall squarely within the parties' broad arbitration clause (JA78-80; JA85-86; JA212-218). Faced with this fact, Qualcomm has attempted to moot these issues by (i)

- 30 -

Confidential Material Has Been Deleted From This Page.

and (ii)

including a statement in its Amended Complaint (filed after Nokia's Notice of

Appeal) that the "products accused of infringement by this Complaint exclude any

Nokia product that is licensed under the [2001 Agreement]" (JA778).

Unfortunately, Qualcomm's efforts have been unsuccessful.

With respect to the scope of the products licensed under

the 2001 Agreement, Qualcomm's Amended Complaint only further complicates

the issue. Rather than simply identifying the products it accuses of infringement,

Qualcomm instead attempted to exclude Nokia's licensed products, but failed to

exclude the very UMTS technology that Nokia believes is licensed (JA778). Thus,

the "exclusion" in the Amended Complaint will require an arbitrator to decide

which products are, in fact, licensed. Because both of these issues are

unquestionably arbitrable and remain unresolved, the district court would have

erred if it in fact held that these issues were "not in the case" or not arbitrable.

### 2. The estoppel defense is arbitrable.

Nokia contends that Qualcomm engaged in conduct during the negotiation

of the 2001 Agreement that led to Nokia's reasonable and justifiable belief that it

had secured complete peace under the terms of the contract without the need for a

GSM license (JA901-902). Courts have consistently found that "arising out of or

- 31 -

Confidential Material Has Been Deleted From This Page.

LEGAL02/30030987v2

relating to" arbitration clauses encompass claims of this nature. For example, the Supreme Court held that the "'arising out of or relating to'" clause was "easily broad enough" to encompass a claim for fraudulent inducement of a contract. *Prima Paint*, 388 U.S. at 406. Likewise, the Ninth Circuit recently observed that claims for quasi-contract and estoppel fall within the scope of "arising out of or relating to" arbitration clauses. *Schoenduve*, 2006 WL 709194, at *4. Even defamation claims are arbitrable under such clauses when the defamatory statements are made in the course of the parties' contractual relationship. *See Simula*, 175 F.3d at 719. Here, the estoppel defense is intimately related to the 2001 Agreement because it is the formation of that agreement and the conduct of the parties during the negotiations that give rise to the dispute over the estoppel defense. Moreover, the 2001 Agreement (and the absence of a GSM license therein) are evidence both of Nokia's reliance on Qualcomm's misleading conduct and the prejudice Nokia has suffered as a result. The dispute over the estoppel defense is clearly "related to" the 2001 Agreement under even the narrowest interpretation of that term.

In fact, Qualcomm itself highlighted the relationship between the estoppel defense and the 2001 Agreement in arguments made to the district court. Specifically, Qualcomm argued that Nokia's estoppel defense lacked merit because the merger clause in the 2001 Agreement would preclude Nokia from relying on

- 32 -

parole evidence to support the estoppel defense (JA76-77; JA84-85). This defense necessarily requires construction of the merger clause and the 2001 Agreement as a whole, which construction is certainly a question for the arbitrator. Thus even Qualcomm acknowledges the necessary role of arbitration in resolving the dispute over the estoppel defense.

Since this estoppel defense, if proved, would provide a complete defense to Qualcomm's affirmative infringement claims, the district court litigation should be stayed pending resolution of this issue by the arbitrator.

## CONCLUSION

For the foregoing reasons, Nokia respectfully requests that this Court reverse the district court's denial of a stay pending the outcome of the arbitration between the parties.

Dated: July 28, 2006.

By: _____
John D. Haynes
ALSTON & BIRD, LLP
1201 W. Peachtree Street
Atlanta, Georgia 30309
404-881-7000 (telephone)
404-881-7635 (facsimile)

- 33 -

## PROOF OF SERVICE

Undersigned counsel hereby certifies that two copies of the

confidential and non-confidential versions of the foregoing Brief were

served in compliance with Federal Rule of Appellate Procedure 25 and

Federal Circuit Rules 28(d) and 31(b) by US Mail on July 28, 2006, upon

the counsel below.  Undersigned counsel further certifies that the original

and eleven copies of the confidential and the original and four copies of the

non-confidential versions of the foregoing Brief were filed in compliance

with Federal Rule of Appellate Procedure 25(d)(2) and Federal Circuit Rule

28(d) by First Class Mail on July 28, 2006, upon the Clerk of the Federal

Circuit.

Christian Mammen
Craig H. Casebeer
DAY CASEBEER MADRID &
BATCHELDER LLP
Suite 400
20300 Stevens Creek Blvd.
Cupertino, CA  95014
(408) 873-0110

By: _____
         John D. Haynes

- 34 -

LEGAL02/30030987v2

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 5,052 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman for both the text and footnotes.

Dated:  July 28, 2006.

John D. Haynes
Attorney for Appellants

# ADDENDUM

MAR-15-06    06:00PM    FROM-4th fl US District Court Southern Dis CA    619 236 4705    T-023  P.002/018  F-030



1
2
3
4
5
6
7
8
9

10                    UNITED STATES DISTRICT COURT

11                  SOUTHERN DISTRICT OF CALIFORNIA

12

13   QUALCOMM INCORPORATED AND      )   Civil No.: 05CV2063-B(BLM)
     SNAPTRACK, INC.,               )
14                                  )   ORDER DENYING DEFENDANTS'
                    Plaintiffs,     )   MOTION TO DISMISS, GRANTING
15                                  )   DEFENDANTS' MOTION FOR A
     v.                             )   MORE DEFINITE STATEMENT
16                                  )   WITH LEAVE TO AMEND, DENYING
     NOKIA CORPORATION AND          )   DEFENDANTS' MOTION TO STAY
17   NOKIA, INC.,                   )   PENDING ARBITRATION, AND
                                    )   GRANTING DEFENDANTS' MOTION
18                  Defendants,     )   TO STAY PENDING APPEAL [13-1 TO
                                    )   13-3]
19

20

21   I.    INTRODUCTION

22         Before the Court are Defendants Nokia Corporation and Nokia Inc.'s (collectively

23   "Nokia") Motion to Stay the instant litigation pending the outcome of an arbitration

24   proceeding and Motions (1) to dismiss the complaint pursuant to Rule 12(b)(6) of the

25   Federal Rules of Civil Procedure and (2) for a more definite statement pursuant to Rule

26   12(e) of the Federal Rules of Civil Procedure against Plaintiffs Qualcomm Incorporated

27

28                                                                  05cv2063

1 ("Qualcomm") and SnapTrack, Inc. ("SnapTrack"), a subsidiary of Qualcomm. For the

2 reasons discussed below, the Court **DENIES** Defendants' Motion to Dismiss, **GRANTS**

3 Defendants' Motion for a More Definite Statement and **GRANTS** Plaintiffs ten days leave

4 to amend, **DENIES** Defendants' Motion to Stay pending arbitration, and **GRANTS**

5 Defendants' Motion to Stay Pending Appeal.

6 **II.    BACKGROUND**

7      In July 2001, Qualcomm and Nokia entered into a "Subscriber Unit and

8 Infrastructure Equipment License Agreement" ("the CDMA Agreement") whereby

9 Qualcomm granted Nokia a non-exclusive license to use certain of Qualcomm's patents to

10 make/sell products that incorporated CDMA[1] technology. The CDMA Agreement contains

11 an arbitration clause that requires arbitration of all disputes arising out of or relating to the

12 CDMA Agreement.

13      On November 4, 2005, Plaintiffs filed a patent infringement suit against Nokia

14 alleging that Nokia infringed eleven patents assigned to Qualcomm and one patent assigned

15 to Snap Track. After Qualcomm filed its complaint, Nokia initiated an arbitration

16 proceeding against Qualcomm on December 20, 2005, in Los Angeles, California. In its

17 demand for arbitration, Nokia seeks declarations that (1) Qualcomm engaged in misconduct

18 concerning the CDMA Agreement that bars it from asserting any of the patents in the

19 instant suit and (2) under Section 14 of the CDMA Agreement, Nokia is free to challenge

20 the validity of the six Pre-1994 Qualcomm patents in the instant action.

21      Nokia responded to the complaint on January 4, 2006, by filing the instant motions

22 for a stay, for dismissal, and for a more definite statement. In its motion to stay, Nokia

23 argues that because the instant patent infringement suits fall within the purview of an

24 arbitration clause in the CDMA agreement, the Court should stay the instant case pending

25 arbitration. Qualcomm opposes these motions. The motions came on for hearing on

26

27     [1]CDMA refers to Code Division Multiple Access, i.e. a wireless telecommunications standard.

28                                                05cv2063

1  February 13, 2006 and March 13, 2006.

2  **III.    DISCUSSION**

3      **A.    Nokia's Motion for a Stay under Federal Arbitration Act**

4      Nokia moves for a mandatory stay of the instant suit under 9 U.S.C. § 3 of the

5  Federal Arbitration Act. Section 3 provides in pertinent part:

6      If any suit or proceeding be brought in any of the courts of the United States upon
    any issue referable to arbitration under an agreement in writing for such arbitration,

7      the court in which such suit is pending, upon being satisfied that the issue involved
    in such suit or proceeding is referable to arbitration under such an agreement, shall

8      on application of one of the parties stay the trial of the action until such arbitration
    has been had in accordance with the terms of the agreement, providing the applicant

9      for the stay is not in default in proceeding with such arbitration. 9 U.S.C. § 3

10      (2005).

11  Thus, according to Section 3, the instant litigation must address an issue that is "referable"

12  to arbitration. Nokia argues that because the issues of (1) whether Qualcomm engaged in

13  misconduct concerning the CDMA Agreement that bars it from asserting any of the patents

14  in the instant suit and (2) whether Section 14 in the CDMA Agreement limits Nokia's

15  ability to challenge the validity of the patents in suit are arbitrable, the instant litigation

16  addresses issues that are "referable" to arbitration. However, there is a difference between

17  Nokia's proving that it initiated an arbitration action on these issues and proving that the

18  instant patent infringement suit is in fact referable to arbitration.

19      The estoppel and Section 14 defenses are not in the instant case. The instant case

20  involves allegations that Nokia infringed twelve patents in suit. The products that are listed

21  in the complaint are non-CDMA products. As such, the Court finds that the patent

22  infringement issues in the instant case are not even remotely connected to the 2001 Agreement.

23  that deals with CDMA products and are not referable to arbitration. Therefore, the Court is not

24  satisfied under 9 U.S.C. § 3 that the issues involved in the instant case are referable to

25  arbitration and accordingly DENIES Nokia's Motion to Stay arbitration under the Federal

26  Arbitration Act.

27

28                              05cv2063

   **B.**   **Court's Discretion to Stay the Action**

1
2      Alternatively, Nokia moves the Court to exercise its broad discretion to stay the
3 instant action pending arbitration. Factors that courts consider in granting a stay include (1)
4 the harm a stay might cause, (2) the hardship or inequity a non-stay will cause, and (3) the
5 judicial efficiency and economy a stay may cause. <u>CMAX, Inc. v. M. Hall</u>, 300 F.2d 265,
6 268 (9th Cir. 1962). Nokia asserts a stay will result in judicial economy because the
7 arbitration may be dispositive if Qualcomm is estopped from bringing the instant action.
8 Nokia further argues that it will suffer prejudice if a stay is not granted because it will
9 needlessly have to spend millions of dollars in litigation in this Court.

10      The Court has inherent power to manage its docket. Here, the Court does not
11 consider the issues before the arbitrator dispositive for the instant suit because the
12 infringement issues in the instant case are not arbitrable, as discussed above. Additionally,
13 judicial efficiency counsels in favor of the Court's not staying the action because six of the
14 patents that are in suit in this action are also in suit in a related case: Qualcomm v.
15 Broadcom (Case No. 05CV1392). As such, a stay would also impede that case as well.
16 Therefore, the Court DECLINES to exercise its discretion to stay this case pending
17 arbitration.

18    **C.**   **Nokia's Motion to Stay the Case Pending Appeal**

19      During oral argument, Nokia moved for the Court to stay the case pending Nokia's
20 appeal of the Court's order denying Nokia's motion for a stay pending arbitration. The
21 Court hereby GRANTS Nokia's motion to stay pending appeal and STAYS the case for
22 ten (10) days to provide Nokia the opportunity to file an appeal with the Federal Circuit. If
23 Nokia does not file an interlocutory appeal within ten days (<u>i.e.</u> by March 24, 2006), the
24 litigation in the instant case will continue. If Nokia does file an appeal by March 24, 2006,
25 the case shall be stayed pending a decision by the Federal Circuit.

26    **D.**   **Nokia's Motion to Dismiss the Complaint**

27      Nokia has filed an alternative motion to dismiss Qualcomm's complaint for failure

28

05cv2063

1    to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  A

2    motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) tests the

3    legal sufficiency of the claims in the complaint.  A claim can only be dismissed with

4    prejudice if "it appears beyond doubt that the plaintiff can prove no set of facts in support

5    of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46

6    (1957).  The court must accept as true all material allegations in the complaint, as well as

7    reasonable inferences to be drawn from them, and must construe the complaint in the light

8    most favorable to plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986);

9    Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).

10          Furthermore, a court should not grant a Rule 12(b)(6) motion without leave to

11    amend unless "it appears beyond doubt that the plaintiff can prove no set of facts in support

12    of his claim which would entitle him to relief." Parks Sch. of Bus., Inc., 51 F.3d at 1484;

13    see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Gilligan v. Jamco Development

14    Corp., 108 F.3d 246, 248 (9th Cir. 1997).   Nokia argues that because Plaintiffs (1) have not

15    identified a single product or service offered by Defendants that allegedly infringes the

16    patents in suit, (2) have not alleged the knowledge or intent elements of contributory or

17    inducing infringement, and (3) have not specified which causes of action are asserted

18    against which Defendants, the complaint should be dismissed for failure to state a cause of

19    action under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

20          Claims for patent infringement are subject to the liberal notice pleading standard of

21    Rule 8 of the Federal Rules of Civil Procedure, which requires, inter alia, "a short and

22    plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8

23    (2005). Here, the complaint alleges one cause of action for patent infringement (i.e. literal

24    infringement, infringement under doctrine of equivalents, and indirect infringement), gives

25    the statutory basis for the alleged types infringement, describes the twelve patents that are

26    allegedly infringed, and adequately names the Defendants.  The Court finds that the

27    complaint states a cause of action and accordingly DENIES Defendants' Rule 12(b)(6)

28                                                                                      05cv2063

1 | Motion to Dismiss.

2 |   **C.    Nokia's Motion for a More Definite Statement**

3 |        Nokia argues that because the complaint is too vague to give them notice of what

4 | products or services are accused, the Court should order Plaintiffs to make a more definite

5 | statement identifying (1) the accused devices, (2) which causes of actions relates to each

6 | Defendant, (3) which theories of infringement relate to each Defendant, (4) which

7 | allegations relate to each Defendant, (5) which patent(s) and patent claims relate to each

8 | Defendant, and (6) which part of which version of the GSM standard do plaintiffs allege

9 | are covered by the claims in suit. Nokia P/A, 16-17 (Doc. No. 12).

10 |        The test in evaluating a motion under Rule 12(e) is whether the complaint provides

11 | the defendant with a sufficient basis to frame a responsive pleading. Federal Sav. and Loan

12 | Ins. Corp. v. Musacchio, 695 F.Supp. 1053, 1060 (N.D. Cal. 1988) (internal citations

13 | omitted). Generally, the court will require a more definite statement only when the

14 | pleading is "so vague or ambiguous that the opposing party cannot respond, even with a

15 | simple denial, in good faith or without prejudice to himself." Delta Educ., Inc. v. Langlois,

16 | 719 F.Supp. 42, 50 (D.N.H. 1989); Bureerong v. Uvawas, 922 F.Supp. 1450, 1461 (C.D.

17 | Cal. 1996) ("[A] motion for a more definite statement should not be granted unless the

18 | defendant literally cannot frame a responsive pleading."). Motions for a more definite

19 | statement are generally viewed with disfavor and are rarely granted. Cellars v. Pacific

20 | Coast Packaging, Inc., 189 F.R.D. 575, 577-8 (N.D. Cal. 1999).

21 |        Paragraph 23 of the Complaint alleges that Nokia manufactures GSM and 3GPP

22 | products but does not state that this manufacture is an infringing act. Therefore, the Court

23 | GRANTS Nokia's Rule 12(e) Motion for a More Definite Statement because there is no

24 | nexus between the manufacture of the listed products and infringement. Contrary to

25 | Nokia's arguments, Qualcomm does not have to identify all of the products that contain

26 | GSM or 3GPP standards or tell which products apply to which Defendants because this

27 | information can be obtained by Nokia during the discovery process. Accordingly, the

28 |                                                                   05cv2063

MAR-15-06  06:02PM  FROM-4th 11 US District Court Southern Dis CA  619 235 4706    T-023  P.006/010  F-070

1   Court **GRANTS** Qualcomm ten (10) days leave to amend the complaint to allege that the

2   manufacture of Nokia's alleged products constitutes infringement of the patents in suit.

3   **IV.    CONCLUSION**

4        For the reasons discussed above, the Court

5        (1) DENIES Defendants' Motion to Dismiss,

6        (2) GRANTS Defendants' Motion for a More Definite Statement and **GRANTS**

7   Plaintiffs ten days leave to amend the complaint,

8        (3) DENIES Defendants' Motion to Stay pending arbitration, and

9        (4) GRANTS Defendants' Motion to Stay Pending Appeal.

10

11       **IT IS SO ORDERED.**

12

13   DATED: _____03-14-06_____         _____

14                                       HON. RUDI M. BREWSTER
                                        United States Senior District Judge
15

16   cc:   Hon. Barbara L. Major
           United States Magistrate Judge
17
         All parties
18

19

20

21

22

23

24

25

26

27

28                                                              05cv2063

                                      JA7

# EXHIBIT L

# *Rules of Arbitration*

*in force as from 1 January 1998*

**Cost scales effective as of 1 July 2003**

**International Chamber of Commerce**
38 cours Albert 1er
75008 Paris - France
Telephone +33 1 49 53 28 28
Fax +33 1 49 53 29 33
Web site www.iccwbo.org

The ICC Rules of Arbitration and their Appendices have been translated into many different languages. However, the English and French versions are the only official texts.

© **International Chamber of Commerce 1997, 2001**

All rights reserved.

**ICC No.: publication 808**

**Date of this online publication: October 2004**

## FOREWORD

The closing decades of the twentieth century saw international commercial arbitration gain worldwide acceptance as the normal means of resolving international commercial disputes. National laws on arbitration have been modernized on all continents. International treaties on arbitration have been signed or adhered to with impressive success. Arbitration has become part of the curricula of large numbers of law schools. With the gradual removal of political and trade barriers and the rapid globalization of the world economy, new challenges have been created for arbitration institutions in response to the growing demand of parties for certainty and predictability, greater rapidity and flexibility as well as neutrality and efficacy in the resolution of international disputes.

Since the International Court of Arbitration was established in 1923, ICC arbitration has been constantly nourished by the experience gathered by the ICC International Court of Arbitration in the course of administering more than thirteen thousand international arbitration cases, now involving each year parties and arbitrators from over 100 countries and from a diversity of legal, economic, cultural and linguistic backgrounds.

The present ICC Rules of Arbitration came into effect on 1 January 1998. They are the result of an intensive, worldwide consultation process and constitute the first major revision of the Rules in more than 20 years. The changes made are designed to reduce delays and ambiguities and to fill certain gaps, taking into account the evolution of arbitration practice. The basic features of the ICC arbitration system have not been altered, however, notably its universality and flexibility, as well as the central role played by the ICC Court in the administration of arbitral cases.

Every ICC arbitration is conducted by an arbitral tribunal with responsibility for examining the merits of the case and rendering a final award. Each year, ICC arbitrations are held in numerous countries, in most major languages

3

and with arbitrators from all over the world. The work of those arbitral tribunals is monitored by the ICC Court, which meets weekly all year round. Composed of members from over 80 countries, the Court organizes and supervises arbitrations held under the ICC Rules of Arbitration. The Court must remain constantly alert to changes in the law and the practice of arbitration in all parts of the world and must adapt its working methods to the evolving needs of parties and arbitrators. For the day-to-day management of cases in many languages, the ICC Court is supported by a Secretariat based at the headquarters of the International Chamber of Commerce, in Paris.

Although the ICC Rules of Arbitration have been especially designed for arbitrations in an international context, they may also be used for non-international cases.

4

### STANDARD ICC ARBITRATION CLAUSE

The ICC recommends that all parties wishing to make reference to ICC arbitration in their contracts use the following standard clause.

Parties are reminded that it may be desirable for them to stipulate in the arbitration clause itself the law governing the contract, the number of arbitrators and the place and language of the arbitration. The parties' free choice of the law governing the contract and of the place and language of the arbitration is not limited by the ICC Rules of Arbitration.

Attention is called to the fact that the laws of certain countries require that parties to contracts expressly accept arbitration clauses, sometimes in a precise and particular manner.

The ICC Rules of Arbitration have been translated into several of the languages listed below. These translations are available on the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

### English

"All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules."

5

## STANDARD CLAUSE FOR AN ICC
## PRE-ARBITRAL REFEREE PROCEDURE AND
## ICC ARBITRATION

The ICC Pre-Arbitral Referee Procedure provides for the appointment of a person empowered to make certain orders that might be necessary prior to a case being referred to arbitration or the courts. Use of this procedure presupposes a written agreement between the parties. Where parties wish to have recourse to both the ICC Pre-Arbitral Referee Procedure and ICC arbitration, specific reference should be made to both procedures. The following standard clause is recommended:

"Any party to this contract shall have the right to have recourse to and shall be bound by the Pre-Arbitral Referee Procedure of the International Chamber of Commerce in accordance with its Rules for a Pre-Arbitral Referee Procedure.
All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules of Arbitration."

For translations of this clause, please consult the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

6

**RULES OF ARBITRATION OF THE
INTERNATIONAL CHAMBER OF COMMERCE**

INTRODUCTORY PROVISIONS

**Article 1
International Court of Arbitration**

1

The International Court of Arbitration (the "Court") of the International Chamber of Commerce (the "ICC") is the arbitration body attached to the ICC. The statutes of the Court are set forth in Appendix I. Members of the Court are appointed by the World Council of the ICC. The function of the Court is to provide for the settlement by arbitration of business disputes of an international character in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules"). If so empowered by an arbitration agreement, the Court shall also provide for the settlement by arbitration in accordance with these Rules of business disputes not of an international character.

2

The Court does not itself settle disputes. It has the function of ensuring the application of these Rules. It draws up its own Internal Rules (Appendix II).

3

The Chairman of the Court or, in the Chairman's absence or otherwise at his request, one of its Vice-Chairmen shall have the power to take urgent decisions on behalf of the Court, provided that any such decision is reported to the Court at its next session.

4

As provided for in its Internal Rules, the Court may delegate to one or more committees composed of its members the power to take certain decisions, provided that any such decision is reported to the Court at its next session.

7

*ICC Rules of Arbitration*

5

The Secretariat of the Court (the "Secretariat") under the direction of its Secretary General (the "Secretary General") shall have its seat at the headquarters of the ICC.

## Article 2
## Definitions

In these Rules:

(i) "Arbitral Tribunal" includes one or more arbitrators.

(ii) "Claimant" includes one or more claimants and "Respondent" includes one or more respondents.

(iii) "Award" includes, *inter alia*, an interim, partial or final Award.

## Article 3
## Written Notifications or Communications;
## Time Limits

1

All pleadings and other written communications submitted by any party, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat. A copy of any communication from the Arbitral Tribunal to the parties shall be sent to the Secretariat.

2

All notifications or communications from the Secretariat and the Arbitral Tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against receipt, registered post, courier, facsimile transmission, telex, telegram or any other means of telecommunication that provides a record of the sending thereof.

3

A notification or communication shall be deemed to have been made on the day it was received by the party itself

8

*ICC Rules of Arbitration*

or by its representative, or would have been received if made in accordance with the preceding paragraph.

**4**

Periods of time specified in or fixed under the present Rules shall start to run on the day following the date a notification or communication is deemed to have been made in accordance with the preceding paragraph. When the day next following such date is an official holiday, or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall commence on the first following business day. Official holidays and non-business days are included in the calculation of the period of time. If the last day of the relevant period of time granted is an official holiday or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall expire at the end of the first following business day.

## COMMENCING THE ARBITRATION

**Article 4**
**Request for Arbitration**

**1**

A party wishing to have recourse to arbitration under these Rules shall submit its Request for Arbitration (the "Request") to the Secretariat, which shall notify the Claimant and Respondent of the receipt of the Request and the date of such receipt.

**2**

The date on which the Request is received by the Secretariat shall, for all purposes, be deemed to be the date of the commencement of the arbitral proceedings.

**3**

The Request shall, *inter alia*, contain the following information:

9

*ICC Rules of Arbitration*

a) the name in full, description and address of each of the parties;

b) a description of the nature and circumstances of the dispute giving rise to the claim(s);

c) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) claimed;

d) the relevant agreements and, in particular, the arbitration agreement;

e) all relevant particulars concerning the number of arbitrators and their choice in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

f) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

4

Together with the Request, the Claimant shall submit the number of copies thereof required by Article 3(1) and shall make the advance payment on administrative expenses required by Appendix III ("Arbitration Costs and Fees") in force on the date the Request is submitted. In the event that the Claimant fails to comply with either of these requirements, the Secretariat may fix a time limit within which the Claimant must comply, failing which the file shall be closed without prejudice to the right of the Claimant to submit the same claims at a later date in another Request.

5

The Secretariat shall send a copy of the Request and the documents annexed thereto to the Respondent for its Answer to the Request once the Secretariat has sufficient copies of the Request and the required advance payment.

6

When a party submits a Request in connection with a legal relationship in respect of which arbitration proceedings between the same parties are already pending under these Rules, the Court may, at the request

*ICC Rules of Arbitration*

of a party, decide to include the claims contained in the Request in the pending proceedings provided that the Terms of Reference have not been signed or approved by the Court. Once the Terms of Reference have been signed or approved by the Court, claims may only be included in the pending proceedings subject to the provisions of Article 19.

## Article 5
## Answer to the Request; Counterclaims

**1**

Within 30 days from the receipt of the Request from the Secretariat, the Respondent shall file an Answer (the "Answer") which shall, *inter alia*, contain the following information:

a) its name in full, description and address;

b) its comments as to the nature and circumstances of the dispute giving rise to the claim(s);

c) its response to the relief sought;

d) any comments concerning the number of arbitrators and their choice in light of the Claimant's proposals and in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

e) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

**2**

The Secretariat may grant the Respondent an extension of the time for filing the Answer, provided the application for such an extension contains the Respondent's comments concerning the number of arbitrators and their choice and, where required by Articles 8, 9 and 10, the nomination of an arbitrator. If the Respondent fails to do so, the Court shall proceed in accordance with these Rules.

**3**

The Answer shall be supplied to the Secretariat in the number of copies specified by Article 3(1).

11

*ICC Rules of Arbitration*

**4**

A copy of the Answer and the documents annexed thereto shall be communicated by the Secretariat to the Claimant.

**5**

Any counterclaim(s) made by the Respondent shall be filed with its Answer and shall provide:

a) a description of the nature and circumstances of the dispute giving rise to the counterclaim(s); and

b) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) counterclaimed.

**6**

The Claimant shall file a reply to any counterclaim within 30 days from the date of receipt of the counterclaim(s) communicated by the Secretariat. The Secretariat may grant the Claimant an extension of time for filing the reply.

## Article 6
## Effect of the Arbitration Agreement

**1**

Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration proceedings, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

**2**

If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral

1 2

Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

**3**

If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure.

**4**

Unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas even though the contract itself may be non-existent or null and void.

## THE ARBITRAL TRIBUNAL

### Article 7
### General Provisions

**1**

Every arbitrator must be and remain independent of the parties involved in the arbitration.

**2**

Before appointment or confirmation, a prospective arbitrator shall sign a statement of independence and disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties. The Secretariat shall provide such information to the parties in writing and fix a time limit for any comments from them.

*ICC Rules of Arbitration*

### 3

An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature which may arise during the arbitration.

### 4

The decisions of the Court as to the appointment, confirmation, challenge or replacement of an arbitrator shall be final and the reasons for such decisions shall not be communicated.

### 5

By accepting to serve, every arbitrator undertakes to carry out his responsibilities in accordance with these Rules.

### 6

Insofar as the parties have not provided otherwise, the Arbitral Tribunal shall be constituted in accordance with the provisions of Articles 8, 9 and 10.

### Article 8
### Number of Arbitrators

### 1

The disputes shall be decided by a sole arbitrator or by three arbitrators.

### 2

Where the parties have not agreed upon the number of arbitrators, the Court shall appoint a sole arbitrator, save where it appears to the Court that the dispute is such as to warrant the appointment of three arbitrators. In such case, the Claimant shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the decision of the Court, and the Respondent shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the nomination made by the Claimant.

### 3

Where the parties have agreed that the dispute shall be settled by a sole arbitrator, they may, by agreement,

14

nominate the sole arbitrator for confirmation. If the parties fail to nominate a sole arbitrator within 30 days from the date when the Claimant's Request for Arbitration has been received by the other party, or within such additional time as may be allowed by the Secretariat, the sole arbitrator shall be appointed by the Court.

4

Where the dispute is to be referred to three arbitrators, each party shall nominate in the Request and the Answer, respectively, one arbitrator for confirmation. If a party fails to nominate an arbitrator, the appointment shall be made by the Court. The third arbitrator, who will act as chairman of the Arbitral Tribunal, shall be appointed by the Court, unless the parties have agreed upon another procedure for such appointment, in which case the nomination will be subject to confirmation pursuant to Article 9. Should such procedure not result in a nomination within the time limit fixed by the parties or the Court, the third arbitrator shall be appointed by the Court.

## Article 9
## Appointment and Confirmation of the Arbitrators

1

In confirming or appointing arbitrators, the Court shall consider the prospective arbitrator's nationality, residence and other relationships with the countries of which the parties or the other arbitrators are nationals and the prospective arbitrator's availability and ability to conduct the arbitration in accordance with these Rules. The same shall apply where the Secretary General confirms arbitrators pursuant to Article 9(2).

2

The Secretary General may confirm as co-arbitrators, sole arbitrators and chairmen of Arbitral Tribunals persons nominated by the parties or pursuant to their particular agreements, provided they have filed a statement of independence without qualification or a qualified statement of independence has not given rise to

*ICC Rules of Arbitration*

objections. Such confirmation shall be reported to the Court at its next session. If the Secretary General considers that a co-arbitrator, sole arbitrator or chairman of an Arbitral Tribunal should not be confirmed, the matter shall be submitted to the Court.

3

Where the Court is to appoint a sole arbitrator or the chairman of an Arbitral Tribunal, it shall make the appointment upon a proposal of a National Committee of the ICC that it considers to be appropriate. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, the Court may repeat its request or may request a proposal from another National Committee that it considers to be appropriate.

4

Where the Court considers that the circumstances so demand, it may choose the sole arbitrator or the chairman of the Arbitral Tribunal from a country where there is no National Committee, provided that neither of the parties objects within the time limit fixed by the Court.

5

The sole arbitrator or the chairman of the Arbitral Tribunal shall be of a nationality other than those of the parties. However, in suitable circumstances and provided that neither of the parties objects within the time limit fixed by the Court, the sole arbitrator or the chairman of the Arbitral Tribunal may be chosen from a country of which any of the parties is a national.

6

Where the Court is to appoint an arbitrator on behalf of a party which has failed to nominate one, it shall make the appointment upon a proposal of the National Committee of the country of which that party is a national. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, or if the country of which the said party is a national has no National

16

*ICC Rules of Arbitration*

Committee, the Court shall be at liberty to choose any person whom it regards as suitable. The Secretariat shall inform the National Committee, if one exists, of the country of which such person is a national.

## Article 10
## Multiple Parties

1

Where there are multiple parties, whether as Claimant or as Respondent, and where the dispute is to be referred to three arbitrators, the multiple Claimants, jointly, and the multiple Respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 9.

2

In the absence of such a joint nomination and where all parties are unable to agree to a method for the constitution of the Arbitral Tribunal, the Court may appoint each member of the Arbitral Tribunal and shall designate one of them to act as chairman. In such case, the Court shall be at liberty to choose any person it regards as suitable to act as arbitrator, applying Article 9 when it considers this appropriate.

## Article 11
## Challenge of Arbitrators

1

A challenge of an arbitrator, whether for an alleged lack of independence or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.

2

For a challenge to be admissible, it must be sent by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.

1 7

*ICC Rules of Arbitration*

**3**

The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the Arbitral Tribunal to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

**Article 12
Replacement of Arbitrators**

**1**

An arbitrator shall be replaced upon his death, upon the acceptance by the Court of the arbitrator's resignation, upon acceptance by the Court of a challenge, or upon the request of all the parties.

**2**

An arbitrator shall also be replaced on the Court's own initiative when it decides that he is prevented *de jure* or *de facto* from fulfilling his functions, or that he is not fulfilling his functions in accordance with the Rules or within the prescribed time limits.

**3**

When, on the basis of information that has come to its attention, the Court considers applying Article 12(2), it shall decide on the matter after the arbitrator concerned, the parties and any other members of the Arbitral Tribunal have had an opportunity to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

**4**

When an arbitrator is to be replaced, the Court has discretion to decide whether or not to follow the original nominating process. Once reconstituted, and after having invited the parties to comment, the Arbitral Tribunal shall determine if and to what extent prior proceedings shall be repeated before the reconstituted Arbitral Tribunal.

*ICC Rules of Arbitration*

5

Subsequent to the closing of the proceedings, instead of replacing an arbitrator who has died or been removed by the Court pursuant to Articles 12(1) and 12(2), the Court may decide, when it considers it appropriate, that the remaining arbitrators shall continue the arbitration. In making such determination, the Court shall take into account the views of the remaining arbitrators and of the parties and such other matters that it considers appropriate in the circumstances.

## THE ARBITRAL PROCEEDINGS

### Article 13
### Transmission of the File to the Arbitral Tribunal

The Secretariat shall transmit the file to the Arbitral Tribunal as soon as it has been constituted, provided the advance on costs requested by the Secretariat at this stage has been paid.

### Article 14
### Place of the Arbitration

1

The place of the arbitration shall be fixed by the Court unless agreed upon by the parties.

2

The Arbitral Tribunal may, after consultation with the parties, conduct hearings and meetings at any location it considers appropriate unless otherwise agreed by the parties.

3

The Arbitral Tribunal may deliberate at any location it considers appropriate.

19

*ICC Rules of Arbitration*

### Article 15
### Rules Governing the Proceedings

1

The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.

2

In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

### Article 16
### Language of the Arbitration

In the absence of an agreement by the parties, the Arbitral Tribunal shall determine the language or languages of the arbitration, due regard being given to all relevant circumstances, including the language of the contract.

### Article 17
### Applicable Rules of Law

1

The parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate.

2

In all cases the Arbitral Tribunal shall take account of the provisions of the contract and the relevant trade usages.

3

The Arbitral Tribunal shall assume the powers of an *amiable compositeur* or decide *ex aequo et bono* only if the parties have agreed to give it such powers.

20

*ICC Rules of Arbitration*

### Article 18
### Terms of Reference; Procedural Timetable

**1**

As soon as it has received the file from the Secretariat, the Arbitral Tribunal shall draw up, on the basis of documents or in the presence of the parties and in the light of their most recent submissions, a document defining its Terms of Reference. This document shall include the following particulars:

a)  the full names and descriptions of the parties;

b)  the addresses of the parties to which notifications and communications arising in the course of the arbitration may be made;

c)  a summary of the parties' respective claims and of the relief sought by each party, with an indication to the extent possible of the amounts claimed or counterclaimed;

d)  unless the Arbitral Tribunal considers it inappropriate, a list of issues to be determined;

e)  the full names, descriptions and addresses of the arbitrators;

f)  the place of the arbitration; and

g)  particulars of the applicable procedural rules and, if such is the case, reference to the power conferred upon the Arbitral Tribunal to act as *amiable compositeur* or to decide *ex aequo et bono*.

**2**

The Terms of Reference shall be signed by the parties and the Arbitral Tribunal. Within two months of the date on which the file has been transmitted to it, the Arbitral Tribunal shall transmit to the Court the Terms of Reference signed by it and by the parties. The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

**3**

If any of the parties refuses to take part in the drawing up of the Terms of Reference or to sign the same, they shall

21

*ICC Rules of Arbitration*

be submitted to the Court for approval. When the Terms of Reference have been signed in accordance with Article 18(2) or approved by the Court, the arbitration shall proceed.

4

When drawing up the Terms of Reference, or as soon as possible thereafter, the Arbitral Tribunal, after having consulted the parties, shall establish in a separate document a provisional timetable that it intends to follow for the conduct of the arbitration and shall communicate it to the Court and the parties. Any subsequent modifications of the provisional timetable shall be communicated to the Court and the parties.

## Article 19
### New Claims

After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances.

## Article 20
### Establishing the Facts of the Case

1

The Arbitral Tribunal shall proceed within as short a time as possible to establish the facts of the case by all appropriate means.

2

After studying the written submissions of the parties and all documents relied upon, the Arbitral Tribunal shall hear the parties together in person if any of them so requests or, failing such a request, it may of its own motion decide to hear them.

3

The Arbitral Tribunal may decide to hear witnesses, experts appointed by the parties or any other person, in

22

the presence of the parties, or in their absence provided they have been duly summoned.

**4**

The Arbitral Tribunal, after having consulted the parties, may appoint one or more experts, define their terms of reference and receive their reports. At the request of a party, the parties shall be given the opportunity to question at a hearing any such expert appointed by the Tribunal.

**5**

At any time during the proceedings, the Arbitral Tribunal may summon any party to provide additional evidence.

**6**

The Arbitral Tribunal may decide the case solely on the documents submitted by the parties unless any of the parties requests a hearing.

**7**

The Arbitral Tribunal may take measures for protecting trade secrets and confidential information.

### Article 21
### Hearings

**1**

When a hearing is to be held, the Arbitral Tribunal, giving reasonable notice, shall summon the parties to appear before it on the day and at the place fixed by it.

**2**

If any of the parties, although duly summoned, fails to appear without valid excuse, the Arbitral Tribunal shall have the power to proceed with the hearing.

**3**

The Arbitral Tribunal shall be in full charge of the hearings, at which all the parties shall be entitled to be present. Save with the approval of the Arbitral Tribunal and the parties, persons not involved in the proceedings shall not be admitted.

*ICC Rules of Arbitration*

4

The parties may appear in person or through duly authorized representatives. In addition, they may be assisted by advisers.

## Article 22
### Closing of the Proceedings

1

When it is satisfied that the parties have had a reasonable opportunity to present their cases, the Arbitral Tribunal shall declare the proceedings closed. Thereafter, no further submission or argument may be made, or evidence produced, unless requested or authorized by the Arbitral Tribunal.

2

When the Arbitral Tribunal has declared the proceedings closed, it shall indicate to the Secretariat an approximate date by which the draft Award will be submitted to the Court for approval pursuant to Article 27. Any postponement of that date shall be communicated to the Secretariat by the Arbitral Tribunal.

## Article 23
### Conservatory and Interim Measures

1

Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate. The Arbitral Tribunal may make the granting of any such measure subject to appropriate security being furnished by the requesting party. Any such measure shall take the form of an order, giving reasons, or of an Award, as the Arbitral Tribunal considers appropriate.

2

Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim

*ICC Rules of Arbitration*

or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an Arbitral Tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the Arbitral Tribunal. Any such application and any measures taken by the judicial authority must be notified without delay to the Secretariat. The Secretariat shall inform the Arbitral Tribunal thereof.

## AWARDS

### Article 24
### Time Limit for the Award

1

The time limit within which the Arbitral Tribunal must render its final Award is six months. Such time limit shall start to run from the date of the last signature by the Arbitral Tribunal or by the parties of the Terms of Reference or, in the case of application of Article 18(3), the date of the notification to the Arbitral Tribunal by the Secretariat of the approval of the Terms of Reference by the Court.

2

The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

### Article 25
### Making of the Award

1

When the Arbitral Tribunal is composed of more than one arbitrator, an Award is given by a majority decision. If there be no majority, the Award shall be made by the chairman of the Arbitral Tribunal alone.

2 5

*ICC Rules of Arbitration*

**2**

The Award shall state the reasons upon which it is based.

**3**

The Award shall be deemed to be made at the place of the arbitration and on the date stated therein.

**Article 26**
**Award by Consent**

If the parties reach a settlement after the file has been transmitted to the Arbitral Tribunal in accordance with Article 13, the settlement shall be recorded in the form of an Award made by consent of the parties if so requested by the parties and if the Arbitral Tribunal agrees to do so.

**Article 27**
**Scrutiny of the Award by the Court**

Before signing any Award, the Arbitral Tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the Award and, without affecting the Arbitral Tribunal's liberty of decision, may also draw its attention to points of substance. No Award shall be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form.

**Article 28**
**Notification, Deposit and Enforceability of the Award**

**1**

Once an Award has been made, the Secretariat shall notify to the parties the text signed by the Arbitral Tribunal, provided always that the costs of the arbitration have been fully paid to the ICC by the parties or by one of them.

**2**

Additional copies certified true by the Secretary General shall be made available on request and at any time to the parties, but to no one else.

26

3

By virtue of the notification made in accordance with Paragraph 1 of this Article, the parties waive any other form of notification or deposit on the part of the Arbitral Tribunal.

4

An original of each Award made in accordance with the present Rules shall be deposited with the Secretariat.

5

The Arbitral Tribunal and the Secretariat shall assist the parties in complying with whatever further formalities may be necessary.

6

Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

### Article 29
### Correction and Interpretation of the Award

1

On its own initiative, the Arbitral Tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an Award, provided such correction is submitted for approval to the Court within 30 days of the date of such Award.

2

Any application of a party for the correction of an error of the kind referred to in Article 29(1), or for the interpretation of an Award, must be made to the Secretariat within 30 days of the receipt of the Award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the Arbitral Tribunal, the latter shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party, to submit any comments

*ICC Rules of Arbitration*

thereon. If the Arbitral Tribunal decides to correct or interpret the Award, it shall submit its decision in draft form to the Court not later than 30 days following the expiration of the time limit for the receipt of any comments from the other party or within such other period as the Court may decide.

3

The decision to correct or to interpret the Award shall take the form of an addendum and shall constitute part of the Award. The provisions of Articles 25, 27 and 28 shall apply *mutatis mutandis.*

## COSTS

**Article 30**
**Advance to Cover the Costs of the Arbitration**

1

After receipt of the Request, the Secretary General may request the Claimant to pay a provisional advance in an amount intended to cover the costs of arbitration until the Terms of Reference have been drawn up.

2

As soon as practicable, the Court shall fix the advance on costs in an amount likely to cover the fees and expenses of the arbitrators and the ICC administrative costs for the claims and counterclaims which have been referred to it by the parties. This amount may be subject to readjustment at any time during the arbitration. Where, apart from the claims, counterclaims are submitted, the Court may fix separate advances on costs for the claims and the counterclaims.

3

The advance on costs fixed by the Court shall be payable in equal shares by the Claimant and the Respondent. Any provisional advance paid on the basis of Article 30(1) will

*ICC Rules of Arbitration*

be considered as a partial payment thereof. However, any party shall be free to pay the whole of the advance on costs in respect of the principal claim or the counterclaim should the other party fail to pay its share. When the Court has set separate advances on costs in accordance with Article 30(2), each of the parties shall pay the advance on costs corresponding to its claims.

4

When a request for an advance on costs has not been complied with, and after consultation with the Arbitral Tribunal, the Secretary General may direct the Arbitral Tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims, or counterclaims, shall be considered as withdrawn. Should the party in question wish to object to this measure, it must make a request within the aforementioned period for the matter to be decided by the Court. Such party shall not be prevented, on the ground of such withdrawal, from reintroducing the same claims or counterclaims at a later date in another proceeding.

5

If one of the parties claims a right to a set-off with regard to either claims or counterclaims, such set-off shall be taken into account in determining the advance to cover the costs of arbitration in the same way as a separate claim insofar as it may require the Arbitral Tribunal to consider additional matters.

**Article 31**
**Decision as to the Costs of the Arbitration**

1

The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

*ICC Rules of Arbitration*

**2**

The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.

**3**

The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

## MISCELLANEOUS

**Article 32**
**Modified Time Limits**

**1**

The parties may agree to shorten the various time limits set out in these Rules. Any such agreement entered into subsequent to the constitution of an Arbitral Tribunal shall become effective only upon the approval of the Arbitral Tribunal.

**2**

The Court, on its own initiative, may extend any time limit which has been modified pursuant to Article 32(1) if it decides that it is necessary to do so in order that the Arbitral Tribunal or the Court may fulfil their responsibilities in accordance with these Rules.

**Article 33**
**Waiver**

A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of these Rules, or of any other rules applicable to the proceedings, any direction given by the Arbitral Tribunal,

*ICC Rules of Arbitration*

or any requirement under the arbitration agreement relating to the constitution of the Arbitral Tribunal, or to the conduct of the proceedings, shall be deemed to have waived its right to object.

### Article 34
### Exclusion of Liability

Neither the arbitrators, nor the Court and its members, nor the ICC and its employees, nor the ICC National Committees shall be liable to any person for any act or omission in connection with the arbitration.

### Article 35
### General Rule

In all matters not expressly provided for in these Rules, the Court and the Arbitral Tribunal shall act in the spirit of these Rules and shall make every effort to make sure that the Award is enforceable at law.

**APPENDIX I**
**STATUTES OF THE INTERNATIONAL**
**COURT OF ARBITRATION OF THE ICC**

**Article 1**
**Function**

1

The function of the International Court of Arbitration of the International Chamber of Commerce (the "Court") is to ensure the application of the Rules of Arbitration of the International Chamber of Commerce, and it has all the necessary powers for that purpose.

2

As an autonomous body, it carries out these functions in complete independence from the ICC and its organs.

3

Its members are independent from the ICC National Committees.

**Article 2**
**Composition of the Court**

The Court shall consist of a Chairman, Vice-Chairmen, and members and alternate members (collectively designated as members). In its work it is assisted by its Secretariat (Secretariat of the Court).

**Article 3**
**Appointment**

1

The Chairman is elected by the ICC World Council upon the recommendation of the Executive Board of the ICC.

2

The ICC World Council appoints the Vice-Chairmen of the Court from among the members of the Court or otherwise.

3 2

*Appendix I to the ICC Rules of Arbitration*

3

Its members are appointed by the ICC World Council on the proposal of National Committees, one member for each Committee.

4

On the proposal of the Chairman of the Court, the World Council may appoint alternate members.

5

The term of office of all members is three years. If a member is no longer in a position to exercise his functions, his successor is appointed by the World Council for the remainder of the term.

### Article 4
### Plenary Session of the Court

The Plenary Sessions of the Court are presided over by the Chairman or, in his absence, by one of the Vice-Chairmen designated by him. The deliberations shall be valid when at least six members are present. Decisions are taken by a majority vote, the Chairman having a casting vote in the event of a tie.

### Article 5
### Committees

The Court may set up one or more Committees and establish the functions and organization of such Committees.

### Article 6
### Confidentiality

The work of the Court is of a confidential nature which must be respected by everyone who participates in that work in whatever capacity. The Court lays down the rules regarding the persons who can attend the meetings of the Court and its Committees and who are entitled to have access to the materials submitted to the Court and its Secretariat.

33

*Appendix I to the ICC Rules of Arbitration*

**Article 7**
**Modification of the Rules of Arbitration**

Any proposal of the Court for a modification of the Rules is laid before the Commission on Arbitration before submission to the Executive Board and the World Council of the ICC for approval.

**APPENDIX II**
**INTERNAL RULES OF THE INTERNATIONAL**
**COURT OF ARBITRATION OF THE ICC**

**Article 1**
**Confidential Character of the Work of the**
**International Court of Arbitration**

1

The sessions of the Court, whether plenary or those of a
Committee of the Court, are open only to its members
and to the Secretariat.

2

However, in exceptional circumstances, the Chairman of
the Court may invite other persons to attend. Such
persons must respect the confidential nature of the work
of the Court.

3

The documents submitted to the Court, or drawn up by it
in the course of its proceedings, are communicated only
to the members of the Court and to the Secretariat and
to persons authorized by the Chairman to attend Court
sessions.

4

The Chairman or the Secretary General of the Court may
authorize researchers undertaking work of a scientific
nature on international trade law to acquaint themselves
with Awards and other documents of general interest,
with the exception of memoranda, notes, statements and
documents remitted by the parties within the framework
of arbitration proceedings.

5

Such authorization shall not be given unless the beneficiary
has undertaken to respect the confidential character of
the documents made available and to refrain from any
publication in their respect without having previously
submitted the text for approval to the Secretary General
of the Court.

35

*Appendix II to the ICC Rules of Arbitration*

6

The Secretariat will in each case submitted to arbitration under the Rules retain in the archives of the Court all Awards, Terms of Reference and decisions of the Court, as well as copies of the pertinent correspondence of the Secretariat.

7

Any documents, communications or correspondence submitted by the parties or the arbitrators may be destroyed unless a party or an arbitrator requests in writing within a period fixed by the Secretariat the return of such documents. All related costs and expenses for the return of those documents shall be paid by such party or arbitrator.

**Article 2**
**Participation of Members of the International Court of Arbitration in ICC Arbitration**

1

The Chairman and the members of the Secretariat of the Court may not act as arbitrators or as counsel in cases submitted to ICC arbitration.

2

The Court shall not appoint Vice-Chairmen or members of the Court as arbitrators. They may, however, be proposed for such duties by one or more of the parties, or pursuant to any other procedure agreed upon by the parties, subject to confirmation.

3

When the Chairman, a Vice-Chairman or a member of the Court or of the Secretariat is involved in any capacity whatsoever in proceedings pending before the Court, such person must inform the Secretary General of the Court upon becoming aware of such involvement.

4

Such person must refrain from participating in the discussions or in the decisions of the Court concerning

the proceedings and must be absent from the courtroom whenever the matter is considered.

5

Such person will not receive any material documentation or information pertaining to such proceedings.

### Article 3
### Relations between the Members of the Court and the ICC National Committees

1

By virtue of their capacity, the members of the Court are independent of the ICC National Committees which proposed them for appointment by the ICC World Council.

2

Furthermore, they must regard as confidential, vis-à-vis the said National Committees, any information concerning individual cases with which they have become acquainted in their capacity as members of the Court, except when they have been requested by the Chairman of the Court or by its Secretary General to communicate specific information to their respective National Committees.

### Article 4
### Committee of the Court

1

In accordance with the provisions of Article 1(4) of the Rules and Article 5 of its Statutes (Appendix I), the Court hereby establishes a Committee of the Court.

2

The members of the Committee consist of a Chairman and at least two other members. The Chairman of the Court acts as the Chairman of the Committee. If absent, the Chairman may designate a Vice-Chairman of the Court or, in exceptional circumstances, another member of the Court as Chairman of the Committee.

37

*Appendix II to the ICC Rules of Arbitration*

**3**

The other two members of the Committee are appointed by the Court from among the Vice-Chairmen or the other members of the Court. At each Plenary Session the Court appoints the members who are to attend the meetings of the Committee to be held before the next Plenary Session.

**4**

The Committee meets when convened by its Chairman. Two members constitute a quorum.

**5**

(a)    The Court shall determine the decisions that may be taken by the Committee.

(b)    The decisions of the Committee are taken unanimously.

(c)    When the Committee cannot reach a decision or deems it preferable to abstain, it transfers the case to the next Plenary Session, making any suggestions it deems appropriate.

(d)    The Committee's decisions are brought to the notice of the Court at its next Plenary Session.

### Article 5
### Court Secretariat

**1**

In case of absence, the Secretary General may delegate to the General Counsel and Deputy Secretary General the authority to confirm arbitrators, to certify true copies of Awards and to request the payment of a provisional advance, respectively provided for in Articles 9(2), 28(2) and 30(1) of the Rules.

**2**

The Secretariat may, with the approval of the Court, issue notes and other documents for the information of the parties and the arbitrators, or as necessary for the proper conduct of the arbitral proceedings.

*Appendix II to the ICC Rules of Arbitration*

**Article 6**
**Scrutiny of Arbitral Awards**

When the Court scrutinizes draft Awards in accordance
with Article 27 of the Rules, it considers, to the extent
practicable, the requirements of mandatory law at the
place of arbitration.

**APPENDIX III**
**ARBITRATION COSTS AND FEES**

**Article 1**
**Advance on Costs**

1

Each request to commence an arbitration pursuant to the Rules must be accompanied by an advance payment of US$ 2,500 on the administrative expenses. Such payment is non-refundable, and shall be credited to the Claimant's portion of the advance on costs.

2

The provisional advance fixed by the Secretary General according to Article 30(1) of the Rules shall normally not exceed the amount obtained by adding together the administrative expenses, the minimum of the fees (as set out in the scale hereinafter) based upon the amount of the claim and the expected reimbursable expenses of the Arbitral Tribunal incurred with respect to the drafting of the Terms of Reference. If such amount is not quantified, the provisional advance shall be fixed at the discretion of the Secretary General. Payment by the Claimant shall be credited to its share of the advance on costs fixed by the Court.

3

In general, after the Terms of Reference have been signed or approved by the Court and the provisional timetable has been established, the Arbitral Tribunal shall, in accordance with Article 30(4) of the Rules, proceed only with respect to those claims or counterclaims in regard to which the whole of the advance on costs has been paid.

4

The advance on costs fixed by the Court according to Article 30(2) of the Rules comprises the fees of the arbitrator or arbitrators (hereinafter referred to as "arbitrator"), any arbitration-related expenses of the arbitrator and the administrative expenses.

40

*Appendix III to the ICC Rules of Arbitration*

**5**

Each party shall pay in cash its share of the total advance on costs. However, if its share exceeds an amount fixed from time to time by the Court, a party may post a bank guarantee for this additional amount.

**6**

A party that has already paid in full its share of the advance on costs fixed by the Court may, in accordance with Article 30(3) of the Rules, pay the unpaid portion of the advance owed by the defaulting party by posting a bank guarantee.

**7**

When the Court has fixed separate advances on costs pursuant to Article 30(2) of the Rules, the Secretariat shall invite each party to pay the amount of the advance corresponding to its respective claim(s).

**8**

When, as a result of the fixing of separate advances on costs, the separate advance fixed for the claim of either party exceeds one half of such global advance as was previously fixed (in respect of the same claims and counterclaims that are the subject of separate advances), a bank guarantee may be posted to cover any such excess amount. In the event that the amount of the separate advance is subsequently increased, at least one half of the increase shall be paid in cash.

**9**

The Secretariat shall establish the terms governing all bank guarantees which the parties may post pursuant to the above provisions.

**10**

As provided in Article 30(2) of the Rules, the advance on costs may be subject to readjustment at any time during the arbitration, in particular to take into account fluctuations in the amount in dispute, changes in the amount of the estimated expenses of the arbitrator, or the evolving difficulty or complexity of arbitration proceedings.

*Appendix III to the ICC Rules of Arbitration*

11

Before any expertise ordered by the Arbitral Tribunal can be commenced, the parties, or one of them, shall pay an advance on costs fixed by the Arbitral Tribunal sufficient to cover the expected fees and expenses of the expert as determined by the Arbitral Tribunal. The Arbitral Tribunal shall be responsible for ensuring the payment by the parties of such fees and expenses.

## Article 2
## Costs and Fees

1

Subject to Article 31(2) of the Rules, the Court shall fix the fees of the arbitrator in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its discretion.

2

In setting the arbitrator's fees, the Court shall take into consideration the diligence of the arbitrator, the time spent, the rapidity of the proceedings, and the complexity of the dispute, so as to arrive at a figure within the limits specified or, in exceptional circumstances (Article 31(2) of the Rules), at a figure higher or lower than those limits.

3

When a case is submitted to more than one arbitrator, the Court, at its discretion, shall have the right to increase the total fees up to a maximum which shall normally not exceed three times the fees of one arbitrator.

4

The arbitrator's fees and expenses shall be fixed exclusively by the Court as required by the Rules. Separate fee arrangements between the parties and the arbitrator are contrary to the Rules.

5

The Court shall fix the administrative expenses of each arbitration in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its

42

*Appendix III to the ICC Rules of Arbitration*

discretion. In exceptional circumstances, the Court may fix the administrative expenses at a lower or higher figure than that which would result from the application of such scale, provided that such expenses shall normally not exceed the maximum amount of the scale. Further, the Court may require the payment of administrative expenses in addition to those provided in the scale of administrative expenses as a condition to holding an arbitration in abeyance at the request of the parties or of one of them with the acquiescence of the other.

6

If an arbitration terminates before the rendering of a final Award, the Court shall fix the costs of the arbitration at its discretion, taking into account the stage attained by the arbitral proceedings and any other relevant circumstances.

7

In the case of an application under Article 29(2) of the Rules, the Court may fix an advance to cover additional fees and expenses of the Arbitral Tribunal and may make the transmission of such application to the Arbitral Tribunal subject to the prior cash payment in full to the ICC of such advance. The Court shall fix at its discretion any possible fees of the arbitrator when approving the decision of the Arbitral Tribunal.

8

When an arbitration is preceded by an attempt at amicable resolution pursuant to the ICC ADR Rules, one half of the administrative expenses paid for such ADR proceedings shall be credited to the administrative expenses of the arbitration.

9

Amounts paid to the arbitrator do not include any possible value added taxes (VAT) or other taxes or charges and imposts applicable to the arbitrator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such charges or taxes is a matter solely between the arbitrator and the parties.

43

*Appendix III to the ICC Rules of Arbitration*

### Article 3
### ICC as Appointing Authority

Any request received for an authority of the ICC to act as appointing authority will be treated in accordance with the Rules of ICC as Appointing Authority in UNCITRAL or Other *Ad Hoc* Arbitration Proceedings and shall be accompanied by a non-refundable sum of US$ 2,500. No request shall be processed unless accompanied by the said sum. For additional services, ICC may at its discretion fix administrative expenses, which shall be commensurate with the services provided and shall not exceed the maximum sum of US$ 10,000.

### Article 4
### Scales of Administrative Expenses and Arbitrator's Fees

1

The Scales of Administrative Expenses and Arbitrator's Fees set forth below shall be effective as of 1 July 2003 in respect of all arbitrations commenced on or after such date, irrespective of the version of the Rules applying to such arbitrations.

2

To calculate the administrative expenses and the arbitrator's fees, the amounts calculated for each successive slice of the sum in dispute must be added together, except that where the sum in dispute is over US$ 80 million, a flat amount of US$ 88,800 shall constitute the entirety of the administrative expenses.

*Appendix III to the ICC Rules of Arbitration*

### A. ADMINISTRATIVE EXPENSES

| Sum in dispute (in US Dollars) | | | Administrative expenses[*] |
|---|---|---|---|
| up to | 50 000 | | $ 2 500 |
| from | 50 001 | to | 100 000 | 3.50% |
| from | 100 001 | to | 500 000 | 1.70% |
| from | 500 001 | to | 1 000 000 | 1.15% |
| from | 1 000 001 | to | 2 000 000 | 0.70% |
| from | 2 000 001 | to | 5 000 000 | 0.30% |
| from | 5 000 001 | to | 10 000 000 | 0.20% |
| from | 10 000 001 | to | 50 000 000 | 0.07% |
| from | 50 000 001 | to | 80 000 000 | 0.06% |
| over | 80 000 000 | | $ 88 800 |

*(*) For illustrative purposes only, the table on the following page indicates the resulting administrative expenses in US$ when the proper calculations have been made.*

### B. ARBITRATOR'S FEES

| Sum in dispute (in US Dollars) | | | Fees[**] | |
|---|---|---|---|---|
| | | | minimum | maximum |
| up to | 50 000 | | $ 2 500 | 17.00% |
| from | 50 001 | to | 100 000 | 2.00% | 11.00% |
| from | 100 001 | to | 500 000 | 1.00% | 5.50% |
| from | 500 001 | to | 1 000 000 | 0.75% | 3.50% |
| from | 1 000 001 | to | 2 000 000 | 0.50% | 2.75% |
| from | 2 000 001 | to | 5 000 000 | 0.25% | 1.12% |
| from | 5 000 001 | to | 10 000 000 | 0.10% | 0.616% |
| from | 10 000 001 | to | 50 000 000 | 0.05% | 0.193% |
| from | 50 000 001 | to | 80 000 000 | 0.03% | 0.136% |
| from | 80 000 001 | to | 100 000 000 | 0.02% | 0.112% |
| over | 100 000 000 | | 0.01% | 0.056% |

*(**) For illustrative purposes only, the table on the following page indicates the resulting range of fees when the proper calculations have been made.*

4 5

*Appendix III to the ICC Rules of Arbitration*

| SUM IN DISPUTE (in US Dollars) | | A. ADMINISTRATIVE EXPENSES(*) (in US Dollars) | B. ARBITRATOR'S FEES(**) (in US Dollars) | |
|---|---|---|---|---|
| | | | Minimum | Maximum |
| | | | | 17.00% of amount in dispute |
| up to | 50 000 | 2 500 | 2 500 | |
| from 50 001 to 100 000 | | 2 500 + 3.50% of amt. over 50 000 | 2 500 + 2.00% of amt. over 50 000 | 8 500 + 11.00% of amt. over 50 000 |
| from 100 001 to 500 000 | | 4 250 + 1.70% of amt. over 100 000 | 3 500 + 1.00% of amt. over 100 000 | 14 000 + 5.50% of amt. over 100 000 |
| from 500 001 to 1 000 000 | | 11 050 + 1.15% of amt. over 500 000 | 7 500 + 0.75% of amt. over 500 000 | 36 000 + 3.50% of amt. over 500 000 |
| from 1 000 001 to 2 000 000 | | 16 800 + 0.70% of amt. over 1 000 000 | 11 250 + 0.50% of amt. over 1 000 000 | 53 500 + 2.75% of amt. over 1 000 000 |
| from 2 000 001 to 5 000 000 | | 23 800 + 0.30% of amt. over 2 000 000 | 16 250 + 0.25% of amt. over 2 000 000 | 81 000 + 1.12% of amt. over 2 000 000 |
| from 5 000 001 to 10 000 000 | | 32 800 + 0.20% of amt. over 5 000 000 | 23 750 + 0.10% of amt. over 5 000 000 | 114 800 + 0.616% of amt. over 5 000 000 |
| from 10 000 001 to 50 000 000 | | 42 800 + 0.07% of amt. over 10 000 000 | 28 750 + 0.05% of amt. over 10 000 000 | 145 400 + 0.193% of amt. over 10 000 000 |
| from 50 000 001 to 80 000 000 | | 70 800 + 0.06% of amt. over 50 000 000 | 48 750 + 0.03% of amt. over 50 000 000 | 222 600 + 0.136% of amt. over 50 000 000 |
| from 80 000 001 to 100 000 000 | | 88 800 | 57 750 + 0.02% of amt. over 80 000 000 | 263 400 + 0.112% of amt. over 80 000 000 |
| over | 100 000 000 | 88 800 | 61 750 + 0.01% of amt. over 100 000 000 | 285 800 + 0.056% of amt. over 100 000 000 |

(*)(**) See preceding page

46