# EXHIBIT M

LEXSEE

**QUALCOMM INCORPORATED and SNAPTRACK, INC., Plaintiffs-Appellees, v. NOKIA CORPORATION and NOKIA, INC., Defendants-Appellants.**

**2006-1317**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**2006 U.S. App. LEXIS 25942**

**October 20, 2006, Decided**

**PRIOR HISTORY:** [*1] Appealed from: United States District Court for the Southern District of California. Senior Judge Rudi M. Brewster.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellee patent holder sued appellant wireless telephone manufacturers, alleging patent infringement. The United States District Court for the Southern District of California denied the manufacturers' motions to dismiss and to stay pursuant to 9 U.S.C.S. § 3, but granted the motion for a more definite statement. The manufacturers appealed.

**OVERVIEW:** The issue was how to reconcile the parties' agreement to delegate arbitrability decisions to an arbitrator with the requirements of 9 U.S.C.S. § 3. If the district court concluded that the parties clearly and unmistakably intended to delegate the power to an arbitrator, then it was to inquire as to whether the party's assertion of arbitrability was wholly groundless. If the district court concluded that the parties did not clearly and unmistakably intend to delegate arbitrability decisions to an arbitrator, it was to undertake a full arbitrability inquiry. Here, the parties clearly and unmistakably intended to delegate arbitrability questions to an arbitrator as evidenced by their incorporation of the American Arbitration Association Rules into their agreement. The remaining question was whether the manufacturers' assertions that its estoppel and license defenses arose out of or related to the agreement were wholly groundless. On remand, the district court was to determine whether the manufacturers' assertions of arbitrability under the agreement were wholly groundless and, if not, stay the trial to permit an arbitrator to rule on the arbitrability of those issues.

**OUTCOME:** The order denying the manufacturers' motion to stay the patent infringement action was vacated. The case was remanded to the district court.

**CORE TERMS:** arbitrability, arbitrator, arbitration, groundless, delegate, motion to stay, unmistakably, license, referable, arbitrable, infringement, technology, licensed, patent, AAA Rules, parties agreed, standard of review, estoppel defense, power to decide, unmistakable, telecommunications, arbitrate, judicial determination, arbitration agreement, de novo review, undertake, definite, intend, abuse of discretion, pending arbitration

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration*
[HN1] See 9 U.S.C.S. § 3.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration*
[HN2] The Federal Arbitration Act (FAA), 9 U.S.C.S. § 1 et seq., is a congressional declaration of a liberal policy favoring arbitration. 9 U.S.C.S. § 3 of the FAA provides for a stay of legal proceedings whenever the issues in a case are within the reach of an arbitration agreement. Pursuant to the statutory language, if a district court is satisfied that the issue involved in the suit is arbitrable, then it must stay the trial of the action.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration*

2006 U.S. App. LEXIS 25942, *

[HN3] The United States Court of Appeals for the Federal Circuit concludes that in order to be satisfied of the arbitrability of an issue pursuant to 9 U.S.C.S. § 3, the district court should first inquire as to who has the primary power to decide arbitrability under the parties' agreement. If the court concludes that the parties did not clearly and unmistakably intend to delegate arbitrability decisions to an arbitrator, the general rule that the question of arbitrability is for judicial determination applies and the court should undertake a full arbitrability inquiry in order to be satisfied that the issue involved is referable to arbitration. If, however, the court concludes that the parties to the agreement did clearly and unmistakably intend to delegate the power to decide arbitrability to an arbitrator, then the court should perform a second, more limited inquiry to determine whether the assertion of arbitrability is wholly groundless. If the court finds that the assertion of arbitrability is not wholly groundless, then it should stay the trial of the action pending a ruling on arbitrability by an arbitrator. If the district court finds that the assertion of arbitrability is wholly groundless, then it may conclude that it is not satisfied under § 3, and deny the moving party's request for a stay.

*Patent Law > Jurisdiction & Review > Standards of Review > General Overview*
[HN4] The United States Court of Appeals for the Federal Circuit applies regional circuit law to questions of arbitrability that are not intimately involved in the substance of enforcement of a patent right.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN5] The United States Court of Appeals for the Ninth Circuit applies both de novo review and abuse of discretion review to district court decisions with respect to arbitration. A denial of a stay of proceedings pending arbitration will only be overturned when there has been an abuse of discretion. However, in order to determine whether a district court abused its discretion, it is necessary to decide whether there were any claims to be arbitrated. A determination of the arbitrability of a dispute, like the interpretation of any contractual provision, is subject to de novo review.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*

[HN6] Generally, the question of arbitrability is undeniably an issue for judicial determination. However, the question of who has the primary power to decide arbitrability turns upon what the parties agreed about that matter. When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification) should apply ordinary state-law principles that govern the formation of contracts. The added qualification is that courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
[HN7] California law is consistent with federal law on the question of who decides disputes over arbitrability. Thus, unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration*
[HN8] A district court's inquiry in order to be satisfied pursuant to 9 U.S.C.S. § 3 begins with the question of who has the power to determine the arbitrability of a dispute between the parties. If the court concludes that the parties clearly and unmistakably intended to delegate the power to an arbitrator, then the court should also inquire as to whether the party's assertion of arbitrability is wholly groundless. If, however, the court concludes that the parties did not clearly and unmistakably intend to delegate arbitrability decisions to an arbitrator, the general rule that the question of arbitrability is for judicial determination applies and the court itself should then undertake a full arbitrability inquiry in order to be satisfied that the issue involved is referable to arbitration.

COUNSEL: Christian E. Mammen, Day, Casebeer, Madrid & Batchelder LLP, of Cupertino, California, argued for plaintiffs-appellees. With him on the brief were James R. Batchelder, and Craig H. Casebeer. Of counsel on the brief were Louis M. Lupin, Alexander H. Rogers, and Roger Martin, QUALCOMM Incorporated, of San Diego, California; Gerald L. McMahon, and David J. Zubkoff, Seltzer, Caplan, McMahon, Vitek, of San Diego, California.

Kathleen M. Sullivan, Quinn, Emanuel, Urquhart, Oliver & Hedges LLP, of Redwood Shores, California, argued for defendants-appellants. Of counsel was Frederick A.

2006 U.S. App. LEXIS 25942, *

Lorig, of Los Angeles, California. On the brief were Patrick J. Flinn, Keith E. Broyles, and John D. Haynes, Alston & Bird, LLP of Atlanta, Georgia.

**JUDGES:** Before NEWMAN, SCHALL, and PROST, Circuit Judges. Opinion for the court filed by Circuit Judge PROST. NEWMAN, Circuit Judge, dissents. Circuit Judge Newman would affirm the judgment of the district court.

**OPINION BY:** PROST

**OPINION:** PROST, Circuit Judge.

Appellants, Nokia Corporation and Nokia, Inc. (collectively, "Nokia"), appeal the March 14, 2006 Order [*2] of the United States District Court for the Southern District of California denying Nokia's motion to stay litigation with appellees, Qualcomm Inc. and SnapTrack, Inc. (collectively, "Qualcomm"), pending arbitration. Qualcomm Inc. v. Nokia Corp., No. 05-CV-2063 B (S.D. Cal. Mar. 14, 2006) ("Order"). Because the district court did not perform the correct inquiry as we discuss herein, we vacate the district court's March 14, 2006 Order with respect to its denial of Nokia's motion to stay, and remand for the court to perform the inquiry in the first instance.

## I. BACKGROUND

Wireless telecommunications require mobile stations and infrastructure equipment that conform to a common set of standards. Two of the primary mobile telecommunications standards are the Code Division Multiple Access standard ("CDMA") and the Global System for Mobile Communications standard ("GSM"). Qualcomm pioneered CDMA technology and consequently holds and licenses patents related to that technology. Nokia manufactures wireless telephone handsets and telecommunications infrastructure equipment used by wireless carriers.

In July 2001, Qualcomm and Nokia entered into a "Subscriber Unit and Infrastructure [*3] Equipment License Agreement" (the "2001 Agreement") whereby Qualcomm granted Nokia a non-exclusive license to some of Qualcomm's patents, permitting Nokia to make and sell products that incorporate CDMA technology. The 2001 Agreement contains an arbitration clause which covers "[a]ny dispute, claim or controversy arising out of or relating to this Agreement, or the breach or validity hereof" and dictates that any such dispute "shall be settled by arbitration in accordance with the arbitration rules of the American Arbitration Association (the 'AAA Rules')." 2001 Agreement at P22. The 2001 Agreement also specifies that it shall be construed in accordance with California law. Id.

On November 4, 2005, Qualcomm sued Nokia for patent infringement in the United States District Court for the Southern District of California, asserting in its Complaint that Nokia infringed twelve of Qualcomm's patents. After Qualcomm filed its Complaint, Nokia initiated an arbitration proceeding against Qualcomm on December 20, 2005. As amended, Nokia's Arbitration Demand asked an arbitrator to resolve its dispute with Qualcomm pertaining to two issues relevant to this appeal: (1) Nokia's estoppel defense, [*4] in which it asserted that Qualcomm engaged in misleading conduct that caused Nokia to believe that Qualcomm did not hold issued or pending patents it intended to assert against Nokia's GSM products, and (2) Nokia's license defense, in which it sought a declaration that it had a valid and enforceable license to make, import, use, sell, offer to sell, lease, or otherwise dispose of products that incorporate CDMA technology and that Qualcomm's claims of infringement against those products should be barred by the 2001 Agreement. Even though these two issues were not directly raised in Qualcomm's Complaint, Nokia sought to assert them as affirmative defenses to Qualcomm's infringement claims. n1

> n1 As Nokia explains it, if Nokia wanted to assert the affirmative defenses in the district court action, it was required to raise them in its Answer. However, if Nokia asserted them in its Answer, it was concerned that it could be accused of waiving the right (should it exist) to arbitrate them. Thus, it appears that Nokia first raised its arbitrability contentions with respect to those defenses in its motion to stay.

Also in response to Qualcomm's Complaint, Nokia filed two [*5] motions in the district court: (1) a motion to stay the district court action pursuant to section 3 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 3, and (2) a motion to dismiss or, in the alternative, for a more definite statement. On March 14, 2006, the district court denied Nokia's motions to stay and to dismiss, but granted in part Nokia's alternative request for a more definite statement. In addressing Nokia's motion to stay, the court found that

> [t]he estoppel. . . defense[] is not in the instant case. The instant case involves allegations that Nokia infringed twelve patents in suit. The products that are listed in the complaint are non-CDMA products. As such, the Court finds that the patent infringement issues in the instant action are not even remotely connected to the 2001

2006 U.S. App. LEXIS 25942, *

Agreement that deals with CDMA products and are not referable to arbitration. Therefore, the Court is not satisfied under 9 U.S.C. § 3 that the issues involved in the instant case are referable to arbitration

. . . .

Order, slip op. at 3.

Thereafter, Qualcomm amended its Complaint in response to the court's order for a more definite [*6] statement, limiting its infringement claims to Nokia's GSM-only products, as opposed to its CDMA products. Paragraphs 23 and 24 of Qualcomm's First Amended Complaint assert:

> 23. On information and belief, Nokia manufacturers, uses, sells, offers for sale, and/or imports into the United States products that comply with the GSM family of standards and technical specifications promulgated, published and/or adopted by the 3rd Generation Partnership Project . . . .
>
> 24. Nokia's Products accused of infringement by this Complaint exclude any Nokia product that is licensed under the [2001] Agreement dated July 2, 2001 . . . .

Qualcomm's First Am. Compl. at PP23-24.

Nokia, however, maintains that paragraph 23 contains allegations directed to standards promulgated by the 3rd Generation Partnership Project, which promulgates standards for UMTS, n2 a technology that Nokia believes is licensed under the 2001 Agreement. Thus, according to Nokia, because paragraph 23 accuses UMTS products of infringement as well as GSM products, but paragraph 24 excludes products licensed under the 2001 Agreement, there is a dispute as to which Nokia products are licensed under the 2001 Agreement. [*7]

> n2 UMTS refers to another telecommunications standard called Universal Mobile Telecommunications Systems.

Following the court's denial of its motion to stay pending arbitration, Nokia filed a motion to stay pending appeal to this court, which the district court granted.

Because the district court's jurisdiction was based on 28 U.S.C. § 1338, the district court's order is appealable under 28 U.S.C. § 1292(a)(1), and we have appellate jurisdiction pursuant to 28 U.S.C. § 1292(c)(1). See Microchip Tech. Inc. v. U.S. Philips Corp., 367 F.3d 1350, 1354-55 (Fed. Cir. 2004) (concluding that section 16 of the FAA renders appealable under § 1292(a)(1) the denial of an injunctive order, i.e., a motion to compel arbitration).

II. DISCUSSION

Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, provides:

> [HN1] If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue [*8] involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

[HN2] The FAA "is a congressional declaration of a liberal policy favoring arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). Section 3 of the FAA provides for a stay of legal proceedings whenever the issues in a case are within the reach of an arbitration agreement. See In re Complaint of Hornbeck Offshore Corp., 981 F.2d 752, 754 (5th Cir. 1993). Pursuant to the statutory language, if a district court is "satisfied" that the issue involved in the suit is arbitrable, then it must stay the trial of the action. See 9 U.S.C. § 3 (2000).

The dispute between the parties is based on the language, "the court . . . upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall. [*9] . . stay the trial of the action. . . ." Id. Specifically, this case raises the question of how to reconcile an agreement to delegate arbitrability decisions to an arbitrator in accordance with the language of section 3 of the FAA, which specifies that the district court be "satisfied" as to the arbitrability of an issue before ordering a stay. Thus, we must neces-

sarily determine what inquiry the district court should perform in order to be "satisfied" under section 3.

Nokia asserts that the court's inquiry is limited to determining whether the 2001 Agreement clearly and unmistakably evidences the parties' intent to delegate arbitrability decisions to an arbitrator. According to Nokia, if the court determines that the parties so intended, it must stay "the trial of the action" until an arbitrator rules on the arbitrability of the disputed issue. n3 Qualcomm, however, advocates a more detailed inquiry by the district court beyond the question of whether the parties intended to have arbitrability issues determined by an arbitrator. Qualcomm's position would essentially allow the court to rule on the arbitrability of an issue in order to be "satisfied" that the issue is actually [*10] arbitrable. Thus, we must determine whether the district court performed the correct inquiry when it determined that Nokia's affirmative defenses did not raise issues that are referable to arbitration.

> n3 While Nokia's arguments in its briefs were limited to the first inquiry discussed above, at oral argument counsel for Nokia agreed that if an assertion of arbitrability were "wholly groundless," or its equivalent, the district court would not be required to stay the trial of the action even though the parties' had clearly and unmistakably intended to delegate arbitrability decisions to an arbitrator.

[HN3] We conclude that in order to be "satisfied" of the arbitrability of an issue pursuant to section 3 of the FAA, the district court should first inquire as to who has the primary power to decide arbitrability under the parties' agreement. If the court concludes that the parties did not clearly and unmistakably intend to delegate arbitrability decisions to an arbitrator, the general rule that the "question of arbitrability . . . is . . . for judicial determination" applies and the court should undertake a full arbitrability inquiry in order to be "satisfied" that the [*11] issue involved is referable to arbitration. AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986). If, however, the court concludes that the parties to the agreement did clearly and unmistakably intend to delegate the power to decide arbitrability to an arbitrator, then the court should perform a second, more limited inquiry to determine whether the assertion of arbitrability is "wholly groundless." See Dream Theater, Inc. v. Dream Theater, 124 Cal. App. 4th 547, 21 Cal. Rptr. 3d 322, 326 (Cal. Ct. App. 2004). If the court finds that the assertion of arbitrability is not "wholly groundless," then it should stay the trial of the action pending a ruling on

arbitrability by an arbitrator. If the district court finds that the assertion of arbitrability is "wholly groundless," then it may conclude that it is not "satisfied" under section 3, and deny the moving party's request for a stay.

A. Standard of Review

The parties dispute what the appropriate standard of review is in this case. While both parties agree that Ninth Circuit law applies, Nokia argues that the Ninth Circuit applies a de novo standard, while Qualcomm argues that it applies [*12] an abuse of discretion standard.

[HN4] This court applies regional circuit law to questions of arbitrability that are not "intimately involved in the substance of enforcement of a patent right." Microchip Tech., 367 F.3d at 1356 (quoting Flex-Foot, Inc. v. CRP, Inc., 238 F.3d 1362, 1365 (Fed. Cir. 2001)). Because the questions of arbitrability in this case are not "intimately involved in . . . a patent right," we look to the law of the regional circuit, in this case the United States Court of Appeals for the Ninth Circuit, to determine the applicable standard of review.

[HN5] The Ninth Circuit applies both de novo review and abuse of discretion review to district court decisions with respect to arbitration. "A denial of a stay of proceedings pending arbitration will only be overturned when there has been an abuse of discretion." Alascom, Inc. v. ITT N. Elec. Co., 727 F.2d 1419, 1422 (9th Cir. 1984) (citing Mediterranean Enters., Inc. v. Ssangyong, 708 F.2d 1458 (9th Cir. 1983)). However, "[i]n order to determine whether [a] district court abused its discretion, it is necessary to decide whether there were any claims to be [*13] arbitrated." Id. "A determination of the arbitrability of a dispute, like the interpretation of any contractual provision, is subject to de novo review." Id. (citing Mediterranean Enters., 708 F.2d at 1462-63).

In this case, however, the issue we confront is not a determination of the arbitrability of a dispute, but rather whether the district court performed the correct inquiry in order to determine whether it was "satisfied" that the issue involved in the case was referable to arbitration pursuant to section 3 of the FAA. Further, it does not appear that the Ninth Circuit has explicitly addressed the standard of review for such decisions under section 3, and neither party has pointed us to a Ninth Circuit case that addresses a denial of a motion to stay in this context. At least two other circuits, however, have directly addressed the standard of review of a district court's order denying a motion to stay under section 3 of the FAA and have applied de novo review. See FSP, Inc. v. Societe Generale, 350 F.3d 27, 30 (2d Cir. 2003) ("We review a district court's denial of a motion to stay an action in favor of arbitration de novo."); [*14] In re Complaint of Hornbeck, 981 F.2d at 754 (reviewing de novo the dis-

trict court's order denying the defendant's motion for stay pursuant to section 3 of the FAA).

Regardless of which standard of review the Ninth Circuit would apply, n4 we conclude that the district court erred because instead of undertaking the inquiry we describe herein, the court undertook a full arbitrability analysis as if the parties had not clearly and unmistakably delegated arbitrability decisions to an arbitrator.

> N4 Because we conclude infra that the district court's inquiry involves both legal and factual inquiries, the Ninth Circuit's standard of review might well be de novo for the contract interpretation inquiry, namely whether the parties clearly and unmistakably intended to delegate arbitrability decisions to an arbitrator, see Alascom. 727 F.2d at 1422 (comparing appellate review of the arbitrability of a dispute to appellate review of an interpretation of a contractual provision), and abuse of discretion when reviewing the court's "wholly groundless" inquiry.

B. Analysis

First, we must determine who has the primary power to decide arbitrability [*15] in this case. [HN6] Generally, the "question of arbitrability . . . is undeniably an issue for judicial determination." AT&T Techs.. 475 U.S. at 649. However, in First Options of Chicago, Inc. v. Kaplan, the United States Supreme Court held that "the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." 514 U.S. 938. 943. 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995). The Court then stated that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts." Id. at 944. However, the added qualification is that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." Id. (quoting AT&T Techs.. 475 U.S. at 649).

In this case, the 2001 Agreement between the parties clearly states that it "shall be governed by and construed and enforced in accordance with the laws of the State of California . . . ." 2001 Agreement at P22. [*16] [HN7] "California law is consistent with federal law on the question of who decides disputes over arbitrability." Dream Theater. 21 Cal. Rptr. 3d at 326. Thus, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." Id.

The 2001 Agreement incorporates the AAA Rules as follows: "Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach or validity hereof, shall be settled by arbitration in accordance with the arbitration rules of the American Arbitration Association (the 'AAA Rules')." 2001 Agreement at P22. Article 15 of the AAA Rules provides that "[t]he tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." In Contec Corp. v. Remote Solution Co., the Second Circuit held that because the agreement at issue in that case incorporated the AAA Rules and because those rules give the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope [*17] or validity of the arbitration agreement," the parties' incorporation of those rules evidences a clear and unmistakable intent to delegate the determination of arbitrability to an arbitrator. 398 F.3d 205. 208 (2d Cir. 2005). We agree with the Second Circuit's analysis in Contec and likewise conclude that the 2001 Agreement, which incorporates the AAA Rules containing the same language as that in Contec, clearly and unmistakably shows the parties' intent to delegate the issue of determining arbitrability to an arbitrator.

Because we conclude that the 2001 Agreement shows the parties' clear and unmistakable intent to delegate arbitrability decisions to an arbitrator, the next inquiry is whether Nokia's assertions of arbitrability are "wholly groundless." n5 In this case, Nokia asserts that it has raised two issues that are arbitrable. The first is an estoppel defense that, as an affirmative defense, Nokia would be required to plead in an answer to Qualcomm's Complaint. Specifically, Nokia asserts that Qualcomm's conduct during the negotiations leading to the 2001 Agreement deliberately led Nokia to believe that Qualcomm did not hold patents related to GSM-based [*18] technology and therefore Nokia did not need to acquire a license for GSM-based products. Further, Nokia argues that its estoppel defense clearly "arises out of or relate[s] to" the 2001 Agreement. Second, Nokia asserts that there is an issue with respect to the scope of the license granted in the 2001 Agreement. Specifically, Nokia points to Qualcomm's First Amended Complaint which, in paragraph 24, excludes any Nokia product licensed under the 2001 Agreement. Nokia thus asserts that any defense based on its license under the 2001 Agreement is also arbitrable.

> n5 We believe that the "wholly groundless" inquiry allows the district court to determine whether it is "satisfied" pursuant to section 3 while also preventing a party from asserting any claim at all, no matter how divorced from the par-

2006 U.S. App. LEXIS 25942, *

ties' agreement, to force an arbitration. In California, for example, even if the court finds that the parties' intent was clear and unmistakable that they delegated arbitrability decisions to an arbitrator, the court may make a second more limited inquiry to determine whether a claim of arbitrability is "wholly groundless." Dream Theater, 21 Cal. Rptr. 3d at 326 (citing McCarroll v. L.A. County Dist. Council of Carpenters, 49 Cal. 2d 45, 315 P.2d 322 (Cal. 1957)).

[*19]

Qualcomm first responds to Nokia's estoppel defense argument by pointing out that the 2001 Agreement covers CDMA products, not GSM-based products. Further, it asserts that Nokia knew it was not negotiating a GSM license and that therefore the estoppel claim does not "aris[e] out of or relat[e]" to the 2001 Agreement. Second, Qualcomm asserts that Nokia's license defense is moot because its First Amended Complaint expressly excludes "any Nokia product that is licensed under" the 2001 Agreement. It also alleges that Nokia raised this issue in its Amended Arbitration Demand in order to artificially keep the arbitration alive and stall the district court action.

Although we recognize that the 2001 Agreement contains a broad arbitration clause, which includes"[a]ny dispute, claim or controversy arising out of or relating to this Agreement, or the breach or validity hereof," 2001 Agreement at P22, and that Nokia's estoppel defense is based on events that transpired during the negotiations surrounding the 2001 Agreement and may, with a favorable ruling, directly affect Qualcomm's infringement case, the district court has not yet had the opportunity to apply the "wholly groundless" [*20] test to either of Nokia's defenses. n6 The transcript of the district court's March 13, 2006 hearing reveals that the district court did not perform a "wholly groundless" inquiry. Rather, the court identified the issue as though it was required to rule on the arbitrability of Nokia's defenses itself: "As I understand the issue that I'm going to have to handle, with respect to that issue, is whether or not the issue is arbitrable in the arbitration. That is to say that the facts of this case, whether they are within the contract, or the CDMA cross licensing." Tr. of Mot. Hr'g at 3:12-16, Qualcomm Inc. v. Nokia Corp., No. 05-CV-2063 B (S.D. Cal. Mar. 13, 2006).

n6 Because Nokia added the license defense to its Arbitration Demand by amendment, the district court's Order did not address it.

On remand, in undertaking the "wholly groundless" inquiry, the district court should look to the scope of the arbitration clause and the precise issues that the moving party asserts are subject to arbitration. Because any inquiry beyond a "wholly groundless" test would invade the province of the arbitrator, whose arbitrability judgment the parties agreed to abide by in the [*21] 2001 Agreement, the district court need not, and should not, determine whether Nokia's defenses are in fact arbitrable. If the assertion of arbitrability is not "wholly groundless," the district court should conclude that it is "satisfied" pursuant to section 3.

CONCLUSION

[HN8] A district court's inquiry in order to be "satisfied" pursuant to section 3 of the FAA begins with the question of who has the power to determine the arbitrability of a dispute between the parties. If the court concludes that the parties clearly and unmistakably intended to delegate the power to an arbitrator, then the court should also inquire as to whether the party's assertion of arbitrability is "wholly groundless." If, however, the court concludes that the parties did not clearly and unmistakably intend to delegate arbitrability decisions to an arbitrator, the general rule that the "question of arbitrability . . . is . . . for judicial determination" applies and the court itself should then undertake a full arbitrability inquiry in order to be "satisfied" that the issue involved is referable to arbitration.

In this case, the parties clearly and unmistakably intended to delegate arbitrability questions to [*22] an arbitrator as evidenced by their incorporation of the AAA Rules into the 2001 Agreement. The remaining question is whether Nokia's assertions that its estoppel and license defenses "aris[e] out of or relat[e] to" the 2001 Agreement are "wholly groundless." On remand, the court should not undertake to determine whether Nokia's assertions are in fact arbitrable, but rather should merely determine whether Nokia's assertions of arbitrability under the 2001 Agreement are "wholly groundless" and, if not, stay the trial of the action to permit an arbitrator to rule on the arbitrability of those issues.

Accordingly, we vacate the district court's March 14, 2006 Order with respect to its denial of Nokia's motion to stay and remand to the district court.

COSTS

Each party shall bear its own costs.

VACATED and REMANDED

NEWMAN, Circuit Judge, dissents. Circuit Judge Newman would affirm the judgment of the district court.

# EXHIBIT N

LEXSEE

**ORIENTAL REPUBLIC OF URUGUAY, et al., Plaintiffs, -against- CHEMICAL OVERSEAS HOLDINGS, INC., et al., Defendants. CHEMICAL OVERSEAS HOLDINGS, INC., et al., Petitioners, -against- REPUBLICA ORIENTAL DEL URUGUAY, et al., Respondents.**

**05 Civ. 6151 (WHP), 05 Civ. 6154 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2006 U.S. Dist. LEXIS 2261**

**January 24, 2006, Decided**

**PRIOR HISTORY:** Chem. Overseas Holdings. Inc. v. Republica Oriental del Uru.. 2005 U.S. Dist. LEXIS 8904 (S.D.N.Y.. May 5. 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a foreign republic, a bank, and a banking assets recovery fund, sued defendants, the bank's shareholders and directors, alleging fraud, breach of fiduciary duty, conversion, and wrongful diversion of corporate assets. Following removal, the shareholders and directors commenced a separate action against the republic, bank, and fund seeking to compel arbitration of their claims. The republic, bank, and fund moved to remand their action.

**OVERVIEW:** The shareholders and directors claimed that the arbitration clause in the parties' subscription and investor rights agreement required that the arbitrability question be decided by an arbitrator. The court initially held that, pursuant to 9 U.S.C.S. § 206, it would compel the arbitration of the question of whether the claims of the republic, bank, and fund in the instant action and in a foreign conciliation proceeding should be resolved in arbitration. The court found that the arbitration clause in the parties' agreement reflected the parties' intention to submit the question of arbitrability to arbitration because the arbitration clause was broad and required arbitration of any disagreement or dispute arising out of or in connection with the agreement, and that the arbitration clause required that arbitration be conducted under the Rules of Arbitration of the International Chamber of Commerce. The court then held that the republic, bank, and fund were not entitled to a remand of their action because a stay pending arbitration pursuant to 9 U.S.C.S.

§ 3 was more appropriate as the results of the arbitration could present additional issues bearing on its jurisdiction.

**OUTCOME:** The motion and petition to compel arbitration filed by the shareholders and directors were granted. The motion to remand filed by the republic, bank, and fund was denied without prejudice. The action was stayed pending arbitration.

**CORE TERMS:** arbitration, arbitrability, arbitration clause, shareholders, arbitrate, arbitrator, compel arbitration, notice, summons, unmistakable, arbitrable, arbitral, parties agreed, arbitration agreement, encompass, quotation, tribunal, removal, Rules of Arbitration, ICC Rules, agreement to arbitrate, intentional misconduct, collectively, breach of fiduciary duty, scope of arbitration, pending arbitration, retain jurisdiction, merits-related, incorporation, presumptively

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
[HN1] When a party to a litigation raises the specter of arbitration, the parties' dispute over the merits temporarily yields to two threshold issues: (1) whether the claims should be resolved in arbitration; and (2) who should decide whether arbitration is the proper forum, a court or the arbitral tribunal itself.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*

2006 U.S. Dist. LEXIS 2261, *

[HN2] The Federal Arbitration Act (FAA) provides that written agreements to arbitrate shall be valid, irrevocable, and enforceable. 9 U.S.C.S. § 2. The FAA implements the strong federal policy in favor of arbitration as an alternative means of dispute resolution.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
*Contracts Law > Contract Interpretation > General Overview*
*Evidence > Inferences & Presumptions > Presumptions*
[HN3] Whether an agreement to arbitrate encompasses a particular dispute is a matter of contract interpretation, to be determined in accord with applicable state law. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. This presumption applies with special force in the field of international commerce.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Evidence > Inferences & Presumptions > Presumptions*
[HN4] Parties may agree to have questions of arbitrability resolved in arbitration. However, in contrast to merits-related disputes, the presumption is against an arbitrator deciding arbitrability and in favor of judicial resolution. Consistent with that presumption, the issue of arbitrability may only be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Evidence > Inferences & Presumptions > Presumptions*
[HN5] Clear and unmistakable evidence that the parties intended that the question of arbitrability should be decided by an arbitrator may be found in an arbitration clause even absent an express contractual commitment of questions of arbitrability to an arbitral forum. For example, a broadly drafted arbitration clause may evidence the parties' intention to arbitrate the issue of arbitrability. Courts have found clear and unmistakable evidence when the parties agree to be bound by the rules of an arbitrable tribunal that requires arbitrability to be decided

in arbitration. Thus, parties may overcome the First Options presumption by entering into a separate agreement that (1) employs the any and all language, or (2) expressly incorporates the provisions of a tribunal that requires questions of arbitrability to be decided in arbitration.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN6] A dispute over arbitrability is encompassed within an arbitration clause that covers all disputes concerning or arising out of the agreement. An arbitration clause does not need to be unlimited in order sufficiently to evidence the parties' intent to arbitrate questions of arbitrability.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*International Law > Dispute Resolution > Arbitration & Mediation > Agreements*
*International Law > Dispute Resolution > International Chamber of Commerce Rules*
[HN7] The United States Court of Appeals for the Second Circuit has held that the incorporation of the Rules of Arbitration of the International Chamber of Commerce in an arbitration agreement sufficiently evidences the parties' intent to arbitrate questions of arbitrability because Article 6, section 2, of those rules specifically provides for the International Court of Arbitration, the arbitral body of the International Chamber of Commerce, to address questions of arbitrability, either sua sponte before an answer is filed or at the specific request of any party.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Settlements > Releases From Liability > General Overview*
[HN8] When parties have agreed that the scope of a release is to be resolved in arbitration, courts have ordered arbitration concerning the effect of the release on the plaintiff's claims before allowing those claims to proceed in federal court.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
[HN9] The United States Supreme Court has instructed that, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to

2006 U.S. Dist. LEXIS 2261, *

rule on the potential merits of the underlying claims. Whether arguable or not, indeed even if it appears to the court to be frivolous, the dispute is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
[HN10] A court may not supplant the role of the arbitrator by anticipating the result likely to emerge from the arbitration process. Rather, as long as the court is satisfied that the parties agreed to arbitrate a particular dispute, including a question of arbitrability, it must enforce the parties' agreement and submit the matter to arbitration. A court must compel arbitration under 9 U.S.C.S. § 206 if the parties agreed to arbitrate and their arbitration agreement encompasses the asserted claims.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
[HN11] A court need not submit a dispute to arbitration if the court determines that the parties did not agree to arbitrate that dispute.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration*
*International Law > Dispute Resolution > Arbitration & Mediation > Stays Pending Arbitration*
[HN12] A district court has authority to stay an action under chapter 2 of the Federal Arbitration Act (FAA) in light of the permissive language of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards art VI, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, and a district court's general discretion in managing its own caseload and suspense docket. 9 U.S.C.S. § 3, which requires a court to stay an action when arbitration is compelled under chapter 1 of the FAA, may be fully incorporated into chapter 2 of the FAA governing foreign arbitration agreements and arbitral awards.

**COUNSEL:** [*1] S. Robert Schrager, Esq., Hodgson Russ, LLP, New York, NY; Dane H. Butswinkas, Esq., Paul B. Gaffey, Esq., Ana C. Reyes, Esq., Williams & Connolly LLP, Washington, D.C., Co-Counsel for Plaintiffs/Respondents Oriental Republic of Uruguay, Banco Comercial S.A. and Banco Central Del Uruguay as

Bankruptcy Trustee of Banco Commercial S.A. Fund for the Recovery of Banking Assets.

Louis B. Kimmelman, Esq., Dana C. MacGrath, Esq., O'Melveny & Myers LLP, New York, NY, Counsel for Defendants/Petitioners Chemical Overseas Holdings, Inc. and Brian D. O'Neill.

Henry Weisburg, Esq., Tai Park, Esq., Shearman & Sterling LLP, New York, NY, Counsel for Defendants/Petitioners Credit Suisse First Boston and David Mulford.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION:**

MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

None of the parties in these two related actions believes that this Court is the appropriate forum in which to adjudicate their dispute. Four defendants in the first-filed action, No. 05 Civ. 6151 (WHP) (the "Fraud Action"), move to compel arbitration pursuant to section 206 of the Federal Arbitration Act ("FAA") and seek a stay. In the subsequently [*2] filed action, No. 05 Civ. 6154 (WHP) (the "Arbitration Action"), those same parties petition for an order compelling arbitration of Plaintiffs' claims in both the Fraud Action and a separate proceeding in Uruguay. n1 In turn, Plaintiffs -- the Oriental Republic of Uruguay (the "RoU"), Banco Comercial S.A. ("Banco Comercial") and Banco Comercial S.A. Fund for the Recovery of Banking Assets (the "Fund") -- move to remand the Fraud Action to New York State court in the event that this Court denies Defendants' applications to compel arbitration. n2

n1 In both actions, Chemical Overseas Holdings, Inc. ("Chemical"), Credit Suisse First Boston ("Credit Suisse"), David C. Mulford ("Mulford") and Brian D. O'Neill ("O'Neill") seek arbitration on behalf of themselves and Dresdner Bank Lateinamerika AG ("Dresdner") and Holger F. Sommer ("Sommer"), who are also defendants in the Fraud Action (collectively, "Defendants").

n2 While recognizing that they are also Respondents in the Arbitration Action, this Court refers to the RoU, Banco Comercial and the Fund as "Plaintiffs" for ease of reference.

2006 U.S. Dist. LEXIS 2261, *

[*3]

All three motions concern the intersection between the parties' obligation to arbitrate disputes "arising out of or in connection with" a written agreement, Plaintiffs' claims regarding events that pre-date the agreement, and the agreement's release provision that potentially disposes of Plaintiffs' claims. Defendants maintain that any dispute requiring construction of the release must be submitted to arbitration. Plaintiffs maintain that the release expressly excludes their claims and that there are no genuine disputes meriting arbitration. The two sides agree only that the agreement to arbitrate is valid and binding on them.

Given the broad language of the arbitration agreement, the parties' single point of concurrence requires that the very question of arbitrability be decided in arbitration and not by this Court. For the reasons that follow, this Court grants Defendants' motion and Petition to compel arbitration, grants Defendants' motion to stay the Fraud Action and denies Plaintiffs' motion to remand.

BACKGROUND

Until 2002, Banco Comercial was the oldest and largest private commercial bank in Uruguay. (Complaint, dated Dec. 9, 2005 ("Compl.") P9; Declaration of Louis [*4]    B. Kimmelman, Esq., dated July 6, 2005 ("Kimmelman Decl.") P6.) n3 Chemical, Credit Suisse and Dresdner (together, the "Shareholders") were shareholders of Banco Comercial. (Compl. PP10-13; Kimmelman Decl. P6.) Mulford, O'Neill and Sommer (collectively, the "Directors") were employees of the Shareholders who served on Banco Comercial's board of directors. (Compl. PP14-16; Kimmelman Decl. P6.)

---

n3 The parties' respective submissions in the Fraud Action are materially the same as their submissions in the Arbitration Action. Unless otherwise noted, citations to the record are to documents filed in the Fraud Action.

---

In early 2002, Banco Comercial teetered on the verge of financial collapse, in part due to a series of allegedly sham transactions designed to camouflage massive investment losses in Argentina. (Compl. PP38-40; see Kimmelman Decl. P7.) Uruguay's economy depended on Banco Comercial's continued solvency and the RoU feared a crippling run on the bank's assets. While Plaintiffs now claim that the Shareholders [*5] and the Directors are liable for failing to oversee management or impose internal controls (Compl. PP45-49),

the RoU approached those Shareholders for additional capital in 2002. (Kimmelman Decl. P8.)

I. The Agreement

On February 26, 2002, the Shareholders entered into a Subscription and Investor Rights Agreement (the "Agreement") with Banco Comercial and the RoU. (Kimmelman Decl. Ex. A ("Agmt.").) Each of the three Shareholders agreed to invest an additional $ 33,333,333 in Banco Comercial. (Agmt. § 2(a)(i).) In return, the RoU promised to maintain Banco Comercial in sound financial condition and provide all necessary liquidity for eleven years. (Agmt. § 6(b)(i).) In the event that the RoU determined that it was "unreasonable" to continue to sustain Banco Comercial, the Shareholders had the right to sell their new investments to the RoU for the return of their capital contribution. (Agmt. § 6(b)(ii).) The RoU and Banco Commercial also agreed to

> irrevocably and unconditionally release[] and forever discharge[] . . . each Investor, and its respective Affiliates, officers, Investor Directors, agents, employees, predecessors and successors (collectively, the "Investor [*6] Parties") from any and all Losses arising out of or related to any action or inaction, or alleged action or inaction, of any Investor Party prior to the date hereof in respect of [Banco Comercial] . . . except in respect of intentional misconduct by such Investor Party.

(the "Release"). (Agmt. § 10(a).)

The Agreement also contains a broad arbitration clause (the "Arbitration Clause") that provides that "any disagreement or dispute ("Dispute") between one or more Parties . . . arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the [International Chamber of Commerce ("ICC")]" by arbitration in New York. (Agmt. § 11(b)(i).) Each party covenanted that arbitration will be "the exclusive method for resolving any Dispute and . . . that it will not commence an action or proceeding based on a Dispute" except in aid of arbitration or if the arbitration clause is adjudged unenforceable. (Agmt. § 11(b)(i)(F).)

II. Disputes Over Obligations in the Agreement

Banco Comercial's financial condition continued to deteriorate even after it received the Shareholders' infusion of additional capital. In August 2002, the [*7] RoU decided to cease Banco Comercial's operations, effective

2006 U.S. Dist. LEXIS 2261, *

at year's end. (Kimmelman Decl. P21.) The Shareholders then sought to exercise their right to sell their supplemental investments but the RoU refused to purchase them. (Kimmelman Decl. P22.) In January 2003, the Shareholders commenced an arbitration proceeding in New York against the RoU claiming that it breached the Agreement. (Kimmelman Decl. P23.) The RoU did not protest the propriety of arbitration as a means to resolve that dispute. On December 31, 2004, the ICC International Court of Arbitration ("ICA") issued an award in favor of the Shareholders for $ 100 million plus interest and costs. (Kimmelman Decl. Ex. B.) The award was confirmed in its entirety in a judicial proceeding in this District. See Chemical Overseas Holdings, Inc. v. Republica Oriental Del Uruguay, 371 F. Supp. 2d 400 (S.D.N.Y. 2005), reconsideration denied, 2005 U.S. Dist. LEXIS 8904, No. 05 Civ. 260 (GEL), 2005 WL 1123897 (S.D.N.Y. May 10, 2005).

III. Disputes Over Matters Pre-Dating the Agreement

A. The Fraud Action

On January 24, 2005, Plaintiffs commenced the Fraud Action in New York State court by filing a Summons with Notice. [*8] The Notice lists each of the Shareholders and Directors as defendants and represents that the action is for "(i) breach of fiduciary duty; (ii) fraud; (iii) corporate waste; (iv) intentional interference with prospective business relations; and (v) conversion" for conduct dating from January 1, 1990. (Summons with Notice, dated Jan. 24, 2005.) Defendants removed the Fraud Action to this Court on July 1, 2005, claiming federal question jurisdiction under sections 202 and 205 of the FAA, 9 U.S.C. § § 202, 205. Immediately upon removal, Defendants moved to compel arbitration and for a stay pending arbitration.

To avoid any expression of consent to federal jurisdiction, Plaintiffs resisted filing a complaint in the Fraud Action even after Defendants removed it to this Court. (Transcript of Hearing on Dec. 1, 2005 ("Tr.") at 25-30.) Instead, citing cases that permit removal from a New York State court based on a mere Summons with Notice, n4 Plaintiffs opted to rely on that document and a "Draft Complaint" submitted with Plaintiffs' opposition papers. (Declaration of Ana C. Reyes, Esq., dated Sept. 7, 2005, Ex. 1.) Because the Federal Rules do not recognize a "draft [*9] complaint" as a pleading, Defendants' applications to compel arbitration navigated in hypothesis and surmise. To dispel that uncertainty, this Court directed Plaintiffs to anchor their claims in a formal pleading without prejudice to their jurisdictional defenses. (Tr. at 29.)

n4 See Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 204 (2d Cir. 2001) ("Although a summons with notice is not technically defined as a pleading under N.Y.C.P.L.R. § 3011, and the notice has no legal effect in New York except in cases of default, we nevertheless conclude that it may constitute an initial pleading for purposes of the federal removal statute."); accord U.S.E. Prods., Ltd. v. Marvel Enters., Inc., 314 F. Supp. 2d 213, 215 (S.D.N.Y. 2004).

Plaintiffs' Complaint, filed on December 9, 2005, alleges that the Fraud Action "arises from Defendants' intentional wrongdoing, including participating in, aiding and enabling a massive fraud that harmed Plaintiffs and the [*10] depositors of Banco Comercial S.A. . . ., intentionally abdicating their duties as directors and controlling shareholders of Banco Comercial and, inter alia, intentionally engaging in self-dealing transactions to their benefit and to the financial detriment of Banco Comercial." (Compl. P1.) Jettisoning some claims enumerated in the Summons with Notice and recasting others, the Complaint alleges claims for fraud, intentional breach of fiduciary duty, conversion and wrongful diversion of corporate assets. (Compl. PP50-88.)

B. Litigation in Uruguay

On February 24, 2005, the RoU filed a judicial demand for a hearing with the Shareholders before the Conciliation Court in Uruguay (the "Uruguayan Conciliation Proceeding"). (Kimmelman Decl. Ex. G.) In that proceeding, the RoU seeks $ 1 billion in "damages arising from liability for the absence of controls and intentional misconduct in relation to the fraudulent scheme carried out at [Banco Comercial] . . . from October 1990 to February 2002." (Kimmelman Decl. Ex. G.) Plaintiffs aver that their Uruguayan claims are essentially the same as their claims in the Fraud Action. (Plaintiffs' Memorandum in Opposition to Motion to Compel [*11] Arbitration, dated Sept. 7, 2005 ("Pls. Mem.") at 8 n.4; Tr. at 32.)

C. ICC Arbitration

On June 30, 2005, Defendants filed a Request for Arbitration with Plaintiffs before the ICC. (Kimmelman Decl. Ex. I.) In that proceeding, Defendants allege that Plaintiffs breached the Agreement by filing the Fraud Action and commencing proceedings in Uruguay. (Kimmelman Decl. Ex. I.) After Plaintiffs objected that the dispute should not be arbitrated, the ICA ruled that the "arbitration shall proceed in accordance with Article 6(2) of the ICC Rules" -- that is, with the arbitrators deciding questions of arbitrability. (Supplemental Declara-

2006 U.S. Dist. LEXIS 2261, *

tion of Louis B. Kimmelman, Esq., dated Oct. 12, 2005 ("Supp. Kimmelman Decl.") Ex. N.)

D. The Arbitration Action

On July 1, 2005 -- the same day they removed the Fraud Action to this Court -- Defendants also commenced the Arbitration Action. With the Arbitration Action, Defendants seek to compel Plaintiffs to arbitrate the claims raised in the Fraud Action, the Uruguayan Conciliation Proceeding and any other proceeding Plaintiffs may have commenced in New York, Uruguay or elsewhere. Briefing on Defendants' Petition proceeded simultaneously with their [*12] motion in the Fraud Action and Plaintiffs' motion to remand.

DISCUSSION

Plaintiffs do not dispute that they entered a valid written agreement to arbitrate certain disputes. However, Plaintiffs contest whether the Arbitration Clause encompasses their claims. Defendants advance two arguments in response. First, they contend that the Arbitration Clause requires the question of arbitrability to be decided by an arbitrator. Second, they contend that Plaintiffs' claims in the Fraud Action and the Uruguayan Conciliation Proceeding must be arbitrated because their viability necessitates construction of the Release, and because the Arbitration Clause applies to any dispute "arising out of or in connection with" the Agreement. n5

n5 Although the Directors are not signatories to the Agreement, Defendants contend that Plaintiffs are estopped from avoiding arbitration with the Directors because of their agreement to arbitrate with the Shareholders. (Defendants' Memorandum in Support of Motion to Compel Arbitration, dated July 6, 2005, at 16 (citing JLM Indus. Inc. v. Stolt-Nielsen S.A., 387 F.3d 163, 178 (2d Cir. 2004); Smith/Enron Cogeneration Ltd. P'ship. Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 98 (2d Cir. 1999).) Plaintiffs do not challenge this contention.

[*13]

I. Arbitration

[HN1] When a party to a litigation raises the specter of arbitration, the parties' dispute over the merits temporarily yields to two threshold issues: (1) whether the claims should be resolved in arbitration; and (2) who should decide whether arbitration is the proper forum -- a court or the arbitral tribunal itself. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 942, 115 S. Ct. 1920,

131 L. Ed. 2d 985 (1995); see also Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) ("Prior to compelling arbitration, the district court must first determine . . . [whether] the parties' dispute falls within the scope of the arbitration agreement."); Sands Bros. & Co. v. Perez, 2004 U.S. Dist. LEXIS 19480, No. 04 Civ. 0005 (JFK), 2004 WL 2186574, at *3 (S.D.N.Y. Sept. 28, 2004) ("The Court must first determine the threshold question of who decides whether the claim is arbitrable -- the Court or the arbitrator.").

Defendants' motion and Petition to compel arbitration are governed by [HN2] the FAA, which provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable." [*14] 9 U.S.C. § 2. The FAA implements the strong federal policy in favor of arbitration as an alternative means of dispute resolution. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985); Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001); In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 248 (S.D.N.Y. 2005).

[HN3] Whether an agreement to arbitrate encompasses a particular dispute is a matter of contract interpretation, to be determined in accord with applicable state law. Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002); see United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960) ("Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983); [*15] accord Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir. 1999). This presumption "applies with special force in the field of international commerce." Mitsubishi Motors, 473 U.S. at 631; accord Smoothline Ltd. v. N. Am. Foreign Trading Corp., 249 F.3d 147, 153 (2d Cir. 2001).

[HN4] Parties may also agree to have questions of arbitrability resolved in arbitration. However, in contrast to merits-related questions, the presumption is against an arbitrator deciding arbitrability and in favor of judicial resolution. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002); First Options, 514 U.S. at 944-45; John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 53 (2d Cir. 2001) ("Issues of 'arbitrability' are presumptively for the court to decide, while issues others than 'arbitrability' are presumptively for the arbitrator." (internal quotations omitted)). Consistent with that presumption, "the issue of

2006 U.S. Dist. LEXIS 2261, *

arbitrability may only be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement, as construed [*16] by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." Bell, 293 F.3d at 566 (internal quotations omitted); see First Options, 514 U.S. at 944; AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986).

Such [HN5] "clear and unmistakable evidence" may be found in the arbitration clause "even absent an express contractual commitment" of questions of arbitrability to an arbitral forum. Shaw Group Inc. v. Tripleline Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003). For example, a broadly drafted arbitration clause may evidence the parties' intention to arbitrate the issue of arbitrability. See Shaw Group, 322 F.3d at 121; PaineWebber, Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) ("The words 'any and all [disputes]' are elastic enough to encompass disputes over whether a claim . . . is within the scope of arbitration."); Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 46, 689 N.E.2d 884, 666 N.Y.S.2d 990 (1997). Courts have also found clear and unmistakable evidence when the parties agree to be bound by the rules of [*17] an arbitrate tribunal that requires arbitrability to be decided in arbitration. See Contec Corp. v. Remote Solution Co., 398 F.3d 205, 211 (2d Cir. 2005) (rules of the American Arbitration Association); Shaw Group, 322 F.3d at 122 (ICC Rules); Bybyk, 81 F.3d at 1202 (National Association of Securities Dealers ("NASD") Code); see also Sacharow, 91 N.Y.2d at 46-47 (NASD Code). Thus, "parties may overcome the First Options presumption by entering into a separate agreement that (1) employs the 'any and all' language . . ., or (2) expressly incorporates the provisions of [a tribunal that requires questions of arbitrability to be decided in arbitration]." Wilson, 254 F.3d at 55.

Both factors are present here. First, the Arbitration Clause is a broad one. It requires arbitration of "any disagreement or dispute . . . arising out of or in connection with the Agreement." (Agmt. § 11(b)(i).) Such broad language reflects the parties' intent to arbitrate all disputes relating to the Agreement -- including whether the Arbitration Clause reaches a particular merits-related dispute. See Shaw Group, 322 F.3d at 121 [*18] (holding that [HN6] a dispute over arbitrability is encompassed within an arbitration clause that covers "all disputes . . . concerning or arising out of" the agreement); see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 371 F. Supp. 2d 571, 575 (S.D.N.Y. 2005) ("An arbitration clause . . . does not need to be unlimited in order sufficiently to evidence the parties' intent to arbitrate questions of arbitrability."). Whether the parties must arbitrate the implications of the Release for Plain-

tiffs' claims is undoubtedly a dispute that arises "in connection with the Agreement." (Agmt. § 11(b)(i).) Accordingly, the Arbitration Clause reflects the parties' agreement to submit that question to arbitration.

Moreover, the Arbitration Clause requires that arbitration be conducted under the Rules of Arbitration of the ICC. In Shaw Group, the parties had agreed to conduct arbitration before "the [ICC] . . . in accordance with the rules and procedures of International Arbitration." 322 F.3d at 122. [HN7] The Court of Appeals held that the incorporation of the ICC Rules sufficiently evidenced the parties' intent to arbitrate questions of arbitrability because [*19] "Article 6, section 2, of those rules . . . specifically provides for the ICA, the arbitral body of the ICC, to address questions of arbitrability, either sua sponte before an answer is filed or at the specific request of any party." Shaw Group, 322 F.3d at 122; see Rules of Arbitration of the International Chamber of Commerce Art. 6(2). So too here, as the ICA has already found (see Supp. Kimmelman Decl. Ex. N), the Agreement's express incorporation of the ICC Rules, together with the broad wording of the arbitration clause, provides clear and unmistakable evidence that the parties agreed to submit questions of arbitrability to arbitration.

Plaintiffs nevertheless contend that their claims lie beyond the scope of the Arbitration Clause because they pre-date the Agreement and because the Release carves out claims for "intentional misconduct." Thus, Plaintiffs protest, there is an "obvious answer" to the question of arbitrability and the issue need not be referred to arbitration. (Pls. Mem. at 14.) However, the answer is more nuanced than Plaintiffs maintain. Indeed, [HN8] when parties have agreed that the scope of a release is to be resolved in arbitration, [*20] courts have ordered arbitration concerning the effect of the release on the plaintiff's claims before allowing those claims to proceed in federal court. See Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano, 331 F. Supp. 2d 247, 257 (S.D.N.Y. 2004); Century Indem. Co. v. Viacom Int'l, Inc., 2003 U.S. Dist. LEXIS 2452, No. 02 Civ. 2779 (DC), 2003 WL 402792, at *5 (S.D.N.Y. Feb. 20, 2003).

In any event, as instructed by [HN9] the Supreme Court:

> In deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the [dispute] is to be decided, not by the court

2006 U.S. Dist. LEXIS 2261, *

asked to order arbitration, but as the parties have agreed, by the arbitrator.

AT & T Techs., 475 U.S. at 649-50; accord Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, 965 F.2d 1224, 1233 (2d Cir. 1992) ("In deciding the contractual issue of arbitrability, courts must take pains not to rule on the merits of the underlying dispute."); Transit Mix Concrete Corp. v. Local Union No. 282, International Brotherhood of Teamsters, etc., 809 F.2d 963, 967-68 (2d Cir. 1987); [*21] Stop & Shop Supermarket Co., LLC v. United Food & Commer. Workers' Union Local 342, 407 F. Supp. 2d 515, 2005 U.S. Dist. LEXIS 31204, No. 05 Civ. 9606 (LBS), 2005 WL 3288132, at *4 (S.D.N.Y. Dec. 5, 2005). n6 [HN10] This Court may not supplant the role of the arbitrator by anticipating the result likely to emerge from that process. Rather, as long as the Court is satisfied that the parties agreed to arbitrate a particular dispute -- including a question of arbitrability, it must enforce the parties' agreement and submit the matter to arbitration. See ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002) (holding that a court must compel arbitration under section 206 of the FAA if the parties agreed to arbitrate and their arbitration agreement encompasses the asserted claims); Smith/Enron, 198 F.3d at 92 ("[A] district court's scope of inquiry in considering a petition to compel arbitration under Chapter Two of the FAA is very limited." (internal quotation omitted)).

n6 Plaintiffs rely on a passage in Woodcrest Nursing Home v. Local 144, Hotel, Hosp., Nursing Home & Allied Workers, 788 F.2d 894, 898 (2d Cir. 1986), in arguing that a court need not refer the question of arbitrability to arbitration if the Court can say "with positive assurance" that the parties did not agree to arbitrate the underlying dispute. In fact, the portion of the decision Plaintiffs cite reiterates the unremarkable proposition that [HN11] a court need not submit a dispute to arbitration if the court determines that the parties did not agree to arbitrate that dispute. See Woodcrest, 788 F.2d at 898. As discussed above, the Arbitration Clause clearly and unmistakably reflects that the parties' agreed to refer questions of arbitrability to arbitration.

[*22]

Here, the threshold dispute requiring arbitration is not whether the Release bars Plaintiffs' claims, but whether that question is arbitrable. Because the Arbitra-

tion Clause provides clear and unmistakable evidence that the parties agreed to submit issues of arbitrability to an arbitral forum, this Court must enforce that agreement.

Accordingly, pursuant to section 206 of the FAA, this Court compels the parties to arbitrate the question whether Plaintiffs' claims in the Fraud Action and the Uruguayan Conciliation Proceeding -- or at least the effect of the Release thereon, must be resolved in arbitration. Indeed, it will be for the arbitrators to determine the scope of arbitration.

II. Stay Pending Arbitration and Plaintiffs' Motion to Remand

Because the arbitrators might determine that there are no arbitrable issues or construe the Release in a manner that excludes Plaintiffs' claims, Plaintiffs might return to this Court to resume litigation of the Fraud Action. Therefore, judicial efficiency militates in favor of staying that action rather than dismissing it. See Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 316 (2d Cir. 1998) (recognizing [*23] [HN12] a district court's authority to stay an action under Chapter 2 of the FAA "in light of the permissive language of Article VI of the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards] and a district court's general discretion in managing its own caseload and suspense docket"); see also Energy Transp., Ltd. v. M.V. San Sebastian, 348 F. Supp. 2d 186, 201 (S.D.N.Y. 2004) (noting that section 3 of the FAA, which requires a Court to stay an action when arbitration is compelled under Chapter 1, "may be fully incorporated" into Chapter 2 of the FAA governing foreign arbitration agreements and arbitral awards); Satcom Int'l Group PLC v. Orbcomm Int'l Partners, L.P., 49 F. Supp. 2d 331, 337 n.4 (S.D.N.Y. 1999) ("There was previously an open question as to whether the court that orders arbitration under the Convention must dismiss the action or may retain jurisdiction in aid of arbitration. Nonetheless, it now appears that the Court may retain jurisdiction and stay the action under its inherent power to control its docket." (citation omitted)). Moreover, re-ignition of the Fraud Action in the wake of arbitration could present additional [*24] issues that bear on this Court's jurisdiction.

Accordingly, this Court stays the Fraud Action pending arbitration and denies Plaintiffs' motion to remand as premature.

CONCLUSION

For the foregoing reasons, Defendants' motion and Petition to compel arbitration are granted, and Plaintiffs' motion to remand is denied without prejudice. The Fraud Action is stayed pending arbitration. Accordingly, the

2006 U.S. Dist. LEXIS 2261, *

Clerk of the Court is directed to transfer the action bearing docket number 05 Civ. 6151 (WHP) to this Court's suspense docket. Because this Memorandum and Order resolved all issues in the Arbitration Action, the Clerk of the Court is directed to close the action bearing docket number 05 Civ. 6154 (WHP).

Dated: January 24, 2006

New York, New York

SO ORDERED:

/s/

WILLIAM H. PAULEY III

U.S.D.J.

# EXHIBIT O

LEXSEE

**FLEXI-VAN LEASING, INC., Appellant v. THROUGH TRANSPORT MUTUAL INSURANCE ASSOCIATION, LTD. and THOMAS MILLER (AMERICAS) INC.**

No. 03-3383

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

108 Fed. Appx. 35; 2004 U.S. App. LEXIS 15352

May 7, 2004, Submitted Under Third Circuit LAR 34.1(a)
July 23, 2004, Filed

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of New Jersey. (D.C. No. 02-cv-03278). District Judge: Honorable Anne E. Thompson.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant lessor challenged the decision of the United States District Court for the District of New Jersey, which dismissed the lessor's lawsuit against appellees, an insurer and its general correspondent, and compelled the parties to submit their insurance coverage dispute to arbitration as requested by appellees pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C.S. § 205.

**OVERVIEW:** The lessor sought the value of the loss of various equipment supplied to a foreign shipping corporation that had become insolvent and was insured by the insurer. The district court ordered arbitration upon determining that New Jersey's direct action statute, N.J. Stat. Ann. § 17:28-2, did not supersede the applicable policy's arbitration clause. The district court also determined that the lessor was a third-party beneficiary of the policy and thus bound by its arbitration clause, and that the insurer was not subject to the State of New Jersey insurance regulation laws, which would have permitted a direct action. The court upheld the removal of the action and the order directing arbitration, because the general

requirement that an out-of-state insurer be authorized by the New Jersey Commissioner of Banking and Insurance to sell insurance in New Jersey did not apply to providers of ocean marine insurance such as the insurer. The court further found that the lessor was bound by the insurance policy's arbitration requirement as a third-party beneficiary.

**OUTCOME:** The court affirmed the order granting the motion to compel arbitration and the motion to dismiss filed by the insurer and its general correspondent.

**CORE TERMS:** insurer, marine, ocean, arbitration, unauthorized, insured, direct action, exemption, chassis, beneficiary, lease, arbitration clause, third-party, surplus, container, final judgment, out-of-state, coverage, vessel, default judgment, insurance policy, motive power, propelled, generator, arbitration agreement, arbitrate, shipping, builders', cargoes, crafts

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*International Trade Law > Dispute Resolution > Arbitration*
*International Trade Law > Dispute Resolution > Convention on the Recognition & Enforcement of Foreign Arbitral Awards*
[HN1] See 9 U.S.C.S. § 205.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN2] An appellate court exercises plenary review over a district court's legal conclusions, including its determination that an underlying dispute is arbitrable. To the extent that a district court's conclusions turn on findings of fact, an appellate court reviews those findings of fact for clear error.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Foreign Arbitral Awards*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN3] An arbitration provision in an international commercial agreement is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention), 9 U.S.C.S. § 201 et seq. Pursuant to the Convention, to which the United States and the United Kingdom are signatories, a district court must order arbitration when confronted with a dispute that is covered by the arbitration provision. Before it compels an unwilling party to arbitrate, a district court must engage in a limited review, to ensure that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement. 9 U.S.C.S. § 4. In conducting this review, a district court operates under a federal policy that favors arbitration, especially with respect to international commercial agreements.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN4] The direct action statute, N.J. Stat. Ann. § 17:28-2, provides that when an injured party who has obtained a judgment against an insured cannot execute the judgment due to the insured's insolvency or bankruptcy, the injured party can proceed directly against the insurance carrier for the amount of the judgment not exceeding the amount of the policy.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Foreign Arbitral Awards*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
[HN5] N.J. Stat. Ann. § 17:28-2 does not apply to all policies or cover all types of losses. The first sentence of

§ 17:28-2 restricts its scope to a policy of insurance against loss or damage resulting from accident to or injury suffered by an employee or other person and for which the person insured is liable, or against loss or damage to property caused by animals or by any vehicle drawn, propelled or operated by any motive power, and for which loss or damage the person insured is liable.

*Governments > Legislation > Interpretation*
*Torts > Transportation Torts > Motor Vehicles > Personal Vehicles*
[HN6] In interpreting a statute, State of New Jersey courts begin with an examination of the statute's plain language.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
[HN7] A party cannot be required to participate in arbitration, rather than adjudication, of a dispute unless it has agreed to submit that dispute, or disputes of like nature, to the arbitral process. Non-signatories to an arbitration agreement may be bound by that agreement through the application of traditional principles of contract and agency law. One such traditional principle, applicable in the arbitration context, is the principle that a third-party beneficiary is bound by the terms of a contract where its claim arises out of that contract. Nonsignatories of a contract may be subject to arbitration if the nonparty is an agent of a party or a third party beneficiary to the contract.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Foreign Arbitral Awards*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN8] A party cannot be required to submit to arbitration before a district court determines that the party was bound to a valid arbitration agreement.

*Business & Corporate Law > Foreign Businesses > Qualifications*
*Insurance Law > Industry Regulation > Insurance Company Operations > Conducting Business > Foreign Insurers*

108 Fed. Appx. 35, *; 2004 U.S. App. LEXIS 15352, **

*Insurance Law > Industry Regulation > Insurance Company Operations > Conducting Business > Surplus Lines Insurers*
[HN9] New Jersey insurance law requires an out-of-state corporation seeking to issue insurance policies to New Jersey residents to be either admitted by the Commissioner of Banking and Insurance, pursuant to N.J. Stat. Ann. § 17:32-18, or given limited approval by the Commissioner as surplus lines insurers providing coverage that is not otherwise available from authorized insurers. § 17:22-6.42. Out-of-state insurers that are neither admitted, nor approved as surplus lines insurers, face restrictions on their ability to litigate claims in New Jersey. Section § 17:22-6.39 provides that an unauthorized insurer cannot institute, file, or maintain any suit, action, or proceeding in New Jersey to enforce any right, claim, or demand arising out of any insurance transaction in the State. Section 17:51-2(a) requires an unauthorized insurer to post security or otherwise demonstrate to a court that it has sufficient assets to satisfy any final judgment that may be entered against it.

*Insurance Law > Industry Regulation > Insurance Company Operations > General Overview*
[HN10] See N.J. Stat. Ann. § 17:51-2(a).

*Admiralty Law > Personal Injuries > Maritime Tort Actions > Multiple Defendants > Indemnity*
*Insurance Law > Business Insurance > Marine Insurance > General Overview*
*Insurance Law > Industry Regulation > Insurance Company Operations > General Overview*
[HN11] The general requirement that an out-of-state insurer be authorized by the New Jersey Commissioner of Banking and Insurance to sell insurance in New Jersey does not apply to providers of ocean marine insurance. N.J. Stat. Ann. § 17:32-21(g) exempts from the authorization requirement insurance of vessels, crafts or hulls, cargoes, marine builders' risks, marine protection and indemnity or other risks including strikes and war risks commonly insured under ocean or wet marine forms of policy.

*Admiralty Law > Personal Injuries > Maritime Tort Actions > Multiple Defendants > Indemnity*
*Insurance Law > Business Insurance > Marine Insurance > General Overview*
*Insurance Law > Industry Regulation > Insurance Company Operations > General Overview*
[HN12] N.J. Stat. Ann. § 17:22-6.37(f) provides an exemption for insurance of vessels, crafts or hulls, cargoes, marine builders' risks, marine protection and indemnity

or other risks including strikes and war risks commonly insured under ocean or wet marine forms of policy, but it is an exemption from a prohibition against acting on behalf of an unauthorized insurer. No person shall in the State of New Jersey directly or indirectly act as agent for, or otherwise represent or aid on behalf of another, any insurer not then authorized to transact such insurance in the State in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in the State.

*Governments > Courts > Judicial Precedents*
*Governments > Legislation > Interpretation*
[HN13] Where a federal court is asked to interpret state law, the federal court must give the decision of a state agency charged with administering that law the same deference accorded it by the State of New Jersey courts. The New Jersey courts give substantial weight to an administrative agency's interpretation of a statute it is charged with enforcing.

*Insurance Law > Business Insurance > Marine Insurance > General Overview*
*Insurance Law > Industry Regulation > Insurance Company Operations > Conducting Business > Foreign Insurers*
[HN14] Out-of-state ocean marine insurers are specifically exempted from the restriction, under N.J. Stat. Ann. § 17:22-6.39, on an unauthorized insurer's ability to institute, file, or maintain a suit in the State of New Jersey.

*Insurance Law > Business Insurance > Marine Insurance > Hull Coverage*
*Insurance Law > Industry Regulation > Insurance Company Operations > General Overview*
[HN15] See N.J. Stat. Ann. § 17:22-6.39.

*Insurance Law > Business Insurance > Marine Insurance > General Overview*
*Insurance Law > Industry Regulation > Insurance Company Operations > General Overview*
[HN16] The security requirement of N.J. Stat. Ann. § 17:51-2(a) does not apply to ocean marine insurers.

COUNSEL: For FLEXI VAN LEASING, Appellant: Keith L. Flicker, Flicker, Garelick & Associates, New York, NY.

For THROUGH TRANSP MUTL, THOMAS MILLER AMER, Americas, Appellees: Alfred J. Kuffler, Montgomery, McCracken, Walker & Rhoads, Philadelphia,

108 Fed. Appx. 35, *; 2004 U.S. App. LEXIS 15352, **

PA. Stephen A. Grossman, Montgomery, McCracken, Walker & Rhoads, Cherry Hill, NJ.

**JUDGES:** Before: SLOVITER and FUENTES, Circuit Judges, and POLLAK, District Judge. *

> * The Honorable Louis H. Pollak, Senior District Judge for the Eastern District of Pennsylvania, sitting by designation.

**OPINION BY:** POLLAK

**OPINION:**

### [*36] OPINION OF THE COURT

POLLAK, *District Judge.*

Flexi-Van Leasing, Inc. ("Flexi-Van"), a lessor of chassis and related shipping equipment, appeals from the District Court's order dismissing Flexi-Van's lawsuit against Through Transport Mutual Insurance Association, Ltd. ("the Association") and Thomas Miller [**2] (Americas) Inc. ("Thomas Miller") and compelling the parties to submit their insurance coverage dispute to arbitration. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

#### I.

Because the parties are familiar with the facts, we recite only those necessary to aid in understanding our decision. Flexi-Van, a Delaware corporation with its principal place of business in New Jersey, leases intermodal chassis and generator sets to container shipping lines. Intermodal chassis are specialized trailers used to transport cargo containers over American roadways; generator sets attach to the underside of intermodal chassis and provide power to refrigerated containers being transported by road. From 1995 to 1997, Flexi-Van executed eleven leases for chassis and generator sets to Cho Yang Shipping Co., Ltd. ("Cho Yang"), a Korean corporation with its United States headquarters in New Jersey and, at the time, one of the world's largest container shipping lines. Each lease contained a provision requiring Cho Yang to obtain and maintain "'All Risk' Physical Damage insurance" equal to the replacement value of the equipment leased.

In accordance with its obligations [**3] under the leases, Cho Yang obtained an insurance policy from the Association, a Bermudan mutual indemnity insurance association managed in London. The policy provided coverage for the total loss, including [*37] constructive loss, of the equipment. A clause in the policy provides that "if any difference or dispute shall arise between you (or any other person) and the Association arising out of or in connection with any insurance provided by the As-

sociation . . ., it shall be referred to arbitration in London." Joint Appendix ("J.A.") at 158 (Policy § G4, P 2.1). The policy also directs that the arbitration proceedings shall be subject to English law, and that no other legal proceedings upon such a dispute may be maintained until the dispute has been referred to arbitration and the award has become final. *See* J.A. at 158 (Policy § G4, PP 2.2, 2.3). "You" is defined by the policy as "an Assured and any Co Assured and Joint Assured under the Assured's insurance." J.A. at 163 (Policy § G5). The policy designates Cho Yang as a "Co-Assured" and its subsidiary, Cho Yang America, Inc., as an "Assured." Flexi-Van is not named in the policy as an insured party of any type.

Cho Yang began to [**4] experience financial difficulties in late 2000, and failed to make the timely payment of rental fees and maintenance and repair charges to Flexi-Van under the leases. By letter dated April 16, 2001, Flexi-Van notified Cho Yang that it was in default of the leases and demanded the immediate return of the equipment. Flexi-Van then conducted recovery operations at terminals, truck depots, storage facilities, and rail yards across the United States, but was unable to recover all of its equipment.

Flexi-Van filed a breach of contract action against Cho Yang in the United States District Court for the District of New Jersey on May 4, 2001, seeking the return of the equipment and damages. In July 2001, Cho Yang filed for liquidation in the Republic of Korea, but never filed for bankruptcy in the United States. Flexi-Van ultimately obtained a default judgment against Cho Yang on January 4, 2002, in the amount of $ 12,287,970.32. According to Flexi-Van, approximately $ 1 million of the default judgment represented the value of equipment that had been lost, stolen, or damaged beyond repair while on lease to Cho Yang. Flexi-Van soon learned that Cho Yang's liabilities vastly exceeded its assets, [**5] and that Flexi-Van would not receive any further payments from Cho Yang to satisfy the default judgment.

Meanwhile, on August 29, 2001, Flexi-Van had submitted a claim to the Association under the policy for the value of the lost chassis and generator sets. In a letter dated October 2, 2001, Thomas Miller, the Association's general correspondent for its members in the Americas, formally denied the claim on behalf of the Association. The letter asserted that Flexi-Van had no right to assert a direct claim, because it was "not an insured or loss payee" under the policy. J.A. at 184.

On May 13, 2002, Flexi-Van filed suit against the Association and Thomas Miller (collectively, "appellees") in the Union County, New Jersey, Superior Court. The appellees removed the action to the United States District Court for the District of New Jersey under 9

108 Fed. Appx. 35, *; 2004 U.S. App. LEXIS 15352, **

U.S.C. § 205, a provision of the Federal Arbitration Act implementing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 3 U.S.T. 2517 ("Convention"), *reprinted as note following* 9 U.S.C. § 201. n1 In federal court, the [*38] appellees moved to compel [**6] arbitration and dismiss, arguing that the policy required Flexi-Van to arbitrate its claim in London. Flexi-Van then amended its complaint to allege that its claim was governed by New Jersey's direct action statute, N.J.S.A. § 17:28-2.

n1 The removal statute provides, in relevant part:

[HN1] Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending.

9 U.S.C. § 205.

The District Court initially denied, without an opinion, the appellees' motion to compel arbitration and dismiss. Upon the appellees' motion for reconsideration, the District Court reversed itself and granted the motion on July 31, 2003, ordering the parties to submit to arbitration and [**7] dismissing the action with prejudice. Ruling from the bench, the District Court found that (1) New Jersey's direct action statute did not supersede the policy's arbitration clause; (2) Flexi-Van was a third-party beneficiary of the policy and thus bound by its arbitration clause; and (3) the Association was not an "unauthorized insurer" subject to restrictions under New Jersey law on its ability to litigate this matter. Flexi-Van appealed.

**II.**

[HN2] We exercise plenary review over the District Court's legal conclusions, including its determination that the underlying dispute is arbitrable. *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1509 (3d Cir. 1994), *aff'd,* 514 U.S. 938, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995). To the extent that the District Court's conclusions turn on findings of fact, we review those findings of fact for clear error. *Id.* at 1509.

[HN3] An arbitration provision in an international commercial agreement such as the policy in this case is governed by the Convention. *Standard Bent Glass Corp. v. Glassrobots Oy,* 333 F.3d 440, 448-49 (3d Cir. 2003). Pursuant to the Convention, to which the United States and [**8] the United Kingdom are signatories, a district court must order arbitration when confronted with a dispute that is covered by the arbitration provision. *Id.* at 449; Convention art. II, P 3. n2 Before it compels an unwilling party to arbitrate, however, the court must engage in a limited review, to ensure that a valid agreement to arbitrate exists between the parties and the specific dispute falls within the substantive scope of that agreement. 9 U.S.C. § 4; *PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir. 1990). In conducting this review, the court operates under a federal policy that favors arbitration, especially with respect to international commercial agreements. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 631, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985).

n2 "The court of a Contracting State, when seized of an action in a matter in respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that said agreement is null and void, inoperative or incapable of being performed." Convention art. II, P 3.

[**9]

**A.**

Flexi-Van first contends that its dispute with the appellees is not arbitrable because it arises under New Jersey's direct action statute, N.J.S.A. § 17:28-2. [HN4] The direct action statute provides that when an injured party who has obtained a judgment against an insured cannot execute the judgment due to the insured's insolvency or bankruptcy, the injured party can proceed directly against the insurance carrier for the amount of the judgment [*39] not exceeding the amount of the policy. N.J.S.A. § 17:28-2. Flexi-Van argues that the statute supersedes the arbitration clause in the policy between the Association and Cho Yang, and that the District Court thus erred in enforcing the arbitration clause and dismissing the lawsuit.

However, as the District Court found, the underlying dispute between Flexi-Van and the Association does not fall within the scope of section 17:28-2. The statute [HN5] does not apply to all policies or cover all types of losses. The first sentence of section 17:28-2 restricts its scope to a

108 Fed. Appx. 35, *; 2004 U.S. App. LEXIS 15352, **

policy of insurance against loss or damage resulting from accident to or injury suffered by an employee or other person and for which the person insured is liable, or [**10] against loss or damage to property caused by animals or by any vehicle drawn, propelled or operated by any motive power, and for which loss or damage the person insured is liable.

*Id.*

Flexi-Van argues that its loss is of the type covered by the second clause of N.J.S.A. § 17:28-2: "loss or damage to property caused by . . . any vehicle drawn, propelled or operated by any motive power." The essence of Flexi-Van's argument is that the loss to its equipment occurred while the equipment was attached to Cho Yang's tractors as part of Cho Yang's over-the-road transportation operations. The tractors are vehicles "drawn, propelled or operated by any motive power." Therefore, Flexi-Van contends, its loss was *caused by* a vehicle drawn, propelled or operated by any motive power. The District Court found section 17:28-2 to be inapplicable, stating in its oral decision that "it seems to me pretty clear that the Direct Action Statute of New Jersey seeks to protect people for motor vehicle - automobile incidents, which we have so many of, and where a victim would be unprotected. . . . But that's not what we have, here." J.A. at 29.

[HN6] In interpreting a statute, New Jersey courts begin [**11] with an examination of the statute's plain language. *Newell v. Ruiz,* 286 F.3d 166 (3d Cir. 2002) (citing *Hubbard ex rel. Hubbard v. Reed,* 168 N.J. 387, 774 A.2d 495, 498 (N.J. 2001)). We agree with the District Court that the loss suffered by Flexi-Van is not within the contemplation of the statute's language. The injury suffered by Flexi-Van was its inability to collect rental fees, maintenance and repair charges, recovery expenses, and unreturned equipment - an injury brought about by Cho Yang's insolvency. To suggest that its loss was "caused by" motor vehicles merely because the equipment it was unable to recover was attached to motor vehicles stretches the language of the direct action statute beyond reasonable bounds. None of the cases cited by Flexi-Van persuades us that the statute was intended to be utilized for the purpose sought here: to enforce a default judgment in an action for breach of contract. n3 [*40] Therefore, we affirm the District Court's conclusion that N.J.S.A. § 17:28-2 is inapplicable, and hence is not a bar to referring the underlying dispute to arbitration.

n3 Of the four cases cited by Flexi-Van in aid of its argument for an expansive reading of N.J.S.A. § 17:28-2, only two offer support for the proposition that New Jersey's direct action statute might be applied outside the context of automobile accidents, and the support the two cases offer is underwhelming. In *In re Hub Recycling, Inc.,* 106 B.R. 372 (D.N.J. 1989), the court determined that New Jersey law authorized a third party to bring an action in trespass directly against an insurer for damage to the third party's land allegedly caused by the insured's illegal dumping. However, the three New Jersey state cases invoking the "caused by . . . vehicle" provision of section 17:28-2 relied on by the *Hub Recycling* court all involved automobile accidents. See *In re Estate of Gardinier,* 40 N.J. 261, 191 A.2d 294 (N.J. 1963); *Miney v. Baum,* 170 N.J. Super. 282, 406 A.2d 234 (N.J. Super. Ct. 1979); *Eschle v. Eastern Freight Ways,* 128 N.J. Super. 299, 319 A.2d 786 (N.J. Super. Ct. 1974).

In dicta in *Caldwell Trucking PRP Group v. Spaulding Composites Co.,* 890 F. Supp. 1247 (D.N.J. 1995), the court suggested that if an assignee obtained a judgment against an insured that could not be executed due to the insured's bankruptcy, "section 17:28-2 could authorize a direct action by the [assignee] against the Defendant insurers." *Id.* at 1253. But section 17:28-2 was not actually at issue in *Caldwell Trucking;* the PRP Group sought to bring a direct action not under 17:28-2 but under a provision of the New Jersey Spill Act, N.J.S.A. § 58:10-23.11s.

The final two cases cited by Flexi-Van do not invoke N.J.S.A. § 17:28-2 at all. See *Muntz v. Smaily,* 118 N.J. Super. 80, 286 A.2d 515 (N.J. Super. Ct. App. Div. 1972) (applying state procedural rule for service of process); *United States v. Tug Marine Venture,* 101 F. Supp. 2d 378 (D. Md. 2000) (analyzing Virginia's direct action statute, Va. Code Ann. § 38.2-2200).

[**12]

**B.**

Second, Flexi-Van argues that the District Court erred by compelling Flexi-Van to submit to arbitration without first making a finding that Flexi-Van was bound by the policy's arbitration clause. Generally speaking, [HN7] a party cannot be required to participate in arbitration, rather than adjudication, of a dispute unless it has agreed to submit that dispute, or disputes of like nature, to the arbitral process. See *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574,

582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960). Flexi-Van was not a signatory to the insurance policy, nor was it listed in the policy as an "Assured," a "Joint Assured," or a "Co-Assured." However, we have recognized that non-signatories to an arbitration agreement may be bound by that agreement through the application of "traditional principles of contract and agency law." _E.J. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Inter-mediates, S.A.S._, 269 F.3d 187, 194-95 (3d Cir. 2001). One such traditional principle, applicable in the arbitra-tion context, is the principle that a third-party beneficiary is bound by the terms of a contract where its claim arises out [**13] of that contract. _Id._ at 195; _see also Jansen v. Salomon Smith Barney, Inc._, 342 N.J. Super. 254, 776 A.2d 816, 820 (N.J. Super. Ct. App. Div. 2001) ("Non-signatories of a contract . . . may . . . be subject to arbi-tration if the nonparty is an agent of a party or a third party beneficiary to the contract") (internal quotations omitted).

In _Sandvik AB v. Advent International Corp._, 220 F.3d 99 (3d Cir. 2000), this court held that [HN8] a party could not be required to submit to arbitration be-fore the district court determined that the party was bound to a valid arbitration agreement. _Id._ at 107. Flexi-Van argues that, under _Sandvik_, the District Court should not have ordered Flexi-Van to submit to arbitration, be-cause it never determined that Flexi-Van was a loss payee, joint insured, co-insured, or third-party benefici-ary under the policy. The record suggests otherwise. Rul-ing from the bench, the District Court stated that Flexi-Van "stands in the shoes of Cho Yang, or [is] a third-party beneficiary of the insurance policy taken by Cho Yang. That insurance [policy] calls for arbitration in the United Kingdom." J. [**14] A. at 29. The District Court thus made the requisite finding that Flexi-Van, as either a subrogee of Cho Yang or a third-party beneficiary of the policy, was bound by the policy's arbitration clause. n4

> n4 We need not review the District Court's determination that Flexi-Van "stands in the shoes of Cho Yang, or [is] a third-party beneficiary of the insurance policy taken by Cho Yang," as Flexi-Van has not challenged the soundness of that determination.

## [*41] C.

As a general matter, [HN9] New Jersey insurance law requires an out-of-state corporation seeking to issue insurance policies to New Jersey residents to be either admitted by the Commissioner of Banking and Insur-ance, N.J.S.A. § 17:32-18, or claim limited approval by the Commissioner as "surplus lines insurers" providing coverage that is not otherwise available from authorized

insurers. N.J.S.A. § 17:22-6.42. Out-of-state insurers that are neither admitted, nor approved as surplus lines insurers, face restrictions on their ability to litigate claims in New [**15] Jersey, two of which have been raised by Flexi-Van. N.J.S.A. § 17:22-6.39 provides that an unauthorized insurer cannot "institute, file, or main-tain . . . any suit, action or proceeding in this State to enforce any right, claim or demand arising out of any insurance transaction in this State . . . ." And N.J.S.A. § 17:51-2(a) requires an unauthorized insurer to post secu-rity or otherwise demonstrate to the court that it has suf-ficient assets to satisfy any final judgment that may be entered against it. n5

> n5 N.J.S.A. § 17:51-2(a) requires an unau-thorized insurer to
>
> > [HN10] deposit with the clerk of the court in which such action or proceeding is pending cash or se-curities or file with such clerk a bond with good and sufficient sureties, to be approved by the court, in an amount to be fixed by the court sufficient to secure the payment of any final judgment which may be rendered in such ac-tion; provided, however, that the court may in its discretion and af-ter reasonable notice to the oppos-ing party and upon a hearing make an order dispensing with such de-posit or bond where the insurer shows to the satisfaction of the court that it maintains, in a State of the United States, funds or se-curities, in trust or otherwise, suf-ficient and available to satisfy any final judgment which may be en-tered in such action or proceeding . . . .

[**16]

It is undisputed that the Association has not been admitted by the Commissioner of Banking and Insur-ance, nor has it been approved by the Commissioner as a surplus lines insurer. Flexi-Van argues that the District Court erred by (1) allowing the Association to file a no-tice of removal and a motion to compel arbitration and dismiss, thereby, so Flexi-Van contends, allowing an unauthorized insurer to "institute, file, or maintain" an action, contrary to section 17:22-6.39; and (2) failing to

108 Fed. Appx. 35, *; 2004 U.S. App. LEXIS 15352, **

require the Association to post security sufficient to satisfy a final judgment, in violation of section 17:51-2(a).

However, [HN11] the general requirement that an out-of-state insurer be authorized by the Commissioner of Banking and Insurance to sell insurance in New Jersey does not apply to providers of ocean marine insurance. N.J.S.A. § 17:32-21(g) exempts from the authorization requirement "insurance of vessels, crafts or hulls, cargoes, marine builders' risks, marine protection and indemnity or other risks including strikes and war risks commonly insured under ocean or wet marine forms of policy." n6 The appellees cite a December [*42] 22, 1992, letter to the Association from the New Jersey Department [**17] of Insurance ("Department") as evidence that the Association qualifies as an ocean marine insurer. The letter was written in response to the Association's surplus lines application regarding its coverage of risks associated with world-wide ocean carriage and vessel operation, including risks related to containers and chassis leased and owned by ship operators. After reviewing the Association's submission, the Department determined that these risks were marine in nature, and therefore that the Association did not require admitted status or approval as a surplus lines carrier in order to provide such insurance in New Jersey.

> n6 The parties cite repeatedly to N.J.S.A. § 17:22-6.37(f) as the source of the Association's claimed exemption from the restrictions on unauthorized insurers. Section 17:22-6.37(f) does [HN12] provide an exemption for "insurances of vessels, crafts or hulls, cargoes, marine builders' risks, marine protection and indemnity or other risks including strikes and war risks commonly insured under ocean or wet marine forms of policy," but it is an exemption from a prohibition not at issue in the present case: the prohibition against acting on behalf of an unauthorized insurer. See N.J.S.A. § 17:22-6.37 ("No person shall in this State directly or indirectly act as agent for, or otherwise represent or aid on behalf of another, any insurer not then authorized to transact such insurance in this State . . . in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this State."). While the exemption found in section 17:22-6.37(f) reinforces our conviction that ocean marine insurers are not subject to New Jersey's restrictions on unauthorized insurers, it is not directly relevant to the present appeal.

[**18]

Flexi-Van attempts to undermine the importance of the Department's letter, primarily by listing the various types of insurance beyond ocean marine coverage offered by the Association. Whether the Association is acting outside the scope of the ocean marine exemption with respect to coverage it provides to other parties is irrelevant, however, to the matter at hand. The coverage provided to Cho Yang is the same as, or substantially similar to, the coverage characterized as "ocean marine" by the Department in 1992. [HN13] Where, as here, a federal court is asked to interpret state law, the federal court must give the decision of a state agency charged with administering that law the same deference accorded it by the New Jersey courts. See Kiwanis Int'l v. Ridgewood Kiwanis Club, 811 F.2d 247, 249 (3d Cir. 1987). The New Jersey courts give substantial weight to an administrative agency's interpretation of a statute it is charged with enforcing. In the Matter of Bd. of Educ. of Town of Boonton, 99 N.J. 523, 494 A.2d 279, 284 (N.J. 1985).

Relying on the Department's letter, the nature of Cho Yang's business, and Flexi-Van's own characterization of Cho Yang's [**19] business as a marine business in its complaint, the District Court determined that the coverage provided by the Association to Cho Yang was maritime in nature. We similarly defer to the Department's classification of the Association as an ocean marine insurer.

In addition to their general exemption from New Jersey's authorization requirement, [HN14] out-of-state ocean marine insurers are also specifically exempted from the restriction, under N.J.S.A. § 17:22-6.39, on an unauthorized insurer's ability to "institute, file, or maintain" a suit in New Jersey. See N.J.S.A. § 17:22-6.39. n7 Therefore, even if Flexi-Van is thought to be correct in its view that the Association, by removing this case to federal court and then moving for dismissal, can be said to have "instituted, filed, or maintained" a suit - a reading of the statutory language which we regard with considerable dubiety - we find that section 17:22-6.39 posed no restriction on those actions.

> n7 N.J.S.A. § 17:22-6.39 provides that
>
> > [HN15] no unauthorized insurer shall institute, file, or maintain . . . any suit, action or proceeding in this State to enforce any right, claim or demand arising out of any insurance transaction in this State except with respect to the following: . . . (2) . . . insurances of ves-

108 Fed. Appx. 35, *; 2004 U.S. App. LEXIS 15352, **

sels, crafts or hulls, cargoes, marine builders' risks, marine protection and indemnity or other risks including strikes and war risks commonly insured under ocean or wet marine forms of policy . . .

(emphasis added).

[**20]

The parties have not brought to our attention, nor have we independently [*43] found, an explicit ocean marine exemption from the security requirement of N.J.S.A. § 17:51-2(a). Nevertheless, given the general ocean marine exemption appearing in N.J.S.A. § 17:32-21(g), we are of the view that [HN16] the security requirement of section 17:51-2(a) was not intended to apply to ocean marine insurers. n8 Accordingly, we uphold the District Court's determination that N.J.S.A. §§ 17:22-6.39 and 17:51-2(a) are inapplicable to the Association.

n8 Even if, in an appropriate case, an unauthorized ocean marine insurer would be held to be bound by the security requirement, it is our view that, given the present posture of this litigation, for this court to direct the District Court, pursuant to N.J.S.A. § 17:51-2(a), either to demand that the Association post security, or to demonstrate that such a step would be unnecessary, would be an essentially pointless exercise. Indeed, Flexi-Van has not suggested in its briefs why such an exercise would be of any consequence

[**21]

III.

For the foregoing reasons, we will affirm the District Court's order granting the appellees' motion to compel arbitration and motion to dismiss.

# EXHIBIT P

LEXSEE

**WARREN T. KITCHEN, Plaintiff, v. WSCO PETROLEUM CORP. dba TOAD'S, Defendant.**

**CV-04-828-ST**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON**

**2006 U.S. Dist. LEXIS 3738**

**January 13, 2006, Decided**

**PRIOR HISTORY:** Kitchen v. WSCO Petroleum Corp., 2006 U.S. Dist. LEXIS 3745 (D. Or., Jan. 13, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant employer alleging violations of the Anti-Retaliation Statute pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and failure to pay overtime wages and reimbursements in violation of Or. Rev. Stat. § § 652.150, 652.200. The employer moved for summary judgment on the basis of judicial estoppel.

**OVERVIEW:** The employee filed a complaint with a state agency alleging sexual harassment and retaliation. The complaint was transferred to the Equal Employment Opportunities Commission who issued a right to sue notice. After he filed the current action, the employee sought bankruptcy protection under Chapter 13. In his schedule of assets the employee did not list or claim the current action. The employee also failed to include his claims against the employer in his Chapter 13 plan. The district court found that the employee did not act in bad faith. When the employee noticed that his claim against the employer was not listed he became concerned and asked his bankruptcy attorney about it, who advised that the schedules could be amended later. The employee relied on that representation and believed that the documents complied with bankruptcy rules. The employee cured any error promptly by amending his bankruptcy schedules just five days after learning about the error from the employer's counsel. The employee's failure to list the claim as an asset did not rise to prejudicial error because the claim was so speculative that the Chapter 13 trustee could not place any accurate value on the claim.

**OUTCOME:** The employer's motion for summary judgment was denied.

**CORE TERMS:** judicial estoppel, summary judgment, modification, manipulation, estopped, lawsuit, honest, confronted, estoppel, unfair advantage, inconsistency, undisclosed, deliberate, disclosure, equitable, asserting, omission, motive, bankruptcy petition, modified, listing, oath, employment discrimination, potential recovery, unsecured creditor, judicial system, fast and loose, opposing party, original plan, inadvertence

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN1] Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position. It is not only limited to asserting inconsistent positions in the same litigation, but also is appropriate to bar litigants from making incompatible statements in two different cases. Because it is intended to protect the integrity of the judicial process, judicial estoppel is an equitable doctrine invoked by a court at its discretion.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN2] A court "may" consider three factors in determining whether to apply the doctrine of judicial estoppel: (1) a party's later position must be clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and

(3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Bankruptcy Law > Estate Property > Content*
[HN3] A lawsuit based on events occurring prior to the filing of a bankruptcy petition is a claim existing as of the date the petition is filed; accordingly, the claim is property of the estate under 11 U.S.C.S. § 541(a)(1).

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN4] Judicial estoppel is designed not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts. Application of judicial estoppel is appropriate to prevent the deliberate manipulation of the courts. Accordingly, courts have judicially estopped parties that have taken inconsistent positions calculated to make a mockery of the judicial system. Many courts have imposed the additional requirement that the party to be estopped must have acted intentionally, not inadvertently.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN5] When a party acts in good faith and the creditors have been adequately informed, no threat is posed to the integrity of the bankruptcy system which depends on full and honest disclosure of debtors of all their assets. Judicial estoppel does not apply if incompatible positions are based not on chicanery or when a party's prior position was based on inadvertence or mistake. Mere inconsistency is not enough to permit a conclusion that a party has been playing fast and loose.

*Bankruptcy Law > Individuals With Regular Income > Plans > Modification*
*Bankruptcy Law > Reorganizations > Plans > Modification*
[HN6] Under bankruptcy law, only a plan proponent or the reorganized debtor may propose a modification of a Chapter 11 plan, leaving creditors vulnerable to late amendments, while even an unsecured creditor may propose a modification of a Chapter 13 plan.

*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*

[HN7] Honest disclosure is required in Chapter 13 bankruptcies, but determining whether a failure to disclose was based on an honest mistake or intentional manipulation of the court depends on the facts of each case.

*Bankruptcy Law > Individuals With Regular Income > Plans > Payments*
*Bankruptcy Law > Individuals With Regular Income > Plans > Modification*
[HN8] Under bankruptcy law, Chapter 13 allows a portion of a debtor's future earnings to be collected by a trustee and paid to creditors. A Chapter 13 plan (which sets out the payments to creditors) may be modified even after the vast majority of plan payments have been made. 11 U.S.C.S. § 1329(a). A debtor, a trustee or an unsecured creditor can all propose a modification of a Chapter 13 plan.

*Bankruptcy Law > Individuals With Regular Income > General Overview*
[HN9] 11 U.S.C.S. § 1325(a)(4) sets forth the amount of money which hypothetically will be distributed to unsecured creditors if the debtor files a chapter 7 bankruptcy.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN10] Judicial estoppel is an equitable doctrine which should not be applied where it would work an injustice.

**COUNSEL:** [*1]  For Warren T. Kitchen, Plaintiff: Franklin G. Patrick, Frank G. Patrick & Associates, Portland, OR.

For WSCO Petroleum Corp. doing business as Toad's, Defendant: Amy S. Campbell, Sarah J. Ryan, Ball Janik, LLP, Portland, OR.

**JUDGES:** Janice M. Stewart, United States Magistrate Judge.

**OPINION BY:** Janice M. Stewart

**OPINION:**

   OPINION AND ORDER

STEWART, Magistrate Judge:

   **INTRODUCTION**

   On February 16, 2005, plaintiff, Warren T. Kitchen ("Kitchen") filed a Third Amended Complaint, alleging the following claims against defendant WSCO Petroleum Corp. ("WSCO"):

2006 U.S. Dist. LEXIS 3738, *

(1) retaliation for opposition to unlawful employment practices in violation of the Anti-Retaliation Statute pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("First Claim");

(2) failure to pay overtime wages and reimbursements in violation of ORS 652.150 and 652.200 ("Second Claim");

(3) prejudgment interest ("Third Claim").

In its answer, WSCO raised nine affirmative defenses.

This court has jurisdiction over Kitchen's First Claim pursuant to 42 U.S.C. § 2000e. Both parties have consented to allow a Magistrate [*2] Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c).

WSCO has now filed a Motion for Summary Judgment (docket # 40) against all claims on the basis of judicial estoppel. For the reasons that follow, the Motion for Summary Judgment is DENIED.

FACTS

WSCO is an Oregon corporation that does business in the state of Oregon under the assumed name of WSCO Petroleum and Toad's. Kitchen commenced at-will employment with WSCO on or about September 23, 2002, and was terminated on or about December 31, 2002.

On August 29, 2003, Kitchen filed a complaint with the Oregon Bureau of Labor and Industries ("BOLI"), alleging sexual harassment and retaliation against WSCO. Defendant's Ex. 1, p. 2. BOLI subsequently transferred the complaint to the Equal Employment Opportunities Commission ("EEOC") for investigation. Id at 1. On or about March 19, 2004, the EEOC issued its determination, stating that based on its investigation, it was "unable to conclude that the information obtained establishes violations of the statutes.". Defendant's Ex. 2, p. 1. Kitchen was provided with [*3] a 90-day right to sue notice. Id. His right to sue expired on or about June 14, 2004. Id.

On April 5, 2004, Kitchen filed a Voluntary Petition for a Chapter 13 Bankruptcy in the United States Bankruptcy Court for the District of Oregon, Case No. 04-33230-rld13, together with mandatory schedules of assets. Defendant's Ex. 3. In his schedule of assets, Kitchen did not disclose or list the claims for relief that Kitchen now alleges against WSCO in this action. Id at 6-7. Instead, Kitchen's claim against WSCO (misspelled as "Westco") was included on the schedule listing unse-

cured, non-priority creditor claims. Id at 14. Kitchen also failed to include his claims against WSCO on his Chapter 13 Plan (the "Plan"), which was filed simultaneously with his bankruptcy petition and later modified on or about May 28, 2004. Defendant's Ex. 4.

On May 11, 2004, at a "341a Meeting of Creditors," the Trustee asked Kitchen whether all his assets were listed on the schedules, and Kitchen responded "yeah." Defendant's Ex. 6, p. 3. No creditors were present at that meeting. Id at 2. The Trustee also asked Kitchen whether he had reviewed the documents signed by him and prepared by his [*4] attorney, and Kitchen again responded "yeah." Id at 4. The Trustee finally asked "Do you find them to be complete, true and accurate to the best of your knowledge?," and Kitchen answered "To the best of my knowledge, yeah." Id.

On June 10, 2004, Kitchen amended his bankruptcy schedules, but did not add his claims against WSCO. Defendant's Ex. 5, p. 3; Defendant's Ex. 7, p. 9. On August 30, 2004, the Bankruptcy Court issued an "Order Confirming Plan and Resolving Motions." Defendant's Ex. 8.

On or about July 5, 2005, WSCO's attorney confronted Kitchen's attorney with WSCO's intent to move for summary judgment on the basis of judicial estoppel relating to the bankruptcy filing. Affidavit of Amy S. Campbell, P 2. On or about July 11, 2005, Kitchen amended his bankruptcy schedules to add his claims against WSCO, as well as a contract claim and malpractice claim against others that he had not previously disclosed. Defendant's Ex. 9, p. 3. This amendment was filed with the bankruptcy court and served on the Chapter 13 and Trustee. Defendant's Ex. 12. Kitchen has never informed his creditors of his claims against WSCO. Id. Kitchen amended his schedules prior to WSCO's motion [*5] for summary judgment, which was filed on July 22, 2005.

On August 2, 2005, Kitchen and the Trustee entered into a stipulation to modify the plan "so that any non-exempt proceeds will be used to fund the plan and to pay claims. The parties anticipate that any such proceeds will increase payment to creditors." Plaintiff's Ex. C, p.2.

DISCUSSION

WSCO argues that Kitchen has failed to meet his obligations as a debtor pursuant to the Bankruptcy Code by not listing his pre-petition claims against WSCO in his original bankruptcy filings, his subsequent testimony and amendments to his schedules and Chapter 13 Plan and by amending his schedules after being confronted with the threat of a motion for summary judgment. Therefore, WSCO believes Kitchen's claims are barred under the doctrine of judicial estoppel.

## I. Legal Standard

[HN1] "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th. Cir. 2001), citing *Rissetto v. Plumbers & Steamfitters Local, 343*, 94 F.3d 597, 600-01 (9th Cir. 1996) [*6] and *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th. Cir. 1990), *cert. denied*, 501 U.S. 1260, 111 S. Ct. 2915, 115 L. Ed. 2d 1078 (1991). It is not only limited to asserting inconsistent positions in the same litigation, but also is appropriate to bar litigants from making incompatible statements in two different cases. *Id.* at 782-83. Because it is intended to protect the integrity of the judicial process, judicial estoppel "is an equitable doctrine invoked by a court at its discretion." *Russell*, 893 F.2d at 1037.

[HN2] A court "may" consider three factors in determining whether to apply the doctrine of judicial estoppel: (1) "a party's later position must be clearly inconsistent with its earlier position;" (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Hamilton*, 270 F.3d at 782-83, quoting [*7] *New Hampshire v. Maine*, 532 U.S. 742, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (internal quotations and citations omitted).

## II. Analysis

[HN3] A lawsuit based on events occurring prior to the filing of a bankruptcy petition is a claim existing as of the date the petition is filed; accordingly, the claim is property of the estate under 11 U.S.C. § 541(a)(1). *United States v. Whiting Pools*, 462 U.S. 198, 205, 103 S. Ct. 2309, 76 L. Ed. 2d 515 n9 (1983). Kitchen's potential employment discrimination claim arose before he filed his bankruptcy petition, and yet he failed to list this claim as an asset on his schedules, although he was expressly required to do so by 11 U.S.C. § 521(1).

[HN4] Judicial estoppel is designed "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general consideration [s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to protect against a litigant playing fast and loose with the courts.'" *Hamilton*, 270 F.3d at 782, citing *Russell*, 893 F.2d at 1037. Application of judicial estoppel is appro-

priate to "prevent the *deliberate* [*8] *manipulation* of the courts." *Helfand v. Gerson*, 105 F.3d 530, 536 (9th. Cir. 1997) (citation omitted, emphasis added). Accordingly, courts have judicially estopped parties that have taken inconsistent positions *calculated to* make a mockery of the judicial system. *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1284 (11th. Cir. 2002) (citations omitted, emphasis added); *see also Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 206 (5th. Cir. 1999) ("many courts have imposed the additional requirement that the party to be estopped must have acted *intentionally*, not inadvertently" (citations omitted, emphasis added)); *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th. Cir. 1973) (interpreting Texas law on judicial estoppel as "the rule looks toward *cold manipulation*") (emphasis added)).

However, [HN5] when a party acts in good faith and the creditors have been adequately informed, no threat is posed to the "integrity of the bankruptcy system [which] depends on full and honest disclosure of debtors of all their assets." *Hamilton*, 270 F.3d at 785, quoting *In re Coastal Plains*, 179 F.3d at 208. [*9] Judicial estoppel does not apply "if incompatible positions are based not on chicanery, *Johnson v. State, Oregon Dept. of Human Resources. Rehab. Div.*, 141 F.3d 1361, 1369 (9th Cir 1998), or "when a party's prior position was based on inadvertence or mistake." *Helfand*, 105 F.3d at 536. Mere inconsistency is not enough to permit a conclusion that a party has been playing fast and loose. *General Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d 1500, 1505 (9th Cir 1995), *cert. denied*, 516 U.S. 1146, 116 S. Ct. 1017, 134 L. Ed. 2d 97 (1996).

The issue is whether Kitchen's failure to include his claim against WSCO on the original schedule of assets was deliberate, intentional and in bad faith, or was due to inadvertence or mistake. WSCO alleges that Kitchen is guilty of "coy shenanigans" because he had knowledge of his pre-petition claims against WSCO at the time he filed for bankruptcy and failed to provide notice to the bankruptcy court, Trustee and creditors until he was confronted by WSCO of its intent to move for summary judgment.

This court finds that Kitchen did not act in bad faith. WSCO relies on an alleged inconsistency between Kitchen's deposition [*10] testimony (stating that he noticed some debts, including the WSCO claim, were missing from the schedules, asked his lawyer about them and was reassured that they could added later by amending the schedules), his oath at the creditors' meeting (certifying that the schedules are true and accurate to the best of his knowledge), and his declaration filed in opposition to the summary judgment motion. As discussed in this court's Opinion and Order on WSCO's Motion to Strike, Kitchen's deposition testimony is not inconsistent with

his oath at the creditors' meeting or his declaration. When Kitchen noticed that some of his "debts" were not listed on his schedules, including his claim against WSCO, he became concerned and asked his bankruptcy attorney about it, who advised that the schedules could be amended later. Deposition of Kitchen, pp. 12, 16, 18, 66-67. Kitchen relied on that representation and believed that the documents complied with bankruptcy rules. *Id* at 9, 12, 27, 41, 58, 61. He found the bankruptcy proceeding totally confusing and did not understand the precise status of his BOLI complaint and how it was connected to the bankruptcy proceeding. Declaration of Kitchen, P 3;  [*11] Deposition of Kitchen, pp. 22-23, 27, 62-64. As a result, he answered all the questions under oath "truthfully to the best of [his] ability on [his] information, knowledge and belief. Declaration of Kitchen, P 13. In hindsight, he could only assume "the materials . . . were misunderstood to result in the mischaracterization of the claim' in the manner which found its way to the Schedule F [creditors holding unsecured nonpriority claims, Defendant's Ex. 3, p. 13]" and that "any mistakes that I . . . caused my lawyer to make have been the result of confusion surrounding the events and not b[y] any effort of mine to hide." *Id* at PP 4, 16. Kitchen did not realize that WSCO was listed in his original schedules, although on the wrong schedule, until the time of his deposition. In fact, the listing of WSCO on the original Schedule F, even if incorrect, corroborates Kitchen's assertion that he told his bankruptcy attorney about the claim against WSCO.

Furthermore, Kitchen cured any error promptly by amending his bankruptcy schedules just five days after learning about the error from WSCO's counsel. Defendant's Ex. 9, p. 3. Some courts outside this jurisdiction have found that [*12] amending is not enough to avoid judicial estoppel. In *Scoggins v. Arrow Trucking Co.. 92 F. Supp. 2d 1372 (SD Ga 2000)*, the court applied judicial estoppel where plaintiff did not inform the trustee or his creditors of the claim until the opposing party filed a summary judgment motion against him. However, plaintiff failed to provide any affidavit or other explanation for his failure to list the claim as an asset on the original schedules and offered no proof that he was in the process of moving to amend his bankruptcy filings to disclose the claim. *Id.* at 1375-76. Kitchen has offered both an explanation of the error and actual proof that he amended his bankruptcy schedules to correct the error.

Other case relied on by WSCO are distinguishable. In *Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3rd. Cir. 1988)*, the Third Circuit applied judicial estoppel where a business debtor listed the bank which had driven him into bankruptcy as a creditor owed $ 7.7 million on the Chapter 11 bankruptcy schedules, failed to list the potential claims against the bank on its assets schedule, and then sued the bank. As later acknowledged by [*13] the Third Circuit in *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.. 81 F.3d 355. 362 (3rd. Cir. 1996)*, another Chapter 11 case, *Oneida* did not expressly analyze the debtor's intent, but found "ample evidence in the record" from which to draw an inference of deliberate manipulation. Whereas the creditors might have been entitled to the full amount of any recovery had they known about the claim in advance, the reorganization plan limited their potential recovery to only one-third of the debtor's potential recovery, and the bank may have voted differently under the plan had it known it would be sued. *Id.* at 363. In contrast, Kitchen's bankruptcy was not caused by WSCO; WSCO did not take any part in the approval of the original plan and was not misled in any way; and unlike *Oneida*, a business engaging in interstate commerce, Kitchen is an unsophisticated party. Moreover, [HN6] "only the plan proponent or the reorganized debtor may propose a modification of a Chapter 11 plan, leaving creditors vulnerable to late amendments, " while even an unsecured creditor may propose a modification of a Chapter 13 plan. *In re Anthony. 302 B.R. 843. 849-50 (Bkrtcy. N.D. Miss. 2003).* [*14]

In *Burnes*, six months after filing for bankruptcy under Chapter 13, the plaintiff filed an employment discrimination suit but failed to amend his schedule to include his lawsuit. Two years later he requested that his Chapter 13 bankruptcy be converted to a Chapter 7 case, was ordered to file amended schedules and again failed to report the pending lawsuit. After he received a "no asset" complete discharge of his debts, plaintiff was confronted with a motion for summary judgment by his opponent in the employment discrimination case on the basis of judicial estoppel, and only then sought to reopen his bankruptcy to include the undisclosed claim. Unlike Kitchen, the plaintiff in *Burnes* clearly benefitted from the omission of his claim and even implicitly acknowledged that disclosing this information would have likely changed the result of his bankruptcy.

In *De Leon v. Comcar Ind.. Inc.. 321 F.3d 1289. 1291 (11th. Cir. 2003)*, a Chapter 13 bankruptcy case, the Eleventh Circuit held that "judicial estoppel bars a plaintiff from asserting claims previously undisclosed to the bankruptcy court where the plaintiff both knew about the undisclosed claims and had a motive [*15]  to conceal them from the bankruptcy court." The plaintiff had not amended his chapter 13 bankruptcy filing to add his lawsuit as a potential asset until after the defendant relied on this omission to file a motion to dismiss the case. Without discussing the facts, the court "inferred from the record [the plaintiff's] intent to make a mockery of the judicial system." *Id.* at 1292 (internal quotations and citations omitted). The court based its decision on *Burnes*,

2006 U.S. Dist. LEXIS 3738, *

involving a Chapter 7 bankruptcy, and found find the differences between Chapters 7 and 13 sufficient enough to affect the applicability of judicial estoppel "because the need for complete and *honest* disclosure exists in all types of bankruptcies." *De Leon*, 321 F.3d at 1291 (emphasis added).

This court agrees that [HN7] honest disclosure is required in Chapter 13 bankruptcies, but determinating whether a failure to disclose was based on an honest mistake or intentional manipulation of the court depends on the facts of each case. *De Leon* is not persuasive because it did not thoroughly discuss the facts. Furthermore, *De Leon* offered no authority for its conclusion that "a financial [*16] motive to secret assets exists under Chapter 13 as well as under Chapter 7 because the hiding of assets affects the amount to be discounted and repaid." *Id.* Another court discussing this conclusion in *De Leon* was not convinced that a Chapter 13 debtor-in-possession has a motive to secret assets, given that the creditors are repaid out of the debtor's income. *EEOC v. Apria Healthcare Group, Inc.*, 222 F.R.D. 608, 613 n3 (E.D. Mo. 2004). This court is similarly unconvinced.

A related question is whether Kitchen has derived an unfair advantage from the inconsistency. n1 [HN8] "Chapter 13 allows a portion of a debtor's future earnings to be collected by a trustee and paid to creditors." *Burnes*, 291 F.3d at 1284.n1. A Chapter 13 plan (which sets out the payments to creditors) may be modified even after the vast majority of plan payments have been made. 11 U.S.C. § 1329(a). The debtor, the trustee or an unsecured creditor could all propose a modification of a Chapter 13 plan. *Id.* Thus, even though the creditors were not aware of the claim against WSCO at the time the creditors' meeting took place, they can propose a modification of the [*17] payment plan. According to the Trustee's attorney, Kitchen's failure to list the claim as an asset "does not rise to prejudicial error because the claim is so speculative that the chapter 13 Trustee could not place any accurate value on the claim and so could not fill in the number in paragraph 2(f) [of the debtor's plan]." *Declaration of Jack Fisher*, p. 3. [HN9] Pursuant to 11 U.S.C. § 1325(a)(4), the number in paragraph 2(f) is "the amount of money which hypothetically would be distributed to unsecured creditors if the debtors had filed a chapter 7 bankruptcy." *Id.* Since the amount could not have been determined initially, the Trustee in Kitchen's

bankruptcy proceedings would have required the debtors to turn over any non-exempt funds for distribution to creditors and would have modified the Chapter 13 plan to reflect that. *Id.* However, the original plan already mandated Kitchen to "report immediately to the trustee any right of the debtor or debtor's spouse to a *distribution of funds*" and not to use these funds without the trustee's permission. Defendant's Ex. 8, p. 1. The creditors were therefore not harmed during the time the claim against WSCO [*18] was not disclosed because no distribution of funds occurred. Had it had occurred, Kitchen would not have been allowed to use these funds without the Trustee's permission, and even unsecured creditors could have requested a modification of the plan to reflect the new funds.

> n1 There is no evidence that WSCO would suffer an unfair detriment if Kitchen is not estopped. In fact, because WSCO was listed as an unsecured non-priority creditor on the original schedules, it either knew or should have known about Kitchen's error, yet did nothing for more than a year before notifying Kitchen's attorney of its intention to move for summary judgment. Surely, WSCO would have acted had it felt Kitchen's omission was detrimental to it.

[HN10] Judicial estoppel is an equitable doctrine which should not be applied "where it would work an injustice." *In re Cassidy*, 892 F.2d 637, 642 (7th. Cir. 1990) (citations omitted). Application of judicial estoppel is not appropriate in this case because Kitchen did not act in bad [*19] faith, has cured his error and has not derived an unfair advantage from his error. In fact, if Kitchen's claims against WSCO have any merit, allowing this case to continue may benefit Kitchen's creditors.

**ORDER**

For the reasons set forth above, defendant's Motion for Summary Judgment (docket # 40) is DENIED.

DATED this 13th day of January, 2006.

Janice M. Stewart

United States Magistrate Judge

# EXHIBIT Q

LEXSEE

**MEDTRONIC AVE INC., Medtronic Vascular, Inc., a/k/a Medtronic Vascular, Inc.
v. CORDIS CORPORATION, Appellant**

No. 04-1042

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

367 F.3d 147; 100 Fed. Appx. 865; 2004 U.S. App. LEXIS 8533

March 26, 2004, Argued
April 30, 2004, Filed

**PRIOR HISTORY:** [**1] On Appeal From the United
States District Court For the District of Delaware. (D. C.
No. 03-cv-00402). District Judge: Honorable Sue L.
Robinson. Medtronic Ave, Inc. v. Cordis Corp., 2003
U.S. Dist. LEXIS 23580 (D. Del., Dec. 11, 2003)
Medtronic AVE Inc. v. Advanced Cardiovascular Sys.,
247 F.3d 44, 2001 U.S. App. LEXIS 6723 (3d Cir. Del.,
2001)

**DISPOSITION:** Vacated and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant company
sought review of an order of the United States District
Court For the District of Delaware, which enjoined arbi-
tration in plaintiff patentee's patent infringement action.

**OVERVIEW:** The company asserted as one of its de-
fenses that it had a license to use the patents under a set-
tlement and license agreement that it entered with the
parent corporation of the patentee prior to litigation. The
district court had originally held that the dispute was
arbitrable, but on reconsideration the court held the dis-
pute was not arbitrable. It entered an order enjoining
arbitration and denied the company's motion to stay the
proceedings. The instant court, however, concluded that
the dispute was arbitrable. The court gave an expansive
interpretation to "arising from." A dispute would "arise
from" the agreement whenever the correct resolution of
the dispute depended on a construction of the agreement.
The validity of the license defense unquestionably turned
on the construction of the agreement. Language in the
agreement (in which one article carved out certain dis-
putes from coverage of that article) confirmed that inter-
pretation. New York law also unquestionably supported
that broad interpretation. The patentee advanced no plau-

sible argument why the "arising from" language should
not be construed in this manner.

**OUTCOME:** The district court's order was vacated, and
the matter was remanded.

**CORE TERMS:** patent, arbitration, arbitrable, license,
arbitration clause, arbitrability, affiliate, arbitrator, li-
censed, after-acquired, arbitration agreement, assurance,
arbitrate, competitor, Federal Arbitration Act, reconsid-
eration, arbitrated, colleagues, order to arbitrate, applica-
bility, susceptible, infringing, formation, expansive, ple-
nary, binding arbitration, license to use, unquestionably,
cross-license, acquisition

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution >
Arbitrations > Arbitrability*
*Civil Procedure > Appeals > Appellate Jurisdiction >
Interlocutory Orders*
*International Trade Law > Dispute Resolution > Arbi-
tration*
[HN1] 9 U.S.C.S. § 16(a)(1)(A) provides for interlocu-
tory review of an order refusing a stay of any action
pending arbitration.

*Civil Procedure > Alternative Dispute Resolution >
Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution >
Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions >
Arbitration Clauses*
[HN2] An order to arbitrate should not be denied unless
it may be said with positive assurance that the arbitration

367 F.3d 147; 100 Fed. Appx. 865, *;
2004 U.S. App. LEXIS 8533, **

clause is not susceptible of an interpretation that covers the asserted dispute.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN3] Arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes - but only those disputes - that the parties have agreed to submit to arbitration.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
[HN4] Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
[HN5] Courts have no business weighing the merits of the issue proposed to be arbitrated. There may be cases in which a preliminary ruling on the merits is unavoidable.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN6] When phrases such as "arising under" and "arising out of" appear in arbitration provisions, they are normally given broad construction. Coupled with the usual strong presumption in favor of arbitrability, a clause providing for the arbitration of all matters "arising from" an agreement overwhelmingly suggests that a given dispute is arbitrable.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN7] A dispute will "arise from" an agreement whenever the correct resolution of the dispute depends on the construction of the agreement.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN8] An order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN9] The Federal Arbitration Act, 9 U.S.C.S. § § 1-16, gives the arbitrator the power to determine the scope of the arbitration clause as well as the substantive merits of the claim.

COUNSEL: KAREN J. LOUDEN, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, RAPHAEL V. LUPO (Argued), NATALIA BLINKOVA, DONNA M. TANGUAY, McDermott, Will & Emery, Washington, DC, ELLIOT SILVERMAN, McDermott, Will & Emery, Irvine, CA, Attorneys for Appellee.

GREGORY L. DISKANT (Argued), EUGENE M. GELERNTER, WILLIAM F. CAVANAUGH, JR., WENDY E. KEMP, SCOTT B. HOWARD, KATHLEEN M. CROTTY, Patterson, Belknap, Webb & Tyler, New York, NY, Attorneys for Appellant.

JUDGES: Before: AMBRO, CHERTOFF and BECKER, Circuit Judges.

OPINION BY: BECKER

OPINION: [*866] BECKER, *Circuit Judge.*

This appeal by Cordis Corp. ("Cordis"), the defendant in a patent infringement lawsuit brought against it by Medtronic AVE, Inc. ("Medtronic AVE"), requires us to decide whether Cordis's claim that it has a license to use certain patents should be determined by an arbitrator. The District Court held that the dispute [**2] was not arbitrable, and enjoined arbitration. We will vacate and remand. Because the parties are fully familiar with the background facts and procedural history we need not set them forth, and limit our discussion to our *ratio decidendi.* n1

367 F.3d 147; 100 Fed. Appx. 865, *;
2004 U.S. App. LEXIS 8533, **

n1 We exercise "plenary review over legal questions concerning the applicability and scope of an arbitration agreement." *Kilkenny v. Guy C. Long. Inc.. 288 F.3d 116. 119 (3d Cir. 2002)* (citing *Medtronic AVE. Inc. v. Advanced Cardiovascular Sys. Inc.. 247 F.3d 44. 53-54 (3d Cir. 2001)).* At all events, where "the district court engages in contract construction"- as it did here - "we exercise plenary review." *Id.* (citing *Medtronic AVE. 247 F.3d at 53-54).*

I.

Medtronic AVE's suit alleges that Cordis is infringing certain patents (the "Boneau patents") in the field of coronary stents. Cordis asserts as one of its defenses that it has a license to use the patents under a Settlement and License Agreement (the "Agreement") [**3] that it entered into with the parent corporation of Medtronic AVE to settle prior litigation. n2 At the District Court, Cordis sought to stay the proceedings in the infringement suit and compel arbitration on the issue of its license defense. Medtronic AVE opposed. The District Court first held that the dispute was arbitrable, but then on reconsideration held that it was not. The District Court entered an order enjoining arbitration, and denied Cordis's motion to stay its proceedings. Cordis appeals to this Court under *9 U.S.C. § 16(a)(1)(A),* which [HN1] provides for interlocutory review of an order "refusing a stay of any action" pending arbitration.

n2 Medtronic AVE's parent corporation, Medtronic, Inc., entered into this agreement with Cordis prior to its acquisition of Arterial Vascular Engineering, Inc. (which, upon acquisition, was renamed Medtronic AVE, Inc. and has since been renamed Medtronic Vascular, Inc.).

The contract dispute at issue is governed by state law (New York law, under [**4] § 11.04 of the Agreement), though we are also guided by cases decided under the Federal Arbitration Act, codified as amended at *9 U.S.C. § § 1-16.* These cases, which lay down the overarching principles by which arbitration clauses are interpreted, are *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.. 460 U.S. 1. 24. 74 L. Ed. 2d 765. 103 S. Ct. 927 (1983)* (explaining that there is a "liberal federal . policy favoring arbitration"); *AT&T Technologies, Inc. v. Communications Workers of America. 475 U.S. 643. 650. 89 L. Ed. 2d 648. 106 S. Ct. 1415 (1986)* [HN2] ("'[An] order to arbitrate ...should not be denied unless it may be said with positive assurance that

the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. '" (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.. 363 U.S. 574. 582-83. 4 L. Ed. 2d 1409. 80 S. Ct. 1347 (1960)));* [*867] *First Options of Chicago. Inc. v. Kaplan. 514 U.S. 938. 943. 131 L. Ed. 2d 985. 115 S. Ct. 1920 (1995)* [HN3] ("Arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes - but only those disputes - that the parties have agreed to [**5] submit to arbitration."); and *Suter v. Munich Reinsurance Co.. 223 F.3d 150. 155 (3d Cir. 2000)* [HN4] ("'Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" (quoting *Patten Sec. Corp. v. Diamond Greyhound & Genetics. Inc.. 819 F.2d 400. 405-07 (3d Cir. 1987))).*

II.

These are useful guidelines, and they are all easily satisfied in this case because we conclude that the contract clearly makes this dispute arbitrable. Two provisions from the agreement command our attention. First is language from Article V, which is captioned "Resolution of Patent Disputes":

> In addition [to other provisions specific to certain enumerated patents], any dispute, claim, or controversy arising under this Agreement which relates to patent matters, the resolution of which is not specifically provided for [in another part of the Agreement], shall be resolved pursuant to binding arbitration ...

Agreement § 5.02. Second is language from Article X, which is captioned "Alternative Dispute Resolution":

> Any dispute, claim, or controversy ("disputes") arising from or relating to this Agreement or alleged [**6] breaches thereof (excluding all disputes related to patent matters, such as all disputes related in whole or in part to a Licensed Patent or any patent alleged to be a Licensed Patent or related to whether a product is in the Field, which disputes shall be resolved pursuant to Article V) ...shall be resolved by binding Alternative Dispute Resolution ...

367 F.3d 147; 100 Fed. Appx. 865, *;
2004 U.S. App. LEXIS 8533, **

Agreement § 10.01. Article X and Article V provide (in sections we have not reproduced) somewhat different procedures for dispute resolution.

We agree with Cordis that Article X establishes a seamless division of "disputes, claims, [and] controversies" into two classes: Those that are arbitrable under Article X and those that are arbitrable under Article V, the latter being "disputes related to patent matters." So long as a dispute "arises from or relates to" the Agreement, it must be arbitrated under either Article V or Article X. There is simply no basis in the plain language of the Agreement for Medtronic AVE's contention that there is an unspoken third category of disputes (to which putative class the instant dispute would belong) that is not governed by either Article V or Article X. This is not "Scylla and Charybdis" [**7] where one may pass in the narrow channel between; rather, in the Agreement, "all roads lead to Rome," for the license issue is either subject to Article V, or if it is not subject to Article V, then it is necessarily subject to Article X.

These conclusions, of course, depend upon the accuracy of the proposition that the dispute in question "arises from or relates to" the Agreement. The District Court held on reconsideration that, this being a licensing agreement, only disputes about *licensed* patents would "arise from or relate to" the Agreement. Since the Court concluded that the Boneau patents were not licensed under the Agreement (and hence not covered by the Agreement), it held that this dispute did not arise from the Agreement, and hence was not arbitrable. Medtronic AVE endorses this reasoning on appeal. We disagree.

Preliminarily, we note the longstanding rule that [HN5] courts "have no business weighing [*868] the merits" of the issue proposed to be arbitrated. *United Steelworkers of Am. v. Am. Mfg. Co.,* 363 U.S. 564, 568, 4 L. Ed. 2d 1403, 80 S. Ct. 1343 (1960). This was, as the District Court recognized, the effect of its ruling on reconsideration. This alone does not render [**8] the District Court's analysis incorrect, for there may be cases in which a preliminary ruling on the merits is unavoidable. In this case, however, a review of (and ruling on) the merits was entirely unnecessary because the District Court erred in its construction of the Agreement's "arising from" language.

We give an expansive interpretation to "arising from." As we explained in *Battaglia v. McKendry,* 233 F.3d 720, 727 (3d Cir. 2000), [HN6] "when phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction." Coupled with our usual strong presumption in favor of arbitrability, *see, e.g., Sharon Steel Corp. v. Jewell Coal & Coke Co.,* 735 F.2d 775, 778 (3d Cir. 1984), a clause providing for the arbitration of all matters "arising from"

an agreement overwhelmingly suggests that a given dispute is arbitrable. Cordis also directs us to interpretations of similar language in a variety of other arbitration agreements. For example, in *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress International, Inc.,* 1 F.3d 639, 642 (7th Cir. 1993), the Court interpreted an arbitration clause [**9] applying to disputes "arising out of the agreement" as covering "any dispute between the contracting parties that is in any way connected with their contract." n3

> n3 Two of the cases cited by Cordis address whether disputes about the very formation of the contract that contains the arbitration clause are arbitrable. These decisions follow the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967), which held that apart from issues that go to the making of the agreement to arbitrate (i. e., the arbitration clause itself), disputes about the very formation of the contract are arbitrable. It seems to us that if this marks the outer limit of what issues are arbitrable under an "arising from" clause, then the dispute in this case is comfortably in the heartland of disputes that ought to be arbitrated under the language of the Agreement.

Moreover, as arbitration clauses are close cousins of jurisdictional provisions, we can look [**10] to the "arising under" language of Article III, section 2 of the United States Constitution. "A case 'arises' under the Constitution or a law of the United States ... whenever its correct decision depends on the construction of either." *Black's Law Dictionary* 108 (6th ed. 1990). Adapting that principle to this case, [HN7] a dispute will "arise from" the Agreement whenever the correct resolution of the dispute depends on the construction of the Agreement. The validity of Cordis's license defense unquestionably turns on the construction of the Agreement.

This interpretation is confirmed by the language of the Agreement itself. As quoted above, § 10.01 of the Agreement carves out (in the "excluding ..." clause) certain disputes from the coverage of Article X. Of course, something can be *excluded* only if it would otherwise be *included,* and so disputes "related to patent matters, such as disputes related in whole or in part to a Licensed Patent or any patent alleged to be a Licensed Patent" must be a subset of the larger set of disputes "arising from or relating to this Agreement or alleged breaches thereof." Because Cordis seeks to arbitrate a "dispute related ...in part to .. [**11] .[a] patent alleged to be a Licensed Patent," the question whether Cordis enjoys a license to the

Boneau patents does [*869] indeed arise under the Agreement, and hence is arbitrable.

New York law, which governs our interpretation of the Agreement, unquestionably supports this interpretation. In *Shaw Group Inc. v. Triplefine International Corp.*, 322 F.3d 115, 120 (2d Cir. 2003), the Court of Appeals for the Second Circuit applied New York law to interpret an arbitration clause which provided that "all disputes [between the parties] concerning or arising out of this Agreement shall be referred to arbitration." The Court interpreted the "arising out of" language very broadly, holding that it required referring even the issue of arbitrability to the arbitrator. *See id.* at 121-25. Furthermore, in that discussion, the Court noted that in *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 689 N.E.2d 884, 666 N.Y.S.2d 990 (N. Y. 1997), the New York Court of Appeals had broadly construed language providing for the arbitration of "any controversy." Clearly "any dispute, claim, or controversy" (as used in Article X of the Agreement) is at least as expansive as [**12] "any controversy" (as used in the *Smith Barney Shearson* agreement).

Moreover, Medtronic AVE has advanced no plausible argument why the "arising from" language should *not* be construed this way. By contrast, for example, the plaintiff in *Battaglia* - who, like Medtronic AVE, sought to avoid arbitration - advanced an argument on appeal that the structure of the agreement at issue rendered the arbitration clause inapplicable to certain matters. *See Battaglia,* 233 F.3d at 728-29. Medtronic AVE offers no such argument, yet the requirement of "positive assurance" that an arbitration clause is inapplicable places the burden squarely on Medtronic AVE in this case. *See AT&T Techs.,* 475 U.S. at 650 [HN8] ("'[An] order to arbitrate ...should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" (quoting *Warrior & Gulf Navigation Co.,* 363 U.S. at 582-83)). We cannot *plausibly* say - let alone say with "positive assurance" - that the "arising from" language does not require arbitration of the license issue.

Finally, we note [**13] that our decision comports with the long line of cases that hold that arbitrability is ultimately a question for the arbitrator to resolve. *See Sharon Steel,* 735 F.2d at 779 [HN9] ("The Federal Arbitration Act gives the arbitrator the power to determine the scope of the arbitration clause as well as the substantive merits of the claim." (citing *Acevedo Maldonado v. PPG Indus.,* 514 F.2d 614, 617 (1st Cir. 1975)).

III.

We limit our holding to the arbitrability of the existence *vel non* of a license to the Boneau patents, but we also note Cordis's counsel's position at oral argument that

Cordis seeks to arbitrate *only* the license issue, and does not argue that Medtronic AVE's entire lawsuit should be referred to arbitration. n4 We need not decide whether arbitration in this case should proceed under the provisions of Article V or Article X; the parties may be able to agree between themselves, and if not, the District Court should have the opportunity to resolve that issue in the first instance. And [*870] we of course intimate no view on the merits of the controversy. *See Am. Mfg. Co.,* 363 U.S. at 567-68.

> n4 Medtronic AVE protests that ruling in Cordis's favor makes virtually any dispute between the parties arbitrable. As this case demonstrates, Medtronic AVE is correct that disputes between the parties in which the Agreement is invoked are arbitrable - though only in part, because only those issues "arising from" the Agreement are arbitrable. This is a far cry from construing the Agreement to give the parties *carte blanche* to arbitrate *the whole of any* dispute between them, which we of course do not do.

[**14]

The order of the District Court will be vacated, and the case remanded with instructions for the District Court to enter an order compelling arbitration of the license issue. The mandate shall issue forthwith.

**CONCUR BY:** AMBRO

**CONCUR:** AMBRO, Circuit Judge, concurring

I concur in the outcome reached by my colleagues, which vacated the District Court's denial of arbitration. I agree that the District Court erred in reaching the merits of the dispute to decide arbitrability. I also agree that "all roads lead to Rome," *i. e.,* arbitration (though there may be one more road not mentioned in Judge Becker's opinion). But I disagree with my colleagues' blanket statement that arbitrability itself is a question for the arbitrator.

It is unnecessary to leave the resolution of arbitrability to the arbitrator in this case. In *Sharon Steel Corp. v. Jewell Coal and Coke Co.,* 735 F.2d 775, 779 (3d Cir. 1984), we did so because "the heart of the problem in that case was the fact that the question of arbitrability was intertwined with the merits ...." We do not have the same problem here because, as Judge Becker notes, reviewing the merits is wholly unnecessary to decide the [**15] question of arbitrability. As a result, the scope (or applicability) of an arbitration agreement is a question for judicial determination. *Medtronic AVE, Inc. v.*

367 F.3d 147; 100 Fed. Appx. 865, *;
2004 U.S. App. LEXIS 8533, **

*Advanced Cardiovascular Systems, Inc.,* 247 F.3d 44, 54 (3d Cir. 2001) ("[Under the Federal Arbitration Act,] the issue of whether the dispute is within the scope of the agreement requires district court resolution." (citing *AT&T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986); *PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 510-11 (3d Cir. 1990))). There is no harm here, however, for my colleagues and I do decide that the dispute is arbitrable rather than leaving that decision to the arbitrator.

I make one other comment - less substantive but necessarily lengthier. It is that there may be yet another "road to Rome." I begin for background with the dispute (which, of course, we are not deciding). At base, it is whether, under the Settlement and License Agreement, Cordis has a license to the Boneau patents owned by Medtronic AVE. n5 If so, Cordis is not infringing these patents by using them.

> n5 As noted by Judge Becker, Medtronic AVE was formerly known as Arterial Vascular Engineering, Inc. ("AVE"). It was acquired by Medtronic Inc. ("Medtronic") in January 1999. Medtronic gave AVE a new name - Medtronic AVE. Medtronic AVE (the subsidiary), and not Medtronic (the parent), is the appellee in this case. It was Medtronic, and not Medtronic AVE, who signed the Agreement.

[**16]

Medtronic claims that the Boneau patents are not licensed to Cordis. It points to § 1.03 of the Agreement, which defines the patents subject to its cross-licensing provisions. Section 1.03 provides that licensed patents under the Agreement "means any and all patents ...that are ...owned by Medtronic or its Affiliates ...on the Effective Date." Medtronic AVE emphasizes that, on "the Effective Date [of the Agreement]" - November 4, 1997 - the Boneau patents were not owned by Medtronic or its Affiliates. Appellee's Br. at 29-30. They belonged to AVE, who was not affiliated with Medtronic at that time. *Id.* at 30. Thus, Medtronic AVE argues, Medtronic could not have licensed out the patents it did not own as of November 4, 1997. *Id.* at 30-31.

Cordis counters by pointing out that § 1.01 of the Agreement defines "Affiliate" as "any entity that is controlled by [Medtronic], on the Effective Date or, subject to [*871] Section[] 11.02(d) or 11.02(e) n6 hereof, *becomes controlled by such party, after the Effective Date.*" Appellant's Br. at 13 (footnote and emphasis added). Cordis claims that because AVE, the owner of the Boneau patents, became controlled by Medtronic after November 4, 1997, it [**17] is an "Affiliate" of Med-

tronic under the Agreement whose patents (including Boneau patents) can be licensed by Cordis. *Id.*

> n6 Section 11.02(e) is not relevant to my analysis. Thus I do not quote it. Section 11.02(d) provides that "if one of the parties hereto acquires a Major Competitor ..., then such party's license rights shall not be extended to cover any products of such Major Competitor." AVE, the predecessor of Medtronic AVE, is identified in § 1.05 of the Agreement as one of the Major Competitors of the signatory parties. Thus, applied to our facts the provision presumably would read: "If [Medtronic] acquires [AVE] ..., then [Medtronic's] license rights shall not be extended to cover any products of [AVE]." In light of the fact that Medtronic owns AVE, the sentence is *narrishkeit.* To make sense of it, should, for example, "such party's" have been "J&J's", or should "license rights" have been "rights as licensor"?

Medtronic AVE does not dispute "Affiliate" includes after-acquired companies [**18] such as itself under § 1.01. n7 It argues, however, that § 1.01 merely meant to confer the benefit of the cross-license *to* after-acquired companies without any corresponding obligation to cross-license their patents (such as the Boneau patents). Appellee's Br. at 30. Cordis counters that after-acquired companies are subject to the obligation of licensing their patents, by pointing to § 11.02(a), which provides that the Agreement *"shall be binding upon* and inure to the benefit of Medtronic ... and [its] Affiliates," and "Affiliates" include after-acquired companies. Medtronic AVE does not respond to this argument. It, however, claims that its patents are not covered under § 11.02 because § 11.02(d) (the scrambled carve-out provision quoted in note 2) specifically refers to the products, and not the patents, of major competitors.

> n7 Thus, Medtronic AVE does not challenge the District Court's ruling that Medtronic AVE is bound by a valid arbitration agreement. It instead claims that the particular issue Cordis seeks to arbitrate is not within the scope of the arbitration agreement.

[**19]

I agree with Cordis that this dispute is a merits question that should be decided by the arbitrator, not by our Court. n8 If the arguments proceed as set out above, the resolution of that dispute turns on how to read § 1.01 and § 11.02 of the Agreement. Insofar as the resolution

367 F.3d 147; 100 Fed. Appx. 865, *;
2004 U.S. App. LEXIS 8533, **

of the issue depends on the reading of § 1.01 ("Affiliate"), the issue is arbitrable under Article X, which covers "any dispute, claim, or controversy ... arising from or relating to this Agreement ...." To the extent that the dispute involves interpreting what obligation, if any, is imposed on after-acquired affiliates by § 11.02, the issue is subject to the arbitration clause in § 11.02(g), which provides that "any dispute, claim, or controversy arising under the provisions of this Section 11.02 shall be resolved pursuant to binding arbitration ...under the provisions of Article X ...."

n8 Medtronic AVE also argues, and the District Court agreed, that the two amendments to the Agreement support the conclusion of non-arbitrability. The amendments purported to grant the parties license rights to patents owned by specific after-acquired companies. The amendments are, if anything, evidence with respect to the underlying dispute, not the arbitrability of it.

[**20]

In any event, and under any interpretation, the analytical path leads to arbitration. Thus I concur.

# EXHIBIT R

LEXSEE

**LISA K. PRATTA, Plaintiff, v. AMERICAN GENERAL FINANCIAL SERVICES, INC., Defendant.**

**Civil Action No. 04-089 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2004 U.S. Dist. LEXIS 23044**

**November 5, 2004, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted by Pratta v. Am. Gen. Fin. Servs., 2006 U.S. Dist. LEXIS 65351 (D. Del., Sept. 13, 2006)

**DISPOSITION:** Defendant's motion to compel arbitration and motion to dismiss denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant former employer filed a motion to compel arbitration and motion to dismiss in connection with plaintiff former employee's action alleging discrimination under the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq.

**OVERVIEW:** The employer instituted a mandatory EDR program on June 1, 1999. In the written materials that the employer allegedly distributed to its employees, the employer stated that the EDR program was the sole means of resolving most employment-related disputes between the employee and the employer or between the employee and another employee. The court found that the employer unilaterally imposed the EDR program containing an arbitration agreement upon its employees, and that the EDR program was a condition of continued employment after June 1, 1999. However, the employer did not sufficiently demonstrate that the employee was actually in receipt of any of the EDR program documents, or that the purpose of the employee's continuing to work manifested an intent to be bound by the terms of the EDR program. The court could not infer the employee's assent to be bound by the arbitration agreement from her continued work. Thus there was no contract evidencing a transaction involving commerce within the meaning of § `2 of the Federal Arbitration Act, 9 U.S.C.S. § 2.

**OUTCOME:** The court denied the employer's motion to compel arbitration and motion to dismiss.

**CORE TERMS:** arbitration agreement, arbitration, arbitrate, age discrimination, evidencing, commerce, assent, reasons discussed, unilaterally, termination, effective, amend

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*International Trade Law > Dispute Resolution > Arbitration*
[HN1] The Federal Arbitration Act, 9 U.S.C.S. § 1 et seq., manifests the liberal federal policy favoring arbitration agreements.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > General Overview*
*International Trade Law > Dispute Resolution > Arbitration*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN2] See 9 U.S.C.S. § 2.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration*
*International Trade Law > Dispute Resolution > Arbitration*
[HN3] Section 3 of the Federal Arbitration Act, 9 U.S.C.S. § 3, allows district courts to stay a proceeding

2004 U.S. Dist. LEXIS 23044, *

upon being satisfied that the issue involved in such proceeding is referable to arbitration under an agreement.

*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
[HN4] The court must answer two threshold questions before compelling or enjoining arbitration: 1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement? 2) Does the dispute between those parties fall within the language of the arbitration agreement?

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN5] In determining whether the parties entered into a valid agreement to arbitrate, a district court is to look to the relevant state law of contracts.

*Contracts Law > Formation > General Overview*
[HN6] Pursuant to Delaware law, a contract comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms.

**COUNSEL:** [*1] Thomas S. Neuberger, Esquire of THOMAS S. NEUBERGER, P.A. and John M. LaRosa, Esquire of LAW OFFICE OF JOHN M. LAROSA, Wilmington, Delaware, for Plaintiff.

Peter Michael Sweeney, Esquire of GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware.

Of Counsel: Barbara Rittinger Rigo, Esquire and Ann Marie Painter, Esquire of LITTLER MENDELSON, P.C., Dallas, Texas, for Defendant.

**JUDGES:** FARNAN, District Judge.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION:**

    **OPINION**

November 5, 2004
Wilmington, Delaware

**FARNAN, District Judge**

Presently before the Court is Defendant's Motion To Compel Arbitration And Motion To Dismiss (D.I. 4). For the reasons discussed, the Court will deny the motion (D.I. 4).

    **Background**

Plaintiff Lisa K. Pratta was hired on September 26, 1980, by Manufacturers Hanover, which American General Financial, Inc. ("AGF") subsequently acquired. Defendant American General Financial Services, Inc. ("AGFS") is a subsidiary of AGF and is incorporated in the state of Delaware. Ms. Pratta was employed by AGFS as a Branch Manager and acted in that capacity until August 13, 2002, when her employment was terminated.

AGF instituted a mandatory EDR Program [*2] on June 1, 1999. In the written materials that AGFS allegedly distributed to its employees, AGFS states that the EDR Program is the sole means of resolving most employment-related disputes between the employee and the company or between the employee and another employee. The EDR Program encompasses disputes with regard to legally protected rights such as freedom from discrimination, retaliation, and harassment. Documents describing the EDR Program state that AGF may amend or terminate the Program at any time, but that such amendment or termination would not be effective: 1) until ten days after reasonable notice of termination is given to employees; and 2) as to any dispute as to which AGF had actual notice on the date of the amendment.

On February 9, 2004, Mr. Pratta filed this federal employment lawsuit alleging two counts of age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. In her Complaint (D.I. 1), Ms. Pratta seeks injunctive relief, and compensatory and statutory liquidated damages. The Complaint includes a demand for a jury trial.

    **Parties' Contentions**

By its motion, AGFS contends that the Court [*3] should compel arbitration and dismiss Ms. Pratta's Complaint because both of Ms. Pratta's claims fall within the ambit of AGF's Employee Dispute Resolution Program ("EDR Program"). AGFS contends that its EDR Program became effective as a condition of employment on June 1, 1999. AGFS argues that it sent EDR Program materials to Ms. Pratta in March 1999, when the program was first implemented, and again in June 2001, when the program was amended. AGFS contends that it made the

Page 2

2004 U.S. Dist. LEXIS 23044, *

EDR Programs' Plan and Rules available on its corporate intranet beginning in June 2001. AGFS further contends that it hung a poster providing details about the EDR Program in the branch office that Ms. Pratta managed.

In response, Ms. Pratta argues that no legally enforceable contractual obligation to arbitrate exists between her and AGFS. Specifically, Ms. Pratta contends that she did not accept any offer by AGFS to arbitrate employment disputes because she had no knowledge of the EDR Program and, thus, could not accept its terms. Ms. Pratta further contends that any agreement to arbitrate is illusory because AGF can unilaterally amend or revoke the arbitration agreement. Ms. Pratta further contends that the [*4] Court should not enforce the arbitration agreement in the EDR Program because it is unconscionable.

**Discussion**

**I. Legal Standard For Compelling Arbitration**

[HN1] The Federal Arbitration Act ("FAA"), 9 U.S.C. § § 1 et seq., manifests the "liberal federal policy favoring arbitration agreements." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991). In relevant part, Section 2 of the FAA provides, [HN2] "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. [HN3] Section 3 of the FAA allows district courts to stay a proceeding "upon being satisfied that the issue involved in such ... proceeding is referable to arbitration under ... an agreement." 9 U.S.C.A. § 3.

[HN4] The Court must answer two threshold questions before compelling or enjoining arbitration: 1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement? [*5] 2) Does the dispute between those parties fall within the language of the arbitration agreement? John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 137 (3d Cir. 1998).

**II. Whether The Parties Entered Into A Valid Agreement To Arbitrate**

[HN5] In determining whether the parties entered into a valid agreement to arbitrate, "we are to look to the relevant state law of contracts...." Id. (citing Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002)). [HN6] Pursuant to Delaware law, a contract "comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms."

Intellisource Group, Inc. v. Williams, 1999 U.S. Dist. LEXIS 12446, 1999 WL 615114, *1 (D. Del., 1999) (citing Telephone & Data Sys., Inc. v. Eastex Cellular L.P., 1993 Del. Ch. LEXIS 182, Civ. A. No. 12888, 1993 WL 344770, at *10 (Del. Ch. Aug. 27, 1993)).

The Court finds that AGFS unilaterally imposed the EDR Program containing an arbitration agreement upon its employees. In the Court's view, however, it does not necessarily follow that Ms. [*6] Pratta and AGFS entered into a valid contract. A review of the materials submitted by the parties reveals that the EDR Program documents state that adherence to the terms of the EDR Program was a condition of continued employment after June 1, 1999. (D.I 5, Ex. B at 3; D.I. 5, Ex. C at 2; D.I. 5, Ex. D at 6.) However, Ms. Pratta disputes that she ever received a copy of any of these documents. The Court finds that AGFS has not sufficiently demonstrated that Ms. Pratta was actually in receipt of any of the EDR Program documents, or that the purpose of Ms. Pratta's continuing to work manifested an intent to be bound by the terms of the EDR Program.

In these circumstances, the Court cannot infer Ms. Pratta's assent to be bound by the arbitration agreement from her continued work at AGFS. Rather, the Court finds that, by continuing to work after the EDR Program was initiated, Ms. Pratta was merely performing her duties under the previous terms of her employment. Thus, the Court concludes that Ms. Pratta's continued work after June 1, 1999, did not constitute acceptance of AGS's offer to arbitrate. Therefore, in the circumstances of this case, there is no "contract evidencing a transaction [*7] involving commerce" within the meaning of section two of the FAA.

Because the Court concludes that no arbitration agreement existed between the parties, it will not explore arguments raised by Ms. Pratta with regard to the illusoriness or unconscionability of the arbitration agreement, or determine whether Ms. Pratta's claims falls within the language of the arbitration agreement.

**Conclusion**

Despite the strong policies in favor of enforcing arbitration agreements, the Court concludes that there is no valid arbitration agreement between Ms. Pratta and AGFS. Accordingly, the Court will deny the Motion To Compel Arbitration And Motion To Dismiss (D.I. 4) filed by Defendant AGFS.

An appropriate Order will be entered.

**ORDER**

At Wilmington, this 5th day of November 2004, for the reasons discussed in the Opinion issued this date;

2004 U.S. Dist. LEXIS 23044, *

IT IS HEREBY ORDERED that Defendant's Motion To Compel Arbitration And Motion To Dismiss (D.I. 4) is **DENIED.**

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT S

LEXSEE

WILLIAM E. THORNBURG, Plaintiff, v. PAK 2000, INC., Defendant.

Civil Action No. 03-824 JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 1544

February 2, 2004, Decided

**DISPOSITION:** [*1] Defendant's motion to dismiss and motion to compel arbitration granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Following his termination from employment by defendant former employer, plaintiff former employee brought an action against the employer alleging breach of contract, breach of covenant, and violation of the Age Discrimination and Employment Act (ADEA). The employer moved to dismiss the employee's complaint and to compel arbitration under 9 U.S.C.S. § 2 of the Federal Arbitration Act (FAA).

**OVERVIEW:** The parties' employment agreement provided that any controversy or claim arising out of or relating to the agreement or the breach thereof would be finally settled by arbitration. The court found that this broad arbitration clause evidenced the parties' intent to arbitrate the employee's ADEA claim, which alleged injuries including loss of pay and qualified commissions, loss of expense reimbursements, loss of severance, and loss of qualified bonuses. These injuries clearly were "related to" the employee's employment agreement with the employer, and therefore was subject to arbitration. The court rejected the employee's argument that the arbitration provision was unenforceable because the employee did not knowingly and voluntarily waive his right to a jury trial. He did not assert any facts demonstrating that his execution of the agreement was the result of fraud, duress, or mistake. Judicial precedent rejected such a knowing and voluntary waiver argument as inconsistent with the FAA. Precedent did not support the argument that the United States and Delaware Constitutions precluded a waiver of the employee's right to a jury trial.

**OUTCOME:** The district court granted the employer's motion to dismiss and motion to compel arbitration.

**CORE TERMS:** employment agreement, arbitrate, arbitration, subject to arbitration, jury trial, arbitration provision, employment contract, lawsuit, favoring arbitration, federal policy, waive, agreement to arbitrate, arbitration agreement, contract of adhesion, contract law, arbitrability, unenforceable, termination, revocation, agreeing, duress, knowingly, prevails

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*International Trade Law > Dispute Resolution > Arbitration*
[HN1] See 9 U.S.C.S. § 2.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Governments > Legislation > Statutory Remedies & Rights*
[HN2] When a party enters into a contract requiring arbitration, a party having made the bargain to arbitrate, should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.

*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Defenses > Duress & Undue Influence > General Overview*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
[HN3] Nothing short of a showing of fraud, duress, mistake, or some other compelling ground to invalidate a

2004 U.S. Dist. LEXIS 1544, *

contract will permit a court to preclude the enforceability of an agreement to arbitrate.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
[HN4] As evidenced by Section 2 of the Federal Arbitration Act, a contract to arbitrate has a presumption of validity. 9 U.S.C.S. § 2. Therefore, absent factors that would exist at law or in equity for the revocation of any contract, a court must enforce the parties' contractual agreement to arbitrate.

*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Arbitration Provisions > Enforcement*
[HN5] The United States Court of Appeals for the Third Circuit has held that applying a "knowing and voluntary" standard to employment contracts with arbitration provisions would be inconsistent with the Federal Arbitration Act and United States Supreme Court precedent.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Contracts Law > Types of Contracts > Adhesion Contracts*
[HN6] Unequal bargaining power is not alone enough to make an agreement to arbitrate a contract of adhesion.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Governments > Courts > Judicial Precedents*
[HN7] The United States Supreme Court has made clear that by agreeing to arbitrate, a party submits to resolution in an arbitral, rather than a judicial, forum.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
[HN8] Questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN9] The question of whether a particular claim is subject to arbitration should be resolved in favor of arbitration. This principle derives from the congressional policy manifested in the Federal Arbitration Act requiring courts to liberally construe the scope of arbitration agreements covered by that Act.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN10] Under New Hampshire law, a contract to arbitrate has a presumption of arbitrability. Therefore, absent positive assurance that the contract is not susceptible of an interpretation that covers the dispute, a court should conclude that a particular dispute is arbitrable.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN11] Statutory claims are subject to arbitration agreements because a party does not forgo the substantive rights afforded by a statute by agreeing to arbitrate.

COUNSEL: Michael P. Kelly, Esquire, Anthony R. Winchester, Esquire, Jennifer M. Zelvin, Esquire of MCCARTER & ENGLISH, LLP, Wilmington, Delaware.

Attorneys for Plaintiff William E. Thornburg.

2004 U.S. Dist. LEXIS 1544, *

William W. Bowser, Esquire, Adria B. Martinelli, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware.

Attorneys for Defendant PAK 2000, Inc.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JOSEPH J. FARNAN, JR.

**OPINION:** Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is PAK 2000 Inc.'s ("PAK") Motion to Dismiss And Motion To Compel Arbitration. (D.I. 7.) For the following reasons, the Court will grant PAK's Motion.

### BACKGROUND

This lawsuit arises from PAK's termination of Plaintiff's employment as one of its security bag account representatives in 2003. When PAK hired Plaintiff the parties entered into an employment contract (the "Employment Agreement") which defined the rights and obligations of each party. Included in the Employment Agreement is an arbitration provision, compelling the parties to submit claims arising from and [*2] related to the Employment Agreement to arbitration. Following his termination, Plaintiff filed the instant lawsuit alleging breach of contract, breach of covenant, and violation of the Age Discrimination and Employment Act ("ADEA"). (D.I. 1.) By its Motion (D.I. 7), PAK requests the Court to dismiss Plaintiff's Complaint and compel arbitration.

### I. Parties' Contentions

#### A. PAK

PAK contends that the Court does not have subject matter jurisdiction over the instant lawsuit because Plaintiff's employment contract requires the parties to arbitrate all controversies "arising out of or relating to" the Employment Agreement. PAK contends that Plaintiff's contractual obligation to arbitrate disputes prevails over Plaintiff's right to pursue his ADEA claim in federal court.

#### B. Plaintiff

Plaintiff contends that the arbitration provision of his Employment Agreement is invalid for several reasons. Plaintiff contends that an individual may not waive his or her right to a jury trial unless it is done "knowingly and voluntarily." Plaintiff also contends that an individual's right to a jury trial, protected by state and federal law, prevails over the federal policy favoring arbitration.

[*3] Plaintiff further contends that his ADEA claim does not arise out of the Employment Agreement.

### DISCUSSION

The Federal Arbitration Act (the "FAA") manifests the "'liberal federal policy favoring arbitration agreements.'" Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25, 114 L. Ed. 2d 26, 111 S. Ct. 1647, 1652 (1991). In relevant part, Section 2 of the FAA provides, [HN1] "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. [HN2] When a party enters into a contract requiring arbitration, a party "having made the bargain to arbitrate, ... should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627-28, 87 L. Ed. 2d 444, 105 S. Ct. 3346, 3354-55 (1985). [HN3] "Nothing short of a showing of fraud, duress, mistake" or some other compelling ground to invalidate [*4] a contract will permit a court to preclude the enforceability of an agreement to arbitrate. Seus v. John Nuveen & Co., Inc., 146 F.3d 175, 184 (3d Cir. 1998).

### I. The Knowing And Voluntary Waiver Of A Right To A Jury Trial Issue

The Court is not persuaded by Plaintiff's contention that the arbitration provision at issue is unenforceable because Plaintiff did not knowingly and voluntarily waive his right to a trial by jury. [HN4] As evidenced by Section 2 of the FAA, a contract to arbitrate has a presumption of validity. 9 U.S.C. § 2. Therefore, absent factors that would "exist at law or in equity for the revocation of any contract," id., a court must enforce the parties' contractual agreement to arbitrate. In the instant case, Plaintiff has not asserted any facts demonstrating that his execution of the Employment Agreement was the result of fraud, duress, or mistake. Seus, 146 F.3d at 184.. Further, the Third Circuit has previously rejected a "knowing and voluntary" waiver argument similar to Plaintiff's. In Sues, [HN5] the Third Circuit held that applying a "knowing and voluntary" standard to employment contracts with arbitration [*5] provisions would be "inconsistent with the FAA and [Supreme Court precedent]." 146 F.3d at 184. n1 Moreover, to the extent Plaintiff contends that his employment contract is unenforceable because it is a contract of adhesion, the Court need only note that [HN6] "unequal bargaining power is not alone enough to make an agreement to arbitrate a contract of adhesion." Id. For these reasons, the

2004 U.S. Dist. LEXIS 1544, *

Court must recognize and defer to the arbitration provision in the Employment Agreement.

n1 The Third Circuit in Sues also rejected an argument identical to Plaintiff's that the Older Workers Benefit Protection Act (the "OWBPA") requires a knowing and voluntary waiver of a party's right to trial by jury. The Third Circuit reasoned that the legislative history of the OWBPA does not indicate that Congress intended the heightened standard to apply to agreements to arbitrate. Instead, the Third Circuit concluded that the OWBPA's knowing and voluntary standard only applied to a party's agreement to waive his or her substantive rights under the ADEA. Seus. 146 F.3d at 181.

[*6]

## II. The Effect Of Federal And State Constitutions Issue

Plaintiff's contention that the state and federal constitutions preclude a waiver of his right to a jury trial is not supported by applicable precedent. In Mitsubishi, [HN7] the Supreme Court made clear that "by agreeing to arbitrate ... a party ... submits to ... resolution in an arbitral, rather than a judicial, forum." 473 U.S. at 628. Plaintiff cites no case, nor has the Court found any, stating that an individual's right to a jury trial precludes enforcement of arbitration agreements. To the contrary, controlling precedent advises that [HN8] "'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'" Id. at 626 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)). Therefore, the Court concludes that the right to a jury trial protected by the U.S. and Delaware Constitutions does not preclude the enforcement of the arbitration agreement in this case.

## III. The ADEA Claim Issues

The determination of whether Plaintiff's ADEA claim arises from or is related to his employment agreement [*7] is a matter of contract law. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 131 L. Ed. 2d 985, 115 S. Ct. 1920, 1924 (1995). Therefore, a court must look to relevant state contract law principles. Id. However, [HN9] the question of whether a particular claim is subject to arbitration "should be resolved in favor of arbitration." Mitsubishi, 473 U.S. at 626 (interior quotation omitted). This principle derives from the "congressional policy manifested in the Federal Arbitration Act ... requiring courts [to] liberally ... construe the scope

of arbitration agreements covered by that Act." Mitsubishi, 473 U.S. at 627.

In the instant case, the arbitration agreement is governed by New Hampshire law. (D.I. 9, Ex. B at 6.) [HN10] Under New Hampshire law, a contract to arbitrate has a presumption of arbitrability. John A. Cookson Co. v. N.H. Ball Bearings, Inc., 147 N.H. 352, 355-56, 787 A.2d 858 (N.H. 2001). Therefore, absent "'positive assurance that the [contract] is not susceptible of an interpretation that covers the dispute,'" id. (quoting Appeal of Town of Bedford, 142 N.H. 637, 706 A.2d 680 (N.H. 1998)), a court should conclude that [*8] a particular dispute is arbitrable. Applying these standards to the Employment Agreement, the Court concludes that Plaintiff's ADEA claim is subject to arbitration.

The Employment Agreement provides that "any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in Mirror Lake, New Hampshire, in accordance with the then prevailing rules of the American Arbitration Association." (D.I. 9, Ex. B at 6.) In the Court's view, this broad arbitration clause evidences the parties' intent to arbitrate Plaintiff's ADEA claim. In his Complaint, Plaintiff alleges that PAK illegally discriminated against him and wrongfully caused him "injuries including, but not limited to, loss of pay, qualified commissions, loss of expense reimbursements, loss of severance, and loss of qualified bonuses (as further described in the ... employment contract)." (D.I. 1.) The Court concludes that the injuries alleged by Plaintiff clearly are "related to" his Employment Agreement with PAK, and therefore, concludes that Plaintiff's ADEA claim is subject to arbitration.

Plaintiff's obligation to arbitrate the instant claims is not weakened because [*9] he alleges a potential statutory violation under the ADEA. See Seus, 146 F.3d at 180. [HN11] Statutory claims are subject to arbitration agreements because a party "does not forgo the substantive rights afforded by [a] statute" by agreeing to arbitrate. Id. Plaintiff may pursue his ADEA cause of action in arbitration, and therefore, the "'statute will continue to serve both its remedial and deterrent function.'" Id. (quoting Mitsubishi, 473 U.S. at 628).

## IV. Conclusion

The Court concludes that Plaintiff's ADEA claim is related to the Employment Agreement, and therefore, the Court will dismiss Plaintiff's Complaint because all of Plaintiff's claims are subject to arbitration.

An Order consistent with this Opinion will be entered.

### ORDER

2004 U.S. Dist. LEXIS 1544, *

At Wilmington this 2nd day of February 2004, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED that PAK 2000, Inc.'s Motion To Dismiss And Motion To Compel Arbitration (D.I. 7) is **GRANTED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

# EXHIBIT T

LEXSEE

**UNITED COMMUNICATIONS HUB, INC., a California corporation, Plaintiff -
Appellee, v. QWEST COMMUNICATIONS, INC., a Delaware Corporation;
TOUCHAMERICA, INC., a subsidiary of Montana Power Company, a Montana
corporation, Defendants - Appellants.**

No. 01-56742

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

46 Fed. Appx. 412; 2002 U.S. App. LEXIS 17746

August 6, 2002, Argued and Submitted, Pasadena, California
August 23, 2002, Filed

**NOTICE:** [**1] RULES OF THE NINTH CIRCUIT
COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States Dis-
trict Court for the Central District of California. D.C. No.
CV-01-04371-ABC. Audrey B. Collins, District Judge,
Presiding.

**DISPOSITION:** Judgment of the district court reversed
and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The United States District
Court for the Central District of California denied defen-
dant corporation's motion to compel arbitration and its
grant of plaintiff corporation's motion for a preliminary
injunction and stay of arbitration.

**OVERVIEW:** The district court concluded that defen-
dant's allegations against plaintiff did not relate to in-
voices or balances, subjects requiring arbitration under
the parties' wholesale services agreement. However, the
instant court held that the allegations fell into two cate-
gories: (1) allegations arising under the agreement that
clearly related to billing or invoices, broadly construed,
and that, therefore, needed to be arbitrated; and (2) alle-
gations that did not arise under the agreement or that did
not relate to billing or invoices and that, therefore,
needed to be arbitrated. The instant court further held
that the decision regarding whether to stay the non-
arbitrable issues, pending arbitration, rested with the
sound discretion of the district court.

**OUTCOME:** The judgment of the district court was
reversed and the case was remanded for entry of a stay
pending arbitration as to the arbitrable claims and to al-
low the district court to exercise its sound discretion in
determining whether or not to proceed in the interim with
the non-arbitrable claims.

**CORE TERMS:** invoice, mandatory arbitration, billing,
customer, arbitrable, non-arbitrable, nonarbitrable, arbi-
trated, falls outside, arbitration, motion to compel arbi-
tration, preliminary injunction, pending arbitration,
sound discretion, de novo, piecemeal, remainder

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution >
Mandatory ADR*
*Civil Procedure > Appeals > Standards of Review > De
Novo Review*
[HN1] An appellate court reviews the district court's de-
nial of a party's motion to compel arbitration de novo.

*Civil Procedure > Appeals > Standards of Review > De
Novo Review*
[HN2] The meaning of an agreement to arbitrate receives
de novo review.

*Civil Procedure > Remedies > Injunctions > Prelimi-
nary & Temporary Injunctions*
*Civil Procedure > Appeals > Standards of Review >
Abuse of Discretion*

46 Fed. Appx. 412, *; 2002 U.S. App. LEXIS 17746, **

[HN3] The district court's grant of the preliminary injunction receives review for abuse of discretion.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN4] Legal issues underlying the district court's grant of the injunction are reviewed de novo.

**COUNSEL:** For UNITED COMMUNICATIONS HUB, INC.,, Plaintiff - Appellee: Daniel S. Alderman, Esq., KINKLE, RODIGER & SPRIGGS, Los Angeles, CA.

For QWEST COMMUNICATIONS, INC., Defendant - Appellant: Bryan A. Merryman, Esq., WHITE & CASE, Los Angeles, CA.

For QWEST COMMUNICATIONS, INC., Defendant - Appellant: Craig R. May, Esq., WHEELER TRIGG & KENNEDY, P.C., Denver, CO.

For TOUCHAMERICA, INC., Defendant - Appellant: Frederick F. Mumm, Esq., DAVIS WRIGHT TREMAINE LLP, Los Angeles, CA.

**JUDGES:** Before: T.G. NELSON, PAEZ, and TALLMAN, Circuit Judges.

**OPINION:**

[*412] MEMORANDUM *

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

[**2]

Before: T.G. NELSON, PAEZ, and TALLMAN, Circuit Judges.

Qwest Communications, Inc. (Qwest) appeals the district court's denial of Qwest's motion to compel arbitration and its grant of United Communications Hub, Inc.'s (UCHub's) motion for a preliminary injunction and stay of arbitration. The district court concluded that Qwest's allegations against UCHub did not relate to invoices or balances, subjects requiring arbitration under the parties' Wholesale Services Agreement (Agreement). Because we conclude that nine of Qwest's allegations do relate to invoices or balances and must therefore be arbitrated, we reverse.

[HN1] We review the district court's denial of Qwest's motion to compel arbitration de novo. n1 Simi-

larly, [HN2] the meaning of an agreement [*413] to arbitrate receives de novo review. n2 [HN3] The district court's grant of the preliminary injunction receives review for abuse of discretion. n3 However, [HN4] legal issues underlying the district court's grant of the injunction are reviewed de novo. n4

n1 *United Food & Commercial Workers Union, Local 770 v. Geldin Meat Co.,* 13 F.3d 1365, 1368 (9th Cir. 1994).
[**3]

n2 *Wolsey, Ltd. v. Foodmaker, Inc.,* 144 F.3d 1205, 1211 (9th Cir. 1998).

n3 *Textile Unlimited, Inc. v. A..BMH & Co.,* 240 F.3d 781, 786 (9th Cir. 2001).

n4 *Foti v. City of Menlo Park,* 146 F.3d 629, 634-35 (9th Cir. 1998).

We reject UCHub's extremely narrow interpretation of the Agreement's mandatory arbitration clause. The narrow subject matter identified by the mandatory arbitration clause -- invoices and balances -- is somewhat countered by the remainder of the clause, which contains broad terms. The clause uses the phrase "relating to," which has a broad and inclusive meaning. n5 Thus, read as a whole, the clause indicates that matters relating to (a broad term) a fairly narrow set of subjects (invoices and balances) must be arbitrated.

n5 See *Mediterranean Enters., Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir. 1983).

Contrary to UCHub's [**4] assertions, nothing in the clause itself, or in the remainder of the Agreement, implies that disputes relating to invoices and balances will be only small, "run-of-the-mill" matters. To the contrary, we would presume that matters meriting the time and expense of arbitration, because they cannot be resolved by long-term contracting partners on their own, would not be small.

In order to apply our interpretation of the mandatory arbitration clause to this case, we must characterize the allegations in the complaint. Our reading of the complaint differs somewhat from the district court's. According to our reading, UCHub's complaint alleges that

46 Fed. Appx. 412, *; 2002 U.S. App. LEXIS 17746, **

Qwest breached the Agreement, as well as federal and
state law, by:

| Allegation | | Claim # |
|---|---|---|
| (a) | failing to provide timely and accurate Call Detail Records (CDRs); | 1,3,4,5,10,11, 19 |
| (b) | billing UCHub at rates other than those agreed to; | 1,3-5,10-12 |
| (c) | billing UCHub amounts that are not due and owing; | 1,3-5,10-12 |
| (d) | failing unreasonably to provide telecommunications services to UCHub at a price that is available to Defendants and/ or Defendants' other customers; | 2 |
| (e) | failing unreasonably to provide billing data to UCHub for traffic delivered to the Qwest and/ or Touchamerica network in a reasonable manner; | 2 |
| (f) | failing to correct billing errors; | 12 |
| (g) | failing to process orders for new service from UCHub's customers timely and accurately; | 1-5, |
| (h) | billing UCHub's customers directly; | 1,3,4,10,11,18,22 |
| (i) | wrongfully threatening to and terminating service to UCHub and its customers without adequate notice; | 1,3,4,10,11 |
| (j) | switching UCHub's customers to Defendants' networks improperly; | 1,10,11,18,21,22 |
| (k) | unreasonably failing to provide telecommunications services to UCHub of a type and/ or quality that is available to Defendants and/ or Defendants' other customers; | 2 |
| (l) | inducing breach of contracts with third parties; otherwise interfering with relationships with third parties through defamatory communications, etc. | 6-11,18 |

[**5]

[*414] The above allegations fall into two categories: (1) allegations arising under the Agreement that clearly relate to billing or invoices, broadly construed, and that, therefore, must be arbitrated, and (2) allegations that do not arise under the Agreement or that do not relate to billing or invoices and that, therefore, need not be arbitrated. n6 For the following reasons, we conclude that allegations (a) through (f), as set out above, fall into the former category and that allegations (g) through (l) fall into the latter.

n6 UCHub also alleged that Qwest fraudulently induced the Agreement by claiming to be able to bill accurately, provide services, etc., in several claims. UCHub does not raise that allegation on appeal, however, and appears to have abandoned it while still before the district court. Accordingly, we do not address that allegation.

Allegation (a) relates to invoices. A CDR is a list of calls that allows the reader to determine which calls were

made by which customer. Thus, they are a kind of [**6] invoice and, as the complaint alleges, were vital to UCHub's understanding of Qwest's bills (as well as to Qwest's own billing of its retail customers).

Allegations (b), (c), and (d) relate to billing. They involve claims that Qwest over-billed, by billing at rates that were too high and by overcharging.

Allegation (e), which involves Qwest's alleged failure to provide accurate invoices, relates directly to invoices. And allegation (f) overtly describes an alleged problem with Qwest invoices and the balances it claimed were due: Qwest's failure to correct billing errors. Accordingly, allegations (a) through (f) relate to invoices or balances and are arbitrable.

Allegation (g) involves services, not invoices or balances. UCHub alleges that Qwest did not process orders for new services to UCHub's customers in a timely manner. This clearly falls outside the scope of the mandatory arbitration clause.

Allegation (h) relates to balances and invoices, referring as it does to billing. However, it complains that Qwest billed UCHub's customers, something entirely outside the Agreement. Accordingly, although the allegation relates to the subjects of mandatory arbitration, it does not arise [**7] under the Agreement. Thus, it falls outside the scope of the mandatory arbitration clause. Allegations (j) and (l) relate to behavior that also falls outside the Agreement. In those allegations, UCHub alleges that Qwest interfered in its relationships with third parties by, among other things, inducing breaches of contract and transferring UCHub customers to Qwest's networks. Thus, those allegations also fall outside the scope of the mandatory arbitration clause.

Allegations (i) and (k) involve services. In allegation (i), UCHub claims that Qwest terminated services to UCHub's customers, [*415] and threatened to do so, without adequate notice. And allegation (k) involves the claim that Qwest provided inferior service to UCHub.

Because allegations (a) through (f) fall within the mandatory arbitration clause, we must reverse. Section 3 of the Federal Arbitration Act compels courts to stay litigation of arbitrable issues n7 regardless of whether those issues intertwine with nonarbitrable issues and regardless of whether "piecemeal litigation" will result. n8

n7 9 U.S.C. § 3.

n8 *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 84 L. Ed. 2d 158, 105 S. Ct. 1238

(1985) (rejecting refusal to grant § 3 stay where arbitrable issues intertwined with nonarbitrable ones, stating that the "preeminent concern of Congress in passing the [Federal Arbitration] Act was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate even if the result is 'piecemeal' litigation").

[**8]

The decision whether to stay the non-arbitrable issues, identified in allegations (g) through (l), pending arbitration rests with the sound discretion of the district court. n9 We note a preference for proceeding with the non-arbitrable claims when feasible, n10 and approve of the reasoning of another district court faced with determining whether to extend a stay to non-arbitrable issues or not. In *Simitar v. Entertainment, Inc. v. Silva Entertainment, Inc.,* n11 the district court offered the following guidance: "Expanding the stay, so as to encompass all of the nonarbitrable claims in the case, is [only] appropriate where the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." n12

n9 *Cf. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 20-21, 74 L. Ed. 2d 765, 103 S. Ct. 927 and n.23 (1983) (in context of staying claims of nonarbitrating parties).

n10 *See, e.g., Dean Witter Reynolds,* 470 U.S. at 225 (J. White, concurring) (stating that "the heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course").

[**9]

n11 44 F. Supp. 2d 986 (D. Minn. 1999).

n12 44 F. Supp. 2d at 997 (citing cases).

For the foregoing reasons, we REVERSE the district court and REMAND for entry of a stay pending arbitration as to the arbitrable claims and to allow the district court to exercise its sound discretion in determining whether or not to proceed in the interim with the non-arbitrable claims.

REVERSED and REMANDED.