# EXHIBIT I

2005 WL 578386                                              Page 1
2005 WL 578386 (S.D.N.Y.)


For opinion see 423 F.Supp.2d 364

**Motions, Pleadings and Filings**

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
to order copies of documents related to this or other matters.
Additional charges apply

**United States** District Court, S.D. New York.
In Re NOKIA OYJ (NOKIA CORP.) SECURITIES LITIGATION.
**No. 04 Civ. 2646 (KMK)**
March 8, 2005.

Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated
Amended Complaint

Kenneth M. Kramer (KK 1462), Jerome S. Fortinsky (JF 1103), Seth M. Kean (SK 0191),
Nicole Coward (NC 1751), Shearman & Sterling LLP, New York, New York, Attorneys for
Defendants

TABLE OF CONTENTS

TABLE OF AUTHORITIES ... ii

PRELIMINARY STATEMENT ... 1

STATEMENT OF FACTS ... 4

 A. Nokia's Business ... 4

 B. Nokia Exceeds Its Fourth Quarter 2003 Expectations ... 5

 C. Nokia's April 6, 2004 Announcement And The Filing Of Stock-Drop Suits ... 7

 D. The Plaintiffs' Consolidated Amended Complaint ... 8

ARGUMENT ... 9

 I. RULE 9(B) AND THE REFORM ACT IMPOSE STRICT PLEADING REQUIREMENTS ... 9

 II. THE AMENDED COMPLAINT FAILS TO ALLEGE ANY FACTS GIVING RISE TO A STRONG
INFERENCE OF FRAUDULENT INTENT AS TO ANY DEFENDANT ... 10

 III. THE AMENDED COMPLAINT FAILS TO IDENTIFY A FALSE OR MISLEADING STATEMENT ...
18

  A. Expressions Of Puffery And Corporate Optimism Are Not Actionable ... 18

  B. Accurate Statements Of Historical Fact Are Not Actionable ... 21

  C. The Amended Complaint Fails To Adequately Explain Why The Alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                                    Page 2
2005 WL 578386 (S.D.N.Y.)

Misstatements Were False ... 22

    1. CDMA ... 23

    2. The N-Gage ... 24

    3. The Product Portfolio ... 26

    4. The Product Roadmap ... 28

   D. Nokia's Forward-Looking Statements Are Not Actionable By Virtue Of Nokia's Specific Warnings To Investors ... 29

  IV. THE PLAINTIFFS' ACCOUNTING ALLEGATIONS ARE WHOLLY WITHOUT MERIT AND DO NOT STATE A CLAIM FOR SECURITIES FRAUD ... 32

  V. THE COURT CANNOT EXERCISE SUBJECT MATTER JURISDICTION OVER CLAIMS BY FOREIGN INVESTORS WHO PURCHASED NOKIA SECURITIES ON EXCHANGES OUTSIDE THE UNITED STATES ... 37

CONCLUSION ... 40

TABLE OF AUTHORITIES

CASES

Atlantic Gypsum Co., Inc. v. Lloyds Int'l Corp., 753 F. Supp. 505 (S.D.N.Y. 1990) ... 10, 11

In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1 (D.D.C. 2000) ... 38, 40

Basic v. Levinson, 485 U.S. 224 (1988) ... 18

In re Bayer AG Sec. Litig., No. 03 Civ. 1546, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004) ... 40

Bersch v. Drexel Firestone, Inc., 519 F.2d 974 (2d Cir. 1975) ... 37, 38, 39

Bolt Elec., Inc. v. City of New York, 53 F.3d 465 (2d Cir. 1995) ... 4

In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ... 12, 14, 18, 21, 36

Butte Mining PLC v. Smith, 76 F.3d 287 (9th Cir. 1996) ... 37

Butte Mining PLC v. Smith, 876 F. Supp. 1153 (D. Mont. 1995), aff'd, 76 F.3d 287 (9th Cir. 1996) ... 38

Carman v. Liuski Int'l, Inc., No. 94 CV 1045, 1996 WL 732825 (E.D.N.Y. Dec. 18, 1996) ... 21

Chill v. Gen. Elec. Co., 101 F.3d 263 (2d Cir. 1996) ... 36

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                                   Page 3
2005 WL 578386 (S.D.N.Y.)

Citibank, N.A. v. K-H Corp., 968 F.2d 1489 (2d Cir. 1992) ... 34

In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ... 14, 29

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991) ... 4

In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), aff'd sub nom Nadoff v. Duane Reade, Inc., No. 03- 9352, 2004 WL 1842801 (2d Cir. Aug. 17, 2004) ... 12, 18

Elliot Assocs., L.P. v. Covance, Inc., No. 00 CIV 4155, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ... 4, 19

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976) ... 10

Fadem v. Ford Motor Co., 352 F. Supp. 2d 501 (S.D.N.Y. 2005) ... 13

Faulkner v. Verizon Communications, Inc., 189 F. Supp. 2d 161 (S.D.N.Y. 2002) ... 14

Fitzer v. Sec. Dynamics Tech. Inc., 119 F. Supp. 2d 12 (D. Mass. 2000) ... 13, 20

In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249 (S.D.N.Y. 2004) ... 36

Frazier v. Vitalworks, Inc., 341 F. Supp. 2d 142 (D. Conn. 2004) ... passim

Gavish v. Revlon, Inc., No. 00 Civ 7291, 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ... 19, 22, 33, 34

Halperin v. eBanker USA.com, Inc., 295 F.3d 352 (2d Cir. 2002) ... 29

In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 WL 283286 (S.D.N.Y. June 1, 1998) ... 14

In re Int'l Bus. Mach. Corp. Sec. Litig., 163 F.3d 102 (2d Cir. 1998) ... 18

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ... 11

Kaufman v. Campeau Corp., 744 F. Supp. 808 (S.D. Ohio 1990) ... 39, 40

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991) ... 4

Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55 (2d Cir. 1996) ... 20

Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005) ... 34

Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986) ... 32

In re MSC Indus. Direct Co., Inc., 283 F. Supp. 2d 838 (E.D.N.Y. 2003) ... 33, 36

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ... 17

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                                    Page 4
2005 WL 578386 (S.D.N.Y.)

McNamara v. Bre-X Minerals Ltd., 68 F. Supp. 2d 759 (E.D. Tex. 1999) ... 40

In re NUI Sec. Litig., 314 F. Supp. 2d 388 (D.N.J. 2004) ... 35

Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105 (S.D.N.Y. 1993)
... 39

Nikko Asset Mgmt. Co., Ltd. v. UBS AG, 303 F. Supp. 2d 456 (S.D.N.Y. 2004) ... 37,
38

In re Nokia Corp. Sec. Litig., No. 96 Civ. 3752, 1998 WL 150963 (S.D.N.Y. Apr. 1,
1998) ... 1, 16, 17, 18, 22

In re Northern Telecom Sec. Litig., 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ... 11, 12,
16, 21

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ... 12, 36

Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996) ... 29, 32

In re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d 176 (D. Mass. 2001 ... 35

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) ... 9, 19

In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477 (S.D.N.Y. 2004) ... 37

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos. Inc., 75
F.3d 801 (2d Cir. 1996) ... 4, 20

Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977) ... 17

In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161 (D. Mass. 2000) ... 33

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ... 10, 11, 19

Société Nationale v. Salomon Bros. Int'l Ltd., 928 F. Supp. 398 (S.D.N.Y. 1996) ...
38

In re Sofamor Danek Group, Inc., 123 F.3d 394 (6th Cir. 1997) ... 21

In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059 (N.D. Cal.
2001) ... 18

Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294 (S.D.N.Y. 2000) ... 31

Tri-Star Farms Ltd. v. Marconi, PLC, 225 F. Supp. 2d 567 (W.D. Pa. 2002) ... 38, 39

STATUTES

15 U.S.C.A. § 78u-4(b)(1) (1998) ... 10, 22

15 U.S.C.A. § 78u-4(b)(2) (1998) ... 10

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                                      Page 5
2005 WL 578386 (S.D.N.Y.)


15 U.S.C.A. § 77z-2(c)(1)(A)(i) (1998) ... 29

                              RULES

Fed. R. Civ. P. 9(b) ... 1, 10

Fed. R. Civ. P. 12(b)(1) ... 1

Fed. R. Civ. P. 12(b)(6) ... 1

 Defendants Nokia OYJ, Jorma Ollila, Pekka Ala-Pietila, Matti Alahuhta, Richard
Simonson, Olli-Pekka Kallasvuo and Anssi Vanjoki respectfully submit this
memorandum of law in support of their motion to dismiss the consolidated amended
complaint (the "CAC" or the "amended complaint") in this action pursuant to Rules
12(b)(1), (b)(6) and 9(b) of the Federal Rules of Civil Procedure and pursuant to
the Private Securities Litigation Reform Act.

                        PRELIMINARY STATEMENT

 Nearly ten years ago, Congress enacted the Private Securities Litigation Reform
Act (the "Reform Act") to eradicate lawsuits like the present one that were filed,
without any investigation, simply because of a sudden decline in a company's stock
price typically just after the announcement of bad news. At the same time that
Congress was considering the Reform Act, Nokia OYJ ("Nokia") announced
disappointing earnings. In the same pattern seen here, its stock price fell and
plaintiffs' lawyers, including many of the same law firms representing the named
plaintiffs in this case, filed, without any investigation, multiple class actions
against Nokia and its senior executives. Those actions were dismissed. In re Nokia
Corp. Sec. Litig., No. 96 Civ. 3752, 1998 WL 150963 (S.D.N.Y. Apr. 1, 1998). Nokia
and its executives were, therefore, well aware at the time they issued the
projections at issue in this case, that missing projections would likely lead to
strike suits. It thus came as no surprise that when Nokia announced it had missed
its net sales projections for the first quarter of 2004, lead plaintiffs' counsel,
Milberg Weiss Bershad Schulman LLP ("Milberg Weiss"), filed, on the same day, the
first of seven stock-drop suits accusing Nokia and members of its management team
of securities fraud.

 Now once again, Nokia and its senior executives stand accused of securities fraud
after a stock drop. The primary theory of the plaintiffs' case is that Nokia issued
knowingly false projections in January for the first quarter of 2004. To support
this theory, the plaintiffs take the explanations provided by Nokia for its
disappointing results in April 2004 and parrot them back as knowing misstatements
because they were all allegedly known at the time that the projections were made.

 Why any executive in his or her right mind would commit such a fraud is not
mentioned anywhere in the eighty-two page complaint. Nokia's officers knew when
they made their sales projections in January that they would have to announce the
results on April 16, 2004. The plaintiffs do not allege any insider trading that
might provide some motive for the alleged fraud. No senior executives benefited
from having a high stock price between January and April. And rather than play out
the alleged fraud for the maximum possible time (i.e., April 16, 2004), Nokia pre-
announced its disappointing first quarter results on April 6, 2004.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Because no conceivable motive for the fraud is alleged; because a one-quarter purposeful fraud without personal benefit to the executives defies common sense; because the plaintiffs do no more than plead fraud by hindsight; because once again complaints were filed on the same day as the stock drop without any investigation, and because this case is an unwarranted and unfair attack on an honest company and its management team, the plaintiffs' amended complaint should be dismissed with prejudice. There are at least two separate and independent bases for the Court to do so.

First, this is an action for securities fraud, not negligence or mismanagement. Securities fraud requires that the plaintiffs plead that the alleged misstatements were made with an intent to deceive investors. There are two ways that plaintiffs can make such a showing in this Circuit: first, by alleging that the defendants had a motive and opportunity to commit the alleged fraud (i.e., by alleging that the company's officers sold substantial portions of their stock prior to the company's announcement of bad news), and second, by showing that the company's officers acted recklessly or with conscious disregard of the truth in speaking to investors.

The plaintiffs have not identified any motive for such a senseless fraud. Without any allegations as to why Nokia's executives would commit such an irrational four-month fraud, the plaintiffs, under clear Second Circuit precedent, must make a much stronger showing that Nokia's executives acted recklessly or with conscious disregard of the truth. The plaintiffs' efforts to do so here fall far short of the mark. Initially, the plaintiffs make the boilerplate allegation that Nokia's executives had access to internal information and they therefore must have seen information contradicting what they told the market. These allegations are routinely rejected by courts in this Circuit and they should be rejected here. The plaintiffs also try to make much of a statement by Nokia's chief executive officer, Jorma Ollila, in response to an analyst question on a conference call in April 2004. The plaintiffs even allege that Ollila, who stood to gain absolutely nothing from the fraud that the plaintiffs have alleged, admitted that he knew in 2003 what the company did not disclose until April 2004. But a fair reading of the transcript shows that he made no such admission - the plaintiffs have simply taken the underlying quotation and misleadingly edited it to support their dubious claims.

Second, the plaintiffs' amended complaint fails to identify an actionable misstatement by Nokia. Instead, the plaintiffs have largely latched on to a combination of (a) forward-looking statements of optimism about Nokia's prospects, (b) "puffing" statements about the strength and variety of its mobile phones, and (c) accurate statements of historical facts. Such statements do not constitute fraud. Even if they were actionable, the plaintiffs have failed to adequately plead how the defendants' statements were false or misleading - that is, how they were inconsistent with the facts set forth in the amended complaint. Even if Nokia's various forward-looking statements could be actionable, they are protected both by the safe harbor provision of the Reform Act and the "bespeaks caution" doctrine because they were accompanied by extensive cautionary language. As a result, the plaintiffs cannot clear the most basic hurdle of a claim for securities fraud: pleading a false representation.

STATEMENT OF FACTS

A. Nokia's Business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nokia, Finland's largest public company, is a worldwide leader in mobile telephones and technology. (CAC ¶ 3; Declaration of Kenneth M. Kramer, dated March 8, 2005, Ex. A.) [FN1] Although it traces its roots to a modest paper mill founded in 1865 near the Nokia river, today Nokia employs 50,000 people worldwide, operates production facilities in nine countries, and its securities trade on stock exchanges in New York (in the form of American Depository Receipts or ADRs), Frankfurt, Stockholm and Helsinki. (CAC ¶ 26.) It concentrates its business in four major areas: Mobile Phones, Multimedia, Networks and Enterprise Solutions. (Id.)

   FN1. The facts set forth in this brief are based on the allegations in the amended complaint, which, solely for purposes of this motion, are presumed to be true. Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995). All factual citations in this memorandum are either to the consolidated amended complaint or to documents cited or referenced in the amended complaint. See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 809 (2d Cir. 1996) (court may consider full text of any document referenced in complaint in deciding motion to dismiss). The Court may also consider documents filed with the SEC. Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). Further, "the court may also consider documents, while not explicitly incorporated into the complaint, that are 'integral' to plaintiff's claims." Elliot Assocs., L.P. v. Covance, Inc., No. 00 Civ. 4155, 2000 WL 1752848, at *4 (S.D.N.Y. Nov. 28, 2000) (quoting Cortec, 949 F.2d at 44). All citations to exhibits refer to the exhibits to the declaration of Kenneth M. Kramer filed in support of this motion. A copy of the amended complaint is attached as Exhibit A to the Kramer Declaration.

B. Nokia Exceeds Its Fourth Quarter 2003 Expectations

   On January 8, 2004, Nokia announced that it had exceeded its sales and profit projections for the fourth quarter of 2003. (CAC ¶ 116; Ex. B.) Specifically, Nokia's fourth quarter Mobil Phones sales totalled EUR 7 billion (up 4% year on year). (Ex. B.) Later that month, Nokia held a conference call with analysts to discuss these positive results and to issue its first quarter projections and discuss the outlook for the industry. (CAC ¶ 119; Ex. C.) During this call, Jorma Ollila projected, "For the first quarter, we currently do expect first of all that Nokia net sales will grow between 3% and 7%." (CAC ¶ 120.)

   The Company identified this statement as forward-looking and referred investors to a number of factors that could cause these projections to vary. At the start of the call, Nokia's Vice President of Investor Relations, Ulla James, stated:

   During the conference call we will be making forward-looking statements regarding the future business and financial performance of Nokia and the mobile communications industry. These statements are predictions that involve risks and uncertainties. Actual results may therefore differ materially from the results currently expected.

   (Ex. C.)

   At the conclusion of the call, Nokia repeated this cautionary statement and referred investors to the cautionary language in the press release it issued that day and the risk factors in the Form 20-F that it had filed previously with the

2005 WL 578386                                          Page 8
2005 WL 578386 (S.D.N.Y.)

SEC:

   I would just like to remind you that during the conference call we have made a
number of forward-looking statements that involve risks and uncertainties. Actual
results may, therefore, differ materially from the results currently expected.
Factors that could cause such differences have been identified in more detail on
pages 11 to 18 in Nokia's Form 20-F and also in our press release issued today.

   (Id.)

   In its Form 20-F, Nokia cautioned investors that it might not reach its targets
and identified a number of variables as risk factors that could materially and
adversely impact Nokia's performance. These included:

   The new advanced products and solutions that we are and will be developing
incorporate complex, evolving technologies, including 3G and subsequent new
technologies. This exposes us to certain risks that, if they were to occur, could
have a material adverse impact on us and our ability to grow our business.

   The markets for our products and solutions are characterized by rapidly changing
and increasingly complex technologies. The business of Nokia Mobile Phones, which
accounted for 77% of our net sales in 2002, could be adversely affected by risks
within and outside of our control related to these new technologies and their
successful commercialization. In order to be competitive, Nokia Mobile Phones must
continuously maintain and develop a wide portfolio of mobile phones that covers all
major consumer segments and technology standards, and that includes phones that
contain increasingly complex software that supports services which continue to
drive the demand for our products and solutions. There is a risk that we will not
be successful in maintaining and developing this wide portfolio, or that the
technologies and related products and solutions on which we focus may not be
brought to market by us and/or mobile network operators as quickly as anticipated,
may not achieve as broad a customer acceptance among operators or end-users as we
expect, or may not prove to be sufficiently compatible with the existing
technologies and products of other product and solution providers.

   . . . .
   We may not reach our targets, and may experience greater variability in our sales
and operating profit than in the past, particularly depending on the general
economic conditions and the pace of development and acceptance of new technologies.

   . . . .
   If we fail to manage the prices and costs of our portfolio of mobile phones, our
sales and operating profit may be negatively affected.

   (Ex. D at 11-13.)

   Likewise, Nokia's January 24 press release identified statements regarding
"expectations and targets for our results of operations" as forward-looking. Nokia
cautioned that these projections could be materially and adversely affected by a
number of factors, including:

   2) timing and success of the introduction and roll-out of new products and
solutions;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                                    Page 9
2005 WL 578386 (S.D.N.Y.)

   3) demand for and market acceptance of our products and solutions;

   4) the impact of changes in technology and the success of our product and
solution development;

   . . . .

   6) our ability to control the variety of factors affecting our ability to reach
our targets and give accurate forecasts.

   (Ex. E.)

C. Nokia's April 6, 2004 Announcement And The Filing Of Stock-Drop Suits

   On April 6, 2004, Nokia issued a press release pre-announcing that its net sales
declined for the first quarter of 2004 by 2% and that, as a result, it had missed
its projections for the quarter. (CAC ¶ 11; Ex. F.) Among other factors, Nokia
attributed its results to "certain gaps in its product portfolio, mainly in the mid
range." (Ex. F.) On the very same day, the plaintiffs' co-lead counsel, Milberg
Weiss, rushed to court to file this suit accusing Nokia and Ollila, Ala-Pietila,
Alahuhta and Simonson - apparently without investigation - of securities fraud by
parroting Nokia's reasons for its shortfall and asserting that Nokia must have been
aware of these reasons three months earlier. (Ex. G.) The original complaint made
three basic allegations: (i) Nokia misrepresented the success of its internal
reorganization, (ii) Nokia misrepresented the strength of its mobile phone
portfolio, and (iii) Nokia had deficient and inadequate internal controls. (Id. at
¶ 32.) In the following weeks, six more virtually identical complaints were filed
against Nokia and members of its management team.

   The Court consolidated these cases in a series of orders and, on August 12, 2004,
appointed Generic Trading of Philadelphia, LLC ("Generic"), Martin Bergljung and
Gerald Hoberman as lead plaintiffs and appointed Milberg Weiss and Entwistle &
Cappucci LLP as the plaintiffs' co-lead counsel. (Ex. H.) Nine months after they
filed their "shoot first, investigate later" complaint, on January 7, 2005, the
plaintiffs' lead counsel submitted an amended complaint on behalf of Generic,
Bergljung and Hoberman. (Ex. A.)

D. The Plaintiffs' Consolidated Amended Complaint

   The plaintiffs' tedious, eighty-two page amended complaint alleges that Nokia knew
as early as October 2003 of the alleged deficiencies in the variety of mobile
phones it offered consumers and that it misrepresented the strength and the variety
of its products until after its April 6, 2004 announcement that "[d]ue to certain
gaps in its product portfolio, mainly in the mid-range, the company was not able to
fully capitalize on positive market developments." (CAC ¶ 11.) In particular, the
plaintiffs have come up with a list of four areas where they apparently think there
are deficiencies in Nokia's phones: (1) CDMA technology (which is short for Code
Division Multiple Access, a type of digital transmission technology), (2) its "N-
Gage" device, (3) its product portfolio, and (4) its product "roadmap" (those
products that Nokia was developing for future release). (Id. ¶ ¶ 46-86.) [FN2]

   FN2. Highlighting that the original Milberg Weiss complaint was filed without
any apparent investigation is the fact that the amended complaint essentially

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                           Page 10
2005 WL 578386 (S.D.N.Y.)

abandons one of the central theories of the original complaint - Nokia's alleged
misrepresentation of the success of its internal reorganization. Indeed, the
complaint now buries this allegation in its 210- paragraph complaint. (CAC ¶ 7.)

The plaintiffs allege that Nokia made misleading statements about each of these
product areas in eleven different statements: (1) Nokia's October 16, 2003 press
release (CAC ¶ ¶ 86-87); (2) an October 16, 2003 conference call with analysts
(id. ¶ ¶ 89-93); (3) Nokia's November 24-25, 2003 "Capital Markets Day" (id. ¶ ¶
95-114); (4) Nokia's January 8, 2004 press release (which was also filed as Form 6-
K with the SEC) (id. ¶ ¶ 116-118); (5) a January 22, 2004 conference call with
analysts (¶ ¶ 119-128); (6) Nokia's 2003 Form 20-F (¶ ¶ 130- 140), filed on
February 6, 2004; (7) Nokia's annual report (¶ ¶ 141-144); (8) a February 23, 2004
press event at the Cannes World Congress in Cannes, France (¶ ¶ 145-149); (9) a
March 17, 2004 trade show in Hanover, Germany known as "CeBIT" (¶ ¶ 150-154); (10)
Nokia's March 25, 2004 shareholders' meeting in Helsinki (¶ ¶ 155-156); and (11)
Nokia's March 25, 2004 press release (¶ ¶ 157- 160). The amended complaint offers
no basis to conclude that anything in these statements constituted
misrepresentations of any kind.

                              ARGUMENT

I. RULE 9(B) AND THE REFORM ACT IMPOSE STRICT PLEADING REQUIREMENTS

To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege,
among other things, that a defendant (1) made misstatements or omissions of (2)
material fact (3) with scienter. Rombach v. Chang, 355 F.3d 164, 170 (2d Cir.
2004). To do so, a plaintiff must meet the demands of Rule 9(b) of the Federal
Rules of Civil Procedure and the Reform Act. Id.

Rule 9(b) requires a complaint to "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state where and when the
statements were made, and (4) explain why the statements were fraudulent." Id. at
170. These requirements serve to "provide a defendant with fair notice of a
plaintiff's claim, to safeguard a defendant's reputation from improvident charges
of wrongdoing, and to protect a defendant against the institution of a strike
suit." Id. at 171; see also Atlantic Gypsum Co., Inc. v. Lloyds Int'l Corp., 753 F.
Supp. 505, 512 (S.D.N.Y. 1990) ("Rule 9(b) is designed to provide the defendant
fair notice of the plaintiff's claims, and to enable the defendant to prepare a
suitable defense, protect his reputation or goodwill from harm, and reduce the
number of strike suits.").

Under the Reform Act, a plaintiff must "specify each statement alleged to have
been misleading, the reason or reasons why the statement is misleading, and, if an
allegation regarding the statement or omission is made on information and belief,
the complaint shall state with particularity all facts on which that belief is
formed." 15 U.S.C.A. § 78u-4(b)(1) (1998). The Reform Act also requires a
plaintiff, for each statement alleged to be false or misleading, to "state with
particularity facts giving rise to a strong inference that the defendant acted with
the required state of mind." Id. § 78u-4(b)(2). Courts routinely dismiss
complaints filed at the pleadings stage when the complaint fails to satisfy these
requirements.

II. THE AMENDED COMPLAINT FAILS TO ALLEGE ANY FACTS GIVING RISE TO A STRONG

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                                    Page 11
2005 WL 578386 (S.D.N.Y.)

INFERENCE OF FRAUDULENT INTENT AS TO ANY DEFENDANT

   The cornerstone of any securities fraud claim is proof that that the defendants acted with scienter - that is, an "intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Indeed, without fraudulent intent, there can be no fraud. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) ("The pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud."). In this Circuit, a plaintiff can establish the requisite "strong inference of fraudulent intent" either (a) by demonstrating "that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001).

   In this case, the plaintiffs have not alleged that the individual defendants had any motive to commit the fraud of which plaintiffs have accused them. They do not allege that any defendant sold his shares of Nokia stock during the relevant period. Nor do they point to any other benefit that any of these individuals received as a result of any purported misstatement or failure to disclose. No rational explanation is given for why a successful international company's executives would commit what is essentially a four-month fraud - that is, there are no allegations that offer any clue why these businessmen would make projections in one quarter that they knew to be false when they would simply have to correct them in the next quarter. Nor are there any allegations that would provide any clue why these executives would make positive statements about the strength of Nokia's products if they knew that such statements were false and knew that they would eventually have to reveal the "truth" to the market. As the Second Circuit has aptly observed, "It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning." Shields, 25 F.3d at 1130. Under these circumstances, this Court should be highly skeptical of the plaintiffs' allegations of fraud. See Lloyds Int'l Corp., 753 F. Supp. at 514; see also Shields, 25 F.3d at 1130 (same).

   Where, as here, "motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious misbehavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142 (emphasis added); see also In re Northern Telecom Sec. Litig., 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders."). Conscious misbehavior or recklessness is not merely a heightened form of negligence, but rather a state of mind "approximating actual intent" to defraud. Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000). To meet this strong circumstantial evidence standard, the plaintiffs must specifically allege defendants' knowledge of the facts or access to specific information contradicting their public statements. In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 562 (S.D.N.Y. 2004).

   In an effort to prop up their dubious theory of fraud, the plaintiffs make two basic allegations of scienter. Neither withstands scrutiny. First, the plaintiffs speculate that because the individual defendants allegedly had access to internal information and production decisions were allegedly made at the highest levels in Finland, they must have known of the alleged problems and inadequacies in Nokia's

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386
2005 WL 578386 (S.D.N.Y.)

product portfolio and product roadmap. (CAC ¶ ¶ 187- 188.) This allegation fails, at a minimum, because the plaintiffs do not sufficiently allege that the individual defendants had access to information about Nokia's product portfolio or product roadmap. By relying on Ollila's access to general sales information and the fact that Nokia, like most companies, forecasted its performance (id. ¶ 187; see also id. ¶ 121), the plaintiffs make the kinds of allegations that courts have consistently rejected as insufficient to support the necessary "strong inference" of fraud. See, e.g., In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478, 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25, 2003) (executives' access to sales information insufficient to establish that they acted with scienter), aff'd sub nom. Nadoff v. Duane Reade, Inc., No. 03-9352, 2004 WL 1842801 (2d Cir. Aug. 17, 2004).

Nor can the plaintiffs carry their burden by relying on the vague and conclusory allegations of former employees. For example, the plaintiffs' allegation that "[a] former Nokia employee sent from Finland to correct perceived problems at Nokia's Marketing and Development office in Irving, Texas confirmed that Nokia's product portfolio and roadmap deficiencies dated back to 2002 and continued into 2003, and that Nokia issued too many versions of each kind of phone" misses the mark. (CAC ¶ 65.) At a minimum, this allegation fails because there is no allegation that this mystery employee ever conveyed this information to any member of Nokia's management team or that it was conveyed during the proposed class period. The district court in Fitzer could have been describing this case when it held:

This Court cannot speculate that because former employees in this corporation knew of changes in the sales profiles, the corporate executives must also have known about the changes and fraudulently concealed them in the October 1997 press release. This is especially the case when the identities of the former employees and the specific roles they played in the company have been withheld.

Fitzer v. Sec. Dynamics Tech., Inc., 119 F. Supp. 2d 12, 25 (D. Mass. 2000). [FN3] This defect also plagues the other paragraphs where the plaintiffs attempt to rely on the alleged statements of former employees. (CAC ¶ ¶ 62, 64, 69-71, 76-80.)

FN3. See also Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 522-23 (S.D.N.Y. 2005) (plaintiffs could not establish scienter based on negative information from former employees where there was no indication that this information was conveyed to senior management; mere fact that there was established "internal communications network" was not sufficient).

In fact, even if this or some other former employee had communicated his or her subjective assessment of Nokia's product portfolio to senior Nokia executives in Finland, this fact alone would not establish that Nokia or the individual defendants had or should have reached this same conclusion. The mere fact that a single employee - who is currently unknown in name, title, seniority and ability - held one opinion about Nokia's "product portfolio" hardly establishes that senior management should have reached the same conclusion and that they spoke with either reckless or conscious disregard of the truth in their public statements. See In re Bristol-Myers, 312 F. Supp. 2d at 562 (memorandum allegedly written by unidentified "Company executives" and three e-mails were "insufficient to lead to an inference that the speakers knew that the general and optimistic statements about Erbitux's clinical and commercial possibilities of which Plaintiffs complain were untrue"); Faulkner v. Verizon Communications, Inc., 189 F. Supp. 2d 161, 172 (S.D.N.Y. 2002) ("The existence of internal memoranda from one executive questioning the company's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

business strategy is simply insufficient to support the inference that Verizon
seriously considered an alternate business plan."). [FN4]

    FN4. It is also important to note virtually all of the purported former
employees that the plaintiffs rely on were employed in the United States. While the
United States is an important market for Nokia, it nevertheless accounted for only
 4,475,000,000 of Nokia's total net sales of  29,455,000,000 in 2003 (approximately
15%).

  The plaintiffs' conclusory allegation that the individual defendants were aware of
the purported deficiencies in Nokia's product portfolio and roadmap "because
decisions about what phone products and designs would be developed and included in
Nokia's roadmaps were made at the highest corporate levels in Finland" (CAC ¶ 188;
see also id. ¶ ¶ 10, 67) also fails to raise a "strong inference of scienter."
This is simply another way of making the argument - an argument routinely rejected
by the courts - that because they were senior executives they must have known what
the plaintiffs alleged was concealed. The plaintiffs cannot establish a strong
inference of scienter with such an allegation. See, e.g., In re Citigroup, Inc.
Sec. Litig., 330 F. Supp. 2d 367, 382 (S.D.N.Y. 2004); In re Health Mgmt. Sys.,
Inc. Sec. Litig., No. 97 Civ. 1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998).

  Second, the plaintiffs allege that, "[w]ith respect to many of the false and
misleading statements alleged to have violated the securities laws (such as with
respect to the deficiencies in Nokia's product portfolio and roadmap), and as
further described herein, Ollila and other of the individual defendants actually
admitted in April 2004 and thereafter that they had known the truth since early
2003." (CAC ¶ 186.) In other words, the plaintiffs assert that the management team
of the world's leading mobile phone company knew of "the deficiencies in Nokia's
product portfolio and roadmap" throughout the proposed class period, yet they -
without any gain to themselves or to Nokia - misrepresented the strength of Nokia's
products and then, when Nokia missed its sales projection for the first quarter of
2004, admitted that they had known the truth all along. Unsurprisingly, this
dubious theory does not withstand scrutiny.

  The plaintiffs' allegation is based primarily on the following exchange between
analyst Tim Luke and Jorma Ollila. The complete exchange is quoted below, with
emphasis added to show what the plaintiffs misleadingly omitted from Ollila's
comments:

  Q. I was wondering, if you look at the key element, which seems to be some
vulnerability in your product portfolio in, I think you specifically mentioned
Europe and the U.S. I was wondering, what steps you might be looking at in order to
alleviate that, and what sort of time line do you think it may take for that
direction to change? Would it be something that you would begin to expect in the
second quarter, or what sort of time line?

  A. I think if we look at the particularly the mid range, you know, we saw early
on last year that what might be happening is that we are not fully competitive, so
certainly we have started to take measures. So if you now look at what is happening
this year, we have launched seven new models and have started shipping five
products that have - that were launched last year. Most of them addressing the -
the areas of vulnerability, as you said.

&copy; 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

They [sic] will be more phones coming to the market that will be launched in the second quarter as well as in the second half And all of those will have a meaningful impact during 2004. With around 40 phones totally [sic] being launched, we expect that this will be a typical year in that respect. But in the early part of the year we will not be quite as competitive in those segments that we did - than we have been earlier and that we will feel that we will be towards the end of the year. It's particularly GSM clam shell, mid-range classic and some of the high-end must have areas.

(Compare CAC ¶ 165 with Ex. I at 3-4.)(emphasis added)

Thus, in context, it is clear that Ollila's statement is not the admission that the plaintiffs allege it to be. Rather, the crux of Ollila's statement is that in early 2003, well before the start of the plaintiffs' proposed class period, Nokia recognized that it "might" not be "fully competitive" in certain product areas, so it launched and shipped new phones in 2003. While in April 2004, Nokia realized that these measures did not sufficiently address what turned out to be the gaps in its product portfolio and that Nokia would not be as "competitive in those segments" as it had been earlier (i.e., in 2003), there is no reasonable way to read this statement in context as an admission that Ollila lied to investors. Further, particularly when considered in light of the irrational nature of the fraud that the plaintiffs have proposed and the fact that, like last time, Nokia pre-announced that it would miss its projections before it was scheduled to report its first quarter results, [FN5] there is no reasonable way that this statement can support a strong inference of fraudulent intent. In re Northern Telecom, 116 F. Supp. 2d. at 463 ("Where plaintiffs' view of the facts defies economic reason . . . it does not yield a reasonable inference of fraudulent intent."); In re Nokia Corp. Sec. Litig., No. 96 Civ. 3752, 1998 WL 150963 (S.D.N.Y. Apr. 1, 1998) ("If anything, the fact that Nokia voluntarily chose to issue a press release earlier than its standard . . . reporting . . . undercuts the allegation that defendants were acting recklessly."). [FN6]

FN5. Although Nokia, as a foreign issuer, is not obligated to release its quarterly results, it indicated in its 2003 annual report that it would issue its first quarter results on April 16, 2004. (Ex. J at 68.) Nokia pre-announced on April 6 that it missed its first quarter projections, but did not report its actual first quarter results and issue its second quarter outlook until April 16. (Exs. F & K.)

FN6. See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 595-97 (1986) ("[A]s presumably rational businesses, petitioners had every incentive not to engage in conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains . . . . Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.").

Although it appears from the plaintiffs' pre-motion conference letter that they believe that Nokia's executives made similar admissions after April 6, 2004, a fair reading of these statements does not support the plaintiffs' characterization. (See CAC ¶ ¶ 167, 173-74, 176-78, 180.) Simply put, Nokia's post-class period statements cannot reasonably be construed as any kind of admission that members of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nokia's management team knew at any time before April 6, 2004 that their optimistic statements about Nokia's performance or that their puffing statements about the strength of Nokia's mobile phone offering were knowingly false. (Id. ¶ ¶ 167, 173, 174, 176.) In several instances, the plaintiffs do not rely on statements by Nokia or its executives; rather, they rely on statements by stock analysts. (Id. ¶ ¶ 177, 178, 180.) In fact, for some of these analyst statements, the plaintiffs do not even quote the actual analyst statements, but instead offer only a crude and self-serving paraphrase. (Compare id. ¶ ¶ 177-78 with Ex. L.) The plaintiffs plainly cannot rely on such allegations. See In re Nokia, 1998 WL 150963, at *11 (plaintiff could not rely on analyst statement to show fraud).

In sum, Nokia's management may have made errors of business judgment in deciding which phones and technologies to emphasize or in their relationships with customers or in their estimates of market growth. But making business decisions that turn out to be unfortunate or wrong is not securities fraud. Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477 (1977). As a result, the amended complaint against Nokia and its senior executives should be dismissed with prejudice.

III. THE AMENDED COMPLAINT FAILS TO IDENTIFY A FALSE OR MISLEADING STATEMENT

A. Expressions Of Puffery And Corporate Optimism Are Not Actionable

A statement is material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Under Second Circuit law, predictive statements of opinion and belief are not considered material for purposes of the securities laws. In re Int'l Bus. Mach. Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998); see also In re Duane Reade, 2003 WL 22801416, at *5. Indeed, "[i]t is well settled that a complaint alleging violations of the securities laws may not rely upon statements that . . . constitute puffery or ordinary expressions of corporate optimism." In re Bristol-Myers, 312 F. Supp. 2d at 557.

Thus, "[s]aying that a product is 'significant,' 'attractive' or 'great' is merely 'puffery,' not actionable securities fraud." Frazier v. Vitalworks, Inc., 341 F. Supp. 2d 142, 153 (D. Conn. 2004); In re Nokia, 1998 WL 150963, at *6 ("[T]he Second Circuit has ruled that general announcements that a company . . . expects a product to perform well do not require disclosure of possible policies that might contradict those predictions."). Similarly, "[h]yperbolic statements assigning reasons for and placing adjectives on past results generally are not actionable since they contain no implicit prediction that those events or conditions will continue in the future." In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001).

"This is because analysts and arbitrageurs rely on facts in determining the value of a security, and are not duped by easily recognizable . . . self-directed corporate puffery." Gavish v. Revlon, Inc., No. 00 Civ. 7291, 2004 WL 2210269, at *20 (S.D.N.Y. Sept. 30, 2004). It is also a reflection of the fact that "the securities laws do not require that investors be treated like children," Elliot Assocs., L.P. v. Covance, Inc., No. 00 Civ. 4155, 2000 WL 1752848, at *9 n.12 (S.D.N.Y. Nov. 28, 2000), and that "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future." Shields, 25 F.3d at 1129; see also Rombach, 355 F.3d at 174 ("Up to a point, companies must be

2005 WL 578386
2005 WL 578386 (S.D.N.Y.)

Page 16

permitted to operate with a hopeful outlook."). After all, "misguided optimism is
not actionable as fraud." Rombach, 355 F.3d at 175.

 In this case, most of the statements that the plaintiffs identify as  "misleading"
are nothing more than statements of puffery or corporate optimism. In fact, when
viewed in comparison to the statements held not actionable in various other
decisions, it is clear that these statements cannot serve as the basis for a claim
of securities fraud.

---

| Allegedly Misleading Statements | Statements Held Not Actionable |
|---|---|
| in the Amended Complaint | |
| "Following an announced commitment two years ago to strengthen our position in the global CDMA handset market, I am very happy to say that we have now doubled our share to the mid-teens from the same quarter last year. We expect to see continued momentum in CDMA going into the fourth quarter as we increase shipments to China, India and all major U.S. CDMA operators. . . . . | "While the environment in 1993 will be as challenging as in 1992, we are budgeting for and expecting a strong year for all of our businesses. We are encouraged by recent retail supermarket share gains for Marlboro as well as the recent narrowing of the price difference between discount and premium brands." San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 805-06 (2d Cir. 1996). |
| The Nokia N-Gage has just gone on sale at 30,000 stores around the world to a very positive initial consumer response. Many outlets sold out of the device during the first day of release. Following on from this, we are seeing strong order intake from distributors and retailers." | "[B]ased on our growth and productivity initiatives, increasing volume momentum, and a narrowing of price gaps in a number of our key categories, we are optimistic about 1993." Id. at 806. |
| (CAC ¶  86.) | |
| (similar - and similarly non-actionable - statements | |

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                                    Page 17
2005 WL 578386 (S.D.N.Y.)

are cited as 'misleading' in paragraphs 90,
  96, 102,
113, 125, 145, and 148 of the CAC.)

---------------------------------------------------------------------------

"Our distribution strategy is bearing fruit     "We believe that these products
  and Nokia                                        will be very
brand is stronger than ever, supported by       attractive to our considerable
                                                   radiology customer

competitive product offering from low-end       base as well as to the entire
  to                                               ambulatory radiology
localized feature-rich devices like the         market . . . I believe that 2002
  pen-based                                        will be another very
Nokia 6108."                                    exciting year for VitalWorks;

                                                  we're already off to a
                                                good start." Frazier, 341 F. Supp.

                                                  2d at 147, 153.


"I expect Nokia volume growth in Q4 to
  exceed the
overall market growth. Our offering is          "We are convinced our business
  being                                            strategies will lead
strengthened by the ramp-up of several          to continued prosperity." Lasker
  significant                                      v. N.Y. State Elec.
new products, such as the Nokia N-Gage, the     & Gas Corp., 85 F.3d 55, 57 (2d
  new                                              Cir. 1996).
imaging phones Nokia 6600, Nokia 3660, GSM
wideband CDMA-based Nokia 7600 and the
  highly
competitive entry-level camera phone, the
  Nokia
3200 series. I am looking forward to a
  quarter that
is expected to bring Nokia new volume and
  market
share record." (CAC ¶ 89.)

(similar - and similarly non-actionable -

  statements

are cited as 'misleading' in paragraphs 91,

  98, 99,

105, 107, 108, 120, 127, 141, 150, and 159

  of the

CAC.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                              Page 18
2005 WL 578386 (S.D.N.Y.)

----------------------------------------------------------------

"Due to this and a favorable product mix,    "Our eleventh straight quarter of
   Nokia                                         record revenues is
Mobile Phones' pro forma operating margin     the result of continued market

                                               demand for our

continued at the excellent level of between  enterprise network and data
   24% and                                       security solutions."
25% for the quarter." (CAC ¶  116.)           Fitzer, 119 F. Supp. 2d at 24, 26.
(similar - and similarly non-actionable -     "Liuski's record third quarter
   statements                                    revenues underscore
are cited as 'misleading' in paragraphs       the success of our aggressive

   117, 123,                                     marketing efforts as

124, 146, and 156 of the CAC.)                well as growing demand for our

                                                 expanded product

                                              line of brand name and private

                                                 label products."

                                              Carman v. Liuski Int'l, Inc., No.

                                                 94 CV 1045, 1996

                                              WL 732825, at *2 (E.D.N.Y. Dec.

                                                 18, 1996).

----------------------------------------------------------------

"Strong product offering: Our strong         "RadConnect RIS is one of the most
   product                                       significant
offering goes beyond voice-centric mobile     product offerings in recent years,
   phones                                        not just for
to include entirely new functional            VitalWorks but for the specialty
   categories of                                 as a whole,
mobile devices, such as enhanced              redefining the standards of speed,
   communicators,                                productivity, and
entertainment, and gaming devices and media   workflow." Frazier, 341 F. Supp.
   and                                           2d at 147-48.
imaging phones." (CAC ¶  132.)                 "Our product lines have never been
                                                 stronger - nor
(similar - and similarly non-actionable -     more diverse." In re Northern
   statements                                    Telecom, 116 F.
are cited as 'misleading' in paragraphs       Supp. 2d at 465.
   134, 157,
and 158 of the CAC.)

----------------------------------------------------------------

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nokia's managers were entitled to be hopeful and optimistic about their business and their products. They were even entitled to be wrong. Business decisions require judgments to be made concerning what products to offer, what technologies to emphasize, which customers to concentrate on and a myriad of other interrelated choices. In a free market economy, companies are judged on the results of these complicated judgments. But making an erroneous judgment is not securities fraud.

B. Accurate Statements Of Historical Fact Are Not Actionable

In addition to statements of corporate optimism and puffery, the plaintiffs also portray a number of accurate statements of historical fact as misleading, even though they do not actually contest the facts quoted. As should be self-evident, accurate statements of historical fact are not misleading. In re Bristol-Myers, 312 F. Supp. 2d at 557 ("It is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true."); see also In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997).

The plaintiffs' list of allegedly misleading statements includes several accurate statements of historical fact. By way of example:

• "Following an announced commitment two years ago to strengthen our position in the global CDMA handset market, I am very happy to say that we have now doubled our share to the mid-teens from the same quarter last year." (CAC ¶ 86; see also id. ¶ ¶ 89, 90, 102, 113, 155.)

• "Nokia Mobile Phones launched 40 new products during 2003 with an emphasis on more advanced devices, CDMA technology, entry level phones and market localization. Of the new products launched, 31 models had color screens, 14 models had cameras and 24 models were MMS-enabled." (CAC ¶ 135; see also id. ¶ ¶ 141, 150, 156, 157.)

• "I'm happy to share with you today that the Nokia 6600, after its introduction to the market last October, has become the world's best selling smart phone where volumes to date exceed two million units." (CAC ¶ 146.)

The plaintiffs have not specifically alleged that any of these statements of historical fact were false, and thus - as a matter of law - they cannot argue that those statements were misleading.

C. The Amended Complaint Fails To Adequately Explain Why The Alleged Misstatements Were False

Even if the Court concludes that the allegedly misleading statements are actionable in nature, the amended complaint still fails to state a claim. To satisfy the requirements of the Reform Act, a complaint must specify the "reasons why the statement is misleading." 15 U.S.C.A. § 78u-4(b)(1) (1998) (emphasis added); see also In re Nokia, 1998 WL 150963, at * 9 ("The Complaint also lacks sufficient allegations as to the falsity of a number of statements made by Nokia. Plaintiffs simply fail to allege how these statements are false."). At a minimum, the plaintiffs must actually allege that supposedly undisclosed facts are inconsistent with what the company actually disclosed. Gavish, 2004 WL 2210269, at *20 ("The specific facts the statements proclaim to be true are not alleged to have

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386
2005 WL 578386 (S.D.N.Y.)

been false and are not inconsistent with what is alleged to have been true."). Here, the plaintiffs have failed to make this showing.

1. CDMA

The amended complaint offers three reasons why Nokia's statements regarding its (truthful) gains in CDMA market share during 2003 and its (non-actionable) statements of optimism about its CDMA prospects in 2004 were false and misleading. (See, e.g., CAC ¶ ¶ 86, 89-91, 102-103, 113, 130, 143.) None withstand scrutiny.

First, the plaintiffs complain that Nokia's statements about its improving CDMA performance were false and misleading because (i) "the market shift from TDMA (where Nokia had a 75% share) to CDMA (where, in 2002, Nokia held only a nominal share and, even in 2003, held less than a 15% share) was harming Nokia's sales performance and market share." (Id. ¶ ¶ 87, 93, 104, 114(d).) On the most basic level, the plaintiffs' allegation - which concerns the effects of general trends on Nokia's overall sales and performance - simply does not contradict Nokia's focused statements about its gains in CDMA market share. Nor does it render Nokia's statement misleading.

Second, the plaintiffs mechanically complain that, "by 2003, Nokia had developed only low end CDMA phones and was far behind its competitors in development of high quality and competitive mid-tier and high end CDMA phones." (Id. ¶ ¶ 87, 93; see also id. ¶ ¶ 104, 114(d).) Again, the plaintiffs' allegation does not establish the falsity of Nokia's statement. Nokia's statement concerned its improved (and hopefully further improving) market share in CDMA generally; it did not say that its CDMA gains were in the middle range or high-end phones.

Third, the plaintiffs assert that Nokia's statements were false because the company's "phone sales performance and prospects were also being depressed by its refusal to customize CDMA phones to operators' specifications." (Id. ¶ 87; see also id. ¶ ¶ 93, 104, 114(d), 131(d), 144(d).) Not only does this conclusory assertion again fail to establish the falsity of Nokia's disclosure, it is not even supported by the allegations of the plaintiffs' own amended complaint. Specifically, the amended complaint identifies four major United States operators - Sprint, Verizon, AT&T and Cingular - and two European operators, Vodafone and France Telecom Orange S.A. ("Orange"). (Id. ¶ ¶ 48, 53.) For the major U.S. operators, the plaintiffs acknowledge that AT&T and Cingular used GSM (rather than CDMA) technology and they do not make any allegations that Nokia refused to customize phones for Sprint or Verizon. (Id.) In fact, the amended complaint acknowledges that Nokia agreed to customize its phones with a Texas Instruments chipset in 2003 for Sprint and Verizon and that these operators began selling Nokia phones in 2003. (Id. ¶ ¶ 49, 54.) Moreover, the amended complaint also acknowledges that Nokia specifically agreed to customize phones for Vodafone, the leading European operator, in 2003. (Id. ¶ 57.) Finally, the plaintiffs' vague allegations about Orange fail because the plaintiffs do not even assert that Orange's alleged request involved CDMA phones. (Id. ¶ 59.) Nor can this fact be reasonably inferred because Orange is primarily a European operator and, as the plaintiffs acknowledge, GSM - not CDMA - is the dominant cellular technology in Europe. (Id. ¶ 48.)

2. The N-Gage

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

At its core, much of this lawsuit is an attempt by the plaintiffs to dress up what they apparently believe were unwise business decisions as a claim for securities fraud. [FN7] Nowhere is this more apparent - and nowhere do the plaintiffs' accusations of securities fraud ring as hollow - than with the plaintiffs' allegations regarding Nokia's entry into games with the N-Gage. In an effort to bootstrap their gripe about the N-Gage into a claim for securities fraud, the plaintiffs argue that all of Nokia's statements about the N-Gage (see, e.g., id. ¶ ¶ 86, 97, 107, 108, 150-51, 158) were false and misleading because the N-Gage, according to the plaintiffs, was an immediate failure. (Id. ¶ ¶ 88, 99(d), 109, 152, 160(a).) However, Nokia never promised investors that the N-Gage would be an overnight success. Rather, Nokia expressed the kind of hopeful optimism that all companies are entitled to express about their products and cautioned that it would be some time before it could assess the success of its launch.

   FN7. "The securities laws are not intended to compensate investors when a product fails in a competitive marketplace." Frazier, 341 F. Supp. 2d at 156.

By way of example, Annsi Vanjoki commented at Nokia's 2003 Capital Markets Day on November 24, 2003 that:

   Games are hot. Christmas is coming. And this year we participate in that market in a grand scale. We have brought the first N-Gage unit to the market and we have started the games business also in the publishing side. If there are hot areas in games it's online and its mobile. What N-Gage does, it puts these two hot areas together and makes it truly hot. It's not going to be one Christmas phenomenon and we are not expecting that the first Christmas is going to make it for us, but when we have gone through three cycles, i.e. three Christmases, because game industry peaks to the tune of Christmas, then we can say whether we have this market in the pocket or not. The starting's [sic] very good. We are tracking this business, we are seeing repeat orders come in and in certain markets which are more prone for this we see the whole thing starting to work just as we have planned.

   (Ex. M at 134; see also CAC ¶ 107.) [FN8]

   FN8. The plaintiffs misquote Vanjoki's actual comments in several respects. (Compare Ex. M at 134 with CAC ¶ 107.)

The plaintiffs allege that this entire statement was false and misleading because "consumers' immediate response to N-Gage was highly negative and those sales that were made relied heavily on promotional discounts." (Id. ¶ 109.) Once again, this contention does not contradict Nokia's statement or render it misleading. Initially, it is clear that the thrust of Nokia's entire statement (rather than the last few lines that the plaintiffs italicize in their complaint) is that the company is optimistic about the N-Gage, but that it will be several years before it can assess the success of the launch. Moreover, the plaintiffs' allegations do not even render excerpts from this statement such as "the starting's [sic] very good" and "we see the whole thing starting to work just as we have planned" false or misleading. Simply put, both of these statements are entirely subjective and somewhat vague and plaintiffs' own subjective contention - a contention that appears to rest primarily on an unattributed rumor that the N-Gage was derided as the "taco phone" (id. ¶ ¶ 69, 109) - does not, even for pleading purposes, establish their falsity.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3. The Product Portfolio

The plaintiffs' blanket allegation that all of Nokia's statements about the phones it sold were false and/or misleading also does not withstand scrutiny. (See, e.g., id. ¶ ¶ 89, 91-92, 97-98, 100, 105, 112-13, 116-17, 120, 123, 127, 130, 132, 134-35, 141, 145-46, 148, 153, 156-59.) For example, the plaintiffs attack the following statement by Anssi Vanjoki at the 2003 Capital Markets Day as false:

 If you look at the current camera industry, which equals about hundred million devices, why should we not count this industry to be the addressable market for Nokia as well? I have at least started to count it as my market. What's special in making a camera? After all in two years we became world's largest manufacturer of cameras.

     . . . .

 Right now we see our cameras are exactly what's there. There are a number of mega pixels and multiple mega pixel cameras available in the market, but first of all are they affordable to the consumer? The answer is no. Secondly, is the whole imaging chain to take use of these cameras existing and in balance? The answer is again no. But next year this is not going to be so anymore. The whole imaging chain is able to support this kind of cameras. And Nokia's early selection of technology to go with fima sensors in the cameras is really starting to pay off for us in a big manner. And in this way we can make the right cost balance for sophisticated imaging devices.

 (Id. ¶ 105.)

 Specifically, the plaintiffs assert that this statement and others like it were false and/or misleading because "Nokia then had significant holes in its current product portfolio and product roadmap for competitive mid and higher quality camera phones." (Id. ¶ 106; see also id. ¶ ¶ 94(a), 99(b), 101, 106, 114(b), 118, 128(a), 131(a)-(c), 133(a), 137(a), 142(a), 144(a)-(c), 147(a), 149, 154, 160(a).) But even if the Court were to accept the argument there were such "holes," that does not come close to making Nokia's statement about camera phones false or misleading.

 Along the same lines, the plaintiffs label Jorma Ollila's reference to a "vastly improved product portfolio" at Nokia's 2003 Capital Markets Day (id. ¶ 113) as false and misleading because "[b]y November 24, 2003, Nokia's product portfolio had sharply degraded and Nokia was simply recirculating the same series 400 phone with different face plates, colors and minor cosmetic changes." There were major holes in Nokia's mid-tier and high-priced offerings, including for high resolution color and camera phones." (Id. ¶ 114(b).) Once again, even accepting the plaintiffs' specious criticisms, they do not make Ollila's statement false or misleading. After all, something can be improved and still require further improvement. The plaintiffs' argument as to why this and similar statements are false is particularly weak because although the plaintiffs freely criticize Nokia's products, they do not adequately explain the basis for their criticism. By way of example, the plaintiffs repeatedly criticize Nokia's series 400 platform (e.g., id.), yet they never bother to explain why Nokia's loyalty to this platform was misplaced. Thus, the plaintiffs have failed to explain why Nokia's various (puffing) statements about its product portfolio were false or misleading.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386
2005 WL 578386 (S.D.N.Y.)

Page 23

## 4. The Product Roadmap

The plaintiffs also fail to allege that Nokia's statements about its "product roadmap" - those products "that were planned and in development for release over the next several quarters" (see, e.g., id. ¶ 94) - were false and misleading. (See, e.g., id. ¶ ¶ 91, 98, 112, 120, 124, 130, 141, 143, 145, 156.) Among other statements, the plaintiffs attack the following statement by Jorma Ollila (which they misleadingly edit in their amended complaint): "And if we look at the broader set of products and opportunities in CDMA, we are working with [a] number of multimedia segment products, which will hit the markets in 2004 and 2005. So, the product's road map is a very exciting one and it has all the same elements with time that our GSM wideband portfolio does have." (Ex. N at 7; see also CAC ¶ 91.)

Once again, upon inspection, the plaintiffs' allegations fail to establish that Ollila's statement (which, in any event, is puffery and cannot serve as the basis for securities fraud) is false or misleading. The plaintiffs' allegation that Nokia's product roadmap was allegedly "inadequate and noncompetitive and lacked form design, such as clamshells, that Nokia's consumer surveys had indicated were in high demand in the United States" does not contradict Ollila's statement. (Id. ¶ 94(b); see also id. ¶ ¶ 99(c), 114(c), 128(b), 133(b), 142(b), 147(b), 160(b).) Indeed, the plaintiffs do not allege Nokia did not have a "number of multimedia segments" in the works. (Id. ¶ 94(b).)

Moreover, as with many of the plaintiffs' allegations regarding Nokia's product portfolio, the plaintiffs do not adequately allege why Nokia's roadmap was "inadequate and noncompetitive." Instead, the plaintiffs make a wholly conclusory allegation that the roadmap was inadequate (id. ¶ 65) and contend that Nokia refused to develop a clamshell or flip phone. (Id. ¶ ¶ 51-52.) Neither allegation meets the rigorous tests of Rule 9(b) and the Reform Act. In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004).

D. Nokia's Forward-Looking Statements Are Not Actionable By Virtue Of Nokia's Specific Warnings To Investors

As described above, the plaintiffs cannot latch their securities fraud claims onto Nokia's various forward-looking statements because these statements are immaterial as a matter of law. See supra pages 18-21. These statements were identified as forward-looking and accompanied by meaningful cautionary language and therefore protected under the "bespeaks caution" doctrine and the Reform Act's safe-harbor for forward-looking statements.

Under the "bespeaks caution" doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002). "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Id. at 357; see also Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996). Likewise, under the Reform Act's safe-harbor provision, defendants have no liability for forward-looking statements where the statements are "accompanied by meaningful cautionary statements identifying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

important factors that could cause actual results to differ materially from those
in the forward-looking statement." 15 U.S.C. § 77z-2(c)(1)(A)(i) (1998).

In this case, Nokia's forward-looking statements were accompanied by meaningful
cautionary language that specifically warned investors of a variety of risks that
could cause its projections to be wrong. For example, Nokia's October 16, 2003
press release provided:

It should be noted that certain statements herein which are not historical facts,
including, without limitation, those regarding . . . B) our ability to develop and
implement new products and technologies; C) expectations regarding market growth
and developments; D) expectations for growth and profitability; and E) statements
preceded by 'believe,' 'expect,' 'anticipate,' 'foresee' or similar expressions,
are forward-looking statements. Because these statements involve risks and
uncertainties, actual results may differ materially from the results that we
currently expect. Factors that could cause these differences include, but are not
limited to: 1) developments in the mobile communications market including the
continued development of the mobile phone replacement market and the timing and
success of the roll-out of new products and solutions based on 3G and subsequent
new technologies; 2) demand for our products and solutions; 3) the development of
the mobile software and services market in general; 4) the availability of new
products and services by network operators; 5) market acceptance of new products
and service introductions; 6) the intensity of competition in the mobile
communications market and changes in the competitive landscape; 7) the impact of
changes in technology . . . as well as 20) the risk factors specified on pages 11
to 18 of the Company's Form 20-F for the year ended December 31, 2002.

(Ex. O.) Nokia's January 8, 2004 and March 25, 2004 press releases contained
similar cautionary language. (Exs. B, P.)

Similarly, Nokia's October 16, 2003 conference call with analysts also identified
forward-looking statements as such and accompanied them with meaningful cautionary
language. At the start of the call, Nokia's Vice President of Investor Relations,
Ulla James, stated:

During the call today we'll be making forward-looking statements regarding the
future business and financial performance of Nokia and the mobile communications
industry.

These statements are predictions that involve risks and uncertainties. Actual
results may therefore differ materially from results currently expected. Factors
that could cause such differences can be both external, such as general economic
and industry conditions, as well as internal operating factors. We have identified
these in more detail on pages 11 to 18 in our 2002 Form 20-F, and also in our press
release issued earlier today.

(Ex. N.)

At the conclusion of the call, Nokia repeated this cautionary statement and again
referred investors to the cautionary language in the press release it issued that
day and the risk factors in its 20-F. (Id.; see also Ex. O.) Nokia included similar
cautionary language at the beginning and at the end of its January 22, 2004 and
April 6, 2004 conference calls, and in the written agenda for the 2003 Capital

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Markets Day presentation. (Exs. C, I, M.) The risk factors in Nokia's 2002 Form 20-
F, which were referred to in all of the relevant conference calls, identified a
number of variables that could materially and adversely impact Nokia's performance.
(Ex. D; see supra pages 6-7.) [FN9] In fact, Nokia specifically warned investors
that: "There is a risk that we will not be successful in maintaining and developing
this wide portfolio, or that the technologies and related products and solutions on
which we focus may not be brought to market by us and/or mobile network operators
as quickly as anticipated, may not achieve as broad a customer acceptance among
operators or end-users as we expect, or may not prove to be sufficiently compatible
with the existing technologies and products of other product and solution
providers." (Ex. D at 11.) [FN10]

    FN9. The plaintiffs' conclusory allegations that these risk factors were false
and misleading (CAC ¶ ¶ 131, 144) are insufficient to deny Nokia the protection of
the statutory safe-harbor. Nor do the plaintiffs' blanket allegations render these
statements independently actionable. Steinberg v. PRT Group, Inc., 88 F. Supp. 2d
294, 310-11 (S.D.N.Y. 2000).

    FN10. Nokia also included similar risk factors in its 2003 annual report.  (Ex.
J at 62.)

    Cautionary language of a much lower threshold has been considered  "sufficiently
specific to warrant a Rule 12(b)(6) dismissal of a Rule 10b-5 claim." Olkey, 98
F.3d 2 at 9; see also Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986). In Luce,
the defendant simply mentioned contingencies as "necessarily speculative," and that
"no assurance could be given that [they] would be realized" and that "actual
results may vary [materially] from the predictions." 802 F.2d at 56. Nokia's
language, as set forth above, is more specific and inclusive. In light of these
cautionary statements, the plaintiffs cannot assert a claim against Nokia based on
the various projections cited in the amended complaint. (See CAC ¶ ¶  86, 89, 91,
112, 113, 120, 127, 145.)

IV. THE PLAINTIFFS' ACCOUNTING ALLEGATIONS ARE WHOLLY WITHOUT MERIT AND DO NOT
STATE A CLAIM FOR SECURITIES FRAUD

    In a desperate attempt to dress up their amended complaint to look more like an
actual securities fraud lawsuit, instead of the grumbling about Nokia's product
portfolio and product roadmap that they have put before the Court, the plaintiffs
have tacked on a series of accounting allegations to the amended complaint. Relying
on a handful of unidentified former employees, the plaintiffs have concocted four
allegations of improper accounting and sales practices: (a) the alleged delivery of
phones to AT&T in the fourth quarter of 2003 "with the understanding that unsold
phones would be returned to Nokia" (Id. ¶ ¶  76-77), (b) the alleged practice of
billing a customer and then holding the products on the shipping dock (id. ¶  78),
(c) the alleged early shipment of products (id. ¶  79) and (d) the shipment of
defective goods to certain customers (id. ¶  80). [FN11] These allegations not only
fail to state a claim for securities fraud against Nokia and the named members of
its management team, they are wholly without merit and they call into question the
good faith of the people that made them.

    FN11. Although the plaintiffs appear to include Nokia's sales of the N-Gage
device in this category (see CAC ¶  140), the plaintiffs do not even allege an
improper accounting practice in connection with Nokia's sales of N-Gage. Rather,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386
2005 WL 578386 (S.D.N.Y.)

the crux of their allegation is that Nokia's sales of the N-Gage during the fourth
quarter of 2003 were disappointing. (Id. ¶ 71.)

First, the plaintiffs do not - and could not in good faith - allege that these
alleged accounting practices had any material impact on Nokia's financial
statements. (See id. ¶ 140(c).) This defect is fatal to all of the plaintiffs'
accounting claims: "a complaint must contain allegations tending to demonstrate the
materiality of the alleged overstatements in light of the defendant's total
financial picture." Gavish, No. 00 Civ. 7291, 2004 WL 2210269, at *16 (S.D.N.Y.
Sept. 30, 2004); see also In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d
161, 170 (D. Mass. 2000) ("Minor adjustments in a company's gross revenues are not,
as a rule, deemed material by either accountants or the securities law."). [FN12]

FN12. In its 2003 Form 20-F, Nokia reported that its net sales for the 2003
year were $37,104,000,000. In order to carry their burden, the plaintiffs would
have to allege, with particularity, that Nokia's alleged accounting improprieties
had a material effect on this amount. (Ex. Q.)

In a recent case involving similar accounting allegations, including similar
allegations of early shipments to customers and bill and hold practices, the court
ruled that the plaintiffs had not stated a claim for securities fraud. The court
held that the "plaintiffs have failed to adequately allege that the financial
results reported in Revlon's public statements and SEC filings were misleading to a
material degree." Gavish, 2004 WL 2210269, at *15; see also In re MSC Indus. Direct
Co., Inc., 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003) ("The amended complaint does
not explain how the defendants' use of reserve manipulation caused earnings figures
that were materially inflated for fiscal years 1999, 2000, 2001 and the first three
quarters of 2002."). The court emphasized that, as in this case, "None of the
complaint's allegations of improper sales practices contain a specific allegation
of monetary consequence at all, let alone one large enough to have been reflected
in Revlon's financial statements." Gavish, 2004 WL 2210269, at *16. Here, the
amended complaint does not contain any allegations that these alleged sales and
accounting improprieties had any material effect on Nokia's financial statements.
Thus, the amended complaint cannot state a claim for securities fraud based on
these allegations.

Second, the plaintiffs have not pleaded sufficient facts to establish loss
causation based on these allegations. A plaintiff can only make this showing by
alleging sufficient facts to establish a "causal connection between the fraud
alleged and the subsequent loss that it suffered." Citibank, N.A. v. K-H Corp., 968
F.2d 1489, 1495 (2d Cir. 1992). To meet this standard, "a plaintiff must allege
that the subject of the fraudulent statement or omission was the cause of the
actual loss suffered, i.e., that the misstatement or omission concealed something
from the market that, when disclosed, negatively affected the value of the
security." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005).
Notably, "it is not enough to allege that a defendant's misrepresentations and
omissions induced a purchase-time value disparity between the price paid for a
security and its true investment quality." Id. at 174.

Here, the plaintiffs have not sufficiently pleaded that the alleged overstatement
in Nokia's 2003 financial results - which they do not even allege to be material -
was the cause of any decline in value of Nokia stock. The plaintiffs' amended
complaint does not lay out any link between the alleged overstatement in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

financial statements that Nokia filed with the SEC as part of its Form 20-F filing on February 6, 2004 and the decline in Nokia's stock on April 6, 2004. Indeed, the plaintiffs do not and cannot point to any mention of Nokia's 2003 financial performance in its supposedly "corrective" disclosures in April 2004 when the value of Nokia's stock declined. This defect is fatal to the plaintiffs' amended complaint. See In re NUI Sec. Litig., 314 F. Supp. 2d 388, 401 (D.N.J. 2004) (dismissing accounting fraud claim premised on defendant's alleged overstatement of revenue for failure to show loss causation). [FN13]

   FN13. See also In re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d 176, 188-89 (D. Mass. 2001) (plaintiffs could not show loss causation based on allegedly improper revenue recognition).

Nor can the plaintiffs make such a showing. Indeed, the heart of their case is that Nokia's alleged misstatements about the strength of its product portfolio and product roadmap inflated the value of its stock until Nokia announced its disappointing first quarter results and allegedly revealed the "truth" about its product portfolio to the market. (CAC ¶ 12 ("With the shock of the April 6, 2004 announcement, the price of Nokia's ADRs traded in the United States, and its stock traded throughout the world, dropped 16% for a single-day trading loss in market capitalization of $17 billion. With the additional revelations made on April 16, 2004, Nokia's stock price dropped another 9%, for another $8 billion one-day drop in Nokia's market capitalization.").) Under these circumstances, the plaintiffs simply cannot show that Nokia's allegedly overstated 2003 financial performance was the reason that the plaintiffs lost money on their investment.

Third, the plaintiffs have not provided sufficient information to allow defendants and the Court to assess the allegations that the plaintiffs claim were supplied by certain former employees. Other than providing vague and generic job titles, the amended complaint does not contain any information to support an inference that these alleged former employees would have had access to the information that they apparently peddled to the plaintiffs' investigators. (Id. ¶ ¶ 75-80.) By way of example only, the amended complaint offers no indication of what a "program manager" is or why a program manager would have any reason to know about return practices with respect to AT&T and information on how long it took to "break down a phone." (Id. ¶ ¶ 76-77.) In fact, for many of these supposed former employees, the plaintiffs have not even alleged that they were employed by Nokia during the purported class period. (Id. ¶ ¶ 78-80.) Numerous courts have held that similar allegations based on information purportedly supplied by former employees were not sufficient to state a claim for securities fraud. Indeed, the district court in MSC Industries could have been describing the plaintiffs' amended complaint in this case:

   The description of these sources are not sufficiently particular to support the probability that they would possess information concerning the alleged reverse manipulation theory. The amended complaint does not state how long these sources worked for MSC. Nor does it state that they had any connection with MSC's accounting department or that their work responsibilities would provide them a basis for knowing the details of the accounting at MSC.

283 F. Supp. 2d at 847. [FN14]

   FN14. See also Novak v. Kasaks, 216 F.3d 300, 313-34 (2d Cir. 2000)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                          Page 28
2005 WL 578386 (S.D.N.Y.)

(confidential sources must be "described in the complaint with sufficient
particularity to support the probability that a person in the position occupied by
the source would possess the information alleged"); In re Flag Telecom Holdings,
Ltd. Sec. Litig., 308 F. Supp. 2d 249, 262 (S.D.N.Y. 2004) (rejecting the
plaintiffs' reliance on former employee because they failed to establish why the
former employee would have had access to the information cited by the plaintiffs in
their complaint).

  Fourth, it is well-settled that "[a]llegations of a violation of GAAP provisions
or SEC regulations, without corresponding fraudulent intent, are not sufficient to
state a securities fraud claim." Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d
Cir. 1996). Even when a company restates its financial results a plaintiff cannot
rely on such a restatement to establish the necessary strong inference of fraud.
See, e.g., In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 565
(S.D.N.Y. 2004). Here, however, the plaintiffs have not made any allegations that
would give rise to a strong inference that any member of senior management either
knew of these alleged practices or that they were so widespread and involved so
much revenue that they should have known. The plaintiffs therefore cannot state a
claim for securities fraud based on these alleged accounting and sales practices.

V. THE COURT CANNOT EXERCISE SUBJECT MATTER JURISDICTION OVER CLAIMS BY FOREIGN
INVESTORS WHO PURCHASED NOKIA SECURITIES ON EXCHANGES OUTSIDE THE UNITED STATES

  The plaintiffs purport to bring suit on behalf of a sweeping worldwide class that
includes, among others, all foreign investors who purchased Nokia securities on
exchanges outside of the United States. (CAC ¶ ¶ 1, 15-16.) [FN15] In determining
whether a federal court has subject matter jurisdiction over such claims, the
operative question is "whether Congress would have wished the precious resources of
United States courts and law enforcement agencies to be devoted to them rather than
leave the problem to foreign countries." Bersch v. Drexel Firestone, Inc., 519 F.2d
974, 985 (2d Cir. 1975) (Friendly, J.). After all, the United States is "not to be
a haven for scoundrels," but it is also not "a host for the world's victims of
securities fraud." Butte Mining PLC v. Smith, 76 F.3d 287, 291 (9th Cir. 1996). It
is the plaintiffs' burden to demonstrate subject matter jurisdiction, Nikko Asset
Mgmt. Co., Ltd. v. UBS AG, 303 F. Supp. 2d 456, 464 (S.D.N.Y. 2004), and
"argumentative inferences favorable to the party asserting jurisdiction should not
be drawn." Société Nationale v. Salomon Bros. Int'l Ltd., 928 F. Supp. 398, 403
(S.D.N.Y. 1996).

     FN15. Of the three lead plaintiffs, Marin Bergljung appears to be the only
   named foreign plaintiff. Although it is not entirely clear from the allegations of
   the complaint (CAC ¶ 25) or his certification, it does not appear that Bergljung
   actually purchased Nokia securities on an exchange other than the New York Stock
   Exchange. Thus, while the plaintiffs seek to represent a worldwide class of all
   investors, even those who purchased on European exchanges, apparently none of the
   lead plaintiffs themselves actually purchased stock outside the United States. It
   is therefore doubtful that they have standing to sue on behalf of the class of
   investors that purchased on European exchanges. See In re Salomon Analyst Level 3
   Litig., 350 F. Supp. 2d 477, 497 (S.D.N.Y. 2004) (named plaintiffs who only
   purchased equities did not have standing to assert claims of bondholders when none
   of the named plaintiffs purchased bonds).

  Under the law of this Circuit, a plaintiff has to satisfy either the conduct test

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or the effects test to establish subject matter jurisdiction. Bersch, 519 F.2d at 985. Here, the plaintiffs allege that the Court has jurisdiction over the claims of foreign investors who purchased on foreign exchanges under the conduct test. (CAC ¶ 16.) Under this test, the plaintiffs must show that (i) defendants' activities in the United States were more than "merely preparatory" to a securities fraud conducted outside of the United States and (ii) the defendants' alleged activities within the United States "directly caused" the claimed losses. Nikko Asset Mgmt. Co., 303 F. Supp. 2d at 464. Here, the plaintiffs have not carried their burden.

First, the plaintiffs' allegation that the Court can exercise subject matter jurisdiction over the claims of foreign investors because Nokia conducts business in the United States is without merit. (CAC ¶ ¶ 17, 21.) While Nokia's presence in the United States might be relevant to issues of personal jurisdiction, it is "irrelevant to subject matter jurisdiction. The conduct test requires that the fraudulent activity take place in the United States, and the fact that defendants conducted other activity in the United States is not significant." In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 10 n.14 (D.D.C. 2000). [FN16]

FN16. See also Tri-Star Farms Ltd. v. Marconi, PLC, 225 F. Supp. 2d 567, 578 n.12 (W.D. Pa. 2002) ("[T]he mere fact that Marconi carries on substantial business operations in the United States is not, in itself, sufficient to confer subject-matter jurisdiction under the securities law."); Butte Mining PLC v. Smith, 876 F. Supp. 1153, 1167 n.48 (D. Mont. 1995) (plaintiff could not establish subject matter jurisdiction under the conduct test by alleging that the foreign defendant owned substantial assets in the United States), aff'd, 76 F.3d 287 (9th Cir. 1996).

Second, the plaintiffs' attempt to establish subject matter jurisdiction by alleging that there is a single worldwide market for Nokia securities (CAC ¶ ¶ 18, 45) is also unavailing. Indeed, the Marconi court rejected this very argument, ruling that plaintiffs' allegations that Marconi ADRs "traded in tandem with Marconi ordinary shares on the London Stock Exchange" and that there was a "seamless, worldwide market" for Marconi securities were not sufficient to establish jurisdiction. 225 F. Supp. at 579.

Third, the plaintiffs cannot establish subject matter jurisdiction simply because Nokia held a presentation in Texas and filed certain documents with the SEC (CAC ¶ ¶ 17, 19) because these activities "are relatively small in comparison to those abroad." Bersch, 519 F.2d at 987. [FN17] Under similar circumstances, courts have ruled that a foreign company's SEC filings and dissemination of information in the United States could not support the extension of jurisdiction to foreign investors who purchased securities on foreign exchanges because they were insubstantial in comparison to the conduct that purportedly occurred outside of the United States. See, e.g., Marconi, 225 F. Supp. 2d at 577-78; Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993); Kaufman v. Campeau Corp., 744 F. Supp. 808, 810 (S.D. Ohio 1990).

FN17. Likewise, the plaintiffs cannot establish subject matter jurisdiction by alleging that certain of Nokia's statements made outside of the United States may have eventually found their way into the United States. (CAC ¶ 19.)

Here, the plaintiffs have accused Nokia, a Finnish company, and six of its executives, all of whom worked outside of the United States during the relevant time period, of engaging in a scheme to defraud investors about the strength of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386                                              Page 30
2005 WL 578386 (S.D.N.Y.)

Nokia's products. The plaintiffs not only allege that the bulk of the misleading
statements were made outside of the United States, they also allege that the
allegedly key business decisions underlying these representations were "made at the
highest corporate levels in Finland." (CAC ¶ 188.) Under these circumstances, the
plaintiffs plainly have not established that the Court has jurisdiction over the
claims of all foreign investors.

 Moreover, even if these allegations were sufficient to satisfy the first prong of
the Second Circuit's conduct test, the plaintiffs cannot satisfy the second prong
because they do not allege that any foreign investors specifically relied on any of
Nokia's SEC filings or Capital Markets Day statements in deciding to purchase Nokia
stock on a foreign exchange. See In re Bayer AG Sec. Litig., No. 03 Civ. 1546, 2004
WL 2190357, at *18 (S.D.N.Y. Sept. 30, 2004) ("[T]he Complaint's allegations that
defendants filed misleading forms with the SEC are insufficient because of the
absence of any allegation that those filings were a substantial or contributing
cause of the foreign residents' decision to purchase Bayer stock."). [FN18]

    FN18. See also In re Baan, 103 F. Supp. 2d at 10 (court did not have subject
matter jurisdiction over foreign plaintiffs' claims because "[t]he complaint
contains no allegations of specific reliance on those fraudulent acts which
occurred in the United States"); McNamara v. Bre-X Minerals Ltd., 68 F. Supp. 2d
759, 762 (E.D. Tex. 1999) (denying motion for reconsideration because plaintiffs
failed to show that they relied on alleged misstatements in the United States);
Kaufman, 744 F. Supp. at 810 ("[T]he Court fails to discern how inclusion of
alleged misrepresentations and omissions in materials filed or circulated in the
United States could have played a significant role in any losses sustained by the
Canadian investors.").

                              CONCLUSION

 For the foregoing reasons, the plaintiffs' consolidated amended complaint should
be dismissed in its entirety and with prejudice.

 Dated: March 8, 2005, New York, New York

 SHEARMAN & STERLING LLP

 By: s/ Kenneth M. Kramer, Kenneth M. Kramer (KK 1462), Jerome S. Fortinsky (JF
1103), Seth M. Kean (SK 0191), Nicole Coward (NC 1751), 599 Lexington Avenue, New
York, NY 10022, Tel: (212) 848-4000, Fax: (212) 848-7179

               Motions, Pleadings and Filings (Back to top)

 • 2005 WL 1429311 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law
in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint (May
16, 2005)

 • 2005 WL 946551 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of
Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended
Complaint (Apr. 7, 2005)

 • 2005 WL 578385 (Trial Pleading) Consolidated Class Action Complaint for
Violations of Federal Securities Laws (Jan. 7, 2005)

         © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 578386
2005 WL 578386 (S.D.N.Y.)

- 1:04cv02646 (Docket) (Apr. 6, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

# ETSI Guide on Intellectual Property Rights (IPRs)

**(As endorsed by the ETSI GA#46 on 23 November 2005)**

© European Telecommunications Standards Institute 2005. All rights reserved.

## Contents

Background ..............................................................................................................................4

Foreword ..............................................................................................................................4

1    The ETSI IPR Policy....................................................................................................4
      1.1      What is the Purpose of the IPR Policy?.....................................................................4
      1.2      Where can I find the ETSI IPR Policy?......................................................................5
      1.3      Terminology ..............................................................................................................5
      1.4      Rights and obligations deriving from the IPR Policy..................................................5
      1.5      "Essential" IPRs .......................................................................................................7

2    Importance of timely disclosure of Essential IPRs .......................................................7
      2.1      Members Duties.........................................................................................................8
               2.1.1      Responding to Calls for IPRs performed in Technical Body meetings ..........8
               2.1.2      Use the ETSI IPR Information Statement and Licensing Declaration
                         forms ...........................................................................................................8
               2.1.3      Update and complete the ETSI IPR Information Statement form ..................8
               2.1.4      Copyrights in ETSI Deliverables .................................................................8
      2.2      Members do NOT have a duty to: ..............................................................................8
      2.3      Technical Body Chairmen's duties .............................................................................9
               2.3.1      Define scope statements for work items ......................................................9
               2.3.2      Make call for IPRs in Technical Bodies meetings ........................................9
               2.3.3      When and How?.........................................................................................9
               2.3.4      Record and report information on IPRs ......................................................10
               2.3.5      Copyrights in ETSI Deliverables .................................................................11
               2.3.6      Confidential information .............................................................................11
      2.4      ETSI Secretariat Duties ............................................................................................11
               2.4.1      Information on Essential IPRs in ETSI Deliverables ....................................11
               2.4.2      Initiate a procedure of clause 8 when no licensing declaration can be
                         obtained......................................................................................................11
               2.4.3      Non response by an IPR owner ...................................................................11
               2.4.4      Redrafting of ETSI Deliverables..................................................................12
               2.4.5      Disclose copyright identified in ETSI documentation...................................12
               2.4.6      Acknowledgement of third parties copyright ...............................................12
               2.4.7      Reporting of a substantial IPR problem ......................................................12
               2.4.8      Maintenance of Information on Essential IPRs ...........................................13

3    Information on Essential IPRs by ETSI........................................................................13
      3.1      Where to find information on essential IPRs ..............................................................13
               3.1.1      ETSI Special Report 000 314......................................................................13
               3.1.2      The ETSI IPR Online Database ...................................................................13
               3.1.3      Requests to the ETSI Secretariat................................................................13
      3.2      What type of information and procedures for updates ................................................14
               3.2.1      Assessment of IPR rights............................................................................14
               3.2.2      Update procedure for the ETSI IPR Online database...................................14

4    Other ETSI IPR Policy matters....................................................................................14
      4.1      Responsibility for specific licensing terms .................................................................14
      4.2      Dispute Resolution....................................................................................................14
      4.3      Notice on the use of NDAs in IPR negotiations ..........................................................15
      4.4      Financial contingency ...............................................................................................15
      4.5      Rationale and clarifying texts for the changes in Article 4.1 of the ETSI IPR Policy .........15
               4.5.1      History of changes .....................................................................................15
               4.5.2      EC DG COMPETITION's position regarding the rationale and scope
                         for the changes of Article 4.1 of the ETSI IPR Policy...................................15
                         4.5.2.1      Addition of the sentence "Subject to Article 4.2
                                      below..." and Deletion of the phrase "... it is aware of
                                      or becomes aware of."...................................................15

| | 4.5.2.2 | Addition of the phrase "... where it participates ..."..............16 |
| | 4.5.2.3 | Re the expression "in particular" ..........................................16 |
| 4.5.3 | | ETSI's position regarding the rationale and scope for the changes of Article 4.1 of the ETSI IPR Policy.............................................................17 |
| | 4.5.3.1 | Re the addition of the sentence "Subject to Article 4.2 below..."......................................................................................17 |
| | 4.5.3.2 | Re the deletion of the phrase "... it is aware of or becomes aware of."..........................................................................17 |
| | 4.5.3.3 | Addition of the phrase "... where it participates ..."..............18 |
| | 4.5.3.4 | Re the expression "in particular" ..........................................18 |
| | 4.5.3.5 | Re the expression "Reasonable Endeavours" ....................18 |

Annex A    ETSI Intellectual Property Rights Policy ...................................................................20

Annex B    ETSI IPR Information Statement and Licensing Declaration Forms ...................................25

Annex C    Check list of the Chairmen's obligations in respect of the notification and disclosure
   of IPRs  27

## Background

The ETSI IPR Policy was adopted by the 21st General Assembly on 23 November 1994 and incorporated in the ETSI Directives as Annex 6 to the ETSI Rules of Procedure.

At a later stage a Technical Body Chairman's Guide on IPRs had been written to help Chairmen and others involved in ETSI's standardization activities to understand and implement the Institute's IPR Policy. That Chairman's Guide on IPR had not been endorsed by the General Assembly or the Board and therefore did not have the same official status as the ETSI Statutes, the Rules of Procedure or the Technical Working procedures. The Technical Body Chairman's Guide on IPRs is now replaced by the present ETSI Guide on IPRs.

In 2002 the ETSI General Assembly #40 identified the need to review the ETSI IPR Policy with a view to addressing and rectifying any uncertainties on the operation of this Policy and on any legal rules and obligations on the membership in order to avoid an incorrect implementation of the ETSI IPR Policy and in order to avoid anti-competitive actions. An ad-hoc IPR group, with a clear mandate to review the implementation of the IPR Policy but not to change the Policy itself, was consequently created and 30 recommendations on the operation of the ETSI IPR Policy where approved by the ETSI General Assembly #42. The present ETSI Guide on IPRs embodies most of these recommendations.

A revised version of the Article 4.1 of the ETSI IPR Policy was adopted by the 46th General Assembly in November 2005. This revision was induced by the EC DG COMPETITION in its concern to generate a general awareness of the risk of "patent ambush" situation in the standard making process. The EC DG COMPETITION rationale behind the changes is given in section 4.5 of the present Guide.

## Foreword

Intellectual property plays an important role in standardization, especially in the telecommunications and electronic communications sector. In that context, the likelihood of having Intellectual Property Rights (IPRs) incorporated into ETSI Deliverables became critical after a few years of existence of ETSI. This tension (proprietary nature of IPRs versus wide dissemination of standards) was minimized with the adoption by the ETSI Membership of the ETSI IPR Policy as found in Annex 6 to the ETSI Rules of Procedure.

In the preparation of standards, IPR issues may arise. It is important for all parties involved in the ETSI standards-making process to be aware of their responsibilities and that there is good co-operation between all parties.

This guide is intended to help ETSI Members and any other party involved in ETSI's standardization activities (e.g. Members, Technical Body Chairmen, Secretariat, etc.) to understand and implement the Institute's IPR Policy.

This guide provides explanatory information on how to handle IPR matters in ETSI and does not replace the ETSI IPR Policy which takes precedence in all cases.

This guide has been endorsed by the Board but does not have the same official status as the Statutes, the Rules of Procedure or the Technical Working Procedures.

Should you (the reader) have any difficulty with provisions of this guide or with any practical aspects of the Policy which are not answered by this guide, please do not hesitate to contact the ETSI Secretariat (hereafter called simply "Secretariat").

## 1    The ETSI IPR Policy

### 1.1    What is the Purpose of the IPR Policy?

The purpose of the ETSI IPR Policy is to facilitate the standards making process within ETSI. In complying with the Policy the Technical Bodies should not become involved in legal discussion on IPR matters. The main characteristics of the Policy can be simplified as follows:

- Members are fully entitled to hold and benefit from any IPRs which they may own, including the right to refuse the granting of licenses.

- Standards and Technical Specifications shall be based on solutions which best meet the technical objectives of ETSI.

- In achieving this objective, the ETSI IPR Policy seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

- The IPR Policy seeks to reduce the risk that investment in the preparation, adoption and application of standards could be wasted as a result of an Essential IPR for a standard or technical specification being unavailable.

- Therefore, the knowledge of the existence of Essential IPRs is required as early as possible within the standards making process, especially in the case where licenses are not available under fair, reasonable and non-discriminatory (FRAND) terms and conditions.

The ETSI IPR Policy defines the rights and obligations for ETSI as an Institute, for its Members and for the Secretariat.

The Policy is intended to ensure that IPRs are identified in sufficient time to avoid wasting effort on the elaboration of a Deliverable which could subsequently be blocked by an Essential IPR.

## 1.2    Where can I find the ETSI IPR Policy?

The ETSI IPR Policy is part of the ETSI Directives and can be found in Annex 6 of the ETSI Rules of Procedures (http://www.etsi.org/legal/home.htm). This means that the rights and obligations specified by the IPR Policy are an integral part of the ETSI Rules of Procedure and are binding on all ETSI Members.

You can also find a copy of the Policy at Annex A.

## 1.3    Terminology

The ETSI IPR Policy defines a number of terms; those used in this guide correspond to those used in the Policy.

In the ETSI IPR Policy:

**an IPR includes:**

- COPYRIGHT
- PATENT
- UTILITY MODEL
- REGISTERED DESIGN
- ... and applications thereof.

**an IPR does not include:**

- TRADEMARKS
- TRADE SECRETS
- CONFIDENTIAL INFORMATION
- RIGHTS RELATING TO GET-UP (packaging)

## 1.4    Rights and obligations deriving from the IPR Policy

The ETSI IPR POLICY defines rights and obligations for ETSI as an Institute, for its Members and for the Secretariat. Non-Members of ETSI also have certain rights under the Policy but do not have legal obligations.

The following table intends to give a clear overview of the most important rights and obligations of the Institute, the Members, the Secretariat and the rights of third parties as specified under the ETSI IPR Policy. *All references below which are in italics relate to the ETSI IPR Policy.*

| | Obligations | Rights |
|---|---|---|
| **Institute** | • to inform users of standards about Essential IPRs declared and ensure that this information is publicly available (*clause 7*).<br>• to perform IPR searches if the EC and/or EFTA so require and reasonable expenses are met (*clause 6.2*).<br>• to grant licenses on ETSI-owned IPRs (other than copyright) on fair, reasonable and non-discriminatory terms and conditions to third parties, free of charge to ETSI Members (*clause 9.3*).<br>• to respect confidential information within a Technical Body until publication of the relevant Deliverable.<br>• to include the information in a standard (*clause 10*). | |
| **Members** | • to inform ETSI about their own, and other people's Essential IPRs (*clause 4.1*).<br>• owners of Essential IPRs are requested to undertake to grant licenses on fair, reasonable and non-discriminatory terms and conditions (*clause 6.1*).<br>• owners of Essential IPRs who refuse to grant license when no alternative is available, are requested to reconsider their position and provide the Director-General with a justification (*clause 8.1*).<br>• to abstain from claiming copyright on standards documentation (text, graphics etc., of the standard itself) on behalf of the member itself and its employees (*clause 9.1*). | • no obligation to conduct IPR searches (*clause 4.2*).<br>• to refuse the inclusion of own IPRs in standards (*clauses 8.1 and 8.2*).<br>• to be granted licenses on fair, reasonable and non-discriminatory terms and conditions in respect of a standard (*clause 6.1*).<br>• to make copies of standards documentation (clause 11) free of charge.<br>• to use IPRs owned by ETSI free of charge (*clause 9.3*).<br>• to have confidential information within a Technical Body respected until publication of the relevant Deliverable (*clause 10*). |
| **Secretariat** | • the Director-General to contact owners of Essential IPRs having refused to grant licenses on behalf of ETSI (*clauses 8.1 and 8.2*).<br>• the Director-General to request the owner of an Essential IPR to give within three months an undertaking in writing that it is prepared to grant licenses (*clause 6.1*). | |
| **Third Parties** | • the ETSI IPR Policy is only binding on ETSI Members. Third parties do not have any legal OBLIGATIONS under the Policy.<br>• when ETSI is informed that an IPR | • Third parties have certain RIGHTS under the ETSI IPR Policy either as owners of Essential IPRs or as users of ETSI standards or documentation:<br>  ○ to refuse the inclusion of their own Essential IPRs in ETSI |

| | | belonging to a non-Member could be essential for a standard, the non-Member owner is also requested to undertake to grant licenses on fair, reasonable and non-discriminatory terms and conditions (*clause 6.1*). | Deliverables (*clause 8.1 and 8.2*). |
| --- | --- | --- | --- |
| | | | o  To be granted licenses on fair, reasonable and non-discriminatory terms and conditions in respect of a standard at least to manufacture, sell, lease, repair, use and operate, (*clause 6.1*) |
| | | | o  to be granted licenses for ETSI owned IPRs (other than copyright in the standard documentation) (*clause 9.3*) on fair, reasonable and non-discriminatory terms and conditions. |
| | | | o  to have confidential information within a Technical Body respected until publication of the relevant Deliverable (*clause 10*). |

## 1.5  "Essential" IPRs

Clause 15.6 of the ETSI IPR Policy gives the following definition of essentiality:

"15.6    *ESSENTIAL as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL".*

In simpler terms, an "essential IPR" is an IPR which has been included within a standard and where it would be impossible to implement the standard without making use of this IPR. The only way to avoid the violation of this IPR in respect of the implementation of the standard is therefore to request a license from the owner.

## 2    Importance of timely disclosure of Essential IPRs

The main problems for ETSI as a standards body which may arise from "late disclosures" include:

- Licenses for Patents which have been disclosed late and are not available at all, or,

- Licenses for Patents which have been disclosed late and which are available, but not on Fair, Reasonable and Non-Discriminatory (FRAND) terms, i.e. the company is unwilling to make a 'FRAND' undertaking/licensing declaration.

If the above problems cannot be satisfactorily resolved, then ETSI has to change the standard, which in some extreme cases could even include the need to start again with the development of that standard.

NOTE 1:    Definitions for "Timeliness" or "Timely" cannot be agreed because such definitions would constitute a "change to the Policy".

NOTE 2:    The following description of Intentional Delay has been noted:

*"Intentional Delay" has arisen when it can be demonstrated that an ETSI Member has deliberately withheld IPR disclosures significantly beyond what would be expected from normal considerations of "Timeliness".*

This description of 'Intentional Delay' should be interpreted in a way that is consistent with the current ETSI IPR Policy. In complying with the requirements of timeliness under section 4.1 of the IPR Policy, Members are recommended to make IPR disclosures at the earliest possible time following their becoming aware of IPRs which may be Essential.

NOTE 3:    "Intentional Delay", where proven, should be treated as a breach of the IPR Policy (clause 14 of the ETSI IPR Policy) and can be sanctioned by the General Assembly.

## 2.1    Members Duties

### 2.1.1    Responding to Calls for IPRs performed in Technical Body meetings

Members participating in Technical Bodies should respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.

Furthermore, the call for IPRs acts as a reminder of the Member's obligations under the IPR Policy and is performed to foster the disclosure of Essential IPRs in a timely fashion.

Members having IPR portfolios should improve their internal IPR co-ordination processes to ensure, as far as possible, that their participants in Technical Bodies are aware of any alleged-essential IPR the company may have (related to the on-going work on a particular ETSI Standard or Technical Specification), that they understand their obligations, and that they know how to discharge them.

Members are encouraged to make general IPR undertakings/licensing declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures.  This process reduces the risk of the standards making process being blocked due to IPR constraints.

### 2.1.2    Use the ETSI IPR Information Statement and Licensing Declaration forms

The ETSI IPR Information Statement and Licensing Declaration forms should be used by any IPR holders wishing to make their disclosures and undertaking to ETSI.

A copy of the ETSI IPR Information Statement and Licensing Declaration Forms can be found at Annex B and online at: http://www.etsi.org/legal/IPR_database/IPRforms-V4.doc

These forms, once completed and duly signed should be returned to the ETSI Director-General.

Any questions related to the completion of the forms should be addressed to the ETSI Legal Advisor.

### 2.1.3    Update and complete the ETSI IPR Information Statement form

Members are not obliged to inform ETSI of any updates to their essential IPRs. Nevertheless, Members are encouraged to update and complete their information statements in line with the forms (see Annex B). A minimum of information should be provided, which allows verifying the essentiality or the potential essentiality of an IPR.

### 2.1.4    Copyrights in ETSI Deliverables

Members should be aware that once a technical proposal has been included into ETSI documentation the copyright is owned by ETSI, for the purpose of the publication of ETSI documentation.

## 2.2    Members do NOT have a duty to:

- conduct IPR searches (see clause 4.2 of the IPR Policy).

- disclose within the Technical Body the commercial terms for licenses for which they have undertaken to grant licenses under FRAND terms and conditions.  Any such commercial

terms are a matter for discussion between the IPR holder and the potential licensee, outside of ETSI (see section 4.1 of this Guide).

## 2.3    Technical Body Chairmen's duties

Chairmen represent the membership while having the authority to represent the Institute in their Technical Body. Chairmen have an important role in respect of both, the identification and disclosure of essential IPRs. They have a duty to remind the Members of their statutory obligations to submit IPR disclosures.

In addition to the actions aiming at the identification of IPRs, the Chairmen also need to take the following actions, which ensure that the disclosure of essential IPRs is properly carried out:

- to record in the report of the meeting that an IPR call has been made and to record any responses;

- to inform the Secretariat of the existence of any essential IPRs identified.

Throughout the standardization process the Chairmen must take the following actions which facilitate the identification of Essential IPRs.

### 2.3.1    Define scope statements for work items

It is vital that Chairmen ensure that the scope statements for all work items in the ETSI work programme are properly defined. This will ensure that if a search for patents is required (under clause 6.2 of the Policy) or chosen to be performed by a Member, the task can be carried out in the most effective manner.
In order that the scope statement of an ETSI work item can be used for IPR purposes, it should contain the following:

- a broad statement concerning the technical field of this work;
- a description of broad system concepts;
- identification of any standard on which the work item is likely to be based;
- a list of features which the standard will define, or on which the standard will place limitations;
- a technical description of each feature listed, in broad terms; and,
- a list of any criteria which the standard must satisfy.

### 2.3.2    Make call for IPRs in Technical Bodies meetings

Every Technical Body and working group meeting shall start with a "Call for IPRs" (either in a written form – as part of the meeting's agenda - or in oral form) performed by the Chairman. This Call for IPRs acts as a reminder of the Member's obligations under the ETSI IPR Policy and is performed to foster the disclosure of Essential IPRs in a timely fashion.

An example of this "Call for IPRs" may be found below in clause 2.3.3. Please note that during the Operational Co-ordination Group meetings (OCG) Chairmen will be reminded to perform that call for IPRs.

Technical Body Chairmen are also invited to encourage Members to make general IPR undertakings/licensing declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures.

### 2.3.3    When and How?

A formal call for IPR disclosures shall be made by the Chairman at the beginning of each meeting.

The formal call for IPR disclosures needs to be made by the Chairman orally or in writing according to the example given below. Members need to be reminded that the recommended form for the notification of essential IPRs and licensing declaration are available on-line and attached in Annex B.

Case 1:05-cv-00016-JJF    Document 90-8    Filed 12/06/2006    Page 43 of 62

**Example of a formal call for IPRs**

> The attention of the members of this Technical Body is drawn to the fact that ETSI Members shall use reasonable endeavours under clause 4.1 of the ETSI IPR Policy, Annex 6 of the Rules of Procedure, to inform ETSI of Essential IPRs in a timely fashion. This section covers the obligation to notify its own IPRs but also other companies' IPRs.
>
> The members take note that they are hereby invited:
>
> - to investigate in their company whether their company does own IPRs which are, or are likely to become Essential in respect of the work of the Technical Body,
>
> - to notify to the Chairman or to the ETSI Director-General all potential IPRs that their company may own, by means of the IPR Information Statement and the Licensing Declaration forms that they can obtain from the ETSI Technical Officer or http://www.etsi.org/legal/IPR_database/IPRforms-V4.doc."
>
> Members are encouraged to make general IPR undertakings/declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures.

During the meeting a short reminder call for IPR disclosures should be made:

- on formal submission of a technical solution;
- on completion of the first stable draft of the standard;
- on working group approval of a draft standard;
- on TB approval of a draft standard.

E.g., this may consist of the following sentence "*May I remind Members of their obligations to use reasonable endeavours to disclose any Essential IPR [related to this issue] in a timely fashion*".

The Technical Body Chairmen should note and should make their attendees aware that disclosure of Essential or potentially Essential IPRs should be made at the earliest possible stage within the above list.

Knowing who has contributed to the development of a standard may help identify IPRs Essential to that standard.

If it becomes apparent that an IPR declaration/licensing undertaking is unlikely to be provided, the Technical Body Chairman should inform the Legal Advisor in the Secretariat, who will take the necessary action.

Ultimately, it may be necessary for the Secretariat to invoke clause 8.1 of the Policy, which could require all work on the standard to stop. In any case, the party owning the IPR is allowed three months consideration time after the Technical Body has examined the matter and the Director-General has invited the IPR owner to reconsider its refusal to grant a license. Chairmen should use their judgment (in consultation with the Secretariat) as to whether or not the Technical Body should suspend work on the standard until the matter has been resolved.

### 2.3.4    Record and report information on IPRs

Technical Body Chairmen must be particularly careful to record in the report of each meeting that a reminder was issued and include details of any responses that were made. If there were no responses, then this fact should also be recorded.

Whenever a Chairman becomes aware of the existence of an Essential or potentially Essential IPR he must immediately inform the Legal Advisor of the ETSI Secretariat.

### 2.3.5    Copyrights in ETSI Deliverables

Chairmen shall ensure that all technical proposals adopted by their Technical Body are recorded in the minutes of the meeting, together with any restrictions on their use, and shall report them to the Secretariat. The Secretariat will inform Chairmen if copyright licenses/assignments are required. If so, then they must be obtained before publication of the document. The Secretariat will determine, with the assistance of the Chairman, which third party copyrights, if any, have to be acknowledged.

### 2.3.6    Confidential information

It may happen that Chairmen or Technical Bodies are offered confidential information. There are certain precautions which must be observed and Chairmen are strongly urged to contact the Secretariat before proceeding.

Clause 10 of the Policy states that information disclosed to ETSI's Technical Bodies is to be regarded as non-confidential, unless all of the following criteria are satisfied:

- the information is in written or other tangible form; and
- the information is identified in writing as confidential at the time it is submitted; and
- the information is first submitted to the Technical Body Chairman and accepted by him as confidential.

Where a Chairman becomes aware that confidential information has been disclosed in breach of a confidential disclosure agreement to which ETSI is a party, he must immediately inform the Secretariat.

### 2.4    ETSI Secretariat Duties

The Secretariat, and especially the Legal Advisor, have a general duty to assist the Chairmen in IPR matters. In addition to this, the Secretariat is responsible for the actions below:

### 2.4.1    Information on Essential IPRs in ETSI Deliverables

The ETSI Secretariat will ensure that an appropriate reminder of the duty to disclose the identity of Essential IPRs is included in all published ETSI Deliverables in the form of a standard text.

Specifically, the Secretariat shall ensure that the following marking appears in ETSI Deliverables prior to Publication, Member vote, Public Enquiry or National Vote:

> **Intellectual Property Rights**
> IPRs essential or potentially essential to the present document may have been declared to ETSI. The information pertaining to these essential IPRs, if any, is publicly available for **ETSI members and non-members**, and can be found in SR 000 314: "*Intellectual Property Rights (IPRs); Essential, or potentially Essential, IPRs notified to ETSI in respect of ETSI standards*", which is available from the ETSI Secretariat. Latest updates are available on the ETSI Web server (http://www.etsi.org/ipr).
>
> Pursuant to the ETSI IPR Policy, no investigation, including IPR searches, has been carried out by ETSI. No guarantee can be given as to the existence of other IPRs not referenced in SR 000 314 (or the updates on the ETSI Web server) which are, or may be, or may become, essential to the present document.

### 2.4.2    Initiate a procedure of clause 8 when no licensing declaration can be obtained

Where an IPR licensing declaration cannot be obtained because of the refusal by the essential IPR owner, the ETSI Secretariat is obliged to initiate the procedure set out in clause 8 of the ETSI IPR Policy.

### 2.4.3    Non response by an IPR owner

In situation where there has been no response from an IPR owner to a request for undertaking/licensing declaration within the three months specified in clause 6.1 of the IPR Policy:

- where a standard has not yet been published and an undertaking/licensing declaration has not been received or is not sufficiently defined, the steps listed in clause 8.1 of the IPR Policy should be applied, e.g. the TB should not pursue development of the standard based on the non-available technology and should look for alternative solutions.

- where a standard has already been published and an undertaking/licensing declaration has not been received or is not sufficiently defined, the steps listed in clause 8.2 of the IPR Policy should be applied, e.g. contact the IPR owner concerned, bring to the attention of the GA, etc. If these steps do not solve the issue of non-availability of licenses, the process of withdrawal of the standard should be initiated.

### 2.4.4    Redrafting of ETSI Deliverables

Published Standards or Technical Specifications should not be redrafted because a change on the essentiality of an IPR arises unless the required undertaking/licensing declaration has not been provided within the three month period foreseen under clause 6.1 of the IPR Policy, or has been refused. Any IPR changes should be entered into the ETSI IPR Database by the Secretariat, showing the date of the entry.

### 2.4.5    Disclose copyright identified in ETSI documentation

The copyright of ETSI documentation, including that produced in its Technical Bodies, is owned by ETSI. The Secretariat shall ensure that the following marking appears in ETSI Deliverables prior to Publication, Member vote, Public Enquiry or National Vote:

> Reproduction is only permitted for the purpose of standardization work undertaken within ETSI.
>
> The copyright and the foregoing restrictions extend to reproduction in all media.
>
> © European Telecommunications Standards Institute yyyy.
> All rights reserved.

This marking shall also appear in document templates provided to the Technical Organization by the Secretariat.

### 2.4.6    Acknowledgement of third parties copyright

Due acknowledgement of copyrights owned by third parties, which are identifiable in ETSI documentation, must be made in the following form:

> Some material contained herein is the copyright of, or has been supplied by...(insert name of party in question).

This legend should appear on the ETSI documents and/or media concerned and should immediately follow the copyright legend(s) referred to above.

In response to the obligation on Chairmen to report to the Secretariat any copyright restrictions in technical proposals adopted by their Technical Body, the Secretariat will inform Chairmen if copyright licenses/assignments are required. If so, then they must be obtained before publication of the document. The Secretariat will determine, with the assistance of the Chairman, which third party copyrights, if any, have to be acknowledged.

### 2.4.7    Reporting of a substantial IPR problem

The ETSI Director-General should bring any [substantial] IPR problem to the ETSI Board and/or General Assembly for further discussion.

**2.4.8    Maintenance of information on Essential IPRs**

The Secretariat is responsible for the maintenance of the ETSI IPR online database and the ETSI Special Report 000 314 (see sections 3.1 and 3.2 of this guide).

# 3    Information on Essential IPRs by ETSI

All information statements and licensing declarations of IPRs received by ETSI are publicly available to ETSI Members and standards' implementers via two means: The ETSI Special Report (SR) 000 314 and the ETSI IPR Online Database.

**3.1    Where to find information on essential IPRs**

**3.1.1    ETSI Special Report 000 314**

The ETSI Special report SR 000 314 is an ETSI Deliverable entirely dedicated to information on IPRs which have been notified to ETSI as being Essential, or potentially Essential, to ETSI standards. This SR is generated twice a year and offers a summary of the information contained in the ETSI IPR Online database as of the time it is generated.

In case of any conflict between the information contained in SR 000 314 and the information contained in the ETSI IPR Online Database, the contents of the database takes precedence.

ETSI SR 000 314 can be found at: http://webapp.etsi.org/ipr.

**3.1.2    The ETSI IPR Online Database**

The ETSI IPR Online Database is an application that has been developed by the ETSI Secretariat to allow electronic online access to Information Statements and Licensing Declarations received by ETSI.

Like the SR 000 314, the ETSI IPR Online Database contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards.

Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Clause 6.1 of Annex 6 of the ETSI Rules of Procedure (the ETSI IPR Policy).

It is important to note that the ETSI IPR online database provides data that is based on the information received, i.e.:

- ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential,
- No investigation or IPR searches have been carried out by ETSI and therefore, no guarantee can be given concerning the existence of other IPRs which are, or may become, essential;
- Potential licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

The ETSI IPR Online Database can be found at: http://webapp.etsi.org/ipr.

**3.1.3    Requests to the ETSI Secretariat**

Whenever requested, the ETSI Secretariat shall provide any details on information statements and licensing undertakings/licensing declarations that it has received. The main contact point is the ETSI Legal Advisor.

**3.2**     **What type of information and procedures for updates**

IPR information reflected by ETSI is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation or IPR searches have been carried out by ETSI and therefore, no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

**3.2.1**     **Assessment of IPR rights**

As a general principle, ETSI does not perform any check on the status and validity of any Essential IPRs notified to ETSI.

In addition, ETSI does not perform any search for Essential IPRs which may exist and have not been notified.

**3.2.2**     **Update procedure for the ETSI IPR Online database**

In addition to the entry of new disclosures and undertakings/licensing declarations, existing data in the ETSI IPR Database should only be updated based on information received from IPR holders or as the result of a General Assembly decision, in particular with respect to the following cases:

- **Completion of an existing data entry,** e.g. the publication number, identification of standard.

- **Updating of legal information,** such as change of legal status of an IPR (e.g. grant, dropped, revoked or expired), change of ownership of the IPR.

- **Addition of information concerning studies performed on the essentiality of an IPR:** Members are obliged to disclose IPRs, which might be essential and ETSI is obliged to make these disclosures available to Members. This disclosure reflects, of course, only an opinion of the Member and some facts on the IPRs, but the Member is responsible for the content. Any further opinion should be added only with the agreement of the Member or to implement a General Assembly decision.

- **Removal of IPR disclosures at the request of the IPR holder:** Members are obliged to declare IPRs which they believe to be essential. A license undertaking/licensing declaration for these IPRs is also published. ETSI is obliged to publish this undertaking/licensing declaration. Any such removal shall be tracked in the IPR on-line database.

- **Removal of IPR disclosures in exceptional circumstances:** Removals not requested by the IPR holder shall only be performed following a decision taken by the General Assembly. Any such removal shall be tracked in the IPR on-line database.

**4**     **Other ETSI IPR Policy matters**

**4.1**     **Responsibility for specific licensing terms**

Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI. Technical Bodies are not the appropriate place to discuss IPR issues. Technical Bodies do not have the competence to deal with commercial issues. Members attending ETSI Technical Bodies are often technical experts who do not have legal or business responsibilities with regard to licensing issues. Discussion on licensing issues among competitors in a standards making process can significantly complicate, delay or derail this process.

**4.2**     **Dispute Resolution**

ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner.

Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat.

However, it should be noted that once an IPR (patent) has been granted, in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes.

### 4.3    Notice on the use of NDAs in IPR negotiations

It is recognized that Non Disclosure Agreements (NDAs) may be used to protect the commercial interests of both potential licensor and potential licensee during an Essential IPR licensing negotiation, and this general practice is not challenged. Nevertheless, ETSI expects its Members (as well as non-ETSI Members) to engage in an impartial and honest Essential IPR licensing negotiation process for FRAND terms and conditions.

### 4.4    Financial contingency

Members developing products based on standards where there may be Essential IPRs, but there is uncertainty, have mechanisms available which they can use to minimize their risk. As a non-exclusive example, a Member might wish to put in place financial contingency, based on their assessment of "reasonable", against the possibility that further/additional license fees might become payable.

### 4.5    Rationale and clarifying texts for the changes in Article 4.1 of the ETSI IPR Policy

A revised version of the Article 4.1 of the ETSI IPR Policy was adopted by the 46th General Assembly on November 2005. This revision was induced by the EC DG COMPETITION in its concern to generate a general awareness of the risk of "patent ambush" situation in the standard making process.

#### 4.5.1    History of changes

Prior to the 46th ETSI General Assembly, Article 4.1 of the ETSI IPR Policy read:

4.1    *Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.*

During the 46th ETSI General Assembly the modifications below to Article 4.1 of the ETSI IPR Policy were adopted.

4.1    *Subject to Article 4.2 below,* ~~E~~each MEMBER shall use its reasonable endeavours, *in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, in particular* ~~to~~ *timely* inform ETSI of ESSENTIAL IPRs *in a timely fashion* ~~it becomes aware of~~. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

#### 4.5.2    EC DG COMPETITION's position regarding the rationale and scope for the changes of Article 4.1 of the ETSI IPR Policy

The extracts below are taken from various correspondences between ETSI and the EC DG COMPETITION services.

##### 4.5.2.1    Addition of the sentence "Subject to Article 4.2 below..." and Deletion of the phrase "... it is aware of or becomes aware of."

RATIONALE from DG COMPETITION

"  .... the deletion of the phrase "*becomes aware of*" is important from the Commission's "patent ambush" perspective...."

Source:    DG COMPETITION letter dated 26 April 2005 reproduced in B#52(05)17, Annex, Footnote 2.

**CLARIFYING LANGUAGE from DG COMPETITION"**

" .... the deletion of the phrase *"becomes aware of"* is important from the Commission's "patent ambush" perspective, [but] does not imply an extra burden on ETSI Members - by definition, a company can only inform about essential IPRs if it has knowledge of such IPRs."

Source:    DG COMPETITION letter dated 26 April 2005 reproduced in B#52(05)17, Annex, Footnote 2.

"... the deletion of the words *"becomes aware of"* *"arguably imposes a higher burden of disclosure for the ETSI Members"*. More specifically, you raise the concern that this might oblige Members to conduct IPR searches. We do not believe that this is warranted. As Mr. Mensching noted in his letter of 28 January 2005, the rationale behind the proposed deletion of *"becomes aware of"* is that we would expect a Member in a standard-setting process to have a general awareness of the scope of its IPR rights in that area, and therefore where necessary, *"use its reasonable endeavours"* to identify these IPR.[1] However, as has been explicitly confirmed to you in writing on numerous occasions, this does not mean that we would expect Members[2] to conduct patent/IPR searches. As such, our proposed change does not create a heightened expectation for Members to identify essential IPRs. Nor does it create any contradiction with Article 4.2 of ETSI's IPR policy. Nevertheless, in order to explicitly convey this message in ETSI's IPR policy itself, we would be willing to incorporate, at the beginning of Article 4.1, the phrase *"Subject to Clause/Article 4.2 below"*. "

Source:    DG COMPETITION LETTER dated 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 4

4.5.2.2    **Addition of the phrase "... where it participates ..."**

**RATIONALE from DG COMPETITION**

"The addition of the phrase *"in which it participates"* therefore addresses the concern expressed by some ETSI members, and also means that to the extent that a member is not participating in an ETSI standards development committee/working group but becomes aware of certain essential IPRs,[3] a general obligation to inform ETSI of the essential IPRs remains".

Source:    DG COMPETETITION LETTER dated 26 April 2005 reproduced in B#52(05)17r1, Annex III (paragraph 4 of Annex to the EC letter of 26.04.05).

4.5.2.3    **Re the expression "in particular"**

**CLARIFYING LANGUAGE from DG COMPETITION**

"Firstly, I note your concern that DG Competition's proposed wording might be interpreted as narrowing the obligation to disclose essential IPR to a very specific phase of the standardisation process. As you stress, we have already confirmed that our proposed changes do not mean that the window of opportunity to declare essential IPR is closed when a standard is adopted. However, to more explicitly address your concern in Article 4.1 of the IPR rules, we are happy to accept your proposed addition of the words *"in particular"*.

Source:    DG COMPETITION LETTER dated 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 2

---

[1]    Once again, this is consistent with the notion of members being invited by the meeting Chairman to identify essential IPR at the beginning of each relevant meeting.

[2]    whether or not they are participating in the development of a standard.

[3]    In this regard, as you correctly noted at the General Assembly, the deletion of the phrase *"becomes aware of"* is important from the Commission's "patent ambush" perspective, but does not imply an extra burden on ETSI members - by definition, a company can only inform about essential IPRs if it has knowledge of such IPRs.

**4.5.3        ETSI's position regarding the rationale and scope for the changes of Article 4.1 of the ETSI IPR Policy**

The extracts below has been developed, with the support of EC DG COMPETITION, by the ETSI membership and endorsed by the 46th ETSI General Assembly.

**4.5.3.1        Re the addition of the sentence "Subject to Article 4.2 below..."**

The insertion of the phrase "Subject to Article 4.2 below" at the beginning of the first sentence of the new text of Article 4.1 is intended to reflect the general framework under which the requirement of disclosure of Article 4.1 operates. This insertion explicitly conveys the notion that the requirement of disclosure contained in Article 4.1 is not to be interpreted as an obligation on ETSI Members to conduct IPR searches.

As DG COMPETITION explicitly confirmed to ETSI in writing on numerous occasions;

-        the new text of Article 4.1 "does not mean that we would expect Members[4] to conduct patent/IPR searches. As such, our proposed change does not create a heightened expectation for Members to identify essential IPRs. Nor does it create any contradiction with Article 4.2 of ETSI's IPR policy. Nevertheless, in order to explicitly convey this message in ETSI's IPR policy itself, we would be willing to incorporate, at the beginning of Article 4.1, the phrase "Subject to Clause/Article 4.2 below".

         Source:        Letter from Angel Trabacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI Director-General, 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 4.

-        "it is clear that it should not be reasonably expected that an ETSI Member should have a duty to take steps to find out about potential IPR it might have relating to ETSI standards development work in areas/committees where that Member is not participating in that work (no more than it should be expected, as we have previously confirmed, that a Member carry out patent/IPR searches)."

         Source:        Letter from Angel Tradacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI Director-General, 26 April 2005, reproduced in B#52(05)17r1, Annex III (paragraph 2 of Annex to the EC letter of 26.04.05).

**4.5.3.2        Re the deletion of the phrase "... it is aware of or becomes aware of."**

DG COMPETITION's intention in pursuing deletion of the phrase "it becomes aware of" is viewed as important from the patent ambush perspective.[5]  The idea is to prevent an ETSI Member from intentionally not disclosing Essential Intellectual Property Rights (EIPR) during the standardization process, and after the standard has issued, then disclosing such EIPR with the intention to not license on fair, reasonable, and non-discriminatory (FRAND) terms as expected by ETSI Policy for EIPR[6]. Intentional non-disclosure of EIPR generally occurs in two instances:

1)        when a representative participating in a Technical Body on behalf of a Member has actual knowledge of EIPR, and yet the Member holds back notification; or,

2)        when a member fosters an atmosphere of ignorance amongst its employees participating at ETSI with the intent to avoid its EIPR disclosure and FRAND licensing obligations.

DG COMPETITION has made it clear that the removal of the "it becomes aware of" wording is not intended to place a higher burden of disclosure upon a Member, nor is it intended to create a heightened expectation for Members to identify EIPR.[7]  This position is consistent with the ETSI IPR

---

4        Whether or not they are participating in the development of a standard.
5        DG COMPETITION letter dated 26 April 2005
6        ETSI Guide on Intellectual Property Rights, Section 6.1.
7        DG COMPETITION letter dated 26 April 2005.

Policy and ETSI practice to requiring Members participating in Technical Bodies to respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.[8]

Further, it has been explicitly confirmed by DG COMPETITION on numerous occasions that the removal of the words does not mean a Member would be required to conduct patent/EIPR searches.[9]

Concern has been raised that removal of the "it becomes aware of" wording places an untenably broad burden of disclosure on ETSI Members. Based on the above, it appears the intent is for the burden to remain the same while identifying conduct whereby "patent ambush" in violation of the ETSI IPR Policy may be assumed.

### 4.5.3.3    Addition of the phrase "... where it participates ..."

The term "where it participates" as employed in Article 4.1 seeks to clarify that a Member's obligation to use such reasonable endeavours under this Article should be adhered to in those Technical Bodies or its Working Groups in which an employee (or otherwise authorised representative) of such Member (as defined within the ETSI IPR Policy) performs at least one of the following:

i)     attends a meeting of;
ii)    participates in or contributes, directly or indirectly, to the work of;
iii)   votes on any matter raised within;

such Technical Body or Working Group where such Technical Body or Working Group is responsible for the ETSI Work Item from which such STANDARD or TECHNICAL SPECIFICATION, [as an ETSI Deliverable], has or will result.

### 4.5.3.4    Re the expression "in particular"

The insertion of the phrase "*in particular*" in the first sentence of the new text of Section 4.1 is intended to reflect the importance placed by DG COMPETITION on a member's informing ETSI of Essential IPRs during the period when that information might be most relevant to the development of a Standard of Technical Specification. DG COMPETITION has made clear (see DG Competition Letter dated 29 March 2005 reproduced in GA#45(05)22, Annex 1, paragraph 2) that the inclusion of this phrase does not mean either that the window of opportunity for a member to declare its Essential IPRs is closed once a standard is adopted or that the member's duty to use its "*reasonable endeavours*" post-adoption is waived or altered.

### 4.5.3.5    Re the expression "Reasonable Endeavours"

The new text of Article 4.1 of the ETSI IPR Policy provides, in part, that each ETSI Member "*shall use its reasonable endeavours, in particular during the development of a Standard or Technical Specification where it participates, to inform ETSI of Essential IPRs in a timely fashion.*" Section 4.2 of the ETSI IPR Policy provides that these disclosure obligations "do however not imply any obligation on Members to conduct IPR searches."

As DG COMPETITION has pointed out, the concept of "*reasonable endeavours*" qualifies the obligation to disclose essential patents. As it has noted, "*it is clear that it should not be reasonably expected that an ETSI Member should have a duty to take steps to find out about potential IPR it might have relating to ETSI standards development work in areas/committees where that Member is not participating in that work (no more than it should be expected, as we have previously confirmed, that a member carry out patent/IPR searches).*"

> Source:    Letter from Angel Tradacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI Director General, 26 April 2005, at Annex.

This interpretation by DG COMPETITION is supported by the longstanding interpretation of "*reasonable endeavours*" in the ETSI Guide on Intellectual Property Rights. The steps that must be

---

8    ETSI Guide on Intellectual Property Rights, Section 2.3.1.
9    DG COMPETITION letter dated 29 March 2005.

taken to identify essential patents focus on the activities and knowledge of the ETSI Member's representatives who are active in a particular ETSI matter. Each Technical Body and working group meeting, for example, must begin with a call for IPRs. *See* ETSI Guide on Intellectual Property Rights, Section 2.3.2. "*Members participating in Technical Bodies should respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.*" *Id.*, Section 2.1.1.

Accordingly, it seems that the "*reasonable endeavours*" that are to be taken to disclose patents that are essential to a particular ETSI deliverable should be measured in terms of the knowledge of representatives of an ETSI Member who are actively involved in the work of the body developing that ETSI deliverable. This interpretation acknowledges, as DG COMPETITION has noted, that "*reasonable endeavours*" has the benefit of being able to cover different scenarios on their merits on a logical, case-by-case basis."

      Source:     Letter from Angel Tradacete at Annex, note 1.

**Annex A     ETSI Intellectual Property Rights Policy**

**[ETSI Rules of Procedure, Annex 6]**

**1          Introduction**

The General Assembly of ETSI has established the following Intellectual Property Rights POLICY.

**2          Definitions**

Terms in the POLICY which are written in capital letters shall have the meaning set forth in Clause 15 entitled DEFINITIONS.

**3          Policy Objectives**

3.1     STANDARDS and TECHNICAL SPECIFICATIONS shall be based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

3.2     IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.

3.3     ETSI shall take reasonable measures to ensure, as far as possible, that its activities which relate to the preparation, adoption and application of STANDARDS and TECHNICAL SPECIFICATIONS, enable STANDARDS and TECHNICAL SPECIFICATIONS to be available to potential users in accordance with the general principles of standardization.

**4          Disclosure of IPRs**

*4.1     Subject to Article 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.*

4.2     The obligations pursuant to clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.

**5          Procedures for Committees**

ETSI shall establish guidelines for the chairmen of COMMITTEES with respect to ESSENTIAL IPRs.

**6          Availability of Licences**

6.1     When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

6.2   At the request of the European Commission and/or EFTA, initially for a specific STANDARD or TECHNICAL SPECIFICATION or a class of STANDARDS/TECHNICAL SPECIFICATIONS, ETSI shall arrange to have carried out in a competent and timely manner an investigation including an IPR search, with the objective of ascertaining whether IPRs exist or are likely to exist which may be or may become ESSENTIAL to a proposed STANDARD or TECHNICAL SPECIFICATIONS and the possible terms and conditions of licences for such IPRs. This shall be subject to the European Commission and/or EFTA meeting all reasonable expenses of such an investigation, in accordance with detailed arrangements to be worked out with the European Commission and/or EFTA prior to the investigation being undertaken.

# 7        Information on IPR by ETSI

7.1   Any published STANDARD or TECHNICAL SPECIFICATION shall include information pertaining to ESSENTIAL IPRs which are brought to the attention of ETSI prior to such publication.

7.2   ETSI shall establish appropriate procedures to allow access to information at any time with respect to ESSENTIAL IPRs which have been brought to the attention of ETSI.

# 8        Non-availability of Licences

8.1   MEMBERS' refusal to license

8.1.1   Where a MEMBER notifies ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION, the General Assembly shall review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION which:

- is not blocked by that IPR; and

- satisfies ETSI's requirements.

8.1.2   Where, in the opinion of the General Assembly, no such viable alternative technology exists, work on the STANDARD or TECHNICAL SPECIFICATION shall cease, and the Director-General of ETSI shall request that MEMBER to reconsider its position. If the MEMBER decides not to withdraw its refusal to license the IPR, it shall inform the Director-General of ETSI of its decision and provide a written explanation of its reasons for refusing to license that IPR, within three months of its receipt of the Director-General's request.

The Director-General shall then send the MEMBER's explanation together with relevant extracts from the minutes of the General Assembly to the ETSI Counsellors for their consideration.

8.2   Non-availability of licences from third parties

Where, in respect of a STANDARD or TECHNICAL SPECIFICATION, ETSI becomes aware that licences are not available from a third party in accordance with clause 6.1 above, that STANDARD or TECHNICAL SPECIFICATION shall be referred to the Director-General of ETSI for further consideration in accordance with the following procedure:

i)   The Director-General shall request full supporting details from any MEMBER who has complained that licences are not available in accordance with clause 6.1 above.

ii)     The Director-General shall write to the IPR owner concerned for an explanation and request that licences be granted according to clause 6.1 above.

iii)    Where the IPR owner refuses the Director-General's request or does not answer the letter within three months, the Director-General shall inform the General Assembly. A vote shall be taken in the General Assembly on an individual weighted basis to immediately refer the STANDARD or TECHNICAL SPECIFICATION to the relevant COMMITTEE to modify it so that the IPR is no longer ESSENTIAL.

iv)    Where the vote in the General Assembly does not succeed, then the General Assembly shall, where appropriate, consult the ETSI Counsellors with a view to finding a solution to the problem. In parallel, the General Assembly may request appropriate MEMBERS to use their good offices to find a solution to the problem.

v)     Where (iv) does not lead to a solution, then the General Assembly shall request the European Commission to see what further action may be appropriate, including non-recognition of the STANDARD or TECHNICAL SPECIFICATION in question.

In carrying out the foregoing procedure due account shall be taken of the interest of the enterprises that have invested in the implementation of the STANDARD or TECHNICAL SPECIFICATION in question.

# 9        ETSI ownership of IPRs

9.1    The ownership of the copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports created by ETSI or any of its COMMITTEES shall vest in ETSI but due acknowledgement shall be given to copyrights owned by third parties that are identifiable in ETSI copyrighted works.

9.2    In respect of IPRs other than copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports, ETSI shall only seek ownership of IPRs generated either by its employees or by secondees to ETSI from organizations who are not MEMBERS.

9.3    ETSI shall, on request by a non-member, grant licences to that non-member on fair and reasonable terms and conditions in respect of any IPRs, other than those referred to in clause 9.1 above, owned by ETSI. MEMBERS shall be allowed to use IPRs owned by ETSI free of charge.

# 10        Confidentiality

The proceedings of a COMMITTEE shall be regarded as non-confidential except as expressly provided below and all information submitted to a COMMITTEE shall be treated as if non-confidential and shall be available for public inspection unless:

- the information is in written or other tangible form; and

- the information is identified in writing, when submitted, as confidential; and

- the information is first submitted to, and accepted by, the chairman of the COMMITTEE as confidential.

CONFIDENTIAL INFORMATION incorporated in a STANDARD or TECHNICAL SPECIFICATION shall be regarded as non-confidential by ETSI and its MEMBERS, from the date on which the STANDARD or TECHNICAL SPECIFICATION is published.

# 11        Reproduction of Standards Documentation

MEMBERS may make copies of STANDARDS and TECHNICAL SPECIFICATIONS documentation produced by ETSI for their own use free of charge but may not distribute such copies to others.

# 12        Law and Regulation

The POLICY shall be governed by the laws of France. However, no MEMBER shall be obliged by the POLICY to commit a breach of the laws or regulations of its country or to act against supranational laws or regulations applicable to its country insofar as derogation by agreement between parties is not permitted by such laws.

Any right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature.

## 13    Policy Decisions

Without prejudice to ETSI's Statutes and Rules of Procedure, no decisions shall be taken by ETSI in relation to implementation of the POLICY unless supported by a 71 % majority of the weighted individual votes cast by MEMBERS.

## 14    Violation of Policy

Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with the ETSI Statutes.

## 15    Definitions

1    "AFFILIATE" of a first legal entity means any other legal entity:

- directly or indirectly owning or controlling the first legal entity, or

- under the same direct or indirect ownership or control as the first legal entity, or

- directly or indirectly owned or controlled by the first legal entity,

for so long as such ownership or control lasts.

Ownership or control shall exist through the direct or indirect:

- ownership of more than 50 % of the nominal value of the issued equity share capital or of more than 50 % of the shares entitling the holders to vote for the election of directors or persons performing similar functions, or

- right by any other means to elect or appoint directors, or persons who collectively can exercise such control. A state, a division of a state or other public entity operating under public law, or any legal entity, linked to the first legal entity solely through a state or any division of a state or other public entity operating under public law, shall be deemed to fall outside the definition of an AFFILIATE.

2    "COMMITTEE" shall mean any Technical Body of ETSI and shall include ETSI Projects, Technical Committees, ETSI Partnership Projects, and their Working Groups.

3    "CONFIDENTIAL INFORMATION" shall mean all information deemed to be confidential pursuant to Clause 10 of the POLICY disclosed directly or indirectly to the MEMBER.

4    "EQUIPMENT" shall mean any system, or device fully conforming to a STANDARD.

5    "METHODS" shall mean any method or operation fully conforming to a STANDARD.

6    "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

7    **"IPR"** shall mean any intellectual property right conferred by statute law including applications thereof other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

8    **"MANUFACTURE"** shall mean production of EQUIPMENT.

9    **"MEMBER"** shall mean a member or associate member of ETSI. References to a MEMBER shall wherever the context permits be interpreted as references to that MEMBER and its AFFILIATES.

10   **"POLICY"** shall mean ETSI's Intellectual Property Rights Policy.

11   **"STANDARD"** shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs) (telecommunications series), ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs (telecommunications series) and including drafts of any of the foregoing, and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all MEMBERS, but not including any standards, or parts thereof, not made by ETSI.

The date on which a STANDARD is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that STANDARD was available to all MEMBERS.

12   **"TECHNICAL SPECIFICATION"** shall mean any Technical Specification (TS) adopted by ETSI including options therein or amended version including drafts, the Technical Specifications of which are available to all MEMBERS, but not including any technical specifications, or parts thereof, not made by ETSI.

The date on which a TECHNICAL SPECIFICATION is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that TECHNICAL SPECIFICATION was available to all MEMBERS.

**Annex B       ETSI IPR Information Statement and Licensing Declaration Forms**

**ANNEX 1**

---

**IPR Holder/Organisation**

   Legal Name: _____

**Signatory**

   Name: _____

   Position: _____

   Department: _____

   Address: _____

                 _____

   Tel.: _____

   Fax: _____

   E-mail: _____

**IPR information statement**

In accordance with the ETSI IPR Policy, Article 4.1, I hereby inform ETSI that,

     with reference to the technical proposal identified as _____
    and/or
     in relation to Work Item No. _____
    and/or
     with reference to ETSI Standard No. _____

it is my belief that the IPRs listed in Annex 2 are, or are likely to become, Essential IPRs in relation to that Standard.

**IPR licensing declaration**

The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in Annex 2 and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

The construction, validity and performance of this DECLARATION shall be governed by the laws of France.

**Place, Date:**                **Signature:**

_____     _____
                        (Signed for and on behalf of the SIGNATORY)

---

Please return this form duly signed to:
ETSI Director General - Karl Heinz Rosenbrock

ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex - FRANCE
Fax. +33 (0) 4 93 65 47 16

ETSI Guide on Intellectual Property Rights (IPRs)
page 26 of 27

**ANNEX 2**

| Project or Standard Name | Standard No. | Section | Version | Patent Proprietor | Patent Application No. | Patent Subject/Title | Country | Patent/application No. | Country |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 12740/00 | Australia |
| Example UMTS | TS 125 215 | 6.1.1.2 | V3.5.0 | Nokia | 1131972 | Scheduling of slotted-mode related measurements | EPO | 99813100.8 | China P.R. |
| | | | | | | | | 108270 | Finland |
| | | | | | | | | 11-318161 | Japan |
| | | | | | | | | 6532226 | USA |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

*Patent family information is provided voluntarily. The completeness and accuracy of any patent family information that is provided cannot be guaranteed.

**Annex C    Check list of the Chairmen's obligations in respect of the notification and disclosure of IPRs**

- Check that the scope statements for work items are sufficiently defined

- Perform "call for IPRs" in Technical Bodies meetings:

  - at the beginning of meetings using the text supplied in clause 2.3.3 of the IPR Guide.

  - during meetings: (reminder of the formal call of IPRs) as in clause 2.3.3 of the IPR Guide:

    - on formal submission of a technical solution;
    - on completion of a first stable draft;
    - on working group approval of a draft standard;
    - on TB approval of a draft standard.

- Record that the "call" has been performed.

- Record any responses received (or the absence thereof) and inform the Secretariat.

- Record any copyright identified (or absence thereof) and inform the Secretariat.

## ETSI – European Telecommunications Standards Institute – Printable and Accessible Text Files

**Home | Back | Next | Site Map | Search | Contact | Formatted Home | ETSI Portal | Print**

---

Read also: **ETSI's Organizational Structure**

## Who is ETSI?

The European Telecommunications Standards Institute (ETSI) is an independent, non-profit organization, whose mission is to produce telecommunications standards for today and for the future.

Based in Sophia Antipolis (France), the European Telecommunications Standards Institute (ETSI) is officially responsible for standardization of **Information and Communication Technologies (ICT)** within Europe. These technologies include telecommunications, broadcasting and related areas such as intelligent transportation and medical electronics.

ETSI unites **654 members from 59 countries** inside and outside Europe, including manufacturers, network operators, administrations, service providers, research bodies and users - in fact, all the key players in the ICT arena.

ETSI plays a major role in developing a wide range of standards and other technical documentation as Europe's contribution to world-wide ICT standardization. This activity is supplemented by interoperability testing services and other specialisms. ETSI's prime objective is to support global harmonization by providing a forum in which all the key players can contribute actively. ETSI is officially recognized by the European Commission and the EFTA secretariat.

ETSI's Members determine the Institute's work programme, allocate resources and approve its deliverables. As a result, ETSI's activities are closely aligned with market needs and there is wide acceptance of its products.

ETSI's standards are built on consensus.

## Standardization in a changing world

The Information Society offers huge potential to enrich everyone's lives. We can communicate with the other side of the world almost as easily as we speak to our next-door neighbour. Our children take for granted what their PC or mobile phone will do. New technology is affecting our work, our rest and our play.

But with new opportunities come challenges. Technology makes things quicker, easier, better. But it is also more complex.
Achieving the Information Society involves practical action by a wide range of players. Data exchange around the world, using different platforms, with different practices, different languages and character sets, requires a neutral tool for all parties to communicate.

Standardization carves a path through this complexity.

**The Benefits of Standardization**

Standardization:

- enable interoperability
- encourages innovation, fosters enterprise and opens up new markets
- creates trust and confidence in products
- expands the market, brings down costs and increases competition
- helps prevent the duplication of effort

Standardization is an essential requirement for the open exchange of information; without it, the network simply will not work.

There are two major caveats, however, without which standardization could impede rather than accelerate progress:

- standards must be produced at a speed that is consistent with market demand,
- standards must consider all interested parties, or they will not be widely acceptable.

**Top of Page**



Last updated 2006/04/13 by P. Reid