IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NOKIA CORPORATION and NOKIA INC., | |
| Plaintiffs, | |
| v. | Civil Action No. 05-16-JJF |
| INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION, | **DEMAND FOR JURY TRIAL** |
| Defendants. | **REDACTED PUBLIC VERSION** |

## EXHIBITS TO
## PLAINTIFFS' MOTION FOR LEAVE TO AMEND THEIR COMPLAINT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for NOKIA CORPORATION
and NOKIA INC.

OF COUNSEL:

ALSTON & BIRD LLP
Patrick Flinn
Randall Allen
Lance Lawson
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000

Original Filing Date: January 9, 2007
Redacted Filing Date: January 24, 2007

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA INC.,

       Plaintiffs,

          v.

INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION,

       Defendants.

Civil Action No. 05-16-JJF

**DEMAND FOR JURY TRIAL**

**CONFIDENTIAL
FILED UNDER SEAL**

## FIRST AMENDED COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (collectively "Nokia") file this First Amended Complaint ("Complaint") against Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively "InterDigital") and in support of this Complaint allege:

### Nature and Basis of Action

1.      This is an action for violations of the Lanham Act (15 U.S.C. §1051 et seq.), common law unfair competition, intentional interference with business relationships or opportunities, injurious falsehood, and commercial or business disparagement, and for violations of the laws of the States of Delaware, Pennsylvania, and Texas. Nokia seeks damages, declaratory and injunctive relief, and disgorgement of unjust enrichment for InterDigital's unlawful conduct.

### The Parties

2.      Nokia Corporation is a global leader in the design, manufacture, and supply of wireless (or "mobile") telephone equipment, including handset and infrastructure products.

3.    Nokia is also a global leader in the design and development of interoperability standards that are central to the functioning of mobile telephony equipment and the economic success of the wireless industry.

4.    Nokia Corporation is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland.

5.    Nokia Inc. is incorporated under the laws of the state of Delaware and has a principal place of business at 6000 Connection Dr., Irving, Texas.

6.    InterDigital Communications Corporation is incorporated under the laws of the State of Pennsylvania and has its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania.

7.    InterDigital Technology Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 300 Delaware Avenue, Suite 527, Wilmington, Delaware.

8.    Upon information and belief, InterDigital Technology Corporation is a wholly owned subsidiary of InterDigital Communications Corporation.

**Jurisdiction and Venue**

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 based on federal question jurisdiction, and has supplemental jurisdiction over all other claims based on 28 U.S.C. § 1367.

10.    This Court has personal jurisdiction over InterDigital Communications Corporation and InterDigital Technology Corporation pursuant to the laws of the State of Delaware, including the Delaware long-arm statute, 10 Del. Code § 3104.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**Facts Giving Rise to this Action**

12.    Wireless telephone handset and infrastructure equipment complies with industry standards that ensure that products produced by different companies can interoperate. The so-called first generation of wireless telephony used analog radio signals to convey messages between wireless handsets and base stations connected to the public switched telephone network. These base stations received and transmitted radio signals to handsets in small areas called "cells," and as a mobile user left one cell and entered another, the call would be transferred to next cell.

13.    The capacity of the first generation system was soon limited, however, because only one user could use a frequency channel at a time in any given cell. A second generation of mobile telephone technology was developed to address this problem. More users could share the same frequency – thereby increasing the capacity of each cell – if the voice communications were digitized. This Second Generation (or "2G") technology used two basic methods to allow multiple users to share the same frequency. The first used time division (called "Time Division Multiple Access," or "TDMA") as the method of sharing the frequency. The 2G standard developed in Europe, of which Nokia is a pioneer, is called GSM. The second method was to spread the digitized signals across a wider bandwidth, giving each user a unique "spreading code" that allowed each separate call to be distinguished by the receiving station. This method is called Code Division Multiple Access (CDMA), and was specified in the United States by a standard called IS-95.

14.    GSM and IS-95 remain the two principal competing 2G standards implemented worldwide. Both have continued to evolve to allow the transmission of data as well as voice communications, and the more efficient transmission of data in "packets." These improvements

and other aspects of the two technologies make them different in other ways besides the method of sharing radio frequencies. The networks between the transmission towers and the public switched telephone network are incompatible between GSM and IS-95.

15.    A third generation ("3G") of wireless telephony has been defined to succeed both IS-95 and GSM. This third generation will use more bandwidth to transmit data, and is intended to transmit information at substantially higher rates than 2G technology, such as video and internet content. The 3G successor to IS-95 is called CDMA 2000, and the 3G successor to GSM is called UMTS (Universal Mobile Telephone Service).

16.    The transition from GSM to UMTS will allow much of the existing GSM network infrastructure to be compatible with UMTS. The method of sharing frequencies is different in UMTS than GSM, however, as UMTS has adopted code division as the method of multiple access. CDMA 2000 also uses code division, and will be backward compatible with IS-95, but the remainder of its network will remain incompatible with GMS and UMTS.

17.    These technologies are made possible by the cooperation of the manufacturers of the equipment used for wireless telephony and the carriers who sell the service to customers. Only if the parties agree on, and specify, the standards for implementing the technology can multiple manufacturers compete to make the telephone handsets and network equipment for carriers.

18.    In the process of specifying standards, the participants may have intellectual property rights ("IPRs") – including patents and published patent applications – where as a technical matter the standard cannot be implemented without infringing the patent (or the patent that would issue if an application were granted). Standards bodies have developed policies

requiring parties to timely identify such IPRs, and with respect to the licensing of identified patents, as a condition of allowing participation in the standards-setting process.

19.    As mentioned above, Nokia was a pioneer in the development of GSM and likewise was a key inventor in much of what has been defined to be the 3G UMTS standard. Nokia holds many patents covering this technology – as do other manufacturers – and has followed the policies specified regarding identifying and licensing patents called for by the applicable standards bodies.

20.    InterDigital's only real business is coercing patent license payments from the wireless telephone industry.  Nonetheless, it has become a member of wireless telephony standards organizations.  It does so in order to claim that it, too, has patents essential to the practice of the standards and it has been particularly active in claiming that it has patents essential to the practice of the UMTS standard.  By claiming that it has essential patents, it insists that all manufacturers of systems that comply with the standards must pay it patent license fees.

21.    InterDigital makes no tangible products, however, and it has in fact invented nothing of value that would merit the license fees it has been demanding from Nokia and others in the industry.  Accordingly, it has had to develop, implement and maintain a scheme to mislead manufacturers and others in the industry into believing, falsely, that its patent portfolio is essential, valuable, and validly covers standards such as UMTS.

*InterDigital's False Statements Regarding Second Generation Technology*

22.    InterDigital began alleging in the early 1990s that it had numerous patents essential to 2G mobile phone standards.  InterDigital has in the past asserted certain of its 2G patents in court against OKI America, Inc., Qualcomm, Inc., Motorola, Inc., and Ericsson, Inc.

23.     The court in the Motorola case determined that all of the asserted patents in those cases were either invalid or not infringed by mobile handset and infrastructure products used in the United States.

24.     In none of these disputes did a court rule that any of InterDigital's patents were valid and infringed.  Indeed, comparison of the claim limitations of InterDigital 2G patents and their prosecution histories to either the 2G mobile phone standards or any systems in use in the United States shows that none of the claims can be infringed by any of those 2G systems, including those utilized by companies such as Motorola, Ericsson, and Nokia.

25.     InterDigital's purpose in declaring patents to be essential to the 2G standard, and in publicizing its contentions regarding essentiality, was to convey, and did in fact convey, the claim that all manufacturers of 2G compliant systems were required to pay InterDigital patent royalties.

26.     These claims were false, in that InterDigital did not have valid patents that were essential to the practice of the applicable 2G standards.  Accordingly, companies were not legally obligated to pay InterDigital money simply because their products were compliant with the 2G standards.

*InterDigital's False Statements Regarding Third Generation Technology*

27.     More recently, InterDigital has alleged that its patents are essential to 3G mobile telephone standards, including UMTS, CDMA 2000, and a standard called TD-SCDMA.

28.     For example, InterDigital has filed declarations claiming at least 195 patents were essential to the practice of the UMTS standard with the European Telecommunications Standards Institute ("ETSI"). InterDigital made these declarations through two filings with ETSI.  The first filing was made in April 2001.  The second filing was made in April 2004.

29.     ETSI is one of the preeminent Standards Setting Organizations ("SSOs") – establishing the wireless standards for one of the largest markets in the world.  Most of the major industry players are accordingly members of ETSI.  ETSI has taken a leadership role amongst SSOs by requiring its members to declare IPRs that are "essential" to UMTS.  ETSI makes these declarations publicly available through a searchable database on its website.

30.     At the time InterDigital made the declarations to ETSI (and currently), the term "ESSENTIAL" with respect to IPRs was a defined term as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

31.     At the time InterDigital made these declarations, it knew that many, if not all, of the IPRs it was declaring to ETSI did not meet this definition of "essential."  Indeed, InterDigital made the deliberate decision to include IPRs that it knew were not technically necessary.  InterDigital has never publicly identified which of the IPRs it declared to ETSI actually meet the ETSI definition of "essential" and which do not.  As a result, ETSI members have been left with the impression that all of InterDigital's declared IPRs are technically essential.

32.     The UMTS Standard has more than four hundred separately numbered provisions, as listed in the "table of contents" in section 5 of ETSI TS 121.101.  For each patent or application that it declared to ETSI, however, InterDigital did not list the particular provision or provisions for which InterDigital contended the declared patent or application was essential.

33.     InterDigital's declarations to ETSI are publicly available through a searchable database on ETSI's website.

34.    In addition, InterDigital has engaged in a campaign of publicity regarding its claim of essentiality in the press and in other ways intended to be disseminated in the communications industry.  InterDigital claims in public statements that it has patents essential to the practice of the UMTS standard, and that it expects to obtain substantial license revenue from all companies who make standards compliant products.  For example, in a press release issued on November 10, 2006, InterDigital claims that it "has built an intellectual property portfolio of more than 7,500 issued patents and patents pending around the world," and boasts of its "active participation in global standards bodies that shape the evolution of the technology and the future of the industry."  InterDigital further claims that its participation in the standards process allowed it to create "a strong portfolio of patented technologies which it licenses to manufacturers of 2G, 2.5G, 3G and 802 products worldwide."

35.    That is, InterDigital does more than just claim that it has essential patents with respect to 3G technologies.  InterDigital claims that its portfolio of patents is sufficiently broad that all manufacturers of 3G products must pay InterDigital substantial fees for the privilege of making standards-compliant products.

36.    These statements, particularly when considered in their totality, are false and misleading in number of respects, including but not necessarily limited to the following:

a.    Participants in the industry, including manufacturers and users of 3G compliant equipment, do not have to pay InterDigital any money, notwithstanding the IPRs claimed in InterDigital's portfolio.  Alternatively, the weakness of the portfolio is such that InterDigital is not entitled to the sums of money it has demanded from the industry for patent license rights it has provided to its portfolio.

b.      The vast majority, if not all, of the IPRs declared by InterDigital to ETSI to be essential to the current implementation of UMTS are not, in fact essential.  A list of such patents is attached hereto as Exhibit A.  In addition, Nokia incorporates by this reference Plaintiffs' Statement Pursuant to Second Discovery Order, served on Defendants December 14, 2006, for a detailed explanation of the falsity of these declarations.

c.      Indeed, InterDigital routinely and knowingly declares patents to be essential to ETSI even though it is well aware that its patents do not meet the definition of "essential" contained in the ETSI IPR policy.

d.      To the extent there are, in fact, any patents in the InterDigital portfolio which meet the definition of "essential," members of the industry do not need to pay InterDigital any money for them.  This is for one or more of the following reasons: (i) the patents are already licensed to most if not all of those in the industry, including Nokia, as part of a package of license rights previously granted for the practice of the IS-95 standard; (ii) the patents are applicable to a specific implementation of the UMTS standard known as Time-Division Duplexing (TDD) ("TDD Patents"), which has not been implemented commercially anywhere in the world with respect to wireless mobile telephones; and/or (iii) the patents cannot be valid and cover the standard at the same time.

e.      Likewise, to the extent there are, in fact, any patents in the InterDigital portfolio which meet the definition of "essential," Nokia does not need to pay InterDigital any money for them for the reasons stated above and for the additional reason that

Nokia has an agreed-upon, fully-paid, irrevocable license to InterDigital's TDD Patents.

f.    In addition, there are no other patents in the InterDigital portfolio that are valid and that are infringed by any Nokia 3G product.

37.    Accordingly, it is false and misleading for InterDigital to say or suggest that the industry as a general matter owes it money, or should pay it money, for the practice of 3G standards, and it is false and misleading for InterDigital to say or suggest that Nokia owes it money, or should pay it money, for the practice of 3G standards.

*InterDigital's Abuse of the Standards Process*

38.    As noted above, InterDigital touts its participation in telecommunications standards bodies as a basis for contending that it has a portfolio of essential patents for which industry manufacturers must pay license fees.  InterDigital has, in fact, grossly abused its membership in standards bodies in order to further its scheme of misleading the industry into paying money for patents for which no money is actually owed.

39.    For example, as alleged above, InterDigital is a member of ETSI, the premier standards body that promulgates the UMTS standard.  That body has promulgated a Policy for declaring IPRs,. That Policy, a true and correct copy of which is attached as Exhibit B and incorporated herein by reference, requires, among other things, good faith implementation by ETSI members.  It further requires the timely disclosure of "essential" patents (as that term is defined in the Policy), and the specification of the particular portion of the standard to which the patent in question is essential.

40.    InterDigital has abused this Policy, deliberately, and in bad faith, in at least the following respects:

a.    *Over-Declaration* – InterDigital has declared IPRs to be essential that are not essential, and which InterDigital knows are not essential, in order to inflate artificially and falsely the perceived value of its portfolio.

b.    *Late Declaration* – InterDigital, aware of the requirement of timely declaration of IPRs, nonetheless withheld IPRs from declaration until 2001, and then between 2001 and 2004, in order to create a "patent ambush" on those in the industry making standards-compliant equipment.

c.    *No Declaration* – InterDigital, again notwithstanding the requirement of timely declaration of IPRs, has, on information and belief, withheld from declaration IPRs since 2004 even though it has evaluated its portfolio since that time and determined that non-declared IPRs meet the criteria it applied for declaring IPRs in 2001 and 2004.  InterDigital is reserving these IPRs, on information and belief, for further use in "ambush" or surprise litigation tactics.

d.    *Deliberately Vague Declaration* – Notwithstanding the requirement, effective before InterDigital's 2004 declarations, that a member specify the portion of the standard to which a declared IPR is essential, InterDigital engaged in a sham intended to limit the ability of the public to evaluate the truth of its essentiality claims.  The declaration form IPR holders were to use when InterDigital made its 2004 declarations contained a column – entitled "Standard No." – for the particular provision of the standard for which a declared IPR is essential.  In its declarations, InterDigital cited only to the Table of Contents for the entire standard, intentionally and deliberately, in order to obfuscate and conceal the lack of actual essentiality of the patents listed.

e.    *Secret Repeal* – InterDigital now claims that it has withdrawn from declaration IPRs that were declared in its 2001 filing with ETSI, but not listed in its 2004 filing. This, too, is a sham intended to avoid the consequences of its bad faith declaration in 2001. There is no evidence that InterDigital ever communicated to the public or interested parties that it had withdrawn any of the IPRs declared in 2001, and those declarations appear in the ETSI database in the same form as the 2004 declarations. InterDigital did not withdraw or update its 2001 declarations. The 2004 declarations did not inform ETSI members that they superseded the 2001 declarations in their entirety. ETSI's policies do not state, moreover, that subsequent declarations supersede previous ones. In fact, on October 30, 2006, InterDigital recently rejected its own endorsement of secret repeal by *explicitly* requesting that ETSI remove its essentiality declarations regarding a small number of IPRs.

41.    This bad faith behavior is a part of the broader scheme InterDigital has implemented to mislead the industry into believing (a) that it has a portfolio of essential patents, (b) that the portfolio's scope and value justify the royalties it has been demanding, and (c) that manufacturers should pay it money in order to manufacture standards-compliant technology.

*Injury to Nokia*

42.    The bad faith conduct, false and misleading behavior, and other wrongful acts set forth herein have injured Nokia. First, the conduct is likely to cause confusion in the marketplace. To the extent there are false statements in the ETSI declarations – whether made in good faith or not – they should be corrected in order to remove the likely confusion in the marketplace. Because InterDigital has refused to withdraw or modify the false declarations (and

indeed has declared in proceedings in this Court that all 195 patents are, in fact, essential), an injunction of this Court requiring InterDigital to withdraw all false declarations and engage in corrective advertising is required.

43.     In addition, InterDigital had in fact acted in bad faith in implementing and maintaining this deceptive scheme.  It has obtained unjust profits from this scheme, and should be ordered to disgorge all profits it has obtained from the illicit plan.

44.     Next, this misconduct has caused a direct financial injury to Nokia.

45.     Notwithstanding the ultimate truth or falsity of InterDigital's essentiality declarations, InterDigital is not relieved from its legal and equitable obligations arising from having made these declarations in the first instance.

46.     Nokia accordingly is entitled to the injunctive and declaratory relief requested herein, as well as money damages and the disgorgement of InterDigital's unjust enrichment.

**COUNT I.**
**Violation of § 43(a) of the Lanham Act**
**(Essentiality Claims)**

47.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 46, as if set forth in full.

48.     InterDigital has used false or misleading descriptions or representations in connection with its patent portfolio, the 3G standards (including the UMTS standard, the CDMA 2000 standard, and the TD-SCDMA standard), Nokia's products, the applicability of InterDigital's patents to Nokia's products, and the applicability of InterDigital's patents to 3G wireless standards within the meaning of 15 U.S.C. § 1125(a) (§43(a) of the Lanham Act). These statements are made in connection with goods or services and are used in interstate commerce within the meaning of 15 U.S.C. § 1125(a).

49.    This misconduct of InterDigital has inhibited the development of 3G technology, damaged Nokia's business, and its reputation in the wireless market.

50.    InterDigital has repeatedly stated that its patents are essential to 3G wireless telecommunications standards and are infringed by current manufacture, use, or sale of 3G-compliant products.  InterDigital has further claimed that manufacturers of 3G technology must pay money to InterDigital as a result of the allegedly essential patents.

51.    These statements are false or misleading for the reasons stated above, and because no valid claim of any InterDigital's patent is necessary for manufacturers to make, sell, or import wireless phone standards currently being implemented compliant with the applicable 3G standards.

52.    InterDigital has repeatedly stated that its patents are essential to 3G wireless telecommunications standards and are infringed by Nokia's manufacture, use, or sale of 3G-compliant products.  InterDigital has further claimed that Nokia must pay money to InterDigital as a result of the allegedly essential patents.

53.    These statements are false or misleading for the reasons stated above, and because no valid claim of any InterDigital's patent is necessary for Nokia to make, sell, offer to sell or import wireless phone standards currently being implemented compliant with the applicable 3G standards.

54.    Nokia will prove that no valid claim of any of the patents in the InterDigital portfolio reads on any Nokia product made, used, sold, offered for sale, or imported into the United States, and thus that Nokia owes no money to InterDigital as a result of its purported 3G patent portfolio.  Even if InterDigital has some patents that may have valid claims that are essential to 3G standards, InterDigital's general claims that its patent portfolio contains essential

patents – which were made after InterDigital declared hundreds of U.S. patents and patent applications essential to ETSI – are false or misleading because Nokia will prove that a substantial number, if not all, of those declarations are false.

55.    These false statements are material and, upon information and belief, have caused actual deception and are likely to deceive a substantial portion of the intended audience.

56.    InterDigital's misrepresentations about the scope and validity of its patents and how these patents apply to Nokia's products have caused actual injuries to Nokia in its business and have damaged Nokia's reputation as alleged herein.

57.    InterDigital has made these false statements in bad faith and with knowledge of their falsity.

58.    Nokia is accordingly entitled to the relief requested herein.

**COUNT II.**
**Violation of § 43(a) of the Lanham Act**
**(ETSI Declarations)**

59.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 58, as if set forth in full.

60.    InterDigital declared to ETSI as essential at least 110 US patents and 85 US patent applications that have issued as patents since they were declared by InterDigital to ETSI.

61.    Through these declarations, InterDigital claimed that each of these 195 patents is infringed by UMTS-compliant 3G products.  Whether the patents are, in fact, essential is an objectively verifiable proposition and not a statement of mere opinion or "puffing."

62.    InterDigital's false and misleading declarations are material and, upon information and belief, have caused actual deception or have a tendency to deceive a substantial portion of the intended audience.

63.    InterDigital's misrepresentations through its ETSI declarations about the scope and validity of its patents and how these patents apply to Nokia's products have caused actual injuries to Nokia in its business and have damaged Nokia's reputation.

64.    Nokia will prove that no valid claim of any of the patents in the InterDigital portfolio reads on any Nokia product made, used, sold, offered for sale, or imported into the United States, and thus that Nokia owes no money to InterDigital as a result of its purported 3G patent portfolio.    Even if InterDigital has some patents that may have valid claims that are essential to 3G standards, InterDigital's general claims that its patent portfolio contains essential patents – which were made after InterDigital declared hundreds of U.S. patents and patent applications essential to ETSI – are false or misleading because Nokia will prove that a substantial number, if not all, of those declarations are false.

65.    InterDigital has made these false and misleading statements in bad faith and with knowledge of their falsity.    These statements are made in connection with goods or services and are used in interstate commerce within the meaning of 15 U.S.C. § 1125(a).

66.    Nokia is accordingly entitled to the relief requested herein.

## COUNT III.
### Violation of Delaware Deceptive Trade Practices Act
### (6 Del. Code § 2532)

67.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 66, as if set forth in full.

68.    InterDigital cast a cloud over Nokia's 3G products by creating the false and misleading impression those products contained technology that infringed InterDigital's patents.

69.    InterDigital declared its patents as essential to 3G standards, when they were not.

70.    InterDigital represented that its patents were essential to 3G standards, even though it knew they were not.

71.    InterDigital sowed confusion in the market by leading consumers to believe that Nokia's and other 3G standards-compliant manufacturers' products infringed its patents.

72.    InterDigital created confusion in the industry, in general, and among ETSI members, in particular, by (a) declaring patents to be essential to 3G standards, when it knew that they were not, (b) not withdrawing the 2001 declarations or indicating that the 2004 declarations replaced the 2001 declarations, (c) not providing sufficient information in the declarations to verify essentiality, and (d) indicating that manufacturers should pay money when no money needs to be paid.

73.    InterDigital's actions were willful and in bad faith.

74.    InterDigital's above-described deceptive trade practices have caused and threaten to continue to cause actual injuries to Nokia.

75.    InterDigital's above-described deceptive trade practices were willful and Nokia is entitled to treble damages pursuant to 6 Del. Code § 2533(c).

76.    Nokia is further entitled to the relief requested herein.

## COUNT IV.
### Common Law Unfair Competition
### (Delaware)

77.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 76, as if set forth in full.

78.    Nokia reasonably anticipated obtaining revenue with respect to 3G technology.

79.    InterDigital's actions were willful and in bad faith.

80.    InterDigital's above-described unfair competition has caused and threatens to continue to cause actual injuries to Nokia.

81.    Nokia is further entitled to the relief requested herein.

## COUNT V.
## Common Law Unfair Competition
## (Pennsylvania)

82.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 81, as if set forth in full.

83.    Nokia reasonably anticipated commercial benefits with respect to 3G products.

84.    Additionally, InterDigital's bad faith and affirmative misrepresentations regarding its patent portfolio constitute unfair methods of competition.

85.    InterDigital's above-described acts of unfair competition has caused and threatens to continue to cause actual injuries to Nokia.

86.    Nokia is further entitled to the relief requested herein.

## COUNT VI.
## Intentional Interference with Prospective Business Opportunities
## (Delaware)

87.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 86, as if set forth in full.

88.    Nokia possessed a reasonable probability of a business opportunity with respect to 3G products.

89.    InterDigital's interference was willful and in bad faith.

90.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and licensees would have paid additional royalties to Nokia.

91.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

92.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay money for license rights to its patents even though it knew the money was not, in fact, owed.  Nokia is therefore entitled to punitive damages from InterDigital.

93.    Nokia is further entitled to the relief requested herein.

### COUNT VII.
### Intentional Interference with Prospective Business Relations
### (Pennsylvania)

94.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 93, as if set forth in full.

95.    Nokia possessed a reasonable probability of revenues from business relations with respect to 3G technology.

96.    InterDigital intentionally interfered with Nokia's reasonable probability of business relations with the purpose or intent of harming Nokia by preventing the relations from occurring, as InterDigital knew or should have known that its declarations would affect the marketability of Nokia's products and the licensing royalties that Nokia would receive.

97.    There was no privilege or justification for InterDigital's interference as InterDigital used an unfair method of competition.

98.    InterDigital's interference was willful and in bad faith.

99.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and Nokia would have received additional royalties.

100.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

101.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay license fees for its patents even though it knew that such fees were not required.  Nokia is therefore entitled to punitive damages from InterDigital.

102.    Nokia is further entitled to the relief requested herein.

## COUNT VIII.
### Intentional Interference with Prospective Business Relations
### (Texas)

103.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 102, as if set forth in full.

104.    Nokia possessed a reasonable probability of revenues from business relations from 3G technology.

105.    InterDigital intentionally and in bad faith interfered with Nokia's reasonable probability of business relations with the a conscious desire to prevent the relations from occurring, or with knowledge that the interference was certain or substantially certain to prevent the relations from occurring, as InterDigital knew or should have known that its declarations would affect the marketability of Nokia's products and the licensing royalties that Nokia would receive.

106.    InterDigital intentionally interfered with Nokia through an independently tortious or unlawful act by the defendant, including through all of the counts set forth herein.

107.    There was no privilege or justification for InterDigital's interference as InterDigital used an unfair method of competition.

108.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and Nokia would have received additional royalties.

109.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

110.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay license fees for its patents even though it knew that such fees were not required.   Nokia is therefore entitled to punitive damages from InterDigital.

111.    Nokia is further entitled to the relief requested herein.

## COUNT IX.
### Injurious Falsehood
### (Delaware)

112.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 111, as if set forth in full.

113.    InterDigital published false statements through its declarations to ETSI.

114.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

115.    InterDigital further intimated that manufacturers such as Nokia needed to pay licensee fees for these patents, even though current 3G technology does not infringe them.

116.    InterDigital's declarations were willful and in bad faith.

117.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia's products.

118.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

119.    Nokia is further entitled to the relief requested herein.

## COUNT X.
### Commercial Disparagement
### (Pennsylvania)

120.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 119, as if set forth in full.

121.    InterDigital published false statements through its declarations to ETSI.

122.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

123.    InterDigital further intimated that manufacturers such as Nokia needed to pay license fees for these patents, even though current 3G technology does not infringe them.

124.    InterDigital's declarations were willful and in bad faith.

125.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia products.

126.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

127.    Nokia is further entitled to the relief requested herein.

## COUNT XI.
### Business Disparagement
### (Texas)

128.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 127, as if set forth in full.

129.    InterDigital published false statements through its declarations to ETSI.

130.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

131.    InterDigital further intimated that manufacturers such as Nokia needed to pay license fees for these patents, even though current 3G technology does not infringe them.

132.    InterDigital's declarations were willful and in bad faith.

133.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia's products.

134.    Upon information and belief, Nokia has suffered lost business expected from persons who are aware of InterDigital's statements.

135.    InterDigital's declarations have caused and threaten to continue to case actual injuries to Nokia.

136.    Nokia is further entitled to the relief requested herein.

### COUNT XII.
### Unjust Enrichment
### (Delaware)

137.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 136, as if set forth in full.

138.    InterDigital received an unjust enrichment of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

139.    Nokia has lost money due to InterDigital's wrongful conduct.

140.    InterDigital's false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith, and caused both InterDigital's unjust enrichment and Nokia's loss.

141.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

142.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

143.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

144.    Nokia is further entitled to the relief requested herein.

## COUNT XII.
### Unjust Enrichment
### (Pennsylvania)

145.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 144, as if set forth in full.

146.    InterDigital received an unjust benefit of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

147.    InterDigital appreciated its unjust benefit as the false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith.

148.    InterDigital accepted and retained its unjust benefit at the expense of Nokia and others and therefore it would be inequitable not to return its benefit.

149.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

150.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

151.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

152.    Nokia is further entitled to the relief requested herein.

**COUNT XIV.**
**Unjust Enrichment**
**(Texas)**

153.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 152, as if set forth in full.

154.    InterDigital received an unjust enrichment of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

155.    InterDigital's false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith.

156.    InterDigital accepted and retained its unjust benefit at the expense of Nokia and others and therefore it would be inequitable not to return its benefit.

157.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

158.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

159.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

160.    Nokia is further entitled to the relief requested herein.

## JURY DEMAND

Nokia demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that the Court enter judgment:

(a)    Declaring the extent to which any of the patents set forth in Attachment A actually meet the definition of "essential" under the ETSI IPR policy;

(b)    Declaring the extent to which any of the patents in Attachment A are necessarily infringed by compliance of a product with a 3G standard actually commercially implemented anywhere in the world;

(c)    Declaring the extent to which any of the patents in Attachment A have valid, enforceable claims which necessarily read on any product compliant with the any 3G standard, including but not necessarily limited to Nokia products made, used, sold, offered for sale or imported in the United States;

(d)    Declaring that no Nokia 3G compliant product infringes any valid, enforceable claim of any of the patents in Attachment A (or any such other United States patent as InterDigital may refuse to concede is not infringed by Nokia);

(e)    That InterDigital's statements concerning the scope and validity of its 3G patents are false or misleading;

(f)    Enjoining InterDigital from continued dissemination of these false and misleading statements;

(g)    Requiring InterDigital to take all necessary steps to have its false and misleading statements withdrawn from ETSI's website;

(h)    Awarding Nokia damages in an amount to be determined at trial for Nokia's losses;

(i)    Awarding Nokia treble damages pursuant to 6 Del. Code § 2533(c);

(j)    Awarding Nokia punitive damages;

(k)    Requiring InterDigital's disgorgement of its unjust enrichment;

(l)    Granting Nokia its attorneys' fees and costs pursuant to 6 Del. Code § 2533(b) and all

other applicable bases for awarding fees and costs; and

(m)    Granting such other and further relief as the Court deems just and proper.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney*
_____
JACK B. BLUMENFELD (#1014)
JULIA HEANEY (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for NOKIA CORPORATION and
NOKIA, INC.

OF COUNSEL:

ALSTON & BIRD LLP
Patrick Flinn
Randall Allen
Lance Lawson
1201 West Peachtree Street
Atlanta, GA 30309
(404)881-7000

January 9, 2007
550110

# EXHIBIT A

## Exhibit A to Nokia's First Amended Complaint

**Patent No.**

5,081,643
5,161,168
5,179,572
5,224,120
5,263,045
5,351,269
5,363,403
5,469,468
5,553,062
5,563,907
5,574,747
5,588,020
5,673,286
5,703,874
5,719,852
5,748,687
5,796,776
5,799,010
5,835,527
5,841,768
5,912,919
5,920,590
5,940,382
5,943,331
5,991,329
5,991,332
5,995,538
6,005,898
6,011,789
6,014,373
6,049,535
6,075,792
6,115,406
6,141,332
6,157,619
6,175,586
6,181,949
6,212,174
6,215,778
6,229,843
6,252,866
6,256,339
6,259,688
6,272,168
6,278,726
6,330,272

**Patent
No.**

6,373,830
6,373,877
6,381,264
6,389,002
6,404,828
6,456,608
6,490,462
6,493,563
6,507,745
6,519,474
6,560,300
6,571,105
6,574,265
6,574,271
6,577,672
6,577,673
6,577,876
6,606,503
6,608,838
6,611,548
6,614,776
6,633,600
6,671,308
6,674,788
6,674,791
6,697,350
6,707,805
6,721,301
6,721,350
6,738,368
6,744,809
6,778,840
6,782,040
6,788,662
6,798,759
6,801,516
6,801,517
6,804,315
6,810,029
6,816,473
6,823,194
6,826,244
6,831,905
6,832,095
6,832,096
6,839,567
6,845,093
6,850,514

**Patent
No.**

6,865,217
6,868,076
6,868,078
6,868,278
6,873,645
6,876,665
6,879,841
6,885,652
6,898,197
6,904,294
6,915,473
6,940,817
6,940,840
6,961,398
6,973,579
6,980,538
6,980,615
6,983,009
6,985,467
6,993,001
7,020,111
7,020,125
7,020,151
7,046,754
7,072,290
7,072,380
7,085,583
7,106,719
7,110,383
7,110,384
7,110,385
7,110,386
7,123,600

# EXHIBIT B

# ETSI Guide on Intellectual Property Rights (IPRs)

**(As endorsed by the ETSI GA#46 on 23 November 2005)**

© European Telecommunications Standards Institute 2005. All rights reserved.

**Contents**

Background .........................................................................................................................4

Foreword ...........................................................................................................................4

1    The ETSI IPR Policy...........................................................................................................4
    1.1    What is the Purpose of the IPR Policy?...............................................................4
    1.2    Where can I find the ETSI IPR Policy?................................................................5
    1.3    Terminology .......................................................................................................5
    1.4    Rights and obligations deriving from the IPR Policy............................................5
    1.5    "Essential" IPRs .................................................................................................7

2    Importance of timely disclosure of Essential IPRs................................................................7
    2.1    Members Duties .................................................................................................8
        2.1.1    Responding to Calls for IPRs performed in Technical Body meetings .........8
        2.1.2    Use the ETSI IPR Information Statement and Licensing Declaration
                forms ........................................................................................................8
        2.1.3    Update and complete the ETSI IPR Information Statement form ...............8
        2.1.4    Copyrights in ETSI Deliverables ...............................................................8
    2.2    Members do NOT have a duty to: .......................................................................8
    2.3    Technical Body Chairmen's duties .....................................................................9
        2.3.1    Define scope statements for work items .....................................................9
        2.3.2    Make call for IPRs in Technical Bodies meetings........................................9
        2.3.3    When and How?..........................................................................................9
        2.3.4    Record and report information on IPRs ......................................................10
        2.3.5    Copyrights in ETSI Deliverables ...............................................................11
        2.3.6    Confidential information ...........................................................................11
    2.4    ETSI Secretariat Duties ...................................................................................11
        2.4.1    Information on Essential IPRs in ETSI Deliverables ..................................11
        2.4.2    Initiate a procedure of clause 8 when no licensing declaration can be
                obtained .................................................................................................11
        2.4.3    Non response by an IPR owner ................................................................11
        2.4.4    Redrafting of ETSI Deliverables ..............................................................12
        2.4.5    Disclose copyright identified in ETSI documentation ................................12
        2.4.6    Acknowledgement of third parties copyright .............................................12
        2.4.7    Reporting of a substantial IPR problem .....................................................12
        2.4.8    Maintenance of information on Essential IPRs ...........................................13

3    Information on Essential IPRs by ETSI...............................................................................13
    3.1    Where to find information on essential IPRs ......................................................13
        3.1.1    ETSI Special Report 000 314....................................................................13
        3.1.2    The ETSI IPR Online Database .................................................................13
        3.1.3    Requests to the ETSI Secretariat..............................................................13
    3.2    What type of information and procedures for updates ........................................14
        3.2.1    Assessment of IPR rights .........................................................................14
        3.2.2    Update procedure for the ETSI IPR Online database..................................14

4    Other ETSI IPR Policy matters...........................................................................................14
    4.1    Responsibility for specific licensing terms ........................................................14
    4.2    Dispute Resolution ...........................................................................................14
    4.3    Notice on the use of NDAs in IPR negotiations .................................................15
    4.4    Financial contingency .......................................................................................15
    4.5    Rationale and clarifying texts for the changes in Article 4.1 of the ETSI IPR Policy.........15
        4.5.1    History of changes ...................................................................................15
        4.5.2    EC DG COMPETITION's position regarding the rationale and scope
                for the changes of Article 4.1 of the ETSI IPR Policy................................15
                4.5.2.1    Addition of the sentence "Subject to Article 4.2
                            below…" and Deletion of the phrase "… it is aware of
                            or becomes aware of."........................................................15

4.5.2.2    Addition of the phrase "… where it participates …"............16
4.5.2.3    Re the expression "in particular" ........................................16
4.5.3    ETSI's position regarding the rationale and scope for the changes of
Article 4.1 of the ETSI IPR Policy....................................................17
4.5.3.1    Re the addition of the sentence "Subject to Article 4.2
below…"..................................................................................17
4.5.3.2    Re the deletion of the phrase "… it is aware of or
becomes aware of." ...............................................................17
4.5.3.3    Addition of the phrase "… where it participates …"............18
4.5.3.4    Re the expression "in particular" ........................................18
4.5.3.5    Re the expression "Reasonable Endeavours" ...................18

Annex A    ETSI Intellectual Property Rights Policy .....................................................20

Annex B    ETSI IPR Information Statement and Licensing Declaration Forms .................25

Annex C    Check list of the Chairmen's obligations in respect of the notification and disclosure
of IPRs    27

## Background

The ETSI IPR Policy was adopted by the 21st General Assembly on 23 November 1994 and incorporated in the ETSI Directives as Annex 6 to the ETSI Rules of Procedure.

At a later stage a Technical Body Chairman's Guide on IPRs had been written to help Chairmen and others involved in ETSI's standardization activities to understand and implement the Institute's IPR Policy. That Chairman's Guide on IPR had not been endorsed by the General Assembly or the Board and therefore did not have the same official status as the ETSI Statutes, the Rules of Procedure or the Technical Working procedures. The Technical Body Chairman's Guide on IPRs is now replaced by the present ETSI Guide on IPRs.

In 2002 the ETSI General Assembly #40 identified the need to review the ETSI IPR Policy with a view to addressing and rectifying any uncertainties on the operation of this Policy and on any legal rules and obligations on the membership in order to avoid an incorrect implementation of the ETSI IPR Policy and in order to avoid anti-competitive actions. An ad-hoc IPR group, with a clear mandate to review the implementation of the IPR Policy but not to change the Policy itself, was consequently created and 30 recommendations on the operation of the ETSI IPR Policy where approved by the ETSI General Assembly #42. The present ETSI Guide on IPRs embodies most of these recommendations.

A revised version of the Article 4.1 of the ETSI IPR Policy was adopted by the 46th General Assembly in November 2005. This revision was induced by the EC DG COMPETITION in its concern to generate a general awareness of the risk of "patent ambush" situation in the standard making process. The EC DG COMPETITION rationale behind the changes is given in section 4.5 of the present Guide.

## Foreword

Intellectual property plays an important role in standardization, especially in the telecommunications and electronic communications sector. In that context, the likelihood of having Intellectual Property Rights (IPRs) incorporated into ETSI Deliverables became critical after a few years of existence of ETSI. This tension (proprietary nature of IPRs versus wide dissemination of standards) was minimized with the adoption by the ETSI Membership of the ETSI IPR Policy as found in Annex 6 to the ETSI Rules of Procedure.

In the preparation of standards, IPR issues may arise. It is important for all parties involved in the ETSI standards-making process to be aware of their responsibilities and that there is good co-operation between all parties.

This guide is intended to help ETSI Members and any other party involved in ETSI's standardization activities (e.g. Members, Technical Body Chairmen, Secretariat, etc.) to understand and implement the Institute's IPR Policy.

This guide provides explanatory information on how to handle IPR matters in ETSI and does not replace the ETSI IPR Policy which takes precedence in all cases.

This guide has been endorsed by the Board but does not have the same official status as the Statutes, the Rules of Procedure or the Technical Working Procedures.

Should you (the reader) have any difficulty with provisions of this guide or with any practical aspects of the Policy which are not answered by this guide, please do not hesitate to contact the ETSI Secretariat (hereafter called simply "Secretariat").

## 1    The ETSI IPR Policy

### 1.1    What is the Purpose of the IPR Policy?

The purpose of the ETSI IPR Policy is to facilitate the standards making process within ETSI.  In complying with the Policy the Technical Bodies should not become involved in legal discussion on IPR matters.  The main characteristics of the Policy can be simplified as follows:

- Members are fully entitled to hold and benefit from any IPRs which they may own, including the right to refuse the granting of licenses.

- Standards and Technical Specifications shall be based on solutions which best meet the technical objectives of ETSI.

- In achieving this objective, the ETSI IPR Policy seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

- The IPR Policy seeks to reduce the risk that investment in the preparation, adoption and application of standards could be wasted as a result of an Essential IPR for a standard or technical specification being unavailable.

- Therefore, the knowledge of the existence of Essential IPRs is required as early as possible within the standards making process, especially in the case where licenses are not available under fair, reasonable and non-discriminatory (FRAND) terms and conditions.

The ETSI IPR Policy defines the rights and obligations for ETSI as an Institute, for its Members and for the Secretariat.

The Policy is intended to ensure that IPRs are identified in sufficient time to avoid wasting effort on the elaboration of a Deliverable which could subsequently be blocked by an Essential IPR.

**1.2    Where can I find the ETSI IPR Policy?**

The ETSI IPR Policy is part of the ETSI Directives and can be found in Annex 6 of the ETSI Rules of Procedures (http://www.etsi.org/legal/home.htm). This means that the rights and obligations specified by the IPR Policy are an integral part of the ETSI Rules of Procedure and are binding on all ETSI Members.

You can also find a copy of the Policy at Annex A.

**1.3    Terminology**

The ETSI IPR Policy defines a number of terms; those used in this guide correspond to those used in the Policy.

In the ETSI IPR Policy:

**an IPR includes**:

- COPYRIGHT
- PATENT
- UTILITY MODEL
- REGISTERED DESIGN
- … and applications thereof.

**an IPR does not include**:

- TRADEMARKS
- TRADE SECRETS
- CONFIDENTIAL INFORMATION
- RIGHTS RELATING TO GET-UP (packaging)

**1.4    Rights and obligations deriving from the IPR Policy**

The ETSI IPR POLICY defines rights and obligations for ETSI as an Institute, for its Members and for the Secretariat. Non-Members of ETSI also have certain rights under the Policy but do not have legal obligations.

The following table intends to give a clear overview of the most important rights and obligations of the Institute, the Members, the Secretariat and the rights of third parties as specified under the ETSI IPR Policy. *All references below which are in italics relate to the ETSI IPR Policy.*

| | Obligations | Rights |
|---|---|---|
| **Institute** | <ul><li>to inform users of standards about Essential IPRs declared and ensure that this information is publicly available (*clause 7*).</li><li>to perform IPR searches if the EC and/or EFTA so require and reasonable expenses are met (*clause 6.2*).</li><li>to grant licenses on ETSI-owned IPRs (other than copyright) on fair, reasonable and non-discriminatory terms and conditions to third parties, free of charge to ETSI Members (*clause 9.3*).</li><li>to respect confidential information within a Technical Body until publication of the relevant Deliverable.</li><li>to include the information in a standard (*clause 10*).</li></ul> | |
| **Members** | <ul><li>to inform ETSI about their own, and other people's Essential IPRs (*clause 4.1*).</li><li>owners of Essential IPRs are requested to undertake to grant licenses on fair, reasonable and non-discriminatory terms and conditions (*clause 6.1*).</li><li>owners of Essential IPRs who refuse to grant license when no alternative is available, are requested to reconsider their position and provide the Director-General with a justification (*clause 8.1*).</li><li>to abstain from claiming copyright on standards documentation (text, graphics etc., of the standard itself) on behalf of the member itself and its employees (*clause 9.1*).</li></ul> | <ul><li>no obligation to conduct IPR searches (*clause 4.2*).</li><li>to refuse the inclusion of own IPRs in standards (*clauses 8.1 and 8.2*).</li><li>to be granted licenses on fair, reasonable and non-discriminatory terms and conditions in respect of a standard (*clause 6.1*).</li><li>to make copies of standards documentation (clause 11) free of charge.</li><li>to use IPRs owned by ETSI free of charge (*clause 9.3*).</li><li>to have confidential information within a Technical Body respected until publication of the relevant Deliverable (*clause 10*)</li></ul> |
| **Secretariat** | <ul><li>the Director-General to contact owners of Essential IPRs having refused to grant licenses on behalf of ETSI (*clauses 8.1 and 8.2*).</li><li>the Director-General to request the owner of an Essential IPR to give within three months an undertaking in writing that it is prepared to grant licenses (*clause 6.1*).</li></ul> | |
| **Third Parties** | <ul><li>the ETSI IPR Policy is only binding on ETSI Members. Third parties do not have any legal OBLIGATIONS under the Policy.</li><li>when ETSI is informed that an IPR</li></ul> | <ul><li>Third parties have certain RIGHTS under the ETSI IPR Policy either as owners of Essential IPRs or as users of ETSI standards or documentation:<ul><li>to refuse the inclusion of their own Essential IPRs in ETSI</li></ul></li></ul> |

| | |
|---|---|
| belonging to a non-Member could be essential for a standard, the non-Member owner is also requested to undertake to grant licenses on fair, reasonable and non-discriminatory terms and conditions (*clause 6.1*). | Deliverables (*clause 8.1 and 8.2*). |
| | o  To be granted licenses on fair, reasonable and non-discriminatory terms and conditions in respect of a standard at least to manufacture, sell, lease, repair, use and operate, (*clause 6.1*). |
| | o  to be granted licenses for ETSI owned IPRs (other than copyright in the standard documentation) (*clause 9.3*) on fair, reasonable and non-discriminatory terms and conditions. |
| | o  to have confidential information within a Technical Body respected until publication of the relevant Deliverable (*clause 10*). |

**1.5    "Essential" IPRs**

Clause 15.6 of the ETSI IPR Policy gives the following definition of essentiality:

> "15.6      *ESSENTIAL as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL".*

In simpler terms, an "essential IPR" is an IPR which has been included within a standard and where it would be impossible to implement the standard without making use of this IPR. The only way to avoid the violation of this IPR in respect of the implementation of the standard is therefore to request a license from the owner.

**2      Importance of timely disclosure of Essential IPRs**

The main problems for ETSI as a standards body which may arise from "late disclosures" include:

- Licenses for Patents which have been disclosed late and are not available at all, or,

- Licenses for Patents which have been disclosed late and which are available, but not on Fair, Reasonable and Non-Discriminatory (FRAND) terms, i.e. the company is unwilling to make a 'FRAND' undertaking/licensing declaration.

If the above problems cannot be satisfactorily resolved, then ETSI has to change the standard, which in some extreme cases could even include the need to start again with the development of that standard.

NOTE 1:      Definitions for "Timeliness" or "Timely" cannot be agreed because such definitions would constitute a "change to the Policy".

NOTE 2:      The following description of Intentional Delay has been noted:

> *"Intentional Delay" has arisen when it can be demonstrated that an ETSI Member has deliberately withheld IPR disclosures significantly beyond what would be expected from normal considerations of "Timeliness".*

This description of 'Intentional Delay' should be interpreted in a way that is consistent with the current ETSI IPR Policy. In complying with the requirements of timeliness under section 4.1 of the IPR Policy, Members are recommended to make IPR disclosures at the earliest possible time following their becoming aware of IPRs which may be Essential.

NOTE 3:    "Intentional Delay", where proven, should be treated as a breach of the IPR Policy (clause 14 of the ETSI IPR Policy) and can be sanctioned by the General Assembly.

## 2.1    Members Duties

### 2.1.1    Responding to Calls for IPRs performed in Technical Body meetings

Members participating in Technical Bodies should respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.

Furthermore, the call for IPRs acts as a reminder of the Member's obligations under the IPR Policy and is performed to foster the disclosure of Essential IPRs in a timely fashion.

Members having IPR portfolios should improve their internal IPR co-ordination processes to ensure, as far as possible, that their participants in Technical Bodies are aware of any alleged-essential IPR the company may have (related to the on-going work on a particular ETSI Standard or Technical Specification), that they understand their obligations, and that they know how to discharge them.

Members are encouraged to make general IPR undertakings/licensing declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures. This process reduces the risk of the standards making process being blocked due to IPR constraints.

### 2.1.2    Use the ETSI IPR Information Statement and Licensing Declaration forms

The ETSI IPR Information Statement and Licensing Declaration forms should be used by any IPR holders wishing to make their disclosures and undertaking to ETSI.

A copy of the ETSI IPR Information Statement and Licensing Declaration Forms can be found at Annex B and online at: http://www.etsi.org/legal/IPR_database/IPRforms-V4.doc

These forms, once completed and duly signed should be returned to the ETSI Director-General.

Any questions related to the completion of the forms should be addressed to the ETSI Legal Advisor.

### 2.1.3    Update and complete the ETSI IPR Information Statement form

Members are not obliged to inform ETSI of any updates to their essential IPRs. Nevertheless, Members are encouraged to update and complete their information statements in line with the forms (see Annex B). A minimum of information should be provided, which allows verifying the essentiality or the potential essentiality of an IPR.

### 2.1.4    Copyrights in ETSI Deliverables

Members should be aware that once a technical proposal has been included into ETSI documentation the copyright is owned by ETSI, for the purpose of the publication of ETSI documentation.

## 2.2    Members do NOT have a duty to:

- conduct IPR searches (see clause 4.2 of the IPR Policy).

- disclose within the Technical Body the commercial terms for licenses for which they have undertaken to grant licenses under FRAND terms and conditions. Any such commercial

terms are a matter for discussion between the IPR holder and the potential licensee, outside of ETSI (see section 4.1 of this Guide).

## 2.3    Technical Body Chairmen's duties

Chairmen represent the membership while having the authority to represent the Institute in their Technical Body. Chairmen have an important role in respect of both, the identification and disclosure of essential IPRs.  They have a duty to remind the Members of their statutory obligations to submit IPR disclosures.

In addition to the actions aiming at the identification of IPRs, the Chairmen also need to take the following actions, which ensure that the disclosure of essential IPRs is properly carried out:

- to record in the report of the meeting that an IPR call has been made and to record any responses;

- to inform the Secretariat of the existence of any essential IPRs identified.

Throughout the standardization process the Chairmen must take the following actions which facilitate the identification of Essential IPRs.

### 2.3.1    Define scope statements for work items

It is vital that Chairmen ensure that the scope statements for all work items in the ETSI work programme are properly defined. This will ensure that if a search for patents is required (under clause 6.2 of the Policy) or chosen to be performed by a Member, the task can be carried out in the most effective manner.
In order that the scope statement of an ETSI work item can be used for IPR purposes, it should contain the following:

- a broad statement concerning the technical field of this work;
- a description of broad system concepts;
- identification of any standard on which the work item is likely to be based;
- a list of features which the standard will define, or on which the standard will place limitations;
- a technical description of each feature listed, in broad terms; and,
- a list of any criteria which the standard must satisfy.

### 2.3.2    Make call for IPRs in Technical Bodies meetings

Every Technical Body and working group meeting shall start with a "Call for IPRs" (either in a written form – as part of the meeting's agenda - or in oral form) performed by the Chairman. This Call for IPRs acts as a reminder of the Member's obligations under the ETSI IPR Policy and is performed to foster the disclosure of Essential IPRs in a timely fashion.

An example of this "Call for IPRs" may be found below in clause 2.3.3. Please note that during the Operational Co-ordination Group meetings (OCG) Chairmen will be reminded to perform that call for IPRs.

Technical Body Chairmen are also invited to encourage Members to make general IPR undertakings/licensing declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures.

### 2.3.3    When and How?

A formal call for IPR disclosures shall be made by the Chairman at the beginning of each meeting.

The formal call for IPR disclosures needs to be made by the Chairman orally or in writing according to the example given below. Members need to be reminded that the recommended form for the notification of essential IPRs and licensing declaration are available on-line and attached in Annex B.

**Example of a formal call for IPRs**

> The attention of the members of this Technical Body is drawn to the fact that ETSI Members shall use reasonable endeavours under clause 4.1 of the ETSI IPR Policy, Annex 6 of the Rules of Procedure, to inform ETSI of Essential IPRs in a timely fashion. This section covers the obligation to notify its own IPRs but also other companies' IPRs.
>
> The members take note that they are hereby invited:
>
> - to investigate in their company whether their company does own IPRs which are, or are likely to become Essential in respect of the work of the Technical Body,
>
> - to notify to the Chairman or to the ETSI Director-General all potential IPRs that their company may own, by means of the IPR Information Statement and the Licensing Declaration forms that they can obtain from the ETSI Technical Officer or http://www.etsi.org/legal/IPR_database/IPRforms-V4.doc."
>
> Members are encouraged to make general IPR undertakings/declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures.

During the meeting a short reminder call for IPR disclosures should be made:

- on formal submission of a technical solution;
- on completion of the first stable draft of the standard;
- on working group approval of a draft standard;
- on TB approval of a draft standard.

E.g., this may consist of the following sentence "*May I remind Members of their obligations to use reasonable endeavours to disclose any Essential IPR [related to this issue] in a timely fashion*".

The Technical Body Chairmen should note and should make their attendees aware that disclosure of Essential or potentially Essential IPRs should be made at the earliest possible stage within the above list.

Knowing who has contributed to the development of a standard may help identify IPRs Essential to that standard.

If it becomes apparent that an IPR declaration/licensing undertaking is unlikely to be provided, the Technical Body Chairman should inform the Legal Advisor in the Secretariat, who will take the necessary action.

Ultimately, it may be necessary for the Secretariat to invoke clause 8.1 of the Policy, which could require all work on the standard to stop. In any case, the party owning the IPR is allowed three months consideration time after the Technical Body has examined the matter and the Director-General has invited the IPR owner to reconsider its refusal to grant a license. Chairmen should use their judgment (in consultation with the Secretariat) as to whether or not the Technical Body should suspend work on the standard until the matter has been resolved.

### 2.3.4    Record and report information on IPRs

Technical Body Chairmen must be particularly careful to record in the report of each meeting that a reminder was issued and include details of any responses that were made. If there were no responses, then this fact should also be recorded.

Whenever a Chairman becomes aware of the existence of an Essential or potentially Essential IPR he must immediately inform the Legal Advisor of the ETSI Secretariat.

### 2.3.5    Copyrights in ETSI Deliverables

Chairmen shall ensure that all technical proposals adopted by their Technical Body are recorded in the minutes of the meeting, together with any restrictions on their use, and shall report them to the Secretariat. The Secretariat will inform Chairmen if copyright licenses/assignments are required. If so, then they must be obtained before publication of the document. The Secretariat will determine, with the assistance of the Chairman, which third party copyrights, if any, have to be acknowledged.

### 2.3.6    Confidential information

It may happen that Chairmen or Technical Bodies are offered confidential information. There are certain precautions which must be observed and Chairmen are strongly urged to contact the Secretariat before proceeding.

Clause 10 of the Policy states that information disclosed to ETSI's Technical Bodies is to be regarded as non-confidential, unless all of the following criteria are satisfied:

- the information is in written or other tangible form; and
- the information is identified in writing as confidential at the time it is submitted; and
- the information is first submitted to the Technical Body Chairman and accepted by him as confidential.

Where a Chairman becomes aware that confidential information has been disclosed in breach of a confidential disclosure agreement to which ETSI is a party, he must immediately inform the Secretariat.

### 2.4    ETSI Secretariat Duties

The Secretariat, and especially the Legal Advisor, have a general duty to assist the Chairmen in IPR matters. In addition to this, the Secretariat is responsible for the actions below:

### 2.4.1    Information on Essential IPRs in ETSI Deliverables

The ETSI Secretariat will ensure that an appropriate reminder of the duty to disclose the identity of Essential IPRs is included in all published ETSI Deliverables in the form of a standard text.

Specifically, the Secretariat shall ensure that the following marking appears in ETSI Deliverables prior to Publication, Member vote, Public Enquiry or National Vote:

> **Intellectual Property Rights**
> IPRs essential or potentially essential to the present document may have been declared to ETSI. The information pertaining to these essential IPRs, if any, is publicly available for **ETSI members and non-members**, and can be found in SR 000 314: "*Intellectual Property Rights (IPRs); Essential, or potentially Essential, IPRs notified to ETSI in respect of ETSI standards*", which is available from the ETSI Secretariat. Latest updates are available on the ETSI Web server (http://www.etsi.org/ipr).
>
> Pursuant to the ETSI IPR Policy, no investigation, including IPR searches, has been carried out by ETSI. No guarantee can be given as to the existence of other IPRs not referenced in SR 000 314 (or the updates on the ETSI Web server) which are, or may be, or may become, essential to the present document.

### 2.4.2    Initiate a procedure of clause 8 when no licensing declaration can be obtained

Where an IPR licensing declaration cannot be obtained because of the refusal by the essential IPR owner, the ETSI Secretariat is obliged to initiate the procedure set out in clause 8 of the ETSI IPR Policy.

### 2.4.3    Non response by an IPR owner

In situation where there has been no response from an IPR owner to a request for undertaking/licensing declaration within the three months specified in clause 6.1 of the IPR Policy:

- where a standard has not yet been published and an undertaking/licensing declaration has not been received or is not sufficiently defined, the steps listed in clause 8.1 of the IPR Policy should be applied, e.g. the TB should not pursue development of the standard based on the non-available technology and should look for alternative solutions.

- where a standard has already been published and an undertaking/licensing declaration has not been received or is not sufficiently defined, the steps listed in clause 8.2 of the IPR Policy should be applied, e.g. contact the IPR owner concerned, bring to the attention of the GA, etc. If these steps do not solve the issue of non-availability of licenses, the process of withdrawal of the standard should be initiated.

### 2.4.4    Redrafting of ETSI Deliverables

Published Standards or Technical Specifications should not be redrafted because a change on the essentiality of an IPR arises unless the required undertaking/licensing declaration has not been provided within the three month period foreseen under clause 6.1 of the IPR Policy, or has been refused. Any IPR changes should be entered into the ETSI IPR Database by the Secretariat, showing the date of the entry.

### 2.4.5    Disclose copyright identified in ETSI documentation

The copyright of ETSI documentation, including that produced in its Technical Bodies, is owned by ETSI. The Secretariat shall ensure that the following marking appears in ETSI Deliverables prior to Publication, Member vote, Public Enquiry or National Vote:

> Reproduction is only permitted for the purpose of standardization work undertaken within ETSI.
>
> The copyright and the foregoing restrictions extend to reproduction in all media.
>
> © European Telecommunications Standards Institute yyyy.
> All rights reserved.

This marking shall also appear in document templates provided to the Technical Organization by the Secretariat.

### 2.4.6    Acknowledgement of third parties copyright

Due acknowledgement of copyrights owned by third parties, which are identifiable in ETSI documentation, must be made in the following form:

> Some material contained herein is the copyright of, or has been supplied by...(insert name of party in question).

This legend should appear on the ETSI documents and/or media concerned and should immediately follow the copyright legend(s) referred to above.

In response to the obligation on Chairmen to report to the Secretariat any copyright restrictions in technical proposals adopted by their Technical Body, the Secretariat will inform Chairmen if copyright licenses/assignments are required. If so, then they must be obtained before publication of the document. The Secretariat will determine, with the assistance of the Chairman, which third party copyrights, if any, have to be acknowledged.

### 2.4.7    Reporting of a substantial IPR problem

The ETSI Director-General should bring any [substantial] IPR problem to the ETSI Board and/or General Assembly for further discussion.

**2.4.8    Maintenance of information on Essential IPRs**

The Secretariat is responsible for the maintenance of the ETSI IPR online database and the ETSI Special Report 000 314 (see sections 3.1 and 3.2 of this guide).

# 3    Information on Essential IPRs by ETSI

All information statements and licensing declarations of IPRs received by ETSI are publicly available to ETSI Members and standards' implementers via two means: The ETSI Special Report (SR) 000 314 and the ETSI IPR Online Database.

**3.1    Where to find information on essential IPRs**

**3.1.1    ETSI Special Report 000 314**

The ETSI Special report SR 000 314 is an ETSI Deliverable entirely dedicated to information on IPRs which have been notified to ETSI as being Essential, or potentially Essential, to ETSI standards. This SR is generated twice a year and offers a summary of the information contained in the ETSI IPR Online database as of the time it is generated.

In case of any conflict between the information contained in SR 000 314 and the information contained in the ETSI IPR Online Database, the contents of the database takes precedence.

ETSI SR 000 314 can be found at: http://webapp.etsi.org/ipr.

**3.1.2    The ETSI IPR Online Database**

The ETSI IPR Online Database is an application that has been developed by the ETSI Secretariat to allow electronic online access to Information Statements and Licensing Declarations received by ETSI.

Like the SR 000 314, the ETSI IPR Online Database contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards.

Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Clause 6.1 of Annex 6 of the ETSI Rules of Procedure (the ETSI IPR Policy).

It is important to note that the ETSI IPR online database provides data that is based on the information received, i.e.:

- ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential,
- No investigation or IPR searches have been carried out by ETSI and therefore, no guarantee can be given concerning the existence of other IPRs which are, or may become, essential;
- Potential licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

The ETSI IPR Online Database can be found at: http://webapp.etsi.org/ipr.

**3.1.3    Requests to the ETSI Secretariat**

Whenever requested, the ETSI Secretariat shall provide any details on information statements and licensing undertakings/licensing declarations that it has received. The main contact point is the ETSI Legal Advisor.

**3.2      What type of information and procedures for updates**

IPR information reflected by ETSI is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation or IPR searches have been carried out by ETSI and therefore, no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

**3.2.1      Assessment of IPR rights**

As a general principle, ETSI does not perform any check on the status and validity of any Essential IPRs notified to ETSI.

In addition, ETSI does not perform any search for Essential IPRs which may exist and have not been notified.

**3.2.2      Update procedure for the ETSI IPR Online database**

In addition to the entry of new disclosures and undertakings/licensing declarations, existing data in the ETSI IPR Database should only be updated based on information received from IPR holders or as the result of a General Assembly decision, in particular with respect to the following cases:

- **Completion of an existing data entry**, e.g. the publication number, identification of standard.

- **Updating of legal information**, such as change of legal status of an IPR (e.g. grant, dropped, revoked or expired), change of ownership of the IPR.

- **Addition of information concerning studies performed on the essentiality of an IPR**: Members are obliged to disclose IPRs, which might be essential and ETSI is obliged to make these disclosures available to Members. This disclosure reflects, of course, only an opinion of the Member and some facts on the IPRs, but the Member is responsible for the content. Any further opinion should be added only with the agreement of the Member or to implement a General Assembly decision.

- **Removal of IPR disclosures at the request of the IPR holder**: Members are obliged to declare IPRs which they believe to be essential. A license undertaking/licensing declaration for these IPRs is also published. ETSI is obliged to publish this undertaking/licensing declaration. Any such removal shall be tracked in the IPR on-line database.

- **Removal of IPR disclosures in exceptional circumstances**: Removals not requested by the IPR holder shall only be performed following a decision taken by the General Assembly. Any such removal shall be tracked in the IPR on-line database.

# 4      Other ETSI IPR Policy matters

**4.1      Responsibility for specific licensing terms**

Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI. Technical Bodies are not the appropriate place to discuss IPR Issues. Technical Bodies do not have the competence to deal with commercial issues. Members attending ETSI Technical Bodies are often technical experts who do not have legal or business responsibilities with regard to licensing issues. Discussion on licensing issues among competitors in a standards making process can significantly complicate, delay or derail this process.

**4.2      Dispute Resolution**

ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner.

Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat.

However, it should be noted that once an IPR (patent) has been granted, in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes.

### 4.3    Notice on the use of NDAs in IPR negotiations

It is recognized that Non Disclosure Agreements (NDAs) may be used to protect the commercial interests of both potential licensor and potential licensee during an Essential IPR licensing negotiation, and this general practice is not challenged. Nevertheless, ETSI expects its Members (as well as non-ETSI Members) to engage in an impartial and honest Essential IPR licensing negotiation process for FRAND terms and conditions.

### 4.4    Financial contingency

Members developing products based on standards where there may be Essential IPRs, but there is uncertainty, have mechanisms available which they can use to minimize their risk. As a non-exclusive example, a Member might wish to put in place financial contingency, based on their assessment of "reasonable", against the possibility that further/additional license fees might become payable.

### 4.5    Rationale and clarifying texts for the changes in Article 4.1 of the ETSI IPR Policy

A revised version of the Article 4.1 of the ETSI IPR Policy was adopted by the 46th General Assembly on November 2005. This revision was induced by the EC DG COMPETITION in its concern to generate a general awareness of the risk of "patent ambush" situation in the standard making process.

#### 4.5.1    History of changes

Prior to the 46th ETSI General Assembly, Article 4.1 of the ETSI IPR Policy read:

*4.1    Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.*

During the 46th ETSI General Assembly the modifications below to Article 4.1 of the ETSI IPR Policy were adopted.

*4.1    Subject to Article 4.2 below, ~~E~~each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, in particular~~to~~ timely inform ETSI of ESSENTIAL IPRs in a timely fashion~~it becomes aware of~~. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.*

#### 4.5.2    EC DG COMPETITION's position regarding the rationale and scope for the changes of Article 4.1 of the ETSI IPR Policy

The extracts below are taken from various correspondences between ETSI and the EC DG COMPETITION services.

##### 4.5.2.1    Addition of the sentence "Subject to Article 4.2 below…" and Deletion of the phrase "… it is aware of or becomes aware of."

**RATIONALE from DG COMPETITION**

" …. the deletion of the phrase "*becomes aware of*" is important from the Commission's "patent ambush" perspective…."

Source:    DG COMPETITION letter dated 26 April 2005 reproduced in B#52(05)17, Annex, Footnote 2.

## CLARIFYING LANGUAGE from DG COMPETITION"

" .... the deletion of the phrase "*becomes aware of*" is important from the Commission's "patent ambush" perspective, [but] does not imply an extra burden on ETSI Members - by definition, a company can only inform about essential IPRs if it has knowledge of such IPRs."

Source:    DG COMPETITION letter dated 26 April 2005 reproduced in B#52(05)17, Annex, Footnote 2.

"... the deletion of the words "*becomes aware of*" "*arguably imposes a higher burden of disclosure for the ETSI Members*". More specifically, you raise the concern that this might oblige Members to conduct IPR searches. We do not believe that this concern is warranted. As Mr. Mensching noted in his letter of 28 January 2005, the rationale behind the proposed deletion of "*becomes aware of*" is that we would expect a Member in a standard-setting process to have a general awareness of the scope of its IPR rights in that area, and therefore where necessary, "*use its reasonable endeavours*" to identify these IPR.[1] However, as has been explicitly confirmed to you in writing on numerous occasions, this does not mean that we would expect Members[2] to conduct patent/IPR searches. As such, our proposed change does not create a heightened expectation for Members to identify essential IPRs. Nor does it create any contradiction with Article 4.2 of ETSI's IPR policy. Nevertheless, in order to explicitly convey this message in ETSI's IPR policy itself, we would be willing to incorporate, at the beginning of Article 4.1, the phrase "*Subject to Clause/Article 4.2 below*". "

Source:    DG COMPETITION LETTER dated 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 4

### 4.5.2.2    Addition of the phrase "… where it participates …"

## RATIONALE from DG COMPETITION

"The addition of the phrase "*in which it participates*" therefore addresses the concern expressed by some ETSI members, and also means that to the extent that a member is not participating in an ETSI standards development committee/working group but becomes aware of certain essential IPRs,[3] a general obligation to inform ETSI of the essential IPRs remains".

Source:    DG COMPETETITION LETTER dated 26 April 2005 reproduced in B#52(05)17r1, Annex III (paragraph 4 of Annex to the EC letter of 26.04.05).

### 4.5.2.3    Re the expression "in particular"

## CLARIFYING LANGUAGE from DG COMPETITION

"Firstly, I note your concern that DG Competition's proposed wording might be interpreted as narrowing the obligation to disclose essential IPR to a very specific phase of the standardisation process. As you stress, we have already confirmed that our proposed changes do not mean that the window of opportunity to declare essential IPR is closed when a standard is adopted. However, to more explicitly address your concern in Article 4.1 of the IPR rules, we are happy to accept your proposed addition of the words "*in particular*".

Source:    DG COMPETITION LETTER dated 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 2

---

[1]    Once again, this is consistent with the notion of members being invited by the meeting Chairman to identify essential IPR at the beginning of each relevant meeting.

[2]    whether or not they are participating in the development of a standard.

[3]    In this regard, as you correctly noted at the General Assembly, the deletion of the phrase "*becomes aware of*" is important from the Commission's "patent ambush" perspective, but does not imply an extra burden on ETSI members - by definition, a company can only inform about essential IPRs if it has knowledge of such IPRs.

**4.5.3**      **ETSI's position regarding the rationale and scope for the changes of Article 4.1 of the ETSI IPR Policy**

The extracts below has been developed, with the support of EC DG COMPETITION, by the ETSI membership and endorsed by the 46th ETSI General Assembly.

**4.5.3.1**      **Re the addition of the sentence "Subject to Article 4.2 below…"**

The insertion of the phrase "Subject to Article 4.2 below" at the beginning of the first sentence of the new text of Article 4.1 is intended to reflect the general framework under which the requirement of disclosure of Article 4.1 operates. This insertion explicitly conveys the notion that the requirement of disclosure contained in Article 4.1 is not to be interpreted as an obligation on ETSI Members to conduct IPR searches.

As DG COMPETITION explicitly confirmed to ETSI in writing on numerous occasions;

-      the new text of Article 4.1 "does not mean that we would expect Members[4] to conduct patent/IPR searches. As such, our proposed change does not create a heightened expectation for Members to identify essential IPRs. Nor does it create any contradiction with Article 4.2 of ETSI's IPR policy. Nevertheless, in order to explicitly convey this message in ETSI's IPR policy itself, we would be willing to incorporate, at the beginning of Article 4.1, the phrase "Subject to Clause/Article 4.2 below".

       Source:      Letter from Angel Trabacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI Director-General, 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 4.

-      "it is clear that it should not be reasonably expected that an ETSI Member should have a duty to take steps to find out about potential IPR it might have relating to ETSI standards development work in areas/committees where that Member is not participating in that work (no more than it should be expected, as we have previously confirmed, that a Member carry out patent/IPR searches)."

       Source:      Letter from Angel Tradacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI Director-General, 26 April 2005, reproduced in B#52(05)17r1, Annex III (paragraph 2 of Annex to the EC letter of 26.04.05).

**4.5.3.2**      **Re the deletion of the phrase "… it is aware of or becomes aware of."**

DG COMPETITION's intention in pursuing deletion of the phrase "*it becomes aware of*" is viewed as important from the patent ambush perspective.[5]   The idea is to prevent an ETSI Member from intentionally not disclosing Essential Intellectual Property Rights (EIPR) during the standardization process, and after the standard has issued, then disclosing such EIPR with the intention to not license on fair, reasonable, and non-discriminatory (FRAND) terms as expected by ETSI Policy for EIPR[6]. Intentional non-disclosure of EIPR generally occurs in two instances:

1)      when a representative participating in a Technical Body on behalf of a Member has actual knowledge of EIPR, and yet the Member holds back notification; or,

2)      when a member fosters an atmosphere of ignorance amongst its employees participating at ETSI with the intent to avoid its EIPR disclosure and FRAND licensing obligations.

DG COMPETITION has made it clear that the removal of the "*it becomes aware of*" wording is not intended to place a higher burden of disclosure upon a Member, nor is it intended to create a heightened expectation for Members to identify EIPR.[7]   This position is consistent with the ETSI IPR

---

[4]      Whether or not they are participating in the development of a standard.
[5]      DG COMPETITION letter dated 26 April 2005
[6]      ETSI Guide on Intellectual Property Rights, Section 6.1.
[7]      DG COMPETITION letter dated 26 April 2005

Policy and ETSI practice to requiring Members participating in Technical Bodies to respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.[8]

Further, it has been explicitly confirmed by DG COMPETITION on numerous occasions that the removal of the words does not mean a Member would be required to conduct patent/EIPR searches.[9]

Concern has been raised that removal of the "it becomes aware of" wording places an untenably broad burden of disclosure on ETSI Members. Based on the above, it appears the intent is for the burden to remain the same while identifying conduct whereby "patent ambush" in violation of the ETSI IPR Policy may be assumed.

### 4.5.3.3    Addition of the phrase "… where it participates …"

The term "where it participates" as employed in Article 4.1 seeks to clarify that a Member's obligation to use such reasonable endeavours under this Article should be adhered to in those Technical Bodies or its Working Groups in which an employee (or otherwise authorised representative) of such Member (as defined within the ETSI IPR Policy) performs at least one of the following:

i)      attends a meeting of;
ii)     participates in or contributes, directly or indirectly, to the work of;
iii)    votes on any matter raised within;

such Technical Body or Working Group where such Technical Body or Working Group is responsible for the ETSI Work Item from which such STANDARD or TECHNICAL SPECIFICATION, [as an ETSI Deliverable], has or will result.

### 4.5.3.4    Re the expression "in particular"

The insertion of the phrase "*in particular*" in the first sentence of the new text of Section 4.1 is intended to reflect the importance placed by DG COMPETITION on a member's informing ETSI of Essential IPRs during the period when that information might be most relevant to the development of a Standard of Technical Specification. DG COMPETITION has made clear (see DG Competition Letter dated 29 March 2005 reproduced in GA#45(05)22, Annex 1, paragraph 2) that the inclusion of this phrase does not mean either that the window of opportunity for a member to declare its Essential IPRs is closed once a standard is adopted or that the member's duty to use its "*reasonable endeavours*" post-adoption is waived or altered.

### 4.5.3.5    Re the expression "Reasonable Endeavours"

The new text of Article 4.1 of the ETSI IPR Policy provides, in part, that each ETSI Member "*shall use its reasonable endeavours, in particular during the development of a Standard or Technical Specification where it participates, to inform ETSI of Essential IPRs in a timely fashion.*" Section 4.2 of the ETSI IPR Policy provides that these disclosure obligations "do however not imply any obligation on Members to conduct IPR searches."

As DG COMPETITION has pointed out, the concept of "*reasonable endeavours*" qualifies the obligation to disclose essential patents. As it has noted, "*it is clear that it should not be reasonably expected that an ETSI Member should have a duty to take steps to find out about potential IPR it might have relating to ETSI standards development work in areas/committees where that Member is not participating in that work (no more than it should be expected, as we have previously confirmed, that a member carry out patent/IPR searches).*"

    Source:    Letter from Angel Tradacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI
               Director General, 26 April 2005, at Annex.

This interpretation by DG COMPETITION is supported by the longstanding interpretation of "*reasonable endeavours*" in the ETSI Guide on Intellectual Property Rights. The steps that must be

---

[8]    ETSI Guide on Intellectual Property Rights, Section 2.3.1.
[9]    DG COMPETITION letter dated 29 March 2005.

taken to identify essential patents focus on the activities and knowledge of the ETSI Member's representatives who are active in a particular ETSI matter. Each Technical Body and working group meeting, for example, must begin with a call for IPRs. *See* ETSI Guide on Intellectual Property Rights, Section 2.3.2. "*Members participating in Technical Bodies should respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.*" *Id.*, Section 2.1.1.

Accordingly, it seems that the "*reasonable endeavours*" that are to be taken to disclose patents that are essential to a particular ETSI deliverable should be measured in terms of the knowledge of representatives of an ETSI Member who are actively involved in the work of the body developing that ETSI deliverable.    This interpretation acknowledges, as DG COMPETITION has noted, that "*reasonable endeavours*" has the benefit of being able to cover different scenarios on their merits on a logical, case-by-case basis."

    Source:    Letter from Angel Tradacete at Annex, note 1.

## Annex A      ETSI Intellectual Property Rights Policy

### [ETSI Rules of Procedure, Annex 6]

**1          Introduction**

The General Assembly of ETSI has established the following Intellectual Property Rights POLICY.

**2          Definitions**

Terms in the POLICY which are written in capital letters shall have the meaning set forth in Clause 15 entitled DEFINITIONS.

**3          Policy Objectives**

3.1      STANDARDS and TECHNICAL SPECIFICATIONS shall be based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

3.2      IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.

3.3      ETSI shall take reasonable measures to ensure, as far as possible, that its activities which relate to the preparation, adoption and application of STANDARDS and TECHNICAL SPECIFICATIONS, enable STANDARDS and TECHNICAL SPECIFICATIONS to be available to potential users in accordance with the general principles of standardization.

**4          Disclosure of IPRs**

*4.1      Subject to Article 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.*

4.2      The obligations pursuant to clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.

**5          Procedures for Committees**

ETSI shall establish guidelines for the chairmen of COMMITTEES with respect to ESSENTIAL IPRs.

**6          Availability of Licences**

6.1      When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

6.2    At the request of the European Commission and/or EFTA, initially for a specific STANDARD or TECHNICAL SPECIFICATION or a class of STANDARDS/TECHNICAL SPECIFICATIONS, ETSI shall arrange to have carried out in a competent and timely manner an investigation including an IPR search, with the objective of ascertaining whether IPRs exist or are likely to exist which may be or may become ESSENTIAL to a proposed STANDARD or TECHNICAL SPECIFICATIONS and the possible terms and conditions of licences for such IPRs. This shall be subject to the European Commission and/or EFTA meeting all reasonable expenses of such an investigation, in accordance with detailed arrangements to be worked out with the European Commission and/or EFTA prior to the investigation being undertaken.

# 7    Information on IPR by ETSI

7.1    Any published STANDARD or TECHNICAL SPECIFICATION shall include information pertaining to ESSENTIAL IPRs which are brought to the attention of ETSI prior to such publication.

7.2    ETSI shall establish appropriate procedures to allow access to information at any time with respect to ESSENTIAL IPRs which have been brought to the attention of ETSI.

# 8    Non-availability of Licences

8.1    MEMBERS' refusal to license

8.1.1    Where a MEMBER notifies ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION, the General Assembly shall review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION which:

- is not blocked by that IPR; and

- satisfies ETSI's requirements.

8.1.2    Where, in the opinion of the General Assembly, no such viable alternative technology exists, work on the STANDARD or TECHNICAL SPECIFICATION shall cease, and the Director-General of ETSI shall request that MEMBER to reconsider its position. If the MEMBER decides not to withdraw its refusal to license the IPR, it shall inform the Director-General of ETSI of its decision and provide a written explanation of its reasons for refusing to license that IPR, within three months of its receipt of the Director-General's request.

The Director-General shall then send the MEMBER's explanation together with relevant extracts from the minutes of the General Assembly to the ETSI Counsellors for their consideration.

8.2    Non-availability of licences from third parties

Where, in respect of a STANDARD or TECHNICAL SPECIFICATION, ETSI becomes aware that licences are not available from a third party in accordance with clause 6.1 above, that STANDARD or TECHNICAL SPECIFICATION shall be referred to the Director-General of ETSI for further consideration in accordance with the following procedure:

i)    The Director-General shall request full supporting details from any MEMBER who has complained that licences are not available in accordance with clause 6.1 above.

ii)    The Director-General shall write to the IPR owner concerned for an explanation and request that licences be granted according to clause 6.1 above.

iii)    Where the IPR owner refuses the Director-General's request or does not answer the letter within three months, the Director-General shall inform the General Assembly. A vote shall be taken in the General Assembly on an individual weighted basis to immediately refer the STANDARD or TECHNICAL SPECIFICATION to the relevant COMMITTEE to modify it so that the IPR is no longer ESSENTIAL.

iv)    Where the vote in the General Assembly does not succeed, then the General Assembly shall, where appropriate, consult the ETSI Counsellors with a view to finding a solution to the problem. In parallel, the General Assembly may request appropriate MEMBERS to use their good offices to find a solution to the problem.

v)    Where (iv) does not lead to a solution, then the General Assembly shall request the European Commission to see what further action may be appropriate, including non-recognition of the STANDARD or TECHNICAL SPECIFICATION in question.

In carrying out the foregoing procedure due account shall be taken of the interest of the enterprises that have invested in the implementation of the STANDARD or TECHNICAL SPECIFICATION in question.

## 9    ETSI ownership of IPRs

9.1    The ownership of the copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports created by ETSI or any of its COMMITTEES shall vest in ETSI but due acknowledgement shall be given to copyrights owned by third parties that are identifiable in ETSI copyrighted works.

9.2    In respect of IPRs other than copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports, ETSI shall only seek ownership of IPRs generated either by its employees or by secondees to ETSI from organizations who are not MEMBERS.

9.3    ETSI shall, on request by a non-member, grant licences to that non-member on fair and reasonable terms and conditions in respect of any IPRs, other than those referred to in clause 9.1 above, owned by ETSI. MEMBERS shall be allowed to use IPRs owned by ETSI free of charge.

## 10    Confidentiality

The proceedings of a COMMITTEE shall be regarded as non-confidential except as expressly provided below and all information submitted to a COMMITTEE shall be treated as if non-confidential and shall be available for public inspection unless:

- the information is in written or other tangible form; and

- the information is identified in writing, when submitted, as confidential; and

- the information is first submitted to, and accepted by, the chairman of the COMMITTEE as confidential.

CONFIDENTIAL INFORMATION incorporated in a STANDARD or TECHNICAL SPECIFICATION shall be regarded as non-confidential by ETSI and its MEMBERS, from the date on which the STANDARD or TECHNICAL SPECIFICATION is published.

## 11    Reproduction of Standards Documentation

MEMBERS may make copies of STANDARDS and TECHNICAL SPECIFICATIONS documentation produced by ETSI for their own use free of charge but may not distribute such copies to others.

## 12    Law and Regulation

The POLICY shall be governed by the laws of France. However, no MEMBER shall be obliged by the POLICY to commit a breach of the laws or regulations of its country or to act against supranational laws or regulations applicable to its country insofar as derogation by agreement between parties is not permitted by such laws.

Any right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature.

## 13        Policy Decisions

Without prejudice to ETSI's Statutes and Rules of Procedure, no decisions shall be taken by ETSI in relation to implementation of the POLICY unless supported by a 71 % majority of the weighted individual votes cast by MEMBERS.

## 14        Violation of Policy

Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with the ETSI Statutes.

## 15        Definitions

1        **"AFFILIATE"** of a first legal entity means any other legal entity:

- directly or indirectly owning or controlling the first legal entity, or

- under the same direct or indirect ownership or control as the first legal entity, or

- directly or indirectly owned or controlled by the first legal entity,

for so long as such ownership or control lasts.

Ownership or control shall exist through the direct or indirect:

- ownership of more than 50 % of the nominal value of the issued equity share capital or of more than 50 % of the shares entitling the holders to vote for the election of directors or persons performing similar functions, or

- right by any other means to elect or appoint directors, or persons who collectively can exercise such control. A state, a division of a state or other public entity operating under public law, or any legal entity, linked to the first legal entity solely through a state or any division of a state or other public entity operating under public law, shall be deemed to fall outside the definition of an AFFILIATE.

2        **"COMMITTEE"** shall mean any Technical Body of ETSI and shall include ETSI Projects, Technical Committees, ETSI Partnership Projects, and their Working Groups.

3        **"CONFIDENTIAL INFORMATION"** shall mean all information deemed to be confidential pursuant to Clause 10 of the POLICY disclosed directly or indirectly to the MEMBER.

4        **"EQUIPMENT"** shall mean any system, or device fully conforming to a STANDARD.

5        **"METHODS"** shall mean any method or operation fully conforming to a STANDARD.

6        **"ESSENTIAL"** as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

7    **"IPR"** shall mean any intellectual property right conferred by statute law including applications thereof other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

8    **"MANUFACTURE"** shall mean production of EQUIPMENT.

9    **"MEMBER"** shall mean a member or associate member of ETSI. References to a MEMBER shall wherever the context permits be interpreted as references to that MEMBER and its AFFILIATES.

10    **"POLICY"** shall mean ETSI's Intellectual Property Rights Policy.

11    **"STANDARD"** shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs) (telecommunications series), ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs (telecommunications series) and including drafts of any of the foregoing, and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all MEMBERS, but not including any standards, or parts thereof, not made by ETSI.

The date on which a STANDARD is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that STANDARD was available to all MEMBERS.

12    **"TECHNICAL SPECIFICATION"** shall mean any Technical Specification (TS) adopted by ETSI including options therein or amended version including drafts, the Technical Specifications of which are available to all MEMBERS, but not including any technical specifications, or parts thereof, not made by ETSI.

The date on which a TECHNICAL SPECIFICATION is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that TECHNICAL SPECIFICATION was available to all MEMBERS.

## Annex B    ETSI IPR Information Statement and Licensing Declaration Forms

**ANNEX 1**

---

**IPR Holder/Organisation**

Legal Name: _____

**Signatory**

Name: _____

Position: _____

Department: _____

Address: _____

_____

Tel.: _____

Fax: _____

E-mail: _____

**IPR information statement**

In accordance with the ETSI IPR Policy, Article 4.1, I hereby inform ETSI that,

with reference to the technical proposal identified as _____
and/or
in relation to Work Item No. _____
and/or
with reference to ETSI Standard No. _____

it is my belief that the IPRs listed in Annex 2 are, or are likely to become, Essential IPRs in relation to that Standard.

**IPR licensing declaration**

The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in Annex 2 and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

The construction, validity and performance of this DECLARATION shall be governed by the laws of France.

**Place, Date:**                              **Signature:**

_____          _____

                                   (Signed for and on behalf of the SIGNATORY)

---

Please return this form duly signed to:
ETSI Director General - Karl Heinz Rosenbrock

ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex - FRANCE
Fax. +33 (0) 4 93 65 47 16

<u>ANNEX 2</u>

| ETSI Standard, Technical Specification or Work Item | | | | Patent Proprietor | Patent/ Application No. | Patent Subject/ Title | Country | OPTIONAL INFORMATION: Other patents/applications in same family*: | |
|---|---|---|---|---|---|---|---|---|---|
| Project or Standard name | Work Item OR Standard No. | Section | Version | | | | | Patent/application No. | Country |
| *Example UMTS* | *TS 125 215* | *6.1.1.2* | *V3.5.0* | *Nokia* | *1131972* | *Scheduling of slotted-mode related measurements* | *EPO* | 12740/00 | Australia |
| | | | | | | | | 99813100.8 | China P.R. |
| | | | | | | | | 108270 | Finland |
| | | | | | | | | 11-318161 | Japan |
| | | | | | | | | 6532226 | USA |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

*Patent family information is provided voluntarily. The completeness and accuracy of any patent family information that is provided cannot be guaranteed.

**Annex C    Check list of the Chairmen's obligations in respect of the notification and disclosure of IPRs**

- Check that the scope statements for work items are sufficiently defined

- Perform "call for IPRs" in Technical Bodies meetings:

  - at the beginning of meetings using the text supplied in clause 2.3.3 of the IPR Guide.

  - during meetings: (reminder of the formal call of IPRs) as in clause 2.3.3 of the IPR Guide:

    - on formal submission of a technical solution;
    - on completion of a first stable draft;
    - on working group approval of a draft standard;
    - on TB approval of a draft standard.

- Record that the "call" has been performed.

- Record any responses received (or the absence thereof) and inform the Secretariat.

- Record any copyright identified (or absence thereof) and inform the Secretariat.

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA, INC.,

Plaintiffs,

v.

INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION,

Defendants.

Civil Action No. _____ 05-16-JJF

**DEMAND FOR JURY TRIAL**

**CONFIDENTIAL**
**FILED UNDER SEAL**

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENTS**

**OF PATENT INVALIDITY AND NONINFRINGEMENT AND VIOLATIONS OF THE LANHAM ACT RELATING TO 3G MOBILE PHONE TECHNOLOGY**

Plaintiffs Nokia Corporation and Nokia, Inc. (collectively referred to as ""Nokia") file this Complaint for Declaratory Judgments Of Patent Invalidity And Noninfringement And Violations Of The Lanham Act Relating To 3G Mobile Phone Technology") file this First Amended Complaint ("Complaint") against Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively ""InterDigital"") and in support of their this Complaint allege:

**Nature And and Basis Of of Action**

1.    This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the United States Patent Laws, 35 U.S.C. § 1 et seq. and the Lanham Act, 15 U.S.C. §1051 et seq..  Nokia requests declarations that:  (i) the claims of various patents owned by

~~InterDigital are invalid; and (ii) Nokia does not infringe any claim of the patents.  Nokia seeks damages and injunctive relief for InterDigital's~~ This is an action for violations of the Lanham Act~~.~~ (15 U.S.C. §1051 et seq.), common law unfair competition, intentional interference with business relationships or opportunities, injurious falsehood, and commercial or business disparagement, and for violations of the laws of the States of Delaware, Pennsylvania, and Texas. Nokia seeks damages, declaratory and injunctive relief, and disgorgement of unjust enrichment for InterDigital's unlawful conduct.

**The Parties**

2.    Nokia Corporation is a global leader in the design, manufacture, and supply of wireless (or "mobile") telephone equipment, including handset and infrastructure products.

3.    Nokia is also a global leader in the design and development of interoperability standards that are central to the functioning of mobile telephony equipment and the economic success of the wireless industry.

4.    Nokia Corporation is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland.

5.    Nokia~~,~~ Inc. is incorporated under the laws of the state of Delaware and has a principal place of business at 6000 Connection Dr., Irving, Texas.

6.    InterDigital Communications Corporation is incorporated under the laws of the State of Pennsylvania and has its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania.

7.    InterDigital Technology Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 300 Delaware Avenue, Suite 527, Wilmington, Delaware.

8.     Upon information and belief, InterDigital Technology Corporation is a wholly-owned subsidiary of InterDigital Communications Corporation.

**Jurisdiction ~~And~~and Venue**

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and ~~1338, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202~~1338 based on federal question jurisdiction~~.~~, and has supplemental jurisdiction over all other claims based on 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over InterDigital Communications Corporation and InterDigital Technology Corporation pursuant to the laws of the State of Delaware, including the Delaware long-arm statute, 10 Del. Code § 3104.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

- 3 -

~~Facts Giving Rise To This Action~~Facts Giving Rise to this Action

12.    Wireless telephone handset and infrastructure equipment complies with industry standards that ensure that products produced by different companies can interoperate. The so-called first generation of wireless telephony used analog radio signals to convey messages between wireless handsets and base stations connected to the public switched telephone network. These base stations received and transmitted radio signals to handsets in small areas called "cells," and as a mobile user left one cell and entered another, the call would be transferred to next cell.

13.    The capacity of the first generation system was soon limited, however, because only one user could use a frequency channel at a time in any given cell. A second generation of mobile telephone technology was developed to address this problem. More users could share the same frequency – thereby increasing the capacity of each cell – if the voice communications were digitized. This Second Generation (or "2G") technology used two basic methods to allow multiple users to share the same frequency. The first used time division (called "Time Division Multiple Access," or "TDMA") as the method of sharing the frequency. The 2G standard developed in Europe, of which Nokia is a pioneer, is called GSM. The second method was to spread the digitized signals across a wider bandwidth, giving each user a unique "spreading code" that allowed each separate call to be distinguished by the receiving station. This method is called Code Division Multiple Access (CDMA), and was specified in the United States by a standard called IS-95.

14.    GSM and IS-95 remain the two principal competing 2G standards implemented worldwide. Both have continued to evolve to allow the transmission of data as well as voice communications, and the more efficient transmission of data in "packets." These improvements

and other aspects of the two technologies make them different in other ways besides the method of sharing radio frequencies. The networks between the transmission towers and the public switched telephone network are incompatible between GSM and IS-95.

15.     A third generation ("3G") of wireless telephony has been defined to succeed both IS-95 and GSM. This third generation will use more bandwidth to transmit data, and is intended to transmit information at substantially higher rates than 2G technology, such as video and internet content. The 3G successor to IS-95 is called CDMA 2000, and the 3G successor to GSM is called UMTS (Universal Mobile Telephone Service).

16.     The transition from GSM to UMTS will allow much of the existing GSM network infrastructure to be compatible with UMTS. The method of sharing frequencies is different in UMTS than GSM, however, as UMTS has adopted code division as the method of multiple access. CDMA 2000 also uses code division, and will be backward compatible with IS-95, but the remainder of its network will remain incompatible with GMS and UMTS.

17.     These technologies are made possible by the cooperation of the manufacturers of the equipment used for wireless telephony and the carriers who sell the service to customers. Only if the parties agree on, and specify, the standards for implementing the technology can multiple manufacturers compete to make the telephone handsets and network equipment for carriers.

18.     In the process of specifying standards, the participants may have intellectual property rights ("IPRs") – including patents and published patent applications – where as a technical matter the standard cannot be implemented without infringing the patent (or the patent that would issue if an application were granted). Standards bodies have developed policies

requiring parties to timely identify such IPRs, and with respect to the licensing of identified patents, as a condition of allowing participation in the standards-setting process.

19.    As mentioned above, Nokia was a pioneer in the development of GSM and likewise was a key inventor in much of what has been defined to be the 3G UMTS standard. Nokia holds many patents covering this technology – as do other manufacturers – and has followed the policies specified regarding identifying and licensing patents called for by the applicable standards bodies.

20.    InterDigital has continued to represent for more than a decade both publicly and to the wireless handset industry that it has hundreds of patents that cover the principal wireless handset standards in the United States.    InterDigital's only real business is coercing patent license payments from the wireless telephone industry. Nonetheless, it has become a member of wireless telephony standards organizations. It does so in order to claim that it, too, has patents essential to the practice of the standards and it has been particularly active in claiming that it has patents essential to the practice of the UMTS standard. By claiming that it has essential patents, it insists that all manufacturers of systems that comply with the standards must pay it patent license fees.

*InterDigital's 2G Allegations*

21.    InterDigital began making allegations in the early 1990's that it had hundreds of patents that cover the principle "2G" mobile phone systems that implement the IS-54/136 and GSM mobile phone standards. The IS 54/136 and GSM standards are implemented through so-called 2G mobile phone systems using Time Division Multiple Access ("TDMA") technology. The IS-54/136 standard, or US-TDMA, is a standard developed in the United States and includes an early version of the standard, IS 54, and a later revision, IS 136. The GSM standard is a

similar standard originally developed in Europe.  Both IS-54/136 and GSM standards use TDMA as a means by which multiple mobile callers can use the same radio frequency concurrently. makes no tangible products, however, and it has in fact invented nothing of value that would merit the license fees it has been demanding from Nokia and others in the industry.  Accordingly, it has had to develop, implement and maintain a scheme to mislead manufacturers and others in the industry into believing, falsely, that its patent portfolio is essential, valuable, and validly covers standards such as UMTS.

*InterDigital's False Statements Regarding Second Generation Technology*

22.  InterDigital began alleging in the early 1990s that it had numerous patents essential to 2G mobile phone standards.  InterDigital has in the past asserted certain of its 2G patents in court against OKI America, Inc., Qualcomm, Inc., Motorola, Inc., and Ericsson, Inc.

23.  The courtscourt in the Motorola and *Ericsson* casescase determined that most, if not all, of the asserted patents in those cases were either invalid or not infringed by mobile handset and infrastructure products used in the United States.

24.  Most of the 2G patents asserted against Motorola and Ericsson byIn none of these disputes did a court rule that any of InterDigital's patents were found to be invalid or notvalid and infringed for at least the following reasons:

- Many of the broad claims of the patents are limited to an obsolete speech compression method different from the method used in 2G systems in the United States;

- Many of the claims of the InterDigital 2G Patents are limited to a system with a single base station controlling a single cell.  This single base station limitation was used by InterDigital in the United States Patent Office in an effort to distinguish InterDigital's patents from prior art.  No industry standard applicable to mobile handsets or their associated infrastructure contemplates such a system; instead, all current mobile systems in use in the United States use multiple base stations to control multiple cells.

- ~~In an effort to distinguish prior art, many of the claims of the 2G patents were limited -- during prosecution of the respective applications in the United States Patent Office and in subsequent litigation -- to systems in which the call path is hard-wired, rather than controlled by software. Likewise, no industry standard applicable to mobile handsets or their associated infrastructure requires hard-wired call paths; instead, mobile systems in use in the United States during any relevant period are controlled dynamically by software.Comparison,~~ Indeed, comparison of the claim limitations of InterDigital 2G patents and their prosecution histories to either the 2G ~~industry~~mobile phone standards or any systems in use in the United States shows that none of the ~~hundreds of~~ claims can be infringed by any of those 2G systems, including those utilized by companies such as Motorola, Ericsson, and Nokia.

~~InterDigital's 3G Allegations~~

25.     InterDigital's purpose in declaring patents to be essential to the 2G standard, and in publicizing its contentions regarding essentiality, was to convey, and did in fact convey, the claim that all manufacturers of 2G compliant systems were required to pay InterDigital patent royalties.

26.     These claims were false, in that InterDigital did not have valid patents that were essential to the practice of the applicable 2G standards. Accordingly, companies were not legally obligated to pay InterDigital money simply because their products were compliant with the 2G standards.

*InterDigital's False Statements Regarding Third Generation Technology*

27.     More recently, InterDigital has ~~made allegations~~alleged that ~~it has~~its patents ~~that~~ ~~cover "3G" mobile systems that are currently being rolled out and further developed in the United States, referred to as the WCDMA and CDMA 2000 products. The WCDMA and CDMA 2000 standards are implemented through 3G mobile systems using Code Division Multiple Access ("CDMA") technology. The patents that InterDigital contends cover 3G mobile systems (hereafter collectively defined as "InterDigital's 3G Patents"), copies of which are attached as~~

Exhibits A-R, include:  are essential to 3G mobile telephone standards, including UMTS, CDMA 2000, and a standard called TD-SCDMA.

U.S. Patent No. 5,574,747, issued November 12, 1996 (the "'747 patent");

U.S. Patent No. 6,181,949, issued January 30, 2001 (the "'949 patent");

U.S. Patent No. 5,841,768, issued November 24, 1998 (the "'768 patent);

U.S. Patent No. 6,215,778, issued April 10, 2001 (the "'778 patent");

U.S. Patent No. 5,179,572, issued January 12, 1993 (the "'572 patent);

U.S. Patent No. 6,075,792, issued June 13, 2000 (the "'792 patent");

U.S. Patent No. 5,799,010, issued August 25, 1998 (the "'010 patent");

U.S. Patent No. 5,614,914, issued March 25, 1997 (the "'914 patent");

U.S. Patent No. 5,663,990, issued September 2, 1997 (the "'990 patent");

U.S. Patent No. 5,859,879, issued January 12, 1999 (the "'879 patent");

U.S. Patent No. 5,363,403, issued November 8, 1994 (the "'403 patent");

U.S. Patent No. 5,553,062, issued September 3, 1996 (the "'062 patent");

U.S. Patent No. 5,719,852, issued February 17, 1998 (the "'852 patent");

U.S. Patent No. 6,014,373, issued January 11, 2000 (the "'373 patent");

U.S. Patent No. 6,259,688, issued July 10, 2001 (the "'688 patent");

U.S. Patent No. 6,289,004, issued September 11, 2001 (the "'004 patent");

U.S. Patent No. 5,081,643, issued January 14, 1992 (the "'643 patent");

and

U.S. Patent No. 5,673,286, issued September 30, 1997 (the "'286 patent").

Although InterDigital contends that 3G mobile products made in the United States infringe its 3G Patents, all of InterDigital's 3G Patents are either invalid or not infringed by

mobile handset and infrastructure products being rolled out on the United States.  In particular, no Nokia product either sold in the United States or in development for sale in the United States infringes any valid claim of InterDigital's 3G Patents.

The License Agreement Between Nokia and InterDigital

28.   Nokia and InterDigital are parties to three expressly interrelated agreements ("the Agreements"), the primary subject matter of which is a license to Nokia of the patents owned by InterDigital that InterDigital alleges are required to make and sell products that are compliant with the 2G and 3G telephone standards.   For example, InterDigital has filed declarations claiming at least 195 patents were essential to the practice of the UMTS standard with the European Telecommunications Standards Institute ("ETSI"). InterDigital made these declarations through two filings with ETSI.  The first filing was made in April 2001.  The second filing was made in April 2004.

29.   ETSI is one of the preeminent Standards Setting Organizations ("SSOs") – establishing the wireless standards for one of the largest markets in the world.  Most of the major industry players are accordingly members of ETSI.  ETSI has taken a leadership role amongst SSOs by requiring its members to declare IPRs that are "essential" to UMTS.  ETSI makes these declarations publicly available through a searchable database on its website.

30.   At the time InterDigital made the declarations to ETSI (and currently), the term "ESSENTIAL" with respect to IPRs was a defined term as follows:

"ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

31.   At the time InterDigital made these declarations, it knew that many, if not all, of the IPRs it was declaring to ETSI did not meet this definition of "essential."  Indeed, InterDigital

- 11 -

made the deliberate decision to include IPRs that it knew were not technically necessary. InterDigital has never publicly identified which of the IPRs it declared to ETSI actually meet the ETSI definition of "essential" and which do not. As a result, ETSI members have been left with the impression that all of InterDigital's declared IPRs are technically essential.

32. The UMTS Standard has more than four hundred separately numbered provisions, as listed in the "table of contents" in section 5 of ETSI TS 121.101. For each patent or application that it declared to ETSI, however, InterDigital did not list the particular provision or provisions for which InterDigital contended the declared patent or application was essential.

33. ~~There is a dispute between Nokia and InterDigital as to the validity and scope of the patents that form the basis of the Agreements between them.~~ InterDigital's declarations to ETSI are publicly available through a searchable database on ETSI's website.

34. ~~With respect to 2G products, despite the invalidity and/or narrowness of InterDigital's 2G patents as determined by the courts in the *Motorola* and *Ericsson* cases, InterDigital has publicly announced its intention to seek hundreds of millions of dollars in royalties from Nokia under the Agreements. Nokia has refused to pay the fees InterDigital is demanding. The parties are currently engaged in an International Chamber of Commerce Arbitration with respect to 2G products, entitled *Nokia Corporation v. InterDigital Communications Corporation and InterDigital Technology Corporation*, ICC Case Number 12-829/JNK.~~ In addition, InterDigital has engaged in a campaign of publicity regarding its claim of essentiality in the press and in other ways intended to be disseminated in the communications industry. InterDigital claims in public statements that it has patents essential to the practice of the UMTS standard, and that it expects to obtain substantial license revenue from all companies who make standards compliant products. For example, in a press release issued on November

10, 2006, InterDigital claims that it "has built an intellectual property portfolio of more than 7,500 issued patents and patents pending around the world," and boasts of its "active participation in global standards bodies that shape the evolution of the technology and the future of the industry." InterDigital further claims that its participation in the standards process allowed it to create "a strong portfolio of patented technologies which it licenses to manufacturers of 2G, 2.5G, 3G and 802 products worldwide."

~~.~~ ~~With respect to 3G products, InterDigital continues to contend that its patents broadly cover 3G technology. Under the Agreements, Nokia is licensed to InterDigital's 3G patents only through the end of 2006. Nokia is currently designing, rolling out and further developing 3G products in the United States that will be manufactured and sold by Nokia after 2006.~~

35. ~~Nokia has a reasonable apprehension that InterDigital will sue Nokia for patent infringement with respect to InterDigital's 3G patents.~~ That is, InterDigital does more than just claim that it has essential patents with respect to 3G technologies. InterDigital claims that its portfolio of patents is sufficiently broad that all manufacturers of 3G products must pay InterDigital substantial fees for the privilege of making standards-compliant products.

36. ~~InterDigital has a history of litigiousness. InterDigital's tactics are so well known, in fact, that *Forbes Magazine* published an article on InterDigital's litigation tactics, a copy of which is attached as Exhibit S. The article describes InterDigital as a company that uses litigation to "extract[] money from companies" that make handheld mobile phones. The article goes on to explain that InterDigital~~These statements, particularly when considered in their totality, are false and misleading in number of respects, including but not necessarily limited to the following:

has earned enmity for its hardball enforcement of intellectual property rights. Virtually all of its $33 million profit from the first nine months [of 2003] has come from dragging customers like Ericsson and NEC Corp. through legal disputes over patents.

. In an August 13, 2003, investor conference call, InterDigital's Chief Executive Officer, Howard Goldberg, acknowledged that InterDigital uses litigation as leverage in disputes with companies such as Nokia, included bringing injunctions to prevent the shipping of handsets. A copy of the transcript of the conference call is attached as Exhibit T (see page 14).

a.    Participants in the industry, including manufacturers and users of 3G compliant equipment, do not have to pay InterDigital any money, notwithstanding the IPRs claimed in InterDigital's portfolio. Alternatively, the weakness of the portfolio is such that InterDigital is not entitled to the sums of money it has demanded from the industry for patent license rights it has provided to its portfolio.

b.    The vast majority, if not all, of the IPRs declared by InterDigital to ETSI to be essential to the current implementation of UMTS are not, in fact essential. A list of such patents is attached hereto as Exhibit A. In addition, Nokia incorporates by this reference Plaintiffs' Statement Pursuant to Second Discovery Order, served on Defendants December 14, 2006, for a detailed explanation of the falsity of these declarations.

c.    Indeed, InterDigital routinely and knowingly declares patents to be essential to ETSI even though it is well aware that its patents do not meet the definition of "essential" contained in the ETSI IPR policy.

d.    To the extent there are, in fact, any patents in the InterDigital portfolio which meet the definition of "essential," members of the industry do not need to pay

InterDigital any money for them. This is for one or more of the following reasons: (i) the patents are already licensed to most if not all of those in the industry, including Nokia, as part of a package of license rights previously granted for the practice of the IS-95 standard; (ii) the patents are applicable to a specific implementation of the UMTS standard known as Time-Division Duplexing (TDD) ("TDD Patents"), which has not been implemented commercially anywhere in the world with respect to wireless mobile telephones; and/or (iii) the patents cannot be valid and cover the standard at the same time.

e.    Likewise, to the extent there are, in fact, any patents in the InterDigital portfolio which meet the definition of "essential," Nokia does not need to pay InterDigital any money for them for the reasons stated above and for the additional reason that Nokia has an agreed-upon, fully-paid, irrevocable license to InterDigital's TDD Patents.

f.    In addition, there are no other patents in the InterDigital portfolio that are valid and that are infringed by any Nokia 3G product.

37.    Such articles and statements by InterDigital executives support Nokia's reasonable apprehension that it has regarding InterDigital's willingness and intent to pursue patent infringement litigation against it. Accordingly, it is false and misleading for InterDigital to say or suggest that the industry as a general matter owes it money, or should pay it money, for the practice of 3G standards, and it is false and misleading for InterDigital to say or suggest that Nokia owes it money, or should pay it money, for the practice of 3G standards.

*InterDigital's Abuse of the Standards Process*

38.    ~~Nokia has filed this suit because of InterDigital's efforts to enhance the value of its patents and Nokia's current need to design and develop 3G products that it will put into wide scale production after 2006.~~  As noted above, InterDigital touts its participation in telecommunications standards bodies as a basis for contending that it has a portfolio of essential patents for which industry manufacturers must pay license fees.  InterDigital has, in fact, grossly abused its membership in standards bodies in order to further its scheme of misleading the industry into paying money for patents for which no money is actually owed.

39.    For example, as alleged above, InterDigital is a member of ETSI, the premier standards body that promulgates the UMTS standard.  That body has promulgated a Policy for declaring IPRs,.  That Policy, a true and correct copy of which is attached as Exhibit B and incorporated herein by reference, requires, among other things, good faith implementation by ETSI members.  It further requires the timely disclosure of "essential" patents (as that term is defined in the Policy), and the specification of the particular portion of the standard to which the patent in question is essential.

40.    InterDigital has abused this Policy, deliberately, and in bad faith, in at least the following respects:

    a.    *Over-Declaration* – InterDigital has declared IPRs to be essential that are not essential, and which InterDigital knows are not essential, in order to inflate artificially and falsely the perceived value of its portfolio.

    b.    *Late Declaration* – InterDigital, aware of the requirement of timely declaration of IPRs, nonetheless withheld IPRs from declaration until 2001, and then between

2001 and 2004, in order to create a "patent ambush" on those in the industry making standards-compliant equipment.

c.      *No Declaration* – InterDigital, again notwithstanding the requirement of timely declaration of IPRs, has, on information and belief, withheld from declaration IPRs since 2004 even though it has evaluated its portfolio since that time and determined that non-declared IPRs meet the criteria it applied for declaring IPRs in 2001 and 2004.  InterDigital is reserving these IPRs, on information and belief, for further use in "ambush" or surprise litigation tactics.

d.      *Deliberately Vague Declaration* – Notwithstanding the requirement, effective before InterDigital's 2004 declarations, that a member specify the portion of the standard to which a declared IPR is essential, InterDigital engaged in a sham intended to limit the ability of the public to evaluate the truth of its essentiality claims.  The declaration form IPR holders were to use when InterDigital made its 2004 declarations contained a column – entitled "Standard No." – for the particular provision of the standard for which a declared IPR is essential.  In its declarations, InterDigital cited only to the Table of Contents for the entire standard, intentionally and deliberately, in order to obfuscate and conceal the lack of actual essentiality of the patents listed.

e.      *Secret Repeal* – InterDigital now claims that it has withdrawn from declaration IPRs that were declared in its 2001 filing with ETSI, but not listed in its 2004 filing.  This, too, is a sham intended to avoid the consequences of its bad faith declaration in 2001.  There is no evidence that InterDigital ever communicated to the public or interested parties that it had withdrawn any of the IPRs declared in

2001, and those declarations appear in the ETSI database in the same form as the 2004 declarations. InterDigital did not withdraw or update its 2001 declarations. The 2004 declarations did not inform ETSI members that they superseded the 2001 declarations in their entirety. ETSI's policies do not state, moreover, that subsequent declarations supersede previous ones. In fact, on October 30, 2006, InterDigital recently rejected its own endorsement of secret repeal by *explicitly* requesting that ETSI remove its essentiality declarations regarding a small number of IPRs.

41.    ~~Nokia seeks declarations that the claims of InterDigital's 3G Patents are either invalid or that Nokia's 3G products do not infringe any valid claim of those patents.~~ This bad faith behavior is a part of the broader scheme InterDigital has implemented to mislead the industry into believing (a) that it has a portfolio of essential patents, (b) that the portfolio's scope and value justify the royalties it has been demanding, and (c) that manufacturers should pay it money in order to manufacture standards-compliant technology.

*Injury to Nokia*

42.    The bad faith conduct, false and misleading behavior, and other wrongful acts set forth herein have injured Nokia. First, the conduct is likely to cause confusion in the marketplace. To the extent there are false statements in the ETSI declarations – whether made in good faith or not – they should be corrected in order to remove the likely confusion in the marketplace. Because InterDigital has refused to withdraw or modify the false declarations (and indeed has declared in proceedings in this Court that all 195 patents are, in fact, essential), an injunction of this Court requiring InterDigital to withdraw all false declarations and engage in corrective advertising is required.

43.    In addition, InterDigital had in fact acted in bad faith in implementing and maintaining this deceptive scheme.  It has obtained unjust profits from this scheme, and should be ordered to disgorge all profits it has obtained from the illicit plan.

44.    Next, this misconduct has caused a direct financial injury to Nokia.

45.    Notwithstanding the ultimate truth or falsity of InterDigital's essentiality declarations, InterDigital is not relieved from its legal and equitable obligations arising from having made these declarations in the first instance.

46.    Although Nokia and InterDigital are currently arbitrating their 2G dispute, that dispute does not involve 3G products.  Further, when Nokia attempted to raise the validity and scope of relevant InterDigital Patents in the arbitration by requesting that the Arbitral Tribunal issue declarations on the validity and scope of InterDigital's 2G patents, InterDigital denied that declarations the invalidity and scope of its patents were arbitrable disputes under the Agreements.

Nokia accordingly is entitled to the injunctive and declaratory relief requested herein, as well as money damages and the disgorgement of InterDigital's unjust enrichment.

## COUNT I.
### Declaration Of NonInfringement Of U.S. Patent No. 5,574,747
### Violation of § 43(a) of the Lanham Act
### (Essentiality Claims)

47.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 22,46, as if set forth in full.

.    The '747 patent relates to a system and method for adaptive power control of a spread spectrum transmitter of a mobile unit operating in a cellular communications network having a plurality of mobile units in communication with a base station.  Claims 1-3, 6-10 and 13-24 of the '747 patent are directed to a circuit in the mobile unit which changes the transmitted

- 19 -

power of the handset so that the power level detected by the base station is at a "threshold level." This change is made using a step-size algorithm located in the mobile unit. The '747 patent requires that an accumulator in a handset store a series of prior power level values and uses this series in the power control algorithm used by the handset.

.    The WCDMA and CDMA 2000 3G standards require a command to raise or lower transmitted power within a WCDMA or CDMA 2000 mobile handset based on a power control algorithm. The standards specify that this adjustment be made by infrastructure, not by an algorithm contained in the handset. Accordingly, Nokia does not infringe claims 1-3, 6-10 and 13-24 of the '747 patent either literally or under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe these claims of the '747 patent.

.    Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '747 patent.

**COUNT .**
**Declaration Of Invalidity Of U.S. Patent No. 5,574,747**

.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 26, as if set forth in full.

.    Upon information and belief, at least claims 4-5 and 11-12 of the '747 patent are invalid. The '747 patent relates to a system and method for adaptive power control of a spread spectrum transmitter of a mobile unit operating in a cellular communications network having a plurality of mobile units in communication with a base station. Claims 4-5 and 11-12 of the '747 patent are invalid in view of a 1993 IEEE publication, Viterbi & Viterbi, *Performance of Power-Controlled Wideband Terrestrial Digital Communication,* IEEE Transactions on

Communications, vol. 41, no. 4, April 1993, pp. 559-569, because the limitations of these claims of the '747 patent are either contained in the Viterbi reference or are inherent in wireless systems, including IS-95 systems.

.       Accordingly, Nokia is entitled to a declaratory judgment of invalidity of claims 4-5 and 11-12 of the '747 patent.

COUNT .
Declaration Of Noninfringement Of U.S. Patent No. 6,181,949

.       Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 29, as if set forth in full.

.       The '949 patent relates to a method of controlling initial power ramp-up in CDMA systems by using short codes. Specifically, the patent relates to a system and method of controlling transmission power during the establishment of a channel in a CDMA communication system utilizing the transmission of a short code from a subscriber unit to a base station during initial power ramp up. According to the '949 patent, the short code is a sequence for detection by the base station which has a much shorter period than a conventional spreading code. The ramp-up starts from a power level that is guaranteed to be lower than the required power level for detection by the base station. The subscriber unit quickly increases transmission power while repeatedly transmitting the short code until the signal is detected by the base station. Once the base station detects the short code, it sends an indication to the subscriber unit to cease increasing transmission power. Various claims of the '949 patent require a second ramp-up rate after the initial power ramp up.

.       Nokia does not infringe Claims 3-5, and 8-10 of the '949 patent. Each of those claims requires a second ramp-up period after the first ramp-up period. WCDMA and CDMA

2000 standards compliant handsets, including those of Nokia, do not have a second ramp up period. Rather they have a single step increase in the power level after the initial ramp up. Therefore, Nokia does not infringe Claims 3-5 or 8-10 of the '949 patent either literally or under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe these claims of the '949 patent.

.    Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '949 patent.

**COUNT .**
**Declaration Of Invalidity Of U.S. Patent No. 6,181,949**

.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 33, as if set forth in full.

.    Upon information and belief, claims 1-2 and 6-7 of the '949 patent are invalid. As alleged in paragraph 31 above, the '949 patent relates to a method of controlling initial power ramp up in CDMA systems.

.    Claims 1-2, and 6-7 of the '949 patent are either anticipated or obvious in view of the IS-95A standard. The IS-95A standard, published by the Telecommunications Industry Association, May 1995, discloses each limitation of these claims of the '949 patent.

.    Claims 1-2, and 6-7 of the '949 patent are also either anticipated or obvious in view of Viterbi & Viterbi, *Erlang Capacity of a Power Controlled CDMA System*, IEEE Journal on Selected Areas in communications, vol. 11, no. 6, August 1993, pp. 892-900. With respect to the ramp-up limitation contained in the claims of the '949 patent, Viterbi states "[i]f this initial power level is not sufficient for detection, and hence acknowledgement is not received, the user

increases his power in constant decibel steps every frame until his request is acknowledged." Id. at p. 898.

Accordingly, Nokia is entitled to a declaratory judgment that Claims 1-2 and 6-7 of the '949 patent are invalid.

## COUNT .
## Declaration Of Noninfringement Of U.S. Patent No. 5,841,768

Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 38, as if set forth in full.

The '768 patent relates to a method of controlling initial power ramp up in a CDMA system. Specifically, the patent relates to a system and method of controlling transmission power during the establishment of a channel in a CDMA communication system utilizing the transmission of a code from a subscriber unit to a base station during initial power ramp up. The code is a sequence for detection by the base station which has a shorter period than a conventional spreading code. The ramp-up starts from a power level that is guaranteed to be lower than the required power level for detection by the base station. The subscriber unit quickly increases transmission power while repeatedly transmitting the code until the signal is detected by the base station. Once the base station detects the code, it sends an indication to the subscriber unit to cease increasing transmission power. The claims of the '768 patent also require transmission of a second periodic signal at a second ramp up rate with the second ramp up rate being less than said first ramp-up rate.

Nokia's products do not implement a second ramp up rate function as claimed in the '768 patent nor does the WCDMA or CDMA 2000 standards require such a second ramp-up rate function. Therefore, Nokia does not infringe any claim of the '768 patent either literally or

under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe any claim of the '768 patent.

.       Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '768 patent.

**COUNT .**
**Declaration Of Noninfringement of U.S. Patent No. 6,215,778**

.       Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 42, as if set forth in full.

.       The '778 patent relates to a bearer channel modification system for a code division multiple access (CDMA) communication system.

.       According to the '778 patent, the multiple access, spread-spectrum communication system disclosed in the patent processes a plurality of information signals received by a Radio Carrier Station (RCS) over telecommunication lines for simultaneous transmission over a radio frequency (RF) channel as a code-division-multiplexed (CDM) signal to a group of Subscriber Units (SUs).  The RCS receives a call request signal that corresponds to a telecommunication line information signal, and a user identification signal that identifies a user to receive the call. The RCS includes a plurality of Code Division Multiple Access (CDMA) modems, one of which provides a global pilot code signal.  The modems provide message code signals synchronized to the global pilot signal.  Each modem combines an information signal with a message code signal to provide a CDM processed signal. The RCS includes a system channel controller coupled to receive a remote call.  An RF transmitter is connected to all of the modems to combine the CDM processed signals with the global pilot code signal to generate a CDM signal. The RF transmitter also modulates a carrier signal with the CDM signal and transmits the modulated carrier signal

through an RF communication channel to the SUs. Each SU includes a CDMA modem which is also synchronized to the global pilot signal. The CDMA modem despreads the CDM signal and provides a despread information signal to the user. The system includes a closed loop power control system for maintaining a minimum system transmit power level for the RCS and the SUs, and system capacity management for maintaining a maximum number of active SUs for improved system performance.

. Accordingly, the claims of the '778 patent are directed to having a subscriber unit change from one spread spectrum channel to another spread spectrum channel having a different data rate.

. WCDMA standards compliant infrastructure manages the bandwidth assigned to a base station by changing the bandwidth of an assigned channel, rather than dynamically adding or removing channels. Nokia's WCDMA products do not infringe the '778 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '778 patent.

. In CDMA 2000 standards compliant systems, infrastructure manages the bandwidth assigned to a base station by determining the order, type, and number of channels assigned to handsets. Claims 4 of the '778 patent requires assigning multiple channels to a subscriber station at a time. CDMA 2000 infrastructure can manage the bandwidth of a handset solely by changing the type of channel currently assigned to the handset. Nokia's CDMA 2000 handsets do not infringe Claim 4 of the '778 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '778 patent.

. Nokia is entitled to a declaratory judgment of non-infringement of the '778 patent.

## COUNT .
### Declaration Of Invalidity of U.S. Patent No. 6,215,778

. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 49, as if set forth in full.

. As alleged in paragraph 44 above, the '778 patent relates to a bearer channel modification system for a code division multiple access (CDMA) communication system.

. Upon information and belief, the claims of the '778 patent are invalid.

. The claims of the '778 patent are directed to having a subscriber unit change from one spread spectrum channel to another spread spectrum channel having a different data rate.

. The claims of the '778 patent are either anticipated or obvious in view of the IS-95a standard of May 1995, as modified by *Telecommunications Systems Bulletin, Support for 14.4 kbps Data Rate and PCS Interaction for Wideband Spread Spectrum Cellular Systems*, dated May 11, 1995. Each limitation of the claims of the '778 patent is disclosed or obvious in view of the IS-95a Telecommunications Systems Bulletin and/or the IS-95a standard.

. The claims of the '778 patent are either anticipated or obvious in view of the A. Baier et al, *Design Study for a CDMA Based Third Generation Mobile Radio System*, IEEE Journal on Selected Areas in Communications, vol. 12, no. 4, May 1994. Each limitation of the claims of the '778 patent is disclosed in the Baier reference and/or the IS-95 standard.

. Nokia is entitled to a declaratory judgment that the claims of the '778 patent are invalid.

## COUNT .
### Declaration Of Noninfringement of U.S. Patent No. 5,179,572

. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 56, as if set forth in full.

.       The '572 patent relates to a spread spectrum conference calling system and method. Specifically, the patent relates to a spread-spectrum-conference-calling receiver for use over multiple communications channels. The patent specifies that at each of a plurality of spread-spectrum transmitters, a transmitter-generic-chip-code generator generates a generic-chip-code signal and a transmitter message-chip-code generator generates a message-chip-code signal. An EXCLUSIVE-OR gate spread-spectrum processes message data with the message-chip-code signal to generate a spread-spectrum signal. The combiner combines the generic-chip-code signal and the spread-spectrum processed signal. A plurality of receiver generic chip code generators generate a plurality of replicas of the generic-chip-code signal. Each receiver-generic mixer recovers a carrier signal from one of the plurality of received spread spectrum communications signals. A plurality of receiver message chip code generators generate a plurality of replica of the message-chip-code signals. A plurality of receiver-message mixers despread one of the plurality of received spread-spectrum communications signal as a modulated-data signal. Tracking and acquisition circuits use the recovered carrier signal for synchronizing the replicas of the generic-chip-code signals to the recovered carrier signals, respectively. An envelope detector demodulates the modulated-data signal as a demodulated signal.

.       The claims of the '572 patent, therefore, are directed to a system and method for synchronously demodulating a plurality of modulated data signals on a plurality of spread-spectrum channels in a conference call. The conference call is sent on multiple channels and the subscriber unit demodulates all of the calls in order to listen to them.

.       Nokia's CDMA 2000 and WCDMA products do not provide for conference calling such that the calls are combined from separate spread spectrum channels at the mobile

- 27 -

handset.  Therefore, Nokia's CDMA 2000 handsets do not infringe the '572 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '572 patent.

. Nokia is entitled to a declaratory judgment of noninfringement of the '572 patent.

**COUNT .**
**Declaration Of Invalidity of U.S. Patent No. 5,179,572**

. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 61, as if set forth in full.

. As alleged in paragraph 58 above, the '572 patent relates to a spread spectrum conference calling system and method.  Specifically, the claims of the '572 patent are directed to a system and method for synchronously demodulating a plurality of modulated data signals on a plurality of spread spectrum channels in a conference call.  The conference call is sent on multiple channels and the subscriber unit demodulates all of the calls in order to listen to them.

. Upon information and belief, if the claims of the '572 patent are not limited to conference calling, the '572 patent is invalid as anticipated or obvious.

**COUNT .**
**Declaration Of Noninfringement of U.S. Patent No. 6,075,792**

. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 64, as if set forth in full.

. The '792 patent relates to a CDMA communication system which selectively allocates bandwidth upon demand.  The '792 patent discusses a CDMA wireless digital communication system which supports all types of voice and data communications while utilizing a minimum amount of bandwidth for the particular application.  According to the '792 patent, the system efficiently allocates ISDN bandwidth on demand by a subscriber.  Upon

initialization of the subscriber unit, the system establishes a channel and generates the necessary spreading codes to support the highest capacity channel desired by the subscriber unit. Portions of the communication spectrum bandwidth are not reserved until actually required by the subscriber unit. The '792 patent states that since the call setup is performed at the beginning of a call from that subscriber unit, including the assignment of spreading codes, a subscriber unit can quickly gain access to the portion of the spectrum that is required to support the particular application.

. The '792 patent, therefore, is directed to bandwidth allocation of the spread spectrum by utilizing different channels that may be added or removed, and selectively used to increase bandwidth. The claims of the '792 patent are directed to subscriber units and base stations that have the capability to use, establish and tear down such channels.

. The WCDMA standard does not dynamically add or tear down channels to establish different data rates. Nokia's products comply with the WCDMA standard and therefore do not implement the bandwidth allocation process claimed in the '792 patent.

. Nokia's products also do not establish or use a wireless ISDN channel. Accordingly, Nokia's products do not infringe the '792 patent, including at least claims 1, 3-6, 10-12, and 17-18, because those claims require the use of an ISDN channel.

. Nokia's handsets also do not assign or allocate wireless channels. Such decisions are done by infrastructure. Therefore, Nokia's products do not infringe the claims of the '792 patent, including at least claim 9, either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '792 patent.

.       Upon information and belief, Nokia's CDMA 2000 handsets do not directly infringe any claim of the '792 patent, because those claims require claim elements that are not present in Nokia's handsets.  Nokia's CDMA 2000 handsets also do not contributorily infringe any claim of the '792 patent because only CDMA 2000 infrastructure, as opposed to handsets, could meet various claim limitations.  Upon information and belief, for each such claim limitation not present in Nokia's CDMA 2000 handsets, there exist substantial uses and infrastructure implementations that do not infringe any claim of the '792 patent.  Therefore, Nokia's products do not infringe any claim of the '792 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '792 patent.

.       Nokia is entitled to a declaratory judgment of noninfringement of the '792 patent.

**COUNT .**
**Declaration Of Invalidity of U.S. Patent No. 6,075,792**

.       Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 72, as if set forth in full.

.       As alleged in paragraph 66 above, the '792 patent relates to a CDMA communication system which selectively allocates bandwidth on demand.

.       Upon information and belief, at least claims 2, 7, 8, and 13-15 of the '792 patent are invalid in view of at least *IS-95 Enhancements for Multi-Media Services* by Chih-Lin I et al.  Each of the elements of these claims of the '792 patent are disclosed or obvious in light of the *IS-95 Enhancements for Multi Media Services* which was published at least as early as Autumn of 1996.

.       Upon information and belief, at least claims 2, 7, 8, and 13-15 of the '792 patent are invalid in view of at least U.S. Patent No. 6,072,787 ("the '787 patent") assigned to Nokia. Each of the elements of these claims of the '792 patent is disclosed or obvious in light of the '787 patent, which was filed on July 5, 1996.

.       Nokia is entitled to a declaratory judgment of invalidity with respect to at least claims 2, 7, 8, and 13-15 of the '792 patent.

**COUNT .**
**Declaration Of Noninfringement of U.S. Patent No. 5,799,010**

.       Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 77, as if set forth in full.

.       The '010 patent relates to a code division multiple access (CDMA) communication system. The '010 patent discusses a multiple access, spread-spectrum communication system that processes a plurality of information signals received by a Radio Carrier Station (RCS) over telecommunication lines for simultaneous transmission over a radio frequency (RF) channel as a code-division-multiplexed (CDM) signal to a group of Subscriber Units (SUs). The RCS receives a call request signal that corresponds to a telecommunication line information signal, and a user identification signal that identifies a user to receive the call. The RCS includes a plurality of Code Division Multiple Access (CDMA) modems, one of which provides a global pilot code signal. The modems provide message code signals synchronized to the global pilot signal. Each modem combines an information signal with a message code signal to provide a CDM processed signal. The RCS includes a system channel controller coupled to receive a remote call. An RF transmitter is connected to all of the modems to combine the CDM processed signals with the global pilot code signal to generate a CDM signal. The RF transmitter

- 31 -

also modulates a carrier signal with the CDM signal and transmits the modulated carrier signal through an RF communication channel to the SUs. Each SU includes a CDMA modem which is also synchronized to the global pilot signal. The CDMA modem despreads the CDM signal and provides a despread information signal to the user.

.       The claims of the '010 patent are therefore directed to a CDMA system that uses a "global pilot code signal" for synchronizing modems. The global pilot code is defined as "a channel with a spreading code but no data modulation."

.       The WCDMA standard does not require that message signals be synchronized to a global pilot code signal as claimed in the '010 patent. In Nokia's WCDMA systems, message channels are not synchronized to a global pilot code signal and therefore do not infringe the '010 patent.

.       Nokia's CDMA 2000 handsets do not directly infringe claims 1-4 and 9 of the '010 patent because those claims require "means for receiving a call request signal" and "modem processing means." These claim limitations, as properly construed, are not present in Nokia's CDMA 2000 handsets. Nokia's CDMA 2000 handsets likewise do not contributorily infringe claim 1-4 and 9 of the '010 patent because only CDMA 2000 infrastructure, as opposed to handsets, could contain "means for receiving a call request signal." There likewise exist substantial uses and infrastructure implementations that do not meet the "means for receiving a call request signal," as properly construed, required in claims 1-4 and 9 of the '010 patent. Therefore, Nokia's CDMA 2000 products do not infringe claims 1-4 and 9 of the '010 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe claims 1-4 and 9 of the '010 patent.

.       Nokia's CDMA 2000 handsets likewise do not infringe claims 5-8 of the '010 patent.  Nokia's CDMA 2000 handsets do not calculate the acquisition signal as required by those claims.  Therefore, Nokia's CDMA 2000 products do not infringe claims 5-8 of the '010 patent either literally or under the doctrine of equivalents, nor contribute to the infringement by others or actively induces others to infringe claims 5-8 of the '010 patent.

.       Nokia's CDMA 2000 handsets also do not infringe any claim of the '010 patent because Nokia's CDMA 2000 handsets are not synchronized to a pilot code as required by the claims of the '010 patent.  Therefore, Nokia's CDMA 2000 products do not infringe any claim of the '010 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '010 patent.

.       Nokia is entitled to a declaratory judgment of noninfringement of the '010 patent.

**COUNT .**
**Declaration Of Invalidity of U.S. Patent No. 5,799,010**

.       Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 85, as if set forth in full.

.       Upon information and belief, the claims of the '010 patent are invalid.  As alleged in paragraph 79 above, the '010 patent relates to a code division multiple access (CDMA) communication system that uses a "global pilot code signal" for synchronizing modems.

.       Each of the claims of the '010 is anticipated by or obvious in light of  the IS-95a standard or the TR45 draft to the IS-95a standard entitled *Mobile Station — Base Station Compatibility Standard for dual Mode Wideband Spread Spectrum Cellular System*, PN-3144, dated December 9, 1992, both of which were published before the filing date of the '010 patent.

.    Each of the claims of the '010 patent is anticipated or obvious in light of Gaudenzi, et al., *Chip Timing Synchronization in an All-Digital Band-Limited DS/SS Modem*, IEEE Conference on Communications (ICC), 1991, pp. 1688-1692.

.    The claims of the '010 patent are therefore either anticipated or rendered obvious by the IS-95a standard, the TR45 draft to the IS-95a standard, and/or Gaudenzi, et al.

.    Nokia is entitled to a declaratory judgment of invalidity of the claims of the '010 patent.

**COUNT .**
**Declaration Of Noninfringement of U.S. Patent No. 5,614,914**

.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 91, as if set forth in full.

.    The '914 patent relates to a wireless telephone distribution system with time and space diversity transmission for determining receiver location.  The '914 patent discloses a wireless communication system that combines time and space diversity to reduce fading.  In particular, the '914 patent discloses a data packet which carries digital telephone traffic that is transmitted at three different times from three different antennas. The mobile subscriber receiver receives the same data packet at three different times from the three different antennas, and uses the best data packet or combination of the data packets to reduce the effects of fading.  A transfer station receives a time division multiplex multiple access (TDMA) signal from a base station carrying telephone data packet traffic to form three data packet repeats at spatially diverse antennas locations. The transfer station further modulates a code division multiple access (CDMA) system using a TDMA signal which links the mobile subscriber receiver to the transfer station.  Each data packet received at the transfer station is retransmitted at three different times

to the mobile subscriber station on a CDMA link. The time division and code division multiplex signals transmitted from space diversity antennas provide the ability to determine subscriber location using the same communication signals which are used for the primary telephone data communication. Specifically, the subscriber station receiver uses the absolute and relative time of arrival of the three repeated data packets to determine the respective distances of the mobile subscriber station to the three transmitting antennas. Because the transmitting antennas are at known fixed locations, receiver location is determined.

.      The '914 patent, therefore, claims a system and method relating to determining the location of a mobile subscriber station using an observed time difference of arrival (OTDOA) of wireless signals from at least three transmitting stations.

.      Nokia does not implement OTDOA in its WCDMA or CDMA 2000 wireless products and therefore does not infringe the '914 patent.

.      Nokia is entitled to a declaratory judgment of noninfringement of the '914 patent.

## COUNT .
## Declaration Of Noninfringement of U.S. Patent No. 5,663,990

.      Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 96, as if set forth in full.

.      Nokia does not infringe any claim of the '990 patent. The '990 patent relates to a wireless telephone distribution system with time and space diversity transmission and has a similar disclosure as that of the '914 patent alleged in paragraph 93 above.

.      The claims of the '990 patent focus on a time switched transmission technique wherein the same data is broadcast twice in two different time slots to achieve time switched transmit diversity.

.        Two open loop transmit diversity schemes are included in the WCDMA standard. These two schemes include Time Switched Transmit Diversity (TSTD) and Space Time Transmit Diversity (STTD). TSTD involves periodically switching the transmit antenna for separate time divided slots and retransmitting the same information. STTD involves coding the signal for separate antennas and transmitting on those antennas simultaneously.

.        All but two of the independent claims (9 and 23) of the '990 patent include a limitation to a communication system or method where the transmitted signal is encoded using a pseudorandom number to achieve spread spectrum modulation. Claims 9 and 23, which do not contain the pseudorandom number encoding limitation, contain a limitation to a system or method where a transfer station is utilized between the base station and the user equipment.

.        None of Nokia's WCDMA or CDMA 2000 products infringe claim 9 or 23 of the '990 patent, or their dependent claims. No implementation of either standard includes a transfer station as required by those claims. Nokia's handsets when used with such systems, therefore, do not infringe claim 9 or 23 of the '990 patent, or the claims which depend from them.

.        Nokia's CDMA 2000 handsets do not infringe any claim of the '990 patent because no CDMA 2000 system has been implemented with either TSTD or STTD. Nokia's handsets when used with such systems, therefore, do not infringe any claim of the '990 patent.

.        The WCDMA standard specifies that the only channel that employs a TSTD scheme is the synchronization channel. In the WCDMA standard, the synchronization channel is not spread as required by all of the independent claims of the '990 patent (except claims 9 and 23).

.        When the WCDMA standard employs STTD, the "same data packet" is not transmitted as required by the claims of the '990 patent. Additionally, when the WCDMA

standard employs STTD, data packets are not discarded as required by the claims of the '990 patent.

. Nokia's WCDMA systems comply with the WCDMA standard. Nokia's systems therefore do not infringe the claims of the '990 patent.

. Nokia is entitled to a declaratory judgment of noninfringement of the '990 patent.

**COUNT .**
**Declaration Of Noninfringement of U.S. Patent No. 5,859,879**

. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 107, as if set forth in full.

. The '879 patent relates to a wireless telephone distribution system with time and space diversity transmission and has a similar disclosure as that of the '914 and '990 patents alleged in paragraphs 93 and 100-101 above.

. The claims of the '879 patent focus on a time divided transmission technique wherein the same data is broadcast twice in two different time slots to achieve time transmit diversity.

. The claims of the '879 patent include a limitation to a communication system or method where the transmitted signal is encoded using a pseudorandom number to achieve spread spectrum modulation.

. As explained in paragraph 104 above, the only channel in WCDMA that employs TSTD is the standard synchronization channel and that channel is not spread as required by all of the claims of the '879 patent.

. As explained in paragraph 105 above, when the WCDMA standard employs STTD, the "same data packet" is not transmitted as required by the claims of the '879 patent..

When the WCDMA standard employs STTD it uses the same spreading code instead of different spreading codes as required by the claims of the '879 patent.

Nokia's WCDMA systems comply with the WCDMA standard. Nokia's systems therefore do not infringe the claims of the '879 patent.

Upon information and belief, Nokia's CDMA 2000 handsets do not infringe any claim of the '879 patent because no CDMA 2000 systems have been implemented with either TSTD or STTD. Nokia's handsets when used with such systems, therefore, do not infringe any claim of the '879 patent.

Nokia is entitled to a declaratory judgment of noninfringement of the '879 patent.

**COUNT .**
**Declaration Of Noninfringement of U.S. Patent Nos. 5,363,403; 5,553,062; 5,719,852;**
**6,014,373; and 6,259,688**

Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 117, as if set forth in full.

Nokia does not infringe any claim of the '403 patent, the '062 patent, the '852 patent, the '373 patent, or the '688 patent.

The '403 patent relates to a spread spectrum CDMA subtractive interference canceler and method. The patent discloses a spread-spectrum code division multiple access interference canceler for reducing interference in a direct sequence CDMA receiver having N-chip-code channels. The interference canceler includes a plurality of correlators or matched filters, a plurality of spread-spectrum processing circuits, subtracting circuits, and channel correlators or channel matched filters. Using a plurality of chip code signals, the plurality of correlators despreads the spread-spectrum CDMA signal as a plurality of despread signals, respectively. The plurality of spread spectrum processing circuits use a timed version of the

plurality of chip code signals, for spread spectrum processing the plurality of despread signals, respectively, with a chip code signal corresponding to a respective despread signal. For recovering a code channel using an i.sup.th chip code signal, the subtracting circuits subtract from the spread-spectrum CDMA signal, each of the N-1 spread-spectrum-processed-despread signals thereby generating a subtracted signal. The N-1 spread-spectrum-processed-despread signals do not include the spread spectrum processed despread signal of the i.sup.th channel of the spread-spectrum CDMA signal. The channel correlator or channel-matched filter despreads the subtracted signal.

.    The '062 patent is a continuation-in-part of the '403 patent. The '852 patent, the '373 patent and the '688 patent are all continuations of the '403 patent.

.    The '403 patent, the '062 patent, the '852 patent, the '373 patent and the '688 patent (the "Subtractive Interference Cancellation patents") all disclose and claim a method and system for subtractive interference cancellation in a multi-channel, spread spectrum CDMA system.

.    In a multiple channel spread spectrum system, interference is created by the multiple channels. When one channel is decoded or despread, interference from the other channels will appear as noise. The system and method in the Subtractive Interference Cancellation patents claim a series of components to remove this noise by subtracting the signals corresponding to other channels from the input signal prior to processing the channel of interest.

.    Nokia's WCDMA digital wireless systems do not implement subtractive interference cancellation techniques and therefore do not infringe any claim of the Subtractive Interference Cancellation patents.

.    Nokia's CDMA 2000 handsets do not implement subtractive interference cancellation techniques as required by InterDigital's patents and therefore do not infringe any claim of the Subtractive Interference Cancellation patents.

.    Nokia is entitled to a declaratory judgment of noninfringement of the Subtractive Interference Cancellation patents.

**COUNT .**
**Declaration Of Noninfringement of U.S. Patent No. 6,289,004**

.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 126, as if set forth in full.

.    The '004 patent relates to adaptive cancellation of fixed interferers and discloses a base station which cancels the effects of known fixed interference sources by producing a signal substantially free from the interference sources to thereby increase channel capacity. The adaptive interference canceler system includes a main antenna for receiving signals from other communication stations and at least one directional antenna directed toward an interference source. The main and directional antennas are coupled to the adaptive canceler, which weights signals received by the directional antennas and sums the weighted signals to produce a cancellation signal. The adaptive canceler subtracts the cancellation signal from the signals received by the main antenna to provide an output signal substantially free from the interference generated by the one or more known interference sources.

.    The claims of the '004 patent all require that the system include a directional antenna with four coplanar feeds mounted near the main base station antenna.

.    Neither the WCDMA standard, nor the CDMA 2000 standard, require the use of directional antennas.

.       Nokia's WCDMA and CDMA 2000 products comply with the WCDMA and CDMA 2000 standards, and do not employ directional antennas.  Nokia's systems therefore do not infringe any claim of the '004 patent.

.       Nokia is entitled to a declaratory judgment of noninfringement of the '004 patent.

## COUNT .
### Declaration Of Noninfringement of
### U.S. Patent No. 5,081,643

.       Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 132, as if set forth in full.

.       The '643 patent relates to a spread spectrum multipath receiver apparatus and method.  In particular, the '643 patent discloses an apparatus for adapting to receive a particular path, having the greatest amplitude, of a spread spectrum signal with multipath. According to the patent, the spread-spectrum signal is modulated by a chip-code. A chip-code generator generates a chip code signal having the same chip code as the spread spectrum signal. A plurality of shift registers shift the chip-code signal by a plurality of time delays.  First and second ring counters generate first and second sequencing signals for controlling first and second switching devices. The first switching device successively switches between a plurality of taps of the shift registers in a direction of increasing or decreasing delays for generating the chip-code signal with the first time delay. The second switching device successively switches between the plurality of taps of the shift registers in a direction of increasing or decreasing delays for generating the chip-code signal with a second time delay.  A first correlator correlates the spread-spectrum signal received at the input with the chip-code signal with the first time delay.  A second correlator correlates the spread-spectrum signal received at the input with the chip-code signal with the second time

delay. A comparator generates first and second comparator signals by comparing the outputs of the first correlator and the second correlator.

.    Nokia's WCDMA and CDMA 2000 products do not include "delay means" or "shift registers" as claimed in the '643 patent.  The WCDMA and CDMA 2000 standards likewise to not require such "delay means" or "shift registers."  Instead of delaying a code after it is generated by the code generator, as required by the '643 patent, Nokia's WCDMA products modify the speed of the code generator by internal clocking.  Instead of delaying a code after it is generated by the code generator with shift registers, as required by the '643 patent, Nokia's CDMA 2000 products choose from multiple samples of the input signal or reprogram the code generator.  Nokia's products therefore do not infringe any claim of the '643 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '643 patent.

.    Nokia's WCDMA products also do not include delay codes by one or more chip intervals, as required by claims 1 and 2  of the '643 patent because Nokia's WCDMA products shift the speed of the internal code generator by 1/2 chip.  Nokia's WCDMA products do not infringe claims 1 and 2 of the '643 patent either literally or under the doctrine of equivalents, nor contribute to the infringement by others or actively induce others to infringe claims 1 and 2 of the '643 patent.

.    Nokia's WCDMA products also do not include a difference amplifier as required by the claims of the in the '643 patent.  Therefore, Nokia's WCDMA products do not infringe the claims of the '643 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe the claims of the '643 patent.

**COUNT .**
**Declaration Of Noninfringement of**
**U.S. Patent No. 5,673,286**

.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 137, as if set forth in full.

.    The '286 patent relates to a spread spectrum multipath processor system and method. In particular, the '286 patent discloses a spread spectrum system and method for providing high capacity communications through multipath compensation. The multipath processor system includes a first plurality of correlators, a second plurality of correlators, a first adder, a second adder, and a selector device or a combiner device is provided for tracking a spread spectrum signal arriving in a plurality of groups. The first plurality of correlators despreads a first group of spread spectrum signals as a first group of despread signals which are added by the first adder to generate a first combined despread signal. The second plurality of correlators despreads a second group of spread spectrum signals as a second group of despread signals which are added by the second adder to generate a second combined despread signal. The selector device selects either the first or the second combined despread signal and outputs the selected signal. According to the patent, the combiner device alternatively combines the first and the second combined despread signals and outputs the combined signal.

.  Nokia's WCDMA and CDMA 2000 products do not include "combining" or "selecting" signals twice as required by the claims of the '286 patent. Nokia's products therefore do not infringe any claim of the '286 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '286 patent.

COUNT .
Violation Of § 43(a) Of The Lanham Act

.   Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 140, as if set forth in full.

48.   InterDigital has used false or misleading descriptions or representations in connection with its patent portfolio, the WCDMA Standard3G standards (including the UMTS standard, the CDMA 2000 standard, and the TD-SCDMA standard), Nokia''s products, the applicability of InterDigital''s patents to Nokia''s products, and the applicability of InterDigital''s patents to 3G wireless standards within the meaning of 15 U.S.C. § 1125(a) (§43(a) of the Lanham Act).  These statements are made in connection with goods or services and are used in interstate commerce within the meaning of 15 U.S.C. § 1125(a).

49.   This misconduct of InterDigital has inhibited the development of 3G technology, damaged Nokia''s business, and its reputation in the wireless market.

50.   Upon information and belief, InterDigital has repeatedly made public statements that its patent portfolio covers the practice of 3G wireless phone systems and the sale of 3G stated that its patents are essential to 3G wireless telecommunications standards and are infringed by current manufacture, use, or sale of 3G-compliant products. These statements are false because InterDigital's patents are not necessary to practice 3G wireless phone standards InterDigital has further claimed that manufacturers of 3G technology must pay money to InterDigital as a result of the allegedly essential patents.

51.   These statements are false or misleading for the reasons stated above, and because no valid claim of any InterDigital's patent is necessary for manufacturers to make, sell, or import

wireless phone standards currently being implemented compliant with the applicable 3G standards.

52.     InterDigital has repeatedly stated that its patents are essential to 3G wireless telecommunications standards and are infringed by Nokia's manufacture, use, or sale of 3G-compliant products.  InterDigital has further claimed that Nokia must pay money to InterDigital as a result of the allegedly essential patents.

53.     These statements are false or misleading for the reasons stated above, and because no valid claim of any InterDigital's patent is necessary for Nokia to make, sell, offer to sell or import wireless phone standards currently being implemented compliant with the applicable 3G standards.

54.     Nokia will prove that no valid claim of any of the patents in the InterDigital portfolio reads on any Nokia product made, used, sold, offered for sale, or imported into the United States, and thus that Nokia owes no money to InterDigital as a result of its purported 3G patent portfolio.  Even if InterDigital has some patents that may have valid claims that are essential to 3G standards, InterDigital's general claims that its patent portfolio contains essential patents – which were made after InterDigital declared hundreds of U.S. patents and patent applications essential to ETSI – are false or misleading because Nokia will prove that a substantial number, if not all, of those declarations are false.

55.     These false statements are material and, upon information and belief, have caused actual deception and are likely to deceive a substantial portion of the intended audience.

56.     InterDigital's misrepresentations about the scope and validity of its patents and how these patents apply to Nokia's products have caused actual injuries to Nokia in its business and have damaged Nokia's reputation as alleged herein.

57.     InterDigital has made these false statements in bad faith and with knowledge of their falsity.

58.     Nokia is accordingly entitled to the relief requested herein.

**COUNT II.**
**Violation of § 43(a) of the Lanham Act**
**(ETSI Declarations)**

59.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 58, as if set forth in full.

60.     InterDigital declared to ETSI as essential at least 110 US patents and 85 US patent applications that have issued as patents since they were declared by InterDigital to ETSI.

61.     Through these declarations, InterDigital claimed that each of these 195 patents is infringed by UMTS-compliant 3G products.  Whether the patents are, in fact, essential is an objectively verifiable proposition and not a statement of mere opinion or "puffing."

62.     InterDigital's false and misleading declarations are material and, upon information and belief, have caused actual deception or have a tendency to deceive a substantial portion of the intended audience.

63.     InterDigital's misrepresentations through its ETSI declarations about the scope and validity of its patents and how these patents apply to Nokia's products have ~~injured~~caused actual injuries to Nokia in its business and have damaged Nokia's reputation.

64.     Nokia will prove that no valid claim of any of the patents in the InterDigital portfolio reads on any Nokia product made, used, sold, offered for sale, or imported into the United States, and thus that Nokia owes no money to InterDigital as a result of its purported 3G patent portfolio.  Even if InterDigital has some patents that may have valid claims that are essential to 3G standards, InterDigital's general claims that its patent portfolio contains essential

- 46 -

patents – which were made after InterDigital declared hundreds of U.S. patents and patent applications essential to ETSI – are false or misleading because Nokia will prove that a substantial number, if not all, of those declarations are false.

65.    InterDigital has made these false and misleading statements in bad faith and with knowledge of their falsity.  These statements are made in connection with goods or services and are used in interstate commerce within the meaning of 15 U.S.C. § 1125(a).

66.    Nokia is accordingly entitled to the relief requested herein.

**COUNT III.**
**Violation of Delaware Deceptive Trade Practices Act**
**(6 Del. Code § 2532)**

67.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 66, as if set forth in full.

68.    InterDigital cast a cloud over Nokia's 3G products by creating the false and misleading impression those products contained technology that infringed InterDigital's patents.

69.    InterDigital declared its patents as essential to 3G standards, when they were not.

70.    InterDigital represented that its patents were essential to 3G standards, even though it knew they were not.

71.    InterDigital sowed confusion in the market by leading consumers to believe that Nokia's and other 3G standards-compliant manufacturers' products infringed its patents.

72.    InterDigital created confusion in the industry, in general, and among ETSI members, in particular, by (a) declaring patents to be essential to 3G standards, when it knew that they were not, (b) not withdrawing the 2001 declarations or indicating that the 2004 declarations replaced the 2001 declarations, (c) not providing sufficient information in the declarations to

verify essentiality, and (d) indicating that manufacturers should pay money when no money needs to be paid.

73. InterDigital's actions were willful and in bad faith.

74. InterDigital's above-described deceptive trade practices have caused and threaten to continue to cause actual injuries to Nokia.

75. InterDigital's above-described deceptive trade practices were willful and Nokia is entitled to treble damages pursuant to 6 Del. Code § 2533(c).

76. Nokia is further entitled to the relief requested herein.

**COUNT IV.**
**Common Law Unfair Competition**
**(Delaware)**

77. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 76, as if set forth in full.

78. Nokia reasonably anticipated obtaining revenue with respect to 3G technology.

79. InterDigital's actions were willful and in bad faith.

80. InterDigital's above-described unfair competition has caused and threatens to continue to cause actual injuries to Nokia.

81. Nokia is further entitled to the relief requested herein.

**COUNT V.**
**Common Law Unfair Competition**
**(Pennsylvania)**

82. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 81, as if set forth in full.

83. Nokia reasonably anticipated commercial benefits with respect to 3G products.

84.     Additionally, InterDigital's bad faith and affirmative misrepresentations regarding its patent portfolio constitute unfair methods of competition.

85.     InterDigital's above-described acts of unfair competition has caused and threatens to continue to cause actual injuries to Nokia.

86.     Nokia is further entitled to the relief requested herein.

**COUNT VI.**
**Intentional Interference with Prospective Business Opportunities**
**(Delaware)**

87.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 86, as if set forth in full.

88.     Nokia possessed a reasonable probability of a business opportunity with respect to 3G products.

89.     InterDigital's interference was willful and in bad faith.

90.     InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and licensees would have paid additional royalties to Nokia.

91.     InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

92.     InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay money for license rights to its patents even though it knew the money was not, in fact, owed.  Nokia is therefore entitled to punitive damages from InterDigital.

93.     Nokia is further entitled to the relief requested herein.

## COUNT VII.
## Intentional Interference with Prospective Business Relations
## (Pennsylvania)

94. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 93, as if set forth in full.

95. Nokia possessed a reasonable probability of revenues from business relations with respect to 3G technology.

96. InterDigital intentionally interfered with Nokia's reasonable probability of business relations with the purpose or intent of harming Nokia by preventing the relations from occurring, as InterDigital knew or should have known that its declarations would affect the marketability of Nokia's products and the licensing royalties that Nokia would receive.

97. There was no privilege or justification for InterDigital's interference as InterDigital used an unfair method of competition.

98. InterDigital's interference was willful and in bad faith.

99. InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and Nokia would have received additional royalties.

100. InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

101. InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay license fees for its patents even though it knew that such fees were not required. Nokia is therefore entitled to punitive damages from InterDigital.

102. Nokia is further entitled to the relief requested herein.

## COUNT VIII.
## Intentional Interference with Prospective Business Relations
## (Texas)

103.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 102, as if set forth in full.

104.    Nokia possessed a reasonable probability of revenues from business relations from 3G technology.

105.    InterDigital intentionally and in bad faith interfered with Nokia's reasonable probability of business relations with the a conscious desire to prevent the relations from occurring, or with knowledge that the interference was certain or substantially certain to prevent the relations from occurring, as InterDigital knew or should have known that its declarations would affect the marketability of Nokia's products and the licensing royalties that Nokia would receive.

106.    InterDigital intentionally interfered with Nokia through an independently tortious or unlawful act by the defendant, including through all of the counts set forth herein.

107.    There was no privilege or justification for InterDigital's interference as InterDigital used an unfair method of competition.

108.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and Nokia would have received additional royalties.

109.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

110.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay license fees for its patents even though it knew that such fees were not required.  Nokia is therefore entitled to punitive damages from InterDigital.

111.    Nokia is further entitled to the relief requested herein.

**COUNT IX.**
**Injurious Falsehood**
**(Delaware)**

112.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 111, as if set forth in full.

113.    InterDigital published false statements through its declarations to ETSI.

114.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

115.    InterDigital further intimated that manufacturers such as Nokia needed to pay licensee fees for these patents, even though current 3G technology does not infringe them.

116.    InterDigital's declarations were willful and in bad faith.

117.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia's products.

118.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

119.    Nokia is further entitled to the relief requested herein.

**COUNT X.**
**Commercial Disparagement**
**(Pennsylvania)**

120.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 119, as if set forth in full.

121.    InterDigital published false statements through its declarations to ETSI.

122.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

123.    InterDigital further intimated that manufacturers such as Nokia needed to pay license fees for these patents, even though current 3G technology does not infringe them.

124.    InterDigital's declarations were willful and in bad faith.

125.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia products.

126.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

127.    Nokia is further entitled to the relief requested herein.

**COUNT XI.**
**Business Disparagement**
**(Texas)**

128.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 127, as if set forth in full.

129.    InterDigital published false statements through its declarations to ETSI.

130.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

131.    InterDigital further intimated that manufacturers such as Nokia needed to pay license fees for these patents, even though current 3G technology does not infringe them.

132.    InterDigital's declarations were willful and in bad faith.

133.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia's products.

134.    Upon information and belief, ~~InterDigital has made these false statements in bad faith and with knowledge of their falsity~~Nokia has suffered lost business expected from persons who are aware of InterDigital's statements.

135.    InterDigital's declarations have caused and threaten to continue to case actual injuries to Nokia.

136.    Nokia is further entitled to the relief requested herein.

**COUNT XII.**
**Unjust Enrichment**
**(Delaware)**

137.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 136, as if set forth in full.

138.    InterDigital received an unjust enrichment of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

139.    Nokia has lost money due to InterDigital's wrongful conduct.

140.    InterDigital's false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith, and caused both InterDigital's unjust enrichment and Nokia's loss.

141.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

142.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

143.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

144.    Nokia is further entitled to the relief requested herein.

**COUNT XII.**
**Unjust Enrichment**
**(Pennsylvania)**

145.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 144, as if set forth in full.

146.    InterDigital received an unjust benefit of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

147.    InterDigital appreciated its unjust benefit as the false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith.

148.    InterDigital accepted and retained its unjust benefit at the expense of Nokia and others and therefore it would be inequitable not to return its benefit.

149.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

150.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

151.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

152.    Nokia is further entitled to the relief requested herein.

**COUNT XIV.**
**Unjust Enrichment**
**(Texas)**

153.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 152, as if set forth in full.

154.    InterDigital received an unjust enrichment of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

155.    InterDigital's false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith.

156.    InterDigital accepted and retained its unjust benefit at the expense of Nokia and others and therefore it would be inequitable not to return its benefit.

157.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

158.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

159.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

160.    Nokia is further entitled to the relief requested herein.

**JURY DEMAND**

Nokia demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that the Court enter judgment:

(a) ~~That Nokia does not infringe the '747 patent, the '949 patent, the '768 patent, the '778 patent, the '572 patent, the '792 patent, the '010 patent, the '914 patent, the '990 patent, the '879 patent, the '403 patent, the '062 patent, the '852 patent, the '373 patent, the '688 patent, the '004 patent, the '643 patent, or the '286 patent;~~Declaring the extent to which any of the patents set forth in Attachment A actually meet the definition of "essential" under the ETSI IPR policy;

(b) ~~That the '747 patent, the '949 patent, the '778 patent, the '792 patent, the '572 patent and the '010 patent are invalid;~~Declaring the extent to which any of the patents in Attachment A are necessarily infringed by compliance of a product with a 3G standard actually commercially implemented anywhere in the world;

(c) Declaring the extent to which any of the patents in Attachment A have valid, enforceable claims which necessarily read on any product compliant with the any 3G standard, including but not necessarily limited to Nokia products made, used, sold, offered for sale or imported in the United States;

(d) Declaring that no Nokia 3G compliant product infringes any valid, enforceable claim of any of the patents in Attachment A (or any such other United States patent as InterDigital may refuse to concede is not infringed by Nokia);

(e) ~~(c)~~That InterDigital's statements concerning the scope and validity of its 3G patents are false ~~and misleading, in violation of § 43(a) of the Lanham Act;~~or misleading;

(f) Enjoining InterDigital from continued dissemination of these false and misleading statements;

(g)    Requiring InterDigital to take all necessary steps to have its false and misleading statements withdrawn from ETSI's website;

(h)    (d) Awarding Nokia damages in an amount to be determined at trial for Nokia's losses;

(i)    Awarding Nokia treble damages pursuant to 6 Del. Code § 2533(c);

(j)    Awarding Nokia punitive damages;

(k)    Requiring InterDigital's disgorgement of its unjust enrichment;

(l)    (e) Granting Nokia its attorneys' fees and costs pursuant to 6 Del. Code § 2533(b) and all other applicable bases for awarding fees and costs; and

(m)    (f) Granting such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/
_____
~~Jack~~JACK B. ~~Blumenfeld~~BLUMENFELD (#1014)
~~Julia Heaney~~JULIA HEANEY (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for NOKIA CORPORATION and
NOKIA, INC.

~~Of Counsel:~~
OF COUNSEL:

ALSTON & BIRD LLP

~~Peter Kontio~~
Patrick ~~J.~~ Flinn
~~Gardner S. Culpepper~~
~~Keith E. Broyles~~
Randall Allen
Lance Lawson
1201 West Peachtree Street
Atlanta, GA  30309~~-3424~~
(404 ~~)~~881-7000
~~Georgia Bar No. 4280~~
~~January 12, 2005~~
January 9, 2007

550110

- 59 -

<u>CERTIFICATE OF SERVICE</u>

I, Julia Heaney, hereby certify that on January 9, 2007 I electronically filed the foregoing

with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the

following:

>Richard L. Horwitz
>Potter Anderson & Corroon LLP

I also certify that copies were caused to be served on January 9, 2007 upon the following

in the manner indicated:

>#### BY HAND AND E-MAIL
>
>Richard L. Horwitz
>Potter Anderson & Corroon LLP
>1313 N. Market Street
>Wilmington, DE  19801
>rhorwitz@potteranderson.com
>
>#### BY E-MAIL
>
>Dan D. Davison
>Fulbright & Jaworski LLP
>2200 Ross Avenue
>Suite 2800
>Dallas, TX 75201-2784
>ddavidson@fulbright.com

>*/s/ Julia Heaney*
>
>_____
>
>Julia Heaney (#3052)

<u>CERTIFICATE OF SERVICE</u>

I, Julia Heaney, hereby certify that on January 24, 2007 I electronically filed the

foregoing with the Clerk of the Court using CM/ECF, which will send notification of such

filing(s) to the following:

> Richard L. Horwitz
> Potter Anderson & Corroon LLP

I also certify that copies were caused to be served on January 24, 2007 upon the

following in the manner indicated:

> <u>BY HAND AND E-MAIL</u>
>
> Richard L. Horwitz
> Potter Anderson & Corroon LLP
> 1313 N. Market Street
> Wilmington, DE 19801
> rhorwitz@potteranderson.com
>
> <u>BY E-MAIL</u>
>
> Dan D. Davison
> Fulbright & Jaworski LLP
> 2200 Ross Avenue
> Suite 2800
> Dallas, TX 75201-2784
> ddavidson@fulbright.com

> */s/ Julia Heaney*
> _____
> Julia Heaney (#3052)