IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NOKIA CORPORATION and NOKIA INC., <br><br> Plaintiffs, <br><br> v. <br><br> INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION, <br><br> Defendants. | Civil Action No. 05-16-JJF <br><br> **DEMAND FOR JURY TRIAL** <br><br> **PUBLIC VERSION** |

## FIRST AMENDED COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (collectively "Nokia") file this First Amended Complaint ("Complaint") against Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively "InterDigital") and in support of this Complaint allege:

### Nature and Basis of Action

1.     This is an action for violations of the Lanham Act (15 U.S.C. §1051 et seq.), common law unfair competition, intentional interference with business relationships or opportunities, injurious falsehood, and commercial or business disparagement, and for violations of the laws of the States of Delaware, Pennsylvania, and Texas.  Nokia seeks damages, declaratory and injunctive relief, and disgorgement of unjust enrichment for InterDigital's unlawful conduct.

### The Parties

2.     Nokia Corporation is a global leader in the design, manufacture, and supply of wireless (or "mobile") telephone equipment, including handset and infrastructure products.

3.      Nokia is also a global leader in the design and development of interoperability standards that are central to the functioning of mobile telephony equipment and the economic success of the wireless industry.

4.      Nokia Corporation is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland.

5.      Nokia Inc. is incorporated under the laws of the state of Delaware and has a principal place of business at 6000 Connection Dr., Irving, Texas.

6.      InterDigital Communications Corporation is incorporated under the laws of the State of Pennsylvania and has its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania.

7.      InterDigital Technology Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 300 Delaware Avenue, Suite 527, Wilmington, Delaware.

8.      Upon information and belief, InterDigital Technology Corporation is a wholly owned subsidiary of InterDigital Communications Corporation.

**Jurisdiction and Venue**

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 based on federal question jurisdiction, and has supplemental jurisdiction over all other claims based on 28 U.S.C. § 1367.

10.      This Court has personal jurisdiction over InterDigital Communications Corporation and InterDigital Technology Corporation pursuant to the laws of the State of Delaware, including the Delaware long-arm statute, 10 Del. Code § 3104.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**Facts Giving Rise to this Action**

12.     Wireless telephone handset and infrastructure equipment complies with industry standards that ensure that products produced by different companies can interoperate.  The so-called first generation of wireless telephony used analog radio signals to convey messages between wireless handsets and base stations connected to the public switched telephone network.  These base stations received and transmitted radio signals to handsets in small areas called "cells," and as a mobile user left one cell and entered another, the call would be transferred to next cell.

13.     The capacity of the first generation system was soon limited, however, because only one user could use a frequency channel at a time in any given cell.  A second generation of mobile telephone technology was developed to address this problem.  More users could share the same frequency – thereby increasing the capacity of each cell – if the voice communications were digitized.  This Second Generation (or "2G") technology used two basic methods to allow multiple users to share the same frequency.  The first used time division (called "Time Division Multiple Access," or "TDMA") as the method of sharing the frequency.  The 2G standard developed in Europe, of which Nokia is a pioneer, is called GSM.  The second method was to spread the digitized signals across a wider bandwidth, giving each user a unique "spreading code" that allowed each separate call to be distinguished by the receiving station.  This method is called Code Division Multiple Access (CDMA), and was specified in the United States by a standard called IS-95.

14.     GSM and IS-95 remain the two principal competing 2G standards implemented worldwide.  Both have continued to evolve to allow the transmission of data as well as voice communications, and the more efficient transmission of data in "packets."  These improvements

and other aspects of the two technologies make them different in other ways besides the method of sharing radio frequencies. The networks between the transmission towers and the public switched telephone network are incompatible between GSM and IS-95.

15.    A third generation ("3G") of wireless telephony has been defined to succeed both IS-95 and GSM. This third generation will use more bandwidth to transmit data, and is intended to transmit information at substantially higher rates than 2G technology, such as video and internet content. The 3G successor to IS-95 is called CDMA 2000, and the 3G successor to GSM is called UMTS (Universal Mobile Telephone Service).

16.    The transition from GSM to UMTS will allow much of the existing GSM network infrastructure to be compatible with UMTS. The method of sharing frequencies is different in UMTS than GSM, however, as UMTS has adopted code division as the method of multiple access. CDMA 2000 also uses code division, and will be backward compatible with IS-95, but the remainder of its network will remain incompatible with GMS and UMTS.

17.    These technologies are made possible by the cooperation of the manufacturers of the equipment used for wireless telephony and the carriers who sell the service to customers. Only if the parties agree on, and specify, the standards for implementing the technology can multiple manufacturers compete to make the telephone handsets and network equipment for carriers.

18.    In the process of specifying standards, the participants may have intellectual property rights ("IPRs") – including patents and published patent applications – where as a technical matter the standard cannot be implemented without infringing the patent (or the patent that would issue if an application were granted). Standards bodies have developed policies

requiring parties to timely identify such IPRs, and with respect to the licensing of identified patents, as a condition of allowing participation in the standards-setting process.

19.    As mentioned above, Nokia was a pioneer in the development of GSM and likewise was a key inventor in much of what has been defined to be the 3G UMTS standard. Nokia holds many patents covering this technology – as do other manufacturers – and has followed the policies specified regarding identifying and licensing patents called for by the applicable standards bodies.

20.    InterDigital's only real business is coercing patent license payments from the wireless telephone industry.  Nonetheless, it has become a member of wireless telephony standards organizations.  It does so in order to claim that it, too, has patents essential to the practice of the standards and it has been particularly active in claiming that it has patents essential to the practice of the UMTS standard.  By claiming that it has essential patents, it insists that all manufacturers of systems that comply with the standards must pay it patent license fees.

21.    InterDigital makes no tangible products, however, and it has in fact invented nothing of value that would merit the license fees it has been demanding from Nokia and others in the industry.  Accordingly, it has had to develop, implement and maintain a scheme to mislead manufacturers and others in the industry into believing, falsely, that its patent portfolio is essential, valuable, and validly covers standards such as UMTS.

*InterDigital's False Statements Regarding Second Generation Technology*

22.    InterDigital began alleging in the early 1990s that it had numerous patents essential to 2G mobile phone standards.  InterDigital has in the past asserted certain of its 2G patents in court against OKI America, Inc., Qualcomm, Inc., Motorola, Inc., and Ericsson, Inc.

23.    The court in the Motorola case determined that all of the asserted patents in those cases were either invalid or not infringed by mobile handset and infrastructure products used in the United States.

24.    In none of these disputes did a court rule that any of InterDigital's patents were valid and infringed.  Indeed, comparison of the claim limitations of InterDigital 2G patents and their prosecution histories to either the 2G mobile phone standards or any systems in use in the United States shows that none of the claims can be infringed by any of those 2G systems, including those utilized by companies such as Motorola, Ericsson, and Nokia.

25.    InterDigital's purpose in declaring patents to be essential to the 2G standard, and in publicizing its contentions regarding essentiality, was to convey, and did in fact convey, the claim that all manufacturers of 2G compliant systems were required to pay InterDigital patent royalties.

26.    These claims were false, in that InterDigital did not have valid patents that were essential to the practice of the applicable 2G standards.  Accordingly, companies were not legally obligated to pay InterDigital money simply because their products were compliant with the 2G standards.

*InterDigital's False Statements Regarding Third Generation Technology*

27.    More recently, InterDigital has alleged that its patents are essential to3G mobile telephone standards, including UMTS, CDMA 2000, and a standard called TD-SCDMA.

28.    For example, InterDigital has filed declarations claiming at least 195 patents were essential to the practice of the UMTS standard with the European Telecommunications Standards Institute ("ETSI"). InterDigital made these declarations through two filings with ETSI.  The first filing was made in April 2001.  The second filing was made in April 2004.

29.    ETSI is one of the preeminent Standards Setting Organizations ("SSOs") – establishing the wireless standards for one of the largest markets in the world.  Most of the major industry players are accordingly members of ETSI.  ETSI has taken a leadership role amongst SSOs by requiring its members to declare IPRs that are "essential" to UMTS.  ETSI makes these declarations publicly available through a searchable database on its website.

30.    At the time InterDigital made the declarations to ETSI (and currently), the term "ESSENTIAL" with respect to IPRs was a defined term as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

31.    At the time InterDigital made these declarations, it knew that many, if not all, of the IPRs it was declaring to ETSI did not meet this definition of "essential."  Indeed, InterDigital made the deliberate decision to include IPRs that it knew were not technically necessary.  InterDigital has never publicly identified which of the IPRs it declared to ETSI actually meet the ETSI definition of "essential" and which do not.  As a result, ETSI members have been left with the impression that all of InterDigital's declared IPRs are technically essential.

32.    The UMTS Standard has more than four hundred separately numbered provisions, as listed in the "table of contents" in section 5 of ETSI TS 121.101.  For each patent or application that it declared to ETSI, however, InterDigital did not list the particular provision or provisions for which InterDigital contended the declared patent or application was essential.

33.    InterDigital's declarations to ETSI are publicly available through a searchable database on ETSI's website.

34.    In addition, InterDigital has engaged in a campaign of publicity regarding its claim of essentiality in the press and in other ways intended to be disseminated in the communications industry.  InterDigital claims in public statements that it has patents essential to the practice of the UMTS standard, and that it expects to obtain substantial license revenue from all companies who make standards compliant products.  For example, in a press release issued on November 10, 2006, InterDigital claims that it "has built an intellectual property portfolio of more than 7,500 issued patents and patents pending around the world," and boasts of its "active participation in global standards bodies that shape the evolution of the technology and the future of the industry."  InterDigital further claims that its participation in the standards process allowed it to create "a strong portfolio of patented technologies which it licenses to manufacturers of 2G, 2.5G, 3G and 802 products worldwide."

35.    That is, InterDigital does more than just claim that it has essential patents with respect to 3G technologies.  InterDigital claims that its portfolio of patents is sufficiently broad that all manufacturers of 3G products must pay InterDigital substantial fees for the privilege of making standards-compliant products.

36.    These statements, particularly when considered in their totality, are false and misleading in number of respects, including but not necessarily limited to the following:

a.    Participants in the industry, including manufacturers and users of 3G compliant equipment, do not have to pay InterDigital any money, notwithstanding the IPRs claimed in InterDigital's portfolio.  Alternatively, the weakness of the portfolio is such that InterDigital is not entitled to the sums of money it has demanded from the industry for patent license rights it has provided to its portfolio.

b.    The vast majority, if not all, of the IPRs declared by InterDigital to ETSI to be essential to the current implementation of UMTS are not, in fact essential.  A list of such patents is attached hereto as Exhibit A.  In addition, Nokia incorporates by this reference Plaintiffs' Statement Pursuant to Second Discovery Order, served on Defendants December 14, 2006, for a detailed explanation of the falsity of these declarations.

c.    Indeed, InterDigital routinely and knowingly declares patents to be essential to ETSI even though it is well aware that its patents do not meet the definition of "essential" contained in the ETSI IPR policy.

d.    To the extent there are, in fact, any patents in the InterDigital portfolio which meet the definition of "essential," members of the industry do not need to pay InterDigital any money for them.  This is for one or more of the following reasons: (i) the patents are already licensed to most if not all of those in the industry, including Nokia, as part of a package of license rights previously granted for the practice of the IS-95 standard; (ii) the patents are applicable to a specific implementation of the UMTS standard known as Time-Division Duplexing (TDD) ("TDD Patents"), which has not been implemented commercially anywhere in the world with respect to wireless mobile telephones; and/or (iii) the patents cannot be valid and cover the standard at the same time.

e.    Likewise, to the extent there are, in fact, any patents in the InterDigital portfolio which meet the definition of "essential," Nokia does not need to pay InterDigital any money for them for the reasons stated above and for the additional reason that

Nokia has an agreed-upon, fully-paid, irrevocable license to InterDigital's TDD Patents.

f.    In addition, there are no other patents in the InterDigital portfolio that are valid and that are infringed by any Nokia 3G product.

37.    Accordingly, it is false and misleading for InterDigital to say or suggest that the industry as a general matter owes it money, or should pay it money, for the practice of 3G standards, and it is false and misleading for InterDigital to say or suggest that Nokia owes it money, or should pay it money, for the practice of 3G standards.

*InterDigital's Abuse of the Standards Process*

38.    As noted above, InterDigital touts its participation in telecommunications standards bodies as a basis for contending that it has a portfolio of essential patents for which industry manufacturers must pay license fees.  InterDigital has, in fact, grossly abused its membership in standards bodies in order to further its scheme of misleading the industry into paying money for patents for which no money is actually owed.

39.    For example, as alleged above, InterDigital is a member of ETSI, the premier standards body that promulgates the UMTS standard.  That body has promulgated a Policy for declaring IPRs,. That Policy, a true and correct copy of which is attached as Exhibit B and incorporated herein by reference, requires, among other things, good faith implementation by ETSI members.  It further requires the timely disclosure of "essential" patents (as that term is defined in the Policy), and the specification of the particular portion of the standard to which the patent in question is essential.

40.    InterDigital has abused this Policy, deliberately, and in bad faith, in at least the following respects:

a.    *Over-Declaration* – InterDigital has declared IPRs to be essential that are not essential, and which InterDigital knows are not essential, in order to inflate artificially and falsely the perceived value of its portfolio.

b.    *Late Declaration* – InterDigital, aware of the requirement of timely declaration of IPRs, nonetheless withheld IPRs from declaration until 2001, and then between 2001 and 2004, in order to create a "patent ambush" on those in the industry making standards-compliant equipment.

c.    *No Declaration* – InterDigital, again notwithstanding the requirement of timely declaration of IPRs, has, on information and belief, withheld from declaration IPRs since 2004 even though it has evaluated its portfolio since that time and determined that non-declared IPRs meet the criteria it applied for declaring IPRs in 2001 and 2004.  InterDigital is reserving these IPRs, on information and belief, for further use in "ambush" or surprise litigation tactics.

d.    *Deliberately Vague Declaration* – Notwithstanding the requirement, effective before InterDigital's 2004 declarations, that a member specify the portion of the standard to which a declared IPR is essential, InterDigital engaged in a sham intended to limit the ability of the public to evaluate the truth of its essentiality claims.  The declaration form IPR holders were to use when InterDigital made its 2004 declarations contained a column – entitled "Standard No." – for the particular provision of the standard for which a declared IPR is essential.  In its declarations, InterDigital cited only to the Table of Contents for the entire standard, intentionally and deliberately, in order to obfuscate and conceal the lack of actual essentiality of the patents listed.

e.    *Secret Repeal* – InterDigital now claims that it has withdrawn from declaration IPRs that were declared in its 2001 filing with ETSI, but not listed in its 2004 filing.  This, too, is a sham intended to avoid the consequences of its bad faith declaration in 2001.  There is no evidence that InterDigital ever communicated to the public or interested parties that it had withdrawn any of the IPRs declared in 2001, and those declarations appear in the ETSI database in the same form as the 2004 declarations.  InterDigital did not withdraw or update its 2001 declarations. The 2004 declarations did not inform ETSI members that they superseded the 2001 declarations in their entirety.  ETSI's policies do not state, moreover, that subsequent declarations supersede previous ones.  In fact, on October 30, 2006, InterDigital recently rejected its own endorsement of secret repeal by *explicitly* requesting that ETSI remove its essentiality declarations regarding a small number of IPRs.

41.    This bad faith behavior is a part of the broader scheme InterDigital has implemented to mislead the industry into believing (a) that it has a portfolio of essential patents, (b) that the portfolio's scope and value justify the royalties it has been demanding, and (c) that manufacturers should pay it money in order to manufacture standards-compliant technology.

*Injury to Nokia*

42.    The bad faith conduct, false and misleading behavior, and other wrongful acts set forth herein have injured Nokia.  First, the conduct is likely to cause confusion in the marketplace.  To the extent there are false statements in the ETSI declarations – whether made in good faith or not – they should be corrected in order to remove the likely confusion in the marketplace.  Because InterDigital has refused to withdraw or modify the false declarations (and

indeed has declared in proceedings in this Court that all 195 patents are, in fact, essential), an injunction of this Court requiring InterDigital to withdraw all false declarations and engage in corrective advertising is required.

43.     In addition, InterDigital had in fact acted in bad faith in implementing and maintaining this deceptive scheme.  It has obtained unjust profits from this scheme, and should be ordered to disgorge all profits it has obtained from the illicit plan.

44.     Next, this misconduct has caused a direct financial injury to Nokia.

45.     Notwithstanding the ultimate truth or falsity of InterDigital's essentiality declarations, InterDigital is not relieved from its legal and equitable obligations arising from having made these declarations in the first instance.

46.     Nokia accordingly is entitled to the injunctive and declaratory relief requested herein, as well as money damages and the disgorgement of InterDigital's unjust enrichment.

### COUNT I.
### Violation of § 43(a) of the Lanham Act
### (Essentiality Claims)

47.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 46, as if set forth in full.

48.     InterDigital has used false or misleading descriptions or representations in connection with its patent portfolio, the 3G standards (including the UMTS standard, the CDMA 2000 standard, and the TD-SCDMA standard), Nokia's products, the applicability of InterDigital's patents to Nokia's products, and the applicability of InterDigital's patents to 3G wireless standards within the meaning of 15 U.S.C. § 1125(a) (§43(a) of the Lanham Act). These statements are made in connection with goods or services and are used in interstate commerce within the meaning of 15 U.S.C. § 1125(a).

49.    This misconduct of InterDigital has inhibited the development of 3G technology, damaged Nokia's business, and its reputation in the wireless market.

50.    InterDigital has repeatedly stated that its patents are essential to 3G wireless telecommunications standards and are infringed by current manufacture, use, or sale of 3G-compliant products.  InterDigital has further claimed that manufacturers of 3G technology must pay money to InterDigital as a result of the allegedly essential patents.

51.    These statements are false or misleading for the reasons stated above, and because no valid claim of any InterDigital's patent is necessary for manufacturers to make, sell, or import wireless phone standards currently being implemented compliant with the applicable 3G standards.

52.    InterDigital has repeatedly stated that its patents are essential to 3G wireless telecommunications standards and are infringed by Nokia's manufacture, use, or sale of 3G-compliant products.  InterDigital has further claimed that Nokia must pay money to InterDigital as a result of the allegedly essential patents.

53.    These statements are false or misleading for the reasons stated above, and because no valid claim of any InterDigital's patent is necessary for Nokia to make, sell, offer to sell or import wireless phone standards currently being implemented compliant with the applicable 3G standards.

54.    Nokia will prove that no valid claim of any of the patents in the InterDigital portfolio reads on any Nokia product made, used, sold, offered for sale, or imported into the United States, and thus that Nokia owes no money to InterDigital as a result of its purported 3G patent portfolio.  Even if InterDigital has some patents that may have valid claims that are essential to 3G standards, InterDigital's general claims that its patent portfolio contains essential

patents – which were made after InterDigital declared hundreds of U.S. patents and patent applications essential to ETSI – are false or misleading because Nokia will prove that a substantial number, if not all, of those declarations are false.

55.    These false statements are material and, upon information and belief, have caused actual deception and are likely to deceive a substantial portion of the intended audience.

56.    InterDigital's misrepresentations about the scope and validity of its patents and how these patents apply to Nokia's products have caused actual injuries to Nokia in its business and have damaged Nokia's reputation as alleged herein.

57.    InterDigital has made these false statements in bad faith and with knowledge of their falsity.

58.    Nokia is accordingly entitled to the relief requested herein.

**COUNT II.**
**Violation of § 43(a) of the Lanham Act**
**(ETSI Declarations)**

59.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 58, as if set forth in full.

60.    InterDigital declared to ETSI as essential at least 110 US patents and 85 US patent applications that have issued as patents since they were declared by InterDigital to ETSI.

61.    Through these declarations, InterDigital claimed that each of these 195 patents is infringed by UMTS-compliant 3G products.  Whether the patents are, in fact, essential is an objectively verifiable proposition and not a statement of mere opinion or "puffing."

62.    InterDigital's false and misleading declarations are material and, upon information and belief, have caused actual deception or have a tendency to deceive a substantial portion of the intended audience.

63.    InterDigital's misrepresentations through its ETSI declarations about the scope and validity of its patents and how these patents apply to Nokia's products have caused actual injuries to Nokia in its business and have damaged Nokia's reputation.

64.    Nokia will prove that no valid claim of any of the patents in the InterDigital portfolio reads on any Nokia product made, used, sold, offered for sale, or imported into the United States, and thus that Nokia owes no money to InterDigital as a result of its purported 3G patent portfolio.  Even if InterDigital has some patents that may have valid claims that are essential to 3G standards, InterDigital's general claims that its patent portfolio contains essential patents – which were made after InterDigital declared hundreds of U.S. patents and patent applications essential to ETSI – are false or misleading because Nokia will prove that a substantial number, if not all, of those declarations are false.

65.    InterDigital has made these false and misleading statements in bad faith and with knowledge of their falsity.  These statements are made in connection with goods or services and are used in interstate commerce within the meaning of 15 U.S.C. § 1125(a).

66.    Nokia is accordingly entitled to the relief requested herein.

**COUNT III.**
**Violation of Delaware Deceptive Trade Practices Act**
**(6 Del. Code § 2532)**

67.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 66, as if set forth in full.

68.    InterDigital cast a cloud over Nokia's 3G products by creating the false and misleading impression those products contained technology that infringed InterDigital's patents.

69.    InterDigital declared its patents as essential to 3G standards, when they were not.

70.    InterDigital represented that its patents were essential to 3G standards, even though it knew they were not.

71.    InterDigital sowed confusion in the market by leading consumers to believe that Nokia's and other 3G standards-compliant manufacturers' products infringed its patents.

72.    InterDigital created confusion in the industry, in general, and among ETSI members, in particular, by (a) declaring patents to be essential to 3G standards, when it knew that they were not, (b) not withdrawing the 2001 declarations or indicating that the 2004 declarations replaced the 2001 declarations, (c) not providing sufficient information in the declarations to verify essentiality, and (d) indicating that manufacturers should pay money when no money needs to be paid.

73.    InterDigital's actions were willful and in bad faith.

74.    InterDigital's above-described deceptive trade practices have caused and threaten to continue to cause actual injuries to Nokia.

75.    InterDigital's above-described deceptive trade practices were willful and Nokia is entitled to treble damages pursuant to 6 Del. Code § 2533(c).

76.    Nokia is further entitled to the relief requested herein.

## COUNT IV.
### Common Law Unfair Competition
### (Delaware)

77.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 76, as if set forth in full.

78.    Nokia reasonably anticipated obtaining revenue with respect to 3G technology.

79.    InterDigital's actions were willful and in bad faith.

80.     InterDigital's above-described unfair competition has caused and threatens to continue to cause actual injuries to Nokia.

81.     Nokia is further entitled to the relief requested herein.

### COUNT V.
### Common Law Unfair Competition
### (Pennsylvania)

82.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 81, as if set forth in full.

83.     Nokia reasonably anticipated commercial benefits with respect to 3G products.

84.     Additionally, InterDigital's bad faith and affirmative misrepresentations regarding its patent portfolio constitute unfair methods of competition.

85.     InterDigital's above-described acts of unfair competition has caused and threatens to continue to cause actual injuries to Nokia.

86.     Nokia is further entitled to the relief requested herein.

### COUNT VI.
### Intentional Interference with Prospective Business Opportunities
### (Delaware)

87.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 86, as if set forth in full.

88.     Nokia possessed a reasonable probability of a business opportunity with respect to 3G products.

89.     InterDigital's interference was willful and in bad faith.

90.     InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and licensees would have paid additional royalties to Nokia.

91.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

92.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay money for license rights to its patents even though it knew the money was not, in fact, owed.  Nokia is therefore entitled to punitive damages from InterDigital.

93.    Nokia is further entitled to the relief requested herein.

**COUNT VII.**
**Intentional Interference with Prospective Business Relations**
**(Pennsylvania)**

94.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 93, as if set forth in full.

95.    Nokia possessed a reasonable probability of revenues from business relations with respect to 3G technology.

96.    InterDigital intentionally interfered with Nokia's reasonable probability of business relations with the purpose or intent of harming Nokia by preventing the relations from occurring, as InterDigital knew or should have known that its declarations would affect the marketability of Nokia's products and the licensing royalties that Nokia would receive.

97.    There was no privilege or justification for InterDigital's interference as InterDigital used an unfair method of competition.

98.    InterDigital's interference was willful and in bad faith.

99.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and Nokia would have received additional royalties.

100.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

101.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay license fees for its patents even though it knew that such fees were not required. Nokia is therefore entitled to punitive damages from InterDigital.

102.    Nokia is further entitled to the relief requested herein.

## COUNT VIII.
### Intentional Interference with Prospective Business Relations
### (Texas)

103.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 102, as if set forth in full.

104.    Nokia possessed a reasonable probability of revenues from business relations from 3G technology.

105.    InterDigital intentionally and in bad faith interfered with Nokia's reasonable probability of business relations with the a conscious desire to prevent the relations from occurring, or with knowledge that the interference was certain or substantially certain to prevent the relations from occurring, as InterDigital knew or should have known that its declarations would affect the marketability of Nokia's products and the licensing royalties that Nokia would receive.

106.    InterDigital intentionally interfered with Nokia through an independently tortious or unlawful act by the defendant, including through all of the counts set forth herein.

107.    There was no privilege or justification for InterDigital's interference as InterDigital used an unfair method of competition.

108.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and Nokia would have received additional royalties.

109.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

110.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay license fees for its patents even though it knew that such fees were not required.    Nokia is therefore entitled to punitive damages from InterDigital.

111.    Nokia is further entitled to the relief requested herein.

## COUNT IX.
### Injurious Falsehood
### (Delaware)

112.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 111, as if set forth in full.

113.    InterDigital published false statements through its declarations to ETSI.

114.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

115.    InterDigital further intimated that manufacturers such as Nokia needed to pay licensee fees for these patents, even though current 3G technology does not infringe them.

116.    InterDigital's declarations were willful and in bad faith.

117.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia's products.

118.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

119.    Nokia is further entitled to the relief requested herein.

## COUNT X.
### Commercial Disparagement
### (Pennsylvania)

120.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 119, as if set forth in full.

121.    InterDigital published false statements through its declarations to ETSI.

122.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

123.    InterDigital further intimated that manufacturers such as Nokia needed to pay license fees for these patents, even though current 3G technology does not infringe them.

124.    InterDigital's declarations were willful and in bad faith.

125.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia products.

126.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

127.    Nokia is further entitled to the relief requested herein.

## COUNT XI.
### Business Disparagement
### (Texas)

128.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 127, as if set forth in full.

129.    InterDigital published false statements through its declarations to ETSI.

130.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

131.    InterDigital further intimated that manufacturers such as Nokia needed to pay license fees for these patents, even though current 3G technology does not infringe them.

132.    InterDigital's declarations were willful and in bad faith.

133.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia's products.

134.    Upon information and belief, Nokia has suffered lost business expected from persons who are aware of InterDigital's statements.

135.    InterDigital's declarations have caused and threaten to continue to case actual injuries to Nokia.

136.    Nokia is further entitled to the relief requested herein.

**COUNT XII.**
**Unjust Enrichment**
**(Delaware)**

137.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 136, as if set forth in full.

138.    InterDigital received an unjust enrichment of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

139.    Nokia has lost money due to InterDigital's wrongful conduct.

140.    InterDigital's false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith, and caused both InterDigital's unjust enrichment and Nokia's loss.

141.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

142.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

143.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

144.    Nokia is further entitled to the relief requested herein.

**COUNT XII.**
**Unjust Enrichment**
**(Pennsylvania)**

145.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 144, as if set forth in full.

146.    InterDigital received an unjust benefit of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

147.    InterDigital appreciated its unjust benefit as the false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith.

148.    InterDigital accepted and retained its unjust benefit at the expense of Nokia and others and therefore it would be inequitable not to return its benefit.

149.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

150.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

151.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

152.    Nokia is further entitled to the relief requested herein.

## COUNT XIV.
## Unjust Enrichment
### (Texas)

153.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 152, as if set forth in full.

154.    InterDigital received an unjust enrichment of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

155.    InterDigital's false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith.

156.    InterDigital accepted and retained its unjust benefit at the expense of Nokia and others and therefore it would be inequitable not to return its benefit.

157.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

158.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

159.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

160.    Nokia is further entitled to the relief requested herein.

## JURY DEMAND

Nokia demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that the Court enter judgment:

(a)    Declaring the extent to which any of the patents set forth in Attachment A actually meet the definition of "essential" under the ETSI IPR policy;

(b)    Declaring the extent to which any of the patents in Attachment A are necessarily infringed by compliance of a product with a 3G standard actually commercially implemented anywhere in the world;

(c)    Declaring the extent to which any of the patents in Attachment A have valid, enforceable claims which necessarily read on any product compliant with the any 3G standard, including but not necessarily limited to Nokia products made, used, sold, offered for sale or imported in the United States;

(d)    Declaring that no Nokia 3G compliant product infringes any valid, enforceable claim of any of the patents in Attachment A (or any such other United States patent as InterDigital may refuse to concede is not infringed by Nokia);

(e)    That InterDigital's statements concerning the scope and validity of its 3G patents are false or misleading;

(f)    Enjoining InterDigital from continued dissemination of these false and misleading statements;

(g)    Requiring InterDigital to take all necessary steps to have its false and misleading statements withdrawn from ETSI's website;

(h)    Awarding Nokia damages in an amount to be determined at trial for Nokia's losses;

(i)    Awarding Nokia treble damages pursuant to 6 Del. Code § 2533(c);

(j)    Awarding Nokia punitive damages;

(k)    Requiring InterDigital's disgorgement of its unjust enrichment;

(l)    Granting Nokia its attorneys' fees and costs pursuant to 6 Del. Code § 2533(b) and all

other applicable bases for awarding fees and costs; and

(m)    Granting such other and further relief as the Court deems just and proper.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney*
_____
JACK B. BLUMENFELD (#1014)
JULIA HEANEY (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for NOKIA CORPORATION and
NOKIA, INC.

OF COUNSEL:

ALSTON & BIRD LLP
Patrick Flinn
Randall Allen
Lance Lawson
1201 West Peachtree Street
Atlanta, GA 30309
(404)881-7000

Original Filing Date:  January 9, 2007
Public Filing Date:  February 9, 2007
550110

<u>CERTIFICATE OF SERVICE</u>

I, Julia Heaney, hereby certify that on February 9, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Richard L. Horwitz
Potter Anderson & Corroon LLP

I also certify that copies were caused to be served on February 9, 2007 upon the following in the manner indicated:

<u>BY HAND AND E-MAIL</u>

Richard L. Horwitz
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE  19801
rhorwitz@potteranderson.com

<u>BY E-MAIL</u>

Dan D. Davison
Fulbright & Jaworski LLP
2200 Ross Avenue
Suite 2800
Dallas, TX 75201-2784
ddavidson@fulbright.com

*/s/ Julia Heaney*

_____
Julia Heaney (#3052)