# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and  )
NOKIA, INC.,  )
  )  C. A. No. 05-16-JJF
    Plaintiffs,  )
  )
    v.  )  **JURY TRIAL DEMANDED**
  )
INTERDIGITAL COMMUNICATIONS  )  **PUBLIC VERSION**
CORPORATION and INTERDIGITAL  )
TECHNOLOGY CORPORATION,  )
  )
    Defendants.  )

## INTERDIGITAL'S ORIGINAL ANSWER TO
## NOKIA'S FIRST AMENDED COMPLAINT
## AND ORIGINAL COUNTERCLAIMS

POTTER ANDERSON & CORROON LLP
Richard L. Horwitz  (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

D. Dudley Oldham
Linda L. Addison
Richard S. Zembek
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Tel:  (713) 651-5151

*Attorneys for Defendants,*
*InterDigital Communications Corporation and*
*InterDigital Technology Corporation*

Dan D. Davison
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Tel:  (214) 855-8000

Dated:  February 21, 2007
Public Version Dated:  March 1, 2007
780493 / 28840

Subject to and without waiving their Motion to Dismiss Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) and 12(h)(3), InterDigital Communications Corporation ("IDCC") and InterDigital Technology Corporation ("ITC") (collectively, "InterDigital") file this Original Answer to Plaintiffs' First Amended Complaint and Original Counterclaim, and for same would respectfully show the Court as follows.

### NATURE AND BASIS OF ACTION

1.      InterDigital admits that this is purportedly an action for violations of the Lanham Act (15 U.S.C. § 1501 *et seq*.), common law unfair competition, intentional interference with business relationships or opportunities, injurious falsehood, and commercial or business disparagement, and for violations of the laws of the states of Delaware, Pennsylvania, and Texas. InterDigital admits that Nokia purports to seek damages, declaratory and injunctive relief, and disgorgement of unjust enrichment. Otherwise, deny.

### THE PARTIES

2.      InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 2.

3.      InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 3.

4.      Admit.

5.      Admit.

6.      Admit.

7.      Admit.

8.      Admit that ITC is a wholly-owned subsidiary of IDCC.

## JURISDICTION AND VENUE

9.      InterDigital admits that this Court has jurisdiction over Nokia's Lanham Act claim pursuant to 28 U.S.C. §§ 1331 and 1338 and has supplemental jurisdiction over Nokia's claims of common law unfair competition, intentional interference with business relationships or opportunities, injurious falsehood, and commercial or business disparagement, and violations of the laws of the States of Delaware, Pennsylvania, and Texas.

10.     Admit.

11.     Admit.

## FACTS PURPORTEDLY GIVING RISE TO THIS ACTION

12.     InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 12.

13.     Admit that a second generation ("2G") of mobile telephone technology was developed to address capacity, one 2G technology used time division (called "Time Division Multiple Access" or "TDMA"), the 2G standard developed in Europe is called GSM, and one 2G technology uses Code Division Multiple Access (CDMA), and was specified in the United States by a standard called IS-95. InterDigital is otherwise without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 13.

14.     Admit that GSM and IS-95 remain the two principal competing 2G standards implemented worldwide. InterDigital is otherwise without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 14.

15.     InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 15.

16.    Admit that cdma2000 also uses code division, and will be backward compatible with IS-95. InterDigital is otherwise without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 16.

17.    InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 17.

18.    Admit that in the process of specifying standards, the participants may have intellectual property rights ("IPRs") – including patents and published patent applications – where as a technical matter the standard cannot be implemented without infringing the patent (or the patent that would issue if an application were granted). Otherwise, InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 18.

19.    InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 19.

20.    Admit that InterDigital has become a member of wireless telephony standards organizations. Otherwise, deny.

21.    Deny.

22.    Admit that ITC has in the past asserted certain of its 2G patents in court against OKI America, Inc., Qualcomm, Inc., Motorola, Inc., and Ericsson, Inc. Otherwise, deny.

23.    Deny.

24.    Admit that in none of these disputes did a court rule that any of ITC's patents were valid and infringed. Otherwise, deny.

25.    Deny.

26.    Deny.

## INTERDIGITAL'S PURPORTED FALSE STATEMENTS REGARDING THIRD GENERATION TECHNOLOGY

27.    Admit that InterDigital has alleged that its patents are essential to 3G mobile telephone standards, including UMTS, CDMA 2000, and TD-SCDMA.

28.    Admit that ITC has filed an IPR Information Statement and Licensing Declaration ("ETSI IPR Statement") that identifies at least 195 patents with the European Telecommunications Standards Institute ("ETSI"). Admit that ITC filed an ETSI IPR Statement in April 2001 and April 2004. Otherwise, deny.

29.    Admit that ETSI is one of the Standards Setting Organizations ("SSOs"). Admit that ETSI requires its members to disclose IPRs that are believed in their opinion to be, are likely to become, or might be Essential, as that term is defined in the ETSI IPR Policy. Admit that ETSI makes the disclosed IPRs publicly available through a searchable database on its website. Otherwise, deny

30.    Admit that at the time ITC made the 2001 and 2004 disclosures to ETSI (and currently), the term "ESSENTIAL" with respect to IPRs was a defined term defined in part as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

Otherwise, deny.

31.    Deny.

4

32.    Admit that section 5 of ETSI TS 121.101 lists separately numbered technical specifications and technical reports. Otherwise, deny.

33.    Admit that the patents ITC disclosed in ITC's ETSI IPR Statements are publicly available through a searchable database on ETSI's website. Otherwise, deny.

34.    Admit that in a press release issued on November 10, 2006, by IDCC states that it "has built an intellectual property portfolio of more than 7,500 issued patents and patents pending around the world," "active participation in global standards bodies that shape the evolution of the technology and the future of the industry," and "a strong portfolio of patented technologies which it licenses to manufacturers of 2G, 2.5G, 3G and 802 products worldwide." Otherwise, deny.

35.    Deny.

36.    Deny.

    a.    InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments regarding "Participants in the industry, including manufacturers and users of 3G compliant equipment." Otherwise, deny.

    b.    Deny. In addition, InterDigital incorporates by reference InterDigital's Statement Pursuant to Second Discovery Order.

    c.    Deny.

    d.    InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments regarding "members of the industry." Otherwise, deny.

e.    Admit that Nokia has an agreed-upon, fully-paid, irrevocable license as to certain of InterDigital Patents for certain applications. Otherwise, deny.

f.    Deny.

37.    InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments regarding "industry as a general matter." Otherwise, deny.

### INTERDIGITAL'S PURPORTED ABUSE OF THE STANDARDS PROCESS

38.    Deny.

39.    Admit that InterDigital is an associate member of ETSI.  Admit that ETSI has promulgated an IPR Policy.  Otherwise, deny.

40.    Deny.

a.    Deny.

b.    Deny.

c.    Deny.

d.    Deny.

e.    Deny.

41.    Deny.

42.    Deny.

43.    Deny.

44.    Deny.

45.    Because of the incomprehensible nature of the averments of Paragraph 45, InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 45.

46.    Deny.

## COUNT I.

### VIOLATION OF § 43(A) OF THE LANHAM ACT
### (ESSENTIALITY CLAIMS)

47.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 46, as if set forth in full.

48.    Deny.

49.    Deny.

50.    Deny.

51.    Deny.

52.    Deny.

53.    Deny.

54.    Deny.

55.    Deny.

56.    Deny.

57.    Deny.

58.    Deny.

## COUNT II.

### VIOLATION OF § 43(A) OF THE LANHAM ACT
### (ETSI DECLARATIONS)

59.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 58, as if set forth in full.

60.    Deny.

61.    Deny.

62.    Deny.

63.    Deny.

7

64.    Deny.

65.    Deny.

66.    Deny.

## COUNT III.

### VIOLATION OF DELAWARE DECEPTIVE TRADE PRACTICES ACT
### (6 DEL. CODE § 2532)

67.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 66, as if set forth in full.

68.    Deny.

69.    Deny.

70.    Deny.

71.    Deny.

72.    Deny.

73.    Deny.

74.    Deny.

75.    Deny.

76.    Deny.

## COUNT IV.

### COMMON LAW UNFAIR COMPETITION
### (DELAWARE)

77.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 76, as if set forth in full.

78.    Deny.

79.    Deny.

80.    Deny.

81.    Deny.

## COUNT V.

### COMMON LAW UNFAIR COMPETITION
### (PENNSYLVANIA)

82.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 81, as if set forth in full.

83.    Deny.

84.    Deny.

85.    Deny.

86.    Deny.

## COUNT VI.

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITIES
### (DELAWARE)

87.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 86, as if set forth in full.

88.    Deny.

89.    Deny.

90.    Deny.

91.    Deny.

92.    Deny.

93.    Deny.

## COUNT VII.

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (PENNSYLVANIA)

94.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 93, as if set forth in full.

95.    Deny.

96.    Deny.

97.    Deny.

98.    Deny.

99.    Deny.

100.    Deny.

101.    Deny.

102.    Deny.

## COUNT VIII.

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS (TEXAS)

103.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 102, as if set forth in full.

104.    Deny.

105.    Deny.

106.    Deny.

107.    Deny.

108.    Deny.

109.    Deny.

110.    Deny.

111.    Deny.

## COUNT IX.

### INJURIOUS FALSEHOOD (DELAWARE)

112.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 111, as if set forth in full.

113.    Deny.

114.    Deny.

10

115.  Deny.

116.  Deny.

117.  Deny.

118.  Deny.

119.  Deny.

## COUNT X.

### COMMERCIAL DISPARAGEMENT
### (PENNSYLVANIA)

120.  InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 119, as if set forth in full.

121.  Deny.

122.  Deny.

123.  Deny.

124.  Deny.

125.  Deny.

126.  Deny.

127.  Deny.

## COUNT XI.

### BUSINESS DISPARAGEMENT
### (TEXAS)

128.  InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 127, as if set forth in full.

129.  Deny.

130.  Deny.

131.  Deny.

132.  Deny.

11

133. Deny.

134. Deny.

135. Deny.

136. Deny.

## COUNT XII.

### UNJUST ENRICHMENT
### (DELAWARE)

137. InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 136, as if set forth in full.

138. Deny.

139. Deny.

140. Deny.

141. Deny.

142. Deny.

143. Deny.

144. Deny.

## COUNT XIII.

### UNJUST ENRICHMENT
### (PENNSYLVANIA)

145. InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 144, as if set forth in full.

146. Deny.

147. Deny.

148. Deny.

149. Deny.

150. Deny.

151.    Deny.

152.    Deny.

## COUNT XIV.

### UNJUST ENRICHMENT
### (TEXAS)

153.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 152, as if set forth in full.

154.    Deny.

155.    Deny.

156.    Deny.

157.    Deny.

158.    Deny.

159.    Deny.

160.    Deny.

## JURY DEMAND

InterDigital demands a trial by jury.

## PRAYER FOR RELIEF

InterDigital denies that Nokia is entitled to the requested relief. Defendants incorporate the Court's Memorandum and Order Granting Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Over the Subject Matter Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3) as to the Declaratory Judgment Claims (Docket Entries Nos. 25 and 26) (the "Court's Order") and Defendants' Motion to Dismiss Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3).

To the extent not expressly admitted above, the factual allegations contained in the Complaint are denied.

## INTERDIGITAL'S DEFENSES
### BACKGROUND

161.    This is a dispute between Plaintiffs Nokia Corporation and Nokia, Inc. (collectively "Nokia"), global leaders in the design, manufacture, and supply of mobile handset and infrastructure products, and Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively "InterDigital"), leading innovators and developers of wireless technology and product platforms for more than 30 years. In 1999, Nokia entered into a Patent License Agreement with InterDigital concerning 2G and 3G digital wireless technologies and a development agreement concerning certain 3G digital wireless technologies.

162.    On January 12, 2005, Nokia filed a Complaint for Declaratory Judgments of Patent Invalidity and Noninfringement and Violations of the Lanham Act Relating to 3G Mobile Phone Technology (hereafter "Complaint"). At the time Nokia filed this lawsuit, Nokia was a licensee of InterDigital's 2G and 3G patented technology. However, InterDigital and Nokia were involved in a pending I.C.C. arbitration initiated by Nokia involving past and future royalty payments due under their Patent License Agreement.

163.    In its Complaint filed in this Court, Nokia originally sought a declaratory judgment that certain claims of InterDigital's patents are invalid and that Nokia does not infringe certain claims of those patents. Nokia also alleged that InterDigital violated Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)). *Id.* at 34-35. On December 21, 2005, the Court dismissed all of Nokia's claims except its Lanham Act claim.

164.    By Order dated March 22, 2006, the Court referred discovery disputes to a Special Master, the Honorable Collins J. Seitz, Jr. Following certain discovery disputes between the parties, on June 12, 2006, the Special Master issued his First Discovery Order requiring Nokia to provide a verified response regarding Paragraph 143 of its Complaint, which alleges that "InterDigital has repeatedly made public statements that its patent portfolio covers the practice of 3G wireless phone systems and the sale of 3G compliant products." Specifically, the Special Master ordered that Nokia:

> [I]dentify separately (a) each public statement that it relies upon for this allegation, (b) the date of the public statement, and (c) the identity of anyone who made the statement. For each public statement, Nokia shall also provide a detailed response why each statement is false.

165.    On June 30, 2006, Nokia served the required verified response, identifying statements that fall into the following four categories:

a.    statements made in filings with the Securities and Exchange Commission;

b.    statements on InterDigital's website and through various news outlets;

c.    statements made to the European Telecommunications Standardization Institute ("ETSI"); and

d.    statements made to Nokia during confidential licensing discussions.

## THE STANDARD SETTING PROCESS AND IPR STATEMENTS

166.    Because (a) Nokia's claims principally concern ETSI and associated intellectual property rights ("IPR") rules and (b) Nokia has fundamentally

mischaracterized these rules, it is necessary to discuss and review the actual wording of same.

167.    3GPP promulgates the UMTS Standard.    3GPP is an association of standard setting organizations.  3GPP includes ETSI as an organizational partner.  *See* www.3gpp.org/About/about.htm.  ETSI is the standard setting organizational partner through which both Nokia and InterDigital, among others, participate in 3GPP.

168.    Participants in the 3GPP standard setting process "should declare, to their organizational Partners, any IPRs which they believe to be essential, or potentially essential, to any work ongoing within 3GPP."  *See* www.3GPP.org/legal/legal.htm. 3GPP does not, however, define "essential" or "potentially essential."  Both Nokia and InterDigital declare to their organizational Partner IPRs that they believe to be essential, or potentially essential, to any work ongoing within 3GPP by submitting to ETSI Information Statements and Licensing Declarations ("ETSI IPR Statement").

169.    In addition to the requirements of 3GPP, ETSI has adopted an Intellectual Property Rights Policy ("ETSI IPR Policy") and a Guide on Intellectual Property Rights ("ETSI IPR Guide").  The ETSI IPR Policy requires ETSI Members to disclose IPRs that they believe are or might be Essential.  Specifically, the ETSI IPR Guide provides that ETSI IPR Statements are merely statements of opinion:

> Members are obliged to disclose IPRs, *which might be essential* and ETSI is obliged to make these disclosures available to Members.  *This disclosure reflects, of course, only an opinion of the Member* and some facts on the IPRs, but the Member is responsible for the content.  *Any further opinion* should be added only with the agreement of the Member or to implement a General Assembly decision.

ETSI IPR Guide at 3.3.3 (emphasis added).

170.    The purpose of the ETSI IPR Policy and Guide is to encourage disclosure of Essential IPRs. As the European Competition Commission explained following closure of investigation of ETSI's IPR Policy: ETSI's recent change to its standard-setting rules "strengthens the requirement for early disclosure of those intellectual property rights (IPRs) which are essential for the implementation of a standard in order to minimise the risk of so-called 'patent ambush' (where a company hides the fact that it owns IPRs essential for a standard)." http://europa.eu/rapid/pressReleasesAction.do?reference=IP/05/1565.    Concerns that ETSI's IPR rules did not sufficiently protect against the risk of "patent ambush" during ETSI standard-setting procedures prompted the Commission's investigation of ETSI's IPR rules. That is, it is under-disclosure – not over-disclosure – that is the concern that the ETSI IPR Policy and Guide seek to address.

171.    Contrary to Nokia's argument █████████████████ ███████████ under the ETSI IPR Policy and ETSI IPR Guide, there is no requirement that an ETSI Member demonstrate any proof of Essentiality. Therefore, a belief that an IPR is or might be Essential is the threshold for the triggering of a disclosure requirement by an ETSI Member. Only the ETSI Member making a disclosure of an IPR can speak to what it believes.

172.    The current version of the ETSI IPR Policy defines IPR as follows:

"**IPR**" shall mean any intellectual property right conferred by statute law including applications therefore other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

173.    The current version of the ETSI IPR Policy defines Essential with two separate limbs as follows:

> "**ESSENTIAL**" [1] as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair use or operate EQUIPMENT of METHODS which comply with a STANDARD without infringing that IPR. [2] For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

174.    Thus, the ETSI definition of Essential includes two limbs. Under the first limb of the ETSI definition of Essential, Essential IPRs include patents that are necessarily infringed by equipment or methods that comply with a Standard when taking into account normal technical practice and the state of the art generally available at the time of standardization. Under the second limb of the ETSI definition of Essential, Essential IPRs also include patents that cover technical solutions for implementing a particular Standard, where all alternative technical solutions of such Standard are also patented.

175.    The definition of Essential is not, however, limited to the current "version" of an ETSI standard or the express requirements of such a standard. The current version of the ETSI definition of Essential is further defined by reference to the defined term STANDARD:

> "**STANDARD**" shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs) (telecommunications series). ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs (telecommunications series) and including drafts of any of the foregoing and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all members, but not including any standards, or parts thereof, not made by ETSI.

176.    Thus, under the ETSI definition, Essential IPRs include patents that satisfy either limb of the definition of the defined term Essential for (a) any adopted standard, (b)

18

options in such standards, (c) amendments to such standards, and (d) drafts of any of the foregoing.

177.    Despite its publication of the ETSI IPR Policy and Guide, ETSI does not establish an internal process that a company should follow in making a determination as to whether it holds Essential IPRs. There are no books that define what internal process a company is to follow in making a determination as to whether it holds Essential IPRs. Nor are there professional or trade organizations that establish a process a company is to follow in making a determination as to whether it holds Essential IPRs.

178.    Prior to 2005, as admitted by Nokia's authorized representative, there was no ETSI prescribed way, nor were there any concrete guidelines, on what information an IPR owner must provide on an ETSI IPR Statement. The lack of such requirements and guidelines resulted in different IPR owners making ETSI IPR Statements in different ways.

179.    Similarly, ███████████████████████████ prior to 2005, there was no ETSI requirement that an ETSI IPR Statement identify to which Standard an Essential IPR relates. Although the ETSI IPR Statement form had a place for stating the Standard number, some IPR owners disclosed this information, while most did not.

180.    Numerous examples of different approaches to providing ETSI IPR Statements may be found in the ETSI IPR Database. By way of examples, Nokia's disclosures have varied over times – sometimes providing and sometimes not providing reference to technical specifications. And, Lucent has not disclosed a single patent in an ETSI IPR Statement. Instead, Lucent has merely informed ETSI that it is likely to have IPRs Essential to UMTS and that it is prepared to license same.

## NOKIA'S IPR STATEMENTS

181.    While complaining about InterDigital's ETSI IPR Statements, Nokia has alleged that it holds hundreds of patents that are Essential to 3G standards, including the UMTS Standard and the cdma2000 Standard (collectively, the "Nokia Declared Essential IPRs").    On the Nokia website, in public presentations to investors, ████████████ ████████████████████ and in ETSI IPR Statements, Nokia has represented and continues to represent that it holds in excess of 300 Essential IPRs for the UMTS Standard (the "Nokia Declared UMTS Essential IPRs") and in excess of 100 Essential IPRs for the cdma2000 Standard ("Nokia's Declared cdma2000 Essential IPRs").

182.    To bolster its claim that it holds more Essential IPR for the UMTS Standard than any other company and to support its royalty demands, Nokia secretly funded an article authored by Drs. David J. Goodman and Robert A. Myers that Nokia promotes as an independent scholarly article (the "Nokia Goodman & Myers Study"). *See* David J. Goodman & Robert A. Myers, 3G Cellular Standards and Patents, IEEE WirelessCom    (June    13,    2005)    available    at http://europe.nokia.com/link?cid=EDITORIAL_6212    (the "Nokia Goodman & Myers Article"). Ironically, even with Nokia's funding and controlling the Nokia Goodman & Myers Study, the Nokia Goodman & Myers Article judged certain patents identified in InterDigital's ETSI IPR Statements to be Essential IPRs. Moreover, the Nokia Goodman & Myers Article demonstrates that InterDigital has one of the highest ratios of patents judged to be essential to disclosed patents among companies that submitted ETSI IPR Statements examined in the Nokia Goodman & Myers Study.

183.    Even with Nokia's funding and controlling the Nokia Goodman & Myers Study, the Nokia Goodman & Myers Article judged over fifty five percent (55%) of the

Nokia Declared UMTS Essential IPRs and over fifty five percent (55%) of the Nokia Declared cdma2000 Essential IPRs to be Non-Essential IPRs (the "Nokia Judged Non-Essential IPRs"). ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████

184.     Nokia intentionally has concealed from standard setting organizations, its investors, the public, ███████████████ the identity of the Nokia Judged Non-Essential IPRs. ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

185.     In addition to the Nokia funded and controlled Goodman & Myers Study,

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

186.     Indeed, Nokia has never requested that ETSI remove a single patent from the ETSI IPR Database – let alone the removal of the Nokia Judged Non-Essential IPRs.

### INTERDIGITAL'S FIRST DEFENSE

187.     InterDigital incorporates by reference Paragraphs 161 through 186.

188.     Nokia has failed to state a claim on which relief may be granted.

### INTERDIGITAL'S SECOND DEFENSE

189.    InterDigital incorporates by reference Paragraphs 161 through 188.

190.    Nokia has waived any claim it may have had.

### INTERDIGITAL'S THIRD DEFENSE

191.    InterDigital incorporates by reference Paragraphs 161 through 190.

192.    Nokia's claims are barred by the equitable doctrine of laches.

### INTERDIGITAL'S FOURTH DEFENSE

193.    InterDigital incorporates by reference Paragraphs 161 through 192.

194.    Nokia's claims are barred by equitable estoppel.

### INTERDIGITAL'S FIFTH DEFENSE

195.    InterDigital incorporates by reference Paragraphs 161 through 194.

196.    Nokia's claims are barred by acquiescence.

### INTERDIGITAL'S SIXTH DEFENSE

197.    InterDigital incorporates by reference Paragraphs 161 through 196.

198.    Nokia's claims are barred in whole and/or in part by the applicable statute

of limitations.

### INTERDIGITAL'S SEVENTH DEFENSE

199.    InterDigital incorporates by reference Paragraphs 161 through 198.

200.    Nokia's claims are barred by the doctrine of unclean hands.

### INTERDIGITAL'S EIGHTH DEFENSE

201.    InterDigital incorporates by reference Paragraphs 161 through 200.

202.    Nokia's claims are barred by the First Amendment.

# I.
## INTERDIGITAL'S ORIGINAL COUNTERCLAIMS

203.    Defendants/Counterplaintiffs InterDigital Communications Corporation ("IDCC") and InterDigital Technology Corporation ("ITC") (collectively "InterDigital") file this Original Counterclaim against Nokia Corporation and Nokia, Inc. (collectively, "Nokia") for violations of Sections 43(a)(1)(A) and 43(a)(1)(B) of the Lanham Act, the laws of the states of Delaware and Pennsylvania, and common law unfair competition, intentional interference with prospective business opportunities, intentional interference with prospective business relations, injurious falsehoods, commercial disparagement, and unjust enrichment.

204.    This counterclaim is filed subject to, and without waiver of the requests for relief set forth in InterDigital's (1) Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration, (2) Motion for Leave to File Motion for Summary Judgment, and (3) Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3).  Specifically, submitting an ETSI Information Statement and Licensing Declaration ("ETSI IPR Statement") is a non-actionable statement of opinion.  In the unlikely event that the Court concludes otherwise, to comply with the Court's Scheduling Order, InterDigital pleads below, in the alternative, a counterclaim under the Lanham Act based in part on Nokia's ETSI IPR Statements and reserves the right to plead additional counterclaims and request additional relief.

### THE PARTIES

205.    InterDigital Communications Corporation is incorporated under the laws of the State of Pennsylvania and has its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania.

23

206. InterDigital Technology Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 300 Delaware Avenue, Suite 527, Wilmington, Delaware.

207. Nokia Corporation is incorporated under the laws of Finland and has a principal place of business at Keilalahdentie 4 Espoo, Finland. Nokia Corporation has previously appeared before the Court for all purposes.

208. Nokia, Inc. is incorporated under the laws of the State of Delaware and has a principal place of business at 6000 Connection Drive, Irving, Texas. Nokia, Inc. has previously appeared before the Court for all purposes.

### JURISDICTION AND VENUE

209. This Court has jurisdiction over InterDigital's counterclaim pursuant to 28 U.S.C. §§ 1331, 1338, 1367; and 28 U.S.C. § 2201 et seq.

210. Venue is proper under 28 U.S.C. § 1391(b) and (c).

211. All parties have previously appeared in this lawsuit, are represented by counsel, and have submitted to the jurisdiction of this Court.

### INTERDIGITAL

212. InterDigital was formed in 1992 by the merger of two companies that, throughout the 1980's, developed, improved, and patented digital wireless systems that provided for the efficient use of the radio spectrum. One predecessor company developed and patented a digital wireless system that utilized Frequency Division Multiple Access, Time Division Multiplexing, and Time Division Multiple Access (an "FD/TDMA System"). The other predecessor company developed and patented a digital wireless system that utilized spread spectrum Code Division Multiple Access ("CDMA").

213.    In the late 1980's and early 1990's, the cellular industry (manufacturers and cellular service providers) cooperated in the development of second generation ("2G") digital wireless system standards – the GSM and US-TDMA FD/TDMA systems and the IS-95 CDMA system – which are widely used today in mobile telephones. Recognizing the unique knowledge and experience of InterDigital's predecessors, the United States standards-setting bodies invited their participation in the development of the US-TDMA and IS-95 2G standards, and adopted in these 2G standards many of their contributions and much of their patented intellectual property.   Similarly, European standards-setting bodies incorporated in the GSM standard much of InterDigital's patented intellectual property.  Because of the pioneering work of its predecessors and the inclusion of InterDigital's patented intellectual property in the 2G standards, InterDigital has, to date, entered into over thirty-five patent license agreements with companies within the cellular industry.

214.    InterDigital's proven ability to conceive of new digital wireless access schemes and to transform these concepts into products has enabled it to become a technology innovator that designs and delivers advanced digital wireless solutions. InterDigital has used this ability successfully under long-term agreements to develop third generation ("3G") digital wireless technology, which includes Universal Mobile Telecommunication Systems ("UMTS") and cdma2000 technology.   Under these 3G agreements, InterDigital develops technology for third parties, owns intellectual property related to that technology, licenses that technology to the third parties, and promotes the use of that technology in 3G applications.

215.    In December 1998, the Third Generation Partnership Project ("3GPP") was formed by various regional standard setting organizations for the purpose of creating a uniform standard for UMTS.  The UMTS Standard includes two modes of operation – Frequency Division Duplex ("FDD") for paired frequency band operation and Time Division Duplex ("TDD") for unpaired frequency band operation.

216.    InterDigital has made numerous contributions to 3GPP, and many of InterDigital's contributions were ultimately adopted as part of the FDD and/or TDD mode UMTS Standard.  In addition, InterDigital has entered numerous development agreements that relate to the FDD and/or TDD mode UMTS Standard.

217.    One such agreement was for the development of a complete TDD technology platform for Nokia – a world leader in wireless infrastructure and terminals and the plaintiff in this lawsuit – for use in Nokia's UMTS equipment.  The agreement involved a multi-year development project of technology components for use in UMTS equipment.  InterDigital successfully designed, developed, and delivered a complete TDD technology platform.  As part of the TDD development project, Nokia audited InterDigital's technology development process and certified InterDigital as one of a handful of technology suppliers to Nokia.

218.    In 2001, InterDigital entered a development agreement with Infineon Technologies, AG, one of the leading semiconductor manufacturers.  Under that agreement, InterDigital developed and provided to Infineon a highly complex software solution referred to in the cellular industry as 3G "access stratum."  Specifically, InterDigital developed layer 2/3 software for use with Infineon's baseband integrated circuits, which power UMTS FDD terminal devices.

219.    In 2004, InterDigital entered into a development agreement with General Dynamics to deliver standards-compliant UMTS modem technology to General Dynamics for incorporation into handheld terminals. The development agreement related to the U.S. military's Mobile User Objective System ("MUOS") program, which is an advanced tactical terrestrial and satellite communications system utilizing 3G commercial cellular technology to provide significantly improved high data rate and assured communications for U.S. warfighters. InterDigital successfully developed a complete terminal unit solution, and InterDigital successfully conducted interoperability testing with Ericsson, which supplied base stations to General Dynamics as part of the MUOS Program.

220.    In 2005, InterDigital entered into a development agreement with Philips Semiconductor, which supplies full semiconductor system solutions for 3G terminal devices. The development agreement relates to the development of a high speed data 3G terminal unit design, which is referred to in the industry as High Speed Packet Data Access ("HSDPA"). The UMTS standard defines HSDPA as a 3G FDD solution, and InterDigital is currently in the process of delivering that solution to Philips.

221.    In 2006, InterDigital entered into a development agreement with SK Telecom, which is the largest mobile phone operator in Korea. SK Telecom currently operates a nationwide UMTS Network. After SK Telecom announced its plans to expand its advanced mobile network across Korea, including building facilities for a broadband wireless Internet technology known as WiBro, SK Telecom approached InterDigital to develop a solution that addresses the need for network interoperability. Specifically, under this agreement InterDigital is in the process of developing a software solution that

will permit SK Telecom's customers to roam seamlessly from SK's UMTS network to SK's recently deployed WiBro wireless network.

222. InterDigital has created a substantial patent portfolio in connection with its performance of the development agreements described above, other development agreements, and through its own investment in the development of wireless technologies. As of December 2005, InterDigital's patent portfolio consisted of 524 United States patents (134 of which issued in 2005), and 1,148 non-United States patents (468 of which issued in 2005). Many of these patents relate to the UMTS Standard and products that comply with this standard.

223. PA Consulting Group ███████████████████████ ███ evaluated many patents disclosed to ETSI. PA Consulting published an extensive report entitled Essential Intellectual Property in 3GPP-FDD (the "3GPP Report"), which is                                    available                                    at http://www.paconsulting.com/services/tech_innovation/wireless/_entry_3gIPR.htm. ███

████████████████████████████████████████████████
███████████
            ████████████████████████████████████
                ████████████████████████████████
                ██████████████████████████
                ████████████████████████████
                ████████████████████████████████
                ██████████████████████████████████
                ████████████████



224.    While InterDigital (a) did not fund or otherwise control the preparation of the PA 3GPP Report and (b) InterDigital disagrees with certain conclusions therein, ▮

225.    ▮

## NOKIA'S WORLDWIDE CAMPAIGN OF ATTACK ON INTERDIGITAL

226.    Nokia's Delaware lawsuit in which this Counterclaim is filed is merely the latest step in Nokia's aggressive, worldwide campaign of attack against InterDigital and its intellectual property rights – a campaign that has dragged InterDigital into courts, arbitrations, and patent proceedings across the United States and abroad.  Nokia originally initiated this campaign because what it once thought to be unthinkable occurred – the triggering of its obligation to pay InterDigital significant royalties on 2G

products under the patent license agreement it voluntarily executed in January 1999 ("PLA").

227.    Under the PLA between InterDigital and Nokia, InterDigital granted to Nokia a worldwide non-exclusive license under defined patents. Those patents included InterDigital's TDMA and CDMA patents, which apply to 2G products such as GSM and US-TDMA-compliant products as well as 3G products such as UMTS and cdma2000-compliant products.

228.    The amount of consideration paid and to be paid by Nokia for this license was divided into two different periods. Period 1 ran through December 2001 and required Nokia to make an irrevocable and non-refundable payment of $31.5 million, which Nokia paid. Period 2 ran from January 2002 to December 2006, and required Nokia to pay royalties at market-defined rates upon the occurrence of InterDigital licensing a contractually-defined "Major Competitor" at royalties paid by this competitor, retroactive to the beginning of Period 2. Under this process, Nokia was treated as a most favored licensee of InterDigital, and, as such, its royalty obligations during Period 2 were to be determined by reference to InterDigital's PLA's patent license agreements with defined Major Competitors, their successors and assigns, and purchasers of the assets that are the subject of the PLA.

229.    One of the defined Major Competitors was Ericsson, Inc. At the time InterDigital and Nokia entered into the PLA in January 1999, InterDigital was engaged in patent litigation with Ericsson. In March 2003, to Nokia's apparent surprise, InterDigital and Ericsson and Sony Ericsson (the successor, assign, and purchaser of Ericsson's handset business) entered into patent license agreements for 2G products at market-based

running royalty rates.  Those licenses triggered Nokia's Period 2 royalty obligations on Nokia's 2G products, which – given Nokia's market share – were very substantial.

230.    The triggering of Nokia's contractual royalty obligations did not result in Nokia's payment of royalties as the parties had agreed and as the PLA required.  Instead, it triggered Nokia's onslaught of legal proceedings against InterDigital.  Nokia's campaign against InterDigital consists of the following adversarial proceedings, all of which Nokia initiated after it refused to pay the Period 2 royalties owed under the PLA:

> a.    An I.C.C. arbitration to vitiate any Period 2 royalty obligations on Nokia's 2G products (the "Arbitration Proceeding");
>
> b.    A revocation proceeding in the United Kingdom seeking to revoke certain of InterDigital's U.K. patents as invalid as well as a declaration that these patents are not Essential to the GSM standard (the "UK1 Action");
>
> c.    A post-judgment, post-settlement intervention in the prior litigation between InterDigital and Ericsson to reinstate certain orders vacated by the district court (resulting in an appeal to the Federal Circuit) (the "Ericsson Action");
>
> d.    Two actions to obtain discovery pursuant to 28 U.S.C. § 1782 (filed against Ericsson and Sony-Ericsson but requiring responses by InterDigital due to indications Nokia intended to use such discovery not just in the U.K. proceeding, as it claimed, but in the arbitration as well);
>
> e.    This lawsuit; and

f.    A second proceeding in the United Kingdom seeking a declaration that certain of InterDigital's U.K. patents are not Essential to the UMTS standard (the "UK2 Action").

Despite Nokia's dominant market position and extensive cash reserves, InterDigital has successfully defended itself against Nokia's meritless campaign.

231.    In June 2005, the Arbitral Tribunal delivered its Final Award in the Arbitration Proceeding.  The Tribunal determined that Nokia's Period 2 obligations had been triggered and established royalty rates that were applicable to Nokia's sales of covered products for the period beginning January 1, 2002, through December 31, 2006.

232.    In August 2005, the Federal Circuit determined that the district court erred as a matter of law and abused its discretion in granting Nokia's motion to intervene in the Ericsson Action for the purpose of seeking reinstatement of the orders previously vacated pursuant to the Ericsson-InterDigital settlement.

233.    In December 2005, a Federal District Court Judge presiding over the enforcement proceeding between InterDigital and Nokia Corporation in the United States District Court for the Southern District of New York confirmed in its entirety the Final Award rendered by the Arbitral Tribunal.  Nokia appealed the December 2005 decision to the Federal Court of Appeals for the Second Circuit.

234.    In April 2006, InterDigital entered into two agreements with Nokia that resolved certain legal proceedings between them.  Specifically, in an Arbitration Settlement Agreement (the "Arbitration Settlement Agreement"), the parties resolved disputes arising out of the June 2005 Arbitration Tribunal Award, including the appeal to the Second Circuit.  Pursuant to a second agreement, Nokia dismissed its claims under

32

the UK1 Action.   Pursuant to the Arbitration Settlement Agreement, Nokia paid InterDigital $253 million.   Under the Arbitration Settlement Agreement, the Nokia License Agreement was terminated.

235.   Because of Nokia's campaign of attack against InterDigital, InterDigital has been forced to file the following against Nokia:

a.   An action in the United States District Court for the Southern District of New York seeking a temporary restraining order and preliminary injunction to prevent Nokia's continued and further violation of contractual restrictions on Nokia's use and disclosure of InterDigital confidential information;

b.   An I.C.C. arbitration to enforce contractual restrictions on Nokia's use and disclosure of InterDigital confidential information;

c.   A proceeding filed in December 2006 in the United Kingdom seeking a declaration that thirty-five of Nokia's European patents registered in the United Kingdom are not Essential to the UMTS standard; and

d.   These counterclaims.

## THE STANDARD SETTING PROCESS AND IPR STATEMENTS

236.   This Court dismissed all of Nokia's original claims except its Lanham Act claim.   Nokia's Lanham Act claim is defective as a matter of law.   *See* InterDigital's Motion for Leave to File Motion for Summary Judgment; InterDigital's Motion to Dismiss Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3).   Nevertheless, Nokia continues to pursue this claim.   Because (a) Nokia's Lanham Act claim principally concerns ETSI and associated intellectual property

rights ("IPR") rules, (b) Nokia has fundamentally mischaracterized these rules, and (c) Nokia's statements related to Essential IPRs is at issue in this case, it is necessary to discuss and review the actual wording of same. (Indeed, as noted above, ETSI IPR Statements are non-actionable statements of opinion.)

237.    ETSI has adopted an Intellectual Property Rights Policy ("ETSI IPR Policy") and a Guide on Intellectual Property Rights ("ETSI IPR Guide"). The ETSI IPR Policy requires ETSI Members to disclose IPRs that they believe are or might be Essential. Specifically, the ETSI IPR Guide provides that ETSI IPR Statements are merely statements of opinion:

> Members are obliged to disclose IPRs, *which might be essential* and ETSI is obliged to make these disclosures available to Members. *This disclosure reflects, of course, only an <u>opinion</u> of the Member* and some facts on the IPRs, but the Member is responsible for the content. *Any further opinion* should be added only with the agreement of the Member or to implement a General Assembly decision.

ETSI IPR Guide at 3.3.3 (emphasis added).

238.    The current version of the ETSI IPR Policy principally defines Essential in the following language:

> **"ESSENTIAL"** [1] as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair use or operate EQUIPMENT of METHODS which comply with a STANDARD without infringing that IPR. [2] For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

> **"IPR"** shall mean any intellectual property right conferred by statute law including applications therefore other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

"**STANDARD**" shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs) (telecommunications series). ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs (telecommunications series) and including drafts of any of the foregoing and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all members, but not including any standards , or parts thereof, not made by ETSI.

### NOKIA'S DISINGENUOUS ATTACKS AGAINST INTERDIGITAL'S ETSI IPR STATEMENTS AND NOKIA'S INTENTIONAL OVER-DECLARATION OF ESSENTIAL IPRs

239.    Nokia has alleged that it holds hundreds of patents that are Essential to 3G standards, including the UMTS Standard and the cdma2000 Standard (collectively, the "Nokia Declared Essential IPRs"). On the Nokia website, in public presentations to investors, ████████████████████████████, and in ETSI IPR Statements, Nokia has represented and continues to represent that it holds in excess of 300 Essential IPRs for the UMTS Standard (the "Nokia Declared UMTS Essential IPRs") and in excess of 100 Essential IPRs for the cdma2000 Standard ("Nokia's Declared cdma2000 Essential IPRs").

240.    To bolster its claim that it holds more Essential IPR for the UMTS Standard than any other company and to support its royalty demands, Nokia secretly funded an article authored by Drs. David J. Goodman and Robert A. Myers that Nokia promotes as an independent scholarly article (the "Nokia Goodman & Myers Study"). *See* David J. Goodman & Robert A. Myers, 3G Cellular Standards and Patents, IEEE WirelessCom    (June    13,    2005)    available    at http://europe.nokia.com/link?cid=EDITORIAL_6212 (the "Nokia Goodman & Myers Article"). The Nokia Goodman & Myers Article fails to disclose the materially relevant fact that the paper was requested, funded, and directed by Nokia, and Nokia fails to

publicly disclose ████████████████████████ that the Nokia Goodman & Myers Article was requested, funded, and directed by Nokia. By failing to disclose that the paper was requested, funded, and directed by Nokia, the Nokia Goodman & Myers Article ignored a basic tenet of scientific publishing and the paper's purported independent academic analysis is in doubt. *See* Martin, Donald L. and De Meyer, Carl, "Patent Counting, a Misleading Index of Patent Value: A Critique of Goodman & Myers and its Uses" (December 4, 2006) available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=949439.

241.    Even with Nokia's funding and controlling the Nokia Goodman & Myers Study, the Nokia Goodman & Myers Article judged over fifty five percent (55%) of the Nokia Declared UMTS Essential IPRs and over fifty five percent (55%) of the Nokia Declared cdma2000 Essential IPRs to be Non-Essential IPRs (the "Nokia Judged Non-Essential IPRs"). ██████████████████████████████

████████████████████████████████████████

████████████████████

242.    Nokia intentionally has concealed from standard setting organizations, its investors, the public, ████████████████████████ ████████████████ that it funded the Nokia Goodman & Myers Study. *See, e.g.,* Ulla James, Nokia IPR Landscape, Nokia Technology Media Briefing (October 3-4, 2006) (relying on Nokia Goodman & Myers Article and failing to disclose Nokia's sponsorship of same) available at http://www.nokia.com/NOKIA_COM_1/Press/Press_Events/Nokia_Technology_Media_Briefing/Ulla_James_03-10-2006.pdf; Tero Ojanperä, Nokia Technology Strategy

(relying on Nokia Goodman & Myers Article and failing to disclose Nokia's sponsorship of same) available at http://www.nokia.com/NOKIA_COM_1/Press/Press_Events/Nokia_Technology_Media_Briefing/Tero_Ojanpera_04-10-2006.pdf. ████████████████████



243.    In addition to the Nokia Goodman & Myers Study, ██████████

244.    Nokia has engaged in a publicity campaign regarding its claim of Essentiality. This publicity has appeared in the press and is intended to be disseminated in the communications industry. Nokia continues falsely to claim in public statements that it has over 300 Essential IPRs that must be licensed to practice the UMTS Standard and over 100 Essential IPRs that must be licensed to practice the cdma2000 Standard. *See, e.g.,* Ulla James, Nokia IPR Landscape, Nokia Technology Media Briefing (October 3-4, 2006).

245.    Nokia makes such false claims and statements in bad faith for the purposes of securing substantial license revenue for its Declared Essential IPRs, including furthering Nokia's demands for royalties ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

246.    Nokia also makes such false claims and statements in bad faith for the purposes of:

    a.    reducing royalties that it otherwise would be required to pay to third parties that hold Essential IPRs, including furthering Nokia's ability to leverage IPRs ████████████████

████████████████████████████

████████████████████

    b.    influencing the business environment, including leveraging IPRs ████████████████████████

████████████████████████

████ ; and

    c.    dominating the standard setting environment, ████████████

████████████████████████

███████████████████████████████████████████

█████████████████████████████████

### NOKIA'S MISUSE OF THE NOKIA GOODMAN & MYERS ARTICLE

247.   Nokia has not merely over-declared Essential IPRs. In addition, and as discussed above, Nokia routinely holds out the Nokia funded and controlled Nokia Goodman & Myers Article as a reliable and independent academic analysis. Nokia uses the article on its website, in its public presentations to investors, in its commercial advertising, ████████████████████████████  Indeed, Nokia routinely holds out the Nokia Goodman & Myers Article as a reliable and "independent" confirmation of its Essential IPR position. Furthermore, in public presentations to its investors, in its commercial advertising, ██████████████████████████████

Nokia asserts that:

a.   a maximum cumulative royalty cap is applicable to Essential IPR for the UMTS Standard;

b.   royalties for Essential IPRs should be distributed based upon the total number of Essential IPRs a company owns; and

c.   the Nokia Goodman & Myers Article is an independent study that

████████████████████████████████████████

████████████████████████████████████████

████████████

248.   Nokia's statements regarding and use of the Nokia Goodman & Myers Article are intentional and in bad faith:

a.   false and misleading descriptions that are likely to cause confusion, cause mistake, and deceive as to the affiliation, connection, or

association of Nokia with such report, including, without limitation, the false impression that such report is in fact a reliable independent report that is in no way affiliated, connected, or associated with Nokia; and

b.   false and misleading descriptions that misrepresent the nature, characteristics, and qualities of Nokia Declared Essential IPRs.

249.   Furthermore, as discussed above, PA Consulting has prepared reports that evaluate Essential IPRs from ETSI IPR Statements. ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

## COUNT I

### VIOLATION OF SECTION 43(A)(1)(A) OF THE LANHAM ACT

250.   To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 203 through 249 of this counterclaim.

251.   In connection with efforts to license Essential IPRs, Nokia has used and continues to use false and misleading descriptions of the Nokia Goodman & Myers Article.

252.   Nokia's false and misleading descriptions have and are likely to cause confusion, cause mistake, and deceive as to the affiliation, connection, or association of Nokia with such report, including, without limitation, the false impression that such report is in fact a reliable independent report that is in no way affiliated, connected, or associated with Nokia.

253.    Nokia has used and continues to use the Nokia Goodman & Myers Article in interstate commerce, including in the State of Delaware and has substantially affected interstate commerce.

254.    Nokia's conduct has damaged InterDigital, including actual damages to InterDigital's business and good will.

255.    Nokia's conduct has caused InterDigital to suffer actual damages. Further, Nokia's conduct was in bad faith and willful, knowing, and intentional such that the imposition of punitive damages in an amount to be determined by the trier of fact is authorized.

## COUNT II

### VIOLATION OF SECTION 43(A)(1)(B) OF THE LANHAM ACT

256.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 203 through 249 of this counterclaim.

257.    In connection with efforts to license Essential IPRs, Nokia has used and continues to use false and misleading descriptions of the Nokia Goodman & Myers Article.

258.    Nokia's false and misleading descriptions misrepresent the nature, characteristics, and qualities of Nokia and InterDigital's Essential IPRs.

259.    Nokia's false and misleading descriptions have been made in bad faith.

260.    Nokia has used and continues to use the Nokia Goodman & Myers Article in interstate commerce, including in the State of Delaware, and has substantially affected interstate commerce.

261.    Nokia's conduct has damaged InterDigital, including actual damages to InterDigital's business and good will.

## COUNT III

### VIOLATION OF SECTION 43(A)(1)(A) OF THE LANHAM ACT

262.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 203 through 249 of this counterclaim.

263.    In connection with efforts to license and leverage Essential IPRs, Nokia has used and continues to use false and misleading descriptions of the Nokia Declared UMTS Essential IPRs.

264.    Nokia's false and misleading descriptions misrepresent the nature, characteristics, and qualities of Nokia Declared UMTS Essential IPRs.

265.    Nokia's false and misleading descriptions have been made in bad faith and with knowledge of their falsity.

266.    Nokia has used and continues to make such false and misleading statements in interstate commerce, including in the State of Delaware, and has substantially affected interstate commerce.

267.    Nokia's conduct has damaged InterDigital, including actual damages to InterDigital's business and good will.

## COUNT IV

### VIOLATION OF DELAWARE DECEPTIVE TRADE PRACTICES ACT (DELAWARE)

268.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

269.    In connection with efforts to license Essential IPRs, Nokia has used and continues to use false and misleading descriptions of the Nokia Goodman & Myers Article and Nokia Declared UMTS Essential IPRs.

270. Nokia's false and misleading descriptions have and are likely to cause confusion or misunderstanding as to the source, affiliation, sponsorship of the Nokia Goodman & Myers Article and quality of Nokia Declared UMTS Essential IPRs. In connection with efforts to license the Essential IPRs, Nokia has used and continues to use the Nokia Goodman & Myers Article to disparage others and falsely describe its Essential IPRs.

271. Nokia's actions were willful and in bad faith.

272. Nokia's above-described unfair competition has caused and continues to cause actual injuries to InterDigital.

273. InterDigital is entitled to the relief requested herein.

## COUNT V

### COMMON LAW UNFAIR COMPETITION
### (DELAWARE)

274. To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

275. InterDigital possessed a reasonable probability of contractual relations with third parties with respect to 3G technology with which Nokia interfered.

276. Nokia's interference was purposeful and intended to harm such relations or prevent such relations from occurring.

277. Nokia had no privilege or justification for its conduct.

278. Nokia's interference has caused and threatens to continue to cause actual injuries to InterDigital.

279. Nokia's interference was knowing and willful and in bad faith as discussed above. InterDigital is therefore entitled to punitive damages from Nokia.

280. InterDigital is further entitled to the relief requested herein.

## COUNT VI

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITIES (DELAWARE)

281.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

282.    InterDigital possessed a reasonable probability of contractual relations with third parties with respect to 3G technology with which Nokia interfered.

283.    Nokia's interference was purposeful and in bad faith and intended to harm such relations or prevent such relations from occurring.

284.    Nokia had no privilege or justification for its conduct.

285.    Nokia's interference has caused and threatens to continue to cause actual injuries to InterDigital.

286.    Nokia's interference was knowing and willful as discussed above. InterDigital is therefore entitled to punitive damages from Nokia.

287.    InterDigital is further entitled to the relief requested herein.

## COUNT VII

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS (PENNSYLVANIA)

288.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

289.    InterDigital possessed a reasonable probability of contractual relations with third parties with respect to 3G technology with which Nokia interfered.

290.    Nokia's interference was purposeful and in bad faith and intended to harm such relations or prevent such relations from occurring.

291.    Nokia had no privilege or justification for its conduct.

292.    Nokia's interference has caused and threatens to continue to cause actual injuries to InterDigital.

293.    Nokia's interference was knowing and willful as discussed above. InterDigital is therefore entitled to punitive damages from Nokia.

294.    InterDigital is further entitled to the relief requested herein.

## COUNT VIII

### INJURIOUS FALSEHOOD
### (DELAWARE)

295.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

296.    Nokia published false statements as discussed above.

297.    Nokia knew that such statements were not true, or acted in reckless disregard of the statements' truth or falsity.

298.    Nokia's statements were willful and in bad faith.

299.    Nokia intended its statements to result in pecuniary harm to InterDigital, or recognized or should have recognized harm would result.

300.    Nokia's interference has caused and threatens to continue to cause actual injuries to Nokia.

301.    InterDigital is further entitled to the relief requested herein.

## COUNT IX

### COMMERCIAL DISPARAGEMENT
### (PENNSYLVANIA)

302.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

303.   Nokia published false statements as discussed above.

304.   Nokia's false statements were willful and in bad faith.

305.   Nokia intended its statements to result in pecuniary harm to InterDigital, or recognized or should have recognized harm would result, as Nokia knew its statements would negatively impact marketability of InterDigital's technology.

306.   Nokia's interference has caused and threatens to continue to cause actual injuries to InterDigital.

## COUNT X

### UNJUST ENRICHMENT
### (DELAWARE)

307.   To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

308.   Nokia received an unjust enrichment of licensing revenues as a result of its false and misleading statements and other conduct described herein.

309.   InterDigital has lost money due to Nokia's wrongful conduct.

310.   Nokia's false and misleading statements and other conduct described herein were purposeful and in bad faith and caused both Nokia's unjust enrichment and InterDigital's loss.

311.   There was no privilege or justification for the false and misleading statements and other conduct described herein as Nokia used an unfair method of competition.

312.   InterDigital suffers the absence of an adequate remedy at law as Nokia has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

313. Nokia's statements and conduct have caused and threaten to continue to cause actual injuries to InterDigital.

314. InterDigital is further entitled to the relief requested herein.

## COUNT XI

### UNJUST ENRICHMENT
### (PENNSYLVANIA)

315. To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

316. Nokia received an unjust enrichment of licensing revenues as a result of its false and misleading statements and other conduct described herein.

317. Nokia appreciated its unjust benefit as the false and misleading statements and other conduct described herein were purposeful and in bad faith.

318. Nokia accepted and retained its unjust benefit at the expense of InterDigital and others and therefore it would be inequitable not to return its benefit.

319. There was no privilege or justification for the false and misleading statements and other conduct described herein as Nokia used an unfair method of competition.

320. InterDigital suffers the absence of an adequate remedy at law as Nokia improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

321. Nokia's statements have caused and threaten to continue to cause actual injuries to InterDigital.

## JURY DEMAND

InterDigital hereby demands a jury on all issues raised in both the Complaint and the Counterclaim in accordance with the Federal Rules of Civil Procedure and the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, InterDigital Communications Corporation and InterDigital Technology Corporation respectfully request that upon final trial a judgment be entered and that the following relief be granted:

1. Plaintiffs' Complaint be dismissed with prejudice;

2. Defendants be awarded their reasonable attorneys' fees and costs;

3. A permanent injunction prohibiting Nokia from continued use of false and misleading statements;

4. InterDigital be awarded treble damages;

5. InterDigital be awarded punitive damages;

6. Nokia be required to disgorge its unjust enrichment; and

7. InterDigital be granted such other and further relief, general and special, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

D. Dudley Oldham
Linda L. Addison
Richard S. Zembek
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Tel: (713) 651-5151

By:  /s/ David E. Moore
     Richard L. Horwitz  (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, Delaware 19801
     Tel: (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

Dan D. Davison
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Tel: (214) 855-8000

*Attorneys for Defendants,
InterDigital Communications Corporation and
InterDigital Technology Corporation*

Dated:  February 21, 2007
Public Version Dated:  March 1, 2007
780493 / 28840

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 1, 2007, the attached document was hand delivered to the following person(s) and was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading:

Jack B. Blumenfeld
Julia Heaney
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347

I hereby certify that on March 1, 2007, I have Electronically Mailed the documents to the following:

Peter Kontio
Patrick J. Flinn
Gardner S. Culpepper
Keith E. Broyles
Randall L. Allen
Lance Lawson
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
pkontio@alston.com
pflinn@alston.com
gculpepper@alston.com
keith.broyles@alston.com
rallen@alston.com
llawson@alston.com

A. William Urquhart
Marshall M. Searcy
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
billurquhart@quinnemanuel.com
marshallsearcy@quinnemanuel.com

By:  /s/ David E. Moore
        Richard L. Horwitz
        David E. Moore
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, Delaware 19899-0951
        (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

713935 / 28840