# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA, INC.   :
                                    :
            Plaintiffs,             :
                                    :
    v.                              :  Civil Action No. 05-16-JJF
                                    :
INTERDIGITAL COMMUNICATIONS         :
CORPORATION and INTERDIGITAL        :
TECHNOLOGY CORPORATION,             :
                                    :
            Defendants.             :

### MEMORANDUM ORDER

Pending before the Court is Plaintiffs Nokia Corporation and Nokia, Inc.'s (collectively, "Nokia") Objections To Special Master's August 20, 2007 Decision. (D.I. 212). Nokia requested that the Special Master grant a temporary stay of discovery regarding two of the patents at issue in their suit against InterDigital Communications, Corp. and InterDigital Technology Corp. (collectively, "InterDigital"). For the reasons discussed, the Court will overrule the Objections filed by Plaintiffs.

Under the First Amended Case Management Order (D.I. 215), issued by the Special Master on July 9, 2007 and entered by this Court on August 29, 2007, Nokia was to submit contentions pursuant to the Special Master's Second Discovery Order (D.I. 71) regarding the 26 patents InterDigital declared to the European Telecommunications Standards Institute ("ETSI") in March 2007, including U.S. Patent Nos. 7,117,004 ("the '004 patent") and 7,1,90,966 ("the '966 patent") by August 10, 2007. On August 10, 2007, Nokia requested a temporary stay of discovery on its

obligations to provide contentions for the '004 patent and the '966 patent because InterDigital had initiated two patent infringement actions on August 7, 2007 on those patents: (1) a complaint with the International Trade Commission under 19 U.S.C. § 1337, *In re Certain 3G Mobile Handsets and Components Thereof*, and (2) a parallel district court action, *InterDigital Communications, LLC v. Nokia Corp.*, C.A. No. 07-489 (D.Del) (collectively, "the infringement actions"). Nokia requested that the Special Master temporarily stay discovery regarding the '004 and '966 patents until the proper forum for addressing common issues in dispute could be resolved.

After receiving letter briefs, the Special Master conducted a telephonic conference on August 20, 2007, and issued an oral ruling denying Nokia's request for a stay, but stayed application of his Order pending review by this Court. Nokia filed its objections to the Special Master's decision with this Court on August 24, 2007. (D.I. 212). By its Objection, Nokia contends that the Special Master erred in denying Nokia's request for a temporary stay of discovery by disregarding the prejudice to Nokia resulting from addressing issues common to this dispute and to the infringement actions. Nokia contends that it will be prejudiced by (1) having to address simultaneously the same issues of essentiality, validity and claim construction on multiple fronts; and (2) the risk that InterDigital will use

2

statements from this case out of context in the infringement actions. (D.I. 219 at 1). Finally, Nokia contends that the stay requested would conserve judicial resources.

Pursuant to Federal Rule of Civil Procedure 53(g), the Court reviews the Special Master's conclusions of law de novo. Fed.R.Civ.P. 53(g)(4). Findings of fact rendered by the Special Master are also reviewed de novo absent the parties' stipulation to the contrary. Fed.R.Civ.P. 53(g)(3). The Special Master's rulings on procedural matters are reviewed under the abuse of discretion standard. Fed.R.Civ.P. 53(g)(5).

When considering the propriety of a stay, the Court evaluates "the possible damage, hardship and inequities to the parties to the lawsuit," and "the relationship of the stay to the fulfillment of judicial objectives of simplification of the issues in question and trial of the case." United Sweetener USA, Inc. v. Nutrasweet Co., 766 F.Supp. 212, 217 (D. Del. 1991). "The proponent of a stay bears the burden of establishing its need." Clinton v. Jones, 520 U.S. 681, 708 (1997). Thus, the moving party "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." Landis v. North America Co., 299 U.S. 248, 255 (1936).

The Court agrees with the Special Master's decision. Nokia has not established that a temporary stay of discovery is

3

necessary to prevent undue hardship or injustice.  See <u>Micron</u>
<u>Tech., Inc. v. Mosel Vitelic</u>, No. Civ. 98-0293-S-LMB, 1999 WL
458168, at *5 (D. Idaho Mar. 31 1999).  At issue in this case is
whether the alleged patents are indeed essential to 3G mobile
telephone technology standards.  Although, as Nokia contends,
determining essentiality of the  patents may implicate issues
synonymous to issues raised in the infringement actions, the
Court agrees with the Special Master that Nokia's Lanham Act
claims are distinct from the claims in the infringement actions,
and therefore any potential overlap does not warrant the
requested stay.  See <u>Micron Tech.</u>, 1999 WL at * 3 (refusing to
grant stay with respect to patent infringement actions raising
"issues that are substantially similar" to patent infringement
claims before the ITC, because "those issues are not the same
issues as required by [28 U.S.C. §1659(a)].").

     Nokia's contentions of prejudice are further undermined by
the Amended Case Management Order, which currently prohibits
discovery relating to validity, enforceability or infringement of
the patents at issue in this case.  Further, InterDigital stated
its intention to comply with the conditions of the Protective
Order during the teleconference with the Special Master.  While
the Order allows another court to order disclosure, any
disclosure of confidential information in the infringement
actions would be by court order, not at InterDigital's impetus.

While minimal prejudice to Nokia would result from the Court's refusal to grant a temporary stay of discovery, InterDigital would be prejudiced were the Court to grant the stay requested, as it is entitled to discovery on the '004 and '966 patents. Further, the Court agrees with the Special Master that granting a stay would not conserve judicial resources, but will instead delay the proceedings, and could result in bifurcated proceedings if the Court were to stay discovery "for two of the patents while the litigation proceeds towards the close of discovery and to trial." (August 20, 2007 Hearing Tr. 22).

Accordingly, the Court will overrule Nokia's objections to the  Special Master's August 20, 2007 Decision.

NOW THEREFORE, IT IS HEREBY ORDERED that Plaintiffs Nokia Corporation and Nokia Inc.'s Objections To Special Master's August 20, 2007 Decision (D.I. 212) are **OVERRULED**.


September 26, 2007                        Joseph J Farnan Jr.
      DATE                        UNITED STATES DISTRICT JUDGE

5

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERDIGITAL COMMUNICATIONS, LLC, <br> a Pennsylvania limited liability company and <br> INTERDIGITAL TECHNOLOGY CORP., <br> a Delaware corporation, <br><br>         Plaintiffs, <br><br>     v. <br><br> NOKIA CORPORATION, <br> a Finnish corporation and <br> NOKIA INC., <br> a Delaware corporation, <br><br>         Defendants. | Civil Action No.: 07-489 SLR <br><br><br> JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

This is an action for patent infringement. Plaintiffs, InterDigital Communications, LLC and InterDigital Technology Corporation (collectively "InterDigital"), through their undersigned counsel, bring this action against Defendants, Nokia Corporation and Nokia Inc. (collectively "the Nokia Defendants"). Pursuant to Federal Rule of Civil Procedure 15(a), Plaintiffs amend the Complaint as a matter of course, no responsive pleading having been yet served. In support of this First Amended Complaint, InterDigital alleges as follows:

## THE PARTIES

1.     Plaintiff, InterDigital Communications, LLC ("InterDigital Communications"), is a Pennsylvania limited liability company, having its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania 19406-1409.

2.      Plaintiff, InterDigital Technology Corporation ("InterDigital Technology"), is a Delaware corporation, having its principal place of business at Hagley Building, Suite 105, 3411 Silverside Road, Concord Plaza, Wilmington, Delaware 19810-4812.

3.      Defendant, Nokia Corporation, is a Finnish corporation, having its principal place of business at Keilalahdentie 2-4, P.O. Box 226, FIN-00045 Espoo, Finland.

4.      Defendant, Nokia Inc., is a Delaware corporation, having its principal place of business at 6000 Connection Drive, Irving, Texas 75039, USA.  Upon information and belief, Nokia Inc. (d/b/a Nokia Mobile Phones) distributes Nokia-branded handsets in the United States.

## JURISDICTION AND VENUE

5.      This is an action for patent infringement arising under the patent laws of the United States.  This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

6.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(c)-(d) and 1400(b).

## FACTUAL BACKGROUND

7.      United States Patent No. 7,117,004 ("the '004 patent"), titled "Method and Subscriber Unit for Performing an Access Procedure," issued on October 3, 2006, to inventors Fatih Ozluturk and Gary Lomp.  InterDigital Technology owns by assignment the entire right, title, and interest in and to the '004 patent.  A true and correct copy of the '004 patent is attached to this Complaint as Exhibit A.

8.      United States Patent No. 7,190,966 ("the '966 patent"), titled "Method and Apparatus for Performing an Access Procedure," issued on March 13, 2007, to inventors Fatih Ozluturk and Gary Lomp.  InterDigital Technology owns by assignment the entire right, title, and interest in and to the '966 patent.  A true and correct copy of the '966 patent is attached to

2

this Complaint as Exhibit B.

9. United States Patent No. 6,973,579 ("the '579 patent"), titled "Generation of User Equipment Identification Specific Scrambling Code for the High Speed Shared Control Channel," issued on December 6, 2005, to inventors Stephen G. Dick, Nader Bolourchi and Sung-Hyuk Shin. InterDigital Technology owns by assignment the entire right, title, and interest in and to the '579 patent. A true and correct copy of the '579 patent is attached to this Complaint as Exhibit C.

## FIRST CAUSE OF ACTION
## INFRINGEMENT OF U.S. PATENT NO. 7,117,004

10. The '004 patent is presumed valid under 28 U.S.C. § 282 and remains enforceable.

11. On information and belief, the Nokia Defendants manufacture, use, import, offer for sale, and/or sell products in the United States that infringe the '004 patent and will continue to do so unless enjoined by this Court.

12. On information and belief, the Nokia Defendants manufacture, use, import, offer to sell, and/or sell in the United States the following Third Generation ("3G") Wideband Code Division Multiple Access ("WCDMA") handset and components thereof that infringe the '004 patent: N75 and N95. The identification of this specific model is not intended to limit the scope of the Complaint, and any remedy should extend to all infringing models.

13. The Nokia Defendants know or should have known of InterDigital's rights in the '004 patent, and their infringement of the '004 patent has been willful and deliberate.

14. The Nokia Defendants' past and continuing infringements of the '004 patent have caused irreparable damage to InterDigital and will continue to do so unless enjoined by this Court.

3

## SECOND CAUSE OF ACTION
## INFRINGEMENT OF U.S. PATENT NO. 7,190,966

15.    The '966 patent is presumed valid under 28 U.S.C. § 282 and remains enforceable.

16.    On information and belief, the Nokia Defendants manufacture, use, import, offer for sale, and/or sell products in the United States that infringe the '966 patent and will continue to do so unless enjoined by this Court.

17.    On information and belief, the Nokia Defendants manufacture, use, import, offer for sale, and/or sell in the United States the following Third Generation ("3G") Wideband Code Division Multiple Access ("WCDMA") handset and components thereof that infringe the '966 patent: N75 and N95. The identification of this specific model is not intended to limit the scope of the Complaint, and any remedy should extend to all infringing models.

18.    The Nokia Defendants know or should have known of InterDigital's rights in the '966 patent, and their infringement of the '966 patent has been willful and deliberate.

19.    The Nokia Defendants' past and continuing infringements of the '966 patent have caused irreparable damage to InterDigital, and will continue to do so unless enjoined by this Court.

## THIRD CAUSE OF ACTION
## INFRINGEMENT OF U.S. PATENT NO. 6,973,579

20.    The '579 patent is presumed valid under 28 U.S.C. § 282 and remains enforceable.

21.    On information and belief, the Nokia Defendants manufacture, use, import, offer for sale, and/or sell products in the United States that infringe the '579 patent and will continue to do so unless enjoined by this Court.

4

22.    On information and belief, the Nokia Defendants manufacture, use, import, offer for sale, and/or sell in the United States the following Third Generation ("3G") Wideband Code Division Multiple Access ("WCDMA") handset and components thereof that infringe the '579 patent: N95. The identification of this specific model is not intended to limit the scope of the Complaint, and any remedy should extend to all infringing models.

23.    The Nokia Defendants know or should have known of InterDigital's rights in the '579 patent, and their infringement of the '579 patent has been willful and deliberate.

24.    The Nokia Defendants' past and continuing infringements of the '579 patent have caused irreparable damage to InterDigital, and will continue to do so unless enjoined by this Court.

## PRAYER FOR RELIEF

25.    WHEREFORE, InterDigital respectfully requests that this Court:

(a)    Find that the Nokia Defendants have infringed one or more claims of the '004 patent, the '966 patent and the '579 patent;

(b)    Find that this is an exceptional case under 35 U.S.C. § 285;

(c)    Permanently enjoin the Nokia Defendants from infringing the '004 patent, the '966 patent and the '579 patent under 35 U.S.C. § 283;

(d)    Award InterDigital an amount to be determined as compensatory damages for the infringement of the '004 patent, the '966 patent and the '579 patent and the costs of the action, as fixed by the Court, under 35 U.S.C. § 284;

(e)    Award InterDigital its costs, including expenses and reasonable attorneys' fees, incurred in bringing and prosecuting this action under 35 U.S.C. § 285;

5

  (f)  Award InterDigital prejudgment and post-judgment interest on all amounts

awarded; and

  (g)  Award InterDigital any further relief that this Court deems just and proper.


**JURY DEMAND**

  26.  InterDigital demands a jury trial as to all issues that are triable by a jury in this

action.


Dated: September 28, 2007     ____/s/ Richard K. Herrmann____
                  Richard K. Herrmann #405
                  Mary B. Matterer #2696
                  MORRIS JAMES LLP
                  500 Delaware Avenue, Suite 1500
                  Wilmington, Delaware 19801
                  (302) 888-6800
                  rherrmann@morrisjames.com

OF COUNSEL:
Patrick J. Coyne
Christopher P. Isaac
Lionel M. Lavenue
Houtan K. Esfahani
Rajeev Gupta
Qingyu Yin
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, DC 20001-4413
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

         Attorneys for Plaintiffs,
         INTERDIGITAL COMMUNICATIONS, LLC
         and INTERDIGITAL TECHNOLOGY CORP.

# EXHIBIT 3

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Paul J. Luckern
Administrative Law Judge

In the Matter of

CERTAIN 3G MOBILE HANDSETS
AND COMPONENTS THEREOF

Investigation No. 337-TA-613

AMENDED COMPLAINT OF INTERDIGITAL COMMUNICATIONS, LLC AND
INTERDIGITAL TECHNOLOGY CORPORATION
UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED

**COMPLAINANTS**

InterDigital Communications, LLC
781 Third Avenue
King of Prussia, Pennsylvania 19406-1409
(610) 878-7800

InterDigital Technology Corporation
Hagley Building, Suite 105
3411 Silverside Road, Concord Plaza
Wilmington, Delaware 19810-4812
(302) 477-2500

**COUNSEL FOR COMPLAINANTS**

Smith R. Brittingham IV
Patrick J. Coyne
Christopher P. Isaac
Lionel M. Lavenue
Houtan K. Esfahani
Elizabeth A. Niemeyer
Rajeev Gupta
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

**RESPONDENTS**

Nokia Corporation
Keilalahdentie 2-4
P.O. Box 226
FIN-00045 Espoo
Finland
358 (0) 7180 08000

Nokia Inc.
6000 Connection Drive
Irving, Texas 75039
USA
(972) 894-5000

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   COMPLAINANT ................................................................................. 2

III.  RESPONDENTS ................................................................................. 3

IV.   THE TECHNOLOGY AND PRODUCTS-AT-ISSUE .................................... 3

V.    THE ASSERTED PATENTS AND NON-TECHNICAL DESCRIPTION OF THE
      INVENTIONS ..................................................................................... 5

   A.   U.S. Patent No. 7,117,004 ............................................................... 5

     1.   Identification of the Patent and Ownership by InterDigital ................. 5

     2.   Non-Technical Description of the Patent ........................................ 6

     3.   Foreign Counterparts to the Patent ............................................... 7

     4.   Licenses............................................................................. 7

   B.   U.S. Patent No. 7,190,966 ............................................................... 7

     1.   Identification of the Patent and Ownership by InterDigital ................. 7

     2.   Non-Technical Description of the Patent ........................................ 8

     3.   Foreign Counterparts to the Patent ............................................... 9

     4.   Licenses............................................................................. 9

   C.   U.S. Patent No. 6,973,579 ............................................................... 10

     1.   Identification of the Patent and Ownership by InterDigital ................. 10

     2.   Non-Technical Description of the Patent ........................................ 10

     3.   Foreign Counterparts to the Patent ............................................... 12

     4.   Licenses............................................................................. 12

VI.   UNLAWFUL AND UNFAIR ACTS OF RESPONDENTS—
      PATENT INFRINGEMENT .................................................................... 12

VII.  SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE ................. 14

VIII. HARMONIZED TARIFF SCHEDULE ITEM NUMBERS ............................ 15

IX.   RELATED LITIGATION ....................................................................... 15

X.    THE DOMESTIC INDUSTRY ............................................................... 18

    A.   Investments in Research and Development, and Engineering................................ 18

    B.   Investments in Licensing ..................................................................................... 19

XI.   RELIEF REQUESTED............................................................................................ 20

## TABLE OF EXHIBITS

| Exhibit | Document |
|---|---|
| 1 | United States Patent No. 7,117,004 |
| 2 | United States Patent No. 7,190,966 |
| 3 | Assignment Documents for the '004 and the '966 Patents |
| 4 | Table Identifying Foreign Counterparts of the '004 and the '966 Patents |
| 5 | CONFIDENTIAL  Identification of Licensees |
| 6 | Claim Charts:  Infringement of '004 Patent by Nokia Handsets |
| 7 | Claim Charts:  Infringement of '966 Patent by Nokia Handsets |
| 8 | CONFIDENTIAL  Test Report Supporting Infringement Claim Charts for Nokia Handsets |
| 9 | Nokia Website Document Supporting Infringement of Asserted Patents by Nokia Handsets |
| 10 | Standards-Related Documents, 3GPP TS 25.211, Supporting Infringement of Asserted Patents by Nokia Handsets |
| 11 | Standards-Related Documents, 3GPP TS 25.213, Supporting Infringement of Asserted Patents by Nokia Handsets |
| 12 | Standards-Related Documents, 3GPP TS 25.301, Supporting Infringement of Asserted Patents by Nokia Handsets |
| 13 | Documents and Photographs of Representative Accused Infringing Nokia Handset Demonstrating Specific Instance of Importation and Sale |
| 14 | CONFIDENTIAL  Identification of InterDigital's Domestic Industry |
| 15 | United States Patent No. 6,973,579 |
| 16 | Assignment Documents for the '579 Patent |
| 17 | Table Identifying Foreign Counterparts of the '579 Patent |
| 18 | Claim Charts:  Infringement of '579 Patent by Nokia Handsets |
| 19 | Standards-Related Documents, ETSI TS 125.212, Supporting Infringement of Asserted Patents by Nokia Handsets |
| 20 | Additional Documents and Photographs Demonstrating Specific Instance of Importation and Sale of Accused Infringing Nokia N95 Handset |
| 21 | Nokia Website Document Supporting Infringement of Asserted Patents by Nokia Handsets |

# TABLE OF APPENDICES

| Appendix | Document |
| --- | --- |
| A | Prosecution History of United States Patent No. 7,117,004 |
| B | Copies of References Cited in the Prosecution History of U.S. Patent No. 7,117,004 |
| C | Prosecution History of United States Patent No. 7,190,966[1] |
| D | Copies of Additional[2] References Cited in the Prosecution History of U.S. Patent No. 7,190,966 |
| E | CONFIDENTIAL Copies of Complainant InterDigital's License Agreements |
| F | Physical Sample of Nokia N75 Handset |
| G | Prosecution History of United States Patent No. 6,973,579 |
| H | Copies of References Cited in the Prosecution History of U.S. Patent No. 6,973,579 |
| I | Physical Sample of Nokia N95 Handset |

[1] Appendix C contains Patent Office records related to the last application in the line of applications leading to issuance of the '966 patent. Since the '966 patent is a continuation of the '004 patent, the Patent Office records related to the earlier applications in the line are contained in Appendix A, which is the prosecution history for the '004 patent.

[2] Because the '966 patent is a continuation of the '004 patent, Appendix D only contains copies of each reference that is cited on the face of the '966 patent or mentioned in its prosecution history, but not in the prosecution history of the '004 patent. The references cited in the prosecution history of the '004 patent are included in Appendix B.

## I.   INTRODUCTION

1.   This Amended Complaint is filed by InterDigital Communications, LLC and InterDigital Technology Corporation (collectively referred to as "InterDigital") under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based on the unlawful importation into the United States, the sale for importation, and the sale within the United States after importation by owners, importers, or consignees of certain 3G mobile handsets and components thereof that infringe any of United States Letters Patent Nos. 7,117,004 ("the '004 patent"), 7,190,966 ("the '966 patent"), and 6,973,579 ("the '579 patent") (sometimes collectively referred to as "the asserted patents").

2.   The respondents are: Nokia Corporation and Nokia Inc. (sometimes collectively referred to as "Nokia").

3.   Certified copies of the '004 and '966 patents were attached to the original Complaint as Exhibits 1 and 2. A certified copy of the '579 patent is attached to this Amended Complaint as Exhibit 15. InterDigital owns all right, title, and interest in each of the asserted patents. The '004 and the '966 patent share the same recorded assignment, a certified copy of which was attached to the original Complaint as Exhibit 3. A copy of the recorded assignment for the '579 patent is attached to this Amended Complaint as Exhibit 16.

4.   An industry as required by 19 U.S.C. § 1337(a)(2) and (3) exists in the United States relating to the technology protected by the asserted patents.

5.   InterDigital seeks, as relief, an exclusion order barring from entry into the United States infringing 3G mobile handsets and components thereof imported by or on behalf of the respondents. InterDigital also seeks, as relief, cease-and-desist orders prohibiting the sale for importation, importation, sale after importation, offer for sale, advertising, testing, the

1

solicitation of sales, and other commercial activity relating to infringing 3G mobile handsets and components thereof.

## II.    COMPLAINANT

6.    Complainant InterDigital Communications, LLC is a Pennsylvania limited liability company with its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania 19406-1409.[3] InterDigital Technology Corporation is a Delaware corporation with its principal place of business at Hagley Building, Suite 105, 3411 Silverside Road, Concord Plaza, Wilmington, Delaware 19810-4812. InterDigital Communications, LLC and InterDigital Technology Corporation are subsidiaries of InterDigital, Inc., a Pennsylvania corporation.

7.    Since 1993, InterDigital has been engaged in the research, development, engineering, and licensing of Code Division Multiple Access ("CDMA") technology in the United States. That work later transitioned into research, development, engineering, and licensing of Wideband CDMA technology ("WCDMA"). WCDMA is one of the wireless technologies often referred to commercially as "3G."

8.    At its King of Prussia, Pennsylvania, and Melville, New York, facilities, among other activities, InterDigital researches, develops, engineers, and licenses technology for 3G mobile handsets. InterDigital also files and prosecutes worldwide patent applications covering its innovative research and development of 3G mobile technology and communications protocols used in connection with that technology.

---

[3] InterDigital Communications, LLC was previously known as InterDigital Communications Corporation, but in connection with an internal corporate reorganization, effective July 3, 2007, InterDigital Communications Corporation (a Pennsylvania corporation) became InterDigital Communications, LLC (a Pennsylvania limited liability company). When referring to historical events, the term "InterDigital" will include the activities of InterDigital Communications Corporation.

9. InterDigital's research, development, and engineering business has developed proprietary technology that is used in most, if not all, 3G WCDMA handsets made throughout the world. InterDigital's technology has been licensed to significant handset manufacturers throughout the world, including, at times in the past, Nokia.

## III.    RESPONDENTS

10. Respondent, Nokia Corporation, is a Finnish corporation, with its principal place of business at Keilalahdentie 2-4, P.O. Box 226, FIN-00045 Nokia Group, Finland. Upon information and belief, Nokia Corporation is involved in the design, development and manufacture of 3G mobile handsets through its Mobile Phones Business Group.

11. Respondent, Nokia Inc., is a Delaware corporation, with its principal place of business at 6000 Connection Drive, Irving, Texas 75039. Upon information and belief, Nokia Inc. (d/b/a Nokia Mobile Phones) distributes Nokia-branded handsets in the United States.

## IV.    THE TECHNOLOGY AND PRODUCTS-AT-ISSUE

12. The technology and products-at-issue concern mobile handsets for use in Third Generation or "3G" systems.

13. The first generation of cellular systems deployed in the United States in the late 1990s was referred to as Advanced Mobile Phone Service, or "AMPS." A variety of entities proposed improvements in that system, leading to "Second Generation" or "2G" systems. Those 2G systems used either Time Division Multiple Access ("TDMA") or Code Division Multiple Access ("CDMA") technology. The drawbacks of these systems spurred further improvements, resulting in so-called "3G" systems that were first deployed in Asia and later in Europe and the United States.

14. The components common to all 3G cellular systems include mobile devices and base stations. A mobile device can be either a portable cellular handset or a cellular PC card

3

used in laptops. Base stations, which include towers, act as the first point of access for the mobile device into the cellular system. To place a call, for example, a mobile device must first establish communication with a base station over a communication channel.

15. In a 3G cellular CDMA system, many mobile devices share the same frequency channel in the system. This sharing of the frequency channel, while enhancing the efficiency of the system, leads to a gradual degradation of the system performance as the number of mobile devices in the system increases because signals transmitted by each mobile device in the system contribute to the overall interference in the system. It is, therefore, important to minimize the power level at which each mobile device transmits, thereby minimizing the overall interference in the system while at the same time providing an acceptable communication quality to users of mobile devices. Controlling the power transmitted from a mobile device is important, for example, when the device first attempts to establish communication with a base station, such as when a user attempts to place a call using the mobile device.

16. In addition to minimizing the power transmitted by a mobile device as it tries to gain access to a cellular system, it is also important for the device to gain access as quickly as possible. Reducing the access time improves the performance of the system as perceived by users when, for example, they attempt to place calls.

17. While cellular mobile devices have primarily been used in the past to place telephone calls, with the growth of the Internet and multimedia applications, support for high speed data applications, such as web browsing and audio and video streaming, in cellular systems has become increasingly important. To meet the rising demand for high speed data applications, some 3G WCDMA systems now support a technology known as High Speed

4

Downlink Packet Access ("HSDPA"). HSDPA uses a variety of encoding and other techniques to make high speed data applications feasible in 3G WCDMA systems.

18. InterDigital's continuing development efforts to improve CDMA cellular systems through development of WCDMA and HSDPA technologies have significantly contributed to the evolution of the 3G systems.

19. The specific products-at-issue in this Investigation are mobile handsets, as well as components thereof, that are capable of operating in 3G cellular systems. Some of the accused WCDMA products also implement HSDPA technology. The mobile handsets at issue operate as cellular mobile telephones, allowing users of the handsets to place and receive telephone calls as well as to run data applications, such as web browsing and audio and video streaming.

## V. THE ASSERTED PATENTS AND NON-TECHNICAL DESCRIPTION OF THE INVENTIONS

20. There are three asserted patents in this Investigation: U.S. Patent No. 7,117,004 ("the '004 patent"), U.S. Patent No. 7,190,966 ("the '966 patent"), and U.S. Patent No. 6,973,579 ("the '579 patent").

### A.    U.S. Patent No. 7,117,004

#### 1.    Identification of the Patent and Ownership by InterDigital

21. The '004 patent, titled "Method and Subscriber Unit for Performing an Access Procedure," issued on October 3, 2006, to inventors Gary Lomp and Fatih Ozluturk. The '004 patent is based on Patent Application Serial No. 10/866,851 filed on June 14, 2004, and claims priority to an application filed on June 27, 1996.

22. The '004 patent has 18 independent claims and 48 dependent claims. Claims 1, 2, 7-10, 14, 15, 21, 22, 24, 30-32, 34, 35, 46, 47, 49, 59, and 60 are being asserted in this Investigation.

23.    InterDigital Technology Corporation owns by assignment the entire right, title, and interest in and to the '004 patent. *See* Exhibit 3 attached to the original Complaint.

24.    A certified copy and three copies of the prosecution history of the '004 patent and four copies of each reference cited on the face of the '004 patent or mentioned in its prosecution history were attached to the original Complaint as Appendices A and B.

2.    Non-Technical Description of the Patent

25.    The '004 patent generally covers improvements to the way a mobile device gains access to a cellular CDMA system. In a CDMA system, the signals transmitted by mobile devices contribute to the overall interference in the system. To minimize interference, it is particularly important that mobile devices transmit at the minimum possible power level necessary to gain access to the system. It is also important for mobile devices to gain access to the system as quickly as possible when, for example, users attempt to place calls.

26.    The improvements of the '004 patent achieve the above and other objectives. When a mobile device attempts to gain access to a cellular CDMA system, the mobile device starts transmitting short probe signals at an initial low power and gradually increases its transmission power until a base station in the system detects one of the short probe signals transmitted by the mobile device. In this fashion, the mobile device "ramps up" its transmission power until the base station hears the mobile device. Transmitting short probe signals while ramping up the power of the signals during the initial attempt to access the system enables the mobile device to gain access to the system in an efficient and rapid manner with minimal contribution to interference in the system.

27.    In contrast to the power ramp up improvements of the '004 patent, prior known approaches employed a series of long signals, which included a message intended to be communicated along with a header. By repeatedly transmitting the entire long message and

6

header, the initial power ramp up procedure introduced substantial unwanted interference into the system, and it took longer for mobile devices to gain access to the system. The additional interference caused poor system performance, including poor connections and failed call attempts. The prior approaches also resulted in longer delays for mobile devices to gain access to the system, further degrading system performance.

### 3.    Foreign Counterparts to the Patent

28.    The '004 patent and its related U.S. applications have a number of foreign counterparts. Those foreign patents and applications, as well as related U.S. applications and patents, are identified in Exhibit 4 attached to the original Complaint.

### 4.    Licenses

29.    Under Commission Rule 210.12(a)(9)(iii), a list of licensed entities was attached to the original Complaint as Confidential Exhibit 5. Under Commission Rule 210.12(c)(1), three copies of the licenses were submitted with the original Complaint as Confidential Appendix E. By a supplement to the original Complaint submitted on August 27, 2007, Confidential Exhibit 5 was revised, and Confidential Appendix E was supplemented with additional documents. A further revised version of Confidential Exhibit 5 that identifies an additional licensee is attached to this Amended Complaint and confidential Appendix E is being further supplemented with additional documents related to the additional license identified in Confidential Exhibit 5.

### B.    U.S. Patent No. 7,190,966

#### 1.    Identification of the Patent and Ownership by InterDigital

30.    The '966 patent, titled "Method and Apparatus for Performing an Access Procedure," issued on March 13, 2007, to inventors Gary Lomp and Fatih Ozluturk. The '966 patent is based on Patent Application Serial No. 11/169,490 filed on June 29, 2005, and claims priority to the same June 27, 1996 application, to which the asserted '004 patent also claims

7

priority. The '996 patent resulted from a continuation of the application that led to the asserted '004 patent.

31.    The '966 patent has 1 independent claim and 11 dependent claims. Claims 1, 3, and 6-12 are being asserted in this Investigation.

32.    InterDigital Technology Corporation owns by assignment the entire right, title, and interest in and to the '966 patent. *See* Exhibit 3 attached to the original Complaint.

33.    The original Complaint was accompanied by a certified copy and three copies of the portion of the prosecution history of the '966 patent that was not included in Appendix A (the prosecution of the '004 patent) and four copies of each reference that was cited on the face of the '966 patent or mentioned in its prosecution history but not already included in Appendix B. *See* Appendices C and D attached to the original Complaint.

2.    Non-Technical Description of the Patent

34.    The '966 patent generally covers improvements to the way a mobile device gains access to a cellular CDMA system. In a CDMA system, the signals transmitted by mobile devices contribute to the overall interference in the system. To minimize interference, it is particularly important that mobile devices transmit at the minimum possible power level necessary to gain access to the system. It is also important for mobile devices to gain access to the system as quickly as possible when, for example, users attempt to place calls.

35.    The improvements of the '966 patent achieve the above and other objectives. When a mobile device attempts to gain access to a cellular CDMA system, the mobile device starts transmitting short signals at an initial low power and gradually increases its transmission power until a base station in the system detects one of the short signals transmitted by the mobile device. After the base station hears the mobile device, the mobile device then transmits to the base station a message that is longer in duration than each of the successively transmitted short

8

signals, indicating to the base station that the mobile device wants to establish communication with the base station. In this fashion, the mobile device "ramps up" its transmission power until the base station hears the mobile device. Transmitting short signals while ramping up the power of the signals during the initial attempt to access the system enables the mobile device to gain access to the system in an efficient and rapid manner with minimal contribution to interference in the system.

36.    In contrast to the power ramp up improvements of the '966 patent, prior known approaches employed a series of long signals, which included a message intended to be communicated along with a header. By repeatedly transmitting the entire long message and header, the initial power ramp up procedure introduced substantial unwanted interference into the system, and it took longer for mobile devices to gain access to the system. The additional interference caused poor system performance, including poor connections and failed call attempts. The prior approaches also resulted in longer delays for mobile devices to gain access to the system, further degrading system performance.

3.    **Foreign Counterparts to the Patent**

37.    The '966 patent and its related U.S. applications have a number of foreign counterparts. Those foreign patents and applications, as well as related U.S. applications and patents, are the same as those identified in connection with the related '004 patent, and are identified in Exhibit 4 attached to the original Complaint.

4.    **Licenses**

38.    Pursuant to Commission Rule 210.12(a)(9)(iii), a list of licensed entities was attached to the original Complaint as Confidential Exhibit 5, and was revised by the supplement to the original Complaint on August 27, 2007. Pursuant to Commission Rule 210.12(c)(1), three copies of the licenses were submitted with the original Complaint as Confidential Appendix E,

9

which was supplemented on August 27, 2007, with three copies of additional documents identified in the August 27, 2007 supplement to the original Complaint. A further revised version of Confidential Exhibit 5 that identifies an additional licensee is attached to this Amended Complaint and confidential Appendix E is being further supplemented with additional documents related to the additional license identified in Confidential Exhibit 5.

### C.    U.S. Patent No. 6,973,579

#### 1.    Identification of the Patent and Ownership by InterDigital

39.    The '579 patent, titled "Generation of User Equipment Identification Specific Scrambling Code for the High Speed Shared Control Channel," issued on December 6, 2005, to inventors Stephen G. Dick, Nader Bolourchi, and Sung-Hyuk Shin. The '579 patent is based on Patent Application Serial No. 10/187,640, filed on July 1, 2002, and claims priority to two provision applications filed on May 7 and May 13, 2002, respectively.

40.    The '579 patent has 5 independent claims and 5 dependent claims. Claims 1, 2, 3, and 4 are being asserted in this investigation.

41.    InterDigital Technology owns by assignment the entire right, title, and interest in and to the '579 patent. *See* Exhibit 16, which is submitted with this Amended Complaint.

42.    This Amended Complaint is accompanied by a certified copy and three copies of the prosecution history of the '579 patent and four copies of each reference cited on the face of the '579 patent or mentioned in its prosecution history. *See* Appendices G and H.

#### 2.    Non-Technical Description of the Patent

43.    The '579 patent generally concerns an improved apparatus for a CDMA system with HSDPA capability. HSDPA capability makes possible high data rate communication, such as video streaming from the base station to the mobile device. The improvement of the '579 patent relates to a high speed control channel that is shared by multiple mobile devices in the

10

system. The system uses this shared high speed control channel to transmit important control information to mobile devices, each of which is identified by a unique user equipment ("UE") identifier in the system. The '579 patent covers the manner in which a mobile device generates a scrambling code using the UE identifier. The mobile device uses the scrambling code to identify, on the shared high speed control channel, control information directed to the mobile device.

44.    During the standardization process for HSDPA, changes were made in the length of the UE identifier. Specifically, the HSDPA standard changed the length of the UE identifier from 10 bits to 16 bits. As a result of this change, a need arose for a way to generate a scrambling code using the 16 bit UE identifier that would be consistent with other requirements of the standard.

45.    The applicable standards-setting organization solicited from participants, including InterDigital, Siemens, and others, proposed technical solutions that would enable scrambling of the high speed shared channel, carrying control information for multiple users, with the 16 bit UE identifier. InterDigital participated in the standardization process and proposed a solution to this technical problem.

46.    InterDigital's solution, which is disclosed in the '579 patent, involves the use of a half-rate convolutional encoder to generate a scrambling code for the high speed shared control channel from the UE identifier. This solution advantageously reduces false detection of control information over the high speed shared control channel by mobile devices other than the intended mobile device.

47.    After reviewing the various proposals and evaluating the technical merits of each, InterDigital's proposed solution was adopted by the standards-setting organization.

11

### 3. Foreign Counterparts to the Patent

48. The '579 patent and its related U.S. applications have a number of foreign counterparts. Those foreign patents and applications, as well as related U.S. applications and patents, are identified in Exhibit 17.

### 4. Licenses

49. Pursuant to Commission Rule 210.12(a)(9)(iii), a list of licensed entities is attached to this amended complaint as Supplemental Revised Confidential Exhibit 5. Pursuant to Commission Rule 210.12(c)(1), three copies of the licenses have been or are being submitted with this amended complaint as Confidential Appendix E.

## VI. UNLAWFUL AND UNFAIR ACTS OF RESPONDENTS— PATENT INFRINGEMENT

50. The accused products are cellular telephone handsets capable of operating within a 3G system. Certain accused products are also capable of using HSDPA technology.

51. Generally, any of respondents' handsets capable of operating in a 3G WCDMA system are accused of infringing claims 1, 2, 7-10, 14, 15, 21, 22, 24, 30-32, 34, 35, 46, 47, 49, 59, and 60 of the '004 patent, and claims 1, 3, and 6-12 of the '966 patent.

52. Additionally, any of respondents' handsets capable of operating pursuant to the HSDPA standard are further accused of infringing claims 1-4 of the '579 patent.

53. In order to confirm that the accused products operate in the manner covered by the asserted patents, InterDigital has tested a selected accused product using analytical techniques that are generally accepted in the industry. The results of those analyses support the infringement allegations set forth in the claim charts accompanying the original Complaint.

54. On information and belief, some of the accused products support HSDPA features set forth in relevant 3G standards, and operate in the manner covered by the '579 patent. A

12

claim chart accompanying this Amended Complaint sets forth the analysis of infringement by one of the accused products of the '579 patent, based on information and belief and the relevant 3G standards.

55.    On information and belief, the respondents collectively manufacture, import, and sell in the United States after importation 3G mobile handsets that infringe one or more of the asserted patents. On information and belief, certain Nokia handsets can operate in a 3G WCDMA system, and some can also use HSDPA techniques. For example, at least the Nokia N75 and N95 (also known as the N95-3 in the United States) handsets infringe one or more of the asserted patents. The identification of specific models is not intended to limit the scope of the Investigation, and any remedy should extend to all infringing models.

56.    A chart that applies representative claim 1 of the '004 patent to the accused Nokia N75 handset was attached to the original Complaint as Exhibit 6.

57.    A chart that applies representative claim 1 of the '966 patent to the accused Nokia N75 handset was attached to the original Complaint as Exhibit 7.

58.    A chart that applies representative claim 1 of the '579 patent to the accused Nokia N95 handset is attached to this Amended Complaint as Exhibit 18.

59.    To the extent any of the asserted claims require products sold by the respondents to be operated in a 3G WCDMA/HSDPA system in order to satisfy all claim elements, on information and belief, the accused products infringe both directly and indirectly.

60.    On information and belief, the respondents test or operate the accused products in the United States by using them in a 3G WCDMA/HSDPA system and performing the claimed methods, thereby directly infringing any claim requiring such operation.

13

61.   Respondents have had notice of the asserted patents since before the filing of the original Complaint or, at a minimum, had notice of the '004 and '966 patents upon the filing of the original Complaint and will receive notice of the '579 patent upon the filing of this amended complaint.

62.   The accused products listed above are specifically designed to be used in a 3G WCDMA system. Moreover, some products designed to be used in a 3G WCDMA system are also configured to comply with the HSDPA standards. When the accused products are operated in a WCDMA/HSDPA system, they have no substantial non-infringing use.

63.   Respondents induce infringement of the asserted claims by advertising their products as complying with the 3G WCDMA and HSDPA standards and being capable of operating according to those standards, by publishing manuals and promotional literature describing the operation of the accused devices in an infringing manner according to the 3G WCDMA and HSDPA standards, and by offering support and technical assistance to their customers that encourage use of the accused products in ways that infringe the asserted claims.

VII.   SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

64.   On or around May 4, 2007, representatives for InterDigital purchased several imported Nokia handsets in the United States. Exhibit 13 is a copy of a receipt for the purchase of a Nokia N75 handset, and a series of photographs of the handset and the box in which the handset was delivered. The label on the box bears a Nokia logo. The label on the inside of the handset states that the handset was made in Finland. A physical sample of the Nokia N75 handset (that was purchased as described above) was submitted with the original Complaint as Appendix F.

65.   On September 27, 2007, representatives for InterDigital purchased several imported Nokia N95 handsets in the United States. Exhibit 20 is a copy of a receipt for the purchase of a

14

Nokia N95 handset, and a series of photographs of the handset and the box in which the handset was packaged. The label on the box bears a Nokia logo. The label on the inside of the handset states that the handset was made in Finland. A physical sample of the Nokia N95 handset (that was purchased as described above) is submitted with this Amended Complaint as Appendix I.

## VIII. HARMONIZED TARIFF SCHEDULE ITEM NUMBERS

66. On information and belief, the Harmonized Tariff Schedule of the United States item numbers under which the infringing Nokia handsets or components thereof may be imported into the United States may be at least HTSUS 8525 and subsections thereof (including 8525.20.05, 8525.20.30, and 8525.20.90), 8527.90.40, 8527.90.95, and 8529 and subsections thereof.

## IX. RELATED LITIGATION

67. There has been no court or agency litigation, domestic or foreign, involving the specific unfair acts asserted in this Complaint.

68. Nokia filed a suit in 2005 against InterDigital Communications Corporation and InterDigital Technology Corporation in the U.S. District Court for the District of Delaware seeking a declaratory judgment that a number of InterDigital patents relating to cellular telephone technology were invalid or not infringed. None of the asserted patents was the subject of any declaratory judgment request, and that declaratory judgment claim was dismissed by the Court. The complaint also claimed that certain of InterDigital's statements that certain of InterDigital's patents are essential to the 3G standard violated the Lanham Act. *See Nokia Corp. v. InterDigital Communications Corp.,* Civ. Action No. 05-16 (D. Del. 2005). Nokia later identified specific InterDigital patents, including the '579 patent but not the '004 or '966 patents, and alleges such patents are not essential to the 3G standard. Pursuant to a First Amended Case Management Order issued on July 9, 2007, by the Special Master in that case and adopted by the

15

Court on August 29, 2007, Nokia's attempt to take discovery on validity, infringement, and enforceability was denied, but Nokia may seek to modify this limitation after claim construction. Moreover, on August 20, 2007, the Special Master ordered Nokia to provide its contentions concerning the essentiality of the '004 and '966 patents. Nokia objected to the August 20, 2007 order, but its objection was overruled by the Court. Nokia has not yet provided its contentions.

69.  In 2003, a dispute arose between InterDigital and Nokia concerning Nokia's royalty obligations under a Patent License Agreement. This matter was submitted to arbitration, and in mid-2005 the Arbitral Tribunal issued its award finding, among other things, that Nokia's obligation to pay certain royalties had been triggered. There was a subsequent action in the Southern District of New York confirming the Award and also a subsequent arbitration between the parties. In April 2006, the parties settled these disputes in a manner that provided Nokia with a 2G license for certain products and a release for certain 3G-related activities occurring before the effective date of the settlement. There is no ongoing 3G license between InterDigital and Nokia.

70.  On March 23, 2007, InterDigital filed a complaint with the International Trade Commission identifying as proposed respondents Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America LLC, and alleging infringement of the '004 patent, U.S. Patent No. 6,674,791 ("the '791 patent"), and the '579 patent. The complaint requested that the Commission institute an investigation and, after determining there had been a violation of 19 U.S.C. § 1337, issue a permanent exclusion order and a permanent cease-and-desist order. An investigation was instituted on April 20, 2007, as Investigation No. 337-TA-601. On June 4, 2007, InterDigital filed an amended complaint in that

16

investigation alleging infringement of the '966 patent. That investigation is currently in discovery.

71.    On March 23, 2007, the same day InterDigital filed the complaint in Investigation No. 337-TA-601, InterDigital filed a complaint against the same Samsung entities in the U.S. District Court for the District of Delaware alleging infringement of the '004, '791, and '579 patents. *See InterDigital Communications Corp. v. Samsung Electronics Corp., Ltd.*, Civ. Action No. 07-165 (D. Del. 2007). On May 4, 2007, InterDigital filed an amended complaint in that action alleging infringement of the '966 patent. This action in the District of Delaware has been stayed until the ITC determination in Investigation No. 337-TA-601 becomes final.

72.    On March 23, 2007, the same day InterDigital filed the complaints in Investigation No. 337-TA-601 and in the U.S. District Court for the District of Delaware, Samsung Telecommunications America LLP ("Samsung Telecom") and Samsung Electronics Co., Ltd. ("Samsung Electronics") filed a complaint against defendants InterDigital Communications Corporation, InterDigital Technology Corporation, and Tantivy Communications, Inc. in the U.S. District Court for the District of Delaware. The complaint seeks damages and injunctive relief for defendants' alleged refusal to comply with their contractual obligations to be prepared to license their patents on fair, reasonable, and nondiscriminatory ("FRAND") terms. The complaint also seeks declarations that (i) InterDigital's alleged refusal to provide FRAND licenses to Samsung Telecom or Samsung Electronics constitutes an unfair business practice; (ii) Samsung Telecom and Samsung Electronics have a right to InterDigital's patents by virtue of their relationship with Qualcomm Incorporated; (iii) the claims of various InterDigital's patents are unenforceable; (iv) the claims of various InterDigital's patents are invalid; and (v) the claims of various InterDigital's patents are not infringed by Samsung Telecom or Samsung Electronics.

17

*See Samsung Electronics Corp., Ltd. v. InterDigital Communications Corp.,* Civ. Action No. 07-167 (D. Del. 2007). None of the asserted patents was specifically identified in the complaint. This action has been stayed until September 14, 2007.

73.    On August 7, 2007, the same day InterDigital filed the complaint in this investigation, InterDigital filed a complaint against the same Nokia entities in the U.S. District Court for the District of Delaware alleging infringement of the '004 and '966 patents. *See InterDigital Communications, LLC v. Nokia Corp.,* Civ. Action No. 07-489 (D. Del. 2007). On September 28, 2007, the same day that motion for leave to file this amended complaint was filed, InterDigital filed an amended complaint in that action to allege infringement of the '579 patent. Nokia has not yet filed an answer to the complaint or amended complaint in that action.

## X.    THE DOMESTIC INDUSTRY

74.    InterDigital has established a domestic industry under at least 19 U.S.C. § 1337(a)(3)(C).

75.    A domestic industry exists with respect to InterDigital's activities in the United States that exploit the asserted patents by reason of InterDigital's substantial investment in domestic research, development, engineering, and licensing of the WCDMA and HSDPA technology protected by the patents, including past and present development of the technology itself, testing of that technology and components, and technical support services to licensees. InterDigital's research activities with respect to CDMA technology date back to 1993 and continue today.

### A.    Investments in Research and Development, and Engineering

76.    InterDigital operates facilities in King of Prussia, Pennsylvania, and Melville, New York, that are used for the research and development and engineering of technology used in the 3G mobile handsets at issue and covered by the asserted patents.

77.    In 1993, InterDigital began working on research and development of a CDMA technology at its Melville, New York facility. That work later transitioned into research and development of WCDMA technology. That WCDMA technology is utilized by handsets and PC cards today, including in the accused products, and is covered by the '004 and '966 patents. In 1997, InterDigital also began working on CDMA research and development projects at its King of Prussia location. Between 1993 and 1999, InterDigital employed between 21 and 130 engineering and technical staff, associated support personnel, and management personnel in that research.

78.    From approximately 2000 to the present, InterDigital has been working at its Melville and King of Prussia locations on research and development projects that eventually resulted in HSDPA technology. HSDPA technology is covered by the '579 patent and is used by the accused handsets. InterDigital's HSDPA research and development work is directed at products and methods that use both the WCDMA technology and the HSDPA technology, and continues to this day. As a result, those accused HSDPA products use the technology in the '579 patent, as well as technologies covered by the '004 and '966 patents. From approximately 2000 to the present, InterDigital has employed between 12 and 162 engineering and technical staff, associated support personnel, and management personnel in the HSDPA research.

79.    The value of InterDigital's plant and equipment and the specific number of employees involved in these research and development activities are disclosed in more detail in Confidential Exhibit 14, a revised version of which is attached to this Amended Complaint.

B.    Investments in Licensing

80.    InterDigital has invested in personnel and resources to monitor the market, identify potential manufacturers and users of its 3G wireless technology, establish contacts with those

19

potential manufacturers and users, provide pre-licensing technical services, negotiate licenses, conduct technology transfers, and monitor licensee compliance with the licensing program.

81.    InterDigital's 3G wireless technology licensing efforts include the '004, '966, and '579 patents.

82.    InterDigital's investments in intellectual property and technology licensing operations attributable to domestic industry activities exploiting the '004, '966, and '579 patents are set forth in more detail in the revised Confidential Exhibit 14 attached to this Amended Complaint.

## XI.    RELIEF REQUESTED

83.    WHEREFORE, by reason of the foregoing, Complainant InterDigital respectfully requests that the United States International Trade Commission:

(a)    Institute an immediate Investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337(a)(1)(B)(i) and (b)(1) with respect to violations of Section 337 based upon the importation, sale for importation, and sale after importation into the United States of infringing 3G mobile handsets and components thereof that infringe one or more of the asserted claims of InterDigital's United States Letters Patent Nos. 7,117,004, 7,190,966, or 6,973,579;

(b)    Schedule and conduct a hearing on said unlawful acts and, following said hearing;

(c)    Issue a permanent exclusion order pursuant to 19 U.S.C. § 1337(d)(1) barring from entry into the United States all infringing 3G mobile handsets and components thereof imported by or on behalf of any of the respondents;

(d)    Issue a permanent cease-and-desist order, pursuant to 19 U.S.C. § 1337(f), directing each respondent to cease and desist from importing, marketing, advertising, demonstrating, warehousing inventory for distribution, offering for sale, selling, distributing,

20

licensing, or using 3G mobile handsets or components thereof that infringe one or more claims of

the asserted patents; and

     (e)    Grant such other and further relief as the Commission deems just and proper

based on the facts determined by the Investigation and the authority of the Commission.

Respectfully Submitted,

Dated:  DRAFT

                                       _____

Smith R. Brittingham IV
Patrick J. Coyne
Christopher P. Isaac
Lionel M. Lavenue
Houtan K. Esfahani
Elizabeth A. Niemeyer
Rajeev Gupta

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C.  20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

Counsel for Complainants
InterDigital Communications, LLC and
InterDigital Technology Corporation

21

## VERIFICATION OF AMENDED COMPLAINT

I, Bruce G. Bernstein, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.    I am the Chief Intellectual Property and Licensing Officer for Complainant InterDigital Communications, LLC, as well as for Complainant InterDigital Technology Corporation. I am duly authorized to sign this Amended Complaint on behalf of both Complainants.

2.    I have read the foregoing Amended Complaint.

3.    To the best of my knowledge, information, and belief, based on reasonable inquiry, the foregoing Amended Complaint is well-founded in fact and is warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

4.    The allegations and other factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

5.    The foregoing Amended Complaint is not being filed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Executed on: October ____, 2007

_____
Bruce G. Bernstein
Chief Intellectual Property and Licensing Officer
InterDigital Communications, LLC


Executed on: October ____, 2007

_____
Bruce G. Bernstein
General Patent Counsel
InterDigital Technology Corporation

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


NOKIA CORPORATION and NOKIA, INC.,    )
                                      )
                    Plaintiffs,       )
                                      )    Civil Action
          v.                          )    No. 05-16
                                      )       (JJF)
INTERDIGITAL COMMUNICATIONS           )
CORPORATION and INTERDIGITAL          )
TECHNOLOGY CORPORATION,               )
                                      )
                    Defendants.       )


          Special Master Teleconference taken at the
law offices of Connolly Bove Lodge & Hutz, LLP,
1007 North Orange Street, Tenth Floor, Wilmington,
Delaware, beginning at 3:00 p.m. on Monday,
August 20, 2007, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.


BEFORE:  COLLINS J. SEITZ, JR., ESQUIRE
         Special Master


APPEARANCES:


         JULIE HEANEY, ESQUIRE
         MORRIS, NICHOLS, ARSHT & TUNNELL
            1201 North Market Street - 18th Floor
            Wilmington, Delaware  19801
                    -and-


---------------------------------------------------
                  WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

                  www.wilfet.com

2

```
 1    APPEARANCES (Continued):

 2

 3              PATRICK J. FLINN, ESQUIRE
            ALSTON & BIRD, LLP
 4            One Atlantic Center
             1201 West Peachtree Street
 5            Atlanta, Georgia   30309-3424
             for the Plaintiffs

 6
             RICHARD L. HORWITZ, ESQUIRE
 7          POTTER ANDERSON & CORROON LLP
             1313 North Market Street
 8            Hercules Plaza - Sixth Floor
             Wilmington, Delaware  19801
 9                  -and-
            RON E. SHULMAN, ESQUIRE
10          MICHAEL B. LEVIN, ESQUIRE
            WILSON SONSINI GOODRICH & ROSATI
11            650 Page Mill Road
             Palo Alto, California   94304
12                  -and-
            CHRISTOPHER P. ISAAC, ESQUIRE
13          FINNEGAN HENDERSON FARABOW
            GARRETT & DUNNER LLP
14            Two Freedom Square
             11955 Freedom Drive
15            Reston, Virginia   20190-5675
             for the Defendants

16

17
     ALSO PRESENT:
18

19              ANDREW G. ISZTWAN, ESQUIRE
            InterDigital Communications
20            781 Third Avenue
             King of Prussia, Pennsylvania  19046-1409
21

22

23                      - - - - -

24
```

3

1            MS. HEANEY:  Julie Heaney from Morris

2    Nichols and Patrick Flinn is on from Alston & Bird.

3            SPECIAL MASTER SEITZ:  Okay.  Welcome.

4    Good afternoon.

5            And for InterDigital?

6            MR. HORWITZ:  It's Rich Horwitz, and with

7    me is Ron Shulman, Mike Levin, Chris Isaac, and Andy

8    Isztwan from InterDigital.

9            MR. FLINN:  Good afternoon, everyone, and

10   thank you.  We are on the record now.

11           Mr. Flinn or Ms. Heaney, I believe it's

12   your request.

13           MR. FLINN:  This is Patrick Flinn,

14   Mr. Seitz.

15           Yes, this is our request with respect to

16   two of the 26 patents that were the subject of a

17   submission to ETSI in March of 2007.  As I'm sure you

18   recall, these 26 patents were the subject of two

19   requests by Nokia not to have them included in the

20   materials we are presently submitting regarding

21   contentions in discovery.

22           On those two occasions, at InterDigital's

23   urging, you overruled our objections and said we

24   should go ahead and provide contentions regarding the

4

1   essentiality of those 26 patents.

2            Some days, literally a couple of days after

3   they last asked you to require us to submit

4   contentions on these patents -- and one of the

5   reasons, ironically, they gave you why we should do

6   this was because they were afraid of multiple

7   litigation -- they filed two actions, one in the ITC,

8   and the other one in District Court in Delaware

9   accusing Nokia of infringing those two patents.

10           With that information, we had asked for

11  relief from your order with respect to those two

12  patents given the fact that we don't know yet where

13  the litigation over these two patents ought to take

14  place:  in this case; in the new case they have filed,

15  which, according to my most recent understanding, was

16  assigned to Judge Robinson; or the case that they

17  filed in the ITC.

18           We think that it is appropriate for

19  contentions regarding these two patents to wait until

20  we find out in which forum they are going to be

21  litigated in the first instance to avoid prejudice as

22  a result of leveraging statements in one patent into

23  another lawsuit, and as a result of the need to move

24  resources in consideration of these patents.

5

1          I would note just a couple of things, one

2    of which is, as I'm sure, Mr. Seitz, you are aware,

3    when an action is filed in the ITC, a respondent, the

4    named respondent is entitled to a stay of infringement

5    litigation of those patents in a District Court action

6    while the ITC matter is proceeding.

7          It is ironic that while they are not

8    entitled to proceed with an infringement litigation

9    that somehow they could get around that by the

10   mechanism that they have used here.

11         My final comment is simply that there's no

12   prejudice in any meaningful way to InterDigital from

13   the relief that we are requesting.  It is not as if we

14   are running out of patents to litigate in the current

15   proceeding that we have in front of us.  There is

16   plenty of work to do on all the other patents.  And if

17   we set these two patents aside for the time being

18   until the proper forum is sorted out, I think no one

19   will be harmed.

20         SPECIAL MASTER SEITZ:  So, Mr. Flinn, the

21   suit that was recently filed by InterDigital, that is

22   a patent infringement action as opposed to a Lanham

23   Act action?  Do I have that correct?

24         MR. FLINN:  That's correct.  It is a patent

6

1    infringement action accusing us of infringing these

2    two patents.

3         SPECIAL MASTER SEITZ:  Explain to me again,

4    because I'm not sure I completely understand, how

5    Nokia is prejudiced by having to fulfill its discovery

6    obligations in the Lanham Act case for these two

7    patents.

8         MR. FLINN:  The issue is two-fold.  The

9    first is there is statutorily recognized prejudice

10   from having to proceed on the same patents in the

11   District Court and in the ITC.

12        SPECIAL MASTER SEITZ:  But it's a different

13   claim.

14        MR. FLINN:  It is a different claim but the

15   same issues are present.  As we have pointed out in

16   the past, our Lanham Act case is not limited merely to

17   the question of whether or not the patents are

18   essential.  Our claim arises from the assertion that

19   InterDigital has made publicly that Nokia and others

20   owe it money for the right to use these patents.

21        SPECIAL MASTER SEITZ:  I understand the

22   overlap in issues, Mr. Flinn.  Do you have any

23   authority for the proposition that where related

24   issues are raised that the ITC proceeding and the stay

7

1   that might accompany it should apply in a case like

2   this?

3             MR. FLINN:  I don't think that anybody has

4   ever attempted to do what InterDigital has done in

5   this case.

6             The argument I raise based on the ITC

7   statute is premised on the policy underlying it.  I

8   don't think that there is any direct precedent in

9   which the patents were being litigated in a Lanham Act

10  case, and where then someone filed an ITC action at

11  the same time.

12            But the statute provides for a mandatory

13  stay if requested by the responding party and a

14  discretionary stay to stay other aspects of it, as

15  necessary, and I think that the policy underlying

16  those provisions are applicable here.

17            But the larger issue is that InterDigital

18  would love to be able to get discovery now on these

19  patents when it's not entitled to that discovery as

20  yet in either of the two proceedings in which those

21  two proceedings and how they are governed and where

22  they will be governed are going to be decided by other

23  judges.

24            Given the fact that the proper location for

8

1    these three patents has not been decided yet, it will

2    have to be decided.  I don't think that there's a

3    reasonable scenario that contemplates the scope and

4    validity of these patents being litigated in this case

5    or in another case at the same time.  That makes no

6    sense at all.

7              If that's going to be the case, we ought to

8    figure out which court they are going to be in so we

9    don't avoid duplication of discovery and we don't

10   avoid the situation in which they are able to take the

11   discovery in this case and leverage it for use in the

12   other proceedings where they are not entitled to

13   discovery.

14             SPECIAL MASTER SEITZ:  Okay.

15             Mr. Shulman, are you speaking?

16             MR. SHULMAN:  Yes, sir, I am, or will be

17   shortly here.  Let me start out where Mr. Flinn left

18   off.

19             The scope and validity of the patents are

20   not at issue in this case.  You have already ruled

21   that infringement, validity, enforceability are not

22   the issues to be discovered in this case, but rather

23   whether or not the patents are essential to the

24   standard.

9

1          The issue of essentiality that's present in

2    the case that we are before you on today is not at

3    issue in the ITC case and is not at issue in the

4    companion District Court case that is pending before

5    Judge Robinson.  Essentiality has nothing to do with

6    infringement.  Either they infringe or they don't, and

7    that's a particular product that infringes and that

8    product is not at issue in the case that brings us

9    here together today.

10         With respect to taking positions on

11   essentiality, once again, that has nothing to do with

12   the way that their product operates.  We are going to

13   address that in the ITC case and/or the District Court

14   action.

15         Here they simply look at the standard which

16   is applicably available information, compare the

17   standards of the patent, and take a position one way

18   or the other as to whether or not they believe that

19   the patent is or is not essential.

20         So there is no direct overlap whatsoever

21   between the issues to be litigated in the ITC and the

22   recently filed District Court action and the issues to

23   be litigated in the present case.  In this case there

24   are no contentions about infringement.  There are none

1    about validity.  There are none about enforceability.

2    Those will be the three issues that get litigated in

3    the ITC case and in the District Court action.

4          So I don't see why there is any reason for

5    them not to take a position.  In fact, they've already

6    taken the position when they gave us their contentions

7    on the other 24 patents.  That document contained

8    their contentions on these two patents because they

9    perfectly well formulated them.  They just masked it

10   out.  So the work is done.

11         Insofar as inconsistent positions are

12   concerned or how we might leverage it, we have a

13   protective order here that allows us to use the

14   information in the manner that is prescribed by the

15   protective order and we intend to abide by that.

16         So this notion that we are somehow going to

17   improperly take discovery that was obtained in this

18   case and use it contrary to however the protective

19   order allows us to use it is just nonsense.

20         So I don't see, going back to the original

21   question that you put to Mr. Flinn, what prejudice are

22   they going to suffer, he hasn't articulated any

23   because there is none.  They have already formulated

24   their positions.  We can go forward.  If they want to

1    stay the District Court action, which is their option,

2    not our option, they are perfectly free to do so.

3              With respect to the insinuation both in the

4    letter to you and in today's comments that somehow we

5    were playing games here, had we filed suit in the ITC

6    and in the District Court two days after instead of

7    two days before the contentions were due, we'd have

8    the contentions and there would be no issue about it.

9    The fact that we did it earlier rather than later gave

10   them more information, not less information.

11             So I don't see any prejudice here.  I don't

12   see any reason to derail what has already been argued

13   three times here; namely, they have to respond on

14   these patents and they should be ordered to do so and

15   they can do it in a heartbeat.  All they have to do is

16   unmask the portions of the work they've already

17   generated.

18             SPECIAL MASTER SEITZ:  Mr. Flinn?

19             MR. FLINN:  A couple of responses.

20             Let me be crystal clear about one issue

21   because I think Mr. Shulman and I see this quite

22   differently.

23             Mr. Shulman says that this case has got

24   nothing to do with the validity of the patents or

12

1    their scope and it says that you have so ruled.

2            Mr. Seitz, with all due respect, you have

3    made rulings with regard to what may be proper subject

4    of discovery, but I don't think there is or can be any

5    legitimate dispute as to the breadth of the

6    allegations that we have made in our first amended

7    complaint and the issues that are tendered to

8    Judge Farnan for resolution.

9            Now, whether or not they want to convince

10    Judge Farnan not to consider these issues does not

11    mean that they are not in the case.  Whether they

12    are -- whether the validity of the patent is currently

13    a subject of discovery under a discovery management

14    plan that they have asked you to implement, again,

15    does not mean that those issues are not to be

16    adjudicated in this case.

17            The other thing that Mr. Shulman said that

18    I think is quite important is his suggestion that

19    there is no connection whatsoever between the

20    essentiality of the patents and their infringement.

21            That is, I don't think, really a

22    sustainable position under much scrutiny at all.  Why

23    would anyone claim that they are essential under any

24    definition of essential if it doesn't mean that you're

13

1    contending that if you comply with the standard that

2    that somehow is connected to your infringement of the

3    patents?

4            If we need any more evidence that there is

5    at least some relationship between infringement and

6    essentiality, you can look to the claims charts that

7    InterDigital submitted to the ITC.

8            If essentiality were completely unrelated

9    to the question of infringement, InterDigital would

10   have said nothing about the standards in its

11   submission to the ITC, but no.  In its claims charts

12   it specifically attempted to read the patents onto the

13   standard.

14           Indeed, if you read their complaint

15   carefully, one of the things that they are trying to

16   get out of the ITC is a ruling not just that Nokia's

17   products currently manufactured in compliance with the

18   standard infringe, but they are going to seek a

19   ruling, and certainly they are complained to use of

20   this, that all standards-compliant products infringe

21   and, thus, joining the issue of essentiality and

22   infringement very closely, which explains the leverage

23   that they are trying to get out of using this

24   proceeding to get discovery that they are not

14

1    necessarily entitled to in the ITC or in their

2    District Court action.

3                It is not the work involved.  It is the

4    prejudice of having to litigate on two or three fronts

5    at the same time that is the prejudice here.  It is,

6    again, I think without reasonable doubt that the scope

7    of the patents and their validity is raised in all

8    three proceedings.

9                SPECIAL MASTER SEITZ:  Mr. Shulman, when

10   you talked about the protective order, does it have

11   one of those provisions in it that talks about the

12   evidence only being used for purposes of this

13   particular proceeding?

14               MR. SHULMAN:  I don't have it before me, so

15   I can't say unequivocally that the answer is yes, but

16   I believe it does.  Maybe somebody else on the line

17   can respond to that.

18               SPECIAL MASTER SEITZ:  Well, or maybe you

19   can just make a commitment or a representation.

20               Is what you are offering is to only use the

21   information for purposes of this proceeding?  I mean,

22   the typical protective order language is such that you

23   can only use it for purposes of the pending

24   proceeding.

15

1          So obviously relief can be sought from

2    that, but as I interpreted those provisions in the

3    past, it basically means that what happens in one case

4    can't be used in another case absent an amendment of a

5    protective order by the Court.

6          MR. SHULMAN:  I am not actually

7    representing InterDigital in the ITC matter, but

8    counsel on the line is, and so I will defer to them on

9    that.  But I believe that the protective order has

10   that provision and, you know, we can certainly

11   double-check, but certainly that was my intention.

12         SPECIAL MASTER SEITZ:  That's why I'm just

13   trying to circle back to why you raised the protective

14   order issue in the first place.

15         MR. SHULMAN:  Yes, because I believe that

16   it has this provision in it that says thou shalt only

17   use stuff in this case and this case only because they

18   typically all do, and so this notion that we are

19   somehow gaining an unfair advantage wouldn't make any

20   sense.

21         If the protective order doesn't have that

22   provision, that may be a different story, but I

23   believe that it doesn't.  I don't know.  Maybe

24   somebody is looking it up while we are speaking on

16

1    this matter.

2              SPECIAL MASTER SEITZ:   Okay.

3              MR. FLINN:   Let me respond to the

4    protective order very briefly because I don't think

5    that it cures any of the problems.

6              First of all, it doesn't cure the problem

7    that we should not be forced to litigate these same

8    patents on the same issues on multiple be fronts.

9              Secondly, there is no guarantee that either

10   Judge Robinson or the ITC would find this protective

11   order to be any particular barrier.  All it takes is

12   an order requiring Nokia to produce to them what we've

13   said in this case, and there is nothing we can do

14   about that.  We would be required to comply with that

15   order or face the sanctions that could be imposed by

16   either Judge Robinson or the ITC.

17             Secondly, this is a bell that cannot be

18   unrung.  Once InterDigital uses this lawsuit to

19   leverage information out of this, they can't forget

20   the information and the same counsel who are here on

21   the pleadings on this case and with entitlement to

22   access to it can have and will have access to it and

23   they can't forget it and put it out of their minds

24   when they are in front of the ITC.

1        The issue is that at some point, some group

2    of people between Judge Farnan, Judge Robinson, and

3    the ITC are going to figure out where these patents

4    belong.  Until that happens, there is no reason to

5    proceed with forcing Nokia to produce discovery on

6    these patents or, frankly, InterDigital from doing

7    discovery on these patents until that issue is sorted

8    out.

9            MR. SHULMAN:  There's not going to be a

10   meeting of three judges.  It never happens in the

11   history of jurisprudence as far as I know.  I mean,

12   cases proceed on the basis that they proceed.  We are

13   allowed to bring an action in the ITC and a companion

14   case in the District Court.

15           The fact that they chose to pick a fight

16   with us earlier that happens to overlap in some sense

17   is not our problem.  We are allowed to proceed in a

18   manner we want to proceed.

19           They can stay the District Court action if

20   they choose to.  It's their right to do that.  We

21   don't have the right to do that.  They have the right

22   to do that.

23           Then they will be proceeding with respect

24   to particular accused products in the ITC on the issue

18

1    of infringement, and we will proceed in this case on

2    the Lanham Act claims which have nothing to do with

3    infringement because there's no product at issue here.

4    It's strictly a comparison between what the standard

5    says and what the patent claims look like.

6              MR. FLINN:  Again, Mr. Shulman's narrow

7    view of our complaint simply can't be reconciled with

8    the plain allegations in it.

9              But more to the point, it is not a given in

10   my mind that the ITC action is going to be the one

11   that proceeds.  Maybe it will.  It's not a given in my

12   mind that the action in front of Judge Robinson won't

13   proceed.  It may be that it does.

14             But the point is you have all three of them

15   in this case, and there is no compelling reason why

16   out of the nearly 300 or more patents that are at

17   issue in this case, for some reason there is a

18   burning, pressing need to get discovery on these two

19   patents.

20             In fact, the fact that InterDigital is so

21   hot and insistent on all the patents getting discovery

22   on these two suggest that there is some reason why

23   they need to get our contentions on these patents

24   forthwith.

1               SPECIAL MASTER SEITZ:  But, Mr. Flinn, as

2     Mr. Shulman said, what if they waited a week and then

3     filed a suit?  Would you be making the same arguments?

4     I mean, with all due respect, I have to say it's

5     somewhat of a "So what?"  If they had waited a week,

6     this wouldn't have even mattered; right?

7               MR. FLINN:  I don't know what their timing

8     was.  I don't know if it was entirely voluntary on

9     their part because I don't know what the ITC made them

10    do when they did it.

11              So it's not entirely clear to me that they

12    were doing us a big favor by doing this earlier.  It

13    may well be that they intended to spring a trap and

14    they just weren't able to.

15              But even if they weren't compelled to make

16    this disclosure earlier than they wanted to, had they,

17    in fact, attempted to do this, the relief we would

18    have sought in that instance might well have been much

19    more significant with respect to preserving our rights

20    here, including whether or not the counsel who

21    attempted to close the track should be able to

22    participate in the other litigations where they would

23    not be entitled to have this information.

24              It may well have been that counsel's

1    calculation about risks and benefits springing the

2    trap were such that they elected to not risk springing

3    the trap because they didn't want to risk being

4    disqualified by this maneuver, particularly when they

5    knew this was all going to happen when they were

6    asking you to make us provide this discovery.

7            They are faced with a protective order that

8    said they are not supposed to be used in other cases,

9    and that may well have been part of their calculation.

10           MR. SHULMAN:  Special Master Seitz, this is

11   Rich Horwitz.  I want to complete the record on the

12   protective order.

13           I'm not going to get into the discussions

14   about whether there was a trap or not.  I think that

15   you asked the right question and I'm not sure if it

16   was even answered.

17           But paragraph 20 of the protective order

18   says:  "Subject to paragraph 2 above, confidential and

19   attorneys'-eyes-only information shall be held in

20   confidence by each person to whom it is disclosed,

21   shall be used only for purposes of this litigation,

22   should not be used for any other purpose, suit,

23   arbitration, or legal proceeding, and shall not be

24   disclosed to any person who is not entitled to receive

1    such information as herein provided.

2              "All produced confidential and

3    attorneys'-eyes-only information shall be carefully

4    maintained so as to preclude access by persons who are

5    not entitled to receive such information."

6              SPECIAL MASTER SEITZ:  And the "subject to"

7    language in 2(a), does that change that result at all?

8              MR. LAWSON:  Your Honor, this is Mr. Lawson

9    for Nokia.

10             It does.  The first sentence of paragraph 2

11   of the protective order says:  "By entering the order

12   and limiting disclosure of information in this case,

13   the Court does not intend to preclude another court

14   from finding that the information may be relevant and

15   subject to disclosure in another case."

16             MR. SHULMAN:  Ron Shulman.

17             Of course, that's always true.  If one

18   Court orders you to do something, you got to do it.

19   But the point is:  You can't voluntarily make use of

20   it.

21             SPECIAL MASTER SEITZ:  Okay.  Your

22   arguments have been helpful.  Here's my ruling.

23             It's my view that there are different

24   claims pending in the case that has been proceeding

1    here in the District of Delaware; namely, Lanham Act

2    claims versus the patent infringement claims which

3    have been brought by InterDigital against Nokia on the

4    two patents and are also the subject of ITC

5    proceedings.

6              Although the issues may overlap to some

7    degree, the claims are different and this litigation

8    has been proceeding apace for some time under the

9    understanding that we are going to get discovery

10   completed in a timely fashion for all patents that so

11   far have been made part of these proceedings and,

12   therefore, in my opinion, it does not warrant

13   excluding these two patents even though they were part

14   of the March 2007 submissions.

15             Again, I want to emphasize, this case has

16   been pending for some time and has been moving apace,

17   and I don't want to see discovery bifurcated for two

18   of the patents while the litigation proceeds towards

19   the close of discovery and to trial.

20             There has been mention, although I'm not

21   relying on it exclusively, of the protective order

22   provision which deals with using the information only

23   for purposes of this litigation.

24             Now that we have had this telephone

23

1    conference and I am making my ruling in this case,

2    obviously there's a heightened concern about sharing

3    information, and I would think that Nokia could bring

4    this to the attention of the District Court when and

5    if appropriate if there is an application made to

6    deviate from the language of the protective order.

7            Finally, I find that there really is no

8    real prejudice to Nokia in providing the information

9    on two patents out of a number of patents.  We are in

10   discovery as opposed to another phase of the

11   litigation as Mr. Flinn pointed out.

12           So although, as he said, there might be

13   prejudice in, quote, litigating the patents, the view

14   I have right now is that we are only in discovery.

15   The issues relate primarily, although not exclusively,

16   to the essentiality determinations.  Therefore, Nokia

17   will not be prejudiced providing this information on

18   the two patents.

19           So it's my ruling and recommendation that

20   the information be provided.  This transcript will act

21   as the formal order entered by me, so if there are

22   exceptions taken from it, follow the local rules for

23   taking exceptions.

24           Is there anything else I can help you with

24

1    today?

2                MR. FLINN:  This is Patrick Flinn,

3    Mr. Seitz.

4                In discussions with my client about seeking

5    review by Judge Farnan from this order, and to the

6    extent necessary, we would be asking Judge Farnan to

7    stay this aspect of the order until he can review it.

8                In many instances, and this is probably one

9    of them, that application has to be first made to you

10   before we can make it to Judge Farnan.

11               So what I would ask is if you would agree

12   to stay the application of this order pending our

13   appeal of it to Judge Farnan.

14               SPECIAL MASTER SEITZ:  I will.  The order

15   is stayed pending your opportunity to have my

16   recommendation reviewed by Judge Farnan.

17               Do you want to fix a date by when you'll

18   decide so that we can get this closed off, Mr. Flinn?

19               MR. FLINN:  We will certainly decide

20   whether to take the appeal by this Friday.

21               SPECIAL MASTER SEITZ:  Okay.  Let's set

22   Friday as the deadline for filing any exceptions to

23   this ruling.

24               I was curious, also, to see that the case

1   was assigned to Judge Robinson, the InterDigital new

2   case.  Did counsel for InterDigital put on the civil

3   cover sheet that this was a related proceeding to the

4   pending proceeding or not?

5               MR. SHULMAN:  Yes.  Notice of related case

6   was actually filed by Nokia, I believe, and we joined

7   in.  But, you know, the inner workings of the court,

8   who knows what happened?

9               SPECIAL MASTER SEITZ:  Okay.  Just very

10  curious.

11              MR. SHULMAN:  There is one other issue we

12  wanted to raise with you if you have just another

13  minute or two.

14              SPECIAL MASTER SEITZ:  Yes.

15              MR. SHULMAN:  We were just wondering,

16  Judge Farnan hasn't entered or signed that other

17  scheduling order.

18              SPECIAL MASTER SEITZ:  Yes.

19              MR. SHULMAN:  I don't know if there's an

20  issue that he needs us to address or what the status

21  is, but we wanted to inquire to see if perhaps you

22  knew if there was something else we needed to do to

23  move that along.

24              SPECIAL MASTER SEITZ:  I'll inquire of the

26

```
 1   Court and see if there are any issues.  Okay?

 2               MR. SHULMAN:  Okay.

 3               SPECIAL MASTER SEITZ:  Mr. Flinn, anything

 4   else?

 5               MR. FLINN:  No.  That is it from our side.

 6               SPECIAL MASTER SEITZ:  Okay.

 7               Mr. Shulman?

 8               MR. SHULMAN:  No.  That's it.  Thank you.

 9               SPECIAL MASTER SEITZ:  Okay.  Thank you

10   very much.

11               ALL:  Thank you.

12               (The hearing was then concluded at

13   3:30 p.m.)

14                    - - - - -

15

16

17

18

19

20

21

22

23

24
```

27

```
 1   State of Delaware     )
                           )
 2   County of New Castle )

 3

 4                C E R T I F I C A T E
 5

 6
                I, Kathleen White Palmer, Registered
 7   Professional Reporter and Notary Public, do hereby
     certify that the foregoing record, pages 1 to 27,
 8   inclusive, is a true and accurate transcript of my
     stenographic notes taken on Monday, August 20, 2007,
 9   in the above-captioned matter.

10              IN WITNESS WHEREOF, I have hereunto set my
     hand and seal this 20th day of August, 2007, in New
11   Castle County.

12

13                           _____
                             KATHLEEN WHITE PALMER, RMR, CSR, CLR
14                           Certification No. 149-RPR
                             (Expires January 31, 2008)
15

16

17

18

19

20

21

22

23

24
```

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY